# EXHIBIT 1

EX-99.(A)(1) 2 v428644_ex99-a1.htm EXHIBIT 99.(A)(1)

PRELIMINARY PROXY STATEMENT OF THE COMPANY

**EXHIBIT (a)-(1)**



_____, 2016

Shareholders of Qihoo 360 Technology Co. Ltd.
Re: Notice of Extraordinary General Meeting of Shareholders

Dear Shareholder:

You are cordially invited to attend an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (the "Company") to be held on _____, 2016 at _____ a.m. (Beijing time). The meeting will be held at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The accompanying notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

On December 18, 2015, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger") and becoming a wholly owned subsidiary of Midco. The purpose of the extraordinary general meeting is for you and the other shareholders of the Company to consider and vote upon a proposal to authorize and approve the Merger Agreement and the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger (the "Plan of Merger"), and the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger. Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to the accompanying proxy statement.

The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group." As of the date of this letter, the Buyer Group collectively beneficially own [6,414,611] Class A ordinary shares and [42,013,812] Class B ordinary shares, which represent approximately [26.7]% in number and approximately [61.6]% in voting rights of the Company's issued and outstanding ordinary shares, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share") and excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options. If the Merger is consummated, the Company will continue its operations as a privately held company, and, as the result of the Merger, the Company's American depositary shares ("ADSs"), two representing three Class A ordinary shares of the Company, will no longer be listed on the New York Stock Exchange (the "NYSE") and the ADS program for the Shares will terminate.

If the Merger is consummated, at the effective time of the Merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) due to or incurred by the Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) will not be converted into the right to receive the consideration described in the immediately preceding sentence, but will be cancelled and cease to exist at the Effective Time:

(a) Shares owned by any Parent Party or the Company (as treasury shares, if any), any Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any options or by any direct or indirect wholly-owned subsidiary of any Parent Party or the Company, in each case immediately prior to the Effective Time, which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor;

(b) Shares owned by shareholders (the "Dissenting Shareholders") who have validly exercised and have not effectively withdrawn or lost their rights to dissent from the Merger in accordance with Section 238 of Companies Law (2013 Revision) of the Cayman Islands (the "Cayman Islands Companies Law") (the "Dissenting Shares"), which will be cancelled and cease to exist, but shall not be converted into or exchangeable for or represent the right to receive the merger consideration pursuant to the Merger Agreement, and each such Dissenting Shareholder shall be entitled only to payment of the fair value of such Dissenting Shares in accordance with Section 238 of the Cayman Islands Companies Law, and from the Effective Time such Dissenting Shareholders shall cease to have any of the rights of a shareholder of the Company except the right to be paid the fair value of such Dissenting Shares; and

(c) 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision (collectively, "Founder Securities"), which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor.

In addition to the foregoing, at the Effective Time, each outstanding vested and unexercised option to purchase shares of the Company (each a "Company Option") granted under the 2006 Employee Shares Option Scheme, 2006 Employee Share Vesting Scheme and 2011 Share Incentive Plan, and any other equity incentive arrangements of the Company (as amended and restated, collectively, the "Company Share Plans") with a per Share exercise price less than the Per Share Merger Consideration (each, a "Cashed-Out Option") will be cancelled and entitle the former holder thereof to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration.

At the Effective Time, each outstanding unvested Company Option to purchase Shares granted under the Company Share Plans will be assumed and converted into an equity incentive award of Parent through Tianjin Qirui Zhongxin Technology Partnership (Limited Partnership) (天津奇睿众信科技合伙企业(有限合伙)), a limited liability partnership formed under the laws of the People's Republic of China for the purposes of holding incentive shares of the Parent (the "Plan Vehicle") or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option.

At the Effective Time, each restricted share of the Company ("Company Restricted Share") that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

ii

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger.

At a meeting on December 18, 2015, the Board (other than the Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING**.

In considering the recommendation of the Special Committee and the Board, you should be aware that some of the Company's directors or executive officers have interests in the Merger that are different from, or in addition to, the interests of the shareholders generally. As of the date of this letter, Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman"), through Global Village, and Mr. Xiangdong Qi, director and president of the Company, through Young Vision, collectively beneficially own approximately [25.4]% in number and approximately [60.9]% in voting rights of the entire issued and outstanding Shares (excluding Shares owned by the Company as treasury shares and Shares reserved (but not yet allocated) by the Company for settlement upon exercise of any options). Global Village and Young Vision have agreed to vote all of the Shares they beneficially own in favor of the authorization and approval of the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger.

The accompanying proxy statement provides detailed information about the Merger and the extraordinary general meeting. We encourage you to read the entire document and all of the attachments and other documents referred to or incorporated by reference herein carefully. You may also obtain more information about the Company from documents the Company has filed with or furnished to the United States Securities and Exchange Commission (the "SEC"), which are available for free at the SEC's website www.sec.gov.

iii

Regardless of the number of Shares that you own, your vote is very important. The Merger cannot be consummated unless the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, are authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting (the "Company Shareholder Approval"). Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on _____, 2016, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"), an amount of Shares representing approximately [5.1]% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

Voting at the extraordinary general meeting will take place by poll voting, as the Chairman has undertaken to demand poll voting at the meeting. Whether or not you plan to attend the extraordinary general meeting, please complete, sign and return to the Company the accompanying proxy card, which is attached as Annex F to the accompanying proxy statement, in accordance with the instructions set forth on the proxy card, as soon as possible so that it is received by the Company no later than _____, 2016 at _____ a.m. (Beijing time), the deadline to lodge your proxy card. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date.

Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are held of record by a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the record holder a proxy issued in your name. If you submit a signed proxy card without indicating how you wish to vote, the Shares represented by your proxy card will be voted FOR the proposal to authorize and approve the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, FOR the proposal to authorize each of the members of the Special Committee, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company to do all things necessary to give effect to the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy will be voted (or not submitted for voting) as your proxy determines.

As the record holder of the Shares represented by ADSs, the ADS Depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions, the form of which is attached as Annex G to the accompanying proxy statement, timely received from holders of ADSs at the close of business in New York City on _____, 2016 (the "ADS Record Date"). The ADS Depositary must receive such instructions no later than 5:00 p.m. (New York City time) on _____, 2016. The ADS Depositary has advised us that, pursuant to Section 4.07 of the amended and restated deposit agreement dated as of May 19, 2014 among the Company, the ADS Depositary and the holders and beneficial owners of ADSs issued thereunder (the "Deposit Agreement"), it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Shares represented by ADSs for which no timely voting instructions are received by the ADS Depositary will not be voted. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

iv

Holders of ADSs will not be able to attend or vote at the extraordinary general meeting unless they surrender their ADSs for delivery of Shares and become registered in the Company's register of members as the holders of Shares prior to the close of business in the Cayman Islands on the Share Record Date. ADS holders who wish to surrender their ADSs need to make arrangements to deliver the ADSs to the ADS Depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)) to be cancelled pursuant to the terms of the Deposit Agreement), which will not be borne by the Surviving Company, and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the ADS Record Date and has not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered, or has given voting instructions to the ADS Depositary as to the ADSs being surrendered but undertakes not to vote the corresponding Shares at the extraordinary general meeting or (ii) did not hold the ADSs as of the ADS Record Date and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to surrender the ADSs on your behalf. Upon surrender of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after the registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman Registrar of Shares, Maples Fund Services (Cayman) Limited, to issue and mail a certificate to your attention. If the Merger is not consummated, the Company will continue to be a publicly traded company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have surrendered your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

Shareholders who elect to dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to the accompanying proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise dissenters' rights with respect to your Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTERS' RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTERS' RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTERS' RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

v

Neither the SEC nor any state securities regulatory agency has approved or disapproved the Merger, passed upon the merits or fairness of the Merger or passed upon the adequacy or accuracy of the disclosure in this letter or in the accompanying notice of the extraordinary general meeting or proxy statement. Any representation to the contrary is a criminal offense.

If you have any questions or need assistance voting your Shares or ADSs, please contact the Company by calling at +86 10 5878-1574 or emailing to ir@360.cn.

Thank you for your cooperation and continued support.

Sincerely,                                                        Sincerely,

Eric X. Chen                                                    Hongyi Zhou
Director and Chairman of the Special Committee                  Chairman of the Board

**The accompanying proxy statement is dated _____, 2016, and is first being mailed to the Company's shareholders and ADS holders on or about _____, 2016.**

vi

**SUMMARY TERM SHEET**

*This "Summary Term Sheet" and the "Questions and Answers About the Extraordinary General Meeting and the Merger" highlight selected information contained in this proxy statement regarding the Merger (as defined below) and may not contain all of the information that may be important to your consideration of the Merger and other transactions contemplated by the Merger Agreement (as defined below). You should carefully read this entire proxy statement and the other documents to which this proxy statement refers for a more complete understanding of the matters being considered at the extraordinary general meeting. In addition, this proxy statement incorporates by reference important business and financial information about the Company. You are encouraged to read all of the documents incorporated by reference into this proxy statement and you may obtain such information without charge by following the instructions in "Where You Can Find More Information" beginning on page 125. In this proxy statement, the terms "the Company," "us," "we" or other terms correlative thereto refer to Qihoo 360 Technology Co. Ltd. All references to "dollars" and "$" in this proxy statement are to U.S. dollars, and all references to "RMB" in this proxy statement are to Renminbi, the lawful currency of the People's Republic of China ("PRC" or "China").*

**The Parties Involved in the Merger**

**The Company**

The Company is a leading Internet company in China. The Company is also the number one provider of Internet and mobile security products in China as measured by its user base, according to iResearch. The Company also provides users with secure access points to the Internet via its market leading web browsers and application stores. The Company has built one of the largest open Internet platforms in China and monetizes its massive user base primarily through online advertising and through Internet value-added services on its open platform.

The Company is an exempted company with limited liability incorporated under the laws of the Cayman Islands. The Company's principal executive office is located at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The Company's telephone number at this address is +86 10 5878-1000 and its fax number is +86 10 5682-2000.

For a description of the Company's history, development, business and organizational structure, see its annual report on Form 20-F for the year ended December 31, 2014, filed with the United States Securities and Exchange Commission (the "SEC") on April 27, 2015, which is incorporated herein by reference. See "Where You Can Find More Information" beginning on page 125 for a description of how to obtain a copy of its annual report.

**Holdco**

Tianjin Qixin Zhicheng Technology Co., Ltd. is a limited liability company incorporated under the laws of the PRC ("Holdco"). The business address of Holdco is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Holdco's telephone number is +86-10-5878-1078 and its fax number is +86 10 5682-2000.

