# EXHIBIT 6

EX-99.(A)(1) 2 v433094_ex99-a1.htm EXHIBIT (A)-(1)

**EXHIBIT (a)-(1)**



March 3, 2016

Shareholders of Qihoo 360 Technology Co. Ltd.
Re: Notice of Extraordinary General Meeting of Shareholders

Dear Shareholder:

You are cordially invited to attend an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (the "Company") to be held on March 30, 2016 at 10:00 a.m. (Beijing time). The meeting will be held at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The accompanying notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

On December 18, 2015, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger") and becoming a wholly owned subsidiary of Midco. Upon the completion of the Merger, the Surviving Company will become a private company beneficially owned solely by the Buyer Group (as defined below), while Hongyi Zhou, the chairman of the board of directors and chief executive officer of the Company, and Xiangdong Qi, a director and the president of the Company, will own 22.8% and 2.2%, respectively, of the Surviving Company. The purpose of the extraordinary general meeting is for you and the other shareholders of the Company to consider and vote upon a proposal to authorize and approve the Merger Agreement and the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger (the "Plan of Merger"), and the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger. Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to the accompanying proxy statement.

The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group." As of the date of this letter, the Buyer Group collectively beneficially own 7,164,611 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represent approximately 26.8% in number and approximately 61.3% in voting rights of the Company's issued and outstanding ordinary shares, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share") and excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options. If the Merger is consummated, the Company will continue its operations as a privately held company, and, as the result of the Merger, the Company's American depositary shares ("ADSs"), two representing three Class A ordinary shares of the Company, will no longer be listed on the New York Stock Exchange (the "NYSE") and the ADS program for the Shares will terminate.

If the Merger is consummated, at the effective time of the Merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) due to or incurred by the ADS Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) and ADS Depositary services fees). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) will not be converted into the right to receive the consideration described in the immediately preceding sentence, but will be cancelled and cease to exist at the Effective Time:

The Buyer Group did not consider the Company's net book value, which is an accounting concept based on historical costs, as a factor because it believed that net book value is not a material indicator of the Company's value as a going concern but rather is indicative of historical costs. The Buyer Group notes, however, that the Per Share Merger Consideration of $51.33 is higher than the Company's net book value per Share as of June 30, 2015, which was $6.44 based on 189,757,657 issued and outstanding Shares as of that date.

In its consideration of the fairness of the Merger, the Buyer Group did not undertake an appraisal of the assets of the Company to determine the Company's liquidation value for the Unaffiliated Holders due to the impracticability of determining a liquidation value given the significant execution risk involved in any breakup. In addition, the Buyer Group did not consider the Company's liquidation value to be a relevant valuation method because they consider the Company to be a viable going concern where value is derived from cash flows generated from its continuing operations, and because the Company will continue to operate its business following the Merger. Moreover, the Buyer Group believes that the value of the Company's assets that might be realized in a liquidation would be significantly less than its going-concern value.

The Buyer Group did not seek to establish a pre-Merger going concern value for the Company's Shares and ADSs to determine the fairness of the Merger Consideration to the Unaffiliated Holders because following the Merger the Company will have a significantly different capital structure. However, to the extent the pre-Merger going concern value was reflected in the pre-announcement price of the ADSs, the Merger Consideration represented a premium to the going concern value of the Company.

The Buyer Group was not aware of, and thus did not consider in their fairness determination, any offers or proposals made by any unaffiliated third parties with respect to (a) a merger or consolidation of the Company with or into another company, (b) a sale of all or a substantial part of the Company's assets or (c) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company. Except as otherwise disclosed in this proxy statement, the members of the Buyer Group did not make any purchases of securities of the Company during the past two years, and so did not consider any such purchases in their fairness determination.

The Buyer Group did not adopt the financial analyses and opinion of J.P. Morgan as its own in reaching its determination as to the fairness of the Merger and other transactions contemplated by the Merger Agreement, the Plan of Merger and the other transaction documents because, while the Buyer Group noted J.P. Morgan's opinion and considered it as a supporting factor in its determination regarding the fairness of the Merger in light of (among other things) J.P. Morgan's general reputation and experience, the Buyer Group did not engage J.P. Morgan, evaluate its credentials or investigate or evaluate the basis, process and quality of J.P. Morgan's financial analysis and opinion, and as a result the Buyer Group believes it is not in a position to formally adopt J.P. Morgan's financial analyses and opinion.

