# EXHIBIT A

EX-99.(A)(1) 2 v428644_ex99-a1.htm EXHIBIT 99.(A)(1)

PRELIMINARY PROXY STATEMENT OF THE COMPANY

**EXHIBIT (a)-(1)**



_____, 2016

Shareholders of Qihoo 360 Technology Co. Ltd.
Re: Notice of Extraordinary General Meeting of Shareholders

Dear Shareholder:

You are cordially invited to attend an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (the "Company") to be held on _____, 2016 at _____ a.m. (Beijing time). The meeting will be held at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The accompanying notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

On December 18, 2015, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger") and becoming a wholly owned subsidiary of Midco. The purpose of the extraordinary general meeting is for you and the other shareholders of the Company to consider and vote upon a proposal to authorize and approve the Merger Agreement and the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger (the "Plan of Merger"), and the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger. Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to the accompanying proxy statement.

The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group." As of the date of this letter, the Buyer Group collectively beneficially own [6,414,611] Class A ordinary shares and [42,013,812] Class B ordinary shares, which represent approximately [26.7]% in number and approximately [61.6]% in voting rights of the Company's issued and outstanding ordinary shares, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share") and excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options. If the Merger is consummated, the Company will continue its operations as a privately held company, and, as the result of the Merger, the Company's American depositary shares ("ADSs"), two representing three Class A ordinary shares of the Company, will no longer be listed on the New York Stock Exchange (the "NYSE") and the ADS program for the Shares will terminate.

If the Merger is consummated, at the effective time of the Merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) due to or incurred by the Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) will not be converted into the right to receive the consideration described in the immediately preceding sentence, but will be cancelled and cease to exist at the Effective Time:

- the Special Committee held 12 telephonic meetings to consider and review the terms of the Merger Agreement and the proposed transaction;

- the recognition by the Special Committee and the Board that the Special Committee had no obligation to recommend the Merger or any other transaction;

- the recognition by the Special Committee and the Board that, under the terms of the Merger Agreement, the Company has the ability to actively solicit bids and negotiate with other bidders for a period of 45 days after the signing of the Merger Agreement;

- the recognition by the Special Committee and the Board that, under the terms of the Merger Agreement, the Company has the ability to consider any Acquisition Proposal if the Board (or the Special Committee) determines in good faith that such Acquisition Proposal constitutes a Superior Proposal or is reasonably likely to result in a Superior Proposal (as defined in the section entitled "The Merger Agreement—Acquisition Proposals" beginning on page 99) until the Company's shareholders vote upon and authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger;

- the Company's ability, subject to compliance with the terms and conditions of the Merger Agreement, to terminate the Merger Agreement prior to the receipt of the Company Shareholder Approval in order to accept an alternative transaction proposed by a third party that the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal (as defined in the section entitled "Merger Agreement—Acquisition Proposals" beginning on page 99);

- the Board and the Special Committee's ability, under certain circumstances, to change, withhold, withdraw, qualify or modify the Company Recommendation (as defined in the section entitled "Merger Agreement—No Company Adverse Recommendation Change" beginning on page 101) that the Company's shareholders vote to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger; and

- the availability of Dissenter Rights to the Unaffiliated Holders who comply with all of the required procedures under the Cayman Islands Companies Law for exercising Dissenter Rights, which allow such shareholders to receive payment of the fair value of their Shares as determined by the Grand Court of the Cayman Islands.

The Special Committee and the Board also considered a variety of potentially negative factors concerning the Merger Agreement and the Merger, including the following, which are not listed in any relative order of importance:

- approval of the Merger Agreement is not subject to any additional approval by the Unaffiliated Holders and, given that the Buyer Group has approximately [61]% of the voting rights of the issued and outstanding Shares, the Buyer Group has the ability to authorize and approve the Merger Agreement at the extraordinary general meeting unless a substantial majority (or possibly all, depending on the number of Shares voted at the meeting) of the Unaffiliated Holders vote against the proposal to authorize and approve the Merger Agreement;

- the Unaffiliated Holders will have no on-going equity participation in the Company following the Merger, and they will cease to participate in the Company's future earnings or growth, if any, or to benefit from increases, if any, in the value of Shares and ADSs, and will not participate in any potential future sale of the Company to a third party or any potential recapitalization of the Company, which could include a dividend to shareholders;

44

- the restrictions on the conduct of the Company's business prior to the consummation of the Merger, which may delay or prevent the Company from undertaking business opportunities that may arise or any other action it would otherwise take with respect to the operations of the Company pending the consummation of the Merger;

- since the Company became publicly listed on the NYSE in March 2011, the highest historical closing price of ADSs (US$121.53 per ADS on March 6, 2014) exceeds the Per ADS Merger Consideration;

