UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALTIMEO ASSET MANAGEMENT and ODS
CAPITAL LLC, *individually and on behalf of all others
similarly situated*,

                                        Plaintiff,

                    -v-

QIHOO 360 TECHNOLOGY CO. LTD., HONGYI
ZHOU, XIANGDONG QI, and ERIC X. CHEN,

                                        Defendants.

19 Civ. 10067 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In this putative class action under the federal securities laws, lead plaintiffs Altimeo

Asset Management ("Altimeo") and ODS Capital LLC ("ODS") (collectively, "plaintiffs") claim

that internet company Qihoo 360 Technology Co. Ltd. ("Qihoo"), its Co-Founder and CEO

Hongyi Zhou ("Zhou"), Co-Founder and President Xiangdong Qi ("Qi"), and Director and

Special Committee Chair Eric Chen ("Chen") (together, "Qihoo" or "defendants") devised and

executed a scheme to depress the price of Qihoo American depository shares ("ADS") and stock

(together, "Qihoo Securities") in order to avoid paying a fair price to Qihoo Securityholders

during a transaction to take the company private in 2016 (the "Merger"). Specifically, plaintiffs

allege that at the time the Merger was announced, defendants already planned to relist Qihoo on

a Chinese stock exchange but deliberately withheld this information from Qihoo Securityholders.

Based on this allegation, plaintiffs allege several false and misleading statements made by Qihoo

in connection with the Merger between December 18, 2015, the day the Merger was announced

via press release, and July 15, 2016, the effective date of the Merger (the "Class Period").

Plaintiffs seek to bring this suit on behalf of all owners and former owners of Qihoo Securities who sold shares, and were damaged thereby, during the Class Period, and all owners and former owners who owned shares as of the effective date of the Merger and have tendered those shares for the Merger consideration.[1]  They allege violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding rule of the Securities and Exchange Commission ("SEC" or "Commission"), 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

Pending now is Qihoo's motion to dismiss Plaintiffs' First Amended Complaint, Dkt. 53 ("FAC"), for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the Court grants the motion and dismisses the FAC in its entirety.

---

[1] Excluded from the Class are: (1) defendants; (2) members of the immediate family of individual defendants and the directors and officers of Qihoo; (3) any entity in which defendants have a controlling interest; (4) any person who was an officer or director of Qihoo during the Class Period; (5) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person previously described.  Dkt. 53 ("FAC") ¶ 300.

## I.     Background[2]

### A.   The Parties

Lead Plaintiffs are Altimeo, an independent portfolio management company based in

France and approved by the French Financial Authority, FAC ¶ 18, and ODS, a Florida limited

liability company, *id.* ¶ 20.  Both entities owned Qihoo Securities, including ADS purchased on

the New York Stock Exchange ("NYSE"), during the putative class period and represent a class

of similarly situated investors.  *Id.* ¶¶ 19–20.  Altimeo purchased 140,261 Qihoo Securities

during the class period and sold 79,613 Qihoo Securities during that time.  *Id.* ¶ 19.  It retained

61,500 Qihoo Securities, including some acquired prior to the start of the class period, through

the Merger; those securities have now been paid in exchange for the Merger consideration.  *Id.*

ODS purchased 86,300 ADS during the class period and sold at least 11,800 ADS during that

time.  *Id.* ¶ 20.  It retained 74,500 ADS through the Merger; those securities have now been paid

in exchange for the Merger consideration.  *Id.*

---

[2] These facts are drawn primarily from the FAC.  Dkt. 53.  For the purpose of resolving the
motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable
inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145
(2d Cir. 2012).  The Court has also considered the documents attached to the declaration of Brian
C. Raphel, Esq. in support of Qihoo's motion to dismiss, Dkt. 79 ("Raphel Decl."), and the
document attached to the declaration of Michael Grunfeld, Esq. in opposition to the motion to
dismiss, Dkt. 81-1 ("Grunfeld Decl.").  Because these documents were incorporated into the
FAC by reference, or are matters of public record, they are properly considered on a motion to
dismiss.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179
(2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any
statements or documents incorporated in it by reference, as well as public disclosure documents
required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs
either possessed or knew about and upon which they relied in bringing the suit" (citation
omitted)).  The Court has considered these documents "not for the truth of the matters asserted
therein," but only "for the fact that the statements were made."  *Clark v. Kitt*, No. 12 Civ. 8061
(CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see Staehr v. Hartford Fin. Servs.
Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press
coverage, prior lawsuits, or regulatory filings contained certain information, without regard to
the truth of their contents . . . ." (emphasis omitted)).

Defendant Qihoo is a Cayman Islands corporation headquartered in Beijing. *Id.* ¶ 21. Qihoo offers a variety of internet and cloud-based products—including internet and mobile security tools, an internet browser, a search engine, and a mobile app store—to hundreds of millions of customers. *Id.* ¶¶ 34–36. Qihoo's "core business at the time of the Merger was its internet security business." *Id.* ¶ 38. Before the Merger, Qihoo registered ADS were listed and traded on the NYSE under the ticker symbol "QIHU." *Id.* ¶ 21. Each ADS was redeemable for 1.5 of Qihoo's Class A ordinary shares. *Id.* Qihoo's common stock was not registered on the SEC or publicly traded prior to the Merger. *Id.*

The individual defendants are Zhou, Qi, and Chen. *Id.* ¶¶ 22–24.

Zhou is Qihoo's Co-Founder and served as Chairman and CEO during the putative class period. *Id.* ¶ 22. He also owned shares in some of the equity investors that participated in taking the company private. *Id.* ¶¶ 29–30. Before the Merger, Zhou owned 17.3% of Qihoo. *Id.* ¶ 62. According to the Final Proxy Statement, he personally owned 22.8% of the Company post-Merger. *Id.* ¶ 64.

Qi is Qihoo's Co-Founder and served as President and Director during the putative class period. *Id.* ¶ 23. Like Zhou, he also owned shares in some of the entities that participated in taking the company private. *Id.* ¶¶ 29–30. Before the Merger, Qi owned 8.1% of Qihoo. *Id.* ¶ 62. According to the Final Proxy Statement, he personally owned 2.2% of the Company post-Merger, as well as an additional 11.5% via Tianjin Xinxinsheng Investment Limited Partnership ("Xinxinsheng"), in which he was the general partner. *Id.* ¶ 64.

Chen served as a Qihoo Director from 2014 through the Merger, and acted as Chairman of the Special Committee of independent directors that the Company appointed to evaluate the Merger. *Id.* ¶¶ 24, 26.

###### B. Qihoo's Merger

###### 1. Origins of the Merger

In early May 2015, Zhou discussed the possibility of an acquisition of Qihoo with Golden Brick Capital Private Equity Fund and China Renaissance Holdings Limited. *Id.* ¶ 41. Later that month, he shared the idea of such a transaction with Qi, as well as representatives of CITIC Securities Co. Ltd. and Sequoia Capital China, whose founding managing partner is a Qihoo Director. *Id.* These discussions sparked the transaction at the center of this dispute. *Id.* On June 17, 2015, the four investment companies and Zhou (collectively, the "Buyer Group") approached Qihoo's Board with a preliminary non-binding proposal to acquire all of Qihoo's outstanding shares for $77.00 in cash per ADS and $51.33 in cash per Class A or Class B ordinary share. *Id.* ¶ 42.

Two days later, on June 19, Qihoo's Board formed a Special Committee to evaluate the transaction, and appointed Defendant Chen as Chairman. *Id.* ¶ 44. The Special Committee was charged with, *inter alia*, evaluating the terms of the Buyer Group's proposal, negotiating with the Buyer Group or their representatives, exploring strategic alternatives, negotiating definitive agreements, and reporting to the Board recommendations and conclusions as to the fairness of the transaction to Qihoo's stakeholders. *Id.* The Special Committee retained J.P. Morgan Securities to act as financial advisor in connection with its review of the Merger proposal, *id.* ¶ 45, and on December 16, 2015, J.P. Morgan gave the Special Committee its opinion that the Buyer Group's preliminary offer ($77.00 per ADS and $51.33 per share Merger consideration) was fair to Qihoo Securityholders, *id.* ¶ 48. The valuation range and pricing conclusions in the fairness opinion were based on a set of management projections provided to J.P. Morgan by Alex

Xu, Qihoo's Co-CFO. [3]  *Id.* ¶ 47.  The Special Committee and the Board approved the Merger

the same day, *id.* 49, and on December 18, 2015, executed the Merger Agreement and issued a

press release announcing the transaction, *id.* ¶ 60.  The total funds necessary to complete the

Merger were $9.4 billion, assuming no shareholder exercised appraisal rights in the Cayman

Islands.  *Id.* ¶ 61.

### 2. Issuance of Proxy Materials

After the execution of the Merger Agreement, Defendants published a series of Proxy

Materials between January 11, 2016, and March 3, 2016, which attempted to persuade Qihoo

Securityholders to vote for the Merger.  *Id.* ¶ 66.  Defendants published the initial transaction

statement for the Merger on Schedule 13E-3, which attached the Company's Preliminary Proxy

Statement and other supporting documents for the Merger (collectively, the "Preliminary Proxy

Materials").[4]  *Id.* ¶ 67.  Plaintiffs allege that the Proxy Materials contained several materially

false and misleading statements about the fairness of and reasons for the Merger, as well as

assurances that no other strategic alternatives were contemplated or imminent.  *Id.* ¶¶ 71–82.

Plaintiffs allege that the statements were misleading because the Proxy Materials did not mention

a possibility, let alone a plan, of relisting the company in China.  *Id.* ¶ 74.  The alleged

misleading statements are discussed in detail *infra*.

---

[3] J.P. Morgan's conclusions also derived from its review of the Merger Agreement, publicly available business and financial information about the company and broader industry, precedent transactions, the financial and operating performance of comparable companies, and other information that J.P. Morgan deemed appropriate.  *Id.* ¶ 52.

[4] The Proxy materials were amended three times: the "Amended Proxy Statement" was published on February 8, 2016; the "Second Amended Proxy Statement" on February 26, 2016; and the "Third Amended Proxy Statement" or "Final Proxy Statement" on March 3, 2016.  The third version included the final materials provided to the Qihoo Securityholders at the March 30, 2016, shareholder vote on the Merger.  *Id.* ¶¶ 67–69.

### 3. Shareholder Vote and Completion of the Merger

On March 30, 2016, the shareholders voted on the Merger based on the information in the Final Proxy Statement. *Id.* ¶ 83. An affirmative vote of shareholders representing at least two-thirds of the voting rights of the shares present and voting in person or by proxy was required for the Merger to pass. *Id.* ¶ 84. Approximately 41% of the Company's outstanding ordinary shares were represented at the meeting, and approximately 99.8% of the total votes cast at the meeting were in favor of the Merger. *Id.* ¶ 86. The transaction therefore passed, and closed on July 15, 2016 ("Effective Time"). *Id.* ¶¶ 86, 93.

### 4. Qihoo's Backdoor Listing in China

After the Merger, Qihoo "conducted a complicated restructuring of its business" to separate its main internet business from non-core operations. *Id.* ¶ 95. On November 2, 2017, more than 15 months after the Merger, an elevator manufacturing company listed on the Shanghai Stock Exchange called SJEC announced that it would merge with Qihoo in order to conduct a backdoor listing, or reverse merger. *Id.* ¶ 96. This allowed Qihoo to list its main internet business on the Chinese stock market without the regulatory hurdles associated with an initial public offering. *Id.* ¶ 97. On February 28, 2018, Qihoo began trading on the Shanghai stock exchange. *Id.* ¶ 100. At the close of trading on that day, it had a market capitalization of 385 billion RMB, or approximately $62 billion. *Id.* According to a *Bloomberg* news article, the value of the former SJEC, the company that Qihoo merged with, "soared as much as 550%" in the time between the announcement of the backdoor listing in November 2017 and Qihoo's relisting on February 28, 2018. *Id.* ¶ 101. The relisting allegedly increased Defendant Zhou's net worth from approximately $2 billion to $13.6 billion. *Id.*

### C. Procedural History

On March 5, 2019, plaintiffs filed their initial complaint in the Central District of California.  Dkt. 1.  On March 18, 2019, plaintiffs moved for appointment as lead plaintiffs and lead counsel.  Dkts. 10–13.

On June 4, 2019, defendants moved to transfer the case to the Southern District of New York.  Dkts. 33–35.  Plaintiffs opposed.  Dkt. 40.  On July 1, 2019, the Honorable John A. Kronstadt, United States District Judge, appointed plaintiffs as lead plaintiffs.  *See* Dkt. 42.  On August 30, 2019, plaintiffs filed the FAC.  FAC.  On October 11, 2019, defendants moved to dismiss the FAC.  Dkts. 57–59.  On October 24, 2019, Judge Kronstadt granted defendants' motion to transfer venue to this District and denied the motion to dismiss as moot.  Dkt. 60.  On October 30, 2019, the case was transferred to the Southern District of New York and assigned to this Court.  Dkt. 61.  On November 15, 2019, the parties filed a joint letter outlining the status of the case and their proposed next steps.  Dkt. 75.  Defendants sought leave "to file an amended motion to dismiss under Second Circuit law."  *Id.*  On November 18, 2019, the Court granted the request and set a briefing schedule.  Dkt. 76.

On December 23, 2019, defendants[5] filed their amended motion to dismiss, Dkt. 77, a memorandum of law, Dkt. 78 ("Def. Mem."), and the declaration of Brian Raphel, Esq., Raphel Decl., with attached exhibits.  On January 31, 2020, plaintiffs filed a memorandum of law in opposition, Dkt. 81 ("Pl. Opp'n"), and the declaration of Michael Grunfeld, Esq., Grunfeld Decl., with attached exhibit.  On February 21, 2020, defendants filed a reply.  Dkt. 83 ("Reply").

---

[5] The instant motion is brought by defendants Chen and Qihoo only, because defendants Zhou and Qi have yet to be successfully served.

8

## II.     Applicable Legal Standards

### A.     Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b).  *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*").  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

### B.   Elements of Plaintiffs' Claims

Plaintiffs assert claims under §§ 10(b), 20A, and 20(a) of the Exchange Act, and Rule 10b-5.  FAC ¶¶ 312–339.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) of the Exchange Act, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted).  A complaint must ultimately allege conduct involving manipulation or deception; § 10(b) does not cover "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted) (quoting *ATSI Commc'ns*, 493 F.3d at 108).  If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed.  *See id.*

To state a claim for insider trading under § 20A of the Exchange Act, a plaintiff must plead (1) a predicate violation of the Exchange Act; (2) contemporaneous trading by defendant and plaintiff; and (3) that the defendant possessed "material, nonpublic information" at the time of the trading activity.  *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013).

Thus, for their claims under either § 20(a) or § 20A of the Exchange Act to survive the motion to dismiss, plaintiffs must successfully plead a *prima facie* violation of § 10(b).  Defendants argue that plaintiffs have failed to allege four of the six elements of a § 10(b) claim: material misrepresentations, reliance, scienter, and loss causation.  *See* Def. Mem. at 1–2, 7–25.

For the reasons that follow, to find for defendants on the motion to dismiss, the Court need only address the first of these alleged deficiencies: that plaintiffs have failed to adequately plead material misrepresentations or omissions by defendants.

### 1.    Pleading a Material Misrepresentation or Omission

#### a.    False or Misleading Statements

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'"  *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17.  The materiality requirement "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32).  As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976) (emphasis omitted).  The "materiality hurdle" is, therefore, "a meaningful pleading obstacle."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).  However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (citation omitted).

As to alleged omissions, "[d]isclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2013) (noting that Section 10(b) and Rule 10b-5(b) do not create "an affirmative duty to disclose any and all material information"). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (explaining that "pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"— "statements that are misleading . . . by virtue of what they omit to disclose"—are).

### b.   Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. Such statements of opinion can give rise to liability in two distinct ways.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were untrue.'" *See Tongue v. Sanofi* ("*Sanofi II*"), 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events . . . ." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004). "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi II*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194). To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Sanofi II*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 188–89). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189); *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

The Supreme Court has instructed that this second theory of liability for opinions, based on the omission of material facts that may render a statement of opinion actionable, should not be given "an overly expansive reading." *See Sanofi II*, 816 F.3d at 210. Rather, establishing liability on such a theory "is no small task for an investor." *Omnicare*, 575 U.S. at 194. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, . . . [and do] not expect that *every* fact known to an issuer supports its opinion statement."

14

*Omnicare*, 575 U.S. at 189–90 (emphasis in original). A statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189.

Further, the Supreme Court has emphasized, statements of opinion must be considered in the context in which they arise. An "investor takes into account the customs and practices of the relevant industry," and "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* at 190.

### c. The PSLRA Safe Harbor for Forward-Looking Statements and the Bespeaks-Caution Doctrine

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u-5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u-5(i)(1). A forward-looking statement is not actionable if it "is [(i)] identified and accompanied by meaningful cautionary language or [(ii)] is immaterial or [(iii)] the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis omitted). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined as above; the first and third categories are defined as follows:

### i. Meaningful Cautionary Language

To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the

forward-looking statement[.]" *Id.* at 771 (quoting H.R. Rep. No. 104-369, at 43 (1995)).
Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772. "To determine
whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed
risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to
determine if a reasonable investor could have been misled into thinking that the risk that
materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352, 359 (2d Cir. 2002)). Plaintiffs may establish that cautionary language is not
meaningful "by showing, for example, that the cautionary language did not expressly warn of or
did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

### ii.     Actual Knowledge

The scienter requirement for forward-looking statements—actual knowledge—is "stricter
than for statements of current fact. Whereas liability for the latter requires a showing of either
knowing falsity or recklessness, liability for [forward-looking statements] attaches only upon
proof of knowing falsity," pled with the requisite particularity. *Slayton*, 604 F.3d at 773 (quoting
*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)); 15 U.S.C. § 78u-4(b)(2).

### iii.    The Bespeaks-Caution Doctrine

The safe harbor for forward-looking statements does not apply to statements made in
connection with an IPO, such as an IPO prospectus. *See* 15 U.S.C. §§ 77z-2(b)(2)(D),
78u-5(b)(2)(D); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
No. 18 Civ. 10320 (AJN), 2020 WL 1529371, at *6 (S.D.N.Y. Mar. 30, 2020); *Gregory v.
ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35
(2d Cir. 2018). However, the bespeaks-caution doctrine, a "corollary of the well-established
principle that a statement or omission must be considered in context," does. *Johnson v. Sequans*

*Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at *9 (S.D.N.Y. Jan. 17, 2013)

(quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)).

Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary

language is not actionable because no reasonable investor could have found the statement

materially misleading." *MF Glob., Ltd.*, 620 F.3d at 141.[6]  To apply, however, the cautionary

language must pertain to the specific risk that was realized.  "[C]autionary language [that] did

not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss" is

insufficient.  *Halperin*, 295 F.3d at 359.

### III.   The FAC's § 10(b) Claim

The Court begins by considering whether plaintiffs' FAC has adequately alleged material

misrepresentations or omissions by defendants, a necessary element of a § 10(b) claim.  The

Court concludes that it has not.

#### A.   The FAC's Core Allegation: Misrepresentations and Omissions Regarding Qihoo's Plan Post-Merger to Relist at a Higher Valuation

The misstatements and omissions that the FAC alleges in the Proxy materials and other

transaction-related filings can be grouped into four categories: (1) statements concerning Qihoo's

intention not to relist; (2) statements regarding the lack of strategic alternatives that would be

more beneficial to Qihoo Securityholders; (3) statements that presented the transaction as "fair"

or in an otherwise positive light; and (4) statements concerning the reasons for the Merger.  *See*

FAC ¶ 159(a), (b), (c), (d).

Critically for this motion, the FAC contends that each set of statements— none of which

mentioned the possibility, let alone the financial benefits, of Qihoo's later relisting in China—

---

[6] The cautionary-language prong of the PSLRA is based, in part, on the bespeaks-caution doctrine.  *See Slayton*, 604 F.3d at 770 n.5.

were false for the same reason: "when these statements were made, the Buyer group already

planned to relist Qihoo at a far-higher valuation" in China post-transaction. FAC ¶ 159(a).[7]   The

———————————————

[7] *See also, e.g.*, *id.* ¶ 2 ("Defendants told the market that Qihoo had no plans at the time of the Merger to relist the Company on any other stock exchange after the Merger . . . .  That was demonstrably false because the group of investors that bought Qihoo in the Merger—led by Defendant Zhou—*planned all along* to relist Qihoo on the Chinese stock market following the Merger at a much higher value than what they paid to Qihoo Securityholders in the Merger." (emphasis added)), ¶ 5 ("Contrary to the Defendants' repeated reassurances about no substantial changes to Qihoo's structure following the Merger, several news reports have revealed that the Buyer Group that took Qihoo private in the Merger *planned all along* to relist the Company in China after the Merger for multiple times what they paid to Qihoo Securityholders . . . ." (emphasis added)), ¶ 71 ("Defendants' most fundamental misleading action was hiding the Buyer Group's plan to relist Qihoo's core business in China following the Merger."), p. 36 ¶ G ("The Buyer Group [p]lanned to [r]elist Qihoo [a]ll [a]long[.]"), ¶ 105 ("Several news articles have reported on a secret plan that Defendant Zhou had with the investors that bought Qihoo in the Merger.  A key term for their participation in the Merger was that Qihoo would relist in the public markets in China shortly after the Company's privatization in the United States . . . . [Defendants'] secret promise to relist Qihoo in the Chinese stock market at a higher value after its privatization is what incentivized those investors to participate in the Merger."), ¶ 110 ("Other news reports confirm that the members of the Buyer Group planned to relist Qihoo in China as part of their agreement to participate in the Merger."), ¶ 134 ("A confidential witness that worked in Qihoo's Public Relations department at its Beijing headquarters from 2014 through 2017 ("CW1") has explained that Defendants *planned all along* to relist the Company in China following the Merger." (emphasis added)), ¶ 152 ("Defendants, however, failed to disclose to Qihoo Securityholders, the Buyer Group's plan to relist Qihoo in the Chinese stock market."), ¶ 159(a) ("These assurances provided to Qihoo Securityholders were false and misleading because when these statements were made, the Buyer Group *already planned to relist* Qihoo at a far-higher valuation." (emphasis added)), ¶ 159(b) ("These statements were false and misleading because they did not mention the alternative of relisting Qihoo on a Chinese stock exchange or paying Qihoo Securityholders fair value in light of that alternative plan."), ¶ 159(c) ("These statements were also false and misleading because the fairness assessment of the Merger price . . . failed to consider . . . how Qihoo's post-Merger businesses would be valued on the Chinese stock market, where the Buyer Group *already planned during the Merger process to relist Qihoo* following the Merger." (emphasis added)); ¶ 159(d) ("These statements were false because the Buyer Group did not intend for Qihoo to remain a private Company.  Rather, *they planned all along* to relist the Company at a higher valuation in China." (emphasis added)), ¶ 171 ("[T]hese statements were false and misleading because such a relisting was not just a possibility that the Buyer Group might consider in the future, but rather, was the Buyer Group's *pre-established plan and its whole reason for the Merger*." (emphasis added)), ¶ 199 ("These statements . . . were false and misleading  . . .  because J.P. Morgan's [fairness] analysis was based on Qihoo's financial projections that did not account for Qihoo's true business prospects in China following the Merger[.]").

Court therefore begins by examining whether the FAC has adequately pled this factual premise underlying all its claims.  For the reasons that follow, the Court finds that it has not.  The FAC therefore does not adequately allege any material misrepresentations or omissions by defendants.

### B.   Discussion

#### 1.   The FAC's Two Key Sources (CW-1 and Newspaper Articles) and the Requirement of an Actual but Undisclosed Relisting Plan

The FAC relies on two key sources to support its repeated claim that the Buyer Group had undisclosed plans to relist Qihoo on a Chinese stock exchange at the time it marketed the Merger to Qihoo Securityholders as a pure take-private: (1) statements made by a confidential witness within Qihoo's Public Relations department ("CW1"); and (2) newspaper articles that ostensibly reveal that the plan to relist preceded the Merger and had been secretly marketed to Buyer Group investors.

In evaluating whether the information attributed to these sources adequately alleges a material misstatement or omission, it is important to focus on the precise nature of what the FAC claims was undisclosed.  Defendants' proxy materials explicitly disclosed the possibility of a future relisting.  For example, these materials stated:

> [S]ubsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, *including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange*.

FAC ¶ 170 (emphasis added) (quoting January 11, 2016 Proxy Statement at 66; *see also* Raphel Decl., Ex. 1 at 33 (same).  Defendants repeatedly made similar disclosures throughout the proxy process.  *See* Raphel Decl., Ex. 4 at 6 (Feb. 8, 2016 Proxy Statement at 66) (same); *id.*, Ex. 5 at 6 (Feb. 26, 2016 Proxy Statement at 66) (same); *id.*, Ex. 6 at 6 (March 3, 2016 Proxy Statement at 68) (same).

These disclosures preclude any viable theory of an actionable misstatement or omission to the extent the FAC asserts a failure to alert shareholders to the *possibility* of a future relisting. That is because the above materials reported this very scenario. *See, e.g.*, *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 408 (RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013) (dismissing § 10(b) claims when defendants made the disclosures that were purportedly omitted, rendering "the factual premise" of the misrepresentation claims unsound), *aff'd* 570 F. App'x 32 (2d Cir. 2014); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("[D]ismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."); *Debora v. WPP Grp., P.L.C.*, No. 91 Civ. 1775 (KTD), 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed." (citing *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 116–17 (2d Cir. 1982))); *Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts[,] which is contradicted by published documents which expressly set forth the very facts allegedly concealed[,] is insufficient to constitute actionable fraud." (citation omitted)); *White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed.").

Plaintiffs are therefore left with the theory that defendants, at the time of the Merger, had already adopted—but did not disclose to the public—an actual, concrete plan to relist in China. The factual hurdles presented to a plaintiff pursuing such a theory are underscored by *Lyndon v. Estate of Winston*, 715 F. Supp. 600 (S.D.N.Y. 1989), a pre-PSLRA case in which § 10(b) claims based on a similar theory of liability were found inadequately pled even under the more lenient

pleading standard of Federal Rule of Civil Procedure 9(b).  Plaintiffs in *Lyndon* were former

shareholders of the public company Winston Network.  They claimed that Winston, when

notifying stockholders of an impending merger and the stock's purchase price, had actionably

misrepresented the true nature of the transaction because it "failed to also advise that it planned

to resell WNI stock at a higher price" later on.  *Id.* at 601.  The district court, however, found this

claim inadequately pled under Rule 9(b) because, *inter alia*, "there are no factual allegations that

support an inference that the alleged plan to find a buyer in the future had been formulated *prior*

*to the merger*[.]"  *Id.* at 602 (emphasis added).  Defendants argue that the same is so here, and

that the express disclosure of the possibility of such a transaction therefore disclosed all that was

necessary.  Plaintiffs attempt to distinguish *Lyndon* on the grounds that the plaintiffs there

alleged only that defendant failed to "advise that it planned to resell" stock at higher price post-

merger, *id.* at 601, but did not allege that, before the merger, defendants had affirmatively denied

the existence of a concrete such plan, as plaintiffs contend occurred here, *see* Pl. Opp'n at 10 n.7.

But plaintiffs' distinction of *Lyndon*, valid or not, itself underscores the minimum factual

allegation necessary for the FAC here to survive: the existence pre-Merger of a specific and

definite plan for Qihoo to relist.[8]

The Court accordingly considers whether the FAC's factual attributions to a confidential

witness and/or to newspaper articles adequately plead the existence, pre-Merger, of a specific

and definite plan for Qihoo to relist in China.  The Court first assesses the legal standards under

---

[8] Plaintiffs implicitly acknowledge this.  *See id.* at 10 ("[O]nce [d]efendants chose to speak about
the plans for Qihoo after the Merger, they had an obligation under Section 10(b) to tell the whole
truth, even if they had no independent duty to disclose such information." (internal quotation
marks, citations, and alterations omitted)); *id.* ("[E]ven if there is no independent duty to disclose
[M]erger negotiations, a defendant is not permitted to falsely deny their existence.")

the PSLRA governing such sources.  The Court then measures the FAC's allegations against these standards.

### 2.      Applicable Legal Standards

#### a.      *Attributions to Confidential Witnesses*

To satisfy the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).  To satisfy the heightened pleading standards of the PSLRA and Rule 9(b), plaintiffs often rely, at least in part, "on information attributed to 'confidential witnesses[.]'" *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 635 (S.D.N.Y. 2013).

"The case law examining facts attributed to unidentified witnesses, however, reflects the need to view such attributions with caution and care."  *Long Miao v. Fanhua, Inc.*, 42 F. Supp. 3d 774, 797 (S.D.N.Y. 2020).  The Second Circuit first addressed attributions to confidential sources in a securities fraud complaint in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).  The Circuit there rejected a district court's holding that such sources must be identified by name for the factual allegations attributed them to be used to satisfy the particularity requirement.  Information attributed to confidential sources may be considered, the Circuit explained, in proper circumstances:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.  Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.  In both of these situations, the plaintiffs will

22

have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out.

*Novak*, 216 F.3d at 314.

Where a securities fraud complaint relies on uncorroborated confidential witnesses ("CW"s), courts presented with challenges to particularity have, on occasion, used procedural devices to test whether such CWs in fact had made the statements attributed to them.  *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 & n.4 (2d Cir. 2010); *see also In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015).  More commonly, however, following *Novak*, courts in this District resolve the adequacy of such complaints as facially pled, and "will credit confidential source allegations, generally, in two situations."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011).  First, "when 'independent [adequately pled] factual allegations' corroborate a confidential source's statements, the requirement of a description of the source's job is loosened."  *Id.* (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 n.10 (S.D.N.Y. 2004)).  Second, in the absence of such well-pled corroborative facts, courts will credit confidential sources when "those sources' positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations."  *Id.* (citation omitted).

At the same time, the assembled case law reflects at least four contexts in which courts have been loathe, under *Novak*, to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs.  First, courts generally have not credited the statements of CWs who are insufficiently described or whose descriptions do not suggest that they were in a position to know the facts attributed to them.  *See, e.g.*, *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018); *In re Lehman*

*Bros. Sec. & Erisa Litig.*, No. 10 Civ. 6637 (LAK), 2013 WL 3989066, at *4 (S.D.N.Y.

July 31, 2013) (disregarding CWs who "were loan level underwriters, not managers or corporate

officers who could have spoken to the company's practices broadly"); *see also Local No. 38 Int'l

Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460

(S.D.N.Y. 2010) (discounting allegations of "low-level, rank-and-file employees or outside

contractors" who the complaint did not indicate had any "access to aggregated data regarding

[the company's] credit risk" or contact with the individual defendants), *aff'd*, 430 F. App'x 63

(2d Cir. 2011).

Second, statements of CWs that cannot situate relevant occurrences in time are

sometimes disregarded because they cannot establish that the challenged statements were

knowingly false when made. *See, e.g.*, *Gregory*, 297 F. Supp. 3d at 409 (disregarding CW

allegations regarding failed clinical studies that were "unmoored in time"); *In re Lululemon Sec.

Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) ("No CW sets forth facts that suggest that any of

the alleged statements were false *when they were made*." (emphasis in original)), *aff'd*,

604 F. App'x 62 (2d Cir. 2015).

Third, allegations by CWs that are insufficiently particular are apt to be discounted or

disregarded. *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y.

2019) (rejecting "[g]eneric and conclusory allegations" from plaintiffs' CWs relating to bribery,

mismanagement, and other alleged "strange dealings" as "so vague as to be meaningless"); *In re

Lululemon*, 14 F. Supp. 3d at 580 ("general allegations" regarding quality control issues "do not

render the [defendants'] statements described herein, considered in context, false or misleading,"

where the complaint does not also "contain the . . . required specific factual allegations (by CWs

or otherwise)"); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007)

24

("[P]laintiffs have not satisfied the heightened pleading requirements for their channel-stuffing claim . . . [because the CW on whom they rely] merely parrots the conclusory allegations contained in the complaint.").

Fourth, courts have tended not to credit uncorroborated statements of CWs who are sourced secondhand—with whom plaintiffs' counsel have not themselves interacted.  For example, in *In re Lehman Brothers*, one set of allegations was based entirely "on confidential witness statements originally recounted in a separate complaint filed by separate counsel in a separate action."  *In re Lehman Bros.*, 2013 WL 3989066, at *3.  The court explained that, without independent corroboration:

> it would be inappropriate to give any weight to these alleged confidential witness statements. There is no suggestion that counsel in this action has spoken with these confidential witnesses or even knows who they are . . . .  When citing alleged confidential witnesses in a complaint, the [Federal Rule of Civil Procedure 11] certification means that counsel has spoken with these confidential witnesses and knows who they are.  Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support.

*Id.* at *4.  Differentiating between confidential statements extracted from a complaint in a lawsuit filed by different counsel and facts recounted in newspaper articles and government reports, the court noted that "the probative value of an independent news article or government report is much greater than that of confidential witness statements recounted in another complaint [because there] is significant motive and opportunity for counsel in any case to misuse or mischaracterize confidential witness statements in a pleading."  *Id.*; *see also id.* ("The unfairness of permitting a plaintiff in a separate action to rely blindly at the pleading stage primarily on confidential witness statements from another case to meet its pleading burden is patent."); *accord In re Millennial Media*, 2015 WL 3443918, at *11.

As this Court has recently observed, "[t]he cases in which securities complaints based on statements attributed to CWs have been sustained as alleging fraud with sufficient particularity supply an illuminating contrast" to the above scenarios.  *Long Miao*, 442 F. Supp. 3d at 800.  For example, in *Employees' Retirement System of Government of the Virgin Islands v. Blanford*,

> the complaint alleged that a coffee manufacturer had made knowingly false misstatements about its production and inventory levels.  Although relying on CWs, the complaint "specifie[d] each [CW's] position, length of employment, and job responsibilities."  It recited that plaintiffs' counsel had had personal contact with these witnesses, and quoted the CWs in detail as giving specific descriptions, for example, as to "the buildup of inventory 'up to the rafters' . . . and even stored in operators' work spaces" and the "need to throw away 'pallet after pallet after pallet' as the coffee products expired."  Witnesses recalled a specific order during the relevant time period "where 500,000 brewers were loaded onto trucks right before an audit, and put back in stock immediately after the auditors left the facility."  These allegations were further corroborated by other witnesses' accounts and a thorough short-seller report containing independent factual allegations.

*Id.* at 800–01 (internal citations omitted) (citing 794 F.3d 297, 307 (2d Cir. 2015)); *see also, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362 n.1 (S.D.N.Y. 2012) (securities fraud claim adequately pled where complaint "sufficiently detail[ed] the precise title and job duties of each of the CWs"—who were employed in the relevant division of the company during the class period—"as well as their respective contacts with" the individual defendant, and facts alleged from other "public and proprietary sources of information" provided at least some corroboration).

> b.      *Attributions to News Reports*

A complaint's reliance on newspaper articles may also be problematic.  "[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability.  Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel[.]'"  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (quoting *In*

*re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007)); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *see also In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *8 (S.D.N.Y. Mar. 30, 2018) (same). "While use of [media reports] is permissible in pleadings, Plaintiffs are not otherwise relieved of their burden to adequately identify and link the sources with the allegations of misconduct derived from those sources. In other words, the news articles cited still must indicate particularized facts about Defendants' conduct in order to support the Plaintiffs' claims." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (internal quotation marks, citation, and alterations omitted); *see also Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 31 (S.D.N.Y. 2016) ("[A] plaintiff is permitted to rely on newspaper articles, provided that the reports themselves indicate particularized facts in order to support Plaintiffs' claims." (internal quotation marks and alterations omitted)).

Accordingly, where a complaint's allegations of a false or misleading statement rely on a news article, the relevant statements in the article must be properly attributed to meet Rule 9(b)'s particularity requirement. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, No. 15 Civ. 9539 (GHW), 2017 WL 1102666, at *27–28 (S.D.N.Y. Mar. 23, 2017) (two *Wall Street Journal* articles did not satisfy Rule 9(b) where "[t]he statements in th[e] article[s] . . . are attributed to 'Vale,' but no further information as to the source of the statements is provided in the article, and no further information about the source is alleged in the complaint"). Similarly, media reports that consist of generalized forecasting or factually unsourced speculation do not, without more, satisfy the PSLRA. *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300–01 (S.D.N.Y. 2010).

Significant too, a public company does not have an obligation to "respond to every potentially disparaging news story or to rebut the musings of the financial press." *Id.* (citing *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) ("Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press or even by directors.")). A company's silence in the face of allegations in the press cannot be treated by a complaint as tacit confirmation of them. Nor may a plaintiff succeed "by alleging fraud by hindsight." *Hershfang v. Citicorp.*, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)); *see also id.* ("Plaintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud . . . . Read as a whole, the complaint creates the strong impression that when [defendant] announced a cut in dividends, plaintiff's counsel simply stepped to the nearest computer console, conducted a global Nexis search, [and] pressed the 'Print' button[.]").

### 3.   Discussion

The Court first assesses the adequacy of the FAC's factual allegations attributed to CW1 and then those attributed to news sources. Considered separately or together, neither source supplies sufficiently particularized allegations to satisfy the PLSRA.

#### a.   *Attributions to CW1*

The FAC's allegations relating to Qihoo's intent to relist post-Merger do no more than recapitulate an interview with CW1 (which the complaint implies but does not clearly state was conducted by plaintiff's counsel). The FAC does not allege any corroborative facts or any independent investigation by counsel substantiating CW1's factual allegations.

According to the FAC, CW1 worked in Qihoo's Public Relations ("PR") department in the Beijing headquarters from 2014 to 2017. FAC ¶ 134. CW1 reported to a senior editor who reported to Qu Bing, Qihoo's vice president in charge of PR, who in turn reported to defendant

Qi.  *Id.*  According to an article published on an "established Chinese online media platform,"

Qu Bing "played an instrumental role in Qihoo's privatization and relisting."  *Id.* at 50 n.24.

CW1 reported that informal discussions of relisting in China began as early as April

2015, and that by mid-2015, the entire PR department knew of the alleged secret plan.  *Id.* ¶ 135.

CW1 described a mid-2015 department meeting in which Qi directed attendees not to disclose

the plan to relist outside of the company via Qihoo's media platform or even in internal

discussions with members of other departments, lest this information be leaked to a competitor in

the industry.  *Id.*  The FAC also attributes the following to CW1:

- Qihoo's employees knew that the relisting would be executed via a backdoor listing, rather than via a traditional IPO, as early as late-2015, *id.* ¶ 135;

- Defendant Zhou was in charge of the privatization and relisting plan due to his large ownership stake in Qihoo, *id.* ¶ 136;

- CW1 had conversations with "a senior employee in the Public Relations department who confirmed that, after privatization, Qihoo would return to China and get relisted," *id.*;

- Defendants attempted to execute the privatization quickly in an effort to push forward with the relisting process and "pledged its headquarters in Beijing and the [c]ompany's trademarks as collateral to overcome funding constraints and secure loans from China Merchants Bank" to lock down financing, *id.* ¶ 136;

- Qihoo's leaders sought to prevent public disclosure of the relisting and told employees to leverage their media connections to try to remove evidence from the internet of the shell company used to execute the relisting, *id.* ¶ 137;

- Qihoo's "employees were confident that the value of the Chinese shell company that Qihoo would merge into would increase dramatically as a result of backdoor listing," *id.*

These allegations attributed to a single CW, however, bear none of the indicia of reliability that have led courts applying *Novak* to sustain CW allegations as worthy of crediting. First, the FAC does not contain any "independent [well-pled] factual allegations" to "corroborate [the] confidential source's statements." *Glaser*, 772 F. Supp. 2d at 590.

Second, CW1's position and job responsibilities are not described at a sufficient level of particularity to "indicate a high likelihood that [CW1] actually knew facts underlying [his or her] allegations." *Id.* Quite the contrary, the little disclosed about CW1 makes it dubious that he or she would be entrusted by corporate management with an explosive secret capable, if revealed, of derailing Qihoo's plan to go private: a definite plan for the company to be relisted following the Merger. The FAC describes CW1 as relatively senior within the PR team. But it describes CW1 as working at least two degrees of separation from defendant Qi within the corporate structure. And it provides no detail on CW1's concrete job responsibilities. Absent substantially more detail, the FAC leaves it implausible that Qihoo would entrust a non-executive PR employee with secrets about high-level corporate strategy—more than 15 months before the actual relisting. That CW1 purportedly participated in "informal[]" discussions to this effect, *see* FAC ¶ 135, does not cure this problem. The FAC's failure to substantiate this improbable allegation or to offer surrounding context that would make this bombshell disclosure to CW1 more plausible badly undermines this pillar of its claim of false and misleading statements. *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 595; *In re Sierra Wireless*, 482 F. Supp. 2d at 376; *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, No. 14 Civ. 4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016).

Third, the content of CW1's allegations, far from being particular, is uncommonly hazy. The FAC alleges conclusorily that the "[d]efendants planned all along to relist the [c]ompany in

China following the Merger" based on "informal discussions" among employees in the PR department to which CW1 was privy and a single meeting in "mid[-]2015" in which Qi revealed the top-secret relisting plan. *See* FAC ¶ 134–35. But the FAC, strikingly, "does not supply any detail as to the who, what, when, where, and how of the" relisting plan itself. *Long Miao*, 442 F. Supp. 3d at 803–04. CW1's statements are so devoid of detail about the future relisting as to call into question whether, if CW1 indeed heard something about a potential relisting, what was heard involved a concrete and definite plan to relist, as opposed merely to the possibility (which was amply publicly disclosed) that Qihoo might later relist. Notably, when Qihoo relisted some 15 months after the Merger vote, it did not do so alone, but instead with a shell company, SJEC, to expedite the relisting process. CW1's allegations do not align with any detail of the relisting that eventually occurred. The information reported by CW1 about a future relisting is instead entirely generic.[9] The FAC's general allegations from an anonymous source therefore fall very short. *See, e.g.*, *Schiro*, 396 F. Supp. 3d at 305–06; *In re Lululemon*, 14 F. Supp. 3d at 579–81; *In re Sierra Wireless*, 482 F. Supp. 2d at 376; *Lopez*, 173 F. Supp. 3d at 31–32 & n.8.

　　Fourth, based on the FAC, plaintiffs' counsel appear to have done nothing whatsoever to confirm the veracity of CW1. *Long Miao*, 442 F. Supp. 3d at 804. Counsel do not explicitly

---

[9] CW1's allegation is so unmoored in time as to call into question whether whatever CW1 heard about a relisting occurred before the Merger. The FAC alleges only that CW1 has "explained that *as the relisting approached*, Qihoo's leaders wanted to avoid public disclosure of the relisting and instructed employees to try to use their media connections to get articles with the identity of the shell company (SJEC) deleted from the internet." FAC ¶ 137 (emphasis added). The FAC, however, offers no basis to credit that these events occurred prior to the Merger, and CW1's statement that these discussions occurred "as the relisting approached" more naturally describe a point a time closer to the end of the 15-month period between the Merger and the relisting announcement than before the start of that period.

state that they have personally interviewed CW1 or even tried to locate this source on which the

FAC so heavily relies.  The manner by which counsel came to learn of CW1's purported

allegations instead is left opaque.  And the FAC does not recount any meaningful effort to

substantiate CW1's claims.  As in prior cases involving similarly problematic allegations,

"[a]llowing counsel to rely on confidential witness statements recounted" at best second-hand

"provide[s] the Court little assurance that the factual contentions have any evidentiary support."

*In re Lehman Bros.*, 2013 WL 3989066, at *4.

The Court accordingly disregards CW1's allegations.  Examined with even minimal

rigor, they do nothing to substantiate the FAC's claims of a § 10-b violation.

> b.     *Attributions to News Articles*

The news articles cited by the FAC do not fill this void.  The articles cited there fall

generally into two groups: (1) reports suggesting that there were two sets of marketing materials

and projections prepared at the time of the Merger—one for Qihoo Securityholders and another

for the Buyer Group that showed substantially more upside as a result of a future relisting; and

(2) reports suggesting a different investment thesis than what was disclosed to investors pre-

Merger.[10]  For the reasons below, none describe with sufficient particularity the existence of an

actual concrete relisting plan at the time of the Merger.

---

[10] The Final Proxy Statement provided to Qihoo Securityholders recited standard rationales for taking a business private.  These included increased flexibility to maximize long-term financial performance (instead of the short-term thinking promoted by public equity markets), the ability to adapt to a changing operating environment with increasing regulatory hurdles, the ability to increase capital expenditures and invest in other technological advancements to bolster the Company's market position, greater time to improve emerging businesses without the scrutiny of public markets, and the avoidance of regulatory costs that come with a public listing.  *See* FAC ¶ 75.

The following are the allegations that the FAC attributes to news outlets:

- A November 12, 2015 article from *CN Stock* (published in Chinese) which reported that the author had obtained an undisclosed copy of the privatization plan that had been provided to Buyer Group investors and conveyed the plan to list in China post-Merger. FAC ¶ 106.  The materials approximated a one-and-a-half-year timeline for the relisting, which proved similar to the actual amount of time that Qihoo took to become private in the United States and execute the relisting in China.  *Id.* ¶ 107.

- A December 29, 2015 article in *Tencent Technology* (published in Chinese) indicating that it had obtained Qihoo's privatization plan from the main underwriter, Huatai United Securities.  The article "also reported that Qihoo planned to return to the Chinese [stock] market through a backdoor listing."  *Id.* ¶ 110.

- A June 23, 2016 article in *Netease* (published in Chinese) explaining that Qihoo had indicated to the media that it "had reached an agreement on the currency exchange plan with the State Administration of Foreign Exchange."  *Id.* ¶ 112.  "The article commented that these developments paved the way for [Qihoo's] relisting in China."  *Id.*

- An August 3, 2016 article in the Chinese newspaper *Caixin* (published in Chinese), published after the Merger, reporting that the Company had planned to relist "as of last year"—that is, while the Merger process was still underway, and before defendants issued the Preliminary Proxy materials.  The Company declined to comment for this article on its plans to relist following the Merger, but according to the FAC, "the article confirms the other similar reports that the private promotional materials that Qihoo used to solicit investors in the Buyer Group secretly advertised that there would be a relisting after the Merger."  *Id.* ¶ 113.

- An August 16, 2016 article in *Netease* (published in Chinese), published post-Merger, stating that Qihoo would soon become a "pure domestic company" at the urging of Chinese government officials who had reached out to Zhou pre-Merger. Because many Chinese government agencies used Qihoo's products, these officials preferred that the company be listed in China. *Id.* ¶ 118.

- An August 22, 2016 article in *The Paper* (published in Chinese), published post-Merger, reporting an interview with Zhou in which he acknowledged that he had decided to split up Qihoo's businesses. He denied that this was part of a relisting plan, rejected the idea that the company had plans for a backdoor relisting, and reiterated China's national security concerns as a reason for privatization. *Id.* ¶¶ 119–22.

- A February 28, 2017 opinion piece[11] in the *Financial Times* (published in English) discussing the trend of "take-privates" of Chinese companies, and attendant litigation, giving the example, *inter alia*, of Qihoo and stating that "[m]arketing materials from the fundraising 'for the privatisation of Qihoo 360 and return of A shares' seen by the FT state that the return to investors assuming an exit in 2019 'may be as high as 5 [times]' and contain ambitious estimates of future net income and other performance metrics going out to 2019." The opinion piece then cites unnamed "[m]inority shareholders," who "say that conversations with Qihoo 360 and its advisers before privatisation [sic] suggested that the company's prospects were not nearly that bright." *Id.* ¶ 115.

---

[11] Although the FAC does not identify this article as an opinion piece, *see id.* ¶ 115, the article itself—which is incorporated by reference into the FAC, *see id.* & n.16—is clearly labeled as such. *See City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 179; *Staehr*, 547 F.3d at 425.

- A November 6, 2017 article in *Pandaily* (translating to English an article published in a Chinese source three days earlier) reporting that "[i]n spite of his straightforward reputation," Zhou had been "tight-lipped about which company he bought" as the vehicle for Qihoo's backdoor listing up until the relisting announcement.  FAC ¶ 116.  The article reiterated Qihoo's desire to be a domestic company in China and the national security strategy as the rationale for the privatization.  It included a discussion of Zhou's vision for the company's core security business, and the fact that "Qihoo [could] play an important role in industrial security, social security, national security, cyber-attack and defense."  *Id.* ¶ 128.  Finally, it noted the disparity between technology stock valuations in China vs. the United States, and explained that, "once Qihoo 360 returned to the [Chinese stock market], its market value would grow many times over."  *Id.* ¶ 152.

- A February 28, 2018 *Bloomberg* article (published in English) noting that technology companies generally command higher valuations in China than they do in the United States.  *Id.*

Of the media reports cited in the FAC, the most significant are the November 12, 2015 article from *CN Stock*, the December 29, 2015 article from *Tencent Technology*, and the August 3, 2016 article in *Caixin*.  Each suggests that a separate, and more rosy, set of projections (based on the secret relisting plan) had been provided to the Buyer Group, but not to Qihoo Securityholders, prior to the Merger.  *Id.* ¶¶ 106, 110, 113.  But these articles ultimately cannot sustain the FAC's allegations.  None of these articles describes a concrete plan to relist, as opposed to Qihoo executives' identification of a post-Merger relisting as a potentially lucrative course.  And Qihoo's proxy materials repeatedly disclosed that possibility.  Even crediting the allegations in these articles, they thus fall short of establishing the fact necessary to make the

35

proxy materials misleading:  that at the time of the Merger, Qihoo had a concrete and definite

relisting plan in place (presumably the one that took effect 15 months later).  And the allegations

in these articles, like the factual attributions to CW1, are far too conclusory, insufficiently

particular, and devoid of details confirming their reliability to allow them to be taken to establish

more than that the possibility of a future relisting was presented to Buyers.  *See In re Optionable*,

577 F. Supp. 2d at 690; *In re Rockwell Med.*, 2018 WL 1725553, at *8; *Miller*, 473 F. Supp. 2d

at 586.  Vitally, the articles, as described in the FAC, do not supply any details of the purported

secret plan.  The *CN Stock* and *Tencent Technology* articles, whose authors purportedly saw

Buyer Group materials addressing a possible relisting, tellingly do not disclose its terms,

participants, profitability, or mechanics.  Like the statements attributed to the CW1, they do not

factually mesh, at all, with the relisting operation that ultimately transpired 15 months after the

Merger.  The lack of these details, and the lack of corroboration in the FAC of the existence of a

concrete plan as opposed to an inchoate hope to relist in the future, makes these articles

ultimately unequal to the task required of plaintiffs to establish that defendants made false or

misleading statements.  *See, e.g.*, *In re Optionable*, 577 F. Supp. 2d at 690 ("newspaper articles

should be credited only to the extent that other factual allegations would be." (citation omitted)).

        The remainder of the articles cited by the FAC contain factual allegations that are only

indirectly relevant to the § 10b claim.  They do not implicate a specific alleged misstatement or

omission.  Rather, they describe secretiveness and similar dynamics among Qihoo leaders that

hint at, but do not concretely allege, wrongdoing.  But any inferences drawn from these general

accounts to the effect that defendants were engaged in fraud in general—let alone the specific

fraud theorized by the FAC—would be rank speculation.  *See Plumbers*, 694 F. Supp. 2d

at 300–01 (media reports relying on speculation are not sufficiently particularized to support a

§ 10b claim at the motion to dismiss stage).  That various statements in these articles are not attributed to any individual further undermines them as a basis for a § 10-b claim.  *See In re Vale*, 2017 WL 1102666, at *27–28.

Finally, the FAC's attempt to minimize the absence of corroborative details in the media reports on which it relies reveals its inadequacy.  To explain why details of the secret plan were not known to the media, the FAC notes that "Qihoo's fundamental restructuring of its businesses was particularly complex and would have required a significant amount of time to complete following the Merger."  FAC ¶ 109.  But that statement is inconsistent with plaintiffs' necessary theory that a relisting plan—as opposed to an aspiration—was in place prior to the Merger.  The FAC's admission that any such plan would require complex restructuring post-Merger all but admits that no specific and definite plan (let alone the one eventually adopted) was in place prior to the Merger.  Similarly damning is the FAC's acknowledgment that the cited media articles chronicle "rumored reports" rather than "definitive" plans to relist.  FAC ¶ 111.

### c. Conclusion

For the foregoing reasons, the FAC fails to plead adequately its necessary factual allegation: that defendants, as of the Merger, had in place a concrete plan to relist Qihoo.  The FAC's repeated declarations that defendants had arranged such a plan, as opposed to envisioning a possible future relisting, are ultimately an *ipse dixit*.  Because the FAC's claims of material misrepresentations and omissions all turn on this factual premise, it fails to adequately allege this element of the § 10(b) claim.  The Court therefore dismisses plaintiffs' § 10(b) claim, with prejudice.

## IV.   The FAC's § 20(a) and § 20A Claims

Because plaintiffs have failed to adequately allege their § 10(b) claim, their claims under §§ 20(a) and 20A fail as a matter of law.  Both require a predicate violation of the Exchange Act,

which the FAC does not adequately plead.  *See Carpenters Pension Tr. Fund of St. Louis*,

750 F.3d at 236; *City of Taylor Gen. Emps. Ret. Sys.*, 967 F. Supp. 2d at 800. These claims, too,

are therefore dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, plaintiffs' First Amended Complaint is dismissed with

prejudice.  The Clerk of Court is respectfully directed to terminate the motions pending at

dockets 77, 80, and 82, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 14, 2020
       New York, New York