# EXHIBIT 2

Case 1:19-cv-10067-PAE   Document 116-2   Filed 04/29/22   Page 2 of 84

EX-99.(A)(1) 2 v433094_ex99-a1.htm EXHIBIT (A)-(1)

**EXHIBIT (a)-(1)**



March 3, 2016

Shareholders of Qihoo 360 Technology Co. Ltd.
Re: Notice of Extraordinary General Meeting of Shareholders

Dear Shareholder:

You are cordially invited to attend an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (the "Company") to be held on March 30, 2016 at 10:00 a.m. (Beijing time). The meeting will be held at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The accompanying notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

On December 18, 2015, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger") and becoming a wholly owned subsidiary of Midco. Upon the completion of the Merger, the Surviving Company will become a private company beneficially owned solely by the Buyer Group (as defined below), while Hongyi Zhou, the chairman of the board of directors and chief executive officer of the Company, and Xiangdong Qi, a director and the president of the Company, will own 22.8% and 2.2%, respectively, of the Surviving Company. The purpose of the extraordinary general meeting is for you and the other shareholders of the Company to consider and vote upon a proposal to authorize and approve the Merger Agreement and the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger (the "Plan of Merger"), and the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger. Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to the accompanying proxy statement.

The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group." As of the date of this letter, the Buyer Group collectively beneficially own 7,164,611 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represent approximately 26.8% in number and approximately 61.3% in voting rights of the Company's issued and outstanding ordinary shares, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share") and excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options. If the Merger is consummated, the Company will continue its operations as a privately held company, and, as the result of the Merger, the Company's American depositary shares ("ADSs"), two representing three Class A ordinary shares of the Company, will no longer be listed on the New York Stock Exchange (the "NYSE") and the ADS program for the Shares will terminate.

If the Merger is consummated, at the effective time of the Merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) due to or incurred by the ADS Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) and ADS Depositary services fees). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) will not be converted into the right to receive the consideration described in the immediately preceding sentence, but will be cancelled and cease to exist at the Effective Time:

Case 1:19-cv-10067-PAE Document 116-2 Filed 04/29/22 Page 3 of 84

(a) Shares owned by any Parent Party or the Company (as treasury shares, if any), any Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any options or by any direct or indirect wholly-owned subsidiary of any Parent Party or the Company, in each case immediately prior to the Effective Time, which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor;

(b) Shares owned by shareholders (the "Dissenting Shareholders") who have validly exercised and have not effectively withdrawn or lost their rights to dissent from the Merger in accordance with Section 238 of Companies Law (2013 Revision) of the Cayman Islands (the "Cayman Islands Companies Law") (the "Dissenting Shares"), which will be cancelled and cease to exist, but shall not be converted into or exchangeable for or represent the right to receive the merger consideration pursuant to the Merger Agreement, and each such Dissenting Shareholder shall be entitled only to payment of the fair value of such Dissenting Shares in accordance with Section 238 of the Cayman Islands Companies Law, and from the Effective Time such Dissenting Shareholders shall cease to have any of the rights of a shareholder of the Company except the right to be paid the fair value of such Dissenting Shares; and

(c) 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision (collectively, "Founder Securities"), which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor.

In addition to the foregoing, at the Effective Time, each outstanding vested and unexercised option to purchase shares of the Company (each a "Company Option") granted under the 2006 Employee Shares Option Scheme, 2006 Employee Share Vesting Scheme and 2011 Share Incentive Plan, and any other equity incentive arrangements of the Company (as amended and restated, collectively, the "Company Share Plans") with a per Share exercise price less than the Per Share Merger Consideration (each, a "Cashed-Out Option") will be cancelled and entitle the former holder thereof to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration.

At the Effective Time, each outstanding unvested Company Option to purchase Shares granted under the Company Share Plans will be assumed and converted into an equity incentive award of Parent through Tianjin Qirui Zhongxin Technology Partnership (Limited Partnership) (天津奇睿众信科技合伙企业(有限合伙)), a limited liability partnership formed under the laws of the People's Republic of China for the purposes of holding incentive shares of the Parent (the "Plan Vehicle") or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option.

At the Effective Time, each restricted share of the Company ("Company Restricted Share") that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

ii

Case 1:19-cv-10067-PAE Document 116-2 Filed 04/29/22 Page 4 of 84

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger.

At a meeting on December 18, 2015, the Board (other than the Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING**.

In considering the recommendation of the Special Committee and the Board, you should be aware that some of the Company's directors or executive officers have interests in the Merger that are different from, or in addition to, the interests of the shareholders generally. As of the date of this letter, Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman"), through Global Village, and Mr. Xiangdong Qi, director and president of the Company, through Young Vision, collectively beneficially own approximately 25.4% in number and approximately 60.6% in voting rights of the entire issued and outstanding Shares (excluding Shares owned by the Company as treasury shares and Shares reserved (but not yet allocated) by the Company for settlement upon exercise of any options). Global Village and Young Vision have agreed to vote all of the Shares they beneficially own in favor of the authorization and approval of the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger.

The accompanying proxy statement provides detailed information about the Merger and the extraordinary general meeting. We encourage you to read the entire document and all of the attachments and other documents referred to or incorporated by reference herein carefully. You may also obtain more information about the Company from documents the Company has filed with or furnished to the United States Securities and Exchange Commission (the "SEC"), which are available for free at the SEC's website www.sec.gov.

iii

Regardless of the number of Shares that you own, your vote is very important. The Merger cannot be consummated unless the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, are authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting (the "Company Shareholder Approval"). Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on March 25, 2016, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"), an amount of Shares representing approximately 5.4% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

Voting at the extraordinary general meeting will take place by poll voting, as the Chairman has undertaken to demand poll voting at the meeting. Whether or not you plan to attend the extraordinary general meeting, please complete, sign and return to the Company the accompanying proxy card, which is attached as Annex F to the accompanying proxy statement, in accordance with the instructions set forth on the proxy card, as soon as possible so that it is received by the Company no later than March 29, 2016 at 9:00 a.m. (Beijing time), the deadline to lodge your proxy card. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date.

Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are held of record by a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the record holder a proxy issued in your name. If you submit a signed proxy card without indicating how you wish to vote, the Shares represented by your proxy card will be voted FOR the proposal to authorize and approve the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, FOR the proposal to authorize each of the members of the Special Committee, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company to do all things necessary to give effect to the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy will be voted (or not submitted for voting) as your proxy determines.

As the record holder of the Shares represented by ADSs, the ADS Depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions, the form of which is attached as Annex G to the accompanying proxy statement, timely received from holders of ADSs at the close of business in New York City on March 7, 2016 (the "ADS Record Date"). The ADS Depositary must receive such instructions no later than 5:00 p.m. (New York City time) on March 25, 2016. The ADS Depositary has advised us that, pursuant to Section 4.07 of the amended and restated deposit agreement dated as of May 19, 2014 among the Company, the ADS Depositary and the holders and beneficial owners of ADSs issued thereunder (the "Deposit Agreement"), it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Shares represented by ADSs for which no timely voting instructions are received by the ADS Depositary will not be voted. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

iv

Holders of ADSs will not be able to attend or vote at the extraordinary general meeting unless they surrender their ADSs for delivery of Shares and become registered in the Company's register of members as the holders of Shares prior to the close of business in the Cayman Islands on the Share Record Date. ADS holders who wish to surrender their ADSs need to make arrangements to deliver the ADSs to the ADS Depositary for cancellation before 5:00 p.m. (New York City time) on March 23, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)) to be cancelled pursuant to the terms of the Deposit Agreement), which will not be borne by the Surviving Company, and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the ADS Record Date and has not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered, or has given voting instructions to the ADS Depositary as to the ADSs being surrendered but undertakes not to vote the corresponding Shares at the extraordinary general meeting or (ii) did not hold the ADSs as of the ADS Record Date and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to surrender the ADSs on your behalf. Upon surrender of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after the registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman Registrar of Shares, Maples Fund Services (Cayman) Limited, to issue and mail a certificate to your attention. If the Merger is not consummated, the Company will continue to be a publicly traded company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have surrendered your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

Shareholders who elect to dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to the accompanying proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise dissenters' rights with respect to your Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTERS' RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON MARCH 23, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTERS' RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTERS' RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

v

Case 1:19-cv-10067-PAE Document 116-2 Filed 04/29/22 Page 7 of 84

**Neither the SEC nor any state securities regulatory agency has approved or disapproved the Merger, passed upon the merits or fairness of the Merger or passed upon the adequacy or accuracy of the disclosure in this letter or in the accompanying notice of the extraordinary general meeting or proxy statement. Any representation to the contrary is a criminal offense.**

If you have any questions or need assistance voting your Shares or ADSs, please contact the Company by calling at +86 10 5878-1574 or emailing to ir@360.cn.

Thank you for your cooperation and continued support.

Sincerely,                                                     Sincerely,

/s/ Eric X. Chen                                              /s/ Hongyi Zhou

Eric X. Chen                                                  Hongyi Zhou
Director and Chairman of the Special Committee               Chairman of the Board

**The accompanying proxy statement is dated March 3, 2016, and is first being mailed to the Company's shareholders and ADS holders on or about March 11, 2016.**

vi

Case 1:19-cv-10067-RAE Document 116-2 1508913 Filed 04/29/22 Page 8 of 84

**QIHOO 360 TECHNOLOGY CO. LTD.**
**NOTICE OF EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS TO BE HELD ON**
**MARCH 30, 2016**

Dear Shareholder:

Notice is hereby given that an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (referred to herein alternately as "the Company," "us," "we" or other terms correlative thereto) will be held on March 30, 2016 at 10:00 a.m. (Beijing time) at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China.

Only registered holders of ordinary shares of the Company, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share"), at the close of business in the Cayman Islands on March 25, 2016 (the "Share Record Date") or their proxy holders are entitled attend and to vote at this extraordinary general meeting or any adjournment thereof. At the extraordinary general meeting, you will be asked to consider and vote upon the following resolutions:

- as a special resolution:

**THAT** the Agreement and Plan of Merger, dated as of December 18, 2015 (the "Merger Agreement"), by and among Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), the Company, and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and together with Global Village, the "Founder Securityholders")) (the Merger Agreement being in the form attached as Annex A to the proxy statement and to be produced and made available for inspection at the extraordinary general meeting), the plan of merger (the "Plan of Merger") required to be registered with the Registrar of Companies in the Cayman Islands (the Plan of Merger being in the form attached as Annex B to the proxy statement and to be produced and made available for inspection at the extraordinary general meeting) in order to give effect to the merger of Merger Sub with and into the Company, with the Company being the surviving company and a wholly owned subsidiary of Midco (the "Merger"), and any and all transactions contemplated by the Merger Agreement and the Plan of Merger, including (i) the Merger, (ii) the variation of the authorized share capital of the Company from $500,000 divided into 378,000,000 Class A ordinary shares of a par value of $0.001 each and 122,000,000 Class B ordinary shares of a par value of $0.001 each to $50,000 divided into 50,000 ordinary shares of a par value of $1.00 each (the "Variation of Capital"), and (iii) the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of the new memorandum and articles of association in the form attached as Appendix II to the Plan of Merger (the "Adoption of Amended M&A"), be authorized and approved;

- as an ordinary resolution:

**THAT** each of the members of the special committee of the board of directors of the Company, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company be authorized to do all things necessary to give effect to the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including (i) the Merger, (ii) the Variation of Capital and (iii) the Adoption of Amended M&A; and

vii

Case 1:19-cv-10067-PAE Document 116-2 Filed 04/29/22 Page 9 of 84

- if necessary, as an ordinary resolution:

**THAT** the extraordinary general meeting be adjourned in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting.

Please refer to the accompanying proxy statement, which is attached to and made a part of this notice. A list of the Company's shareholders will be available at its principal executive offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, during ordinary business hours for the two business days immediately prior to the extraordinary general meeting.

Pursuant to the Merger Agreement, Global Village, an existing shareholder of the Company and a British Virgin Islands company controlled by Mr. Hongyi Zhou, chairman and chief executive officer of the Company, and Young Vision, an existing shareholder of the Company and a British Virgin Islands company controlled by Mr. Xiangdong Qi, director and president of the Company, agreed that they will vote all of the Shares (including Shares represented by the Company's American depositary shares ("ADSs")) beneficially owned by them in favor of the approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. As of the date of this notice, the Buyer Group collectively beneficially own 7,164,611 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represent approximately 26.8% in number and approximately 61.3% in voting rights of the Company's issued and outstanding ordinary shares (excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options). The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group."

After careful consideration and upon the unanimous recommendation of a special committee of the Board (the "Special Committee"), composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company, the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present) (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the shareholders and ADS holders of the Company, other than shareholders and ADS holders who are affiliates of the Company including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of, one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders") and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger, and (c) resolved to recommend the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval. The Board recommends that you vote FOR the proposal to authorize and approve the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, FOR the proposal to authorize each of the members of the Special Committee, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company to do all things necessary to give effect to the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting.

Regardless of the number of Shares that you own, your vote is very important. The Merger cannot be consummated unless the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, are authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting. Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on the Share Record Date, an amount of Shares representing approximately 5.4% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

viii

Even if you plan to attend the extraordinary general meeting in person, we request that you submit your proxy in accordance with the instructions set forth on the proxy card, which is attached as Annex F to the accompanying proxy statement, as promptly as possible. To be valid, your proxy card must be completed, signed and returned to the Company's offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, attention: Investor Relations Department, or alternatively a copy of the completed and signed proxy card may be sent by email to ir@360.cn, in each case so that the proxy card is received by the Company no later than March 29, 2016 at 9:00 a.m. (Beijing time). The proxy card is the "instrument of proxy" and the "instrument appointing a proxy" as referred to in the Company's articles of association. Voting at the extraordinary general meeting will take place by poll voting as the Chairman has undertaken to demand poll voting at the meeting. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date. If you receive more than one proxy card because you own Shares that are registered in different names, please vote all of your Shares shown on each of your proxy cards in accordance with the instructions set forth on the proxy card.

Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are registered in the name of a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the record holder a proxy issued in your name.

If you abstain from voting, fail to cast your vote in person, fail to complete and return your proxy card in accordance with the instructions set forth on the proxy card, or fail to give voting instructions to your broker, bank or other nominee, your vote will not be counted.

When proxies are properly dated, executed and returned by holders of Shares, the Shares they represent will be voted at the extraordinary general meeting in accordance with the instructions of the shareholders. If no specific instructions are given by such shareholders, such Shares will be voted "FOR" the proposals as described above, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy card will be voted (or not submitted for voting) as your proxy determines.

If you own ADSs as of the close of business in New York City on March 7, 2016 (the "ADS Record Date") (and do not surrender such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may give voting instructions, the form of which is attached as Annex G to the accompanying proxy statement, to The Bank of New York Mellon (the "ADS Depositary"), in its capacity as the ADS depositary and the holder of the Shares underlying your ADSs, how to vote the Shares underlying your ADSs by completing and signing the ADS voting instruction card and returning it in accordance with the instructions printed on it as soon as possible. The ADS Depositary must receive your instructions no later than 5:00 p.m. (New York City time) on March 25, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote. Alternatively, if you own ADSs as of the close of business in New York City on the ADS Record Date, you may vote at the extraordinary general meeting directly if you surrender your ADSs and become a registered holder of the Shares underlying your ADSs prior to the close of business in the Cayman Islands on March 25, 2016, the Share Record Date. If you wish to surrender your ADSs for the purpose of voting Shares directly, you need to make arrangements to deliver your ADSs to the ADS Depositary for cancellation before 5:00 p.m. (New York City time) on March 23, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the amended and restated deposit agreement, dated as of May 19, 2014, among the Company, the ADS Depositary and the holders and beneficial owners of ADSs issued thereunder (the "Deposit Agreement")), which will not be borne by the Surviving Company, and any applicable taxes, and (c) a certification that you held the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being cancelled. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf.

ix

Shareholders who dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to the accompanying proxy statement. The fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise dissenters' rights with respect to their Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTERS' RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON MARCH 23, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTERS' RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NEW YORK STOCK EXCHANGE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NEW YORK STOCK EXCHANGE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTERS' RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

PLEASE DO NOT SEND YOUR SHARE CERTIFICATES OR ADSs AT THIS TIME. IF THE MERGER IS CONSUMMATED, YOU WILL BE SENT INSTRUCTIONS REGARDING THE SURRENDER OF YOUR SHARE CERTIFICATES OR ADSs.

x

If you have any questions or need assistance voting your Shares or ADSs, please call +86 10-5878-1574 or email to ir@360.cn.

The Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger, are described in the accompanying proxy statement. Copies of the Merger Agreement and the Plan of Merger are included as Annex A and Annex B, respectively, to the accompanying proxy statement. We urge you to read the entire accompanying proxy statement carefully.

Notes:

1.  In the case of joint holders, the vote of the senior holder who tenders a vote, whether in person or by proxy, will be accepted to the exclusion of the votes of the joint holders. For this purpose, seniority will be determined by the order in which the names stand in the register of members of the Company.

2.  The instrument appointing a proxy must be in writing under the hand of the appointer or of his or her attorney duly authorized in writing or, if the appointer is a corporation, under the hand of an officer or attorney duly authorized.

3.  A proxy need not be a member (registered shareholder) of the Company.

4.  The chairman of the extraordinary general meeting may in any event at his or her discretion direct that a proxy card will be deemed to have been duly deposited. A proxy card that is not deposited in the manner permitted (that is, in accordance with the instructions set forth on the proxy card, which is attached as Annex F to the accompanying proxy statement, or which is otherwise directed by the chairman to be deemed to have been duly deposited) will be invalid.

5.  Votes given in accordance with the terms of a proxy card will be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the Share or Shares in respect of which the proxy is given, unless notice in writing of such death, insanity, revocation or transfer is received by the Company at the Company's offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, attention: Investor Relations Department, no later than the commencement of the extraordinary general meeting, or adjourned meeting at which such proxy is used.

BY ORDER OF THE BOARD OF DIRECTORS,

/s/ Hongyi Zhou
Hongyi Zhou
Chairman of the Board
March 3, 2016

xi

Case 1:19-cv-10067-PAE    Document 116-2    Filed 04/29/22    Page 13 of 184

**PROXY STATEMENT**

**Dated March 3, 2016**

**SUMMARY VOTING INSTRUCTIONS**

**Ensure that your shares of Qihoo 360 Technology Co. Ltd. can be voted at the extraordinary general meeting by submitting your proxy or contacting your broker, bank or other nominee.**

***If your shares are registered in the name of a broker, bank or other nominee***: check the voting instruction card forwarded by your broker, bank or other nominee to see which voting options are available or contact your broker, bank or other nominee in order to obtain directions as to how to ensure that your shares are voted at the extraordinary general meeting.

***If your shares are registered in your name***: submit your proxy as soon as possible by signing, dating and returning the accompanying proxy card in the enclosed postage-paid envelope, which is also attached as Annex F to the accompanying proxy statement, so that your shares can be voted at the extraordinary general meeting in accordance with your instruction.

If you submit your proxy card without indicating how you wish to vote, the shares represented by your proxy will be voted in favor of the resolutions to be proposed at the extraordinary general meeting, unless you appoint a person other than the chairman of the meeting as proxy, in which case the shares represented by your proxy will be voted (or not submitted for voting) as your proxy determines.

*If you have any questions, require assistance with voting your proxy card, or need additional copies of proxy material, please contact the Company by calling at +86 10 5878-1574 or emailing to ir@360.cn.*

xii

**Table of Contents**

|  | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| The Parties Involved in the Merger | 1 |
| The Merger (Page 92) | 2 |
| Merger Consideration (Page 92) | 3 |
| Treatment of Company Options (Page 93) | 4 |
| Treatment of Company Restricted Shares (Page 93) | 4 |
| Treatment of Company Convertible Notes (Page 93) | 5 |
| Recommendation of the Special Committee and the Board (Page 41) | 5 |
| Record Date and Voting (Page 86) | 6 |
| Shareholder Vote Required to Authorize and Approve the Merger Agreement and the Plan of Merger (Page 87) | 6 |
| Voting Information (Page 87) | 7 |
| Dissenter Rights of Shareholders and ADS Holders (Page 113) | 8 |
| Purposes and Effects of the Merger (Page 60) | 9 |
| Plans for the Company after the Merger (Page 68) | 9 |
| Position of the Buyer Group as to Fairness of the Merger (Page 47) | 9 |
| Financing of the Merger (Page 69) | 10 |
| Limited Guarantees; Global Village Guarantee (Page 73) | 10 |
| Escrow Agreement (Page 73) | 10 |
| Interim Investors Agreement (Page 73) | 10 |
| Opinion of the Special Committee's Financial Advisor (Page 53) | 10 |
| Interests of the Company's Executive Officers and Directors in the Merger (Page 74) | 11 |
| Acquisition Proposal (Page 101) | 12 |
| Conditions to the Merger (Page 107) | 13 |
| Termination of the Merger Agreement (Page 108) | 14 |
| Termination Fee (Page 109) | 15 |
| Material U.S. Federal Income Tax Consequences (Page 79) | 16 |
| Material PRC Income Tax Consequences (Page 82) | 16 |
| Material Cayman Islands Tax Consequences (Page 83) | 16 |
| Regulatory Matters (Page 79) | 16 |
| Litigation Related to the Merger (Page 79) | 17 |
| Accounting Treatment of the Merger (Page 79) | 17 |
| Market Price of the ADSs (Page 84) | 17 |
| Fees and Expenses (Page 78) | 17 |
| Remedies (Page 74) | 17 |
| QUESTIONS AND ANSWERS ABOUT THE EXTRAORDINARY GENERAL MEETING AND THE MERGER | 18 |
| SPECIAL FACTORS | 29 |
| Background of the Merger | 29 |
| Reasons for the Merger and Recommendation of the Special Committee and the Board | 41 |
| Position of the Buyer Group as to the Fairness of the Merger | 47 |
| Certain Financial Projections | 51 |
| Opinion of the Special Committee's Financial Advisor | 53 |
| Purposes of and Reasons for the Merger | 60 |
| Effects of the Merger on the Company | 61 |
| Plans for the Company after the Merger | 68 |
| Alternatives to the Merger | 68 |
| Effects on the Company if the Merger Is Not Consummated | 69 |
| Financing of the Merger | 69 |
| Limited Guarantees; Global Village Guarantee | 73 |
| Escrow Agreements | 73 |
| Interim Investors Agreement | 73 |
| Remedies | 74 |

xiii

| | |
|---|---|
| Interests of Certain Persons in the Merger | 74 |
| Related-Party Transactions | 78 |
| Fees and Expenses | 78 |
| Voting by the Buyer Group at the Extraordinary General Meeting | 78 |
| Litigation Related to the Merger | 79 |
| Accounting Treatment of the Merger | 79 |
| Regulatory Matters | 79 |
| Dissenter Rights | 79 |
| Material U.S. Federal Income Tax Consequences | 79 |
| Material PRC Income Tax Consequences | 82 |
| Material Cayman Islands Tax Consequences | 83 |
| MARKET PRICE OF THE COMPANY'S ADSs, DIVIDENDS AND OTHER MATTERS | 84 |
| Market Price of the ADSs | 84 |
| Dividend Policy | 84 |
| THE EXTRAORDINARY GENERAL MEETING | 85 |
| Date, Time and Place of the Extraordinary General Meeting | 85 |
| Proposals to be Considered at the Extraordinary General Meeting | 85 |
| The Board's Recommendation | 86 |
| Record Date; Shares and ADSs Entitled to Vote | 86 |
| Quorum | 86 |
| Vote Required | 87 |
| Procedures for Voting | 87 |
| Proxy Holders for Registered Shareholders | 89 |
| Voting of Proxies and Failure to Vote | 89 |
| Revocability of Proxies | 89 |
| Rights of Shareholders Who Object to the Merger | 90 |
| Whom to Call for Assistance | 91 |
| Solicitation of Proxies | 91 |
| Other Business | 91 |
| THE MERGER AGREEMENT | 92 |
| Structure and Consummation of the Merger | 92 |
| Memorandum and Articles of Association; Directors and Officers of the Surviving Company | 92 |
| Merger Consideration | 92 |
| Treatment of Company Options and Company Restricted Shares | 93 |
| Treatment of Company Convertible Notes | 93 |
| Exchange Procedures | 93 |
| Representations and Warranties | 94 |
| Conduct of Business Prior to Closing | 98 |
| Shareholders' Meeting | 100 |
| Acquisition Proposals | 101 |
| No Company Adverse Recommendation Change | 103 |
| Indemnification; Directors' and Officers' Insurance | 104 |
| Financing | 105 |
| Obligations of Founder Securityholders | 106 |
| Other Covenants | 106 |
| Conditions to the Merger | 107 |
| Termination of the Merger Agreement | 108 |
| Termination Fee | 109 |
| Remedies and Limitations on Liability | 110 |
| Amendment | 111 |
| PROVISIONS FOR UNAFFILIATED HOLDERS | 112 |
| DISSENTER RIGHTS | 113 |
| Requirements for Exercising Dissenter Rights | 113 |
| FINANCIAL INFORMATION | 115 |
| Selected Historical Financial Information | 115 |

xiv

|  |  |
|---|---|
| Ratio of Earnings to Fixed Charges | 117 |
| Net Book Value per Share of Our Shares | 117 |
| TRANSACTIONS IN SHARES AND ADSs | 118 |
| Purchases by the Company | 118 |
| Purchases by the Buyer Group | 118 |
| Prior Public Offerings | 121 |
| Transactions in Prior 60 Days | 121 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF THE COMPANY | 122 |
| FUTURE SHAREHOLDER PROPOSALS | 124 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 125 |
| WHERE YOU CAN FIND MORE INFORMATION | 127 |
| ANNEX A: AGREEMENT AND PLAN OF MERGER | A-1 |
| ANNEX B: PLAN OF MERGER | B-1 |
| ANNEX C: OPINION OF J.P. Morgan Securities (Asia Pacific) Limited AS FINANCIAL ADVISOR | C-1 |
| ANNEX D: CAYMAN ISLANDS COMPANIES LAW CAP. 22 (LAW 3 OF 1961, AS CONSOLIDATED AND REVISED) – SECTION 238 | D-1 |
| ANNEX E: DIRECTORS AND EXECUTIVE OFFICERS OF EACH FILING PERSON | E-1 |
| ANNEX F: FORM OF PROXY CARD | F-1 |
| ANNEX G: FORM OF ADS VOTING INSTRUCTION CARD | G-1 |

xv

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 17 of 184

**SUMMARY TERM SHEET**

*This "Summary Term Sheet" and the "Questions and Answers About the Extraordinary General Meeting and the Merger" highlight selected information contained in this proxy statement regarding the Merger (as defined below) and may not contain all of the information that may be important to your consideration of the Merger and other transactions contemplated by the Merger Agreement (as defined below). You should carefully read this entire proxy statement and the other documents to which this proxy statement refers for a more complete understanding of the matters being considered at the extraordinary general meeting. In addition, this proxy statement incorporates by reference important business and financial information about the Company. You are encouraged to read all of the documents incorporated by reference into this proxy statement and you may obtain such information without charge by following the instructions in "Where You Can Find More Information" beginning on page 127. In this proxy statement, the terms "the Company," "us," "we" or other terms correlative thereto refer to Qihoo 360 Technology Co. Ltd. All references to "dollars" and "$" in this proxy statement are to U.S. dollars, and all references to "RMB" in this proxy statement are to Renminbi, the lawful currency of the People's Republic of China ("PRC" or "China").*

**The Parties Involved in the Merger**

**The Company**

The Company is a leading Internet company in China. The Company is also the number one provider of Internet and mobile security products in China as measured by its user base, according to iResearch. The Company also provides users with secure access points to the Internet via its market leading web browsers and application stores. The Company has built one of the largest open Internet platforms in China and monetizes its massive user base primarily through online advertising and through Internet value-added services on its open platform.

The Company is an exempted company with limited liability incorporated under the laws of the Cayman Islands. The Company's principal executive office is located at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The Company's telephone number at this address is +86 10 5878-1000 and its fax number is +86 10 5682-2000.

For a description of the Company's history, development, business and organizational structure, see its annual report on Form 20-F for the year ended December 31, 2014, filed with the United States Securities and Exchange Commission (the "SEC") on April 27, 2015, which is incorporated herein by reference. See "Where You Can Find More Information" beginning on page 127 for a description of how to obtain a copy of its annual report.

**Holdco**

Tianjin Qixin Zhicheng Technology Co., Ltd. is a limited liability company incorporated under the laws of the PRC ("Holdco"). The business address of Holdco is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Holdco's telephone number is +86-10-5878-1078 and its fax number is +86 10 5682-2000.

**Parent**

Tianjin Qixin Tongda Technology Co., Ltd. is a limited liability company incorporated under the laws of the PRC ("Parent"). The business address of Parent is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015. Parent's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

**Midco**

True Thrive Limited is an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco") formed solely for the purpose of holding the equity interest in Merger Sub (as defined below) and consummating the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger (as defined below). The business address of Merger Sub is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Merger Sub's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

1

Case 1:19-cv-10067-RA Document 116-2 Filed 04/29/23 Page 18 of 84

**Merger Sub**

New Summit Limited is an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub") formed solely for the purpose of effecting the Merger. The business address of Merger Sub is at Building #2, No.6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. Merger Sub's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000.

**Global Village Associates Limited**

Global Village Associates Limited is a British Virgin Islands company ("Global Village"). The registered office of Global Village is P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, the British Virgin Islands and its executive offices are located at Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. Global Village's telephone number is +86 10 5878-1078 and its fax number is +86 10 5682-2000. Global Village is wholly owned by Fair Point International Limited, a British Virgin Islands company, which is wholly owned by a revocable trust constituted under the laws of Singapore with Mr. Hongyi Zhou and his wife as the settlers and Mr. Zhou as investment manager with sole voting and dispositive power and certain family members of Mr. Zhou as the beneficiaries. Huan Hu is the sole director of Global Village.

**Young Vision Group Limited**

Young Vision Group Limited is a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"). The registered office of Young Vision is 2nd Floor, Abbott Building, Road Town, Tortola, British Virgin Islands and its executive offices are located at Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. Young Vision's telephone number is +86 10 5682-2141 and its fax number is +86 10 5682-2000. Young Vision is wholly owned by East Line Holdings Limited, a British Virgin Islands company, which is in turn wholly-owned by Mr. Xiangdong Qi. Mr. Qi is the sole director of Young Vision.

**Hongyi Zhou**

Mr. Zhou is the co-founder, chairman and chief executive officer of the Company (the "Chairman"), and is a PRC citizen. The business address of Mr. Zhou is Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, the People's Republic of China. During the last five years, Mr. Zhou has not been: (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining Mr. Zhou from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

**Xiangdong Qi**

Mr. Qi is the co-founder, director and president of the Company, and is a PRC citizen. The business address of Mr. Qi is Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. During the last five years, Mr. Qi has not been: (i) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining Mr. Qi from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

**Tianjin Xinxin Qiyuan Investment Limited Partnership**

Tianjin Xinxin Qiyuan Investment Limited Partnership is a limited partnership organized under the laws of the PRC ("Xinxin Qiyuan"). Its business address is 4-B-31, 4/F Building #3, 188 Rixin Street, Binhai Technology Campus, Binhai High-Tech Industrial Development Area, Tianjin, People's Republic of China. Its telephone number is +86 22 2378-5971 and its fax number is +86 22 8717-6696. Its principle business is equity investment.

**Tianjin Xinxinsheng Investment Limited Partnership**

Tianjin Xinxinsheng Investment Limited Partnership is a limited partnership organized under the laws of the PRC ("Xinxinsheng"). Its business address is Electronic City, 6 Jiuxianqiao Road, Chaoyang District, Beijing, People's Republic of China. Its telephone number is +86 10 5682-1940 and its fax number is +86 10 5878-2000. Its principal business is investment.

**The Merger (Page 92)**

The Company, Holdco, Parent, Midco, Merger Sub, and, solely for the purposes of Section 6.19 of the Merger Agreement, Global Village and Young Vision entered into an agreement and plan of merger (the "Merger Agreement") on December 18, 2015, pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger"). You are being asked to vote upon a proposal to authorize and approve the Merger Agreement, the plan of merger (the "Plan of Merger") required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger, and the transactions contemplated thereby, including the Merger.

2

Pursuant to the terms of the Merger Agreement, assuming the Merger Agreement and the Plan of Merger are authorized and approved by the requisite vote of the shareholders of the Company and the other conditions to the consummation of the Merger are satisfied or waived in accordance with the terms of the Merger Agreement, the following will occur:

- the Company will file the Plan of Merger with the Cayman Registrar and the Merger will be effective upon the filing of the Plan of Merger with the Cayman Registrar or such other time as maybe agreed and otherwise on the date specified in the Plan of Merger (the "Effective Time");

- the Surviving Company will become a wholly owned subsidiary of Midco and cease to be a publicly traded company;

- each Share issued and outstanding immediately prior to the Effective Time (including Shares represented by American depositary shares ("ADSs"), every two representing three Class A ordinary shares) will be cancelled and cease to exist, in exchange for the right to receive the consideration further described below, except for the Excluded Shares (as defined below);

- the Company's ADS program for Class A ordinary shares will be terminated and ADSs will cease to be listed on the New York Stock Exchange (the "NYSE"), and price quotations with respect to sales of ADSs in the public market will no longer be available;

- 90 days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of Shares under the United States Securities Exchange Act of 1934, as amended (the "Exchange Act") will be terminated;

- the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies, and the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company; and

- the Company's shareholders (other than members of the Buyer Group) will no longer have any interest in, and will no longer be shareholders of, the Company, and will not participate in any of the Company's future earnings or growth.

Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to this proxy statement. You should read the Merger Agreement and the Plan of Merger in their entirety because they, and not this proxy statement, are the legal documents that govern the Merger.

**Merger Consideration (Page 92)**

If the Merger is consummated, at Effective Time, each ordinary share of the Company, consisting of Class A ordinary share or Class B ordinary share, par value $0.001 per share (each a "Share") issued and outstanding immediately prior to the Effective Time (other than Excluded Shares (as defined below)) will be cancelled and cease to exist in exchange for the right to receive $51.33 (the "Per Share Merger Consideration") in cash without interest and each issued and outstanding ADS (other than ADSs that represent Excluded Shares) will represent the right to receive $77.00 (the "Per ADS Merger Consideration") in cash without interest, in each case, net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) incurred by the ADS Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) and ADS Depositary services fees). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) (collectively, the "Excluded Shares") will not be converted into the right to receive the consideration described in the immediately preceding sentence:

(a) Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options (as defined below) or by any direct or indirect wholly owned subsidiary of any Parent Party or the Company, in each case immediately prior to the Effective Time, which will be cancelled and cease to exist and no consideration shall be delivered or deliverable in exchange therefor;

3

(b)  Shares held by shareholders ("Dissenting Shareholders") who have validly exercised and have not effectively withdrawn or lost their rights to dissent from the Merger ("Dissenter Rights") pursuant to Section 238 of the Cayman Islands Companies Law (collectively, the "Dissenting Shares"), which will be cancelled and cease to exist, but shall not be converted into or exchangeable for or represent the right to receive the merger consideration pursuant to the Merger Agreement, and such Dissenting Shareholder shall be entitled only to payment of the fair value of such Dissenting Shares in accordance with Section 238 of the Cayman Islands Companies Law, and from the Effective Time such Dissenting Shareholders shall cease to have any of the rights of a shareholder of the Company except the right to be paid the fair value of such Dissenting Shares; and

(c)  (i) 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village and (ii) 4,904,709 Class B ordinary shares held by Young Vision, which will be cancelled and cease to exist and no consideration shall be delivered or deliverable in exchange therefor.

**Treatment of Company Options (Page 93)**

At the Effective Time, each outstanding vested and unexercised option to purchase Shares of the Company (the "Company Option") granted under the 2006 Employee Shares Option Scheme, 2006 Employee Share Vesting Scheme and 2011 Share Incentive Plan, and any other equity incentive arrangements of the Company (as amended and restated, collectively, the "Company Share Plans") with a per Share exercise price less than the Per Share Merger Consideration (each, a "Cashed-Out Option") will be cancelled and entitle the former holder thereof to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration.

At the Effective Time, each outstanding unvested Company Option granted under the Company Share Plans will be assumed and converted into an equity incentive award of Parent through Tianjin Qirui Zhongxin Technology Partnership (Limited Partnership) (天津奇睿众信科技合伙企业(有限合伙)), a limited liability partnership formed under the laws of the People's Republic of China for the purposes of holding incentive shares of the Parent (the "Plan Vehicle") or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option.

**Treatment of Company Restricted Shares (Page 93)**

At the Effective Time, each restricted share of the Company ("Company Restricted Share") that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent, through the Plan Vehicle or such other arrangements, on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

4

**Treatment of Company Convertible Notes (Page 93)**

Each holder of Company Convertible Notes has the option to require the Surviving Company to repurchase such holder's Company Convertible Notes for a purchase price equal to 100% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest, if any, through but excluding, the applicable fundamental change repurchase date as defined under the applicable Indenture Agreements (as defined below). Furthermore, after the Effective Time but prior to and including the third business day prior to the applicable fundamental change repurchase date, each holder of Company Convertible Notes will be entitled, subject to the terms and conditions of the applicable Indenture Agreements, to convert such holder's Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements plus any entitled increase in the conversion rate as determined pursuant to the applicable Indenture Agreements. After the third business day prior to the applicable fundamental change repurchase date, each holder of the Company Convertible Notes, to the extent such holder has not exercised its right to require the Surviving Company to repurchase such holder's Company Convertible Notes, will be entitled to convert such Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements. As used herein, the term "Company Convertible Notes" means, collectively, the Company's 2.5% convertible senior notes due September 15, 2018 that were issued pursuant to the indenture, dated September 5, 2013, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2018 Notes Indenture"), the Company's 0.5% convertible senior notes due August 15, 2020 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2020 Notes Indenture"), and the Company's 1.75% convertible senior notes due August 15, 2021 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2021 Notes Indenture" and together with the 2018 Notes Indenture and the 2020 Notes Indenture, the "Indenture Agreements").

**Recommendation of the Special Committee and the Board (Page 41)**

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of, one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger.

The Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

5

ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING.

For a detailed discussion of the material factors considered by the Special Committee and the Board in determining to recommend the approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, and in determining that the Merger is fair to and in the best interest of the Company and the Unaffiliated Holders, see "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 41 and "Special Factors—Effects of the Merger on the Company—Primary Benefits and Detriments of the Merger" beginning on page 63. The foregoing summary is qualified in its entirety by reference to these sections.

**Record Date and Voting (Page 86)**

You are entitled to vote at the extraordinary general meeting if you have Shares registered in your name at the close of business in the Cayman Islands on March 25, 2016, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"). If you own Shares at the close of business in the Cayman Islands on the Share Record Date, you should lodge your proxy card and vote so that the proxy card is received by the Company no later than March 29, 2016 at 9:00 a.m. (Beijing time).

If you own ADSs as of the close of business in New York City on March 7, 2016 (the "ADS Record Date") (and do not surrender such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may give voting instructions, the form of which is attached as Annex G to this proxy statement, to the ADS Depositary, in its capacity as the holder of the Shares underlying your ADSs, how to vote the Shares underlying your ADSs. The ADS Depositary must receive your instructions no later than 5:00 p.m. (New York City time) on March 25, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote. Alternatively, if you own ADSs as of the close of business in New York City on the ADS Record Date, you may vote at the extraordinary general meeting directly if you surrender your ADSs and become a registered holder of the Shares underlying your ADSs prior to the close of business in the Cayman Islands on March 25, 2016, the Share Record Date. If you wish to surrender your ADSs for the purpose of voting Shares directly, you need to make arrangements to deliver your ADSs to the ADS Depositary for cancellation before 5:00 p.m. (New York City time) on March 23, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the amended and restated deposit agreement dated May 19, 2014 among the Company, the ADS Depositary and the holders and beneficiary owners of ADSs issued thereunder (the "Deposit Agreement")), and (c) a certification that you held the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date. See "—Voting Information" below.

**Shareholder Vote Required to Authorize and Approve the Merger Agreement and the Plan of Merger (Page 87)**

In order for the Merger to be consummated, the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, must be authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting (the "Company Shareholder Approval").

6

Case 1:19-cv-10067-RAE   Document 116-2   Filed 04/29/22   Page 23 of 184

As of the date of this proxy statement, the Holdco, Parent, Midco, Merger Sub, the Founder Securityholders, the equity investors (the "Equity Investors") named in Exhibit B of the Merger Agreement (collectively, the "Buyer Group") beneficially own an aggregate of 7,164,611 Class A ordinary shares (including Class A ordinary shares represented by ADSs) and 41,263,812 Class B ordinary shares, which represent approximately 26.8% in number and 61.3% in voting rights of the entire issued and outstanding Shares excluding Shares owned by the Company as treasury shares and Shares reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options. See "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 122 for additional information. Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on the Share Record Date, an amount of Shares representing approximately 5.4% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

**Voting Information (Page 87)**

Before voting your Shares, we encourage you to read this proxy statement in its entirety, including all of the annexes, attachments, exhibits and materials incorporated by reference, and carefully consider how the Merger will affect you. To ensure that your Shares can be voted at the extraordinary general meeting, please complete the accompanying proxy card in accordance with the instructions set forth on the proxy card as soon as possible. You should lodge your proxy card so that it is received by the Company no later than March 29, 2016, at 9:00 a.m. (Beijing time). If a broker, bank or other nominee holds your Shares in "street name," your broker, bank or other nominee should provide you with instructions on how to vote your Shares. Your broker, bank or other nominee will not vote your Shares in the absence of specific instructions from you. These non-voted Shares are referred to as "broker non-votes."

If you own ADSs as of the close of business in New York City on the ADS Record Date (and do not surrender such ADSs and become a registered holder of the Shares underlying your ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS Depositary (as the holder of Shares underlying your ADSs) how to vote the Shares underlying your ADSs by completing and signing the ADS voting instruction card and returning it in accordance with the instructions printed on it as soon as possible. The ADS Depositary must receive such instructions no later than 5:00 p.m. (New York City time) on March 25, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting. The ADS Depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions timely received from holders of ADSs. The ADS Depositary has advised us that, pursuant to Section 4.07 of the Deposit Agreement, it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

Alternatively, if you own ADSs as of the close of business in New York City on the ADS Record Date, you may vote at the extraordinary general meeting directly if you surrender your ADSs and become a holder of the Shares underlying your ADSs prior to the close of business in the Cayman Islands on the Share Record Date. If you wish to surrender your ADSs for the purpose of voting Shares, you need to make arrangements to deliver your ADSs to the ADS Depositary for cancellation before 5:00 p.m. (New York City time) on March 23, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the Deposit Agreement) and any applicable taxes, and (c) a certification that you held the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon surrender of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If the Merger is not consummated, the Company will continue to be a publicly traded company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have converted your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

7

Case 1:19-cv-10067-PAE    Document 116-2    Filed 04/29/22    Page 24 of 84

**Dissenter Rights of Shareholders and ADS Holders (Page 113)**

Shareholders who elect to dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of Dissenter Rights, which is attached as Annex D to this proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise Dissenter Rights with respect to your Shares.

ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON MARCH 23, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.

We encourage you to read the section of this proxy statement entitled "Dissenter Rights" as well as Annex D to this proxy statement carefully and to consult your Cayman Islands legal counsel if you desire to exercise your Dissenter Rights.

**Purposes and Effects of the Merger (Page 60)**

The purpose of the Merger is to enable Parent to acquire 100% control of the Company in a transaction in which the holders of Shares and ADSs (other than the Excluded Shares and ADSs representing the Excluded Shares) will be cashed out in exchange for the Per Share Merger Consideration or the Per ADS Merger Consideration, as applicable, so that Parent, through Midco, will bear the rewards and risks of the sole ownership of the Company. See "Special Factors—Purposes of and Reasons for the Merger" beginning on page 60 for additional information.

The Company's ADSs, every two representing three Class A ordinary shares, are currently listed on the NYSE under the symbol "QIHU." It is expected that, following the consummation of the Merger, the Company will cease to be a publicly traded company and will instead become a private company beneficially owned solely by the Buyer Group. Following the consummation of the Merger, ADSs will no longer be listed on any securities exchange or quotation system, including the NYSE, and price quotations with respect to sales of ADSs in the public market will no longer be available. In addition, registration of Shares under the Exchange Act may be terminated upon the Company's application to the SEC if Shares are not listed on a national securities exchange and there are fewer than 300 record holders of Shares. Ninety days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of the Shares under the Exchange Act will be terminated and the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. Following the consummation of the Merger, the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company. Furthermore, following the consummation of the Merger, the ADS program for the Shares will terminate. See "Special Factors—Effects of the Merger for the Company" beginning on page 61 for additional information.

**Plans for the Company after the Merger (Page 68)**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Position of the Buyer Group as to Fairness of the Merger (Page 47)**

Each member of the Buyer Group believes that the Merger is fair to the Unaffiliated Holders. Their belief is based upon the factors discussed under the section entitled "Special Factors—Position of the Buyer Group as to Fairness of the Merger" beginning on page 47.

Each member of the Buyer Group is making the statements included in this paragraph solely for the purpose of ensuring compliance with the requirements of Rule 13E-3 and related rules under the Exchange Act. The views of each member of the Buyer Group as to the fairness of the Merger are not intended to be and should not be construed as a recommendation to any shareholder of the Company as to how that shareholder should vote on the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger.

9

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 26 of 184

**Financing of the Merger (Page 69)**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the Merger and the related transactions, including payment of fees and expenses in connection with the Merger, is anticipated to be approximately $9.4 billion, assuming no exercise of Dissenter Rights by shareholders of the Company. In calculating this amount, the Company and the Buyer Group did not consider the value of 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision or Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options or by any direct or indirect wholly-owned Subsidiary of any Parent Party or the Company, which will be cancelled for no consideration.

The Buyer Group expects to provide this amount through a combination of (a) cash contributions from the Equity Investors pursuant to their respective equity commitment letters, each dated December 18, 2015 (the "Equity Commitment Letters"), and (b) the proceeds from a committed term loan facility in an amount up to the RMB equivalent of $3 billion (the "Term Facility") and a bridge loan facility of up to the RMB equivalent of $400 million (the "Bridge Facility"), pursuant to certain debt commitment letters dated December 18, 2015 provided by China Merchants Bank Co., Ltd. (the "Debt Commitment Letters"). See "Special Factors—Financing of the Merger" beginning on page 69 for additional information.

**Limited Guarantees; Global Village Guarantee (Page 73)**

Concurrently with the execution of the Merger Agreement, each of the Equity Investors and the Founder Securityholders (each a "Guarantor") entered into a limited guarantee (each a "Limited Guarantee") with Holdco, Parent and the Company to guarantee a portion of the Parent Parties' obligation to pay the Parent Termination Fee (as defined in the section entitled "The Merger Agreement–Termination Fee") and certain other payment obligations of the Parent Parties in relation to the financing for the Merger. In addition, concurrently with the execution of the Merger Agreement, Global Village entered into a limited guarantee (the "Global Village Guarantee") in favor of the Company to (i) guarantee the payment obligations of certain Buyer Group member under its Equity Commitment Letter and Limited Guarantee, and (ii) agree to use its reasonable best efforts to cause Parent to enforce the Escrow Agreements and not to utilize or release any escrowed amount from the escrow except in accordance with the terms of the applicable Escrow Agreements. See "Special Factors—Limited Guarantees" beginning on page 73 for additional information.

**Escrow Agreement (Page 73)**

Concurrently with the execution of the Merger Agreement, each of the Equity Investors entered into an escrow agreement (each an "Escrow Agreement") with Parent and the Company pursuant to which each Equity Investor will deposit a percentage of its equity commitment under the Equity Commitment Letter with Parent as earnest money which will be applied toward (i) the payment of certain of such Equity Investor's obligations under such Equity Investor's Equity Commitment Letter and Limited Guarantee, and/or (ii) the payment by Parent of the Parent Termination Fee that may become due and payable pursuant to the terms of the Merger Agreement. See "Special Factors—Escrow Agreement" beginning on page 73 for additional information.

**Interim Investors Agreement (Page 73)**

Concurrently with the execution of the Merger Agreement, the Founder Securityholders and the Equity Investors entered into an interim investors agreement with Holdco, Parent, Midco and Merger Sub (the "Interim Investors Agreement"), which governs, among other matters, the actions of Holdco, Parent, Midco and Merger Sub and the relationship among the Equity Investors with respect to the Merger Agreement and the transactions contemplated thereby. See "Special Factors—Interim Investors Agreement" beginning on page 73 for additional information.

**Opinion of the Special Committee's Financial Advisor (Page 53)**

On December 18, 2015, J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") rendered an oral opinion to the Special Committee (which was confirmed in writing by delivery of a written opinion by J.P. Morgan dated the same date), as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion.

10

The opinion of J.P. Morgan was addressed to the Special Committee and only addressed the fairness from a financial point of view of the Per Share Merger Consideration and Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, and does not address any other aspect or implication of the Merger. The summary of the opinion of J.P. Morgan in this proxy statement is qualified in its entirety by reference to the full text of its written opinion, which is included as Annex C to this proxy statement and sets forth the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by J.P. Morgan in preparing its opinion. We encourage the Unaffiliated Holders to read carefully the full text of the written opinion of J.P. Morgan. However, the opinion of J.P. Morgan, the summary of the opinion and the related analyses set forth in this proxy statement are not intended to be, and do not constitute advice or a recommendation to any shareholder, or holder of ADSs, of the Company as to how to act or vote with respect to the Merger or any other matter. Please see "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information.

**Interests of the Company's Executive Officers and Directors in the Merger (Page 74)**

In considering the recommendations of the Board, the Company's shareholders should be aware that certain of the Company's executive officers and directors have interests in the transaction that are different from, and/or in addition to, the interests of the Company's shareholders and ADS holders generally. These interests include, among others:

- the beneficial ownership of equity interest in Parent by the Chairman and Mr. Xiangdong Qi, following the consummation of the Merger, as a result of which they will be able to enjoy the benefits from future earnings and growth of the Surviving Company after the completion of the Merger;

- continued indemnification rights, rights to advancement of fees and directors and officers liability insurance to be provided by the Surviving Company to the directors and officers of the Company;

- the compensation of members of the Special Committee in exchange for their services in such capacity in an amount of $15,000 per member per month with the aggregate amount per member capped at $120,000 (or, in the case of the chairman of the Special Committee, an amount of $25,000 per month with the aggregate amount capped at $200,000) (the payment of which is not contingent upon the consummation of the Merger or the Special Committee's or the Board's recommendation of the Merger);

- the cash-out of all outstanding in-the-money Company Options held by certain directors and executive officers of the Company and the assumption by the Surviving Company, through the Plan Vehicle or such other arrangements, of outstanding unvested Company Options and Company Restricted Shares held by certain executive officers of the Company, as a result of which such executive officers will continue to hold an equity interest in the Surviving Company through the Plan Vehicle or such other arrangements and be able to enjoy the benefits from future earnings and growth of the Surviving Company after the completion of the Merger; and

- the potential continuation of service of the executive officers of the Company with the Surviving Company in positions that are substantially similar to their current positions, allowing them to benefit from remuneration arrangements, including equity compensation, with the Surviving Company.

The Special Committee and the Board were aware of these potential conflicts of interest and considered them, among other matters, in reaching their decisions and recommendations with respect to the Merger Agreement and related matters. See "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 122 and "Special Factors—Interests of Certain Persons in the Merger" beginning on page 74 for additional information.

11

Case 1:19-cv-10067-PAE    Document 116-2    Filed 04/29/22    Page 28 of 84

**Acquisition Proposal (Page 101)**

Until 11:59 p.m. Hong Kong time on February 1, 2016 (the "Go-Shop Period End Date"), the Company and its subsidiaries and their respective representatives are permitted (acting under the direction of the Special Committee) to directly or indirectly:

- initiate, solicit and encourage Acquisition Proposals (as defined under "The Merger Agreement—Acquisition Proposals" beginning on page 101), including by way of public disclosure and providing access to non-public information to any person pursuant to confidentiality agreements meeting certain requirements (provided that the Company will promptly provide to Parent any information concerning the Company or its subsidiaries that it has provided to any such person which was not previously provided to Parent); and

- enter into and maintain discussions or negotiations with respect to Acquisition Proposals or otherwise cooperate with, assist or participate in, facilitate, or take any other action in connection with any such inquiries, proposals, discussions or negotiations.

Except as permitted by the terms of the Merger Agreement, the Company is required to immediately cease any discussions with any person (other than Parent and any excluded party) that are ongoing as of the Go-Shop Period End Date and that relate, or may reasonably be expected, to lead to an Acquisition Proposal, and (y) promptly request each person (other than Parent and any excluded party) that has prior to the date of the Merger Agreement executed a standstill, confidentiality or similar agreement in connection with such person's consideration of an Acquisition Proposal to return or destroy all information required to be returned or destroyed by such person under the terms of the applicable agreement.

Except as otherwise permitted by the terms of the Merger Agreement, after the Go-Shop Period End Date until the Effective Time (or if earlier, the termination of the Merger Agreement in accordance with its terms), neither the Company nor any of its subsidiaries will, nor will the Company or any of its subsidiaries authorize or permit any of their respective representatives to, directly or indirectly:

- initiate, solicit, propose, encourage (including by providing information) or take any action to knowingly facilitate any inquiries or the making of any proposal or offer that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal;

- engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any information or data concerning the Company or any of its subsidiaries to any person relating to, any Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal, with the intent to induce the making, submission or announcement of, or the intent to encourage, facilitate or assist, an Acquisition Proposal;

- grant any waiver, amendment or release under any standstill or confidentiality agreement or any anti-takeover law, or otherwise knowingly facilitate any effort or attempt by any person to make an Acquisition Proposal;

- approve, endorse, recommend, execute or enter into any agreement or other contract relating to any Acquisition Proposal or any proposal or offer that could reasonably be expected to lead to an Acquisition Proposal; or

- propose, agree or publicly announce an intention to do any of the foregoing.

Prior to obtaining the approval by the Company's shareholders of the Merger Agreement and the transactions contemplated thereby, the Company, its subsidiaries and the Company's and its subsidiaries' representatives may, following the receipt of an unsolicited bona fide written acquisition proposal that did not result from a breach by the Company of the go-shop and non-solicitation provisions of the Merger Agreement (i) grant a waiver, amendment or release under any standstill or confidentiality agreement or any anti-takeover law for the purpose of allowing any person or group to make an Acquisition Proposal; (ii) contact the person or group who has made such Acquisition Proposal to clarify and understand the terms and conditions thereof so as to determine whether such Acquisition Proposal constitutes a Superior Proposal (as defined under "The Merger Agreement—Acquisition Proposal" beginning on page 101) or could reasonably be expected to result in a Superior Proposal; (iii) provide information (including any non-public information or data concerning the Company or any of its subsidiaries) in response to the request of the person or group who has made such Acquisition Proposal, if and only if, prior to providing such information, the Company has received from the person or group so requesting such information an executed confidentiality agreements meeting certain requirements (a copy of which shall be provided to Parent within 48 hours); and/or (iv) engage or participate through the Special Committee in any discussions or negotiations with the person or group who has made such Acquisition Proposal.

12

**Conditions to the Merger (Page 107)**

The obligations of each party to the Merger Agreement to effect the Merger and the other transactions contemplated thereby are subject to the satisfaction or waiver of the following conditions:

- the shareholders of the Company shall have approved the Merger Agreement and the transactions contemplated thereby;

- no law shall have been enacted, entered, promulgated or enforced and no order shall have been issued by any governmental entity which is in effect and enjoins, restrains, prohibits or otherwise makes illegal the consummation of the Merger; and

- all PRC Required Approvals (as defined under "The Merger Agreement—Conditions to the Merger" beginning on page 107) in relation to the transaction contemplated by the Merger Agreement shall have been obtained.

The obligations of the Parent Parties to effect the Merger and the other transactions contemplated thereby are also subject to the satisfaction or waiver of the following conditions:

- (i) other than representations and warranties of the Company regarding capitalization, the representations and warranties of the Company contained in the Merger Agreement shall be true and correct in all respects as of the date of the Merger Agreement and as of the closing date of the Merger (or, to the extent such representations and warranties speak as of a specified date, as of such specified date) without regard to any materiality or similar qualifications, except where the failure to be so true and correct, in the aggregate, does not constitute a Company Material Adverse Effect, and (ii) the representations and warranties of the Company regarding capitalization shall be true and correct in all respects (except for de minimus inaccuracies) as of the date of the Merger Agreement and as of the closing date of the Merger;

- the Company shall have performed or complied in all material respects with all agreements and covenants required by the Merger Agreement to be performed or complied with by it on or prior to the closing date of the Merger;

- the Company shall have delivered to Parent a certificate, dated the closing date of the Merger, signed by an executive officer of the Company, confirming the satisfaction of the above conditions;

- the aggregate amount of dissenting shares (excluding Shares owned by the Buyer Group and their affiliates) shall be less than 20% of the total outstanding Shares of the Company immediately prior to the Effective Time; and

- since the date of the Merger Agreement, there shall not have occurred a Company Material Adverse Effect which is continuing.

The obligation of the Company to effect the Merger and the other transactions contemplated thereby are also subject to the satisfaction or waiver of the following conditions:

- the representations and warranties of the Parent Parties set forth in the Merger Agreement shall be true and correct (without regard to any materiality qualification) as of the date of the Merger Agreement and as of the closing date of the Merger as if made at and as of such closing date (except to the extent that any such representation or warranty expressly speaks as of a specified date, as of such specified date), except for such failures to be true and correct which, individually or in the aggregate, have not and would not prevent, materially delay or materially impede the performance by any Parent Party of its obligations under the Merger Agreement;

13

- each Parent Party shall have performed or compiled in all material respects with all agreements and covenants required by the Merger Agreement to be performed or complied with by such Parent Party on or prior to the Closing Date; and

- Parent shall have delivered to the Company a certificate, dated the closing date of the Merger, signed by an executive officer of Parent, confirming the satisfaction of the above conditions.

**Termination of the Merger Agreement (Page 108)**

The Merger Agreement may be terminated at any time prior to the Effective Time (if by the Company, acting only upon the recommendation of the Special Committee):

- by mutual written consent of Parent and the Company; or

- by either Parent or the Company:

  - if the Merger shall not have been consummated by 11:59 p.m., Hong Kong time, on September 18, 2016 (the "End Date");

  - if (i) any order of any governmental entity having competent jurisdiction is entered enjoining the Company or any Parent Party from consummating the Merger and such order has become final and non-appealable or (ii) there is any law that makes consummation of the Merger illegal or otherwise prohibited; or

  - if the Company's shareholders do not approve the Merger Agreement and the transactions contemplated thereby at the shareholder meeting convened for such purpose or any adjournment thereof;

  provided that the termination right above is not available to any party whose failure to fulfill any obligation under the Merger Agreement or other breach has been the primary cause of, or resulted in, the failure of the applicable condition(s) being satisfied; or

- by the Company:

  - if (i) any Parent Party shall have breached any of the covenants or agreements contained in the Merger Agreement such that the corresponding closing condition would not be satisfied or (ii) there exists a breach of any representation or warranty of any Parent Party contained in the Merger Agreement such that the corresponding closing condition would not be satisfied, and, in either case, such breach is incapable of being cured by the End Date or is not cured by the Parent Parties within 30 calendar days after receiving written notice from the Company; provided that the Company shall not have this right to terminate if, at the time of such termination, there exists a breach by the Company of the Merger Agreement that would result in the corresponding conditions to the obligations of the Parent Parties not being satisfied;

  - (i) all of the conditions to the obligations of the Parent Parties (other than those conditions that by their nature are only to be satisfied by actions taken at the closing) have been satisfied, (ii) the Company has delivered to Parent an irrevocable confirmation in writing that all of the closing conditions solely for the benefit of the Company (other than those conditions that by their nature are only to be satisfied by actions taken at the closing) have been satisfied (or that the Company is willing to waive any unsatisfied conditions) and that the Company is ready, willing and able to consummate the Merger and (iii) the Parent Parties fail to complete the Merger within 15 business days; or

  - prior to obtaining the approval by the Company's shareholders of the Merger Agreement and the transactions contemplated thereby, in order to enter into an agreement or other contract with respect to a Superior Proposal in accordance with the go-shop and non-solicitation provisions described above; or

14

- by Parent:

  - if (i) the Company shall have breached any of the covenants or agreements contained in the Merger Agreement such that the corresponding closing condition would not be satisfied or (ii) there exists a breach of any representation or warranty of the Company contained in the Merger Agreement such that the corresponding closing condition would not be satisfied, and, in either case, such breach is incapable of being cured by the End Date or is not cured by the Company within 30 calendar days after receiving the written notice from any Parent Party; provided that Parent shall not have this right to terminate if, at the time of such termination, there exists a breach by any Parent Party of the Merger Agreement that would result in the corresponding conditions to the obligations of the Company not being satisfied; or

if (i) the Board or any committee thereof shall have effected a Company Adverse Recommendation Change (as defined under "The Merger Agreement—No Company Adverse Recommendation Change" beginning on page 103), or (ii) the Board has approved or recommended, or entered into or allowed the Company or any of its subsidiaries to enter into an agreement or other contract with respect to an Acquisition Proposal.

**Termination Fee (Page 109)**

The Company is required to pay Parent a termination fee of approximately RMB1.44 billion (or RMB641 million in certain circumstances described below) (the "Company Termination Fee") if the Merger Agreement is validly terminated:

- by Parent due to (a) a breach by the Company of any representation, warranty, covenant or agreement in the Merger Agreement, or (b) the Board or any committee thereof effecting a Company Adverse Recommendation Change or the Board approving or recommending, or entering into or allowing the Company or any of its subsidiaries to enter into an agreement or other contract with respect to an Acquisition Proposal;

- by the Company in order to enter into an agreement or other contract with respect to a Superior Proposal; or

- by either Parent or the Company if at or prior to such termination, a third party has delivered to the Board a bona fide Acquisition Proposal (provided that, all references to "20%" in the definition of "Acquisition Proposal" will be deemed to be references to "50%"), such Acquisition Proposal is not withdrawn prior to such termination, and within 12 months after such termination, the transactions contemplated by the Acquisition Proposal are consummated.

However, in the event the Merger Agreement is terminated (i) by the Company in order to enter into an agreement or other contract with respect to a Superior Proposal or (ii) by Parent due to the Board or any committee thereof effecting a Company Adverse Recommendation Change or the Board approving or recommending, or entering into or allowing the Company or any subsidiaries of the Company to enter into an agreement or other contract with respect to an Acquisition Proposal, in each case in connection with an acquisition proposal received by the Company at or prior to the Go-Shop Period End Date, the termination fee payable by the Company will be RMB641 million.

Parent is required to pay the Company a termination fee of approximately RMB2.88 billion (or RMB641 million in certain circumstances described below) (the "Parent Termination Fee") if the Merger Agreement is validly terminated in accordance with the termination provisions:

- by the Company due to a breach by any Parent Party of any representation, warranty, covenant or agreement of the Merger Agreement; or

- (i) all of the conditions to the obligations of the Parent Parties (other than those conditions that by their nature are only to be satisfied by actions taken at the closing) have been satisfied, (ii) the Company has delivered to Parent an irrevocable confirmation in writing that all of the closing conditions solely for the benefit of the Company (other than those conditions that by their nature are only to be satisfied by actions taken at the closing) have been satisfied (or that the Company is willing to waive any unsatisfied conditions) and that the Company is ready, willing and able to consummate the Merger and (iii) the Parent Parties fail to complete the Merger within 15 business days.

15

However, the termination fee payable by Parent will be RMB641 million if the Merger Agreement is terminated by the Company or by Parent (i) due to failure of the Merger to be consummated by the End Date, as a result of the PRC Required Approvals not being obtained by the End Date, or (ii) as a result of any order from governmental entity enjoining the consummation of the Merger, while (a) the Company has not breached the Merger Agreement in any material respect such that the corresponding closing condition would not be satisfied, and (b) all other conditions to closing (other than those that by their terms are to be satisfied at the closing) have been satisfied or waived.

**Material U.S. Federal Income Tax Consequences (Page 79)**

The receipt of cash pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. See "Special Factors—Material U.S. Federal Income Tax Consequences" beginning on page 79. The U.S. federal income tax consequences of the Merger to you will depend upon your personal circumstances. You should consult your tax advisors regarding the U.S. federal, state, local, foreign and other tax consequences of the Merger to you.

**Material PRC Income Tax Consequences (Page 82)**

The Company does not believe that it should be considered a resident enterprise under the PRC Enterprise Income Tax Law (the "EIT Law") or that the gain recognized on the receipt of cash for the Shares or ADSs should otherwise be subject to PRC tax to holders of such Shares or ADSs that are not PRC residents. However, there is uncertainty regarding whether the PRC tax authorities would deem the Company to be a resident enterprise. If the PRC tax authorities were to determine that the Company should be considered a resident enterprise, then gain recognized on the receipt of cash for our Shares or ADSs pursuant to the Merger by our shareholders or ADSs holders who are not PRC residents could be treated as PRC-sourced income that would be subject to PRC income tax at a rate of 10% in the case of enterprises or 20% in the case of individuals (subject to applicable tax treaty relief, if any), and, even in the event that the Company is not considered a resident enterprise, gain recognized on the receipt of cash for Shares or ADSs is subject to PRC tax if the holders of such Shares or ADSs are PRC residents. You should consult your own tax advisor regarding the tax consequences of the Merger to you, including any PRC tax consequences.

See "Special Factors—Material PRC Income Tax Consequences" beginning on page 82 for additional information.

**Material Cayman Islands Tax Consequences (Page 83)**

The Cayman Islands currently has no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax. No taxes, fees or charges will be payable (either by direct assessment or withholding) to the government or other taxing authority in the Cayman Islands under the laws of the Cayman Islands in respect of the Merger or the receipt of cash for the Shares under the terms of the Merger Agreement. This is subject to the qualification that (a) Cayman Islands stamp duty may be payable if any original transaction documents are brought to or executed or produced before a court in the Cayman Islands (for example, for enforcement), (b) registration fees will be payable to the Cayman Registrar to register the Plan of Merger and (c) fees will be payable to the Cayman Islands Government Gazette Office to publish the notice of the Merger in the Cayman Islands Government Gazette. See "Special Factors—Material Cayman Islands Tax Consequences" beginning on page 83 for additional information.

**Regulatory Matters (Page 79)**

The Company does not believe that any material regulatory approvals, filings or notices are required in connection with effecting the Merger other than the PRC Required Approvals in relation to the transactions contemplated by the Merger Agreement, the approvals, filings or notices required under the U.S. federal securities laws and the filing of the Plan of Merger (and supporting documentation as specified in the Cayman Islands Companies Law) with the Cayman Registrar and, in the event the Merger becomes effective, a copy of the Certificate of Merger being given to the shareholders and creditors of the Company and Merger Sub as at the time of the filing of the Plan of Merger and notice of the Merger being published in the Cayman Islands Government Gazette.

16

**Litigation Related to the Merger (Page 79)**

We are not aware of any lawsuit that challenges the Merger, the Merger Agreement or any of the transactions contemplated thereby.

**Accounting Treatment of the Merger (Page 79)**

The Merger is expected to be accounted for, at historical cost, as a Merger of entities under common control in accordance with Accounting Standards Codification 805-50, "Business Combinations—Related Issues."

**Market Price of the ADSs (Page 84)**

The closing price of ADSs on the NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, was $66.05 per ADS. The consideration of $77.00 per ADS to be paid in the Merger represents a premium of approximately 16.6% over that closing price.

**Fees and Expenses (Page 78)**

Whether or not the Merger is consummated, all costs and expenses incurred in connection with the Merger Agreement and the transactions contemplated thereby will be paid by the party incurring such costs and expenses except as otherwise provided in the Merger Agreement.

**Remedies (Page 74)**

The parties to the Merger Agreement are entitled to specific performance of the terms of the Merger Agreement, including an injunction or injunctions to prevent breaches of the Merger Agreement, in addition to any other remedy at law or in equity.

In the event that the Parent Parties fail to effect the closing when required under the Merger Agreement for any reason or no reason or they otherwise breach the Merger Agreement or otherwise fail to perform under the Merger Agreement, then, except for an order of specific performance as and only to the extent expressly permitted by the Merger Agreement, the Company's termination of the Merger Agreement and receipt of the Parent Termination Fee and the guarantee of such obligations pursuant to the Limited Guarantees (subject to their terms, conditions and limitations), will be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of the Company and other members of the Company Group (as defined under the section entitled "The Merger Agreement—Remedies and Limitations on Liability") against the Parent parties and other members of the parent Group (as defined under the section entitled "The Merger Agreement—Remedies and Limitations on Liability") for any loss or damage suffered as a result of any breach of any representation, warranty, covenant or agreement (whether willfully, intentionally, unintentionally or otherwise) or failure to perform hereunder or other failure of the Merger to be consummated.

If the Company pays the Company Termination Fee pursuant to the terms of the Merger Agreement, then any such payment shall be the sole and exclusive remedy of the Parent Group against the Company Group and none of the members of Company Group shall have any further liability or obligation relating to or arising out of the Merger Agreement, the transactions contemplated hereby or the failure of the Merger to be consummated. See "The Merger Agreement—Remedies and Limitations on Liability" beginning on page 110 for additional information.

17

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/23    Page 34 of 184

## SPECIAL FACTORS

**Background of the Merger**

*Events leading to the execution of the Merger Agreement described in this Background of the Merger occurred primarily in the PRC or Hong Kong. As a result, all dates and times referenced in this Background of the Merger refer to China Standard Time.*

The Board and senior management of the Company periodically review the Company's long-term strategic plans with the goal of maximizing shareholder value. As part of this ongoing process, the Board and senior management of the Company have, from time to time, considered strategic alternatives that may be available to the Company.

From time to time, a number of parties have approached Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman") about possible transactions involving the Company. In early May 2015, the Chairman discussed separately with representatives of Golden Brick Capital Private Equity Fund I L.P. ("Golden Brick") and China Renaissance Holdings Limited regarding current market conditions and possible transactions involving the Company, including an acquisition of the Company.

Between late-May 2015 and mid-June 2015, the Chairman had discussions with Mr. Xiangdong Qi, co-founder and a director and president of the Company, representatives of CITIC Securities Co. Ltd. ("CITIC Securities") and Mr. Neil Nanpeng Shen, a director of the Company and founding managing partner of Sequoia Capital China, regarding the possibility of acquiring the Company. The discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in the PRC, the Company's long term strategic plans, and the structure, timetable, pros and cons of a potential acquisition of the Company.

On June 17, 2015, the Board received a preliminary non-binding proposal letter from the Chairman, CITIC Securities, Golden Brick, China Renaissance and Sequoia Capital China, to acquire all of the outstanding Class A and Class B ordinary shares of the Company not owned by them or their affiliates (collectively, the "Initial Consortium Members"), including Class A ordinary shares represented by American depositary shares (the "ADSs", each two representing three Class A ordinary shares), for $51.33 in cash per Class A or Class B ordinary share, or $77.00 in cash per ADS (the "Proposal"). In the Proposal, the Initial Consortium Members stated, among things, that they were not interested in selling their shares in any other transaction involving the Company.

On the same day, the Company issued a press release regarding its receipt of the Proposal and the transaction proposed therein, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

On June 19, 2015, the Board formed the Special Committee, being comprised of three independent, disinterested directors of the Company, Dr. Eric Chen, Dr. Ming Huang and Dr. Jianwen Liao, to consider the Proposal. The Board appointed Dr. Eric Chen as the chairman of the Special Committee after considering Dr. Chen's background and expertise such as his work experience with a renowned investment fund, technology sector companies and an investment bank.

On the same day, by way of unanimous written resolutions of the directors, the Board granted to the Special Committee the power to (i) make such investigation of the Proposal, the proposed transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate; (ii) evaluate the terms of the Proposal; (iii) discuss and negotiate with the Buyer Group and their representatives any terms of the proposed transaction and implement the proposed transaction as the Special Committee deems appropriate; (iv) explore any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company; (v) negotiate definitive agreements, if and when appropriate, with respect to the proposed transaction or any alternative transaction, the execution and delivery of any such agreement being subject, however, to the approval of the Board; (vi) report to the Board the recommendations and conclusions of the Special Committee with respect to the proposed transaction and/or any alternative transaction and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board; (vii) if and when appropriate at its sole discretion, adopt defensive measures with respect to unsolicited proposals for an alternative transaction; and (viii) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsels, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate to assist the Special Committee in discharging its responsibilities.

29

Shortly after being formed, the Special Committee considered the credentials of several prospective U.S. legal counsels, and noted that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") had extensive experience in advising on going-private transactions and did not have any conflict of interest with respect to representing the Special Committee. The Special Committee then decided to retain Skadden to act as its U.S. legal counsel in connection with the proposed transaction.

Later on June 19, 2015, the Company issued a press release regarding the formation of the Special Committee and the Special Committee's decision to retain Skadden as its U.S. legal counsel, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

On June 19, 2015, the Buyer Group decided to retain Huatai United Securities Co., Ltd. ("Huatai") as its financial advisor in connection with the proposed transaction, primarily because of Huatai's knowledge of and expertise in the TMT (technology, media and telecom) sector in China, as well as its reputation and experience in providing financial advice in mergers and acquisitions transactions.

Between June 19, 2015 and June 25, 2015, Dr. Eric Chen, as authorized by and on behalf of the Special Committee, invited and interviewed several investment banks to act as the financial advisor to the Special Committee.

On June 25, 2015, after reviewing the qualifications, experience and other characteristics of each potential financial advisor and considering the extensive experience of J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") in representing special committees in going-private transactions, its strong reputation and its significant experience in working with China-based companies, the Special Committee decided, through unanimous written resolutions, to retain J.P. Morgan as its financial advisor in connection with the review and evaluation of the Proposal. The Special Committee noted that J.P. Morgan had a prior relationship with one of the Initial Consortium Members, CITIC Securities, in providing corporate finance and treasury services to CITIC Securities and had a less-than-1% common equity ownership in CITIC Securities at the time. The Special Committee noted that the amount of service fees J.P. Morgan received for such services was small and J.P. Morgan only held a very small percentage of equity interest in one of the five Initial Consortium Members. Further, the Special Committee noted that, as a full service investment banking firm, J.P. Morgan provides various services out of separate divisions and that J.P. Morgan 's proposed senior deal team members were not providing, and had not provided, services to CITIC Securities or other Initial Consortium Members. As a result, the Special Committee determined that such relationship did not create a conflict of interest with respect to assisting the Special Committee in its review and evaluation of the Proposal and the transactions contemplated thereby.

On June 25, 2015, through unanimous written resolutions, the Special Committee decided to retain Maples and Calder ("Maples"), which the Special Committee noted had significant experience in advising on going-private transactions, to act as its Cayman Islands legal counsel in connection with the proposed transaction, and ratified and affirmed its engagement of Skadden as its U.S. legal counsel in connection with the proposed transaction.

On June 25, 2015, the Special Committee convened its first meeting by telephone. During the meeting, a representative of Maples first provided a summary of the directors' fiduciary duties under the laws of the Cayman Islands and best practices in the context of a going-private transaction. Representatives of Skadden then provided a summary of going-private considerations and the purposes and roles of the Special Committee, and discussed best practices for the Special Committee as well as the Company's management. The Special Committee raised questions and discussed a few key issues relating to its fiduciary duties and U.S. securities law disclosure requirements and also sought advice from the advisors on the communication protocol between the Special Committee and the Buyer Group. The Special Committee then instructed the advisors to advise the Company's management of the communication protocol between the Company and the Buyer Group, the best practices and the role of management in the context of a going-private transaction. Thereafter, representatives of J.P. Morgan provided a summary of the general process of a going-private transaction and an indicative timetable for the proposed transaction, as well as a summary of the financial advisor's role in assisting the Special Committee in its work. At the same meeting, the Special Committee also discussed with J.P. Morgan and Skadden negotiation strategies and certain key issues frequently negotiated in going-private transactions, including the pros and cons of conducting a market check before entering into the definitive agreements. After deliberation, the Special Committee decided that it would revisit the issue of a pre-signing market check once the financial advisor had progressed its financial analyses. The Special Committee instructed J.P. Morgan to contact the Buyer Group on behalf of the Special Committee to establish communication protocols and obtain further information regarding the Buyer Group's due diligence requirements, financing plan and plan regarding the composition of the Buyer Group. The Special Committee then instructed Skadden, on behalf of the Company, to prepare a draft confidentiality agreement and negotiate it with the Buyer Group in anticipation of the Buyer Group's request to conduct due diligence on the Company.

30

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/23    Page 36 of 184

On the same day following the Special Committee meeting, Skadden sent a draft confidentiality agreement between the Company and each of the Initial Consortium Members to Kirkland & Ellis LLP ("Kirkland"), U.S. legal counsel to the Buyer Group in connection with the proposed transaction. Between June 26, 2015 and July 1, 2015, Skadden and Kirkland engaged in negotiations on the terms of the confidentiality agreement.

On June 29, 2015, Sequoia Capital China UR Holdings Limited, and its sole director and shareholder, Mr. Neil Nanpeng Shen, filed a Schedule 13D with the SEC reporting that they acquired beneficial ownership of certain Shares in the Company as part of certain in-kind distributions made by several Sequoia funds of the Shares held by them to their respective partners, as well as the submission of the Proposal to the Board.

On July 6, 2015 after finalizing the detailed terms of the engagement, the Company issued a press release regarding the engagement of J.P. Morgan as financial advisor by the Special Committee, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

Between July 15, 2015 and August 10, 2015, Kirkland and counsels to certain of the Initial Consortium Members resumed negotiation with Skadden on the terms of the confidentiality agreements. Following such negotiations, the Special Committee, on behalf of the Company, entered into confidentiality agreements with the Chairman and each of the other Initial Consortium Members (the "Confidentiality Agreements") on or about August 10, 2015.

On July 23, 2015, at the instruction of the Special Committee, representatives from Skadden and J.P. Morgan held a telephonic conference with members of the Company management to advise the Company's management of the communication protocol between the Company and the Buyer Group and best practices and the role of management in the context of a going-private transaction.

Between mid-August 2015 and mid-September 2015, representatives of the Buyer Group and its financial, legal and accounting advisors had various discussions with the management of the Company regarding the business, operations and financial performance of the Company and conducted preliminary legal, business, financial and accounting due diligence on the Company.

From early September to early October 2015, representatives of the Buyer Group had preliminary discussions with certain potential lenders regarding arranging debt financing for a potential transaction involving the Company.

Between mid-September 2015 and mid-October 2015, the Buyer Group and Huatai discussed the potential transaction with various potential investors who might be interested in joining the Buyer Group.

On October 8, 2015, the Special Committee convened its second meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, the Special Committee and its advisors discussed possible structures for alternative transactions in light of the Buyer Group's existing beneficial ownership and its express statement regarding their unwillingness to sell their shares in any other transaction involving the Company and representatives of Skadden discussed the likely impact of the PRC anti-monopoly law on the viability of each alternative. J.P. Morgan then provided an update on the trading prices of the ADSs following the announcement of the proposed transaction and reported that they had not received any inbound proposal by a third party with respect to a potential transaction involving the Company. J.P. Morgan also noted that any inquiries regarding the proposed transaction should be carefully handled in order not to disrupt the Company management's attention to the operation of the Company's business or result in the disclosure of any confidential information relating to the Company or the proposed transaction. The Special Committee then discussed the mechanism of, and consideration associated with, a "go-shop" provision in a potential merger agreement.

31

Between mid-October 2015 and late-November 2015, Huatai arranged further meetings between representatives of the Buyer Group and key potential investors who might be interested in joining the Buyer Group.

From mid-October to early December 2015, the Buyer Group and its representatives had further negotiations with select potential lenders regarding the terms of the debt financing arrangements for the proposed transaction.

On November 10, 2015, Huatai updated J.P. Morgan on the status of the Buyer Group's due diligence and financing, the potential size and composition of the Buyer Group as well as the Buyer Group's proposed timetable to signing of definitive agreements with the Company.

On November 12, 2015, a representative of Kirkland reached out to Skadden to provide a status update on the proposed transaction and express the Buyer Group's desire to move quickly towards signing definitive agreements with the Company.

Later that day, Skadden received an initial draft of the Merger Agreement from Kirkland.

On November 18, 2015, the Special Committee convened its third meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, J.P. Morgan informed the Special Committee that, based on its discussions with Huatai, the Buyer Group (i) had largely completed its due diligence; (ii) was in the process of securing the required debt financing from a few PRC banks; and (iii) was in the process of obtaining equity financing from various potential sources in the PRC. Representatives of Skadden reported to the Special Committee that it had received a draft Merger Agreement. The Special Committee instructed Skadden to prepare a list of key issues presented in the draft Merger Agreement and determined to hold another meeting to discuss the key issues and material terms of the draft Merger Agreement. The Special Committee then discussed the deal negotiation strategies with its advisors and noted the need to obtain greater clarity and confirmation from the Buyer Group on various items, including (i) the Buyer Group's position on valuation; (ii) the status and expected timing of equity financing, the composition of the buyer consortium, the identity of each consortium member and allocation of equity among the members; (iii) the status and expected timing of debt financing, the identity of debt financing sources, and the amount committed by each of the debt financing sources; and (iv) the regulatory and other external approval requirements with respect to the Buyer Group's proposed transaction. Following a thorough discussion, the Special Committee instructed Skadden and J.P. Morgan to prepare an information request list, requesting updates and/or confirmation on the aforementioned various items (the "Information Request List"). Lastly, the Special Committee noted the necessity to engage a PRC legal counsel to advise on PRC legal issues and resolved to engage Jun He Law Offices ("Jun He") as the PRC legal counsel to the Special Committee.

On November 21, 2015, at the instruction of the Special Committee, J.P. Morgan sent the Information Request List to Huatai.

On November 24, 2015, the Special Committee convened its fourth meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, representatives of Skadden provided an overview and explanation of the key issues presented by the draft Merger Agreement, together with recommendations regarding the position to be taken by the Special Committee. Among other things, the Special Committee and its advisors discussed (i) the treatment of share incentive awards under the Company's share incentive plans; (ii) the treatment of outstanding convertible notes of the Company; (iii) the approach to be taken by the Company with respect to the representations and warranties requested to be made in the draft Merger Agreement; (iv) a go-shop right and a comparison of the go-shop right with pre-signing market check; (v) the threshold for a superior proposal and other aspects of its definition; (vi) the Buyer Group's match right in connection with the submission of a superior proposal; (vii) the "force-the-vote" provision contained in the draft Merger Agreement, and the inclusion of a "fiduciary out" in the Special Committee's response to the Buyer Group; (viii) the various closing conditions reflected in the draft Merger Agreement, in particular (x) the shareholder approval requirement, (y) the requirement that less than 5% of the outstanding shares of the Company dissent from the proposed transactions, and (z) PRC regulatory approval requirements; (ix) the assistance that the Company would be required to provide to the Buyer Group in connection with obtaining its required financing; (x) the termination fee payable by the Company and the reverse termination fee payable by the Buyer Group in certain circumstances. The Special Committee and its advisors also discussed matters relating to the Buyer Group's anticipated onshore financing and its likely large number of equity financing sources that would be part of the Buyer Group.

32

At the same meeting, after discussing with its advisors the effect and implications of the various positions taken by the Buyer Group in the draft Merger Agreement, the Special Committee instructed Skadden to mark up the draft Merger Agreement and negotiate with Kirkland pursuant to the following initial positions: (i) the representations and warranties of the Company shall be qualified by the knowledge of the Buyer Group; (ii) the Company should have a go-shop right, pursuant to which the Company may actively solicit alternative acquisition proposals from other potential buyers during a 60-day period after the signing of the Merger Agreement; (iii) the Company (Special Committee) should have a "fiduciary out" and should have the right to terminate the Merger Agreement in connection with a superior proposal, and the threshold for a superior proposal should be 50%, instead of 66 2/3% proposed by the Buyer Group in their draft of the Merger Agreement; (iv) in addition to the statutory shareholder vote requirement, the consummation of the proposed transaction should be conditioned upon the approval by the affirmative vote of shareholders representing more than 50% of the voting rights of the shares excluding the shares beneficially owned by the buyer group (the so-called "majority of the minority" vote condition) and (v) the consummation of the proposed transaction should not be conditioned on less than 5% of the outstanding shares of the Company dissenting from the transactions. Additionally, the Special Committee instructed J.P. Morgan to provide information with respect to precedent transactions in order for the Special Committee to determine the size of the termination fee payable by the Company and the reverse termination fee payable by the Buyer Group in certain circumstances to be proposed to the Buyer Group.

Later that day, J.P. Morgan received from the Buyer Group a response to the Information Request List. In the response, the Buyer Group (i) confirmed that the purchase price as set forth in the Proposal remained the Buyer Group's proposed merger consideration; (ii) confirmed that the Buyer Group expected to provide approximately $6.0 billion of equity commitments in connection with the Merger and was in the process of finalizing the composition of the Buyer Group and arrangements among the Buyer Group members and expected such arrangements to be completed in the following two weeks; (iii) confirmed that the Buyer Group was negotiating with various potential debt financing sources for debt financing of approximately $3.4 billion and that debt commitment letters were expected to be finalized in the following two weeks; (iv) provided a summary of certain requisite PRC regulatory approvals in connection with the Merger and confirmed that the Buyer Group did not expect that any filing or approval would be required under the PRC anti-monopoly law; and (v) confirmed that the Buyer Group had largely completed their due diligence.

On November 25, 2015, representatives of Jun He and Skadden had a meeting by telephone with representatives of Fangda Partners ("Fangda"), PRC legal counsel to the Buyer Group, and Kirkland, to discuss, among other things, PRC regulatory approvals or filings that might be required in connection with the Buyer Group's potential debt and equity financing in Renminbi from PRC onshore sources and the subsequent exchange of Renminbi into U.S. dollars for the proposed transaction offshore.

On November 27, 2015, at the instruction of the Special Committee, Skadden sent Kirkland its comments to the draft Merger Agreement.

On December 2, 2015, Skadden received from Kirkland a revised draft of the Merger Agreement, an initial draft of each of the form Equity Commitment Letter, the form Limited Guarantee and the Interim Investors Agreement. The revised draft of the Merger Agreement received from Kirkland showed that Young Vision, a holding vehicle of Company shares of Mr. Xiangdong Qi, would be part of the Buyer Group.

On December 4, 2015, Skadden received from Kirkland some preliminary information relating to the composition of the Buyer Group and an initial draft of the Debt Commitment Letters to be provided by China Merchants Bank Co., Ltd. ("CMB").

On December 6, 2015, with the permission of the Special Committee, Skadden sent Kirkland its initial comments on the Debt Commitment Letters, including comments with respect to the conditions precedent to the obligations of CMB to provide the debt financing under the Debt Commitment Letters. On the morning of December 7, 2015, representatives of Skadden and Jun He had a telephonic meeting with representatives of Kirkland and Fangda to discuss Skadden's initial comments on the Debt Commitment Letters. Following the request of Skadden, Fangda sent to Skadden the draft fee letters in connection with the Debt Commitment Letters later that day.

33

On December 7, 2015, the Special Committee convened its fifth meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, representatives of Skadden discussed with the Special Committee the key issues raised in the revised draft Merger Agreement received from Kirkland, and offered recommendations regarding the position to be taken by the Special Committee. Among other things, the Special Committee and its advisors discussed (i) the need for clarification on the Buyer Group's right to withhold tax; (ii) the approach to be taken by the Company with respect to the "insider" knowledge qualification to representations and warranties in the Merger Agreement; (iii) the approach to be taken by the Company with respect to a go-shop right; (iv) the approach to be taken by the Company with respect to "fiduciary out" in the absence of a superior proposal; (v) the definition of a superior proposal and the Buyer Group's right to match a superior proposal; (vi) the various closing conditions reflected in the revised draft Merger Agreement, in particular (x) the deletion of the "majority of the minority" shareholder vote condition, (y) the inclusion of a condition that less than 5% of the outstanding shares of the Company dissent from the proposed transaction, and (z) PRC regulatory approval requirements; and (vii) the amount of reverse termination fee payable by the Buyer Group as well as the relevant triggers for the payment of such reverse termination fee. At the request of the Special Committee, J.P. Morgan then summarized a range of termination fees payable in selected precedent transactions. The Special Committee and its advisors then discussed the size of the reverse termination fee payable by the Buyer Group, which was based on market practices and also reflected the inherent uncertainties related to the financing for the proposed transaction given its size and the large number of participating sources.

After discussing with its advisors the effect and implications of the various positions taken by the Buyer Group in the revised draft Merger Agreement, the Special Committee instructed Skadden to revert back to the Buyer Group and its counsel with the following positions: (i) the representations and warranties of the Company shall be qualified by the knowledge of the "insiders"; (ii) the Company should have a go-shop right, pursuant to which the Company may actively solicit alternative acquisition proposals from other potential buyers during a 60-day period after the signing of the Merger Agreement; (iii) the Company (Special Committee) should have the right to terminate the Merger Agreement and/or change Board recommendation even in the absence of a superior proposal if doing so would be required in the exercise of its fiduciary duties; (iv) in addition to the statutory shareholder vote requirement, the consummation of the proposed transactions should be conditioned upon the approval by the affirmative vote of shareholders representing more than 50% of the voting rights of the shares held by shareholders present in person or by proxy at the extraordinary general meeting (excluding the shares beneficially owned by the Buyer Group); (v) the consummation of the proposed transactions should not be conditioned on less than 5% of the outstanding shares of the Company dissenting from the transactions; and (vi) the Buyer Group shall pay the Company a reverse termination fee in an amount equal to 8% of the equity value of the Company implied by the merger consideration payable by the Buyer Group (not taking into account the Founder Securities) if the Merger Agreement is terminated by the Company because of Buyer Group's failure to obtain requisite governmental approval for the Merger or failure to close when required to do so.

At the same meeting, representatives of Skadden also described the structure and key terms of the Debt Commitment Letters and discussed with the Special Committee the principal funding conditions in the Debt Commitment Letters.

At the end of the meeting, J.P. Morgan updated the Special Committee on the status of their financial analyses with respect to the Company and the proposed transaction. The Special Committee and its advisors then discussed general considerations relating to the equity financing of the Buyer Group and the composition and size of the Buyer Group. The Special Committee then instructed its advisors to communicate with the Buyer Group and its advisors on the process relating to the proposed transaction.

Later that day, Skadden and J.P. Morgan had a telephonic meeting with Kirkland and Huatai to discuss certain process-related matters.

On the same day, Skadden sent Kirkland its comments on the revised draft Merger Agreement and the draft form Equity Commitment Letter, form Limited Guarantee and Interim Investors Agreement.

On December 8, 2015, representatives of J.P. Morgan, Jun He and Skadden had a telephonic meeting with Huatai, Fangda and Kirkland to clarify the composition and identity of members of the Buyer Group and discuss the PRC regulatory approvals required for these equity investors to make equity commitments and participate in the proposed transaction. Following the meeting, Huatai sent to J.P. Morgan, Skadden and Jun He an updated list of the entities that the equity investors would likely use to sign the Equity Commitment Letters and the Limited Guarantees.

34

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 40 of 84

Later on the same day, representatives of Skadden and representatives of Kirkland held a telephonic meeting to discuss the open issues in the draft Merger Agreement and ancillary documents. Kirkland indicated to Skadden that the Buyer Group did not agree to the proposed 60-day "go-shop" right. Skadden indicated to Kirkland that since the Special Committee had not conducted a pre-signing market check, it was critical that the Company had a go-shop right that would allow the Company to actively solicit alternative acquisition proposals from other potential buyers during a 60-day period after the signing of the Merger Agreement. Skadden and Kirkland also exchanged views on other outstanding issues under the Merger Agreement, including, among others, (i) the "insider" knowledge qualification to representations and warranties in the Merger Agreement; (ii) whether the Company should have the right to terminate the Merger Agreement and/or change board recommendation even in the absence of a superior proposal if doing so would be required in the exercise of its fiduciary duties; (iii) the "majority of the minority" shareholder vote condition; (iv) the appraisal condition where the consummation of the proposed transactions is conditioned on less than 5% of the outstanding shares of the Company dissenting from the transactions; and (v) the reverse termination fee tied to the Buyer Group's failure to obtain requisite governmental approval for the Merger. At the meeting, Skadden also indicated to Kirkland that the Special Committee expected the amount of reverse termination fee to be 8% of the equity value of the Company implied by the merger consideration payable by the Buyer Group (not taking into account the Founder Securities) and termination fee payable by the Company to be 50% of the reverse termination fee, and that a lower termination fee equal to 50% of the regular termination fee payable by the Company would apply if the Merger Agreement is terminated because the Company enters into an agreement in connection with a superior proposal received during the go-shop period.

Later that day following the telephonic discussion between Skadden and Kirkland, Kirkland sent revised drafts of the Merger Agreement, form Equity Commitment Letter and form Limited Guarantee to Skadden, (i) rejecting the 60-day "go-shop" right; (ii) removing the "insider" knowledge qualification to representations and warranties in the Merger Agreement; (iii) objecting to the proposal that the Company has the right to terminate the Merger Agreement and/or change board recommendation in the absence of a superior proposal if doing so would be required in the exercise of its fiduciary duties, and insisting that the Board of the Company can only change its recommendation in connection with a superior proposal; (iv) deleting the "majority of the minority" shareholder vote condition; (v) increasing the threshold for the appraisal condition from 5% of the total and outstanding Shares of the Company to 10%; (vi) agreeing to the proposal that reverse termination fee is payable in the event of the Buyer Group's failure to obtain requisite governmental approval for the Merger; and (vii) proposing the RMB equivalent of $150 million for the termination fee payable by the Company and the RMB equivalent of $250 million for the reverse termination fee payable by the Buyer Group, representing approximately 2% and 3%, respectively, of the equity value implied by the merger consideration payable by the Buyer Group (not taking into account the Founder Securities).

On December 9, 2015, the Special Committee convened its sixth meeting by telephone, at which Mr. Alex Zuoli Xu, the Co-CFO of the Company, and representatives of Skadden, J.P. Morgan and Jun He were present. Mr. Xu presented the management's projections for the Company's future financial performance. During this presentation, Mr. Xu discussed management projections for the Company for the fiscal year ending December 31, 2015 through fiscal year ending December 31, 2025 (which financial projections are summarized under "Special Factors—Certain Financial Projections"). After the Co-CFO recused himself from the meeting, the Special Committee continued to discuss the projections with its advisors. The Special Committee found the projections to be reasonable and logically consistent and expressed its confidence in the projections. Thereafter, J.P. Morgan reported to the Special Committee that they were in the process of completing their financial analyses with respect to the Company and the proposed transaction. J.P. Morgan also discussed with the Special Committee the possibility and strategy for negotiating for a purchase price increase. After discussion with its advisors, the Special Committee instructed its advisors to seek an increase in the purchase price to $80.00 per ADS.

Thereafter, representatives from Skadden and Jun He discussed with the Special Committee issues related to requisite PRC governmental approvals for the completion of the Merger, including the outbound investment approvals relating to the exchange of Renminbi proceeds raised from debt and equity financing into U.S. dollars for the proposed transaction offshore and a filing under the PRC anti-monopoly law. Based on available information provided by the Buyer Group and discussion with Fangda, PRC counsel to the Buyer Group, Jun He stated that it did not find it likely that a filing under the PRC anti-monopoly law would be required for the proposed Merger, or the requisite PRC governmental approvals would prohibit or substantially delay the completion of the Merger. However, given the size of the Buyer Group and various nature of the entities involved, the Special Committee agreed that any risk associated with the required PRC regulatory approvals should be allocated to the Buyer Group.

A representative from Skadden then discussed with the Special Committee the outstanding key issues in the revised draft Merger Agreement received from Kirkland. Among other things, the Special Committee and its advisors discussed (i) the approach to be taken by the Company with respect to the "insider" knowledge qualification to representations and warranties in the Merger Agreement; (ii) the approach to be taken by the Company with respect to go-shop right; (iii) the approach to be taken by the Company with respect to "fiduciary out" in the absence of a superior proposal; (iv) the various closing conditions reflected in the revised draft Merger Agreement, in particular (x) the "majority of the minority" shareholder vote condition, and (y) the condition that less than 10% of the outstanding shares of the Company dissent from the proposed transaction; and (v) the amount of reverse termination fee payable by the Buyer Group as well as the relevant triggers for the payment of such reverse termination fee. After extensive discussion with its advisors, the Special Committee instructed Skadden and J.P. Morgan to prepare a package proposal, based on the Special Committee's feedback and direction, to be delivered to the Buyer Group.

Following the meeting, Skadden and J.P. Morgan prepared a package proposal, based on the Special Committee's feedback and direction, to be delivered to the Buyer Group and obtained the Special Committee's approval on the package proposal. Later that day, with the permission of the Special Committee, Skadden delivered the following package proposal to Kirkland: (i) representations and warranties to be made by the Company in the Merger Agreement will not be qualified by "insider" knowledge; (ii) the Company would have a go-shop right, pursuant to which the Company may actively solicit alternative acquisition proposals from other potential buyers during a 45-day period after the signing of the Merger Agreement; (iii) the Company should have the right to change board recommendation even in the absence of a superior proposal if doing so would be required in the exercise of its fiduciary duties, but cannot terminate the Merger Agreement absent a superior proposal; (iv) the consummation of the proposed transaction will not be conditioned on the "majority of the minority" vote; (v) the threshold for the appraisal condition shall be increased from 10% of the total and outstanding Shares of the Company to 20%; (vi) the reverse termination fee shall be payable in the event that closing fails to occur as a result of an injunction or failure to obtain requisite PRC regulatory approvals; and (vii) the Company shall be a party to the escrow arrangement that had been contemplated by the Buyer Group and thus gain access to the funds in the escrow account in the event the reverse termination fee becomes payable. Later that day, Skadden sent Kirkland its comments on the revised draft of the Merger Agreement, form Equity Commitment Letter and form Limited Guarantee which reflected the package proposal.

On the same date, Fangda sent revised drafts of the Debt Commitment Letters to Skadden, and representatives of Skadden engaged in further discussion with representatives of Fangda and Kirkland on the Debt Commitment Letters.

On the morning of December 10, 2015, Kirkland sent Skadden further revised drafts of the Merger Agreement, form Equity Commitment Letter and form Limited Guarantee, pursuant to which the Buyer Group offered a reverse termination fee of the RMB equivalent to $400 million in exchange for the Special Committee dropping the "go-shop" and the request that the Company be a party to the escrow arrangement, and agreed that the Company has the right to change board recommendation in response to an intervening event if the Board or the Special Committee determines in good faith that failure to do so would reasonably be expected to be inconsistent with its fiduciary duties. Later that day, J.P. Morgan and Skadden delivered to Kirkland through a teleconference the Special Committee's request for an increase in the purchase price to $80.00 per ADS and the other terms in the original package proposal conveyed to the Buyer Group on the previous day. Later in the evening, Skadden received responses from Kirkland on the previously delivered package proposal – the Buyer Group rejected the price increase and insisted on their position with respect to the other terms as reflected in their revised draft of the Merger Agreement and other transaction documents sent across in the morning.

On December 11, 2015, the Special Committee convened its seventh meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, the Special Committee discussed with its advisors the Buyer Group's responses to the Special Committee's package proposal including terms such as: purchase price increase, go-shop right, change of board recommendation in response to an intervening event, the "majority of the minority" vote condition, reverse termination fee and the mechanism for ensuring the enforceability of the Limited Guarantees. After deliberation, the Special Committee instructed its advisors to continue to negotiate for the purchase price increase, go-shop right, reverse termination fee equivalent to 8% of the equity value of the Company (not taking into account the Founder Securities) and the mechanism for ensuring enforceability of the Limited Guarantees as well as other terms in the original package proposal.

Later that day, Kirkland sent Skadden the initial draft of the form Escrow Agreement, pursuant to which each of the equity financing sources would agree to fund 3% of their respective equity contributions to an account established by Parent within five business days following the signing of the Escrow Agreement.

During the course of the day, Skadden and J.P. Morgan continued the negotiation with the Buyer Group's advisors based on the Special Committee's instructions. Representatives of J.P. Morgan and Skadden also had a teleconference with representatives of Huatai to further discuss the list of equity investors sent across by Huatai and Kirkland over the past few days, and requesting evidence of creditworthiness of each entity signing the Equity Commitment Letters and the Limited Guarantees.

On the evening of that date, Skadden received responses from Kirkland delivering the Buyer Group's counter proposal, pursuant to which the Buyer Group would agree to have the Company be a party to the escrow arrangement, and increase the reverse termination fee from the RMB equivalent of $400 million to $450 million, in exchange for the Special Committee dropping the requests for purchase price increase and "go-shop."

On December 12, 2015, the Special Committee convened its eighth meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, a representative of Skadden updated the Special Committee on developments in the discussions with the Buyer Group on the outstanding key terms of the proposed transaction, including (i) the Buyer Group's agreement to include the Company as a party to the escrow arrangement; (ii) the Buyer Group's agreement to increase the reverse termination fee from the RMB equivalent of $400 million to $450 million; (iii) the Buyer Group's rejection of a purchase price increase; and (iv) the Buyer Group's rejection of the "go-shop" right. The Special Committee and its advisors then had an extensive discussion regarding (i) the escrow arrangement, and (ii) potential alternative to the "go-shop" right, including market practices related to such provision in Chinese going-private transactions involving Cayman incorporated companies.

36

During the rest of December 12, 2015, Skadden continued to negotiate with Kirkland and Huatai, reiterating the Special Committee's emphasis on the purchase price increase and the go-shop right.

On December 13, 2015, Skadden sent to Kirkland its comments on the draft form Escrow Agreement, including, among others, adding the Company as a party to the Escrow Agreement.

Later that day, Kirkland and Huatai delivered the Buyer Group's revised counter proposal to Skadden and J.P. Morgan, respectively, including agreement to (i) provide the Company with a 45-day "go shop" right in the Merger Agreement and (ii) keep the regular reverse termination fee at the RMB equivalent of $450 million, in exchange for (iii) no purchase price increase and (iv) lowering the reverse termination fee tied to failure to obtain requisite PRC regulatory approval to the RMB equivalent of $50 million. Skadden reverted to Kirkland and Huatai, indicating that the proposed $50 million reverse termination fee tied to failure to obtain requisite PRC regulatory approvals was too low and reiterating the request that the Buyer Group provide materials evidencing the creditworthiness of the entities that were to sign the Equity Commitment Letters and the Limited Guarantees to the satisfaction of the Special Committee.

The next day, Huatai sent to J.P. Morgan and Skadden updates to the list of equity investors, which included certain background information about each of the equity investors.

On the same day, Kirkland forwarded to Skadden the confirmation of pre-filing with the NDRC that Parent had received, which filing relates to Parent's outbound investment for the proposed transaction offshore and is required for the signing of the Merger Agreement.

On the morning of December 14, 2015, representatives of Skadden and J.P. Morgan had a teleconference with representatives of Huatai and Kirkland, during which the parties discussed (i) the amount of reduced reverse termination fee tied to failure to obtain requisite PRC regulatory approvals, and (ii) the creditworthiness of the equity investors. Huatai indicated on the conference call that the Buyer Group would be willing to increase the amount of reverse termination fee tied to failure to obtain requisite PRC regulatory approvals from the RMB equivalent of $50 million to $100 million. Skadden also emphasized the request that the Buyer Group provide materials evidencing the creditworthiness of the entities signing the Equity Commitment Letters and the Limited Guarantees.

Following the teleconference, Skadden and J.P. Morgan reported to the Special Committee on the developments in the discussions with the Buyer Group on the outstanding key terms of the proposed transaction since the previous Special Committee meeting. The Special Committee instructed Skadden to continue to work on the Merger Agreement and the rest of the transaction documents, and J.P. Morgan to request from Huatai evidence of the creditworthiness of the equity investors who are signing the Equity Commitment Letters and the Limited Guarantees.

Later that day, Skadden sent to Kirkland its comments on the draft Merger Agreement and form Limited Guarantee.

Over the course of the same day, J.P. Morgan, Skadden and Jun He were engaged in substantial discussions with Huatai on the creditworthiness of the equity investors.

Later that evening, Kirkland sent to Skadden the revised draft of the transaction documents, including the Merger Agreement, form Limited Guarantee, form Equity Commitment Letter, form Escrow Agreement, Interim Investors Agreement and an initial draft of Global Village's guarantee for certain Buyer Group member's obligations under its Limited Guarantee and Equity Commitment Letter. In addition to the Buyer Group's position that there would be no purchase price increase, the revised transaction documents mainly reflected the Buyer Group's agreement to (i) provide the Company with 45-day "go shop" right, (ii) the regular reverse termination fee of the RMB equivalent of $450 million, and the reduced reverse termination fee tied to failure to obtain requisite PRC regulatory approvals of the RMB equivalent of $100 million, and (iii) the regular Company termination fee of the RMB equivalent of $225 million and the reduced Company termination fee of the RMB equivalent of $112.5 million in the event that the Company enters into an agreement for a superior proposal received during the go-shop period, as well as (iv) Global Village's agreement to provide back-to-back limited guarantee for certain Buyer Group member's performance of its obligations under its Limited Guarantee and Equity Commitment Letter.

On the morning of December 15, 2015, representatives of Skadden communicated to representatives of Kirkland and Huatai the request that the Chairman be a party to the Escrow Agreements agreeing not to cause Parent to breach the Escrow Agreements, or alternatively, the scope of Global Village's guarantee be expanded to cover Parent's performance or enforcement of the Escrow Agreements. Thereafter, Skadden sent to Kirkland its comments on the form Escrow Agreement and the Global Village Guarantee reflecting the request. Later that morning, representatives of Skadden and J.P. Morgan had a teleconference with representatives of Huatai and Kirkland discussing the outstanding key issues.

37

Later that day, the Special Committee convened its ninth meeting by telephone with representatives of Skadden and J.P. Morgan. A representative from Skadden first updated the Special Committee on developments in the discussions with the Buyer Group on the outstanding key terms of the transaction, including (i) the Buyer Group's agreement to the Company's "go-shop" right; (ii) the Buyer Group's agreement to a lower termination fee of $112.5 million where the Merger Agreement is terminated by the Company due to a superior proposal; (iii) the Buyer Group's request for a lower reverse termination fee of $100 million where the Buyer Group fails to complete the transaction due to failure to obtain requisite PRC governmental approvals after reasonable best efforts; (iv) the Buyer Group's agreement to include the Company as a party to the escrow arrangement, pursuant to which the escrowed amounts cannot be used for purposes other than payment of the Merger Consideration or reverse termination fee; and (v) the Buyer Group's agreement that Global Village, a holding vehicle of Company shares of the Chairman, will provide back-to-back guarantee in relation to certain Buyer Group member's obligations under its Limited Guarantee and Equity Commitment Letter, as well as Parent's performance or enforcement of the Escrow Agreements. Thereafter, J.P. Morgan provided an update to the Special Committee on the information received from Huatai regarding the creditworthiness of the equity investors. The Special Committee discussed the outstanding issues with its advisors and found them to be acceptable to the Company and instructed its advisors to finalize the transaction documents with the Buyer Group.

On the same day following the Special Committee meeting, Skadden sent to Kirkland its comments on the Merger Agreement, and emphasized the Special Committee's position that (i) Global Village shall guarantee Parent's performance or shall otherwise cause Parent to perform its obligations under the Escrow Agreements, and (ii) the amount of reverse termination fee for failure to obtain requisite PRC government approvals by the Buyer Group after they make their reasonable best efforts shall be the same as the amount of termination fee payable by the Company as a result of the Company's entry into an agreement in connection with a superior proposal received during the go-shop period.

Later that day, Kirkland sent to Skadden (i) revised drafts of the Global Village Guarantee and form Escrow Agreement, agreeing that Global Village will guarantee Parent's obligation under the Escrow Agreements, and (ii) a revised draft of the Merger Agreement, agreeing that the amount of reverse termination fee for failure to obtain requisite PRC government approvals by the Buyer Group and the amount of termination fee payable by the Company as a result of the Company's entry into an agreement in connection with a superior proposal received during the go-shop period shall both be $100 million.

During the rest of the day, Skadden and Kirkland continued to work on and finalize the terms of the Merger Agreement and other transaction documents. Later that night, Kirkland sent Skadden the Merger Agreement and other transaction documents in agreed form, as well as the final allocation of equity commitments among members of the Buyer Group, and Fangda sent Skadden the final version of the Debt Commitment Letters and other related ancillary documents.

On December 16, 2015, the Special Committee convened its tenth meeting by telephone with representatives of J.P. Morgan, Skadden, Maples and Jun He. At the outset of the meeting, a representative from Maples reviewed with the members of the Special Committee the directors' fiduciary duties under the laws of the Cayman Islands in connection with their consideration of the proposed transaction, including their duties of loyalty, honesty and good faith. Thereafter, a representative from J.P. Morgan presented to the Special Committee J.P. Morgan's financial analyses with respect to the Company and the transaction proposed by the Buyer Group to acquire the Shares (other than the Excluded Shares and ADSs representing the Excluded Shares) at a purchase price of $77.00 per ADS or $51.33 per Share, and then rendered its oral opinion that as of December 16, 2015, the $77.00 Per ADS Merger Consideration and the $51.33 Per Share Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed transaction is fair, from a financial point of view, to such Unaffiliated Holders, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered in preparing its opinion. Representatives from Skadden then gave the Special Committee an overview of the material terms reflected in the final draft Merger Agreement and other transaction documents. Thereafter, the Special Committee members had an extensive and detailed discussion of the updated terms of the Merger Agreement and other transaction documents, as well as J.P. Morgan's financial analyses and fairness opinion, following which the Special Committee unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of, the Company and its Unaffiliated Holders, (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger.

38

On the same day following the meeting of the Special Committee, the Board held a telephonic meeting. Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, after announcing their presence at the meeting and disclosing their respective interests relating to the proposed transactions, including the Merger, recused themselves from the meeting. Thereafter, the Board (other than the Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), based on the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, (b) authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

Later in the evening on December 16, 2015, based on a discussion between representatives of J.P. Morgan and Huatai, it was determined that certain share count information of the Company that J.P. Morgan had received from the Company management which was also included in the draft Merger Agreement, did not match the share count information previously provided by the Company management to Huatai. Following an extensive discussion, it was found that the inconsistency resulted from an inadvertent clerical error made by the Company management based on a misunderstanding of certain categories of shares. In light of this inadvertent error, J.P. Morgan withdrew the oral fairness opinion previously rendered to the Special Committee during the meeting earlier that day pending the provision of updated share data by the Company and the resulting revision of its financial analyses. Shortly thereafter, representatives of Skadden informed each member of the Special Committee of J.P. Morgan's withdrawal of the oral fairness opinion previously rendered, and the Special Committee instructed Skadden to withhold the exchange of signatures to the Merger Agreement and other transaction documents before the updated share data was provided and the Special Committee had a clearer understanding of the occurrence of the clerical error and its impact and received from J.P. Morgan an updated presentation on its financial analyses and opinion.

On December 17, 2015, the Special Committee convened its eleventh meeting by telephone with representatives of Skadden and J.P. Morgan and certain members of the Company management. During the meeting, a representative of J.P. Morgan first updated the Special Committee on the background for their withdrawal of the oral opinion previously rendered to the Special Committee at the meeting on December 16, 2015 in light of the incorrect share data previously received by J.P. Morgan from the Company, and then informed the Special Committee that J.P. Morgan had received updated share data from the Company management and was ready to provide a revised presentation of its financial analyses reflecting the corrected share count information provided by the Company management. The Special Committee members made inquiries on how the error occurred, and representatives of the Company management responded. The Special Committee members then had extensive discussions with its advisors on the impact that this error in share count numbers may cause to the valuation of the Company and the fairness opinion from J.P. Morgan, as well as the impact on the equity commitments from the equity investors of the Buyer Group taking into account the combination of debt financing and equity financing raised by the Buyer Group. In particular, the Special Committee found it important to verify and confirm that each of the equity investors in the Buyer Group made their investment decision, i.e., the equity commitment, based on the correct share count numbers and equity value of the Company. For this purpose, the Special Committee requested J.P. Morgan and Skadden reach out to the relevant personnel from the Company and Huatai to find out whether the correct share count numbers had been fully disclosed to the Buyer Group, and report back to the Special Committee.

From December 16, 2015 to December 18, 2015, J.P. Morgan, Huatai, Skadden and Kirkland continued to update and finalize the execution form of the Merger Agreement and other transaction documents, including the Equity Commitment Letters, the Escrow Agreements, the Limited Guarantees, the Global Village Guarantee and the Debt Commitment Letters.

On the morning of December 18, 2015, representatives of Skadden and J.P. Morgan held a tele-conference with the Company management, at which a representative of Latham was also present. During the conference call, the Company management explained that they misunderstood the meaning of certain categories of shares and therefore inadvertently provided incorrect numbers of restricted shares and options in response to J.P. Morgan's request for confirmation, and also confirmed that they had never provided incorrect share count numbers to any member of the Buyer Group. After that, representatives of Skadden and J.P. Morgan then had a tele-conference with representatives of Huatai, at which representatives of Kirkland were also present and during which Huatai confirmed that no incorrect share count numbers had ever been provided to the equity investors in the Buyer Group.

39

Later that day, the Special Committee convened its twelfth meeting by telephone with representatives of Skadden and J.P. Morgan. During the meeting, representatives from Skadden reported to the Special Committee the findings from the due diligence with the Company management and Huatai. The Special Committee made further inquiries and had discussions with its advisors regarding the findings. Thereafter, a representative from Maples reviewed with the members of the Special Committee the directors' fiduciary duties under the laws of the Cayman Islands in connection with their consideration of the proposed transaction, including their duties of loyalty, honesty and good faith. Thereafter, a representative from J.P. Morgan presented to the Special Committee J.P. Morgan's financial analyses with respect to the Company and the transaction proposed by the Buyer Group to acquire the Shares (other than the Excluded Shares) at a purchase price of $77.00 per ADS or $51.33 per Share, and then rendered its oral opinion that as of December 18, 2015, the $77.00 Per ADS Merger Consideration and the $51.33 Per Share Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed transaction is fair, from a financial point of view, to such Unaffiliated Holders, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered in preparing its opinion. The written opinion of J.P. Morgan was delivered on the same day. The full text of the written opinion of J.P. Morgan is attached as Annex C to this proxy statement. For additional information regarding the financial analyses performed by and the opinion rendered by J.P. Morgan, please refer to "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53. At the conclusion of the meeting, the Special Committee reaffirmed the resolutions adopted in its meeting on December 16, 2015, and unanimously resolved to approve and recommend that the Board approve the proposed Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger. See "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 41 for a description of the resolutions of the Special Committee at this meeting.

On the same day following the meeting of the Special Committee, the Board held a telephonic meeting. Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, after announcing their presence at the meeting and disclosing their respective interests relating to the proposed transactions, including the Merger, recused themselves from the meeting. Thereafter, the Board (other than the Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), based on the unanimous recommendation of the Special Committee, reaffirmed the resolutions adopted in its meeting on December 16, 2015, and resolved to approve the proposed Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and recommended that the Company's shareholders vote to approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. See "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 41 for a description of the resolutions of the Board at this meeting.

Later that day, the Company, Holdco, Parent, Midco, Merger Sub, Global Village and Young Vision executed the Merger Agreement and other transaction documents. On the same date, Holdco and Parent entered into the Debt Commitment Letters and the related fee letters with CMB.

On the same day, the Company issued a press release announcing the execution of the Merger Agreement, and furnished the press release and the executed Merger Agreement to the SEC as exhibits to its current report on Form 6-K.

On December 28, 2015, (i) The Chairman and Global Village, together with another entity that is the sole shareholder of Global Village, jointly filed with the SEC a Schedule 13D, (ii) Mr. Xiangdong Qi and Young Vision, together with another entity that is the sole shareholder of Young Vision, jointly filed with the SEC a Schedule 13D, and (iii) Sequoia Capital China UR Holdings Limited, and its sole director and shareholder, Mr. Neil Nanpeng Shen, jointly filed with the SEC Amendment No. 1 to their Schedule 13D, each in connection with the execution by the Buyer Group of the Merger Agreement and other transaction documents, including the Equity Commitment Letters, the Escrow Agreements, the Limited Guarantees, the Global Village Guarantee, the Interim Investors Agreement and the Debt Commitment Letters.

On December 30, 2015, Trustbridge Partners III, L.P., which is affiliated to one member of the Buyer Group, together with two of its affiliates, jointly filed with the SEC a Schedule 13D in connection with the execution by the Buyer Group of the Merger Agreement and other transaction documents, including the Equity Commitment Letters, the Escrow Agreements, the Limited Guarantees, the Global Village Guarantee, the Interim Investors Agreement and the Debt Commitment Letters.

The go-shop period under the Merger Agreement, during which the Company was permitted to actively initiate, solicit and encourage Acquisitions Proposals, commenced on December 18, 2015 and expired at 11:59 p.m. on February 1, 2016, Hong Kong time (the "Go-Shop Period End Date"). During the go-shop period, J.P. Morgan, on behalf of the Special Committee, contacted three selected potential strategic bidders, which are considered to be the most likely parties that might have been interested in exploring, and be able to consummate, an alternative transaction, given general timing consideration, the size of and required funding for any potential alternative transaction, the percentage ownership held by the Buyer Group, and the nature of the Company's business. None of the three contacted parties expressed an interest in exploring an alternative transaction with the Company. No one approached the Special Committee separately from the Company's solicitation of Acquisition Proposals during the go-shop period.

40

**Reasons for the Merger and Recommendation of the Special Committee and the Board**

The Special Committee and the Board believe that, as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance.

In addition, as an SEC-reporting company, the Company's management and accounting staff, which comprise a relatively small number of individuals, must devote significant time to SEC reporting and compliance. The Company is also required to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and would not be disclosed by a non-reporting company. As a result, its actual or potential competitors, customers, lenders and vendors all have ready access to such information, which potentially may help them compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

Subsequent to the completion of the Merger, the Company will no longer be subject to the Exchange Act and NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses. The Company estimates that such costs and expenses currently amount to approximately $4.0 million to $4.5 million per year, including legal and compliance expenses, audit fees and financial printer and other expenses.

At a meeting on December 18, 2015, the Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of, the Company and its Unaffiliated Holders, (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger.

At a meeting on December 18, 2015, the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, (b) authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

In the course of reaching their respective determinations, the Special Committee and the Board considered the following substantive factors and potential benefits of the Merger, each of which the Special Committee and the Board believe supported their respective decisions to recommend the Merger Agreement and that the Merger is substantively fair to the Unaffiliated Holders. These factors and potential benefits, which are not listed in any relative order of importance, are discussed below:

- the current and historical market prices of ADSs, and the fact that the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 offered to the Unaffiliated Holders implies a 16.6% premium over the Company's closing price of $66.05 per ADS on June 16, 2015, the last full trading day prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its announcement of its receipt of a going-private proposal;

- the lowest closing price of the Company's ADSs was $42.21 during the 52-week period prior to December 18, 2015, the date that the Company announced the execution of the Merger Agreement;

41

- the increased costs of regulatory compliance for public companies;

- the recognition that, as an SEC-reporting company, the Company's management and accounting staff, which comprise a relatively small number of individuals, must devote significant time to SEC reporting and compliance;

- the recognition that, as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance. Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii) monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics;

- the recognition that, as an SEC-reporting company, the Company is required to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and would not be disclosed by a non-reporting company and which potentially may help its actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be;

- the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account (i) the likelihood of being consummated, given the size of and required funding for any potential alternative transaction, the percentage ownership held by the Buyer Group and their express statement regarding their unwillingness to sell their shares in any other transaction involving the Company, and general timing consideration, (ii) the business, competitive, industry and market risks, (iii) the likely impact of the PRC anti-monopoly law on the viability of potential alternatives, and (iv) the absence of any proposals made by any unsolicited potential buyers since the announcement of the proposed transaction on June 17, 2015;

- the fact that the consideration payable in the Merger is entirely in cash, which will allow the Unaffiliated Holders to immediately realize liquidity for their investment and provide them with certainty of the value of their Shares or ADSs;

- the possibility that it could take a considerable period of time before the trading price of the ADSs would reach and sustain at least the per ADS Merger consideration of $77.00, as adjusted for present value, and the possibility that such value might never be obtained;

- the negotiations with respect to the Per Share Merger Consideration and Per ADS Merger Consideration and the Special Committee's determination that, following extensive negotiations with the Buyer Group, $51.33 per Share and $77.00 per ADS was the highest price that the Buyer Group would agree to pay, with the Special Committee basing its belief on a number of factors, including the duration and tenor of negotiations and the experience of the Special Committee and its advisors;

- the likelihood that the Merger would be consummated based on, among other things (not in any relative order of importance):

  - the fact that the Parent Parties had obtained the debt and equity financings necessary to complete the Merger, the conditions to the financing and the due diligence on the creditworthiness of the financing sources;

  - the absence of a financing condition in the Merger Agreement;

  - the likelihood and anticipated timing of consummating the Merger in light of the scope of the conditions to closing; and

  - the Company's ability, as set out in the Merger Agreement, the Equity Commitment Letters and the Escrow Agreements, to seek specific performance to prevent breaches of such agreements and to enforce specifically the terms of such agreements,

42

- the fact that the Merger Agreement provides that, in the event of a failure of the Merger to be consummated under certain circumstances, Parent will pay the Company a termination fee of approximately RMB2.88 billion, the guarantee of such payment obligation by members of the Buyer Group pursuant to the Limited Guarantees and a back-to-back limited guarantee provided by Global Village, a holding vehicle for Mr. Hongyi Zhou of Shares (see "The Merger Agreement—Termination Fee" beginning on page 109 and "Special Factors—Limited Guarantees; Global Village Guarantee" beginning on page 73);

- the Company's access to the escrow arrangement, pursuant to which each of the Equity Investors agreed to deposit 3% of their respective equity contributions with Parent as earnest money, which will be applied towards the payment to the Company by Parent of the termination fee that may become due and payable pursuant to the terms of the Merger Agreement, and/or the payment of certain of such Equity Investor's obligations under its Equity Commitment Letter and Limited Guarantee;

- the belief of the Special Committee that the reduced termination fee in an amount of RMB641 million payable by the Company as a result of the Company's entry into an agreement in connection with a Superior Proposal received during the go-shop period would not likely discourage a proposal for a competing transaction from an interested bidder considering a transaction with the Company at a higher price;

- the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion (see "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information); and

- since the announcement of the proposed transaction on June 17, 2015 and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group had contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company.

In addition, the Special Committee and the Board believed that sufficient procedural safeguards were and are present to ensure that the Merger is procedurally fair to the Unaffiliated Holders and to permit the Special Committee and the Board to represent effectively the interests of such Unaffiliated Holders, which procedural safeguards include the following, which are not listed in any relative order of importance:

- the consideration and negotiation of the Merger Agreement was conducted entirely under the control and supervision of the Special Committee, which consists of three independent directors, each of whom is an outside, non-employee director, and that no limitations were placed on the Special Committee's authority;

- in considering the transaction with the Buyer Group, the Special Committee acted solely to represent the interests of the Unaffiliated Holders, and the Special Committee had independent control of the extensive negotiations with the Buyer Group and its advisors on behalf of the Unaffiliated Holders;

- all of the members of Special Committee during the entire process were and are independent directors and free from any affiliation with the Buyer Group; in addition, none of the members of the Special Committee is or ever was an employee of the Company or any of its subsidiaries or affiliates and none of such members has any financial interest in the Merger that is different from that of the Unaffiliated Holders other than the members' receipt of Board and Special Committee compensation (which is not contingent upon the consummation of the Merger or the Special Committee's or the Board's recommendation of the Merger) and their indemnification and liability insurance rights under the Merger Agreement;

- the Special Committee was assisted in negotiations with the Buyer Group and in its evaluation of the Merger by J.P. Morgan as its financial advisor and Skadden, Maples and Jun He as its legal advisors;

- the Special Committee was empowered to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group in connection with the proposed transaction from the date the Special Committee was established, and no evaluation, negotiation or response regarding the proposed transaction in connection therewith from that date forward was considered by the Board for approval until the Special Committee had recommended such action to the Board;

43

- the terms and conditions of the Merger Agreement were the product of extensive negotiations between the Special Committee and its advisors, on the one hand, and the Buyer Group and its advisors, on the other hand;

- the Special Committee was empowered to exercise the full power and authority of the Board in connection with the proposed transaction and related process;

- the Special Committee held 12 telephonic meetings to consider and review the terms of the Merger Agreement and the proposed transaction;

- the recognition by the Special Committee and the Board that the Special Committee had no obligation to recommend the Merger or any other transaction;

- the recognition by the Special Committee and the Board that, under the terms of the Merger Agreement, the Company has the ability to actively solicit bids and negotiate with other bidders for a period of 45 days after the signing of the Merger Agreement;

- the recognition by the Special Committee and the Board that, under the terms of the Merger Agreement, the Company has the ability to consider any Acquisition Proposal if the Board (or the Special Committee) determines in good faith that such Acquisition Proposal constitutes a Superior Proposal or is reasonably likely to result in a Superior Proposal (as defined in the section entitled "The Merger Agreement— Acquisition Proposals" beginning on page 101) until the Company's shareholders vote upon and authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger;

- the Company's ability, subject to compliance with the terms and conditions of the Merger Agreement, to terminate the Merger Agreement prior to the receipt of the Company Shareholder Approval in order to accept an alternative transaction proposed by a third party that the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal (as defined in the section entitled "Merger Agreement—Acquisition Proposals" beginning on page 101);

- the Board and the Special Committee's ability, under certain circumstances, to change, withhold, withdraw, qualify or modify the Company Recommendation (as defined in the section entitled "Merger Agreement—No Company Adverse Recommendation Change" beginning on page 103) that the Company's shareholders vote to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger; and

- the availability of Dissenter Rights to the Unaffiliated Holders who comply with all of the required procedures under the Cayman Islands Companies Law for exercising Dissenter Rights, which allow such shareholders to receive payment of the fair value of their Shares as determined by the Grand Court of the Cayman Islands.

The Special Committee and the Board also considered a variety of potentially negative factors concerning the Merger Agreement and the Merger, including the following, which are not listed in any relative order of importance:

- approval of the Merger Agreement is not subject to any additional approval by the Unaffiliated Holders and, given that the Buyer Group has approximately 61.3% of the voting rights of the issued and outstanding Shares, the Buyer Group has the ability to authorize and approve the Merger Agreement at the extraordinary general meeting unless a substantial majority (or possibly all, depending on the number of Shares voted at the meeting) of the Unaffiliated Holders vote against the proposal to authorize and approve the Merger Agreement;

- the Unaffiliated Holders will have no on-going equity participation in the Company following the Merger, and they will cease to participate in the Company's future earnings or growth, if any, or to benefit from increases, if any, in the value of Shares and ADSs, and will not participate in any potential future sale of the Company to a third party or any potential recapitalization of the Company, which could include a dividend to shareholders;

44

Case 1:19-cv-10067-PAE    Document 116-2    Filed 04/29/23    Page 50 of 184

- the restrictions on the conduct of the Company's business prior to the consummation of the Merger, which may delay or prevent the Company from undertaking business opportunities that may arise or any other action it would otherwise take with respect to the operations of the Company pending the consummation of the Merger;

- since the Company became publicly listed on the NYSE in March 2011, the highest historical closing price of ADSs ($121.53 per ADS on March 6, 2014) exceeds the Per ADS Merger Consideration;

- the risks and costs to the Company if the Merger does not consummate, including the diversion of management and employee attention, potential employee attrition and the potential disruptive effect on the Company's business and customer relationships, as well as the negative impact of a public announcement on the Company's business and operating results and the Company's ability to attract and retain key management and other personnel;

- the Company may be required, under certain circumstances, to pay Parent a termination fee of RMB1.44 billion ($225 million) in connection with a termination of the Merger Agreement;

- the Company's remedy in the event of a breach of the Merger Agreement by the Parent Parties is limited, under certain circumstances, to receipt of a reverse termination fee of RMB2.88 billion ($450 million), and under certain circumstances the Company may be entitled to a reduced reverse termination fee or no reverse termination fee at all;

- the terms of the Buyer Group's participation in the Merger and the fact that Mr. Hongyi Zhou, the chairman of the Board and chief executive officer of the Company, and Mr. Xiangdong Qi, a director and the president of the Company have interests in the Merger that are different from, or in addition to, those of the Unaffiliated Holders (see "Special Factors—Interests of Certain Persons in the Merger" beginning on page 74 for additional information);

- the possibility that the Merger might not be consummated, considering (i) the large number of Equity Investors that will provide equity financing to the Buyer Group, (ii) the increased risks associated with the PRC regulatory approvals or filings required in connection with the Buyer Group's potential debt and equity financing in Renminbi from PRC onshore sources and the subsequent exchange of Renminbi into U.S. dollars for the proposed transaction offshore, (iii) the possibility that the Buyer Group fails to find alternative debt financing if the debt financing source does not provide the financing pursuant to the Debt Commitment Letters, or (iv) the possibility that the Buyer Group fails to find alternative equity financing source to make up the shortfall if any one or more of the 36 Equity Investors fail to meet their commitment to provide the equity financing; and

- the taxability of an all-cash transaction to the Unaffiliated Holders who are U.S. Holders (as defined under "Special Factors—Material U.S. Federal Income tax Consequences") for U.S. federal income tax purposes, and the likely taxability of such a transaction to the Unaffiliated Holders in other jurisdictions.

The foregoing discussion of information and factors considered by the Special Committee and the Board is not intended to be exhaustive, but includes a number of the factors considered by the Special Committee and the Board. In view of the wide variety of factors considered by the Special Committee and the Board, neither the Special Committee nor the Board found it practicable to quantify or otherwise assign relative weights to the foregoing factors in reaching its conclusions. In addition, individual members of the Special Committee and the Board may have given different weights to different factors and may have viewed some factors more positively or negatively than others. The Special Committee recommended that the Board authorize and approve, and the Board authorized and approved, the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, based upon the totality of the information presented to and considered by it.

45

In reaching its conclusion regarding the fairness of the Merger to the Unaffiliated Holders and its decision to recommend the authorization and approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, the Special Committee considered financial analyses presented by J.P. Morgan. The analyses included a discounted cash flow analysis and a public trading multiples analysis. J.P. Morgan also reviewed with the Special Committee, solely for informational purposes, historical trading prices of the ADSs, certain precedent transactions and the premia paid in certain precedent U.S. listed Chinese take-private transactions, but noted that these are not valuation methodologies but were presented merely for informational purposes. All of the material financial analyses as presented to the Special Committee on December 18, 2015 are summarized below under the section entitled "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53. The Special Committee expressly adopted such analyses and opinion, among other factors considered, in reaching its determination as to the fairness of the Merger and other transactions contemplated by the Merger Agreement, the Plan of Merger and the other transaction documents.

Neither the Special Committee nor the Board considered the liquidation value of the Company's assets because each considers the Company to be a viable going-concern business where value is derived from cash flows generated from its continuing operations. In addition, the Special Committee and the Board believe that the value of the Company's assets that might be realized in a liquidation would be significantly less than its going-concern value. Each of the Special Committee and the Board believes the analyses and additional factors it reviewed provided an indication of the Company's going-concern value. Each of the Special Committee and the Board also considered the historical market prices of our ADSs as described under the section entitled "Market Price of the Company's ADSs, Dividends and Other Matters—Market Price of the ADSs" beginning on page 84. Each of the Special Committee and the Board considered the purchase prices paid in previous purchases as described under "Transactions in Shares and ADSs" beginning on page 118. Neither the Special Committee nor the Board, however, considered the Company's net book value, which is defined as total assets minus total liabilities, attributable to the Company's shareholders, as a factor. The Special Committee and the Board believe that net book value is not a material indicator of the value of the Company as a going concern as it does not take into account the future prospects of the Company, market conditions, trends in the industry or the business risks inherent in competing with larger companies in that industry. The Company's net book value per Share as of June 30, 2015 was $6.44 based on 189,757,657 issued and outstanding Shares as of that date. The Company is not aware of any firm offers made by any unaffiliated person, other than the Buyer Group, during the past two years for (i) the merger or consolidation of the Company with or into another company, (ii) the sale of all or a substantial part of the Company's assets or (iii) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company.

In reaching its determination that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders and its decision to authorize and approve the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and recommend the authorization and approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, by the Company's shareholders, the Board, on behalf of the Company, considered the analyses and recommendation of the Special Committee and the factors examined by the Special Committee as described above under this section and under "Special Factors—Background of the Merger," and adopted such recommendations and analyses. During its consideration of the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, the Board was also aware that some of the Company's directors and shareholders, including the chairman of the Board, and other employees of the Company, have interests with respect to the Merger that are, or may be, different from, or in addition to those of the Company's Unaffiliated Holders generally, as described under the section entitled "Special Factors—Interests of Certain Persons in the Merger" beginning on page 74.

Except as set forth under this section, the section entitled "Special Factors—Background of the Merger" beginning on page 29 and the section entitled "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53, no director who is not an employee of the Company has retained an unaffiliated representative to act solely on behalf of Unaffiliated Holders for purposes of negotiating the terms of, and/or preparing a report concerning the fairness of, the Merger and other transactions contemplated by the Merger Agreement, the Plan of Merger and the other transaction documents.

**For the foregoing reasons, the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders.**

46

Case 1:19-cv-10067-RAE Document 116-2 Filed 04/29/22 Page 52 of 84

**Position of the Buyer Group as to the Fairness of the Merger**

The Buyer Group is making the statements included in this section solely for the purpose of ensuring compliance with the requirements of Rule 13e-3 and related rules under the Exchange Act. The views of the Buyer Group as to the fairness of the Merger are not intended and should not be construed as a recommendation to any holder of Shares or ADSs as to how to vote on the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Buyer Group has interests in the Merger that are different from, and in addition to, those of the Unaffiliated Holders by virtue of their continuing interests in the Surviving Company after the consummation of the Merger. See "Special Factors—Interests of Certain Persons in the Merger" beginning on page 74 for additional information.

The Buyer Group believes the interests of the Unaffiliated Holders were represented by the Special Committee, which negotiated the terms and conditions of the Merger Agreement with the assistance of its independent legal and financial advisors. The Buyer Group attempted to negotiate a transaction that would be most favorable to them, rather than to the Unaffiliated Holders and, accordingly, did not negotiate the Merger Agreement with a goal of obtaining terms that were substantively and procedurally fair to such holders. No member of the Buyer Group participated in the deliberations of the Special Committee regarding, and did not receive any advice from the Special Committee's legal or financial advisors as to, the fairness of the Merger to the Unaffiliated Holders. Furthermore, the Buyer Group did not engage a financial advisor for the purpose of performing any independent valuation or other analysis to assist them in assessing the fairness of the Per Share Merger Consideration or Per ADS Merger Consideration, as applicable, to the Company's Unaffiliated Holders.

Based on their knowledge and analysis of available information regarding the Company, as well as the factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board discussed in "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 41, the Buyer Group believes the Merger is substantively and procedurally fair to the Unaffiliated Holders. In particular, the Buyer Group's belief is supported by the following factors, which are not listed in any relative order of importance:

- the Per ADS Merger Consideration of $77.00 represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by the NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal;

- the Company's ADSs traded as low as $41.64 per ADS during the 52-week period prior to the announcement of the execution of the Merger Agreement on December 18, 2015;

47

- the Special Committee consists solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company and do not have any interests in the Merger different from, or in addition to, those of the Unaffiliated Holders, other than (i) the directors' receipt of Board compensation in the ordinary course, (ii) Special Committee members' compensation in connection with its evaluation of the Merger and other strategic alternatives of the Company (which compensation is not contingent upon the consummation of the Merger or the Special Committee's or Board's recommendation of the Merger) and (iii) the directors' indemnification and liability insurance rights under the Merger Agreement;

- the Special Committee was established and given authority to, among other things, review, evaluate and negotiate the terms of the Merger and to recommend to the Board what action should be taken by the Company, including not to engage in the Merger;

- the Special Committee determined that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are fair to and in the best interests of the Company and the Unaffiliated Holders;

- the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval;

- the Buyer Group did not participate in or seek to influence the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- the Special Committee and the Board had no obligation to recommend the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger to the shareholders of the Company;

- the Special Committee retained and was advised by independent legal counsels and independent financial advisor, all of whom are experienced in advising committees such as the Special Committee in similar transactions;

48

Case 1:19-cv-10067-RAE Document 116-2 Filed 04/29/23 Page 54 of 84

- the Merger Consideration and other terms and conditions of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby were the result of robust negotiations between the Buyer Group and the Special Committee and their respective legal and financial advisors;

- under the terms of the Merger Agreement, during the 45-day. After the date of the Merger Agreement, the Company is permitted to (i) initiate, solicit and encourage Acquisition Proposals (as defined in the section entitled "The Merger Agreement —Acquisition Proposals"), including by way of public disclosure and by way of providing access to non-public information to any person (subject to certain limitations and restrictions) and (ii) enter into and maintain discussions or negotiations with respect to Acquisition Proposals or otherwise cooperate with, assist or participate in, facilitate, or take any other action in connection with any such inquiries, proposals, discussions or negotiations (subject to certain limitations and restrictions);

- under the terms of the Merger Agreement, in certain circumstances relating to an unsolicited bona fide written Acquisition Proposal, prior to obtaining the Company Shareholder Approval of the Merger, the Company is permitted (subject to certain limitations and restrictions set forth in the Merger Agreement) to furnish information to and participate (through the Special Committee) in discussions or negotiations with persons making such Acquisition Proposals if the Board (or the Special Committee) determines in good faith that such Acquisition Proposal constitutes a Superior Prosposal or is reasonably likely to result in a Superior Proposal (subject to certain other conditions, limitations and restrictions set forth in the Merger Agreement);

- prior to obtaining the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) is permitted to effect a Company Adverse Recommendation Change (i) in response to an intervening event if the Board (or the Special Committee) determines in good faith that failure to do so would reasonably be expected to be inconsistent with its fiduciary duties under applicable laws (subject to certain other conditions, limitations and restrictions set forth in the Merger Agreement), and/or (ii) with respect to an Acquisition Proposal if the Company has received a bona fide written Acquisition Proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal (subject to certain other conditions, limitations and restrictions set forth in the Merger Agreement);

- prior to obtaining the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) may authorize the Company to terminate the Merger Agreement to enter into any contract, commitment or agreement relating to an Acquisition Proposal if the Company has received a bona fide written Acquisition Proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal (subject to certain other conditions, limitations and restrictions set forth in the Merger Agreement);

- the termination fee payable by the Company to Parent if the Merger Agreement is terminated under certain circumstances is approximately RMB1.44 billion, which amount is reduced to RMB641 million if such circumstances are in connection with an Acquisition Proposal received by the Company on or before the end of the 45-day Go-Shop Period;

- the termination fee payable by Parent to the Company if the Merger Agreement is terminated under certain circumstances is approximately RMB2.88 billion, which is twice the amount of the termination fee payable by the Company to Parent, if the Merger Agreement is terminated under certain circumstances and more than four times the amount of the termination fee payable by the Company to Parent if such circumstances are in connection with an Acquisition Proposal received by the Company on or before the end of the 45-day Go-Shop Period;

49

- each Guarantor has agreed to guarantee the obligations of Parent under the Merger Agreement to pay the termination fee to the Company and reimburse certain costs and expenses of the Company if the Merger Agreement is terminated under certain circumstances, and Global Village has agreed to provide a back-to-back limited guarantee to guarantee the payment obligations of certain Buyer Group member under its Equity Commitment Letter and Limited Guarantee and agreed to use its reasonable best efforts to cause Parent to perform under and enforce the Escrow Agreements;

- the Company has access to the escrow arrangement, pursuant to which each of the Equity Investors has agreed to deposit 3% of their respective equity contributions with Parent as earnest money, which will be applied towards the payment to the Company by Parent of the termination fee that may become due and payable by Parent pursuant to the terms of the Merger Agreement, and/or the payment of certain of such Equity Investor's obligations under its Equity Commitment Letter and Limited Guarantee;

- the Company has the ability to specifically enforce the terms of the Merger Agreement under certain circumstances;

- notwithstanding that the Buyer Group may not rely upon the opinion provided by the financial advisors to the Special Committee, the Special Committee having received from its financial advisor an opinion, dated December 18, 2015, stating that, as of such date and based upon and subject to the factors, assumptions, and limitations set forth therein, the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented in ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders;

- the availability of Dissenters Rights to the Unaffiliated Holders (and any ADS holder who elects to first timely convert his or her ADSs into Shares) who comply with the required procedures under Section 238 of the Cayman Islands Companies Law for exercising dissenters' rights, which allow such holders to seek appraisal of the fair value of their Shares as determined by the Grand Court of the Cayman Islands;

- the consideration to be paid to the Unaffiliated Holders in the Merger is all cash, allowing the Unaffiliated Holders to immediately realize certainty of value and liquidity for all of their Shares or ADSs, without incurring brokerage and other costs typically associated with market sales;

- the Buyer Group obtained debt financing commitments for the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger, as well as the limited number and nature of the conditions to the debt financing; and

- the Board was fully informed about the extent to which the interests of the Buyer Group in the Merger differed from those of the Unaffiliated Holders.

In its consideration of the fairness of the Merger, the Buyer Group noted that the authorization and approval of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, is not subject to the majority-of-the-minority voting requirement. Nevertheless, the Buyer Group believes the Merger is procedurally fair to the Unaffiliated Holders because (i) the Cayman Islands laws do not require a merger to be conditioned upon the majority-of-the-minority voting requirement and this condition is not customary in going-private transactions involving Cayman Islands companies and (ii) various safeguards and protective steps have been adopted to ensure the procedural fairness of the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger, including without limitation (a) the formation of and the broad authorities granted to the Special Committee in reviewing, evaluating and negotiating (and ultimately authorizing and approving) the terms of the Merger Agreement, (b) the Special Committee retained and was advised by competent and experienced independent legal counsels and independent financial advisor, (c) the rights of the Company during the 45-day Go-Shop Period and with regard to a Superior Proposal and an intervening event and (d) the availability of dissenters' rights to the Unaffiliated Holders. In addition, due to the factors noted in the second part of the prior sentence and other factors set forth in this section above, including without limitation the fact that the Merger was approved by the Board and the Special Committee (consisting solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company), the Buyer Group, in its determination regarding the fairness of the Merger, did not separately consider whether (i) a majority of directors who are not employees of the Company retained an unaffiliated representative to act solely on behalf of unaffiliated security holders for purposes of negotiating the terms of the Merger or (ii) the Merger was approved by a majority of directors of the Company who are not employees of the Company.

50

The Buyer Group did not consider the Company's net book value, which is an accounting concept based on historical costs, as a factor because it believed that net book value is not a material indicator of the Company's value as a going concern but rather is indicative of historical costs. The Buyer Group notes, however, that the Per Share Merger Consideration of $51.33 is higher than the Company's net book value per Share as of June 30, 2015, which was $6.44 based on 189,757,657 issued and outstanding Shares as of that date.

In its consideration of the fairness of the Merger, the Buyer Group did not undertake an appraisal of the assets of the Company to determine the Company's liquidation value for the Unaffiliated Holders due to the impracticability of determining a liquidation value given the significant execution risk involved in any breakup. In addition, the Buyer Group did not consider the Company's liquidation value to be a relevant valuation method because they consider the Company to be a viable going concern where value is derived from cash flows generated from its continuing operations, and because the Company will continue to operate its business following the Merger. Moreover, the Buyer Group believes that the value of the Company's assets that might be realized in a liquidation would be significantly less than its going-concern value.

The Buyer Group did not seek to establish a pre-Merger going concern value for the Company's Shares and ADSs to determine the fairness of the Merger Consideration to the Unaffiliated Holders because following the Merger the Company will have a significantly different capital structure. However, to the extent the pre-Merger going concern value was reflected in the pre-announcement price of the ADSs, the Merger Consideration represented a premium to the going concern value of the Company.

The Buyer Group was not aware of, and thus did not consider in their fairness determination, any offers or proposals made by any unaffiliated third parties with respect to (a) a merger or consolidation of the Company with or into another company, (b) a sale of all or a substantial part of the Company's assets or (c) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company. Except as otherwise disclosed in this proxy statement, the members of the Buyer Group did not make any purchases of securities of the Company during the past two years, and so did not consider any such purchases in their fairness determination.

The Buyer Group did not adopt the financial analyses and opinion of J.P. Morgan as its own in reaching its determination as to the fairness of the Merger and other transactions contemplated by the Merger Agreement, the Plan of Merger and the other transaction documents because, while the Buyer Group noted J.P. Morgan's opinion and considered it as a supporting factor in its determination regarding the fairness of the Merger in light of (among other things) J.P. Morgan's general reputation and experience, the Buyer Group did not engage J.P. Morgan, evaluate its credentials or investigate or evaluate the basis, process and quality of J.P. Morgan's financial analysis and opinion, and as a result the Buyer Group believes it is not in a position to formally adopt J.P. Morgan's financial analyses and opinion.

The foregoing discussion of the information and factors considered and given weight by the Buyer Group in connection with its evaluation of the substantive and procedural fairness of the Merger to the Unaffiliated Holders is not intended to be exhaustive, but is believed to include all material factors considered. The Buyer Group found it impracticable to assign, and did not assign, relative weights to the foregoing factors considered in reaching its conclusions as to the substantive and procedural fairness of the Merger to the Unaffiliated Holders. Rather, the Buyer Group made the fairness determinations after considering all of the foregoing factors as a whole.

The Buyer Group believes these factors provide a reasonable basis for its belief that the Merger is both substantively and procedurally fair to the Unaffiliated Holders. This belief, however, is not intended to be and should not be construed as a recommendation by the Buyer Group to any shareholder or ADS holder of the Company to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Buyer Group does not make any recommendation as to how such shareholders or ADS holders should vote relating to the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, at the extraordinary general meeting.

**Certain Financial Projections**

The Company does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of the Company has prepared the prospective financial information set forth below for the fiscal year ended December 31, 2015 through the fiscal year ending December 31, 2025 for internal use, which was approved by the Special Committee for use by the Special Committee's financial advisor in connection with their financial analyses related to the Merger and opinion provided to the Special Committee. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Company's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this document are cautioned not to place undue reliance on the prospective financial information.

51

The financial projections are not a guarantee of performance. In compiling the projections, the Company's management took into account historical performance, combined with estimates regarding revenues, gross profit, EBIT, EBITDA, net income and capital expenditure. Although the projections are presented with numerical specificity, they were based on numerous assumptions and estimates as to future events made by the Company's management that the management believed were reasonable at the time the projections were prepared. This information is not, however, fact and should not be relied upon as being necessarily indicative of actual future results. In addition, factors such as industry performance, the market for the Company's existing and new products, the competitive environment, expectations regarding future acquisitions or any other transaction and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of the management, may cause actual future results to differ materially from the results forecasted in these financial projections. In addition, the projections do not take into account any circumstances or events occurring after the date that they were prepared. For instance, the projections do not give effect to the Merger or any changes to the Company's operations or strategy that may be implemented after the time the projections were prepared. We cannot assure you that the projections will be realized or that actual results will not be significantly different from those contained in the projections.

Neither the Company's independent auditors, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information. The Company's independent auditor's report accompanying the Company's audited consolidated financial statements included in the Company's annual report on Form 20-F for the year ended December 31, 2014 incorporated by reference in this proxy statement refers exclusively to the Company's historical financial statements and does not cover any other information in this proxy statement and should not be read to do so. The financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the Special Committee's financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal for his, her or its Shares pursuant to Section 238 of the Cayman Islands Companies Law.

The following table sets forth the financial projections prepared by the Company's management and considered by the Special Committee and its financial advisor in connection with their analysis of the Merger:

| | Management Projections Fiscal Year Ended December 31, | | | | | | | | | | |
| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | ($ in millions, non-GAAP*) | | | | | | |
| **Total revenue** | 1,806 | 3,630 | 4,819 | 6,255 | 7,657 | 8,948 | 9,646 | 10,143 | 10,543 | 10,890 | 11,221 |
| Growth % | 29.9% | 101.0% | 32.7% | 29.8% | 22.4% | 16.9% | 7.8% | 5.2% | 3.9% | 3.3% | 3.0% |
| Traditional business[1] | 1,658 | 2,002 | 2,417 | 2,898 | 3,360 | 3,851 | 4,088 | 4,234 | 4,361 | 4,473 | 4,593 |
| *As % of total revenue* | *91.8%* | *55.1%* | *50.1%* | *46.3%* | *43.9%* | *43.0%* | *42.4%* | *41.7%* | *41.4%* | *41.1%* | *40.9%* |
| Emerging business[2] | 148 | 1,628 | 2,403 | 3,357 | 4,297 | 5,097 | 5,559 | 5,909 | 6,182 | 6,417 | 6,627 |
| *As % of total revenue* | *8.2%* | *44.9%* | *49.9%* | *53.7%* | *56.1%* | *57.0%* | *57.6%* | *58.3%* | *58.6%* | *58.9%* | *59.1%* |
| **Gross profit** | 1,437 | 2,089 | 2,726 | 3,587 | 4,357 | 5,056 | 5,422 | 5,671 | 5,876 | 6,055 | 6,231 |
| *Margin %* | *79.6%* | *57.5%* | *56.6%* | *57.3%* | *56.9%* | *56.5%* | *56.2%* | *55.9%* | *55.7%* | *55.6%* | *55.5%* |
| Traditional business[1] | 1,386 | 1,666 | 2,006 | 2,406 | 2,789 | 3,196 | 3,393 | 3,514 | 3,619 | 3,713 | 3,812 |
| *Margin %* | *83.6%* | *83.2%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* |
| Emerging business[2] | 51 | 423 | 721 | 1,182 | 1,568 | 1,860 | 2,029 | 2,157 | 2,256 | 2,342 | 2,419 |
| *Margin %* | *34.5%* | *26.0%* | *30.0%* | *35.2%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* |
| Selling and marketing expenses | (387) | (575) | (687) | (844) | (1,012) | (1,168) | (1,248) | (1,306) | (1,353) | (1,395) | (1,436) |
| *As % of revenue* | *(21.4)%* | *(15.8)%* | *(14.3)%* | *(13.5)%* | *(13.2)%* | *(13.1)%* | *(12.9)%* | *(12.9)%* | *(12.8)%* | *(12.8)%* | *(12.8)%* |
| General and administrative expenses | (98) | (200) | (255) | (305) | (371) | (433) | (457) | (480) | (499) | (515) | (530) |
| *As % of revenue* | *(5.4)%* | *(5.5)%* | *(5.3)%* | *(4.9)%* | *(4.9)%* | *(4.8)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* |
| Product development costs | (523) | (798) | (945) | (1,189) | (1,437) | (1,663) | (1,786) | (1,871) | (1,940) | (2,001) | (2,060) |
| *As % of revenue* | *(28.9)%* | *(22.0)%* | *(19.6)%* | *(19.0)%* | *(18.8)%* | *(18.6)%* | *(18.5)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* |
| Subsidy income | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **EBIT** | 440 | 527 | 848 | 1,260 | 1,546 | 1,802 | 1,941 | 2,024 | 2,093 | 2,154 | 2,215 |
| *Margin %* | *24.4%* | *14.5%* | *17.6%* | *20.1%* | *20.2%* | *20.1%* | *20.1%* | *20.0%* | *19.9%* | *19.8%* | *19.7%* |
| **EBITDA** | 544 | 667 | 1,046 | 1,680 | 1,996 | 2,282 | 2,433 | 2,528 | 2,609 | 2,682 | 2,755 |
| *Margin %* | *30.1%* | *18.4%* | *21.7%* | *26.9%* | *26.1%* | *25.5%* | *25.2%* | *24.9%* | *24.8%* | *24.6%* | *24.6%* |
| **Net income** | 414 | 490 | 758 | 1,100 | 1,346 | 1,573 | 1,702 | 1,792 | 1,878 | 1,958 | 2,040 |
| *Margin %* | *22.9%* | *13.5%* | *15.7%* | *17.6%* | *17.6%* | *17.6%* | *17.6%* | *17.7%* | *17.8%* | *18.0%* | *18.2%* |
| Capital expenditure | 200 | 500 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| *As % of revenue* | *11.1%* | *13.8%* | *12.5%* | *9.6%* | *7.8%* | *6.7%* | *6.2%* | *5.9%* | *5.7%* | *5.5%* | *5.3%* |

52

Case 1:19-cv-10067-RAE Document 116-2 Filed 04/29/22 Page 58 of 184

* Non-GAAP financial measure is adjusted from results based on U.S. GAAP to exclude share-based compensation expenses and interest expense of the Company Convertible Notes.

(1) Traditional business mainly includes online advertising and internet value-added services.

(2) Emerging business includes enterprise security business, smartphone and other hardware and hardware-enabled value-added services, and international business.

In preparing these projections, the Company's management necessarily made certain assumptions about future financial factors affecting the Company's business, including, primarily, that (i) users of personal computers, smart phones and broadband internet services and their penetration in China and elsewhere would continue in line with management's expectations, (ii) the Company would be able to successfully expand its product offering by developing and launching new PC and mobile products, (iii) the popularity of the Company's products would remain stable in the geographic markets in which the Company operated, (iv) the Company would be able to successfully implement its business plan to compete effectively in both its traditional business and emerging business, (v) the market for smartphone and IoT (internet of things) devices would develop in line with management's expectations, (vi) the Company's emerging business would develop successfully, driven by both further hardware penetration and increasing monetization from smartphone and IoT devices, and (vii) material costs and expenses would increase in connection with the Company's revenue increase. The Company's management also assumed that the overall economy in China will remain stable, and that there will be no material change in competition affecting the Company.

J.P. Morgan, as the Special Committee's financial advisor, reviewed with the Special Committee certain financial analyses that were based, in part, on the financial projections above. For additional information regarding the analyses by the Special Committee's financial advisor, see "Discussion Materials prepared by J.P. Morgan Securities (Asia Pacific) Limited for discussion with the special committee of the board of directors of the Company, December 18, 2015" filed as Exhibit (c)-(2) to the Company's transaction statement on Schedule 13E-3 and "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53.

**NONE OF THE COMPANY OR ITS AFFILIATES, ADVISORS, OFFICERS, DIRECTORS OR REPRESENTATIVES HAS MADE OR MAKES ANY REPRESENTATION TO ANY SHAREHOLDER OR OTHER PERSON REGARDING THE ULTIMATE PERFORMANCE OF THE COMPANY COMPARED TO THE INFORMATION CONTAINED IN THE PROJECTIONS OR THAT PROJECTED RESULTS WILL BE ACHIEVED.**

**BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, THE COMPANY UNDERTAKES NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAW.**

The financial projections are forward-looking statements. For information on factors that may cause the Company's future financial results to materially vary, see "Cautionary Note Regarding Forward-Looking Statements" beginning on page 125 and "Item 3. Key Information—D. Risk Factors" included in the Company's annual report on Form 20-F for the fiscal year ended December 31, 2014, incorporated by reference into this proxy statement.

**Opinion of the Special Committee's Financial Advisor**

Pursuant to an engagement letter dated July 6, 2015, the Special Committee retained J.P. Morgan as its financial advisor to deliver a fairness opinion in connection with the Merger. J.P. Morgan is an internationally recognized financial services firm that, among other things, is regularly engaged in the investment banking business, including the valuation of businesses and securities in connection with mergers and acquisitions, underwritings and private placements of securities, and other investment banking services.

53

At the meeting of the Special Committee on December 18, 2015, J.P. Morgan rendered its oral opinion to the Special Committee that, as of such date and based upon and subject to the factors, assumptions, and limitations set forth in its opinion, the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders. J.P. Morgan has confirmed its December 18, 2015 oral opinion by delivering its written opinion to the Special Committee, dated as of the same date, that, as of such date, the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders. No limitations were imposed by the Special Committee upon J.P. Morgan with respect to the investigations made or procedures followed by it in rendering its opinions. As further described in "Special Factors — Background of the Merger," J.P. Morgan had previously rendered a substantially similar oral opinion to the Special Committee on December 16, 2015, which was subsequently withdrawn as a result of a change to certain capitalization information provided by the management of the Company, prior to rendering the oral opinion and issuing the written opinion described above on December 18, 2015.

The full text of the written opinion of J.P. Morgan dated December 18, 2015, which sets forth the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken, is attached as Annex C to this proxy statement and is incorporated herein by reference. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. The shareholders of the Company are urged to read the opinion in its entirety. J.P. Morgan's written opinion is addressed to the Special Committee (in its capacity as such), is directed only to the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid in the Merger to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) and does not constitute a recommendation to any shareholder, or holder of ADSs, of the Company as to how such shareholder, or holder of ADSs, should vote with respect to the Merger or any other matter.

In connection with preparing its opinion, J.P. Morgan, among other things:

- reviewed the Merger Agreement;

- reviewed certain publicly available business and financial information concerning the Company and the industries in which it operates;

- compared the proposed financial terms of the transactions contemplated by the Merger Agreement and the Plan of Merger with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration paid for such companies;

- compared the financial and operating performance of the Company with publicly available information concerning certain other companies J.P. Morgan deemed relevant and reviewed the current and historical market prices of the Shares and ADSs and certain publicly traded securities of such other companies;

- reviewed certain internal financial analyses and forecasts prepared by the management of the Company relating to its business; and

- performed such other financial studies and analyses and considered such other information as J.P. Morgan deemed appropriate for the purposes of its opinion.

J.P. Morgan also held discussions with certain members of the management of the Company with respect to certain aspects of the Merger, the past and current business operations of the Company, the financial condition and future prospects and operations of the Company, and certain other matters J.P. Morgan believed necessary or appropriate to its inquiry.

54

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 60 of 184

In giving its opinion, J.P. Morgan relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with J.P. Morgan by the Company or otherwise reviewed by or for J.P. Morgan. J.P. Morgan did not independently verify any such information or its accuracy or completeness, and pursuant to its engagement letter with the Special Committee, did not assume any obligation to undertake any such independent verification. J.P. Morgan did not conduct and was not provided with any valuation or appraisal of any assets or liabilities, nor did J.P. Morgan evaluate the solvency of the Company, any member of the Buyer Group or any other person under any applicable laws relating to bankruptcy, insolvency or similar matters. In relying on financial analyses and forecasts provided to it or derived therefrom, J.P. Morgan assumed that they had been reasonably prepared based on assumptions reflecting the best then-available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate. J.P. Morgan expressed no view as to such analyses or forecasts or the assumptions on which they were based. J.P. Morgan also assumed that the Merger and the other transactions contemplated by the Merger Agreement will be consummated as described in the Merger Agreement. J.P. Morgan also assumed that the representations and warranties made by the Company and Acquiror Group in the Merger Agreement and the related agreements were and will be true and correct in all respects material to its analysis. J.P. Morgan did not act as legal, regulatory or tax expert and relied on the assessments made by advisors to the Special Committee with respect to such issues. J.P. Morgan further assumed that all material governmental, regulatory or other consents and approvals necessary for the consummation of the Merger will be obtained without any adverse effect on the Company or on the contemplated benefits of the Merger.

The financial projections furnished to J.P. Morgan for the Company and used in connection with J.P. Morgan's analysis of the Merger were prepared by or at the direction of the management of the Company and approved for use by J.P. Morgan by the Special Committee. The Company informed J.P. Morgan that it does not publicly disclose internal management projections of the type provided to J.P. Morgan in connection with J.P. Morgan's analysis of the Merger, and such projections were not prepared with a view toward public disclosure. These projections were based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of management, including, without limitation, factors related to general economic and competitive conditions and prevailing interest rates. Accordingly, actual results could vary significantly from those set forth in such projections.

J.P. Morgan's opinion is necessarily based on economic, market and other conditions as in effect on, and the information made available to J.P. Morgan as of, the date of such opinion. It should be understood that subsequent developments may affect J.P. Morgan's opinion, and J.P. Morgan does not have any obligation to update, revise, or reaffirm such opinion. J.P. Morgan's opinion is limited to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed Merger, and J.P. Morgan expressed no opinion as to the fairness of the Merger to, or any consideration paid in connection with the Merger to, the holders of any other class of securities, creditors or other constituencies of the Company or the underlying decision by the Company to engage in the Merger. Furthermore J.P. Morgan expressed no opinion with respect to the amount or nature of any compensation to any officers, directors, or employees of any party to the Merger, or any class of such persons relative to the Per Share Merger Consideration or the Per ADS Merger Consideration to be paid to the Unaffiliated Holders of the Shares or ADSs (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger or with respect to the fairness of any such compensation.

J.P. Morgan noted that, prior to December 18, 2015, the date on which J.P. Morgan delivered the written opinion to the Special Committee, it was not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of the Company or any other alternative transaction.

In accordance with customary investment banking practice, J.P. Morgan employed generally accepted valuation methods in reaching its opinion. The following is a summary of the material financial analyses utilized by J.P. Morgan in connection with providing its opinion. J.P. Morgan has consented to the inclusion and disclosure of its financial analyses in this proxy statement. Some of the summaries of the financial analyses include information presented in tabular format. The tables are not intended to stand alone. In order to fully understand the financial analyses used by J.P. Morgan, the tables must be read together with the full text of each summary. Considering the data in the tables without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of J.P. Morgan's financial analyses.

55

Case 1:19-cv-10067-RAE   Document 116-2   Filed 04/29/22   Page 61 of 84

All values in the sections "Discounted Cash Flow Analysis" and "Public Trading Multiples Analysis" below are presented on an equity value per ADS basis. In arriving at equity value per ADS for the Company, the Discounted Cash Flow analysis started with the determination of firm value, or "FV", for the Company. Firm value was then adjusted by subtracting total debt outstanding as of June 30, 2015, subtracting total non-controlling interest as of June 30, 2015 adjusted by including the pro-forma non-controlling interest in Coolpad E-Commerce Inc. provided by the Company, adding total cash and cash equivalents and short term investments outstanding as of June 30, 2015, subtracting the cash utilized to repurchase the Company's outstanding ordinary shares post June 30, 2015, and adding long-term investments as of June 30, 2015 adjusted by excluding the investment in Coolpad E-Commerce Inc. (as the Company was in the process of obtaining control of Coolpad E-Commerce Inc.) to arrive at equity value for the Company. Equity value was then divided by the diluted ADS count to arrive at equity value per ADS. In arriving at the equity value per ADS for the Company in the Public Trading Multiples analysis, J.P. Morgan reviewed certain selected companies' trading multiples based on ratio of market capitalization to estimated net income for calendar year 2016. Based on the results of such analysis, J.P. Morgan applied a multiple reference range of 18.0x to 25.0x to the Company's estimated non-GAAP net income (non-GAAP net income is adjusted for share based compensation expenses and interest expenses in relation to the convertible senior notes, in a manner consistent with the Company's historical filings) for calendar year 2016 based on management estimates. All market data used by J.P. Morgan in its analyses was as of December 15, 2015. Accordingly, this information may not reflect current or future market conditions. In addition, as each ADS represents 1.5 underlying Shares, all calculations of equity value per ADS or implied equity value per ADS below represent the value attributable to 1.5 Shares.

### *Discounted Cash Flow Analysis*

J.P. Morgan conducted a discounted cash flow analysis for the purpose of determining the diluted equity value per ADS for the ADSs. A discounted cash flow analysis is a method of evaluating an asset using estimates of the future unlevered free cash flows generated by the asset and taking into consideration the time value of money with respect to those future cash flows by calculating their "present value." "Present value" refers to the current value of one or more future cash payments from the asset, which is referred to as that asset's cash flows, and is obtained by discounting those cash flows back to the present using a discount rate that takes into account macro-economic assumptions and estimates of risk, the opportunity cost of capital, capitalized returns and other appropriate factors. "Terminal value" refers to the capitalized value of all cash flows from an asset for periods beyond the final forecast period.

J.P. Morgan calculated the unlevered free cash flows that the Company is expected to generate during fiscal years 2015 to 2025 based upon financial projections prepared by the management of the Company. See "Special Factors—Certain Financial Projections" beginning on page 51 for additional information. J.P. Morgan also calculated a range of terminal asset values of the Company at the end of the projection period ending 2025 by applying a perpetual growth rate ranging from 2.5% to 3.5%. The perpetual growth rate range was selected based on a combination of macroeconomic factors, such as general industry trends and expected inflation rates, and the professional judgment of J.P. Morgan. The unlevered free cash flows and the range of terminal asset values were then discounted to present values using a range of discount rates from 12.5% to 14.5%, which were chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company. The present value of the unlevered free cash flows and the range of terminal asset values were then adjusted by subtracting total debt outstanding as of June 30, 2015, subtracting total non-controlling interest as of June 30, 2015 adjusted by including the pro-forma non-controlling interest in Coolpad E-Commerce Inc. provided by the Company, adding total cash and cash equivalents and short term investments outstanding as of June 30, 2015, subtracting the cash utilized to repurchase the Company's outstanding ordinary shares post June 30, 2015, and adding long-term investments as of June 30, 2015 adjusted by excluding the investment in Coolpad E-Commerce Inc. (as the Company was in the process of obtaining control of Coolpad E-Commerce Inc.) Based on these assumptions, the discounted cash flow analysis indicated a range of per ADS equity values of between $68.43 and $91.61.

### *Public Trading Multiples Analysis*

Using publicly available information, J.P. Morgan compared selected financial data of the Company with similar data for selected publicly traded companies engaged in businesses which J.P. Morgan judged to be most similar to the Company. The companies selected by J.P. Morgan were:

- Tencent Holdings Limited
- Baidu, Inc.
- Kingsoft Corporation Limited
- Cheetah Mobile Inc.

These companies were selected, among other reasons, because they represent the main publicly traded peers in China's internet industry with operations and businesses that, for purpose of J.P. Morgan's analysis, may be considered similar to that of the Company. However, none of the selected companies reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company.

In all instances, multiples were based on closing share prices on December 15, 2015. For the following analyses performed by J.P. Morgan, estimated financial data for the selected companies were based on the selected companies' filings with the SEC and any other relevant stock exchanges as well as the publicly available consensus estimates of Wall Street analysts, and estimated financial data for the Company was based on the financial projections prepared by the management of the Company. See "Special Factors—Certain Financial Projections" beginning on page 51 for additional information.

In conducting its analyses, J.P. Morgan reviewed the selected companies' trading multiples based on ratio of market capitalization to estimated net income, referred to as the P/E multiple, for calendar year 2016. Results of the analyses were presented for the selected companies, as indicated in the following table:

| Company | P/E 2016E |
|---|---|
| Tencent Holdings Limited | 24.8x |
| Baidu, Inc. | 28.9x |
| Kingsoft Corporation Limited | 18.6x |
| Cheetah Mobile Inc. | 22.2x |

Based on the above analyses, J.P. Morgan applied a multiple reference range of 18.0x to 25.0x to the Company's estimated non-GAAP net income (non-GAAP net income is adjusted for share based compensation expenses and interest expenses in relation to the convertible senior notes, in a manner consistent with the Company's historical filings) for calendar year 2016 based on management estimates. In comparison to the per ADS consideration, the analyses indicated the following equity values per ADS:

| P/E 2016E |
|---|
| $69.10 to $95.77 |

### Other Analyses for Informational Purposes Only

J.P. Morgan also reviewed, solely for informational purposes, historical trading prices of the ADSs, certain precedent transactions and the premia paid in certain precedent U.S. listed Chinese take-private transactions (including, but not limited to, the privatization transactions of the companies listed below), but noted, and the Special Committee understood and acknowledged, that these are not valuation methodologies but were presented merely for informational purposes. The selection of premia in certain precedent U.S. listed Chinese take-private transactions involved substantial analyses and judgments by J.P. Morgan in identifying and excluding outliers, adjusting for or excluding cases with special circumstances, and calculating various statistics (such as median and average) to determine the range of premia paid in such transactions.

57

**Company**

**Cayman Incorporated**

Tongjitang Chinese Medicines Company
Chemspec International Limited
Funtalk China Holdings Limited
Shanda Interactive Entertainment Limited
China Real Estate Information Corporation
China GrenTech Corporation Limited
Gushan Environmental Energy Limited
China Nuokang Bio-Pharmaceutical Inc.
ShangPharma Corporation
Focus Media Holding Limited
SYSWIN Inc.
3SBio Inc.
7 Days Group Holdings Limited
Ninetowns Internet Technology Group Company Limited
Simcere Pharmaceutical Group
Pactera Technology International Ltd.
iSoftStone Holdings Limited
ChinaEdu Corporation
Spreadtrum Communications, Inc.
China Hydroelectric Corporation
Charm Communications Inc.
RDA Microelectronics, Inc.
Giant Interactive Group Inc.
Noah Education Holdings Ltd.
Shanda Games Limited
AutoNavi Holdings Limited
Montage Technology Group Limited
Perfect World Co., Ltd.
Sungy Mobile Limited
China Mobile Games and Entertainment Group Limited

**Non-Cayman Incorporated**

Sinoenergy Corporation
Harbin Electric, Inc.
Fushi Copperweld, Inc.
China Fire & Security Group, Inc.
China Security & Surveillance Technology, Inc.
Tiens Biotech Group (USA), Inc.
AsiaInfo-Linkage, Inc.
China Transinfo Technology Corp.
Zhongpin Inc.
Winner Medical Group Inc.
Yucheng Technologies Limited
LJ International Inc.
Feihe International, Inc.
Yongye International, Inc.
Trunkbow International Holdings Limited
Camelot Information Systems Inc.
Exceed Company Ltd.

58

When conducting a fairness analysis, it is J.P. Morgan's standard practice to review various potential valuation methodologies and select those valuation methodologies that are most suitable for the transaction in question. J.P. Morgan believes such review not only could enhance the quality of the valuation analysis but is also necessary and advisable given the wide range of valuation methodologies that are available. Such review and analyses and any determination to select certain but not other valuation methodologies necessarily involve complex considerations and judgments concerning differences in the theoretical basis and characteristics of the valuation methodologies, financial and operational characteristics of the companies involved, the history and background of the transaction in question, the identity of the parties involved and other factors that could affect the accuracy or suitability of the valuation methodologies. For example, premia paid in precedent transactions as a valuation methodology may be subject to distortion by factors including (without limitation) the competitive dynamic in the precedent transaction, the conditions and prospects of the industries and geographical regions in which companies involved in the precedent transactions operate, and the specific circumstances and growth prospects of such companies, and therefore may or may not produce reliable reference points for the transaction currently being analyzed. Similarly, historical stock prices of the subject company may also be subject to distortion by factors including (without limitation) historical events that may no longer be relevant to the company's current value, as well as various other factors that could affect the stock prices of publicly traded companies.

However, J.P. Morgan presented certain data relevant to certain valuation methodologies for informational purposes only even though such methodologies were not selected as valuation methodologies in its fairness analysis, because, among other reasons, (i) such presentation demonstrates the scope of J.P. Morgan's analysis and that it considered these valuation methodologies, which could be useful to the Special Committee's evaluation of J.P. Morgan's advice; and (ii) J.P. Morgan recognizes that the Special Committee's determination on whether or not to pursue any particular strategic alternative of the Company necessarily takes into account various factors beyond just the fairness, from a financial point of view, of the consideration payable in any transaction being evaluated, and therefore, although the data presented were not directly used as the basis of J.P. Morgan's fairness analysis, such data could nonetheless be useful to the Special Committee's decision making process.

The foregoing summary of certain material financial analyses does not purport to be a complete description of the analyses or data presented by J.P. Morgan. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. J.P. Morgan believes that the foregoing summary and its analyses must be considered as a whole and that selecting portions of the foregoing summary and these analyses, without considering all of its analyses as a whole, could create an incomplete view of the processes underlying the analyses and its opinion. In arriving at its opinion, J.P. Morgan did not attribute any particular weight to any analyses or factors considered by it and did not form an opinion as to whether any individual analysis or factor (positive or negative), considered in isolation, supported or failed to support its opinion. Rather, J.P. Morgan considered the totality of the factors and analyses performed in determining its opinion.

59

Analyses based upon forecasts of future results are inherently uncertain, as they are subject to numerous factors or events beyond the control of the parties and their advisors. Accordingly, forecasts and analyses used or made by J.P. Morgan are not necessarily indicative of actual future results or, should the Merger fail to be consummated, the future value of the ADSs, which may be significantly more or less favorable than suggested by those analyses. Moreover, J.P. Morgan's analyses are not and do not purport to be appraisals or otherwise reflective of the prices at which businesses actually could be bought or sold. None of the selected companies reviewed as described in the above summary is identical to the Company. However, the companies selected were chosen because they are publicly traded companies with operations and businesses that, for purposes of J.P. Morgan's analysis, may be considered similar to those of the Company. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies compared to the Company.

As a part of its investment banking business, J.P. Morgan and its affiliates are continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, investments for passive and control purposes, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for estate, corporate and other purposes. J.P. Morgan was selected to deliver an opinion to the Special Committee with respect to the Merger on the basis of such experience and its familiarity with the Company.

Under the terms of J.P. Morgan's engagement and for its service, the Company has agreed to pay J.P. Morgan (1) a fee of $1.0 million upon delivery of the opinion, (2) an additional fee of $1.5 million, payable upon the consummation of the Merger, and (3) a discretionary fee of $500,000 payable in the sole discretion of the Special Committee upon the consummation of the Merger. In addition, the Company has agreed to reimburse J.P. Morgan for its reasonable expenses incurred in connection with its services, including the reasonable fees and expenses of outside legal counsel engaged by J.P. Morgan in connection with its performance of services hereunder. The Company has also agreed to indemnify J.P. Morgan for certain liabilities arising out of J.P. Morgan's engagement.

In addition, during the two years preceding the date of its opinion, J.P. Morgan and its affiliates have had, and may continue to have in the future, commercial and/or investment banking relationships with the Company and certain affiliates of certain members of the Buyer Group, for which J.P. Morgan and such affiliates have received and may in the future receive customary compensation. As of December 16, 2015, J.P. Morgan and/or its affiliates own, on a proprietary basis, approximately 0.19% of the outstanding ADSs. In the ordinary course of its businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities of the Company and affiliates of certain members of the Acquirer Group for its own account or for the accounts of customers and, accordingly, J.P. Morgan and its affiliates may at any time hold long or short positions in such securities.

**Purposes of and Reasons for the Merger**

*The Buyer Group*

Under a possible interpretation of the SEC rules governing going-private transactions, each member of the Buyer Group may be deemed to be engaged in a going-private transaction and, therefore, required to express its reasons for the Merger to the Company's Unaffiliated Holders. Each member of the Buyer Group is making the statements included in this section solely for the purpose of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. For the Buyer Group, the purpose of the Merger is to enable Parent to acquire 100% control of the Company in a transaction in which the Company's shareholders and ADS holders (other than the Excluded Shares) will be cashed out in exchange for the Per Share Merger Consideration or the Per ADS Merger Consideration, as applicable, so that Parent, through Midco, will bear the rewards and risks of the sole ownership of the Company after the Merger, including any future earnings and growth of the Company as a result of improvements to the Company's operations or acquisitions of other businesses. In addition, the Merger will allow members of the Buyer Group which are currently shareholders of the Company to maintain a significant portion of their investment in the Company through their respective indirect ownership in Parent as described under "Special Factors—Interests of Certain Persons in the Merger—Interests of the Buyer Group" below and at the same time enable certain members of the Buyer Group to maintain their leadership role with the Company.

<hr>

60

The Buyer Group believes the operating environment has become more challenging due to recent operating conditions and industry trends. There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

Further, as a privately held company, the Company will be relieved of many of the expenses, burdens and constraints imposed on companies that are subject to the public reporting requirements under the U.S. federal securities laws, including the Exchange Act and the Sarbanes-Oxley Act of 2002. In particular, the Buyer Group believes that as a privately held company, the Company would no longer be subject to (i) the increased costs of regulatory compliance as an SEC reporting company and (ii) the requirement to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and may potentially help the Company's actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger.

*The Company*

The Company's purpose for engaging in the Merger is to enable its shareholders to receive $51.33 per Share and its ADS holders to receive $77.00 per ADS in cash, without interest and net of any applicable withholding taxes, which represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal. The Company has determined to undertake the Merger at this time based on the analyses, determinations and conclusions of the Special Committee and the Board described in detail under the caption"—Reasons for the Merger and Recommendation of the Special Committee and the Board."

**Effects of the Merger on the Company**

**Private Ownership**

ADSs representing Shares are currently listed on the NYSE under the symbol "QIHU." It is expected that, following the consummation of the Merger, the Company will cease to be a publicly traded company and will instead become a private company beneficially owned by the Buyer Group. Following the consummation of the Merger, ADSs will no longer be listed on any securities exchange or quotation system, including the NYSE, and price quotations with respect to sales of the ADSs in the public market will no longer be available. In addition, registration of Shares under the Exchange Act may be terminated upon the Company's application to the SEC if Shares are not listed on a national securities exchange and there are fewer than 300 record holders of Shares. Ninety days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of Shares under the Exchange Act will be terminated and the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. The costs of complying with the United States federal securities laws, including the Sarbanes-Oxley Act of 2002, totaled approximately $1.7 million and $2.3 million for the years ended December 31, 2013 and December 31, 2014, respectively. After the consummation of the Merger, the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company. Furthermore, following the consummation of the Merger, the ADS program for the Shares will terminate.

61

Upon the consummation of the Merger, each issued and outstanding Share and ADS (other than the Excluded Shares or ADSs representing the Excluded Shares) will be cancelled in exchange for the right to receive the Per Share Merger Consideration and the Per ADS Merger Consideration, respectively, in cash, without interest and net of any applicable withholding taxes. At the Effective Time, (a) the Excluded Shares other than the Dissenting Shares (including Shares represented by ADSs) will be cancelled for no consideration or distribution therefor and (b) the Dissenting Shares will be cancelled and will entitle the former holders thereof to receive the fair value of such shares as determined in accordance with such holders' Dissenter Rights under Section 238 of the Cayman Islands Companies Law. At the Effective Time, each ordinary share of Merger Sub issued and outstanding immediately prior to the Effective Time will be converted into one fully paid and non-assessable ordinary share of the Surviving Company. As a result, current shareholders and ADS holders of the Company, other than the members of the Buyer Group, will no longer have any equity interest in, or be shareholders or ADS holders of, the Company upon the consummation of the Merger. As a result, the Company's shareholders and ADS holders, other than the members of the Buyer Group, will not have the opportunity to participate in the earnings and growth of the Company and they will not have the right to vote on corporate matters. Similarly, the Company's current shareholders and ADS holders, other than the members of the Buyer Group, will not be exposed to the risk of loss in relation to their investment in the Company.

At the Effective Time, each Cashed-Out Option will be cancelled and shall entitle the former holder thereof to receive an amount equal to the product of (a) the excess of Per Share Merger Consideration over the per share exercise price of such Cashed-Out Option and (b) the number of Shares (including Shares represented by ADSs) underlying such Cashed-Out Option payable as promptly as practicable following the Closing, in cash, without interest and net of any applicable withholding taxes. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled without any consideration. Each unvested Company Option will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements, on substantially the same terms and subject to the same vesting conditions as were provided to such option immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such option.

At the Effective Time, each Company Restricted Share that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

Each holder of Company Convertible Notes has the option to require the Surviving Company to repurchase such holder's Company Convertible Notes for a purchase price equal to 100% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest, if any, through but excluding, the applicable fundamental change repurchase date as defined under the applicable Indenture Agreements. Furthermore, after the Effective Time but prior to and including the third business day prior to the applicable fundamental change repurchase date, each holder of Company Convertible Notes will be entitled, subject to the terms and conditions of the applicable Indenture Agreements, to convert such holder's Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements plus any entitled increase in the conversion rate as determined pursuant to the applicable Indenture Agreements. After the third business day prior to the applicable fundamental change repurchase date, each holder of the Company Convertible Notes, to the extent such holder has not exercised its right to require the Surviving Company to repurchase such holder's Company Convertible Notes, will be entitled to convert such Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements.

**Directors and Management of the Surviving Company**

If the Merger is consummated, the Surviving Company will adopt new memorandum and articles of association in the form attached as Appendix II to the Plan of Merger, which are substantively identical to the memorandum and articles of association of the Merger Sub, as in effect prior to the consummation of the Merger, except that all references to the name of the Surviving Company will be to "Qihoo 360 Technology Co. Ltd." and all references to the authorized share capital of the Surviving Company will be amended as necessary to correctly describe the authorized share capital of the Surviving Company as approved in the Plan of Merger). In addition, the directors of Merger Sub immediately prior to the consummation of the Merger (identified below in "Annex E—Directors and Executive Officers of Each Filing Person") will become the directors of the Surviving Company and the officers of the Company will remain the officers of the Surviving Company, unless otherwise determined by Parent prior to the Effective Time.

**Primary Benefits and Detriments of the Merger**

The primary benefits of the Merger to the Unaffiliated Holders include the following:

- The receipt by the Unaffiliated Holders of the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 in cash, representing a premium of 16.6 % to the Company's closing price of $66.05 per ADS as quoted by the NYSE on June 16, 2015, the last full trading day prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal.

- The avoidance of the risk associated with any possible decrease in the Company's future revenues and free cash flow, growth or value following the Merger.

The primary detriments of the Merger to the Unaffiliated Holders include the following:

- Such shareholders and ADS holders will cease to have an interest in the Company and, therefore, will no longer benefit from possible increases in the future revenues and free cash flow, growth or value of the Company or payment of dividends on the Company's ordinary shares, if any.

- In general, the receipt of cash pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. See "Special Factors —Material U.S. Federal Income Tax Consequences" beginning on page 79.

- Since the Company became publicly listed in March 2011, the highest historical closing price of its ADSs ($121.53 per ADS) exceeds the Per ADS Merger Consideration.

The primary benefits of the Merger to the Buyer Group include the following:

- If the Company successfully executes its business strategies, the value of the Buyer Group's equity investment could increase because of possible increases in future revenues and free cash flow, possible increases in the underlying value of the Company or the possible payment of dividends that will accrue to Parent.

- The Surviving Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from investment analysts to make decisions that may produce better short-term results, but may not maximize equity value in the long term.

- The Surviving Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation.

- The Surviving Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations.

- The Surviving Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts.

63

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/23    Page 69 of 184

- There will be a reduction of costs and expenses in the amount of approximately $4.0 million to $4.5 million per year and administrative burden associated with operating the Company as a publicly traded company, including the costs associated with regulatory filings and compliance requirements.

The primary detriments of the Merger to the Buyer Group include the following:

- The risk of any possible decrease in the revenues, free cash flow or value of the Surviving Company following the Merger will be borne by the Buyer Group.

- The business risks facing the Company, including increased competition and government regulation, will be borne by the Buyer Group.

- The borrowings of an aggregate amount up to the RMB equivalent of $3.4 billion under the Term Facility and the Bridge Facility necessary to consummate the Merger and the related transactions will increase the debt of Holdco and Parent.

- An equity investment in Holdco and Parent by the Buyer Group following the Merger will involve substantial risk resulting from the limited liquidity of such an investment.

- Following the Merger, there will be no trading market for the Surviving Company's equity securities.

The primary benefits of the Merger to the Company's directors and executive officers (other than members of the Buyer Group) include, without limitation, the following:

- The continuation of service of certain executive officers of the Company with the Surviving Company in positions that are substantially similar to their current positions.

- Continued indemnification rights, rights to advancement of fees and directors and officers liability insurance to be provided by the Surviving Company to former directors and officers of the Company.

- The compensation of members of the Special Committee in exchange for their services in such capacity in an amount of $15,000 per member per month with the aggregate amount per member capped at $120,000 (or, in the case of the chairman of the Special Committee, an amount of $25,000 per month with the aggregate amount capped at $200,000), the payment of which is not contingent upon the completion of the Merger or the Special Committee's or the Board's recommendation of the Merger.

- The cash-out of certain in-the-money Cashed-Out Options held by certain of the Company's directors and executive officers.

- The assumption and conversion of certain unvested Company Options and Company Restricted Shares held by certain of the Company's executive officers into equity incentive awards of Parent through the Plan Vehicle or such other arrangements.

The primary detriments of the Merger to the Company's directors and executive officers (other than members of the Buyer Group) include, without limitation, the following:

- Certain directors and executive officers of the Company, to the extent and in their capacity as shareholders of the Company, will no longer benefit from possible increases in the future revenues and free cash flow, growth or value of the Company or payment of dividends on the Shares, if any.

- In general, the receipt of cash pursuant to the Merger will be a taxable transaction for U.S. federal income tax purposes. See "Special Factors —Material U.S. Federal Income Tax Consequences" beginning on page 79.

64

**Plans for the Company after the Merger**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets. However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange, as well as any actions to address the challenges referred to in "Special Factors—Purposes of and Reasons for the Merger" above, in each case, which they consider to be in the best interests of the Surviving Company and its shareholders. The Buyer Group expressly reserves the right to make any changes they deem appropriate to the operation of the Surviving Company in light of such evaluation and review as well as any future developments.

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Alternatives to the Merger**

The Board did not independently determine to initiate a process for the sale of the Company. The Special Committee was formed on June 19, 2015 in response to the receipt of the proposal letter from the Buyer Group on June 17, 2015. In light of (i) the Buyer Group's beneficial ownership of approximately 26.8% in number and 61.3% in voting rights of the entire issued and outstanding Shares excluding treasury shares, which consisted of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options (as of the date of this proxy statement) and (ii) the fact that, since the announcement of the proposed transaction and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company, the Special Committee determined that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group.

The Special Committee also took into account that, subject to compliance with the terms and conditions of the Merger Agreement, (i) the Company has the ability to actively solicit bids from any third party for a period of 45 days after the signing of the Merger Agreement, (ii) prior to the receipt of the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) is permitted to effect a Company Adverse Recommendation Change (as defined in the section entitled "The Merger Agreement—No Company Adverse Recommendation Change") with respect to an alternative acquisition proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal, and (iii) prior to the receipt of the Company Shareholder Approval, can terminate the Merger Agreement in order to enter into an agreement in connection with an alternative transaction proposed by a third party that is a Superior Proposal, subject to the payment of a termination fee of approximately RMB1.44 billion, which amount is reduced to RMB641 million if the Merger Agreement is terminated by the Company in connection with an Acquisition Proposal received by the Company during the Go-Shop Period, in each case as provided in the Merger Agreement. In this regard, the Special Committee recognized that it has flexibility under the Merger Agreement to respond to an alternative transaction proposed by a third party that is or is reasonably likely to result in a Superior Proposal, including the ability to provide information to and engage in discussions and negotiations with such party (and, if such proposal is a Superior Proposal, recommend such proposal to the Company's shareholders).

In addition, the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market.

68

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 71 of 84

During the go-shop period as provided under the Merger Agreement, J.P. Morgan, on behalf of the Special Committee, contacted three selected potential strategic bidders. None of the three contacted parties expressed an interest in exploring an alternative transaction with the Company. No one approached the Special Committee separately from the Company's solicitation of Acquisition Proposals during the go-shop period.

**Effects on the Company if the Merger Is Not Consummated**

If the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are not authorized and approved by the shareholders of the Company or if the Merger is not consummated for any other reason, the shareholders or ADS holders of the Company will not receive any payment for their Shares or ADSs, as applicable, in connection with the Merger, nor will the holders of any Vested Company Options receive any payment pursuant to the Merger Agreement, nor will any unvested Company Options or Company Restricted Shares be assumed and converted into equity incentive awards of Parent. Instead, the Company will remain a publicly traded company, the ADSs will continue to be listed and traded on the NYSE, provided that the Company continues to meet the NYSE's listing requirements, and the Company will remain subject to SEC reporting obligations. Therefore, the Company's shareholders and ADS holders will continue to be subject to similar risks and opportunities as they currently are with respect to their ownership of the Shares or ADSs. Accordingly, if the Merger is not consummated, we cannot assure you as to the effect of these risks and opportunities on the future value of the Shares or ADSs, including the risk that the market price of the ADSs may decline to the extent that the current market price reflects a market assumption that the Merger will be consummated.

Under specified circumstances, the Company may be required to pay Parent or its designees a termination fee of approximately RMB1.44 billion (which amount is reduced to RMB641 million if such circumstances are in connection with an Acquisition or Parent may be required to pay a designee of the Company a termination fee of approximately RMB2.88 billion, in each case as described in the section entitled "The Merger Agreement— Termination Fee" beginning on page 109.

If the Merger is not consummated, the Board will, from time to time, evaluate and review, among other things, the business, operations, dividend policy and capitalization of the Company and make such changes as are deemed appropriate, and continue to seek to identify strategic alternatives to enhance shareholder value. If the Merger Agreement is not approved by the shareholders or if the Merger is not consummated for any other reason, we cannot assure you that any other transaction acceptable to the Company will be offered, or that the business, prospects or results of operations of the Company will not be adversely impacted.

**Financing of the Merger**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the Merger and the related transactions, including payment of fees and expenses in connection with the Merger, is anticipated to be approximately $9.4 billion, assuming no exercise of Dissenter Rights by shareholders of the Company. In calculating this amount, the Company and the Buyer Group did not consider the value of the Founder Shares or Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options or by any direct or indirect wholly owned Subsidiary of any Parent Party or the Company, which will be cancelled for no consideration.

The Buyer Group expects to provide this amount through a combination of (a) cash contributions from the Equity Investors as defined in and pursuant to the Equity Commitment Letters, and (b) the proceeds from a committed term loan facility in an amount up to the RMB equivalent of $3.0 billion and a bridge loan facility of up to the RMB equivalent of $400 million, pursuant to certain debt commitment letters dated December 18, 2015 provided by China Merchants Bank Co., Ltd. Other than the financing arrangements detailed below, the Buyer Group does not have alternative financial arrangements or alternative financing plans in the event such arrangements are not available.

69

Case 1:19-cv-10067-RAE   Document 116-2   Filed 04/29/22   Page 72 of 184

- Prior to the Effective Time, the Company shall and, if the Company is unable to, Parent shall cause the Surviving Company as of the Effective Time to, obtain and fully pay the premium for the extension of the directors' and officers' liability coverage of the Company's existing directors' and officers' insurance policies, for a claims reporting or discovery period of at least six (6) years from and after the Effective Time with respect to any claim related to any period or time at or prior to the Effective Time from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance and fiduciary liability insurance with terms, conditions, retentions and limits of liability that are at least as favorable as the coverage provided under the Company's existing policy with respect to any matter claimed against a director or officer of the Company or any of its subsidiaries by reason of him or her serving in such capacity that existed or occurred at or prior to the Effective Time (including in connection with the Merger Agreement or the transactions or actions contemplated thereby); <u>provided</u> that in no event shall Parent or the Surviving Company be required to expend for such policy an annual premium amount in excess of three-hundred percent (300%) of the annual premiums currently paid by the Company for such insurance; <u>provided</u>, further that if the annual premiums of such insurance coverage exceed such amount, the Surviving Company shall obtain a policy with the greatest coverage available for a cost not exceeding such amount.

- From and after the Effective Time, the Surviving Company shall indemnify and hold harmless, to the fullest extent permitted by applicable laws, its memorandum and articles of association and any applicable contracts, against any and all liabilities arising out of or pertaining to such Indemnified Party's service as a director or officer of the Company or any of its subsidiaries or services performed by such person at the request of the Company or any of its subsidiaries, including (i) any and all matters pending, existing or occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time, and (ii) any claim arising from the transactions contemplated by the Merger Agreement, and any actions taken by any Parent Party with respect thereto (including any disposition of assets of the Surviving Company or any subsidiary of the Company which is alleged to have rendered the Surviving Company and/or any subsidiary of the Company insolvent).

**The Special Committee**

On June 19, 2015, the Board established a Special Committee of directors to consider the proposal from the Buyer Group and to take any actions it deems appropriate to assess the fairness and viability of such proposal. The Special Committee is composed of independent and disinterested directors: Dr. Eric Chen, Dr. Jianwen Liao and Dr. Ming Huang. Other than their receipt of Board and Special Committee compensation (which are not contingent upon the consummation of the Merger or the Special Committee's or the Board's recommendation of the Merger) and their indemnification and liability insurance rights under the Merger Agreement, none of the members of the Special Committee has a financial interest in the Merger or any of transactions contemplated thereby that is different from that of the Unaffiliated Holders and none of them is related to any member of the Buyer Group. The Board did not place any limitations on the authority of the Special Committee regarding its investigation and evaluation of the Merger.

The Company compensates the members of the Special Committee in exchange for their service in such capacity at a rate of $25,000 per month with the aggregate amount capped at $200,000 for the chairman of the Special Committee and $15,000 per member per month with the aggregate amount per member capped at $120,000 for each other member of the Special Committee (the payment of which is not contingent upon the consummation of the Merger or the Special Committee's or the board's recommendation of the Merger).

**Position with the Surviving Company**

The directors of Merger Sub immediately prior to the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Company and the officers of the Company immediately prior to the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Company, until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the memorandum and articles of association of the Surviving Company.

77

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 73 of 184

**Litigation Related to the Merger**

We are not aware of any lawsuit that challenges the Merger Agreement or any of the Transactions, including the Merger.

**Accounting Treatment of the Merger**

The Merger is expected to be accounted for, at historical cost, as a merger of entities under common control in accordance with Accounting Standards Codification 805-50, "Business Combinations—Related Issues."

**Regulatory Matters**

The Company does not believe that any material regulatory approvals, filings or notices are required in connection with effecting the Merger other than the PRC Required Approvals in relation to the transactions contemplated by the Merger Agreement, the approvals, filings or notices required under the U.S. federal securities laws and the filing of the Plan of Merger (and supporting documentation as specified in the Cayman Islands Companies Law) with the Cayman Registrar and, in the event the Merger becomes effective, a copy of the Certificate of Merger being given to the shareholders and creditors of the Company and Merger Sub as at the time of the filing of the Plan of Merger and notice of the Merger being published in the Cayman Islands Government Gazette. See "Merger Agreement—Conditions to the Merger" beginning on page 107 for additional information.

**Dissenter Rights**

Holders of the Shares who exercise Dissenter Rights will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of Dissenter Rights, a copy which is attached as Annex D to this proxy statement. The fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise Dissenter Rights with respect to their Shares. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenter Rights (as described under the section entitled "Dissenter Rights" on page 113).

**Material U.S. Federal Income Tax Consequences**

The following is a general discussion of material U.S. federal income tax consequences to U.S. Holders (as defined below) of the exchange of Shares for cash pursuant to the Merger Agreement, but does not purport to be a complete analysis of all potential tax effects. The effects of other U.S. federal tax laws, such as estate and gift tax laws, and any applicable state, local or non-U.S. tax laws are not discussed. For purposes of this discussion, references to Shares include ownership interests in Shares through ADSs. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "IRS"), in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively resulting in tax consequences different from those described below. This discussion is not binding on the IRS and the IRS may challenge any of the conclusions set forth below.

This discussion is limited to U.S. Holders that hold the Shares as capital assets within the meaning of Section 1221 of Code (generally, property held for investment). This discussion does not address all U.S. federal income tax consequences that may be relevant in light of a U.S. Holder's particular circumstances, consequences to Founder Securityholders or Dissenting Shareholders, alternative minimum tax consequences, or tax consequences applicable to U.S. Holders subject to special rules, such as:

- certain financial institutions;

79

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/23    Page 74 of 184

## THE EXTRAORDINARY GENERAL MEETING

*We are furnishing this proxy statement to you, as a holder of the Shares, as part of the solicitation of proxies by the Board for use at the extraordinary general meeting described below.*

### Date, Time and Place of the Extraordinary General Meeting

The extraordinary general meeting will be held on March 30, 2016, at 10:00 a.m. (Beijing time) at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China.

### Proposals to be Considered at the Extraordinary General Meeting

At the meeting, you will be asked to consider and vote upon:

- as a special resolution:

**THAT** the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, be authorized and approved;

- as an ordinary resolution:

**THAT** each of the members of the special committee of the board of directors of the Company, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company be authorized to do all things necessary to give effect to the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger; and

- if necessary, as an ordinary resolution:

**THAT** the extraordinary general meeting be adjourned in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting.

At the Effective Time, all Shares will be cancelled and cease to exist. If the Merger is consummated, each issued and outstanding Share and ADS, other than the Excluded Shares (including such Shares represented by ADSs) and the Dissenting Shares, will be cancelled in exchange for the right to receive the Per Share Merger Consideration and the Per ADS Merger Consideration, respectively, in each case, in cash, without interest and net of any applicable withholding taxes, in accordance with the terms and conditions set forth in the Merger Agreement. The Excluded Shares and ADSs representing the Excluded Shares will be cancelled without payment of any consideration or distribution therefor. The Dissenting Shares will thereafter represent only the right to receive the fair value of each Share as determined under Section 238 of the Cayman Islands Companies Law.

In addition to the foregoing, at the Effective Time,

(i) each Cashed-Out Option will be converted into the right to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Company Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration;

(ii) each unvested Company Option will be assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option;

(iii) each Company Restricted Share that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share; and

85

(iv) each ordinary share, par value $1.00 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time will be converted into one validly issued, fully paid and non-assessable ordinary share, par value $0.001 per share, of the Surviving Company.

**The Board's Recommendation**

The Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee:

- determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger;

- authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, other transactions and the transactions contemplated thereby, including the Merger; and

- resolved to recommend in favor of the authorization and approval of the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**Record Date; Shares and ADSs Entitled to Vote**

You are entitled to attend and vote at the extraordinary general meeting if you have Shares registered in your name at the close of business in the Cayman Islands on the Share Record Date. If you own Shares at the close of business in the Cayman Islands on the Share Record Date, you should lodge your proxy card and vote so that the proxy card is received by the Company no later than March 29, 2016 at 9:00 a.m. (Beijing time).

If you own ADSs as of the close of business in New York City on the ADS Record Date (and do not surrender such ADSs and become a registered holder of the Shares underlying such ADSs, as explained below), you cannot vote directly nor are you able to attend the extraordinary general meeting, but you may instruct the ADS Depositary (as the holder of the Shares underlying your ADSs) how to vote the Shares underlying your ADSs. The ADS Depositary must receive your instructions no later than 5:00 p.m. (New York City time) on March 25, 2016 in order to ensure the Shares underlying your ADSs are properly voted at the extraordinary general meeting.

Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date. We expect that, as of the Share Record Date, there will be 180,839,445 Shares entitled to be voted at the extraordinary general meeting. See "The Extraordinary General Meeting—Procedures for Voting" below for additional information.

**Quorum**

A quorum of the Company's shareholders is necessary to have a valid shareholders' meeting. The required quorum for the transaction of business at the extraordinary general meeting is the presence, in person or by proxy (or in the case of a shareholder being a corporation, by a duly authorized corporate representative), of one or more shareholders holding at least one third in nominal value of the outstanding Shares that are entitled to vote on the Share Record Date. In the event that a quorum is not present at the extraordinary general meeting, we currently expect that we will adjourn the extraordinary general meeting to solicit additional proxies in favor of the authorization and approval of the Merger Agreement.

86

Case 1:19-cv-10067-RAE     Document 116-2     Filed 04/29/22     Page 76 of 184

**Vote Required**

Under the Cayman Islands Companies Law and the Merger Agreement, in order for the Merger to be consummated, the Merger Agreement and the Plan of Merger must be approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires the affirmative vote of holder of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting. If this vote is not obtained, the Merger will not be consummated.

As of the date of this proxy statement, there are 180,839,445 Shares issued and outstanding (including Shares represented by ADSs), all of which are entitled to vote on the proposals at the extraordinary general meeting, subject to the procedures described below under "—Procedures for Voting." We expect that, as of the Share Record Date, there will be 180,839,445 Shares issued and outstanding (including Shares represented by ADSs), all of which will be entitled to vote on the proposals at the extraordinary general meeting, subject to the procedures described below under "The Extraordinary General Meeting—Procedures for Voting."

As of the date of this proxy statement, the Chairman, through Global Village, and Mr. Qi, through Young Vision, collectively beneficially own 4,740,568 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represent approximately 25.4% in number and approximately 60.6% in voting rights of the Company's issued and outstanding ordinary shares (excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options). See "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 122 for additional information. Global Village and Young Vision have agreed to vote these Shares in favor of the authorization and approval of the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, at the extraordinary general meeting. Given the Buyer Group's beneficial ownership in the Company and assuming Global Village and Young Vision comply with their voting undertakings under the Merger Agreement, and Sequoia and Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge, which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on the Share Record Date, an amount of Shares representing approximately 5.4% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than Global Village and Young Vision must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be authorized and approved, assuming all shareholders will be present and voting in person or by proxy at the extraordinary general meeting.

**Procedures for Voting**

*Shares*

Only shareholders registered in the register of members of the Company at the close of business in the Cayman Islands on the Share Record Date will receive the final proxy statement and proxy card directly from the Company. Shareholders registered in the register of members of the Company as of the Share Record Date or their proxy holders are entitled to vote and may participate in the extraordinary general meeting or any adjournment thereof. Shareholders who have acquired Shares after the close of business on the Share Record Date may not attend the extraordinary general meeting unless they receive a proxy from the person or entity who had sold them the Shares. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share.

Shareholders wanting to vote by proxy should indicate on their proxy card how they want to vote, sign and date the proxy card, and mail the proxy card in the return envelope as soon as possible so that it is received by the Company no later than 9:00 a.m. on March 29, 2016 (Beijing time), the deadline to lodge the proxy card. Shareholders can also attend the extraordinary general meeting and vote in person.

Shareholders who have questions or requests for assistance in completing and submitting proxy cards or need additional copies of this proxy statement or the accompanying proxy card should contact the Company by calling +86 10-5878-1574 or emailing to ir@360.cn.

87

***ADSs***

Holders of ADSs as of the close of business in New York City on the ADS Record Date will receive the final proxy statement and ADS voting instruction card either directly from the ADS Depositary (in the case of registered holders of ADSs) or these materials will be forwarded to them by a third party service provider (in the case of beneficial owners of ADSs who are not registered holders of ADSs). Holders of ADSs as of 5:00 p.m. (New York City time) on March 23, 2016 (who do not surrender such ADSs and become a registered holder of the Shares underlying such ADSs, as explained in the following paragraph) cannot attend or vote at the extraordinary general meeting directly, but may instruct the ADS Depositary how to vote the Shares underlying the ADSs by completing and signing an ADS voting instruction card provided by the ADS Depositary and returning it in accordance with the instructions printed on the card. The ADS Depositary must receive the ADS voting instruction card no later than 5:00 p.m. (New York City time) on March 25, 2016. The ADS Depositary will endeavor, in so far as practicable, to vote or cause to be voted the Shares represented by ADSs in accordance with your voting instructions. The ADS Depositary has advised us that, pursuant to Section 4.07 of the Deposit Agreement, it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Shares represented by ADSs for which no timely voting instructions are received by the ADS Depositary will not be voted. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

Holders of ADSs will not be able to attend the extraordinary general meeting unless they surrender their ADSs and become holders of Shares prior to the close of business in the Cayman Islands on the Share Record Date. ADS holders who wish to surrender their ADSs need to make arrangements to deliver the ADSs to the ADS Depositary for cancellation before 5:00 p.m. (New York City time) on March 23, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the Deposit Agreement), which will not be borne by the Surviving Corporation, and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the ADS Record Date and has not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being converted, or has given voting instructions to the ADS Depositary as to the ADSs being surrendered but undertakes not to vote the corresponding Shares at the extraordinary general meeting or (ii) did not hold the ADSs as of the ADS Record Date and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon conversion of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after the registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman Registrar of Shares, Maples Corporate Services Limited, to issue and mail a certificate to your attention. If the Merger is not consummated, the Company will continue to be a public company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have surrendered your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

Persons holding ADSs in a brokerage, bank or other nominee account should consult with their broker, bank or other nominee to obtain directions on how to provide such broker, bank or other nominee with instructions on how to vote their ADSs.

88

**Proxy Holders for Registered Shareholders**

Shareholders registered in the register of members of the Company as of the Share Record Date who are unable to participate in the extraordinary general meeting may appoint as a representative another shareholder, a third party or the chairman of the extraordinary general meeting as proxy holder by completing and returning the form of proxy in accordance with the instructions printed thereon. With regard to the items listed on the agenda and without any explicit instructions to the contrary, the chairman of the extraordinary general meeting as proxy holder will vote in favor of the resolutions proposed at the extraordinary general meeting according to the recommendation of the Board. If new proposals (other than those on the agenda) are put forth before the extraordinary general meeting, the chairman of the extraordinary general meeting as proxy holder will vote in accordance with the position of the Board.

**Voting of Proxies and Failure to Vote**

All Shares represented by valid proxies will be voted at the extraordinary general meeting in the manner specified by the holder. If a shareholder returns a properly signed proxy card but does not indicate how the shareholder wants to vote, Shares represented by that proxy card will be voted FOR the proposal to authorize and approve the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, FOR the proposal to authorize each of the members of the special committee of the board of directors of the Company, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company to do all things necessary to give effect to the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received to pass the resolutions during the extraordinary general meeting, unless the shareholder appoints a person other than the chairman of the meeting as proxy, in which case the Shares represented by that proxy card will be voted (or not submitted for voting) as the proxy determines. If a shareholder fails to vote by proxy or in person, it will be more difficult for the Company to obtain the necessary quorum to transact business at the extraordinary general meeting and to obtain required votes described in "The Extraordinary General Meeting—Vote Required."

Brokers, banks or other nominees who hold Shares in "street name" for customers who are the beneficial owners of such Shares may not give a proxy to vote those customers' Shares in the absence of specific instructions from those customers. If proxies are properly dated, executed and returned by holders of Shares and no specific instructions are given by such holders, such Shares will be voted "FOR" the proposals and in the proxy holder's discretion as to other matters that may properly come before the extraordinary general meeting. Abstentions by holders of Shares are included in the determination of the number of Shares present and voting but are not counted as votes for or against a proposal. If no proxy is given by such holders of Shares, broker non-votes will be counted toward a quorum but will not be treated as voted on any proposals at the extraordinary general meeting.

If holders of ADSs do not timely deliver specific voting instructions to the ADS Depositary, the ADS Depositary has advised the Company that it will not vote or attempt to exercise the right to vote any Shares underlying such holders' ADSs.

Brokers, banks and other nominees who hold ADSs in "street name" for their customers do not have discretionary authority to provide the ADS Depositary with voting instructions on how to vote the Shares underlying the ADSs with respect to the adoption of the Merger Agreement. Accordingly, if banks, brokers or other nominees do not receive specific voting instructions from the beneficial owner of ADSs, they may not provide the ADS Depositary with voting instructions on how to vote the Shares underlying the ADSs with respect to the adoption of the Merger Agreement.

**Revocability of Proxies**

Registered holders of the Shares may revoke their proxies in one of three ways:

- First, a registered shareholder can revoke a proxy by written notice of revocation given to the chairman of the extraordinary general meeting before the commencement of the extraordinary general meeting. Any written notice revoking a proxy should also be sent to the Company's offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, attention: Investor Relations Department.

89

Case 1:19-cv-10067-RAE     Document 116-2     Filed 04/29/22     Page 79 of 84

- Second, a registered shareholder can complete, date and submit a new proxy card bearing a later date than the proxy card sought to be revoked to the Company so that the new proxy card is received by the Company no later than 9:00 a.m. (Beijing time) on March 29, 2016, which is the deadline for shareholders to lodge proxy cards.

- Third, a registered shareholder can attend the meeting and vote in person. Attendance, by itself, will not revoke a proxy. It will only be revoked if the registered shareholder actually votes at the extraordinary general meeting.

If a shareholder holds Shares through a broker, bank or other nominee and has instructed the broker, bank or other nominee to vote the shareholder's Shares, the shareholder must follow directions received from the broker, bank or other nominee to change those instructions.

Holders of our ADSs may revoke their voting instructions by notification to the ADS Depositary in writing at any time prior to 5:00 p.m. (New York City time) on March 25, 2016. A holder of ADSs can do this in one of two ways:

- First, a holder of ADSs can revoke its voting instruction by written notice of revocation timely delivered to the ADS Depositary.

- Second, a holder of ADSs can complete, date and submit a new ADS voting instruction card to the ADS Depositary bearing a later date than the ADS voting instruction card sought to be revoked.

If you hold your ADSs through a broker, bank or other nominee and you have instructed your broker, bank or other nominee to give ADS voting instructions to the ADS Depositary, you must follow the directions of your broker, bank or other nominee to change those instructions.

**Rights of Shareholders Who Object to the Merger**

Shareholders who continue to hold their Shares in their own name until the consummation of the Merger will have the right to exercise dissenters' rights and receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law, which is attached as Annex D to this proxy statement, for the exercise of dissenters' rights. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise dissenters' rights with respect to your Shares.

ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTERS' RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON MARCH 23, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTERS' RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLIC COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTERS' RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.

90

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 80 of 184

**Whom to Call for Assistance**

If you need assistance, including help in changing or revoking your proxy, please contact the Company, by calling at +86 10 5878-1574 or emailing to ir@360.cn.

**Solicitation of Proxies**

In addition, proxies may be solicited by mail, in person, by telephone, by internet or by facsimile by certain of our officers, directors and employees. These persons will receive no additional compensation for solicitation of proxies but may be reimbursed for reasonable out-of-pocket expenses.

The Company will ask banks, brokers and other custodians, nominees and fiduciaries to forward the Company's proxy solicitation materials to the beneficial owners of the Shares or ADSs held of record by such nominee holders. The Company will reimburse these nominee holders for their customary clerical and mailing expenses incurred in forwarding the proxy solicitation materials to the beneficial owners and in obtaining voting instructions from those beneficial owners. In addition, proxies may be solicited by mail, in person, by telephone, by internet or by facsimile by certain of the Company's officers, directors and employees. These persons will receive no additional compensation for solicitation of proxies but may be reimbursed for reasonable out-of-pocket expenses. The Company will pay all expenses of filing, printing and mailing this proxy statement.

**Other Business**

We are not currently aware of any business to be acted upon at the extraordinary general meeting other than the matters discussed in this proxy statement.

91

Case 1:19-cv-10067-RAE    Document 116-2    Filed 04/29/22    Page 81 of 184

**DISSENTER RIGHTS**

The following is a brief summary of the rights of holders of the Shares to dissent from the Merger and receive payment of the fair value of their Shares ("Dissenter Rights"). This summary is not a complete statement of the law, and is qualified in its entirety by the complete text of Section 238 of the Cayman Islands Companies Law, a copy of which is attached as Annex D to this proxy statement. If you are contemplating the possibility of dissenting from the Merger, you should carefully review the text of Annex D, particularly the procedural steps required to perfect your Dissenter Rights. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenter Rights.

**Requirements for Exercising Dissenter Rights**

A Dissenting Shareholder is entitled to payment of the fair value of its, his or her Shares upon dissenting from the Merger in accordance with Section 238 of the Cayman Islands Companies Law.

The valid exercise of your Dissenter Rights will preclude the exercise of any other rights by virtue of holding Shares in connection with the Merger, other than the right to participate fully in proceedings to determine the fair value of Shares held by you and to seek relief on the grounds that the Merger is void or unlawful. To exercise your Dissenter Rights, the following procedures must be followed:

- You must give written notice of objection ("Notice of Objection") to the Company prior to the vote to authorize and approve the Merger. The Notice of Objection must include a statement that you propose to demand payment for your Shares if the Merger is authorized by the vote at the extraordinary general meeting.

- Within 20 days immediately following the date on which the vote authorizing the Merger is made, the Company must give written notice of the authorization ("Authorization Notice") to all Dissenting Shareholders who have served a Notice of Objection.

- Within 20 days immediately following the date on which the Authorization Notice is given (the "Dissent Period"), any Dissenting Shareholder who elects to dissent must give a written notice of its, his or her decision to dissent (a "Notice of Dissent") to the Company stating its, his or her name and address and the number and class of the Shares with respect to which it, he or she dissents and demanding payment of the fair value of its, his or her Shares. A Dissenting Shareholder who dissents must do so in respect of all the Shares which it, he or she holds. Upon giving of the Notice of Dissent, the Dissenting Shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of its, his or her Shares, and the rights to participate fully in proceedings to determine the fair value of such Shares and to seek relief on the grounds that the Merger is void or unlawful.

- Within seven days immediately following (a) the date of expiry of the Dissent Period or (b) the date on which the Plan of Merger is filed with the Cayman Registrar, whichever is later, the Company, as the Surviving Company, must make a written offer (a "Fair Value Offer") to each Dissenting Shareholder to purchase its, his or her Shares at a price determined by the Company to be the fair value of such Shares.

- If, within 30 days immediately following the date of the Fair Value Offer, the Company and the Dissenting Shareholder fail to agree on a price at which the Company will purchase the Dissenting Shareholder's Shares, then, within 20 days immediately following the date of the expiry of such 30-day period, the Company must, and the Dissenting Shareholder may, file a petition with the Grand Court of the Cayman Islands (the "Grand Court") for a determination of the fair value of the Shares held by all Dissenting Shareholders who have served a Notice of Dissent and who have not agreed with the Company as to the fair value of their Shares, which petition by the Company must be accompanied by a verified list containing the names and addresses of all members who have filed a Notice of Dissent and who have not agreed with the Company as to the fair value of such Shares.

113

- If a petition is timely filed and served, the Grand Court will determine at a hearing (a) which shareholders are entitled to Dissenter Rights, (b) the fair value of such Shares held by those shareholders with a fair rate of interest, if any, to be paid by the Company upon the amount determined to be the fair value and (c) the costs of the proceeding and the allocation of such costs upon the parties.

All notices and petitions must be executed by or for the shareholder of record, fully and correctly, as such shareholder's name appears on the register of members of the Company. If Shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, these notices must be executed by or for the fiduciary. If Shares are owned by or for more than one person such notices and petitions must be executed by or for all joint owners. An authorized agent, including an agent for two or more joint owners, may execute the notices or petitions for a shareholder of record. The agent must, however, identify the record owner and expressly disclose the fact that, in exercising the notice, he or she is acting as agent for the record owner. A person having a beneficial interest in Shares held of record in the name of another person, such as a broker or other nominee, must act promptly to cause the record holder to follow the steps summarized above and in a timely manner to perfect whatever Dissenter Rights attached to such Shares.

You must be a registered holder of Shares in order to exercise your Dissenter Rights. A holder of ADSs who wishes to dissent must surrender his, her or its ADSs to the ADS Depositary for delivery of Shares and pay the fees of the ADS Depositary to cancel his, her or its ADSs and then become a record holder of such Shares and comply with the procedures described above in order to exercise the Dissenter Rights with respect to the Shares prior to the extraordinary general meeting. The ADS Depositary will not exercise Dissenter Rights on behalf of a holder of ADSs and any Notice of Dissent delivered to the ADS Depositary will not be effective under the Cayman Islands Companies Law. If you wish to cancel your ADSs, please contact the ADS Depositary's office at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286.

If you do not satisfy each of these requirements, you cannot exercise Dissenter Rights and will be bound by the terms of the Merger Agreement and the Plan of Merger. Submitting a proxy card that does not direct how the Shares represented by that proxy are to be voted will give the proxy discretion to vote as it determines appropriate. In addition, failure to vote your Shares, or a vote against the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, will not alone satisfy the notice requirement referred to above. You must send all notices to the Company's offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, attention: Investor Relations Department.

If you are considering dissenting, you should be aware that the fair value of your Shares determined under Section 238 of the Cayman Islands Companies Law could be more than, the same as, or less than the $51.33 in cash, without interest, for each Share of the Company that you would otherwise receive as consideration pursuant to the Merger Agreement if you do not exercise Dissenter Rights with respect to your Shares. In addition, in any proceedings for determination of the fair value of the Shares covered by a Notice of Dissent, the Company and the Buyer Group intend to assert that the Per Share Merger Consideration is equal to the fair value of each of your Shares.

The provisions of Section 238 of the Cayman Islands Companies Law are technical and complex. If you fail to comply strictly with the procedures set forth in Section 238, you will lose your Dissenter Rights. You should consult your Cayman Islands legal counsel if you wish to exercise Dissenter Rights.

114

Case 1:19-cv-10067-PAE Document 116-2 Filed 04/29/22 Page 83 of 184

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements in this proxy statement, the documents attached hereto and the documents incorporated by reference in this proxy statement are forward-looking statements based on estimates and assumptions. These include statements as to such things as our financial condition, results of operations, plans, objectives, future performance and business, as well as forward-looking statements relating to the Merger. Such forward-looking statements are based on facts and conditions as they exist at the time such statements are made. Forward-looking statements are also based on current expectations, estimates and projections about our business and the Merger, the accurate prediction of which may be difficult and involve the assessment of events beyond our control. The forward-looking statements are further based on assumptions made by management. Forward-looking statements can be identified by forward-looking language, including words such as "believes," "anticipates," "expects," "estimates," "intends," "may," "plans," "predicts," "projects," "will," "would" and similar expressions, or the negative of these words. These statements are not guarantees of the underlying expectations or future performance and involve risks and uncertainties that are difficult to predict. Readers of this proxy statement are cautioned to consider these risks and uncertainties and not to place undue reliance on any forward-looking statements.

The following factors, among others, could cause actual results or matters related to the Merger to differ materially from what is expressed or forecasted in the forward-looking statements:

- the satisfaction of the conditions to the consummation of the Merger, including the authorization and approval of the Merger Agreement by the Company's shareholders;

- the occurrence of any event, change or other circumstance that could give rise to the termination of the Merger Agreement;

- the cash position of the Company and its subsidiaries at the Effective Time;

- debt or equity financing may not be funded at the Effective Time because of the failure of the Parent Parties to meet the closing conditions or for other reasons, which may result in the Merger not being consummated promptly or at all;

- the effect of the announcement or pendency of the Merger on our business relationships, results of operations and business generally;

- the risk that the Merger may not be consummated in a timely manner or at all, which may adversely affect our business and the prices of our Shares and ADSs;

- the potential adverse effect on our business, properties and operations because of certain covenants we agreed to in the Merger Agreement;

- diversion of our management's attention from our ongoing business operations;

- loss of our senior management;

- the amount of the costs, fees, expenses and charges related to the Merger and the actual terms of the financings that will be obtained for the Merger;

- our failure to comply with regulations and changes in regulations;

- the outcome of any legal proceedings, regulatory proceedings or enforcement matters that may be instituted against us and others relating to the Merger; and

- other risks detailed in our filings with the SEC, including the information set forth under the section entitled "Item 3. Key Information—D. Risk Factors" in our annual report on Form 20-F for the year ended December 31, 2014. See "Where You Can Find More Information" beginning on page 127 for additional information.

125

Furthermore, the forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, collaborations, dividends or investments made by the parties. We believe that the assumptions on which our forward-looking statements are based are reasonable. However, forward-looking statements involve inherent risks, uncertainties and assumptions. In addition, many of the factors that will determine our future results are, however, beyond our ability to control or predict and we cannot guarantee any future results, levels of activity, performance or achievements. We cannot assure you that the actual results or developments we anticipate will be realized or, if realized, that they will have the expected effects on our business or operations. In light of the significant uncertainties inherent in the forward-looking statements, readers should not place undue reliance on forward-looking statements, which speak only as of the date on which the statements were made and it should not be assumed that the statements remain accurate as of any future date. All subsequent written and oral forward-looking statements concerning the Merger or other matters addressed in this proxy statement and attributable to us or any person acting on our behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Further, forward-looking statements speak only as of the date they are made and, except as required by applicable law or regulation, we undertake no obligation to update these forward-looking statements to reflect future events or circumstances.

126