# EXHIBIT 9

Case 1:19-cv-10067-RAE Document 116-9 Filed 04/29/22 Page 2 of 23

EX-99.A1 2 v432681_ex99-a1.htm EXHIBIT (A)-(1)

PRELIMINARY PROXY STATEMENT OF THE COMPANY

**EXHIBIT (a)-(1)**



_____, 2016

Shareholders of Qihoo 360 Technology Co. Ltd.
Re: Notice of Extraordinary General Meeting of Shareholders

Dear Shareholder:

You are cordially invited to attend an extraordinary general meeting of the shareholders of Qihoo 360 Technology Co. Ltd. (the "Company") to be held on _____, 2016 at _____ a.m. (Beijing time). The meeting will be held at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China. The accompanying notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

On December 18, 2015, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Tianjin Qixin Zhicheng Technology Co., Ltd. (天津奇信志成科技有限公司), a limited liability company incorporated under the laws of the PRC ("Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (天津奇信通达科技有限公司), a limited liability company incorporated under the laws of the PRC ("Parent"), True Thrive Limited (诚盛有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco"), New Summit Limited (新峰有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Merger Sub" and, together with Holdco, Parent and Midco, each a "Parent Party" and collectively the "Parent Parties"), and solely for purposes of Section 6.19 of the Merger Agreement, Global Village Associates Limited, a British Virgin Islands company ("Global Village"), and Young Vision Group Limited, a British Virgin Islands company ("Young Vision" and, together with Global Village, the "Founder Securityholders"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "Surviving Company") (the "Merger") and becoming a wholly owned subsidiary of Midco. Upon the completion of the Merger, the Surviving Company will become a private company beneficially owned solely by the Buyer Group (as defined below), while Hongyi Zhou, the chairman of the board of directors and chief executive officer of the Company, and Xiangdong Qi, a director and the president of the Company, will own 22.3% and 2.2%, respectively, of the Surviving Company. The purpose of the extraordinary general meeting is for you and the other shareholders of the Company to consider and vote upon a proposal to authorize and approve the Merger Agreement and the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands (the "Cayman Registrar") in connection with the Merger (the "Plan of Merger"), and the transactions contemplated by the Merger Agreement and the Plan of Merger, including the Merger. Copies of the Merger Agreement and the Plan of Merger are attached as Annex A and Annex B, respectively, to the accompanying proxy statement.

The Parent Parties, the Founder Securityholders and the equity investors named in Exhibit B of the Merger Agreement (collectively, the "Equity Investors") are collectively referred to herein as the "Buyer Group." As of the date of this letter, the Buyer Group collectively beneficially own [6,414,611] Class A ordinary shares and [42,013,812] Class B ordinary shares, which represent approximately [26.7]% in number and approximately [61.6]% in voting rights of the Company's issued and outstanding ordinary shares, consisting of Class A ordinary shares and Class B ordinary shares, par value $0.001 per share (each, a "Share") and excluding treasury shares, which consist of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options. If the Merger is consummated, the Company will continue its operations as a privately held company, and, as the result of the Merger, the Company's American depositary shares ("ADSs"), two representing three Class A ordinary shares of the Company, will no longer be listed on the New York Stock Exchange (the "NYSE") and the ADS program for the Shares will terminate.

If the Merger is consummated, at the effective time of the Merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes. The ADS holders will pay any applicable fees, charges and expenses of The Bank of New York Mellon (the "ADS Depositary") and government charges (including withholding taxes if any) due to or incurred by the ADS Depositary, in its capacity as the ADS depositary, in connection with the cancellation of the ADSs surrendered and distribution of the merger consideration to holders of ADSs, including applicable ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof) and ADS Depositary services fees). Notwithstanding the foregoing, if the Merger is consummated, the following Shares (including Shares represented by ADSs) will not be converted into the right to receive the consideration described in the immediately preceding sentence, but will be cancelled and cease to exist at the Effective Time:

Case 1:19-cv-10067-RAE Document 116-9 Filed 04/29/22 Page 3 of 23

(a) Shares owned by any Parent Party or the Company (as treasury shares, if any), any Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any options or by any direct or indirect wholly-owned subsidiary of any Parent Party or the Company, in each case immediately prior to the Effective Time, which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor;

(b) Shares owned by shareholders (the "Dissenting Shareholders") who have validly exercised and have not effectively withdrawn or lost their rights to dissent from the Merger in accordance with Section 238 of Companies Law (2013 Revision) of the Cayman Islands (the "Cayman Islands Companies Law") (the "Dissenting Shares"), which will be cancelled and cease to exist, but shall not be converted into or exchangeable for or represent the right to receive the merger consideration pursuant to the Merger Agreement, and each such Dissenting Shareholder shall be entitled only to payment of the fair value of such Dissenting Shares in accordance with Section 238 of the Cayman Islands Companies Law, and from the Effective Time such Dissenting Shareholders shall cease to have any of the rights of a shareholder of the Company except the right to be paid the fair value of such Dissenting Shares; and

(c) 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision (collectively, "Founder Securities"), which will be cancelled and cease to exist, and no consideration shall be delivered or deliverable in exchange therefor.

In addition to the foregoing, at the Effective Time, each outstanding vested and unexercised option to purchase shares of the Company (each a "Company Option") granted under the 2006 Employee Shares Option Scheme, 2006 Employee Share Vesting Scheme and 2011 Share Incentive Plan, and any other equity incentive arrangements of the Company (as amended and restated, collectively, the "Company Share Plans") with a per Share exercise price less than the Per Share Merger Consideration (each, a "Cashed-Out Option") will be cancelled and entitle the former holder thereof to receive a cash amount equal to the excess of (i) the Per Share Merger Consideration over (ii) the exercise price of such Cashed-Out Option, multiplied by the number of Shares underlying such Cashed-Out Option. Each outstanding vested and unexercised Company Option with a per Share exercise price greater than or equal to the Per Share Merger Consideration will be cancelled at the Effective Time for no consideration.

At the Effective Time, each outstanding unvested Company Option to purchase Shares granted under the Company Share Plans will be assumed and converted into an equity incentive award of Parent through Tianjin Qirui Zhongxin Technology Partnership (Limited Partnership) (天津奇睿众信科技合伙企业(有限合伙)), a limited liability partnership formed under the laws of the People's Republic of China for the purposes of holding incentive shares of the Parent (the "Plan Vehicle") or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such unvested Company Option immediately prior to the Effective Time, to provide no less favorable economic benefits to the holder of such unvested Company Option.

At the Effective Time, each restricted share of the Company ("Company Restricted Share") that remains outstanding as of immediately prior to the Effective Time will be automatically assumed and converted into an equity incentive award of Parent through the Plan Vehicle or such other arrangements on substantially the same terms and subject to the same vesting conditions as were provided to such share immediately prior to the Effective Time, to provide no less favorable economic benefits to the former holder of such share.

ii

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger.

At a meeting on December 18, 2015, the Board (other than the Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING.**

In considering the recommendation of the Special Committee and the Board, you should be aware that some of the Company's directors or executive officers have interests in the Merger that are different from, or in addition to, the interests of the shareholders generally. As of the date of this letter, Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman"), through Global Village, and Mr. Xiangdong Qi, director and president of the Company, through Young Vision, collectively beneficially own approximately [25.4]% in number and approximately [60.9]% in voting rights of the entire issued and outstanding Shares (excluding Shares owned by the Company as treasury shares and Shares reserved (but not yet allocated) by the Company for settlement upon exercise of any options). Global Village and Young Vision have agreed to vote all of the Shares they beneficially own in favor of the authorization and approval of the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger.

The accompanying proxy statement provides detailed information about the Merger and the extraordinary general meeting. We encourage you to read the entire document and all of the attachments and other documents referred to or incorporated by reference herein carefully. You may also obtain more information about the Company from documents the Company has filed with or furnished to the United States Securities and Exchange Commission (the "SEC"), which are available for free at the SEC's website www.sec.gov.

iii

Case 1:19-cv-10067-PAE Document 116-9 Filed 04/29/22 Page 6 of 23

Regardless of the number of Shares that you own, your vote is very important. The Merger cannot be consummated unless the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, are authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting (the "Company Shareholder Approval"). Given the Buyer Group's beneficial ownership in the Company as described above and assuming Global Village and Young Vision comply with their undertakings to vote, and Sequoia Capital China UR Holdings Limited ("Sequoia"), and its sole director and shareholder, Mr. Neil Nanpeng Shen, who are affiliated to one member of the Buyer Group, and Trustbridge Partners III, L.P. ("Trustbridge"), which is affiliated to another member of the Buyer Group, also vote, all of the Shares they respectively beneficially own in favor of the authorization and approval of the Merger Agreement and the Merger, based on the number of Shares expected to be issued and outstanding on _____, 2016, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"), an amount of Shares representing approximately [5.1]% of the voting rights of the entire issued and outstanding Shares as of the Share Record Date owned by shareholders and on behalf of ADS holders other than members of the Buyer Group must be voted in favor of the special resolution to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the Company will be present and voting in person or by proxy at the extraordinary general meeting.

Voting at the extraordinary general meeting will take place by poll voting, as the Chairman has undertaken to demand poll voting at the meeting. Whether or not you plan to attend the extraordinary general meeting, please complete, sign and return to the Company the accompanying proxy card, which is attached as Annex F to the accompanying proxy statement, in accordance with the instructions set forth on the proxy card, as soon as possible so that it is received by the Company no later than _____, 2016 at _____ a.m. (Beijing time), the deadline to lodge your proxy card. Each holder has one vote for each Class A ordinary share and five votes for each Class B ordinary share, in each case held as of the close of business in the Cayman Islands on the Share Record Date.

Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are held of record by a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the record holder a proxy issued in your name. If you submit a signed proxy card without indicating how you wish to vote, the Shares represented by your proxy card will be voted FOR the proposal to authorize and approve the Merger Agreement, the Plan of Merger, and the transactions contemplated thereby, including the Merger, FOR the proposal to authorize each of the members of the Special Committee, the chief executive officer of the Company, the chief financial officer of the Company and the co-chief financial officer of the Company to do all things necessary to give effect to the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the resolutions to be proposed at the extraordinary general meeting, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy will be voted (or not submitted for voting) as your proxy determines.

As the record holder of the Shares represented by ADSs, the ADS Depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions, the form of which is attached as Annex G to the accompanying proxy statement, timely received from holders of ADSs at the close of business in New York City on _____, 2016 (the "ADS Record Date"). The ADS Depositary must receive such instructions no later than 5:00 p.m. (New York City time) on _____, 2016. The ADS Depositary has advised us that, pursuant to Section 4.07 of the amended and restated deposit agreement dated as of May 19, 2014 among the Company, the ADS Depositary and the holders and beneficial owners of ADSs issued thereunder (the "Deposit Agreement"), it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Shares represented by ADSs for which no timely voting instructions are received by the ADS Depositary will not be voted. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

iv

Holders of ADSs will not be able to attend or vote at the extraordinary general meeting unless they surrender their ADSs for delivery of Shares and become registered in the Company's register of members as the holders of Shares prior to the close of business in the Cayman Islands on the Share Record Date. ADS holders who wish to surrender their ADSs need to make arrangements to deliver the ADSs to the ADS Depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of such Shares), (b) payment of the ADS cancellation fees ($5.00 for each 100 ADSs (or portion thereof)) to be cancelled pursuant to the terms of the Deposit Agreement), which will not be borne by the Surviving Company, and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the ADS Record Date and has not given, and will not give, voting instructions to the ADS Depositary as to the ADSs being surrendered, or has given voting instructions to the ADS Depositary as to the ADSs being surrendered but undertakes not to vote the corresponding Shares at the extraordinary general meeting or (ii) did not hold the ADSs as of the ADS Record Date and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or other nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to surrender the ADSs on your behalf. Upon surrender of the ADSs, the ADS Depositary will arrange for The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after the registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman Registrar of Shares, Maples Fund Services (Cayman) Limited, to issue and mail a certificate to your attention. If the Merger is not consummated, the Company will continue to be a publicly traded company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have surrendered your ADSs to attend the extraordinary general meeting and the Merger is not consummated and you wish to be able to sell your Shares on a stock exchange, you will need to deposit your Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

Shareholders who elect to dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to the accompanying proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the Merger Agreement if you do not exercise dissenters' rights with respect to your Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTERS' RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTERS' RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR DELIVERY OF SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HOLD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE 5:00 P.M. (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING. THEREAFTER, SUCH FORMER ADS HOLDERS MUST COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTERS' RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT CONSUMMATED, THE COMPANY WILL CONTINUE TO BE A PUBLICLY TRADED COMPANY IN THE UNITED STATES AND ADSs WILL CONTINUE TO BE LISTED ON THE NYSE. SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS SURRENDERED HIS, HER OR ITS ADSs TO EXERCISE DISSENTERS' RIGHTS AND THE MERGER IS NOT CONSUMMATED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WILL NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S ADS PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs ($5.00 FOR EACH 100 ADSs (OR PORTION THEREOF) ISSUED) AND APPLICABLE SHARE TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

v

**Treatment of Company Convertible Notes (Page 91)**

Each holder of Company Convertible Notes has the option to require the Surviving Company to repurchase such holder's Company Convertible Notes for a purchase price equal to 100% of the principal amount of the notes to be repurchased, plus accrued and unpaid interest, if any, through but excluding, the applicable fundamental change repurchase date as defined under the applicable Indenture Agreements (as defined below). Furthermore, after the Effective Time but prior to and including the third business day prior to the applicable fundamental change repurchase date, each holder of Company Convertible Notes will be entitled, subject to the terms and conditions of the applicable Indenture Agreements, to convert such holder's Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements plus any entitled increase in the conversion rate as determined pursuant to the applicable Indenture Agreements. After the third business day prior to the applicable fundamental change repurchase date, each holder of the Company Convertible Notes, to the extent such holder has not exercised its right to require the Surviving Company to repurchase such holder's Company Convertible Notes, will be entitled to convert such Company Convertible Notes into the right to receive an amount in cash for each $1,000 principal amount of the Company Convertible Notes held by such holder equal to the product of (a) the Per ADS Merger Consideration and (b) the Conversion Rate as defined in the applicable Indenture Agreements. As used herein, the term "Company Convertible Notes" means, collectively, the Company's 2.5% convertible senior notes due September 15, 2018 that were issued pursuant to the indenture, dated September 5, 2013, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2018 Notes Indenture"), the Company's 0.5% convertible senior notes due August 15, 2020 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2020 Notes Indenture"), and the Company's 1.75% convertible senior notes due August 15, 2021 that were issued pursuant to the indenture, dated August 6, 2014, as amended or supplemented, by and between the Company and Citicorp International Limited, as trustee (the "2021 Notes Indenture" and together with the 2018 Notes Indenture and the 2020 Notes Indenture, the "Indenture Agreements").

**Recommendation of the Special Committee and the Board (Page 41)**

A special committee of the board of directors of the Company (the "Board") composed solely of directors who are unaffiliated with any member of the Buyer Group or any member of the management of the Company (the "Special Committee") reviewed and considered the terms and conditions of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of the Company and the Company's shareholders and ADS holders, other than shareholders and ADS holders who are affiliates of the Company, including members of the Buyer Group and any other shareholders and ADS holders who will provide financing to, or hold securities of, one or more members of the Parent Parties prior to, at or after the consummation of the Merger (such shareholders and ADS holders are referred to herein as the "Unaffiliated Holders"), (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger.

The Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, other transaction documents, the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE, THE CHIEF EXECUTIVE OFFICER OF THE COMPANY, THE CHIEF FINANCIAL OFFICER OF THE COMPANY AND THE CO-CHIEF FINANCIAL OFFICER OF THE COMPANY TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER, THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING.**

5

Case 1:19-cv-10067-PAE Document 116-9 Filed 04/29/22 Page 9 of 23

**Q:** **What happens if I sell my Shares or ADSs before the extraordinary general meeting?**

**A:** The Share Record Date for voting at the extraordinary general meeting is earlier than the date of the extraordinary general meeting and the date that the Merger is expected to be consummated. If you transfer your Shares after the Share Record Date for voting but before the extraordinary general meeting, you will retain your right to vote at the extraordinary general meeting unless you have given, and not revoked, a proxy to the person to whom you transfer your Shares, but will transfer the right to receive the merger consideration to such person, so long as such person is registered as the owner of such Shares when the Merger is consummated. In such case, your vote is still very important and you are encouraged to vote.

The ADS Record Date is the close of business in New York City on _____, 2016. If you transfer your ADSs after the ADS Record Date but before the extraordinary general meeting, you will retain your right to instruct the ADS Depositary to vote at the extraordinary general meeting, but will transfer the right to receive the merger consideration to the person to whom you transfer your ADSs, so long as such person owns such ADSs when the Merger is consummated.

**Q:** **Am I entitled to dissenters' rights?**

**A:** Shareholders who dissent from the Merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the Merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the Merger is taken at the extraordinary general meeting, a written objection to the Merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenters' rights, a copy of which is attached as Annex D to this proxy statement. The fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise dissenters' rights with respect to their Shares.

ADS holders will not have the right to exercise dissenters' rights and receive payment of the fair value of the Shares underlying their ADSs. The ADS Depositary will not exercise or attempt to exercise any dissenters' rights with respect to any of the Shares that it holds, even if an ADS holder requests the ADS Depositary to do so. ADS holders wishing to exercise dissenters' rights must surrender their ADSs to the ADS Depositary for delivery of Shares, pay the ADS Depositary's fees required for the cancellation of their ADSs, provide instructions for the registration of the corresponding Shares in the Company's register of members, and certify that they hold the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions as to their ADS before 5:00 p.m. (New York City time) on _____, 2016, and become registered holders of Shares before the vote to authorize and approve the Merger is taken at the extraordinary general meeting. Thereafter, such former ADS holders must comply with the procedures and requirements for exercising dissenters' rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law. If the Merger is not consummated, the Company will continue to be a public company in the United States and ADSs will continue to be listed on the NYSE. Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if a former ADS holder has surrendered his, her or its ADSs to exercise dissenters' rights and the Merger is not consummated and such former ADS holder wishes to be able to sell his, her or its Shares on a stock exchange, such former ADS holder will need to deposit his, her or its Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable Share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

We encourage you to read the section of this proxy statement entitled "Dissenters' Rights" beginning on page 111 as well as "Annex D— Cayman Islands Companies Law Cap. 22 (Law 3 of 1961, as consolidated and revised)—Section 238" to this proxy statement carefully and to consult your own Cayman Islands legal counsel if you desire to exercise your dissenters' rights.

27

**Q:     What do I need to do now?**

A:      We urge you to read this proxy statement carefully, including its annexes, exhibits, attachments and the other documents referred to or incorporated by reference herein and to consider how the Merger affects you as a shareholder. After you have done so, please vote as soon as possible.

**Q:     Will any proxy solicitors be used in connection with the extraordinary general meeting?**

A:      We have not retained a third-party service provider to assist in the solicitation process. We will ask banks, brokers and other custodians, nominees and fiduciaries to forward our proxy solicitation materials to the beneficial owners of Shares or ADSs held of record by such nominee holders. We will reimburse these nominee holders for their customary clerical and mailing expenses incurred in forwarding the proxy solicitation materials to the beneficial owners and in obtaining voting instructions from those owners. In addition, proxies may be solicited by mail, in person, by telephone, by internet or by facsimile by certain of our officers, directors and employees. These persons will receive no additional compensation for solicitation of proxies but may be reimbursed for reasonable out-of-pocket expenses. We will pay all expenses of filing, printing and mailing this proxy statement.

**Q:     Who can help answer my questions?**

A:      If you have any questions about the Merger or if you need additional copies of this proxy statement or the accompanying proxy card, you should contact the Company by calling +86 10-5878-1574 or emailing to ir@360.cn.

    *In order for you to receive timely delivery of any additional copy of this proxy statement or the accompanying proxy card in advance of the extraordinary general meeting, you must make your request no later than ten days prior to the date of the extraordinary general meeting.*

---

28

**SPECIAL FACTORS**

**Background of the Merger**

*Events leading to the execution of the Merger Agreement described in this Background of the Merger occurred primarily in the PRC or Hong Kong. As a result, all dates and times referenced in this Background of the Merger refer to China Standard Time.*

The Board and senior management of the Company periodically review the Company's long-term strategic plans with the goal of maximizing shareholder value. As part of this ongoing process, the Board and senior management of the Company have, from time to time, considered strategic alternatives that may be available to the Company.

From time to time, a number of parties have approached Mr. Hongyi Zhou, chairman and chief executive officer of the Company (the "Chairman") about possible transactions involving the Company. In early May 2015, the Chairman discussed separately with representatives of Golden Brick Capital Private Equity Fund I L.P. ("Golden Brick") and China Renaissance Holdings Limited regarding current market conditions and possible transactions involving the Company, including an acquisition of the Company.

Between late-May 2015 and mid-June 2015, the Chairman had discussions with Mr. Xiangdong Qi, co-founder and a director and president of the Company, representatives of CITIC Securities Co. Ltd. ("CITIC Securities") and Mr. Neil Nanpeng Shen, a director of the Company and founding managing partner of Sequoia Capital China, regarding the possibility of acquiring the Company. The discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in the PRC, the Company's long term strategic plans, and the structure, timetable, pros and cons of a potential acquisition of the Company.

On June 17, 2015, the Board received a preliminary non-binding proposal letter from the Chairman, CITIC Securities, Golden Brick, China Renaissance and Sequoia Capital China, to acquire all of the outstanding Class A and Class B ordinary shares of the Company not owned by them or their affiliates (collectively, the "Initial Consortium Members"), including Class A ordinary shares represented by American depositary shares (the "ADSs", each two representing three Class A ordinary shares), for $51.33 in cash per Class A or Class B ordinary share, or $77.00 in cash per ADS (the "Proposal"). In the Proposal, the Initial Consortium Members stated, among things, that they were not interested in selling their shares in any other transaction involving the Company.

On the same day, the Company issued a press release regarding its receipt of the Proposal and the transaction proposed therein, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

On June 19, 2015, the Board formed the Special Committee, being comprised of three independent, disinterested directors of the Company, Dr. Eric Chen, Dr. Ming Huang and Dr. Jianwen Liao, to consider the Proposal. The Board appointed Dr. Eric Chen as the chairman of the Special Committee after considering Dr. Chen's background and expertise such as his work experience with a renowned investment fund, technology sector companies and an investment bank.

On the same day, by way of unanimous written resolutions of the directors, the Board granted to the Special Committee the power to (i) make such investigation of the Proposal, the proposed transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate; (ii) evaluate the terms of the Proposal; (iii) discuss and negotiate with the Buyer Group and their representatives any terms of the proposed transaction and implement the proposed transaction as the Special Committee deems appropriate; (iv) explore any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company; (v) negotiate definitive agreements, if and when appropriate, with respect to the proposed transaction or any alternative transaction, the execution and delivery of any such agreement being subject, however, to the approval of the Board; (vi) report to the Board the recommendations and conclusions of the Special Committee with respect to the proposed transaction and/or any alternative transaction and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board; (vii) if and when appropriate at its sole discretion, adopt defensive measures with respect to unsolicited proposals for an alternative transaction; and (viii) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsels, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate to assist the Special Committee in discharging its responsibilities.

29

Shortly after being formed, the Special Committee considered the credentials of several prospective U.S. legal counsels, and noted that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") had extensive experience in advising on going-private transactions and did not have any conflict of interest with respect to representing the Special Committee. The Special Committee then decided to retain Skadden to act as its U.S. legal counsel in connection with the proposed transaction.

Later on June 19, 2015, the Company issued a press release regarding the formation of the Special Committee and the Special Committee's decision to retain Skadden as its U.S. legal counsel, and furnished the press release to the SEC as an exhibit to its current report on Form 6-K.

On June 19, 2015, the Buyer Group decided to retain Huatai United Securities Co., Ltd. ("Huatai") as its financial advisor in connection with the proposed transaction, primarily because of Huatai's knowledge of and expertise in the TMT (technology, media and telecom) sector in China, as well as its reputation and experience in providing financial advice in mergers and acquisitions transactions.

Between June 19, 2015 and June 25, 2015, Dr. Eric Chen, as authorized by and on behalf of the Special Committee, invited and interviewed several investment banks to act as the financial advisor to the Special Committee.

On June 25, 2015, after reviewing the qualifications, experience and other characteristics of each potential financial advisor and considering the extensive experience of J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") in representing special committees in going-private transactions, its strong reputation and its significant experience in working with China-based companies, the Special Committee decided, through unanimous written resolutions, to retain J.P. Morgan as its financial advisor in connection with the review and evaluation of the Proposal. The Special Committee noted that J.P. Morgan had a prior relationship with one of the Initial Consortium Members, CITIC Securities, in providing corporate finance and treasury services to CITIC Securities and had a less-than-1% common equity ownership in CITIC Securities at the time. The Special Committee noted that the amount of service fees J.P. Morgan received for such services was small and J.P. Morgan only held a very small percentage of equity interest in one of the five Initial Consortium Members. Further, the Special Committee noted that, as a full service investment banking firm, J.P. Morgan provides various services out of separate divisions and that J.P. Morgan 's proposed senior deal team members were not providing, and had not provided, services to CITIC Securities or other Initial Consortium Members. As a result, the Special Committee determined that such relationship did not create a conflict of interest with respect to assisting the Special Committee in its review and evaluation of the Proposal and the transactions contemplated thereby.

On June 25, 2015, through unanimous written resolutions, the Special Committee decided to retain Maples and Calder ("Maples"), which the Special Committee noted had significant experience in advising on going-private transactions, to act as its Cayman Islands legal counsel in connection with the proposed transaction, and ratified and affirmed its engagement of Skadden as its U.S. legal counsel in connection with the proposed transaction.

On June 25, 2015, the Special Committee convened its first meeting by telephone. During the meeting, a representative of Maples first provided a summary of the directors' fiduciary duties under the laws of the Cayman Islands and best practices in the context of a going-private transaction. Representatives of Skadden then provided a summary of going-private considerations and the purposes and roles of the Special Committee, and discussed best practices for the Special Committee as well as the Company's management. The Special Committee raised questions and discussed a few key issues relating to its fiduciary duties and U.S. securities law disclosure requirements and also sought advice from the advisors on the communication protocol between the Special Committee and the Buyer Group. The Special Committee then instructed the advisors to advise the Company's management of the communication protocol between the Company and the Buyer Group, the best practices and the role of management in the context of a going-private transaction. Thereafter, representatives of J.P. Morgan provided a summary of the general process of a going-private transaction and an indicative timetable for the proposed transaction, as well as a summary of the financial advisor's role in assisting the Special Committee in its work. At the same meeting, the Special Committee also discussed with J.P. Morgan and Skadden negotiation strategies and certain key issues frequently negotiated in going-private transactions, including the pros and cons of conducting a market check before entering into the definitive agreements. After deliberation, the Special Committee decided that it would revisit the issue of a pre-signing market check once the financial advisor had progressed its financial analyses. The Special Committee instructed J.P. Morgan to contact the Buyer Group on behalf of the Special Committee to establish communication protocols and obtain further information regarding the Buyer Group's due diligence requirements, financing plan and plan regarding the composition of the Buyer Group. The Special Committee then instructed Skadden, on behalf of the Company, to prepare a draft confidentiality agreement and negotiate it with the Buyer Group in anticipation of the Buyer Group's request to conduct due diligence on the Company.

30

Case 1:19-cv-10067-RAE    Document 116-9    Filed 04/29/22    Page 13 of 23

**Reasons for the Merger and Recommendation of the Special Committee and the Board**

The Special Committee and the Board believe that, as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance.

In addition, as an SEC-reporting company, the Company's management and accounting staff, which comprise a relatively small number of individuals, must devote significant time to SEC reporting and compliance. The Company is also required to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and would not be disclosed by a non-reporting company. As a result, its actual or potential competitors, customers, lenders and vendors all have ready access to such information, which potentially may help them compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

Subsequent to the completion of the Merger, the Company will no longer be subject to the Exchange Act and NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses. The Company estimates that such costs and expenses currently amount to approximately $4.0 million to $4.5 million per year, including legal and compliance expenses, audit fees and financial printer and other expenses.

At a meeting on December 18, 2015, the Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of, the Company and its Unaffiliated Holders, (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger.

At a meeting on December 18, 2015, the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, (b) authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

In the course of reaching their respective determinations, the Special Committee and the Board considered the following substantive factors and potential benefits of the Merger, each of which the Special Committee and the Board believe supported their respective decisions to recommend the Merger Agreement and that the Merger is substantively fair to the Unaffiliated Holders. These factors and potential benefits, which are not listed in any relative order of importance, are discussed below:

- the current and historical market prices of ADSs, and the fact that the Per Share Merger Consideration of US$51.33 and the Per ADS Merger Consideration of US$77.00 offered to the Unaffiliated Holders implies a 16.6% premium over the Company's closing price of US$66.05 per ADS on June 16, 2015, the last full trading day prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its announcement of its receipt of a going-private proposal;

- the lowest closing price of the Company's ADSs was $42.21 during the 52-week period prior to December 18, 2015, the date that the Company announced the execution of the Merger Agreement;

41

- the increased costs of regulatory compliance for public companies;

- the recognition that, as an SEC-reporting company, the Company's management and accounting staff, which comprise a relatively small number of individuals, must devote significant time to SEC reporting and compliance;

- the recognition that, as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance. Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii) monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics.

- the recognition that, as an SEC-reporting company, the Company is required to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and would not be disclosed by a non-reporting company and which potentially may help its actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be;

- the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account (i) the likelihood of being consummated, given the size of and required funding for any potential alternative transaction, the percentage ownership held by the Buyer Group and their express statement regarding their unwillingness to sell their shares in any other transaction involving the Company, and general timing consideration, (ii) the business, competitive, industry and market risks, (iii) the likely impact of the PRC anti-monopoly law on the viability of potential alternatives, and (iv) the absence of any proposals made by any unsolicited potential buyers since the announcement of the proposed transaction on June 17, 2015.

- the fact that the consideration payable in the Merger is entirely in cash, which will allow the Unaffiliated Holders to immediately realize liquidity for their investment and provide them with certainty of the value of their Shares or ADSs;

- the possibility that it could take a considerable period of time before the trading price of the ADSs would reach and sustain at least the per ADS Merger consideration of US$77.00, as adjusted for present value, and the possibility that such value might never be obtained;

- the negotiations with respect to the Per Share Merger Consideration and Per ADS Merger Consideration and the Special Committee's determination that, following extensive negotiations with the Buyer Group, US$51.33 per Share and US$77.00 per ADS was the highest price that the Buyer Group would agree to pay, with the Special Committee basing its belief on a number of factors, including the duration and tenor of negotiations and the experience of the Special Committee and its advisors;

- the likelihood that the Merger would be consummated based on, among other things (not in any relative order of importance):

  - the fact that the Parent Parties had obtained the debt and equity financings necessary to complete the Merger, the conditions to the financing and the due diligence on the creditworthiness of the financing sources;

  - the absence of a financing condition in the Merger Agreement;

  - the likelihood and anticipated timing of consummating the Merger in light of the scope of the conditions to closing; and

  - the Company's ability, as set out in the Merger Agreement, the Equity Commitment Letters and the Escrow Agreements, to seek specific performance to prevent breaches of such agreements and to enforce specifically the terms of such agreements,

- the fact that the Merger Agreement provides that, in the event of a failure of the Merger to be consummated under certain circumstances, Parent will pay the Company a termination fee of approximately RMB2.88 billion, the guarantee of such payment obligation by members of the Buyer Group pursuant to the Limited Guarantees and a back-to-back limited guarantee provided by Global Village, a holding vehicle for Mr. Hongyi Zhou of Shares (see "The Merger Agreement—Termination Fee" beginning on page 107 and "Special Factors—Limited Guarantees; Global Village Guarantee" beginning on page 71);

- the Company's access to the escrow arrangement, pursuant to which each of the Equity Investors agreed to deposit 3% of their respective equity contributions with Parent as earnest money, which will be applied towards the payment to the Company by Parent of the termination fee that may become due and payable pursuant to the terms of the Merger Agreement, and/or the payment of certain of such Equity Investor's obligations under its Equity Commitment Letter and Limited Guarantee;

Case 1:19-cv-10067-RAE   Document 116-9   Filed 04/29/22   Page 15 of 23

42

Case 1:19-cv-10067-RAE    Document 116-9    Filed 04/29/22    Page 16 of 23

- the belief of the Special Committee that the reduced termination fee in an amount of RMB641 million payable by the Company as a result of the Company's entry into an agreement in connection with a Superior Proposal received during the go-shop period would not likely discourage a proposal for a competing transaction from an interested bidder considering a transaction with the Company at a higher price;

- the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion (see "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information); and

- since the announcement of the proposed transaction on June 17, 2015 and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group had contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company.

In addition, the Special Committee and the Board believed that sufficient procedural safeguards were and are present to ensure that the Merger is procedurally fair to the Unaffiliated Holders and to permit the Special Committee and the Board to represent effectively the interests of such Unaffiliated Holders, which procedural safeguards include the following, which are not listed in any relative order of importance:

- the consideration and negotiation of the Merger Agreement was conducted entirely under the control and supervision of the Special Committee, which consists of three independent directors, each of whom is an outside, non-employee director, and that no limitations were placed on the Special Committee's authority;

- in considering the transaction with the Buyer Group, the Special Committee acted solely to represent the interests of the Unaffiliated Holders, and the Special Committee had independent control of the extensive negotiations with the Buyer Group and its advisors on behalf of the Unaffiliated Holders;

- all of the members of Special Committee during the entire process were and are independent directors and free from any affiliation with the Buyer Group; in addition, none of the members of the Special Committee is or ever was an employee of the Company or any of its subsidiaries or affiliates and none of such members has any financial interest in the Merger that is different from that of the Unaffiliated Holders other than the members' receipt of Board and Special Committee compensation (which is not contingent upon the consummation of the Merger or the Special Committee's or the Board's recommendation of the Merger) and their indemnification and liability insurance rights under the Merger Agreement;

- the Special Committee was assisted in negotiations with the Buyer Group and in its evaluation of the Merger by J.P. Morgan as its financial advisor and Skadden, Maples and Jun He as its legal advisors;

- the Special Committee was empowered to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group in connection with the proposed transaction from the date the Special Committee was established, and no evaluation, negotiation or response regarding the proposed transaction in connection therewith from that date forward was considered by the Board for approval until the Special Committee had recommended such action to the Board;

- the terms and conditions of the Merger Agreement were the product of extensive negotiations between the Special Committee and its advisors, on the one hand, and the Buyer Group and its advisors, on the other hand;

- the Special Committee was empowered to exercise the full power and authority of the Board in connection with the proposed transaction and related process;

43

The Buyer Group did not consider the Company's net book value, which is an accounting concept based on historical costs, as a factor because it believed that net book value is not a material indicator of the Company's value as a going concern but rather is indicative of historical costs. The Buyer Group notes, however, that the Per Share Merger Consideration of $51.33 is higher than the Company's net book value per Share as of [June 30, 2015], which was $[6.44] based on 189,757,657 issued and outstanding Shares as of that date.

In its consideration of the fairness of the Merger, the Buyer Group did not undertake an appraisal of the assets of the Company to determine the Company's liquidation value for the Unaffiliated Holders due to the impracticability of determining a liquidation value given the significant execution risk involved in any breakup. In addition, the Buyer Group did not consider the Company's liquidation value to be a relevant valuation method because they consider the Company to be a viable going concern where value is derived from cash flows generated from its continuing operations, and because the Company will continue to operate its business following the Merger. Moreover, the Buyer Group believes that the value of the Company's assets that might be realized in a liquidation would be significantly less than its going-concern value.

The Buyer Group did not seek to establish a pre-Merger going concern value for the Company's Shares and ADSs to determine the fairness of the Merger Consideration to the Unaffiliated Holders because following the Merger the Company will have a significantly different capital structure. However, to the extent the pre-Merger going concern value was reflected in the pre-announcement price of the ADSs, the Merger Consideration represented a premium to the going concern value of the Company.

The Buyer Group was not aware of, and thus did not consider in their fairness determination, any offers or proposals made by any unaffiliated third parties with respect to (a) a merger or consolidation of the Company with or into another company, (b) a sale of all or a substantial part of the Company's assets or (c) the purchase of the Company's voting securities that would enable the holder to exercise control over the Company. Except as otherwise disclosed in this proxy statement, the members of the Buyer Group did not make any purchases of securities of the Company during the past two years, and so did not consider any such purchases in their fairness determination.

The Buyer Group did not adopt the financial analyses and opinion of J.P. Morgan as its own in reaching its determination as to the fairness of the Merger and other transactions contemplated by the Merger Agreement, the Plan of Merger and the other transaction documents because, while the Buyer Group noted J.P. Morgan's opinion and considered it as a supporting factor in its determination regarding the fairness of the Merger in light of (among other things) J.P. Morgan's general reputation and experience, the Buyer Group did not engage J.P. Morgan, evaluate its credentials or investigate or evaluate the basis, process and quality of J.P. Morgan's financial analysis and opinion, and as a result the Buyer Group believes it is not in a position to formally adopt J.P. Morgan's financial analyses and opinion.

The foregoing discussion of the information and factors considered and given weight by the Buyer Group in connection with its evaluation of the substantive and procedural fairness of the Merger to the Unaffiliated Holders is not intended to be exhaustive, but is believed to include all material factors considered. The Buyer Group found it impracticable to assign, and did not assign, relative weights to the foregoing factors considered in reaching its conclusions as to the substantive and procedural fairness of the Merger to the Unaffiliated Holders. Rather, the Buyer Group made the fairness determinations after considering all of the foregoing factors as a whole.

The Buyer Group believes these factors provide a reasonable basis for its belief that the Merger is both substantively and procedurally fair to the Unaffiliated Holders. This belief, however, is not intended to be and should not be construed as a recommendation by the Buyer Group to any shareholder or ADS holder of the Company to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger. The Buyer Group does not make any recommendation as to how such shareholders or ADS holders should vote relating to the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, at the extraordinary general meeting.

**Certain Financial Projections**

The Company does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of the Company has prepared the prospective financial information set forth below for the fiscal year ended December 31, 2015 through the fiscal year ending December 31, 2025 for internal use, which was approved by the Special Committee for use by the Special Committee's financial advisor in connection with their financial analyses related to the Merger and opinion provided to the Special Committee. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Company's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of the Company. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this document are cautioned not to place undue reliance on the prospective financial information.

51

The financial projections are not a guarantee of performance. In compiling the projections, the Company's management took into account historical performance, combined with estimates regarding revenues, gross profit, EBIT, EBITDA, net income and capital expenditure. Although the projections are presented with numerical specificity, they were based on numerous assumptions and estimates as to future events made by the Company's management that the management believed were reasonable at the time the projections were prepared. This information is not, however, fact and should not be relied upon as being necessarily indicative of actual future results. In addition, factors such as industry performance, the market for the Company's existing and new products, the competitive environment, expectations regarding future acquisitions or any other transaction and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of the management, may cause actual future results to differ materially from the results forecasted in these financial projections. In addition, the projections do not take into account any circumstances or events occurring after the date that they were prepared. For instance, the projections do not give effect to the Merger or any changes to the Company's operations or strategy that may be implemented after the time the projections were prepared. We cannot assure you that the projections will be realized or that actual results will not be significantly different from those contained in the projections.

Neither the Company's independent auditors, nor any other independent accountants, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information. The Company's independent auditor's report accompanying the Company's audited consolidated financial statements included in the Company's annual report on Form 20-F for the year ended December 31, 2014 incorporated by reference in this proxy statement refers exclusively to the Company's historical financial statements and does not cover any other information in this proxy statement and should not be read to do so. The financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the Special Committee's financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal for his, her or its Shares pursuant to Section 238 of the Cayman Islands Companies Law.

The following table sets forth the financial projections prepared by the Company's management and considered by the Special Committee and its financial advisor in connection with their analysis of the Merger:

### Management Projections
#### Fiscal Year Ended December 31,

|  | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | ($ in millions, non-GAAP*) |  |  |  |  |  |  |  |
| **Total revenue** | 1,806 | 3,630 | 4,819 | 6,255 | 7,657 | 8,948 | 9,646 | 10,143 | 10,543 | 10,890 | 11,221 |
| Growth % | 29.9% | 101.0% | 32.7% | 29.8% | 22.4% | 16.9% | 7.8% | 5.2% | 3.9% | 3.3% | 3.0% |
| Traditional business[1] | 1,658 | 2,002 | 2,417 | 2,898 | 3,360 | 3,851 | 4,088 | 4,234 | 4,361 | 4,473 | 4,593 |
| *As % of total revenue* | *91.8%* | *55.1%* | *50.1%* | *46.3%* | *43.9%* | *43.0%* | *42.4%* | *41.7%* | *41.4%* | *41.1%* | *40.9%* |
| Emerging business[2] | 148 | 1,628 | 2,403 | 3,357 | 4,297 | 5,097 | 5,559 | 5,909 | 6,182 | 6,417 | 6,627 |
| *As % of total revenue* | *8.2%* | *44.9%* | *49.9%* | *53.7%* | *56.1%* | *57.0%* | *57.6%* | *58.3%* | *58.6%* | *58.9%* | *59.1%* |
| **Gross profit** | 1,437 | 2,089 | 2,726 | 3,587 | 4,357 | 5,056 | 5,422 | 5,671 | 5,876 | 6,055 | 6,231 |
| *Margin %* | *79.6%* | *57.5%* | *56.6%* | *57.3%* | *56.9%* | *56.5%* | *56.2%* | *55.9%* | *55.7%* | *55.6%* | *55.5%* |
| Traditional business[1] | 1,386 | 1,666 | 2,006 | 2,406 | 2,789 | 3,196 | 3,393 | 3,514 | 3,619 | 3,713 | 3,812 |
| *Margin %* | *83.6%* | *83.2%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* | *83.0%* |
| Emerging business[2] | 51 | 423 | 721 | 1,182 | 1,568 | 1,860 | 2,029 | 2,157 | 2,256 | 2,342 | 2,419 |
| *Margin %* | *34.5%* | *26.0%* | *30.0%* | *35.2%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* | *36.5%* |
| Selling and marketing expenses | (387) | (575) | (687) | (844) | (1,012) | (1,168) | (1,248) | (1,306) | (1,353) | (1,395) | (1,436) |
| *As % of revenue* | *(21.4)%* | *(15.8)%* | *(14.3)%* | *(13.5)%* | *(13.2)%* | *(13.1)%* | *(12.9)%* | *(12.9)%* | *(12.8)%* | *(12.8)%* | *(12.8)%* |
| General and administrative expenses | (98) | (200) | (255) | (305) | (371) | (433) | (457) | (480) | (499) | (515) | (530) |
| *As % of revenue* | *(5.4)%* | *(5.5)%* | *(5.3)%* | *(4.9)%* | *(4.9)%* | *(4.8)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* | *(4.7)%* |
| Product development costs | (523) | (798) | (945) | (1,189) | (1,437) | (1,663) | (1,786) | (1,871) | (1,940) | (2,001) | (2,060) |
| *As % of revenue* | *(28.9)%* | *(22.0)%* | *(19.6)%* | *(19.0)%* | *(18.8)%* | *(18.6)%* | *(18.5)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* | *(18.4)%* |
| Subsidy income | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **EBIT** | 440 | 527 | 848 | 1,260 | 1,546 | 1,802 | 1,941 | 2,024 | 2,093 | 2,154 | 2,215 |
| *Margin %* | *24.4%* | *14.5%* | *17.6%* | *20.1%* | *20.2%* | *20.1%* | *20.1%* | *20.0%* | *19.9%* | *19.8%* | *19.7%* |
| **EBITDA** | 544 | 667 | 1,046 | 1,680 | 1,996 | 2,282 | 2,433 | 2,528 | 2,609 | 2,682 | 2,755 |
| *Margin %* | *30.1%* | *18.4%* | *21.7%* | *26.9%* | *26.1%* | *25.5%* | *25.2%* | *24.9%* | *24.8%* | *24.6%* | *24.6%* |
| **Net income** | 414 | 490 | 758 | 1,100 | 1,346 | 1,573 | 1,702 | 1,792 | 1,878 | 1,958 | 2,040 |
| *Margin %* | *22.9%* | *13.5%* | *15.7%* | *17.6%* | *17.6%* | *17.6%* | *17.6%* | *17.7%* | *17.8%* | *18.0%* | *18.2%* |
| Capital expenditure | 200 | 500 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| *As % of revenue* | *11.1%* | *13.8%* | *12.5%* | *9.6%* | *7.8%* | *6.7%* | *6.2%* | *5.9%* | *5.7%* | *5.5%* | *5.3%* |

52

Case 1:19-cv-10067-RAE    Document 116-9    Filed 04/29/22    Page 19 of 23

The Buyer Group believes the operating environment has become more challenging due to recent operating conditions and industry trends. There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

Further, as a privately held company, the Company will be relieved of many of the expenses, burdens and constraints imposed on companies that are subject to the public reporting requirements under the U.S. federal securities laws, including the Exchange Act and the Sarbanes-Oxley Act of 2002. In particular, the Buyer Group believes that as a privately held company, the Company would no longer be subject to (i) the increased costs of regulatory compliance as an SEC reporting company and (ii) the requirement to disclose a considerable amount of business information to the public, some of which would otherwise be considered competitively sensitive and may potentially help the Company's actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger.

### *The Company*

The Company's purpose for engaging in the Merger is to enable its shareholders to receive $51.33 per Share and its ADS holders to receive $77.00 per ADS in cash, without interest and net of any applicable withholding taxes, which represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a "going-private" proposal. The Company has determined to undertake the Merger at this time based on the analyses, determinations and conclusions of the Special Committee and the Board described in detail under the caption"—Reasons for the Merger and Recommendation of the Special Committee and the Board."

### Effects of the Merger on the Company

### Private Ownership

ADSs representing Shares are currently listed on the NYSE under the symbol "QIHU." It is expected that, following the consummation of the Merger, the Company will cease to be a publicly traded company and will instead become a private company beneficially owned by the Buyer Group. Following the consummation of the Merger, ADSs will no longer be listed on any securities exchange or quotation system, including the NYSE, and price quotations with respect to sales of the ADSs in the public market will no longer be available. In addition, registration of Shares under the Exchange Act may be terminated upon the Company's application to the SEC if Shares are not listed on a national securities exchange and there are fewer than 300 record holders of Shares. Ninety days after the filing of Form 15 in connection with the consummation of the Merger or such shorter period as may be determined by the SEC, registration of Shares under the Exchange Act will be terminated and the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. The costs of complying with the United States federal securities laws, including the Sarbanes-Oxley Act of 2002, totaled approximately $1.7 million and $2.3 million for the years ended December 31, 2013 and December 31, 2014, respectively. After the consummation of the Merger, the Company's shareholders will no longer enjoy the rights or protections that the U.S. federal securities laws provide, including reporting obligations for directors, officers and principal securities holders of the Company. Furthermore, following the consummation of the Merger, the ADS program for the Shares will terminate.

59

**Plans for the Company after the Merger**

Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets. However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange, as well as any actions to address the challenges referred to in "Special Factors—Purposes of and Reasons for the Merger" above, in each case, which they consider to be in the best interests of the Surviving Company and its shareholders. The Buyer Group expressly reserves the right to make any changes they deem appropriate to the operation of the Surviving Company in light of such evaluation and review as well as any future developments.

Subsequent to the consummation of the Merger, the Company will no longer be subject to the Exchange Act and the NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses.

**Alternatives to the Merger**

The Board did not independently determine to initiate a process for the sale of the Company. The Special Committee was formed on June 19, 2015 in response to the receipt of the proposal letter from the Buyer Group on June 17, 2015. In light of (i) the Buyer Group's beneficial ownership of approximately [26.7]% in number and [61.6]% in voting rights of the entire issued and outstanding Shares excluding treasury shares, which consisted of ordinary shares repurchased but un-cancelled and ordinary shares reserved for future issuance upon exercise of vested Company Options (as of the date of this proxy statement) and (ii) the fact that, since the announcement of the proposed transaction and prior to the entry into the Merger Agreement, no party other than the members of the Buyer Group has contacted the Company or the Special Committee expressing an interest in exploring an alternative transaction with the Company, the Special Committee determined that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group.

The Special Committee also took into account that, subject to compliance with the terms and conditions of the Merger Agreement, (i) the Company has the ability to actively solicit bids from any third party for a period of 45 days after the signing of the Merger Agreement, (ii) prior to the receipt of the Company Shareholder Approval of the Merger, the Board (upon recommendation of the Special Committee) is permitted to effect a Company Adverse Recommendation Change (as defined in the section entitled "The Merger Agreement—No Company Adverse Recommendation Change") with respect to an alternative acquisition proposal that is not withdrawn and the Board (upon recommendation of the Special Committee) concludes in good faith constitutes a Superior Proposal, and (iii) prior to the receipt of the Company Shareholder Approval, can terminate the Merger Agreement in order to enter into an agreement in connection with an alternative transaction proposed by a third party that is a Superior Proposal, subject to the payment of a termination fee of approximately RMB1.44 billion, which amount is reduced to RMB641 million if the Merger Agreement is terminated by the Company in connection with an Acquisition Proposal received by the Company during the Go-Shop Period, in each case as provided in the Merger Agreement. In this regard, the Special Committee recognized that it has flexibility under the Merger Agreement to respond to an alternative transaction proposed by a third party that is or is reasonably likely to result in a Superior Proposal, including the ability to provide information to and engage in discussions and negotiations with such party (and, if such proposal is a Superior Proposal, recommend such proposal to the Company's shareholders).

In addition, the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market.

66

During the go-shop period as provided under the Merger Agreement, J.P. Morgan, on behalf of the Special Committee, contacted three selected potential strategic bidders. None of the three contacted parties expressed an interest in exploring an alternative transaction with the Company. No one approached the Special Committee separately from the Company's solicitation of Acquisition Proposals during the go-shop period.

**Effects on the Company if the Merger Is Not Consummated**

If the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are not authorized and approved by the shareholders of the Company or if the Merger is not consummated for any other reason, the shareholders or ADS holders of the Company will not receive any payment for their Shares or ADSs, as applicable, in connection with the Merger, nor will the holders of any Vested Company Options receive any payment pursuant to the Merger Agreement, nor will any unvested Company Options or Company Restricted Shares be assumed and converted into equity incentive awards of Parent. Instead, the Company will remain a publicly traded company, the ADSs will continue to be listed and traded on the NYSE, provided that the Company continues to meet the NYSE's listing requirements, and the Company will remain subject to SEC reporting obligations. Therefore, the Company's shareholders and ADS holders will continue to be subject to similar risks and opportunities as they currently are with respect to their ownership of the Shares or ADSs. Accordingly, if the Merger is not consummated, we cannot assure you as to the effect of these risks and opportunities on the future value of the Shares or ADSs, including the risk that the market price of the ADSs may decline to the extent that the current market price reflects a market assumption that the Merger will be consummated.

Under specified circumstances, the Company may be required to pay Parent or its designees a termination fee of approximately RMB1.44 billion (which amount is reduced to RMB641 million if such circumstances are in connection with an Acquisition or Parent may be required to pay a designee of the Company a termination fee of approximately RMB2.88 billion, in each case as described in the section entitled "The Merger Agreement—Termination Fee" beginning on page 107.

If the Merger is not consummated, the Board will, from time to time, evaluate and review, among other things, the business, operations, dividend policy and capitalization of the Company and make such changes as are deemed appropriate, and continue to seek to identify strategic alternatives to enhance shareholder value. If the Merger Agreement is not approved by the shareholders or if the Merger is not consummated for any other reason, we cannot assure you that any other transaction acceptable to the Company will be offered, or that the business, prospects or results of operations of the Company will not be adversely impacted.

**Financing of the Merger**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the Merger and the related transactions, including payment of fees and expenses in connection with the Merger, is anticipated to be approximately $[9.4] billion, assuming no exercise of Dissenter Rights by shareholders of the Company. In calculating this amount, the Company and the Buyer Group did not consider the value of the Founder Shares or Shares owned by (or represented by ADSs which are owned by) any Parent Party or the Company (as treasury shares, if any) and Shares (including Shares represented by ADSs) reserved (but not yet allocated) by the Company for settlement upon exercise of any Company Options or by any direct or indirect wholly owned Subsidiary of any Parent Party or the Company, which will be cancelled for no consideration.

The Buyer Group expects to provide this amount through a combination of (a) cash contributions from the Equity Investors as defined in and pursuant to the Equity Commitment Letters, and (b) the proceeds from a committed term loan facility in an amount up to the RMB equivalent of $3.0 billion and a bridge loan facility of up to the RMB equivalent of $400 million, pursuant to certain debt commitment letters dated December 18, 2015 provided by China Merchants Bank Co., Ltd. Other than the financing arrangements detailed below, the Buyer Group does not have alternative financial arrangements or alternative financing plans in the event such arrangements are not available.

67

Case 1:19-cv-10067-RAE    Document 116-9    Filed 04/29/22    Page 22 of 23

**DISSENTER RIGHTS**

The following is a brief summary of the rights of holders of the Shares to dissent from the Merger and receive payment of the fair value of their Shares ("Dissenter Rights"). This summary is not a complete statement of the law, and is qualified in its entirety by the complete text of Section 238 of the Cayman Islands Companies Law, a copy of which is attached as Annex D to this proxy statement. If you are contemplating the possibility of dissenting from the Merger, you should carefully review the text of Annex D, particularly the procedural steps required to perfect your Dissenter Rights. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenter Rights.

**Requirements for Exercising Dissenter Rights**

A Dissenting Shareholder is entitled to payment of the fair value of its, his or her Shares upon dissenting from the Merger in accordance with Section 238 of the Cayman Islands Companies Law.

The valid exercise of your Dissenter Rights will preclude the exercise of any other rights by virtue of holding Shares in connection with the Merger, other than the right to participate fully in proceedings to determine the fair value of Shares held by you and to seek relief on the grounds that the Merger is void or unlawful. To exercise your Dissenter Rights, the following procedures must be followed:

- You must give written notice of objection ("Notice of Objection") to the Company prior to the vote to authorize and approve the Merger. The Notice of Objection must include a statement that you propose to demand payment for your Shares if the Merger is authorized by the vote at the extraordinary general meeting.

- Within 20 days immediately following the date on which the vote authorizing the Merger is made, the Company must give written notice of the authorization ("Authorization Notice") to all Dissenting Shareholders who have served a Notice of Objection.

- Within 20 days immediately following the date on which the Authorization Notice is given (the "Dissent Period"), any Dissenting Shareholder who elects to dissent must give a written notice of its, his or her decision to dissent (a "Notice of Dissent") to the Company stating its, his or her name and address and the number and class of the Shares with respect to which it, he or she dissents and demanding payment of the fair value of its, his or her Shares. A Dissenting Shareholder who dissents must do so in respect of all the Shares which it, he or she holds. Upon giving of the Notice of Dissent, the Dissenting Shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of its, his or her Shares, and the rights to participate fully in proceedings to determine the fair value of such Shares and to seek relief on the grounds that the Merger is void or unlawful.

- Within seven days immediately following (a) the date of expiry of the Dissent Period or (b) the date on which the Plan of Merger is filed with the Cayman Registrar, whichever is later, the Company, as the Surviving Company, must make a written offer (a "Fair Value Offer") to each Dissenting Shareholder to purchase its, his or her Shares at a price determined by the Company to be the fair value of such Shares.

- If, within 30 days immediately following the date of the Fair Value Offer, the Company and the Dissenting Shareholder fail to agree on a price at which the Company will purchase the Dissenting Shareholder's Shares, then, within 20 days immediately following the date of the expiry of such 30-day period, the Company must, and the Dissenting Shareholder may, file a petition with the Grand Court of the Cayman Islands (the "Grand Court") for a determination of the fair value of the Shares held by all Dissenting Shareholders who have served a Notice of Dissent and who have not agreed with the Company as to the fair value of their Shares, which petition by the Company must be accompanied by a verified list containing the names and addresses of all members who have filed a Notice of Dissent and who have not agreed with the Company as to the fair value of such Shares.

111

Case 1:19-cv-10067-PAE   Document 116-9   Filed 04/29/22   Page 23 of 23

- If a petition is timely filed and served, the Grand Court will determine at a hearing (a) which shareholders are entitled to Dissenter Rights, (b) the fair value of such Shares held by those shareholders with a fair rate of interest, if any, to be paid by the Company upon the amount determined to be the fair value and (c) the costs of the proceeding and the allocation of such costs upon the parties.

All notices and petitions must be executed by or for the shareholder of record, fully and correctly, as such shareholder's name appears on the register of members of the Company. If Shares are owned of record in a fiduciary capacity, such as by a trustee, guardian or custodian, these notices must be executed by or for the fiduciary. If Shares are owned by or for more than one person such notices and petitions must be executed by or for all joint owners. An authorized agent, including an agent for two or more joint owners, may execute the notices or petitions for a shareholder of record. The agent must, however, identify the record owner and expressly disclose the fact that, in exercising the notice, he or she is acting as agent for the record owner. A person having a beneficial interest in Shares held of record in the name of another person, such as a broker or other nominee, must act promptly to cause the record holder to follow the steps summarized above and in a timely manner to perfect whatever Dissenter Rights attached to such Shares.

You must be a registered holder of Shares in order to exercise your Dissenter Rights. A holder of ADSs who wishes to dissent must surrender his, her or its ADSs to the ADS Depositary for delivery of Shares and pay the fees of the ADS Depositary to cancel his, her or its ADSs and then become a record holder of such Shares and comply with the procedures described above in order to exercise the Dissenter Rights with respect to the Shares prior to the extraordinary general meeting. The ADS Depositary will not exercise Dissenter Rights on behalf of a holder of ADSs and any Notice of Dissent delivered to the ADS Depositary will not be effective under the Cayman Islands Companies Law. If you wish to cancel your ADSs, please contact the ADS Depositary's office at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286.

If you do not satisfy each of these requirements, you cannot exercise Dissenter Rights and will be bound by the terms of the Merger Agreement and the Plan of Merger. Submitting a proxy card that does not direct how the Shares represented by that proxy are to be voted will give the proxy discretion to vote as it determines appropriate. In addition, failure to vote your Shares, or a vote against the proposal to authorize and approve the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, will not alone satisfy the notice requirement referred to above. You must send all notices to the Company's offices at 3/F, Building #2, 6 Jiuxianqiao Road, Chaoyang District, Beijing 100015, People's Republic of China, attention: Investor Relations Department.

If you are considering dissenting, you should be aware that the fair value of your Shares determined under Section 238 of the Cayman Islands Companies Law could be more than, the same as, or less than the $51.33 in cash, without interest, for each Share of the Company that you would otherwise receive as consideration pursuant to the Merger Agreement if you do not exercise Dissenter Rights with respect to your Shares. In addition, in any proceedings for determination of the fair value of the Shares covered by a Notice of Dissent, the Company and the Buyer Group intend to assert that the Per Share Merger Consideration is equal to the fair value of each of your Shares.

The provisions of Section 238 of the Cayman Islands Companies Law are technical and complex. If you fail to comply strictly with the procedures set forth in Section 238, you will lose your Dissenter Rights. You should consult your Cayman Islands legal counsel if you wish to exercise Dissenter Rights.

112