**Parent**

Tianjin Qixin Tongda Technology Co., Ltd. is a limited liability company incorporated under the laws of the PRC ("Parent"). The business address of Parent is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015. Parent's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

**Midco**

True Thrive Limited is an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco") formed solely for the purpose of holding the equity interest in Merger Sub (as defined below) and consummating the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger (as defined below). The business address of Merger Sub is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Merger Sub's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

1

**Merger Sub**

New Summit Limited is an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub") formed solely for the purpose of effecting the Merger. The business address of Merger Sub is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Merger Sub's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

**Global Village Associates Limited**

Global Village Associates Limited is a British Virgin Islands company ("Global Village"). The registered office of Global Village is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, the British Virgin Islands and its executive offices are located at Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. Global Village's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000. Global Village is wholly owned by Fair Point International Limited, a British Virgin Islands company, which is wholly owned by a revocable trust constituted under the laws of Singapore with Mr. Hongyi Zhou and his wife as the settlers and Mr. Zhou as investment manager with sole voting and dispositive power and certain family members of Mr. Zhou as the beneficiaries. Huan Hu is the sole director of Global Village.

**Young Vision Group Limited**

Young Vision Group Limited is a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"). The registered office of Young Vision is 2nd Floor, Abbott Building, Road Town, Tortola, British Virgin Islands and its executive offices are located at Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. Young Vision's telephone number is +86 10 5682-2141 and its fax number is +86 10 5682-2000. Young Vision is wholly owned by East Line Holdings Limited, a British Virgin Islands company, which is in turn wholly-owned by Mr. Xiangdong Qi. Mr. Qi is the sole director of Young Vision.

**Hongyi Zhou**

Mr. Zhou is the co-founder, chairman and chief executive officer of the Company (the "Chairman"), and is a PRC citizen. The business address of Mr. Zhou is Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. During the last five years, Mr. Zhou has not been: (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining Mr. Zhou from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

**Xiangdong Qi**

Mr. Qi is the co-founder, director and president of the Company, and is a PRC citizen. The business address of Mr. Qi is Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. During the last five years, Mr. Qi has not been: (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining Mr. Qi from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

**The Merger (Page 90)**

The Company, Holdco, Parent, Midco, Merger Sub, and, solely for the purposes of Section 6.19 of the Merger Agreement, Global Village and Young Vision entered into an agreement and plan of merger (the "Merger Agreement") on December 18, 2015, pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger"). You are being asked to vote upon a proposal to authorize and approve the Merger Agreement, the plan of merger (the "Plan of Merger") required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger, and the transactions contemplated thereby, including the Merger.

2

Pursuant to the terms of the Merger Agreement, assuming the Merger Agreement and the Plan of Merger are authorized and approved by the requisite vote of the shareholders of the Company and the other conditions to the consummation of the Merger are satisfied or waived in accordance with the terms of the Merger Agreement, the following will occur:

- the Company will file the Plan of Merger with the Cayman Registrar and the Merger will be effective upon the filing of the Plan of Merger with the Cayman Registrar or such other time as maybe agreed and otherwise on the date specified in the Plan of Merger (the "Effective Time");

- the Surviving Company will become a wholly owned subsidiary of Midco and cease to be a publicly traded company;

- each Share issued and outstanding immediately prior to the Effective Time (including Shares represented by American depositary shares ("ADSs"), every two representing three Class A ordinary shares) will be cancelled and cease to exist, in exchange for the right to receive the consideration further described below, except for the Excluded Shares (as defined below).

- the Company's ADS program for Class A ordinary shares will be terminated and ADSs will cease to be listed on the New York Stock Exchange (the "NYSE"), and price quotations with respect to sales of ADSs in the public market will no longer be available;

- 90 days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of Shares under the United States Securities Exchange Act of 1934, as amended (the "Exchange Act") will be terminated;

- the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies, and the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company; and

- the Company's shareholders (other than members of the Buyer Group) will no longer have any interest in, and will no longer be shareholders of, the Company, and will not participate in any of the Company's future earnings or growth.

Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to this proxy statement. You should read the Merger Agreement and the Plan of Merger in their entirety because they, and not this proxy statement, are the legal documents that govern the Merger.

**Merger Consideration (Page 90)**

If the Merger is consummated, at Effective Time, each ordinary share of the Company, consisting of Class A ordinary share or Class B ordinary share, par value $0.001 per share (each a "Share") issued and outstanding immediately prior to the Effective Time (other than Excluded Shares (as defined below)) will be cancelled and cease to exist in exchange for the right to receive $51.33 (the "Per Share Merger Consideration") in cash without interest and each issued and outstanding ADS (other than ADSs that represent Excluded Shares) will represent the right to receive $77.00 (the "Per ADS Merger Consideration") in cash without interest, in each case, net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) incurred by the Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) (collectively, the "Excluded Shares") will not be converted into the right to receive the consideration described in the immediately preceding sentence:

(a) Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options (as defined below) or by any direct or indirect wholly owned subsidiary of any Parent Party or the Company, in each case immediately prior to the Effective Time, which will be cancelled and cease to exist and no consideration shall be delivered or deliverable in exchange therefor;

3

(b)  Shares held by shareholders ("Dissenting Shareholders") who have validly exercised and have not effectively withdrawn or lost their rights to dissent from the Merger ("Dissenter Rights") pursuant to Section 238 of the Cayman Islands Companies Law (collectively, the "Dissenting Shares"), which will be cancelled and cease to exist, but shall not be converted into or exchangeable for or represent the right to receive the merger consideration pursuant to the Merger Agreement, and such Dissenting Shareholder shall be entitled only to payment of the fair value of such Dissenting Shares in accordance with Section 238 of the Cayman Islands Companies Law, and from the Effective Time such Dissenting Shareholders shall cease to have any of the rights of a shareholder of the Company except the right to be paid the fair value of such Dissenting Shares; and

(c)  (i) 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village and (ii) 4,904,709 Class B ordinary shares held by Young Vision, which will be cancelled and cease to exist and no consideration shall be delivered or deliverable in exchange therefor.

**Treatment of Company Options (Page 91)**

At the Effective Time, each outstanding vested and unexercised option to purchase Shares of the Company (the "Company Option") granted under the 2006 Employee Shares Option Scheme, 2006 Employee Share Vesting Scheme and 2011 Share Incentive Plan, and any other equity incentive arrangements of the Company (as amended and restated, collectively, the "Company Share Plans") with a per Share exercise price less than the Per Share Merger Consideration (each, a "Cashed-Out Option") will be cancelled and entitle the former holder thereof to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration.

At the Effective Time, each outstanding unvested Company Option granted under the Company Share Plans will be assumed and converted into an equity incentive award of Parent through Tianjin Qirui Zhongxin Technology Partnership (Limited Partnership) (天津奇睿众信科技合伙企业(有限合 伙)), a limited liability partnership formed under the laws of the People's Republic of China for the purposes of holding incentive shares of the Parent (the "Plan Vehicle") or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option.

**Treatment of Company Restricted Shares (Page 91)**

At the Effective Time, each restricted share of the Company ("Company Restricted Share") that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent, through the Plan Vehicle or such other arrangements, on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

4

**Treatment of Company Convertible Notes (Page 91)**

Each holder of Company Convertible Notes has the option to require the Surviving Company to repurchase such holder's Company Convertible Notes for a purchase price equal to 100% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest, if any, through but excluding, the applicable fundamental change repurchase date as defined under the applicable Indenture Agreements (as defined below). Furthermore, after the Effective Time but prior to and including the third business day prior to the applicable fundamental change repurchase date, each holder of Company Convertible Notes will be entitled, subject to the terms and conditions of the applicable Indenture Agreements, to convert such holder's Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements plus any entitled increase in the conversion rate as determined pursuant to the applicable Indenture Agreements. After the third business day prior to the applicable fundamental change repurchase date, each holder of the Company Convertible Notes, to the extent such holder has not exercised its right to require the Surviving Company to repurchase such holder's Company Convertible Notes, will be entitled to convert such Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements. As used herein, the term "Company Convertible Notes" means, collectively, the Company's 2.5% convertible senior notes due September 15, 2018 that were issued pursuant to the indenture, dated September 5, 2013, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2018 Notes Indenture"), the Company's 0.5% convertible senior notes due August 15, 2020 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2020 Notes Indenture"), and the Company's 1.75% convertible senior notes due August 15, 2021 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2021 Notes Indenture" and together with the 2018 Notes Indenture and the 2020 Notes Indenture, the "Indenture Agreements").

**Recommendation of the Special Committee and the Board (Page 41)**

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of, one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger.

The Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING.**

For a detailed discussion of the material factors considered by the Special Committee and the Board in determining to recommend the approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, and in determining that the Merger is fair to and in the best interest of the Company and the Unaffiliated Holders, see "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 29 and "Special Factors—Effects of the Merger on the Company—Primary Benefits and Detriments of the Merger" beginning on page 61. The foregoing summary is qualified in its entirety by reference to these sections.

**Record Date and Voting (Page 84)**

You are entitled to vote at the extraordinary general meeting if you have Shares registered in your name at the close of business in the Cayman Islands on _____, 2016, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"). If you own Shares at the close of business in the Cayman Islands on the Share Record Date, you should lodge your proxy card and vote so that the proxy card is received by the Company no later than _____, 2016 at _____ a.m. (Beijing time).

If you own ADSs as of the close of business in New York City on _____, 2016 (the "ADS Record Date") (and do not surrender such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may give voting instructions, the form of which is attached as Annex G to this proxy statement, to the ADS Depositary, in its capacity as the holder of the Shares underlying your ADSs, how to vote the Shares underlying your ADSs. The ADS Depositary must receive your instructions no later than 5:00 p.m. (New York City time) on _____, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote. Alternatively, if you own ADSs as of the close of business in New York City on the ADS Record Date, you may vote at the extraordinary general meeting directly if you surrender your ADSs and become a registered holder of the Shares underlying your ADSs prior to the close of business in the Cayman Islands on _____, 2016, the Share Record Date. If you wish to surrender your ADSs for the purpose of voting Shares directly, you need to make arrangements to deliver your ADSs to the ADS Depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the amended and restated deposit agreement dated May 19, 2014 among the Company, the ADS Depositary and the holders and beneficiary owners of ADSs issued thereunder (the "Deposit Agreement")), and (c) a certification that you held the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date. See "—Voting Information" below.

**Shareholder Vote Required to Authorize and Approve the Merger Agreement and the Plan of Merger (Page 85)**

In order for the Merger to be consummated, the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, must be authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting (the "Company Shareholder Approval").

https://www.sec.gov/Archives/edgar/data/1508913/000114420416074992/v428644_ex99-a1.htm

As of the date of this proxy statement, the Holdco, Parent, Midco, Merger Sub, the Founder Securityholders, the equity investors (the "Equity Investors") named in Exhibit B of the Merger Agreement (collectively, the "Buyer Group") beneficially own an aggregate of [6,414,611] Class A ordinary shares (including Class A ordinary shares represented by ADSs) and [42,013,812] Class B ordinary shares, which represent approximately [26.7]% in number and [61.6]% in voting rights of the entire issued and outstanding Shares excluding Shares owned by the Company as treasury shares and Shares reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options. See "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 120 for additional information. Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on the Share Record Date, an amount of Shares representing approximately [5.1]% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

**Voting Information (Page 85)**

Before voting your Shares, we encourage you to read this proxy statement in its entirety, including all of the annexes, attachments, exhibits and materials incorporated by reference, and carefully consider how the Merger will affect you. To ensure that your Shares can be voted at the extraordinary general meeting, please complete the accompanying proxy card in accordance with the instructions set forth on the proxy card as soon as possible. You should lodge your proxy card so that it is received by the Company no later than _____, 2016, at _____ a.m. (Beijing time). If a broker, bank or other nominee holds your Shares in "street name," your broker, bank or other nominee should provide you with instructions on how to vote your Shares. Your broker, bank or other nominee will not vote your Shares in the absence of specific instructions from you. These non-voted Shares are referred to as "broker non-votes."

If you own ADSs as of the close of business in New York City on the ADS Record Date (and do not surrender such ADSs and become a registered holder of the Shares underlying your ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS Depositary (as the holder of Shares underlying your ADSs) how to vote the Shares underlying your ADSs by completing and signing the ADS voting instruction card and returning it in accordance with the instructions printed on it as soon as possible. The ADS Depositary must receive such instructions no later than 5:00 p.m. (New York City time) on _____, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting. The ADS Depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions timely received from holders of ADSs. The ADS Depositary has advised us that, pursuant to Section 4.07 of the Deposit Agreement, it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

Alternatively, if you own ADSs as of the close of business in New York City on the ADS Record Date, you may vote at the extraordinary general meeting directly if you surrender your ADSs and become a holder of the Shares underlying your ADSs prior to the close of business in the Cayman Islands on the Share Record Date. If you wish to surrender your ADSs for the purpose of voting Shares, you need to make arrangements to deliver your ADSs to the ADS Depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the Deposit Agreement) and any applicable taxes, and (c) a certification that you held the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon surrender of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If the Merger is not consummated, the Company will continue to be a publicly traded company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have converted your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

7

**Dissenter Rights of Shareholders and ADS Holders (Page 111)**

Shareholders who elect to dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of Dissenter Rights, which is attached as Annex D to this proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise Dissenter Rights with respect to your Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

https://www.sec.gov/Archives/edgar/data/1508913/000114420416074992/v428644_ex99-a1.htm

We encourage you to read the section of this proxy statement entitled "Dissenter Rights" as well as Annex D to this proxy statement carefully and to consult your Cayman Islands legal counsel if you desire to exercise your Dissenter Rights.

**Purposes and Effects of the Merger (Page 58)**

The purpose of the Merger is to enable Parent to acquire 100% control of the Company in a transaction in which the holders of Shares and ADSs (other than the Excluded Shares and ADSs representing the Excluded Shares) will be cashed out in exchange for the Per Share Merger Consideration or the Per ADS Merger Consideration, as applicable, so that Parent, through Midco, will bear the rewards and risks of the sole ownership of the Company. See "Special Factors—Purposes of and Reasons for the Merger" beginning on page 40 for additional information.

The Company's ADSs, every two representing three Class A ordinary shares, are currently listed on the NYSE under the symbol "QIHU." It is expected that, following the consummation of the Merger, the Company will cease to be a publicly traded company and will instead become a private company beneficially owned solely by the Buyer Group. Following the consummation of the Merger, ADSs will no longer be listed on any securities exchange or quotation system, including the NYSE, and price quotations with respect to sales of ADSs in the public market will no longer be available. In addition, registration of Shares under the Exchange Act may be terminated upon the Company's application to the SEC if Shares are not listed on a national securities exchange and there are fewer than 300 record holders of Shares. Ninety days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of the Shares under the Exchange Act will be terminated and the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. Following the consummation of the Merger, the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company. Furthermore, following the consummation of the Merger, the ADS program for the Shares will terminate. See "Special Factors—Effects of the Merger for the Company" beginning on page 41 for additional information.

**Plans for the Company after the Merger (Page 66)**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Position of the Buyer Group as to Fairness of the Merger (Page 47)**

Each member of the Buyer Group believes that the Merger is fair to the Unaffiliated Holders. Their belief is based upon the factors discussed under the section entitled "Special Factors—Position of the Buyer Group as to Fairness of the Merger" beginning on page 47.

Each member of the Buyer Group is making the statements included in this paragraph solely for the purpose of ensuring compliance with the requirements of Rule 13E-3 and related rules under the Exchange Act. The views of each member of the Buyer Group as to the fairness of the Merger are not intended to be and should not be construed as a recommendation to any shareholder of the Company as to how that shareholder should vote on the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger.

9

**Financing of the Merger (Page 67)**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the Merger and the related transactions, including payment of fees and expenses in connection with the Merger, is anticipated to be approximately $[9.4] billion, assuming no exercise of Dissenter Rights by shareholders of the Company. In calculating this amount, the Company and the Buyer Group did not consider the value of 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision or Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options or by any direct or indirect wholly-owned Subsidiary of any Parent Party or the Company, which will be cancelled for no consideration.

The Buyer Group expects to provide this amount through a combination of (a) cash contributions from the Equity Investors pursuant to their respective equity commitment letters, each dated December 18, 2015 (the "Equity Commitment Letters"), and (b) the proceeds from a committed term loan facility in an amount up to the RMB equivalent of $3 billion (the "Term Facility") and a bridge loan facility of up to the RMB equivalent of $400 million (the "Bridge Facility"), pursuant to certain debt commitment letters dated December 18, 2015 provided by China Merchants Bank Co., Ltd. (the "Debt Commitment Letters"). See "Special Factors—Financing of the Merger" beginning on page 49 for additional information.

**Limited Guarantees; Global Village Guarantee (Page 71)**

Concurrently with the execution of the Merger Agreement, each of the Equity Investors and the Founder Securityholders (each a "Guarantor") entered into a limited guarantee (each a "Limited Guarantee") with Holdco, Parent and the Company to guarantee a portion of the Parent Parties' obligation to pay the Parent Termination Fee (as defined in the section entitled "The Merger Agreement–Termination Fee") and certain other payment obligations of the Parent Parties in relation to the financing for the Merger. In addition, concurrently with the execution of the Merger Agreement, Global Village entered into a limited guarantee (the "Global Village Guarantee") in favor of the Company to (i) guarantee the payment obligations of certain Buyer Group member under its Equity Commitment Letter and Limited Guarantee, and (ii) agree to use its reasonable best efforts to cause Parent to enforce the Escrow Agreements and not to utilize or release any escrowed amount from the escrow except in accordance with the terms of the applicable Escrow Agreements. See "Special Factors—Limited Guarantees" beginning on page 71 for additional information.

**Escrow Agreement (Page 71)**

Concurrently with the execution of the Merger Agreement, each of the Equity Investors entered into an escrow agreement (each an "Escrow Agreement") with Parent and the Company pursuant to which each Equity Investor will deposit a percentage of its equity commitment under the Equity Commitment Letter with Parent as earnest money which will be applied toward (i) the payment of certain of such Equity Investor's obligations under such Equity Investor's Equity Commitment Letter and Limited Guarantee, and/or (ii) the payment by Parent of the Parent Termination Fee that may become due and payable pursuant to the terms of the Merger Agreement. See "Special Factors—Escrow Agreement" beginning on page 71 for additional information.

**Interim Investors Agreement (Page 71)**

Concurrently with the execution of the Merger Agreement, the Founder Securityholders and the Equity Investors entered into an interim investors agreement with Holdco, Parent, Midco and Merger Sub (the "Interim Investors Agreement"), which governs, among other matters, the actions of Holdco, Parent, Midco and Merger Sub and the relationship among the Equity Investors with respect to the Merger Agreement and the transactions contemplated thereby. See "Special Factors—Interim Investors Agreement" beginning on page 71 for additional information.

**Opinion of the Special Committee's Financial Advisor (Page 35)**

On December 18, 2015, J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") rendered an oral opinion to the Special Committee (which was confirmed in writing by delivery of a written opinion by J.P. Morgan dated the same date), as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion.

10

The opinion of J.P. Morgan was addressed to the Special Committee and only addressed the fairness from a financial point of view of the Per Share Merger Consideration and Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, and does not address any other aspect or implication of the Merger. The summary of the opinion of J.P. Morgan in this proxy statement is qualified in its entirety by reference to the full text of its written opinion, which is included as Annex C to this proxy statement and sets forth the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by J.P. Morgan in preparing its opinion. We encourage the Unaffiliated Holders to read carefully the full text of the written opinion of J.P. Morgan. However, the opinion of J.P. Morgan, the summary of the opinion and the related analyses set forth in this proxy statement are not intended to be, and do not constitute advice or a recommendation to any shareholder, or holder of ADSs, of the Company as to how to act or vote with respect to the Merger or any other matter. Please see "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information.

**Interests of the Company's Executive Officers and Directors in the Merger (Page 54)**

In considering the recommendations of the Board, the Company's shareholders should be aware that certain of the Company's executive officers and directors have interests in the transaction that are different from, and/or in addition to, the interests of the Company's shareholders and ADS holders generally. These interests include, among others:

- the beneficial ownership of equity interest in Parent by the Chairman and Mr. Xiangdong Qi, following the consummation of the Merger, as a result of which they will be able to enjoy the benefits from future earnings and growth of the Surviving Company after the completion of the Merger;

- continued indemnification rights, rights to advancement of fees and directors and officers liability insurance to be provided by the Surviving Company to the directors and officers of the Company;

- the compensation of members of the Special Committee in exchange for their services in such capacity in an amount of $15,000 per member per month with the aggregate amount per member capped at $120,000 (or, in the case of the chairman of the Special Committee, an amount of $25,000 per month with the aggregate amount capped at $200,000) (the payment of which is not contingent upon the consummation of the Merger or the Special Committee's or the Board's recommendation of the Merger);

- the cash-out of all outstanding in-the-money Company Options held by certain directors and executive officers of the Company and the assumption by the Surviving Company, through the Plan Vehicle or such other arrangements, of outstanding unvested Company Options and Company Restricted Shares held by certain executive officers of the Company, as a result of which such executive officers will continue to hold an equity interest in the Surviving Company through the Plan Vehicle or such other arrangements and be able to enjoy the benefits from future earnings and growth of the Surviving Company after the completion of the Merger; and

- the potential continuation of service of the executive officers of the Company with the Surviving Company in positions that are substantially similar to their current positions, allowing them to benefit from remuneration arrangements, including equity compensation, with the Surviving Company.

The Special Committee and the Board were aware of these potential conflicts of interest and considered them, among other matters, in reaching their decisions and recommendations with respect to the Merger Agreement and related matters. See "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 120 and "Special Factors—Interests of Certain Persons in the Merger" beginning on page 72 for additional information.

11

**Q:**      **What happens if I sell my Shares or ADSs before the extraordinary general meeting?**

**A:**      The Share Record Date for voting at the extraordinary general meeting is earlier than the date of the extraordinary general meeting and the date that the Merger is expected to be consummated. If you transfer your Shares after the Share Record Date for voting but before the extraordinary general meeting, you will retain your right to vote at the extraordinary general meeting unless you have given, and not revoked, a proxy to the person to whom you transfer your Shares, but will transfer the right to receive the merger consideration to such person, so long as such person is registered as the owner of such Shares when the Merger is consummated. In such case, your vote is still very important and you are encouraged to vote.

     The ADS Record Date is the close of business in New York City on _____, 2016. If you transfer your ADSs after the ADS Record Date but before the extraordinary general meeting, you will retain your right to instruct the ADS Depositary to vote at the extraordinary general meeting, but will transfer the right to receive the merger consideration to the person to whom you transfer your ADSs, so long as such person owns such ADSs when the Merger is consummated.

**Q:**      **Am I entitled to dissenters' rights?**

**A:**      Shareholders who dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to this proxy statement. The fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise dissenters' rights with respect to their Shares.

     ADS holders will not have the right to exercise dissenters' rights and receive payment of the fair value of the Shares underlying their ADSs. The ADS Depositary will not exercise or attempt to exercise any dissenters' rights with respect to any of the Shares that it holds, even if an ADS holder requests the ADS Depositary to do so. ADS holders wishing to exercise dissenters' rights must surrender their ADSs to the ADS Depositary for delivery of Shares, pay the ADS Depositary's fees required for the cancellation of their ADSs, provide instructions for the registration of the corresponding Shares in the Company's register of members, and certify that they hold the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions as to their ADS before 5:00 p.m. (New York City time) on _____, 2016, and become registered holders of Shares before the vote to authorize and approve the Merger is taken at the extraordinary general meeting. Thereafter, such former ADS holders must comply with the procedures and requirements for exercising dissenters' rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law. If the Merger is not consummated, the Company will continue to be a public company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if a former ADS holder has surrendered his, her or its ADSs to exercise dissenters' rights and the Merger is not consummated and such former ADS holder wishes to be able to sell his, her or its Shares on a stock exchange, such former ADS holder will need to deposit his, her or its Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable Share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

     We encourage you to read the section of this proxy statement entitled "Dissenters' Rights" beginning on page 111 as well as "Annex D—Cayman Islands Companies Law Cap. 22 (Law 3 of 1961, as consolidated and revised)—Section 238" to this proxy statement carefully and to consult your own Cayman Islands legal counsel if you desire to exercise your dissenters' rights.

27

**SPECIAL FACTORS**

**Background of the Merger**

*Events leading to the execution of the Merger Agreement described in this Background of the Merger occurred primarily in the PRC or Hong Kong. As a result, all dates and times referenced in this Background of the Merger refer to China Standard Time.*

The Board and senior management of the Company periodically review the Company's long-term strategic plans with the goal of maximizing shareholder value. As part of this ongoing process, the Board and senior management of the Company have, from time to time, considered strategic alternatives that may be available to the Company.

From time to time, a number of parties have approached Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman") about possible transactions involving the Company. In early May 2015, the Chairman discussed separately with representatives of Golden Brick Capital Private Equity Fund I L.P. ("Golden Brick") and China Renaissance Holdings Limited regarding current market conditions and possible transactions involving the Company, including an acquisition of the Company.

Between late-May 2015 and mid-June 2015, the Chairman had discussions with Mr. Xiangdong Qi, co-founder and a director and president of the Company, representatives of CITIC Securities Co. Ltd. ("CITIC Securities") and Mr. Neil Nanpeng Shen, a director of the Company and founding managing partner of Sequoia Capital China, regarding the possibility of acquiring the Company.

On June 17, 2015, the Board received a preliminary non-binding proposal letter from the Chairman, CITIC Securities, Golden Brick, China Renaissance and Sequoia Capital China, to acquire all of the outstanding Class A and Class B ordinary shares of the Company not owned by them or their affiliates (collectively, the "Initial Consortium Members"), including Class A ordinary shares represented by American depositary shares (the "ADSs", each two representing three Class A ordinary shares), for $51.33 in cash per Class A or Class B ordinary share, or $77.00 in cash per ADS (the "Proposal"). In the Proposal, the Initial Consortium Members stated, among things, that they were not interested in selling their shares in any other transaction involving the Company.

On the same day, the Company issued a press release regarding its receipt of the Proposal and the transaction proposed therein, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

On June 19, 2015, the Board formed the Special Committee, being comprised of three independent, disinterested directors of the Company, Dr. Eric Chen, Dr. Ming Huang and Dr. Jianwen Liao, to consider the Proposal. Dr. Eric Chen was elected the chairman of the Special Committee.

On the same day, by way of unanimous written resolutions of the directors, the Board granted to the Special Committee the power to (i) make such investigation of the Proposal, the proposed transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate; (ii) evaluate the terms of the Proposal; (iii) discuss and negotiate with the Buyer Group and their representatives any terms of the proposed transaction and implement the proposed transaction as the Special Committee deems appropriate; (iv) explore any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company; (v) negotiate definitive agreements, if and when appropriate, with respect to the proposed transaction or any alternative transaction, the execution and delivery of any such agreement being subject, however, to the approval of the Board; (vi) report to the Board the recommendations and conclusions of the Special Committee with respect to the proposed transaction and/or any alternative transaction and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board; (vii) if and when appropriate at its sole discretion, adopt defensive measures with respect to unsolicited proposals for an alternative transaction; and (viii) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsels, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate to assist the Special Committee in discharging its responsibilities.

29

Shortly after being formed, the Special Committee considered the credentials of several prospective U.S. legal counsels, and noted that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") had extensive experience in advising on going-private transactions and did not have any conflict of interest with respect to representing the Special Committee. The Special Committee then decided to retain Skadden to act as its U.S. legal counsel in connection with the proposed transaction.

Later on June 19, 2015, the Company issued a press release regarding the formation of the Special Committee and the Special Committee's decision to retain Skadden as its U.S. legal counsel, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

Between June 19, 2015 and June 25, 2015, Dr. Eric Chen, as authorized by and on behalf of the Special Committee, invited and interviewed several investment banks to act as the financial advisor to the Special Committee.

On June 25, 2015, after reviewing the qualifications, experience and other characteristics of each potential financial advisor and considering the extensive experience of J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") in representing special committees in going-private transactions, its strong reputation and its significant experience in working with China-based companies, the Special Committee decided, through unanimous written resolutions, to retain J.P. Morgan as its financial advisor in connection with the review and evaluation of the Proposal. The Special Committee noted that J.P. Morgan had a prior relationship with one of the Initial Consortium Members, CITIC Securities, in providing corporate finance and treasury services to CITIC Securities and had a less-than-1% common equity ownership in CITIC Securities at the time, and determined that such relationship did not create a conflict of interest with respect to assisting the Special Committee in its review and evaluation of the Proposal and the transactions contemplated thereby.

On June 25, 2015, through unanimous written resolutions, the Special Committee decided to retain Maples and Calder ("Maples"), which the Special Committee noted had significant experience in advising on going-private transactions, to act as its Cayman Islands legal counsel in connection with the proposed transaction, and ratified and affirmed its engagement of Skadden as its U.S. legal counsel in connection with the proposed transaction.

On June 25, 2015, the Special Committee convened its first meeting by telephone. During the meeting, a representative of Maples first provided a summary of the directors' fiduciary duties under the laws of the Cayman Islands and best practices in the context of a going-private transaction. Representatives of Skadden then provided a summary of going-private considerations and the purposes and roles of the Special Committee, and discussed best practices for the Special Committee as well as the Company's management. The Special Committee raised questions and discussed a few key issues relating to its fiduciary duties and U.S. securities law disclosure requirements and also sought advice from the advisors on the communication protocol between the Special Committee and the Buyer Group. The Special Committee then instructed the advisors to advise the Company's management of the communication protocol between the Company and the Buyer Group, the best practices and the role of management in the context of a going-private transaction. Thereafter, representatives of J.P. Morgan provided a summary of the general process of a going-private transaction and an indicative timetable for the proposed transaction, as well as a summary of the financial advisor's role in assisting the Special Committee in its work. At the same meeting, the Special Committee also discussed with J.P. Morgan and Skadden negotiation strategies and certain key issues frequently negotiated in going-private transactions, including the pros and cons of conducting a market check before entering into the definitive agreements. After deliberation, the Special Committee decided that it would revisit the issue of a pre-signing market check once the financial advisor had progressed its financial analyses. The Special Committee instructed J.P. Morgan to contact the Buyer Group on behalf of the Special Committee to establish communication protocols and obtain further information regarding the Buyer Group's due diligence requirements, financing plan and plan regarding the composition of the Buyer Group. The Special Committee then instructed Skadden, on behalf of the Company, to prepare a draft confidentiality agreement and negotiate it with the Buyer Group in anticipation of the Buyer Group's request to conduct due diligence on the Company.

30

On the same day following the Special Committee meeting, Skadden sent a draft confidentiality agreement between the Company and each of the Initial Consortium Members to Kirkland & Ellis LLP ("Kirkland"), U.S. legal counsel to the Buyer Group in connection with the proposed transaction. Between June 26, 2015 and July 1, 2015, Skadden and Kirkland engaged in negotiations on the terms of the confidentiality agreement.

On June 29, 2015, Sequoia Capital China UR Holdings Limited, and its sole director and shareholder, Mr. Neil Nanpeng Shen, filed a Schedule 13D with the SEC reporting that they acquired beneficial ownership of certain Shares in the Company as part of certain in-kind distributions made by several Sequoia funds of the Shares held by them to their respective partners, as well as the submission of the Proposal to the Board.

In late June 2015, the Buyer Group decided to retain Huatai United Securities Co., Ltd. ("Huatai") as its financial advisor in connection with the proposed transaction.

On July 6, 2015 after finalizing the detailed terms of the engagement, the Company issued a press release regarding the engagement of J.P. Morgan as financial advisor by the Special Committee, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

Between July 15, 2015 and August 10, 2015, Kirkland and counsels to certain of the Initial Consortium Members resumed negotiation with Skadden on the terms of the confidentiality agreements. Following such negotiations, the Special Committee, on behalf of the Company, entered into confidentiality agreements with the Chairman and each of the other Initial Consortium Members (the "Confidentiality Agreements") on or about August 10, 2015.

On July 23, 2015, at the instruction of the Special Committee, representatives from Skadden and J.P. Morgan held a telephonic conference with members of the Company management to advise the Company's management of the communication protocol between the Company and the Buyer Group and best practices and the role of management in the context of a going-private transaction.

Between mid-August 2015 and mid-September 2015, representatives of the Buyer Group and its financial, legal and accounting advisors had various discussions with the management of the Company regarding the business, operations and financial performance of the Company and conducted preliminary legal, business, financial and accounting due diligence on the Company.

From early September to early October 2015, representatives of the Buyer Group had preliminary discussions with certain potential lenders regarding arranging debt financing for a potential transaction involving the Company.

Between mid-September 2015 and mid-October 2015, the Buyer Group and Huatai discussed the potential transaction with various potential investors who might be interested in joining the Buyer Group.

On October 8, 2015, the Special Committee convened its second meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, the Special Committee and its advisors discussed possible structures for alternative transactions in light of the Buyer Group's existing beneficial ownership and its express statement regarding their unwillingness to sell their shares in any other transaction involving the Company and representatives of Skadden discussed the likely impact of the PRC anti-monopoly law on the viability of each alternative. J.P. Morgan then provided an update on the trading prices of the ADSs following the announcement of the proposed transaction and reported that they had not received any inbound proposal by a third party with respect to a potential transaction involving the Company. J.P. Morgan also noted that any inquiries regarding the proposed transaction should be carefully handled in order not to disrupt the Company management's attention to the operation of the Company's business or result in the disclosure of any confidential information relating to the Company or the proposed transaction. The Special Committee then discussed the mechanism of, and consideration associated with, a "go-shop" provision in a potential merger agreement.

31

The Buyer Group did not consider the Company's net book value, which is an accounting concept based on historical costs, as a factor because it believed that net book value is not a material indicator of the Company's value as a going concern but rather is indicative of historical costs. The Buyer Group notes, however, that the Per Share Merger Consideration of $51.33 is higher than the Company's net book value per Share as of [June 30, 2015], which was $[6.44] based on 189,757,657 issued and outstanding Shares as of that date.

In its consideration of the fairness of the Merger, the Buyer Group did not undertake an appraisal of the assets of the Company to determine the Company's liquidation value for the Unaffiliated Holders due to the impracticability of determining a liquidation value given the significant execution risk involved in any breakup. In addition, the Buyer Group did not consider the Company's liquidation value to be a relevant valuation method because they consider the Company to be a viable going concern where value is derived from cash flows generated from its continuing operations, and because the Company will continue to operate its business following the Merger.

The Buyer Group did not seek to establish a pre-Merger going concern value for the Company's Shares and ADSs to determine the fairness of the Merger Consideration to the Unaffiliated Holders because following the Merger the Company will have a significantly different capital structure. However, to the extent the pre-Merger going concern value was reflected in the pre-announcement price of the ADSs, the Merger Consideration represented a premium to the going concern value of the Company.

The Buyer Group was not aware of, and thus did not consider in their fairness determination, any offers or proposals made by any unaffiliated third parties with respect to (a) a merger or consolidation of the Company with or into another company, (b) a sale of all or a substantial part of the Company's assets or (c) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company. Except as otherwise disclosed in this proxy statement, the members of the Buyer Group did not make any purchases of securities of the Company during the past two years, and so did not consider any such purchases in their fairness determination.

The foregoing discussion of the information and factors considered and given weight by the Buyer Group in connection with its evaluation of the substantive and procedural fairness of the Merger to the Unaffiliated Holders is not intended to be exhaustive, but is believed to include all material factors considered. The Buyer Group found it impracticable to assign, and did not assign, relative weights to the foregoing factors considered in reaching its conclusions as to the substantive and procedural fairness of the Merger to the Unaffiliated Holders. Rather, the Buyer Group made the fairness determinations after considering all of the foregoing factors as a whole.

The Buyer Group believes these factors provide a reasonable basis for its belief that the Merger is both substantively and procedurally fair to the Unaffiliated Holders. This belief, however, is not intended to be and should not be construed as a recommendation by the Buyer Group to any shareholder or ADS holder of the Company to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Buyer Group does not make any recommendation as to how such shareholders or ADS holders should vote relating to the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, at the extraordinary general meeting.

**Certain Financial Projections**

The Company does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of the Company has prepared the prospective financial information set forth below for the fiscal year ended December 31, 2015 through the fiscal year ending December 31, 2025 for internal use, which was approved by the Special Committee for use by the Special Committee's financial advisor in connection with their financial analyses related to the Merger and opinion provided to the Special Committee. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Company's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this document are cautioned not to place undue reliance on the prospective financial information.

51

The financial projections are not a guarantee of performance. In compiling the projections, the Company's management took into account historical performance, combined with estimates regarding revenues, gross profit, EBIT, EBITDA, net income and capital expenditure. Although the projections are presented with numerical specificity, they were based on numerous assumptions and estimates as to future events made by the Company's management that the management believed were reasonable at the time the projections were prepared. This information is not, however, fact and should not be relied upon as being necessarily indicative of actual future results. In addition, factors such as industry performance, the market for the Company's existing and new products, the competitive environment, expectations regarding future acquisitions or any other transaction and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of the management, may cause actual future results to differ materially from the results forecasted in these financial projections. In addition, the projections do not take into account any circumstances or events occurring after the date that they were prepared. For instance, the projections do not give effect to the Merger or any changes to the Company's operations or strategy that may be implemented after the time the projections were prepared. We cannot assure you that the projections will be realized or that actual results will not be significantly different from those contained in the projections.

Neither the Company's independent auditors, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information. The Company's independent auditor's report accompanying the Company's audited consolidated financial statements included in the Company's annual report on Form 20-F for the year ended December 31, 2014 incorporated by reference in this proxy statement refers exclusively to the Company's historical financial statements and does not cover any other information in this proxy statement and should not be read to do so. The financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the Special Committee's financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal for his, her or its Shares pursuant to Section 238 of the Cayman Islands Companies Law.

The following table summarizes the financial projections prepared by the Company's management and considered by the Special Committee and its financial advisor in connection with their analysis of the Merger:

Management Projections
Fiscal Year Ended December 31,

| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ($ in millions, non-GAAP*) | | | | | | |
| **Total revenue** | 1,806 | 3,630 | 4,819 | 6,255 | 7,657 | 8,948 | 9,646 | 10,143 | 10,543 | 10,890 | 11,221 |
| Growth % | 29.9% | 101.0% | 32.7% | 29.8% | 22.4% | 16.9% | 7.8% | 5.2% | 3.9% | 3.3% | 3.0% |
| Traditional business[1] | 1,658 | 2,002 | 2,417 | 2,898 | 3,360 | 3,851 | 4,088 | 4,234 | 4,361 | 4,473 | 4,593 |
| *As % of total revenue* | *91.8%* | *55.1%* | *50.1%* | *46.3%* | *43.9%* | *43.0%* | *42.4%* | *41.7%* | *41.4%* | *41.1%* | *40.9%* |
| Emerging business[2] | 148 | 1,628 | 2,403 | 3,357 | 4,297 | 5,097 | 5,559 | 5,909 | 6,182 | 6,417 | 6,627 |
| *As % of total revenue* | *8.2%* | *44.9%* | *49.9%* | *53.7%* | *56.1%* | *57.0%* | *57.6%* | *58.3%* | *58.6%* | *58.9%* | *59.1%* |
| **Gross profit** | 1,437 | 2,089 | 2,726 | 3,587 | 4,357 | 5,056 | 5,422 | 5,671 | 5,876 | 6,055 | 6,231 |
| *Margin %* | *79.6%* | *57.5%* | *56.6%* | *57.3%* | *56.9%* | *56.5%* | *56.2%* | *55.9%* | *55.7%* | *55.6%* | *55.5%* |
| Traditional business[1] | 1,386 | 1,666 | 2,006 | 2,406 | 2,789 | 3,196 | 3,393 | 3,514 | 3,619 | 3,713 | 3,812 |
| *Margin %* | *83.6%* | *83.2%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* |
| Emerging business[2] | 51 | 423 | 721 | 1,182 | 1,568 | 1,860 | 2,029 | 2,157 | 2,256 | 2,342 | 2,419 |
| *Margin %* | *34.5%* | *26.0%* | *30.0%* | *35.2%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* |
| **EBIT** | 440 | 527 | 848 | 1,260 | 1,546 | 1,802 | 1,941 | 2,024 | 2,093 | 2,154 | 2,215 |
| *Margin %* | *24.4%* | *14.5%* | *17.6%* | *20.1%* | *20.2%* | *20.1%* | *20.1%* | *20.0%* | *19.9%* | *19.8%* | *19.7%* |
| **EBITDA** | 544 | 667 | 1,046 | 1,680 | 1,996 | 2,282 | 2,433 | 2,528 | 2,609 | 2,682 | 2,755 |
| *Margin %* | *30.1%* | *18.4%* | *21.7%* | *26.9%* | *26.1%* | *25.5%* | *25.2%* | *24.9%* | *24.8%* | *24.6%* | *24.6%* |
| **Net income** | 414 | 490 | 758 | 1,100 | 1,346 | 1,573 | 1,702 | 1,792 | 1,878 | 1,958 | 2,040 |
| *Margin %* | *22.9%* | *13.5%* | *15.7%* | *17.6%* | *17.6%* | *17.6%* | *17.6%* | *17.7%* | *17.8%* | *18.0%* | *18.2%* |
| Capital expenditure | 200 | 500 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| *As % of revenue* | *11.1%* | *13.8%* | *12.5%* | *9.6%* | *7.8%* | *6.7%* | *6.2%* | *5.9%* | *5.7%* | *5.5%* | *5.3%* |

52

\* Non-GAAP financial measure is adjusted from results based on U.S. GAAP to exclude share-based compensation expenses and interest expense of the Company Convertible Notes.

(1) Traditional business mainly includes online advertising and internet value-added services.

(2) Emerging business includes enterprise security business, smartphone and other hardware and hardware-enabled value-added services, and international business.

J.P. Morgan, as the Special Committee's financial advisor, reviewed with the Special Committee certain financial analyses that were based, in part, on the financial projections above. For additional information regarding the analyses by the Special Committee's financial advisor, see "Discussion Materials prepared by J.P. Morgan Securities (Asia Pacific) Limited for discussion with the special committee of the board of directors of the Company, December 18, 2015" filed as Exhibit (c)-(2) to the Company's transaction statement on Schedule 13E-3 and "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53.

**NONE OF THE COMPANY OR ITS AFFILIATES, ADVISORS, OFFICERS, DIRECTORS OR REPRESENTATIVES HAS MADE OR MAKES ANY REPRESENTATION TO ANY SHAREHOLDER OR OTHER PERSON REGARDING THE ULTIMATE PERFORMANCE OF THE COMPANY COMPARED TO THE INFORMATION CONTAINED IN THE PROJECTIONS OR THAT PROJECTED RESULTS WILL BE ACHIEVED.**

**BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, THE COMPANY UNDERTAKES NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAW.**

The financial projections are forward-looking statements. For information on factors that may cause the Company's future financial results to materially vary, see "Cautionary Note Regarding Forward-Looking Statements" beginning on page 123 and "Item 3. Key Information—D. Risk Factors" included in the Company's annual report on Form 20-F for the fiscal year ended December 31, 2014, incorporated by reference into this proxy statement.

**Opinion of the Special Committee's Financial Advisor**

Pursuant to an engagement letter dated July 6, 2015, the Special Committee retained J.P. Morgan as its financial advisor to deliver a fairness opinion in connection with the Merger. J.P. Morgan is an internationally recognized financial services firm that, among other things, is regularly engaged in the investment banking business, including the valuation of businesses and securities in connection with mergers and acquisitions, underwritings and private placements of securities, and other investment banking services.

53

At the meeting of the Special Committee on December 18, 2015, J.P. Morgan rendered its oral opinion to the Special Committee that, as of such date and based upon and subject to the factors, assumptions, and limitations set forth in its opinion, the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders. J.P. Morgan has confirmed its December 18, 2015 oral opinion by delivering its written opinion to the Special Committee, dated as of the same date, that, as of such date, the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders. No limitations were imposed by the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinions. As further described in "Special Factors — Background of the Merger," J.P. Morgan had previously rendered a substantially similar oral opinion to the Special Committee on December 16, 2015, which was subsequently withdrawn as a result of a change to certain capitalization information provided by the management of the Company, prior to rendering the oral opinion and issuing the written opinion described above on December 18, 2015.

The full text of the written opinion of J.P. Morgan dated December 18, 2015, which sets forth the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken, is attached as Annex C to this proxy statement and is incorporated herein by reference. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. The shareholders of the Company are urged to read the opinion in its entirety. J.P. Morgan's written opinion is addressed to the Special Committee (in its capacity as such), is directed only to the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid in the Merger to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) and does not constitute a recommendation to any shareholder, or holder of ADSs, of the Company as to how such shareholder, or holder of ADSs, should vote with respect to the Merger or any other matter.

In connection with preparing its opinion, J.P. Morgan, among other things:

- reviewed the Merger Agreement;

- reviewed certain publicly available business and financial information concerning the Company and the industries in which it operates;

- compared the proposed financial terms of the transactions contemplated by the Merger Agreement and the Plan of Merger with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration paid for such companies;

- compared the financial and operating performance of the Company with publicly available information concerning certain other companies J.P. Morgan deemed relevant and reviewed the current and historical market prices of the Shares and ADSs and certain publicly traded securities of such other companies;

- reviewed certain internal financial analyses and forecasts prepared by the management of the Company relating to its business; and

- performed such other financial studies and analyses and considered such other information as J.P. Morgan deemed appropriate for the purposes of its opinion.

J.P. Morgan also held discussions with certain members of the management of the Company with respect to certain aspects of the Merger, the past and current business operations of the Company, the financial condition and future prospects and operations of the Company, and certain other matters J.P. Morgan believed necessary or appropriate to its inquiry.

https://www.sec.gov/Archives/edgar/data/1508913/000114420416074992/v428644_ex99-a1.htm

In giving its opinion, J.P. Morgan relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with J.P. Morgan by the Company or otherwise reviewed by or for J.P. Morgan. J.P. Morgan did not independently verify (nor did J.P. Morgan assume responsibility or liability for independently verifying) any such information or its accuracy or completeness. J.P. Morgan did not conduct and was not provided with any valuation or appraisal of any assets or liabilities, nor did J.P. Morgan evaluate the solvency of the Company, any member of the Buyer Group or any other person under any applicable laws relating to bankruptcy, insolvency or similar matters. In relying on financial analyses and forecasts provided to it or derived therefrom, J.P. Morgan assumed that they had been reasonably prepared based on assumptions reflecting the best then-available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate. J.P. Morgan expressed no view as to such analyses or forecasts or the assumptions on which they were based. J.P. Morgan also assumed that the Merger and the other transactions contemplated by the Merger Agreement will be consummated as described in the Merger Agreement. J.P. Morgan also assumed that the representations and warranties made by the Company and Acquiror Group in the Merger Agreement and the related agreements were and will be true and correct in all respects material to its analysis. J.P. Morgan did not act as legal, regulatory or tax expert and relied on the assessments made by advisors to the Special Committee with respect to such issues. J.P. Morgan further assumed that all material governmental, regulatory or other consents and approvals necessary for the consummation of the Merger will be obtained without any adverse effect on the Company or on the contemplated benefits of the Merger.

The financial projections furnished to J.P. Morgan for the Company and used in connection with J.P. Morgan's analysis of the Merger were prepared by or at the direction of the management of the Company and approved for use by J.P. Morgan by the Special Committee. The Company informed J.P. Morgan that it does not publicly disclose internal management projections of the type provided to J.P. Morgan in connection with J.P. Morgan's analysis of the Merger, and such projections were not prepared with a view toward public disclosure. These projections were based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of management, including, without limitation, factors related to general economic and competitive conditions and prevailing interest rates. Accordingly, actual results could vary significantly from those set forth in such projections.

J.P. Morgan's opinion is necessarily based on economic, market and other conditions as in effect on, and the information made available to J.P. Morgan as of, the date of such opinion. It should be understood that subsequent developments may affect J.P. Morgan's opinion, and J.P. Morgan does not have any obligation to update, revise, or reaffirm such opinion. J.P. Morgan's opinion is limited to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed Merger, and J.P. Morgan expressed no opinion as to the fairness of the Merger to, or any consideration paid in connection with the Merger to, the holders of any other class of securities, creditors or other constituencies of the Company or the underlying decision by the Company to engage in the Merger. Furthermore J.P. Morgan expressed no opinion with respect to the amount or nature of any compensation to any officers, directors, or employees of any party to the Merger, or any class of such persons relative to the Per Share Merger Consideration or the Per ADS Merger Consideration to be paid to the Unaffiliated Holders of the Shares or ADSs (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger or with respect to the fairness of any such compensation.

J.P. Morgan noted that, prior to December 18, 2015, the date on which J.P. Morgan delivered the written opinion to the Special Committee, it was not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of the Company or any other alternative transaction.

In accordance with customary investment banking practice, J.P. Morgan employed generally accepted valuation methods in reaching its opinion. The following is a summary of the material financial analyses utilized by J.P. Morgan in connection with providing its opinion. J.P. Morgan has consented to the inclusion and disclosure of its financial analyses in this proxy statement. Some of the summaries of the financial analyses include information presented in tabular format. The tables are not intended to stand alone. In order to fully understand the financial analyses used by J.P. Morgan, the tables must be read together with the full text of each summary. Considering the data in the tables without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of J.P. Morgan's financial analyses.

55

All values in the sections "Discounted Cash Flow Analysis" and "Public Trading Multiples Analysis" below are presented on an equity value per ADS basis. In arriving at equity value per ADS for the Company, the Discounted Cash Flow analysis started with the determination of firm value, or "FV", for the Company. Firm value was then adjusted by subtracting total debt outstanding as of June 30, 2015, subtracting total non-controlling interest as of June 30, 2015 adjusted by including the pro-forma non-controlling interest in Coolpad E-Commerce Inc. provided by the Company, adding total cash and cash equivalents and short term investments outstanding as of June 30, 2015, subtracting the cash utilized to repurchase the Company's outstanding ordinary shares post June 30, 2015, and adding long-term investments as of June 30, 2015 adjusted by excluding the investment in Coolpad E-Commerce Inc. (as the Company was in the process of obtaining control of Coolpad E-Commerce Inc.) to arrive at equity value for the Company. Equity value was then divided by the diluted ADS count to arrive at equity value per ADS. In arriving at the equity value per ADS for the Company in the Public Trading Multiples analysis, J.P. Morgan reviewed certain selected companies' trading multiples based on ratio of market capitalization to estimated net income for calendar year 2016. Based on the results of such analysis, J.P. Morgan applied a multiple reference range of 18.0x to 25.0x to the Company's estimated non-GAAP net income (non-GAAP net income is adjusted for share based compensation expenses and interest expenses in relation to the convertible senior notes, in a manner consistent with the Company's historical filings) for calendar year 2016 based on management estimates. All market data used by J.P. Morgan in its analyses was as of December 15, 2015. Accordingly, this information may not reflect current or future market conditions. In addition, as each ADS represents 1.5 underlying Shares, all calculations of equity value per ADS or implied equity value per ADS below represent the value attributable to 1.5 Shares.

### *Discounted Cash Flow Analysis*

J.P. Morgan conducted a discounted cash flow analysis for the purpose of determining the diluted equity value per ADS for the ADSs. A discounted cash flow analysis is a method of evaluating an asset using estimates of the future unlevered free cash flows generated by the asset and taking into consideration the time value of money with respect to those future cash flows by calculating their "present value." "Present value" refers to the current value of one or more future cash payments from the asset, which is referred to as that asset's cash flows, and is obtained by discounting those cash flows back to the present using a discount rate that takes into account macro-economic assumptions and estimates of risk, the opportunity cost of capital, capitalized returns and other appropriate factors. "Terminal value" refers to the capitalized value of all cash flows from an asset for periods beyond the final forecast period.

J.P. Morgan calculated the unlevered free cash flows that the Company is expected to generate during fiscal years 2015 to 2025 based upon financial projections prepared by the management of the Company. See "Special Factors—Certain Financial Projections" beginning on page 51 for additional information. J.P. Morgan also calculated a range of terminal asset values of the Company at the end of the projection period ending 2025 by applying a perpetual growth rate ranging from 2.5% to 3.5%. The perpetual growth rate range was selected based on a combination of macroeconomic factors, such as general industry trends and expected inflation rates, and the professional judgment of J.P. Morgan. The unlevered free cash flows and the range of terminal asset values were then discounted to present values using a range of discount rates from 12.5% to 14.5%, which were chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company. The present value of the unlevered free cash flows and the range of terminal asset values were then adjusted by subtracting total debt outstanding as of June 30, 2015, subtracting total non-controlling interest as of June 30, 2015 adjusted by including the pro-forma non-controlling interest in Coolpad E-Commerce Inc. provided by the Company, adding total cash and cash equivalents and short term investments outstanding as of June 30, 2015, subtracting the cash utilized to repurchase the Company's outstanding ordinary shares post June 30, 2015, and adding long-term investments as of June 30, 2015 adjusted by excluding the investment in Coolpad E-Commerce Inc. (as the Company was in the process of obtaining control of Coolpad E-Commerce Inc.) Based on these assumptions, the discounted cash flow analysis indicated a range of per ADS equity values of between $68.43 and $91.61.

### *Public Trading Multiples Analysis*

Using publicly available information, J.P. Morgan compared selected financial data of the Company with similar data for selected publicly traded companies engaged in businesses which J.P. Morgan judged to be most similar to the Company. The companies selected by J.P. Morgan were:

- Tencent Holdings Limited
- Baidu, Inc.
- Kingsoft Corporation Limited
- Cheetah Mobile Inc.

56

These companies were selected, among other reasons, because they represent the main publicly traded peers in China's internet industry with operations and businesses that, for purpose of J.P. Morgan's analysis, may be considered similar to that of the Company. However, none of the selected companies reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company.

In all instances, multiples were based on closing share prices on December 15, 2015. For the following analyses performed by J.P. Morgan, estimated financial data for the selected companies were based on the selected companies' filings with the SEC and any other relevant stock exchanges as well as the publicly available consensus estimates of Wall Street analysts, and estimated financial data for the Company was based on the financial projections prepared by the management of the Company. See "Special Factors—Certain Financial Projections" beginning on page 51 for additional information.

In conducting its analyses, J.P. Morgan reviewed the selected companies' trading multiples based on ratio of market capitalization to estimated net income, referred to as the P/E multiple, for calendar year 2016. Results of the analyses were presented for the selected companies, as indicated in the following table:

| Company | P/E 2016E |
|---|---|
| Tencent Holdings Limited | 24.8x |
| Baidu, Inc. | 28.9x |
| Kingsoft Corporation Limited | 18.6x |
| Cheetah Mobile Inc. | 22.2x |

Based on the above analyses, J.P. Morgan applied a multiple reference range of 18.0x to 25.0x to the Company's estimated non-GAAP net income (non-GAAP net income is adjusted for share based compensation expenses and interest expenses in relation to the convertible senior notes, in a manner consistent with the Company's historical filings) for calendar year 2016 based on management estimates. In comparison to the per ADS consideration, the analyses indicated the following equity values per ADS:

| P/E 2016E |
|---|
| $69.10 to $95.77 |

***Other Analyses for Informational Purposes Only***

J.P. Morgan also reviewed, solely for informational purposes, historical trading prices of the ADSs, certain precedent transactions and the premia paid in certain precedent U.S. listed Chinese take-private transactions, but noted, and the Special Committee understood and acknowledged, that these are not valuation methodologies but were presented merely for informational purposes.

The foregoing summary of certain material financial analyses does not purport to be a complete description of the analyses or data presented by J.P. Morgan. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. J.P. Morgan believes that the foregoing summary and its analyses must be considered as a whole and that selecting portions of the foregoing summary and these analyses, without considering all of its analyses as a whole, could create an incomplete view of the processes underlying the analyses and its opinion. In arriving at its opinion, J.P. Morgan did not attribute any particular weight to any analyses or factors considered by it and did not form an opinion as to whether any individual analysis or factor (positive or negative), considered in isolation, supported or failed to support its opinion. Rather, J.P. Morgan considered the totality of the factors and analyses performed in determining its opinion.

Analyses based upon forecasts of future results are inherently uncertain, as they are subject to numerous factors or events beyond the control of the parties and their advisors. Accordingly, forecasts and analyses used or made by J.P. Morgan are not necessarily indicative of actual future results or, should the Merger fail to be consummated, the future value of the ADSs, which may be significantly more or less favorable than suggested by those analyses. Moreover, J.P. Morgan's analyses are not and do not purport to be appraisals or otherwise reflective of the prices at which businesses actually could be bought or sold. None of the selected companies reviewed as described in the above summary is identical to the Company. However, the companies selected were chosen because they are publicly traded companies with operations and businesses that, for purposes of J.P. Morgan's analysis, may be considered similar to those of the Company. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies compared to the Company.

As a part of its investment banking business, J.P. Morgan and its affiliates are continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, investments for passive and control purposes, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for estate, corporate and other purposes. J.P. Morgan was selected to deliver an opinion to the Special Committee with respect to the Merger on the basis of such experience and its familiarity with the Company.

Under the terms of J.P. Morgan's engagement and for its service, the Company has agreed to pay J.P. Morgan (1) a fee of $1.0 million upon delivery of the opinion, (2) an additional fee of $1.5 million, payable upon the consummation of the Merger, and (3) a discretionary fee payable in the sole discretion of the Special Committee upon the consummation of the Merger. In addition, the Company has agreed to reimburse J.P. Morgan for its reasonable expenses incurred in connection with its services, including the reasonable fees and expenses of outside legal counsel engaged by J.P. Morgan in connection with its performance of services hereunder. The Company has also agreed to indemnify J.P. Morgan for certain liabilities arising out of J.P. Morgan's engagement.

In addition, during the two years preceding the date of its opinion, J.P. Morgan and its affiliates have had, and may continue to have in the future, commercial and/or investment banking relationships with the Company and certain affiliates of certain members of the Buyer Group, for which J.P. Morgan and such affiliates have received and may in the future receive customary compensation. As of December 16, 2015, J.P. Morgan and/or its affiliates own, on a proprietary basis, approximately 0.19% of the outstanding ADSs. In the ordinary course of its businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities of the Company and affiliates of certain members of the Acquirer Group for its own account or for the accounts of customers and, accordingly, J.P. Morgan and its affiliates may at any time hold long or short positions in such securities.

**Purposes of and Reasons for the Merger**

*The Buyer Group*

Under a possible interpretation of the SEC rules governing going-private transactions, each member of the Buyer Group may be deemed to be engaged in a going-private transaction and, therefore, required to express its reasons for the Merger to the Company's Unaffiliated Holders. Each member of the Buyer Group is making the statements included in this section solely for the purpose of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. For the Buyer Group, the purpose of the Merger is to enable Parent to acquire 100% control of the Company in a transaction in which the Company's shareholders and ADS holders (other than the Excluded Shares) will be cashed out in exchange for the Per Share Merger Consideration or the Per ADS Merger Consideration, as applicable, so that Parent, through Midco, will bear the rewards and risks of the sole ownership of the Company after the Merger, including any future earnings and growth of the Company as a result of improvements to the Company's operations or acquisitions of other businesses. In addition, the Merger will allow members of the Buyer Group which are currently shareholders of the Company to maintain a significant portion of their investment in the Company through their respective indirect ownership in Parent as described under "Special Factors—Interests of Certain Persons in the Merger—Interests of the Buyer Group" below and at the same time enable certain members of the Buyer Group to maintain their leadership role with the Company.

58

The Buyer Group believes the operating environment has become more challenging due to recent operating conditions and industry trends. There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

Further, as a privately held company, the Company will be relieved of many of the expenses, burdens and constraints imposed on companies that are subject to the public reporting requirements under the U.S. federal securities laws, including the Exchange Act and the Sarbanes-Oxley Act of 2002. In particular, the Buyer Group believes that as a privately held company, the Company would no longer be subject to (i) the increased costs of regulatory compliance as an SEC reporting company and (ii) the requirement to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and may potentially help the Company's actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger.

*The Company*

The Company's purpose for engaging in the Merger is to enable its shareholders to receive $51.33 per Share and its ADS holders to receive $77.00 per ADS in cash, without interest and net of any applicable withholding taxes, which represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal. The Company has determined to undertake the Merger at this time based on the analyses, determinations and conclusions of the Special Committee and the Board described in detail under the caption"—Reasons for the Merger and Recommendation of the Special Committee and the Board."

**Effects of the Merger on the Company**

**Private Ownership**

ADSs representing Shares are currently listed on the NYSE under the symbol "QIHU." It is expected that, following the consummation of the Merger, the Company will cease to be a publicly traded company and will instead become a private company beneficially owned by the Buyer Group. Following the consummation of the Merger, ADSs will no longer be listed on any securities exchange or quotation system, including the NYSE, and price quotations with respect to sales of the ADSs in the public market will no longer be available. In addition, registration of Shares under the Exchange Act may be terminated upon the Company's application to the SEC if Shares are not listed on a national securities exchange and there are fewer than 300 record holders of Shares. Ninety days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of Shares under the Exchange Act will be terminated and the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. The costs of complying with the United States federal securities laws, including the Sarbanes-Oxley Act of 2002, totaled approximately $1.7 million and $2.3 million for the years ended December 31, 2013 and December 31, 2014, respectively. After the consummation of the Merger, the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company. Furthermore, following the consummation of the Merger, the ADS program for the Shares will terminate.

https://www.sec.gov/Archives/edgar/data/1508913/000114420416074992/v428644_ex99-a1.htm

Upon the consummation of the Merger, each issued and outstanding Share and ADS (other than the Excluded Shares or ADSs representing the Excluded Shares) will be cancelled in exchange for the right to receive the Per Share Merger Consideration and the Per ADS Merger Consideration, respectively, in cash, without interest and net of any applicable withholding taxes. At the Effective Time, (a) the Excluded Shares other than the Dissenting Shares (including Shares represented by ADSs) will be cancelled for no consideration or distribution therefor and (b) the Dissenting Shares will be cancelled and will entitle the former holders thereof to receive the fair value of such shares as determined in accordance with such holders' Dissenter Rights under Section 238 of the Cayman Islands Companies Law. At the Effective Time, each ordinary share of Merger Sub issued and outstanding immediately prior to the Effective Time will be converted into one fully paid and non-assessable ordinary share of the Surviving Company. As a result, current shareholders and ADS holders of the Company, other than the members of the Buyer Group, will no longer have any equity interest in, or be shareholders or ADS holders of, the Company upon the consummation of the Merger. As a result, the Company's shareholders and ADS holders, other than the members of the Buyer Group, will not have the opportunity to participate in the earnings and growth of the Company and they will not have the right to vote on corporate matters. Similarly, the Company's current shareholders and ADS holders, other than the members of the Buyer Group, will not be exposed to the risk of loss in relation to their investment in the Company.

At the Effective Time, each Cashed-Out Option will be cancelled and shall entitle the former holder thereof to receive an amount equal to the product of (a) the excess of Per Share Merger Consideration over the per share exercise price of such Cashed-Out Option and (b) the number of Shares (including Shares represented by ADSs) underlying such Cashed-Out Option payable as promptly as practicable following the Closing, in cash, without interest and net of any applicable withholding taxes. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled without any consideration. Each unvested Company Option will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements, on substantially the same terms and subject to the same vesting conditions as were provided to such option immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such option.

At the Effective Time, each Company Restricted Share that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

Each holder of Company Convertible Notes has the option to require the Surviving Company to repurchase such holder's Company Convertible Notes for a purchase price equal to 100% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest, if any, through but excluding, the applicable fundamental change repurchase date as defined under the applicable Indenture Agreements. Furthermore, after the Effective Time but prior to and including the third business day prior to the applicable fundamental change repurchase date, each holder of Company Convertible Notes will be entitled, subject to the terms and conditions of the applicable Indenture Agreements, to convert such holder's Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements plus any entitled increase in the conversion rate as determined pursuant to the applicable Indenture Agreements. After the third business day prior to the applicable fundamental change repurchase date, each holder of the Company Convertible Notes, to the extent such holder has not exercised its right to require the Surviving Company to repurchase such holder's Company Convertible Notes, will be entitled to convert such Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements.

60

**Plans for the Company after the Merger**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets. However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange, as well as any actions to address the challenges referred to in "Special Factors—Purposes of and Reasons for the Merger" above, in each case, which they consider to be in the best interests of the Surviving Company and its shareholders. The Buyer Group expressly reserves the right to make any changes they deem appropriate to the operation of the Surviving Company in light of such evaluation and review as well as any future developments.

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Alternatives to the Merger**

The Board did not independently determine to initiate a process for the sale of the Company. The Special Committee was formed on June 19, 2015 in response to the receipt of the proposal letter from the Buyer Group on June 17, 2015. In light of (i) the Buyer Group's beneficial ownership of approximately [26.7]% in number and [61.6]% in voting rights of the entire issued and outstanding Shares excluding treasury shares, which consisted of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options (as of the date of this proxy statement) and (ii) the fact that, since the announcement of the proposed transaction and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company, the Special Committee determined that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group.

The Special Committee also took into account that, subject to compliance with the terms and conditions of the Merger Agreement, (i) the Company has the ability to actively solicit bids from any third party for a period of 45 days after the signing of the Merger Agreement, (ii) prior to the receipt of the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) is permitted to effect a Company Adverse Recommendation Change (as defined in the section entitled "The Merger Agreement—No Company Adverse Recommendation Change") with respect to an alternative acquisition proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal, and (iii) prior to the receipt of the Company Shareholder Approval, can terminate the Merger Agreement in order to enter into an agreement in connection with an alternative transaction proposed by a third party that is a Superior Proposal, subject to the payment of a termination fee of approximately RMB1.44 billion, which amount is reduced to RMB641 million if the Merger Agreement is terminated by the Company in connection with an Acquisition Proposal received by the Company during the Go-Shop Period, in each case as provided in the Merger Agreement. In this regard, the Special Committee recognized that it has flexibility under the Merger Agreement to respond to an alternative transaction proposed by a third party that is or is reasonably likely to result in a Superior Proposal, including the ability to provide information to and engage in discussions and negotiations with such party (and, if such proposal is a Superior Proposal, recommend such proposal to the Company's shareholders).

In addition, the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market.

**Effects on the Company if the Merger Is Not Consummated**

If the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are not authorized and approved by the shareholders of the Company or if the Merger is not consummated for any other reason, the shareholders or ADS holders of the Company will not receive any payment for their Shares or ADSs, as applicable, in connection with the Merger, nor will the holders of any Vested Company Options receive any payment pursuant to the Merger Agreement, nor will any unvested Company Options or Company Restricted Shares be assumed and converted into equity incentive awards of Parent. Instead, the Company will remain a publicly traded company, the ADSs will continue to be listed and traded on the NYSE, provided that the Company continues to meet the NYSE's listing requirements, and the Company will remain subject to SEC reporting obligations. Therefore, the Company's shareholders and ADS holders will continue to be subject to similar risks and opportunities as they currently are with respect to their ownership of the Shares or ADSs. Accordingly, if the Merger is not consummated, we cannot assure you as to the effect of these risks and opportunities on the future value of the Shares or ADSs, including the risk that the market price of the ADSs may decline to the extent that the current market price reflects a market assumption that the Merger will be consummated.

Under specified circumstances, the Company may be required to pay Parent or its designees a termination fee of approximately RMB1.44 billion (which amount is reduced to RMB641 million if such circumstances are in connection with an Acquisition or Parent may be required to pay a designee of the Company a termination fee of approximately RMB2.88 billion, in each case as described in the section entitled "The Merger Agreement—Termination Fee" beginning on page 107.

If the Merger is not consummated, the Board will, from time to time, evaluate and review, among other things, the business, operations, dividend policy and capitalization of the Company and make such changes as are deemed appropriate, and continue to seek to identify strategic alternatives to enhance shareholder value. If the Merger Agreement is not approved by the shareholders or if the Merger is not consummated for any other reason, we cannot assure you that any other transaction acceptable to the Company will be offered, or that the business, prospects or results of operations of the Company will not be adversely impacted.

**Financing of the Merger**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the Merger and the related transactions, including payment of fees and expenses in connection with the Merger, is anticipated to be approximately $[9.4] billion, assuming no exercise of Dissenter Rights by shareholders of the Company. In calculating this amount, the Company and the Buyer Group did not consider the value of the Founder Shares or Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options or by any direct or indirect wholly owned Subsidiary of any Parent Party or the Company, which will be cancelled for no consideration.

The Buyer Group expects to provide this amount through a combination of (a) cash contributions from the Equity Investors as defined in and pursuant to the Equity Commitment Letters, and (b) the proceeds from a committed term loan facility in an amount up to the RMB equivalent of $3.0 billion and a bridge loan facility of up to the RMB equivalent of $400 million, pursuant to certain debt commitment letters dated December 18, 2015 provided by China Merchants Bank Co., Ltd.

67

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements in this proxy statement, the documents attached hereto and the documents incorporated by reference in this proxy statement are forward-looking statements based on estimates and assumptions. These include statements as to such things as our financial condition, results of operations, plans, objectives, future performance and business, as well as forward-looking statements relating to the Merger. Such forward-looking statements are based on facts and conditions as they exist at the time such statements are made. Forward-looking statements are also based on current expectations, estimates and projections about our business and the Merger, the accurate prediction of which may be difficult and involve the assessment of events beyond our control. The forward-looking statements are further based on assumptions made by management. Forward-looking statements can be identified by forward-looking language, including words such as "believes," "anticipates," "expects," "estimates," "intends," "may," "plans," "predicts," "projects," "will," "would" and similar expressions, or the negative of these words. These statements are not guarantees of the underlying expectations or future performance and involve risks and uncertainties that are difficult to predict. Readers of this proxy statement are cautioned to consider these risks and uncertainties and not to place undue reliance on any forward-looking statements.

The following factors, among others, could cause actual results or matters related to the Merger to differ materially from what is expressed or forecasted in the forward-looking statements:

- the satisfaction of the conditions to the consummation of the Merger, including the authorization and approval of the Merger Agreement by the Company's shareholders;

- the occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement;

- the cash position of the Company and its subsidiaries at the Effective Time;

- debt or equity financing may not be funded at the Effective Time because of the failure of the Parent Parties to meet the closing conditions or for other reasons, which may result in the Merger not being consummated promptly or at all;

- the effect of the announcement or pendency of the Merger on our business relationships, results of operations and business generally;

- the risk that the Merger may not be consummated in a timely manner or at all, which may adversely affect our business and the prices of our Shares and ADSs;

- the potential adverse effect on our business, properties and operations because of certain covenants we agreed to in the Merger Agreement;

- diversion of our management's attention from our ongoing business operations;

- loss of our senior management;

- the amount of the costs, fees, expenses and charges related to the Merger and the actual terms of the financings that will be obtained for the Merger;

- our failure to comply with regulations and changes in regulations;

- the outcome of any legal proceedings, regulatory proceedings or enforcement matters that may be instituted against us and others relating to the Merger; and

- other risks detailed in our filings with the SEC, including the information set forth under the section entitled "Item 3. Key Information—D. Risk Factors" in our annual report on Form 20-F for the year ended December 31, 2014. See "Where You Can Find More Information" beginning on page 125 for additional information.

123

https://www.sec.gov/Archives/edgar/data/1508913/000114420416074992/v428644_ex99-a1.htm

Furthermore, the forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, collaborations, dividends or investments made by the parties. We believe that the assumptions on which our forward-looking statements are based are reasonable. However, forward-looking statements involve inherent risks, uncertainties and assumptions. In addition, many of the factors that will determine our future results are, however, beyond our ability to control or predict and we cannot guarantee any future results, levels of activity, performance or achievements. We cannot assure you that the actual results or developments we anticipate will be realized or, if realized, that they will have the expected effects on our business or operations. In light of the significant uncertainties inherent in the forward-looking statements, readers should not place undue reliance on forward-looking statements, which speak only as of the date on which the statements were made and it should not be assumed that the statements remain accurate as of any future date. All subsequent written and oral forward-looking statements concerning the Merger or other matters addressed in this proxy statement and attributable to us or any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Further, forward-looking statements speak only as of the date they are made and, except as required by applicable law or regulation, we undertake no obligation to update these forward-looking statements to reflect future events or circumstances.

124