The foregoing discussion of the information and factors considered and given weight by the Buyer Group in connection with its evaluation of the substantive and procedural fairness of the Merger to the Unaffiliated Holders is not intended to be exhaustive, but is believed to include all material factors considered. The Buyer Group found it impracticable to assign, and did not assign, relative weights to the foregoing factors considered in reaching its conclusions as to the substantive and procedural fairness of the Merger to the Unaffiliated Holders. Rather, the Buyer Group made the fairness determinations after considering all of the foregoing factors as a whole.

The Buyer Group believes these factors provide a reasonable basis for its belief that the Merger is both substantively and procedurally fair to the Unaffiliated Holders. This belief, however, is not intended to be and should not be construed as a recommendation by the Buyer Group to any shareholder or ADS holder of the Company to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Buyer Group does not make any recommendation as to how such shareholders or ADS holders should vote relating to the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, at the extraordinary general meeting.

**Certain Financial Projections**

The Company does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of the Company has prepared the prospective financial information set forth below for the fiscal year ended December 31, 2015 through the fiscal year ending December 31, 2025 for internal use, which was approved by the Special Committee for use by the Special Committee's financial advisor in connection with their financial analyses related to the Merger and opinion provided to the Special Committee. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Company's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this document are cautioned not to place undue reliance on the prospective financial information.

51

The financial projections are not a guarantee of performance. In compiling the projections, the Company's management took into account historical performance, combined with estimates regarding revenues, gross profit, EBIT, EBITDA, net income and capital expenditure. Although the projections are presented with numerical specificity, they were based on numerous assumptions and estimates as to future events made by the Company's management that the management believed were reasonable at the time the projections were prepared. This information is not, however, fact and should not be relied upon as being necessarily indicative of actual future results. In addition, factors such as industry performance, the market for the Company's existing and new products, the competitive environment, expectations regarding future acquisitions or any other transaction and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of the management, may cause actual future results to differ materially from the results forecasted in these financial projections. In addition, the projections do not take into account any circumstances or events occurring after the date that they were prepared. For instance, the projections do not give effect to the Merger or any changes to the Company's operations or strategy that may be implemented after the time the projections were prepared. We cannot assure you that the projections will be realized or that actual results will not be significantly different from those contained in the projections.

Neither the Company's independent auditors, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information. The Company's independent auditor's report accompanying the Company's audited consolidated financial statements included in the Company's annual report on Form 20-F for the year ended December 31, 2014 incorporated by reference in this proxy statement refers exclusively to the Company's historical financial statements and does not cover any other information in this proxy statement and should not be read to do so. The financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the Special Committee's financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal for his, her or its Shares pursuant to Section 238 of the Cayman Islands Companies Law.

The following table sets forth the financial projections prepared by the Company's management and considered by the Special Committee and its financial advisor in connection with their analysis of the Merger:

| | Management Projections Fiscal Year Ended December 31, | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
| | ($ in millions, non-GAAP*) | | | | | | | | | | |
| **Total revenue** | 1,806 | 3,630 | 4,819 | 6,255 | 7,657 | 8,948 | 9,646 | 10,143 | 10,543 | 10,890 | 11,221 |
| Growth % | 29.9% | 101.0% | 32.7% | 29.8% | 22.4% | 16.9% | 7.8% | 5.2% | 3.9% | 3.3% | 3.0% |
| Traditional business[1] | 1,658 | 2,002 | 2,417 | 2,898 | 3,360 | 3,851 | 4,088 | 4,234 | 4,361 | 4,473 | 4,593 |
| *As % of total revenue* | *91.8%* | *55.1%* | *50.1%* | *46.3%* | *43.9%* | *43.0%* | *42.4%* | *41.7%* | *41.4%* | *41.1%* | *40.9%* |
| Emerging business[2] | 148 | 1,628 | 2,403 | 3,357 | 4,297 | 5,097 | 5,559 | 5,909 | 6,182 | 6,417 | 6,627 |
| *As % of total revenue* | *8.2%* | *44.9%* | *49.9%* | *53.7%* | *56.1%* | *57.0%* | *57.6%* | *58.3%* | *58.6%* | *58.9%* | *59.1%* |
| **Gross profit** | 1,437 | 2,089 | 2,726 | 3,587 | 4,357 | 5,056 | 5,422 | 5,671 | 5,876 | 6,055 | 6,231 |
| *Margin %* | *79.6%* | *57.5%* | *56.6%* | *57.3%* | *56.9%* | *56.5%* | *56.2%* | *55.9%* | *55.7%* | *55.6%* | *55.5%* |
| Traditional business[1] | 1,386 | 1,666 | 2,006 | 2,406 | 2,789 | 3,196 | 3,393 | 3,514 | 3,619 | 3,713 | 3,812 |
| *Margin %* | *83.6%* | *83.2%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* |
| Emerging business[2] | 51 | 423 | 721 | 1,182 | 1,568 | 1,860 | 2,029 | 2,157 | 2,256 | 2,342 | 2,419 |
| *Margin %* | *34.5%* | *26.0%* | *30.0%* | *35.2%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* |
| Selling and marketing expenses | (387) | (575) | (687) | (844) | (1,012) | (1,168) | (1,248) | (1,306) | (1,353) | (1,395) | (1,436) |
| *As % of revenue* | *(21.4)%* | *(15.8)%* | *(14.3)%* | *(13.5)%* | *(13.2)%* | *(13.1)%* | *(12.9)%* | *(12.9)%* | *(12.8)%* | *(12.8)%* | *(12.8)%* |
| General and administrative expenses | (98) | (200) | (255) | (305) | (371) | (433) | (457) | (480) | (499) | (515) | (530) |
| *As % of revenue* | *(5.4)%* | *(5.5)%* | *(5.3)%* | *(4.9)%* | *(4.9)%* | *(4.8)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* |
| Product development costs | (523) | (798) | (945) | (1,189) | (1,437) | (1,663) | (1,786) | (1,871) | (1,940) | (2,001) | (2,060) |
| *As % of revenue* | *(28.9)%* | *(22.0)%* | *(19.6)%* | *(19.0)%* | *(18.8)%* | *(18.6)%* | *(18.5)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* |
| Subsidy income | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **EBIT** | 440 | 527 | 848 | 1,260 | 1,546 | 1,802 | 1,941 | 2,024 | 2,093 | 2,154 | 2,215 |
| *Margin %* | *24.4%* | *14.5%* | *17.6%* | *20.1%* | *20.2%* | *20.1%* | *20.1%* | *20.0%* | *19.9%* | *19.8%* | *19.7%* |
| **EBITDA** | 544 | 667 | 1,046 | 1,680 | 1,996 | 2,282 | 2,433 | 2,528 | 2,609 | 2,682 | 2,755 |
| *Margin %* | *30.1%* | *18.4%* | *21.7%* | *26.9%* | *26.1%* | *25.5%* | *25.2%* | *24.9%* | *24.8%* | *24.6%* | *24.6%* |
| **Net income** | 414 | 490 | 758 | 1,100 | 1,346 | 1,573 | 1,702 | 1,792 | 1,878 | 1,958 | 2,040 |
| *Margin %* | *22.9%* | *13.5%* | *15.7%* | *17.6%* | *17.6%* | *17.6%* | *17.6%* | *17.7%* | *17.8%* | *18.0%* | *18.2%* |
| Capital expenditure | 200 | 500 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| *As % of revenue* | *11.1%* | *13.8%* | *12.5%* | *9.6%* | *7.8%* | *6.7%* | *6.2%* | *5.9%* | *5.7%* | *5.5%* | *5.3%* |

52

\* Non-GAAP financial measure is adjusted from results based on U.S. GAAP to exclude share-based compensation expenses and interest expense of the Company Convertible Notes.

(1) Traditional business mainly includes online advertising and internet value-added services.

(2) Emerging business includes enterprise security business, smartphone and other hardware and hardware-enabled value-added services, and international business.

In preparing these projections, the Company's management necessarily made certain assumptions about future financial factors affecting the Company's business, including, primarily, that (i) users of personal computers, smart phones and broadband internet services and their penetration in China and elsewhere would continue in line with management's expectations, (ii) the Company would be able to successfully expand its product offering by developing and launching new PC and mobile products, (iii) the popularity of the Company's products would remain stable in the geographic markets in which the Company operated, (iv) the Company would be able to successfully implement its business plan to compete effectively in both its traditional business and emerging business, (v) the market for smartphone and IoT (internet of things) devices would develop in line with management's expectations, (vi) the Company's emerging business would develop successfully, driven by both further hardware penetration and increasing monetization from smartphone and IoT devices, and (vii) material costs and expenses would increase in connection with the Company's revenue increase. The Company's management also assumed that the overall economy in China will remain stable, and that there will be no material change in competition affecting the Company.

J.P. Morgan, as the Special Committee's financial advisor, reviewed with the Special Committee certain financial analyses that were based, in part, on the financial projections above. For additional information regarding the analyses by the Special Committee's financial advisor, see "Discussion Materials prepared by J.P. Morgan Securities (Asia Pacific) Limited for discussion with the special committee of the board of directors of the Company, December 18, 2015" filed as Exhibit (c)-(2) to the Company's transaction statement on Schedule 13E-3 and "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53.

**NONE OF THE COMPANY OR ITS AFFILIATES, ADVISORS, OFFICERS, DIRECTORS OR REPRESENTATIVES HAS MADE OR MAKES ANY REPRESENTATION TO ANY SHAREHOLDER OR OTHER PERSON REGARDING THE ULTIMATE PERFORMANCE OF THE COMPANY COMPARED TO THE INFORMATION CONTAINED IN THE PROJECTIONS OR THAT PROJECTED RESULTS WILL BE ACHIEVED.**

**BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, THE COMPANY UNDERTAKES NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAW.**

The financial projections are forward-looking statements. For information on factors that may cause the Company's future financial results to materially vary, see "Cautionary Note Regarding Forward-Looking Statements" beginning on page 125 and "Item 3. Key Information—D. Risk Factors" included in the Company's annual report on Form 20-F for the fiscal year ended December 31, 2014, incorporated by reference into this proxy statement.

**Opinion of the Special Committee's Financial Advisor**

Pursuant to an engagement letter dated July 6, 2015, the Special Committee retained J.P. Morgan as its financial advisor to deliver a fairness opinion in connection with the Merger. J.P. Morgan is an internationally recognized financial services firm that, among other things, is regularly engaged in the investment banking business, including the valuation of businesses and securities in connection with mergers and acquisitions, underwritings and private placements of securities, and other investment banking services.

53

**Plans for the Company after the Merger**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets. However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange, as well as any actions to address the challenges referred to in "Special Factors—Purposes of and Reasons for the Merger" above, in each case, which they consider to be in the best interests of the Surviving Company and its shareholders. The Buyer Group expressly reserves the right to make any changes they deem appropriate to the operation of the Surviving Company in light of such evaluation and review as well as any future developments.

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Alternatives to the Merger**

The Board did not independently determine to initiate a process for the sale of the Company. The Special Committee was formed on June 19, 2015 in response to the receipt of the proposal letter from the Buyer Group on June 17, 2015. In light of (i) the Buyer Group's beneficial ownership of approximately 26.8% in number and 61.3% in voting rights of the entire issued and outstanding Shares excluding treasury shares, which consisted of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options (as of the date of this proxy statement) and (ii) the fact that, since the announcement of the proposed transaction and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company, the Special Committee determined that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group.

The Special Committee also took into account that, subject to compliance with the terms and conditions of the Merger Agreement, (i) the Company has the ability to actively solicit bids from any third party for a period of 45 days after the signing of the Merger Agreement, (ii) prior to the receipt of the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) is permitted to effect a Company Adverse Recommendation Change (as defined in the section entitled "The Merger Agreement—No Company Adverse Recommendation Change") with respect to an alternative acquisition proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal, and (iii) prior to the receipt of the Company Shareholder Approval, can terminate the Merger Agreement in order to enter into an agreement in connection with an alternative transaction proposed by a third party that is a Superior Proposal, subject to the payment of a termination fee of approximately RMB1.44 billion, which amount is reduced to RMB641 million if the Merger Agreement is terminated by the Company in connection with an Acquisition Proposal received by the Company during the Go-Shop Period, in each case as provided in the Merger Agreement. In this regard, the Special Committee recognized that it has flexibility under the Merger Agreement to respond to an alternative transaction proposed by a third party that is or is reasonably likely to result in a Superior Proposal, including the ability to provide information to and engage in discussions and negotiations with such party (and, if such proposal is a Superior Proposal, recommend such proposal to the Company's shareholders).

In addition, the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market.

68