- the risks and costs to the Company if the Merger does not consummate, including the diversion of management and employee attention, potential employee attrition and the potential disruptive effect on the Company's business and customer relationships, as well as the negative impact of a public announcement on the Company's business and operating results and the Company's ability to attract and retain key management and other personnel;

- the Company may be required, under certain circumstances, to pay Parent a termination fee of RMB1.44 billion (US$225 million) in connection with a termination of the Merger Agreement;

- the Company's remedy in the event of a breach of the Merger Agreement by the Parent Parties is limited, under certain circumstances, to receipt of a reverse termination fee of RMB2.88 billion (US$450 million), and under certain circumstances the Company may be entitled to a reduced reverse termination fee or no reverse termination fee at all;

- the terms of the Buyer Group's participation in the Merger and the fact that Mr. Hongyi Zhou, the chairman of the Board and chief executive officer of the Company, and Mr. Xiangdong Qi, a director and the president of the Company have interests in the Merger that are different from, or in addition to, those of the Unaffiliated Holders (see "Special Factors—Interests of Certain Persons in the Merger" beginning on page 72 for additional information);

- the possibility that the Merger might not be consummated, considering (i) the large number of Equity Investors that will provide equity financing to the Buyer Group, (ii) the increased risks associated with the PRC regulatory approvals or filings required in connection with the Buyer Group's potential debt and equity financing in Renminbi from PRC onshore sources and the subsequent exchange of Renminbi into U.S. dollars for the proposed transaction offshore, (iii) the possibility that the Buyer Group fails to find alternative debt financing if the debt financing source does not provide the financing pursuant to the Debt Commitment Letters, or (iv) the possibility that the Buyer Group fails to find alternative equity financing source to make up the shortfall if any one or more of the 36 Equity Investors fail to meet their commitment to provide the equity financing; and

- the taxability of an all-cash transaction to the Unaffiliated Holders who are U.S. Holders (as defined under "Special Factors—Material U.S. Federal Income tax Consequences") for U.S. federal income tax purposes, and the likely taxability of such a transaction to the Unaffiliated Holders in other jurisdictions.

The foregoing discussion of information and factors considered by the Special Committee and the Board is not intended to be exhaustive, but includes a number of the factors considered by the Special Committee and the Board. In view of the wide variety of factors considered by the Special Committee and the Board, neither the Special Committee nor the Board found it practicable to quantify or otherwise assign relative weights to the foregoing factors in reaching its conclusions. In addition, individual members of the Special Committee and the Board may have given different weights to different factors and may have viewed some factors more positively or negatively than others. The Special Committee recommended that the Board authorize and approve, and the Board authorized and approved, the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, based upon the totality of the information presented to and considered by it.

45

**Directors and Management of the Surviving Company**

If the Merger is consummated, the Surviving Company will adopt new memorandum and articles of association in the form attached as Appendix II to the Plan of Merger, which are substantively identical to the memorandum and articles of association of the Merger Sub, as in effect prior to the consummation of the Merger, except that all references to the name of the Surviving Company will be to "Qihoo 360 Technology Co. Ltd." and all references to the authorized share capital of the Surviving Company will be amended as necessary to correctly describe the authorized share capital of the Surviving Company as approved in the Plan of Merger). In addition, the directors of Merger Sub immediately prior to the consummation of the Merger (identified below in "Annex E—Directors and Executive Officers of Each Filing Person") will become the directors of the Surviving Company and the officers of the Company will remain the officers of the Surviving Company, unless otherwise determined by Parent prior to the Effective Time.

**Primary Benefits and Detriments of the Merger**

The primary benefits of the Merger to the Unaffiliated Holders include the following:

- The receipt by the Unaffiliated Holders of the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 in cash, representing a premium of 16.6 % to the Company's closing price of $66.05 per ADS as quoted by the NYSE on June 16, 2015, the last full trading day prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal.

- The avoidance of the risk associated with any possible decrease in the Company's future revenues and free cash flow, growth or value following the Merger.

The primary detriments of the Merger to the Unaffiliated Holders include the following:

- Such shareholders and ADS holders will cease to have an interest in the Company and, therefore, will no longer benefit from possible increases in the future revenues and free cash flow, growth or value of the Company or payment of dividends on the Company's ordinary shares, if any.

- In general, the receipt of cash pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. See "Special Factors —Material U.S. Federal Income Tax Consequences" beginning on page 77."

- Since the Company became publicly listed in March 2011, the highest historical closing price of its ADSs ($121.53 per ADS) exceeds the Per ADS Merger Consideration.

The primary benefits of the Merger to the Buyer Group include the following:

- If the Company successfully executes its business strategies, the value of the Buyer Group's equity investment could increase because of possible increases in future revenues and free cash flow, possible increases in the underlying value of the Company or the possible payment of dividends that will accrue to Parent.

- The Surviving Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from investment analysts to make decisions that may produce better short-term results, but may not maximize equity value in the long term.

- The Surviving Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation.

- The Surviving Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations.

- The Surviving Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts.