UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALTIMEO ASSET MANAGEMENT and ODS
CAPITAL LLC, *individually and on behalf of all others
similarly situated*,

                                    Plaintiffs,

                      -v-

QIHOO 360 TECHNOLOGY CO. LTD., HONGYI
ZHOU, XIANGDONG QI, and ERIC X. CHEN,

                                    Defendants.

19 Civ. 10067 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This is a putative class action under the federal securities laws.  Lead plaintiffs Altimeo

Asset Management ("Altimeo") and ODS Capital LLC ("ODS") (collectively, "plaintiffs") claim

that internet company Qihoo 360 Technology Co. Ltd. ("Qihoo") and three of its leaders carried

out a scheme to depress the price of Qihoo's American Depositary Shares ("ADS") and stock

(together, "Qihoo securities") to enable them to pay Qihoo shareholders an unfairly low price

when they took the company private in 2016 (the "Go-Private Merger" or the "Merger").  The

three leaders are Qihoo's co-founder and chief executive officer ("CEO") Hongyi Zhou, co-

founder and president Xiangdong Qi, and director and special committee chair Eric Chen (with

Qihoo, Zhou, and Qi, "defendants").

Plaintiffs allege that at the time the Go-Private Merger was announced, defendants had a

concrete plan eventually to relist Qihoo on a Chinese stock exchange, but did not disclose this

information.  Defendants' non-disclosure of their plan to revive Qihoo as a public company,

plaintiffs claim, depressed the market price of Qihoo shares, harming shareholders who (1) sold

shares in the open market before the Merger or (2) traded their shares in at a negotiated price as

part of the Merger.  They allege that Qihoo made various false and misleading statements regarding the Merger between December 18, 2015, the day the Merger was announced in a press release, and July 15, 2016, the Merger's effective date (the "class period").  Plaintiffs bring suit on behalf of a putative class comprised of owners of Qihoo securities who sold shares during the class period ("seller shareholders"), or who tendered those shares for the Merger consideration ("tenderer shareholders").[1]  Plaintiffs allege violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and the implementing rule of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

In an earlier decision, this Court granted Qihoo and Chen's motion to dismiss plaintiffs' First Amended Complaint ("FAC"), Dkt. 53, for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.* ("*Altimeo I*"), No. 19 Civ. 10067 (PAE), 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020), *vacated and remanded*, 19 F.4th 145 (2d Cir. 2021).  The Court held that the FAC did not plausibly allege "that defendants, as of the Merger, had in place a concrete plan to relist," which was the factual premise on which its "claims of material misrepresentations and omissions all turn."  *Id.* at *17. The Second Circuit vacated that decision.  *See Altimeo Asset Mgmt.* ("*Altimeo II*"), 19 F.4th. The Circuit held that the FAC alleged facts plausibly supporting the inference that, as of the shareholder plan to approve the Go-Private Merger, defendants had an undisclosed plan in place to relist.  *Id.* at 149–52.  The Circuit remanded the case for further proceedings.  *Id.* at 152.

---

[1] Excluded from the putative class are: (1) defendants; (2) officers and directors of Qihoo during the class period; (3) members of the immediate families of individual defendants and directors and officers of Qihoo; (4) any entity in which defendants have a controlling interest; (5) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assignees of any of the above excluded persons.  Dkt. 53 ¶ 300.

At the time of the Circuit's decision, Zhou had not been served, but now has been.  He now moves to dismiss the FAC under Rules 12(b)(6) and 9(b), making arguments both specific to him and of broader applicability.  For the following reasons, the Court grants the motion in part and denies it in part.

## I.     Background[2]

### A.     The Parties

Altimeo is an independent portfolio management company based in France and approved by the French Financial Authority.  FAC ¶ 18.  ODS is a Florida limited liability company.  *Id.* ¶ 20.  Both entities owned Qihoo securities, including ADS purchased on the New York Stock Exchange ("NYSE"), during the putative class period.[3]  They seek to represent a class of similarly situated investors.  *Id.* ¶¶ 19–20.

---

[2] These facts are drawn from the FAC and materials referenced in it or otherwise cognizable. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court has also considered documents attached to the declaration of Hanyu Xie in support of Zhou's motion to dismiss, Dkt. 116 ("Xie Decl."), the declaration of Michael Grunfeld, Esq., in opposition to Zhou's motion to dismiss, Dkt. 129 ("Grunfeld Decl."), and the declaration of Nathan McClellan, Dkt. 59.  Because these documents were incorporated into the FAC by reference, or are matters of public record, they are properly considered on this motion.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit" (citation omitted)).  The Court has considered such documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made."  *Clark v. Kitt*, No. 12 Civ. 8061 (CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents . . . ." (emphasis omitted)).

[3] The American depositary receipt system is the means by which American investors hold and trade equity interests in foreign companies.  *Gas Nat. v. E.ON AG*, 468 F. Supp. 2d 595, 596 n.1

Altimeo and ODS each sold shares during the class period and tendered shares in connection with the Go-Private Merger.  *See id.*; *see also* Dkt. 12-3 (certifications of Altimeo and ODS purchase and sales).  Altimeo purchased 140,261 Qihoo ADS during the class period and sold 79,613 such shares during that period.  FAC ¶ 19.  As of the Merger, Altimeo retained 61,500 Qihoo shares, including some it had acquired before the start of the class period; it exchanged those for cash pursuant to the Merger.  *Id.*  ODS purchased 86,300 ADS during the class period and sold at least 11,800 ADS during that time.  *Id.* ¶ 20.  It retained 74,500 ADS through the Merger; it exchanged those securities for cash pursuant to the Merger.  *Id.*

Qihoo is a Cayman Islands corporation headquartered in Beijing.  *Id.* ¶ 21.  It offers various internet and cloud-based products—including internet and mobile security tools, an internet browser, a search engine, and a mobile app store—to hundreds of millions of customers.  *Id.* ¶¶ 34–36.

---

(S.D.N.Y. 2006).  To trade on an American stock exchange, a foreign corporation must issue and deposit ADS with an American financial institution.  *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 566 n.3 (S.D.N.Y. 2016).  The depositary institution issues American Depositary Receipts ("ADRs") to the beneficial owners of the ADS, who may then sell the ADS on American securities exchanges.  *Id.*

The FAC does not identify specifically the foreign stock exchange to which Qihoo's ADS corresponded.  And the Court could not find an explicit statement as to that in the submitted exhibits.  *See* FAC ¶¶ 155 (alleging J.P. Morgan's comparisons of Qihoo to other companies were flawed because it failed to compare Qihoo to any companies listed on "a Chinese stock exchange"), 12 (discussing "Qihoo's relisting in the Chinese stock market"), 100 (when 360 Security Technology began trading on Shanghai Stock Exchange after reverse merger, it "marked the completion of Qihoo's return to the Chinese capital markets").  The Court infers from the submitted declarations and the FAC's discussion of Qihoo's "*re*listing" on the Shanghai Stock Exchange, *id.* ¶ 12 (emphasis added), that, before the Merger, Qihoo shares were traded on the Shanghai Stock Exchange and Qihoo's ADS corresponded to shares listed there.  *Compare id.* ¶ 21 (each ADS redeemable for 1.5 of Qihoo's class A ordinary shares), *and id.* ¶ 30 (discussing class B ordinary shares), Dkt. 116, Ex. 2 ("Final Proxy Statement") at 29 (same), *with* Xie Decl., Ex. 12 at 3–4 (class A and B ordinary shares are those that trade on either the Shanghai or Shenzhen stock exchanges).  *See also* FAC ¶ 21 ("The only public market for Qihoo Securities was for the Company's NYSE-listed ADS.").

Qihoo's "core business at the time of the Merger was its internet security business." *Id.* ¶ 38. Before the Merger, Qihoo-registered ADS were listed and traded on the NYSE under the ticker symbol "QIHU." *Id.* ¶ 21. The Bank of New York Mellon administered Qihoo's ADS from its New York corporate headquarters and trust office and served as the depositary for Qihoo's ADS. *Id.* ¶ 15. The Hongkong and Shanghai Banking Corporation was the custodian holding the ADS. Final Proxy Statement at v. Each ADS was redeemable for 1.5 of Qihoo's Class A ordinary shares. FAC ¶ 15. Qihoo's common stock was not registered with the SEC or publicly traded in the United States before the Merger. *Id.*

Zhou is Qihoo's co-founder and served as chairman and CEO during the class period. *Id.* ¶ 22. He also owned shares in some equity investors that participated in taking Qihoo private. *Id.* ¶¶ 29–30 & n.2. Before the Merger, Zhou owned 17.3% of Qihoo. *Id.* ¶ 62. According to the final proxy statement, after the Merger, he personally owned 22.8% of the Company. *Id.* ¶ 64.

Qi is Qihoo's co-founder and served as president and director during the class period. *Id.* ¶ 23. Like Zhou, he also owned shares in some entities that participated in taking Qihoo private. *Id.* ¶¶ 29–30 & n.3. Before the Merger, Qi owned 8.1% of Qihoo. *Id.* ¶ 62. According to the final proxy statement, he personally owned 2.2% of the Company after the Merger, plus an additional 11.5% via Tianjin Xinxinsheng Investment Limited Partnership ("Xinxinsheng"), in which he was the general partner. *Id.* ¶ 64.

Chen served as a Qihoo director from 2014 through the Merger, and acted as chairman of the special committee of independent directors that the Company appointed to evaluate the Merger. *Id.* ¶¶ 24, 26.

###### B.      The Go-Private Merger

####### 1.      Origins of the Merger

In early May 2015, Zhou discussed the possibility of acquiring Qihoo with Golden Brick

Capital Private Equity Fund and China Renaissance Holdings Limited.  *Id.* ¶ 41.  Later that

month, he discussed such a transaction with Qi and representatives of CITIC Securities Co. Ltd.

and Sequoia Capital China, whose founding managing partner is a Qihoo director.  *Id.*  These

discussions sparked the transaction at the center of this dispute.  *Id.*  On June 17, 2015, the four

investment companies and Zhou (collectively, the "Buyer Group") approached Qihoo's board

with a preliminary non-binding proposal to acquire all of Qihoo's outstanding shares for $77.00

in cash per ADS and $51.33 in cash per Class A or Class B ordinary share.  *Id.* ¶ 42.

Two days later, on June 19, 2015, Qihoo's board formed a special committee, chaired by

Chen, to evaluate the transaction.  *Id.* ¶ 44.  Zhou was not a member of the committee.  *Id.* ¶ 26.

The committee was charged with evaluating the terms of the Buyer Group's proposal,

negotiating with the Buyer Group or its representatives, exploring strategic alternatives,

negotiating definitive agreements, and reporting to the Board recommendations and conclusions

as to the fairness of the proposed transaction to Qihoo's stakeholders.  *Id.* ¶ 44.  The special

committee retained J.P. Morgan Securities to act as a financial advisor in connection with its

review of the Merger proposal, *id.* ¶ 45, and Skadden, Arps, Slate, Meagher & Flom LLP

("Skadden Arps") to act as legal counsel, Final Proxy Statement at 30.

Heated negotiations over the terms of the Merger agreement followed.  During the

negotiation period, the Buyer Group rejected the special committee's proposal to extend the go-

shop period, during which it could solicit alternative acquisition proposals.  Final Proxy

Statement at 35.  The Buyer Group also repeatedly rejected the special committee's attempts to

negotiate a higher Merger price of $80.00 per ADS on December 9, 2015.  *Id.* at 35–36.

After the Buyer Group's first rejection of the $80.00 per ADS price, the special committee discussed the Buyer Group's rejection and a renewed strategy for negotiating that price with J.P. Morgan and Skadden Arps.  *Id.* at 36.  Skadden Arps continued to negotiate with the Buyer Group's representatives, and "reiterate[] the [s]pecial [c]ommittee's emphasis on the purchase price increase," through December 12, 2015.  *Id.* at 37.  The Buyer Group, however, refused to increase the purchase price it proposed to pay.  *Id.*

On December 16, 2015, at its 10th meeting by telephone with the special committee, *id.* at 38, J.P. Morgan gave the special committee its opinion that the Buyer Group's preliminary offer ($77.00 per ADS and $51.33 per ordinary share) was fair to Qihoo shareholders, FAC ¶ 48. The valuation range and pricing conclusions in the fairness opinion were based on management projections provided to J.P. Morgan by Alex Xu, Qihoo's co-CFO.[4]  *Id.* ¶ 47.  The special committee and the Board approved the Merger the same day.  *Id.* ¶ 49.

On December 18, 2015, the Board executed the Merger Agreement and issued a press release announcing the transaction.  *Id.* ¶ 60; Xie Decl., Ex. 5 (the "Press Release").  The Press Release stated that each ADS "will be cancelled in exchange for the right to receive US$77.00 in cash," which represented "a premium of 16.6% to the closing price of the Company's ADSs on June 16, 2015, the last trading day prior to the Company's announcement of its receipt of a 'going-private' proposal," and "a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a 'going-private' proposal."

---

[4] J.P. Morgan's conclusions were also based on its review of, *inter alia*, the Merger Agreement, publicly available business and financial information about Qihoo and the broader industry, precedential transactions, and the financial and operating performance of comparable companies. FAC ¶ 52.  J.P. Morgan considered the premiums paid in prior U.S.-listed Chinese take-private transactions.  *See* Final Proxy Statement at 46.  *But see* FAC ¶ 155 (faulting J.P. Morgan for not comparing Qihoo to any companies that were listed on a Chinese stock exchange).

Press Release at 2.[5]  The Merger Agreement contemplated using $9.4 billion to complete the

Merger, assuming that no shareholder exercised appraisal rights in the Cayman Islands.  FAC

¶ 61.

### 2.    Issuance of Proxy Materials

After execution of the Merger Agreement, Qihoo, between January 11, 2016, and March

3, 2016, published four successive versions of Proxy Materials (collectively, "proxy materials").

These sought to persuade shareholders to vote for the Merger.  *Id.* ¶ 66.  The initial filing, on

January 11, 2016, was in the form of a Schedule 13E-3 filing, which attached the Company's

preliminary proxy statement and other supporting documents for the Merger.  *Id.* ¶ 67.  The

ensuing versions amended these.[6]  Plaintiffs allege that the proxy materials contained materially

false and misleading statements—about the reasons for the Go-Private Merger, the fairness of the

proposed terms, and the strategic alternatives that had been considered.  *Id.* ¶¶ 71–82.  Plaintiffs

centrally allege that the statements were misleading because the proxy materials did not mention

that the individual defendants had a plan eventually to relist the company in China, at a higher

valuation.  *Id.* ¶¶ 71, 74.  The Court reviews the alleged misleading statements *infra*.

Zhou signed all the proxy statements.  *See id.* ¶¶ 166, 233, 243, 245.  As to each, he also

attested:  "[A]fter due inquiry and to the best of my knowledge and belief, I certify that the

---

[5] Where exhibits lack internal page numbering, the Court cites to individual pages within
exhibits by the pages' Bates-stamped numbers.  The Court otherwise uses internal page numbers
in citing to pages within exhibits.

[6] The Proxy materials were amended three times.  The "Preliminary Proxy Statement" was
published on January 11, 2016, FAC ¶ 67, and is excerpted at Dkt. 116, Ex. 7; the "Amended
Proxy Statement" was published on February 8, 2016, FAC ¶ 68, and is excerpted at Dkt. 116,
Ex. 8; the "Second Amended Proxy Statement" was published on February 26, 2016, FAC ¶ 68,
and is excerpted at Dkt. 116, Ex. 9; and the "Final Proxy Statement" was published on March 3,
2016, FAC ¶ 69, and is excerpted at Dkt. 116, Ex. 2.  The final proxy statement included the
materials provided to Qihoo shareholders at the March 30, 2016 shareholder vote on the Merger.
FAC ¶ 69.

information set forth in this statement is true, complete and correct." *Id.* ¶¶ 227 (preliminary

proxy statement), 234 (amended proxy statement), 244 (second amended proxy statement), 246

(final proxy statement); *see also* Dkt. 59-8 at 29 (preliminary proxy, Section 13E-3 statement

signature page); Dkt. 59-9 at 29 (amended proxy statement, same); Dkt. 59-10 at 29 (second

amended proxy statement, same); Dkt. 59-10 at 29 (final proxy statement, same).  Zhou also

signed the Merger Agreement, which was filed with the preliminary proxy materials.  It

warranted that

> [e]ach of the Parent Parties and the Company agrees, as to it and its respective
> Affiliates, directors, officers, employees, agents or Representatives, that none of
> the information supplied or to be supplied by any Parent Party or the Company, as
> applicable, expressly for inclusion or incorporation by reference in the Proxy
> Statement, the Schedule 13E-3 or any other documents filed or to be filed with the
> SEC in connection with the transactions contemplated hereby, will, as of the time
> such documents (or any amendment thereof or supplement thereto) are mailed to
> the holders of Company Shares and at the time of the Company Shareholders
> Meeting or any adjournment thereof, contain any untrue statement of a material
> fact, or omit to state any material fact required to be stated therein or necessary in
> order to make the statements therein, in light of the circumstances under which they
> were made, not misleading.

FAC ¶ 229.

As of March 3, 2016, the date of the final proxy statement, the Buyer Group collectively

owned approximately 26.8% by number, and 61.3% in voting rights, of the Company's issued

and outstanding ordinary shares.  *Id.* ¶ 83.

### 3.    Shareholder Vote and Completion of the Go-Private Merger

On March 30, 2016, the shareholders voted on the Go-Private Merger.  *Id.*  For the

Merger to pass, at least two-thirds of the voting rights of the shares present and voting in person

or by proxy had to vote for it.  *Id.* ¶ 84.  Approximately 41% of the Company's outstanding

ordinary shares were represented at the meeting, representing 69.3% of the total outstanding

votes on the record date.  *Id.* ¶ 86.  Approximately 99.8% of the total votes cast at the meeting

were in favor of the Merger, thereby approving it.  *Id.*  Pursuant to its terms, the transaction

closed on July 15, 2016 ("Effective Time").  *Id.* ¶¶ 86, 93.

Plaintiffs allege that, had defendants disclosed the Buyer Group's intention "to relist

Qihoo in China after the Merger . . . Qihoo's true value, and Qihoo's business opportunities in

China following the Merger," "more shareholders would have attended the extraordinary

meeting . . . and voted against the Merger or would have dissented from the Merger and

exercised their appraisal rights in the Cayman Islands."  *Id.* ¶ 87.

### 4.      Qihoo's Post-Merger "Backdoor Listing" in China

After the Merger, Qihoo "conducted a complicated restructuring of its business" to

separate its main internet business from non-core operations.  *Id.* ¶ 95.  On November 2, 2017,

more than 15 months after the Go-Private Merger, a publicly traded elevator manufacturing

company, SJEC, which was listed on the Shanghai Stock Exchange, announced that it would

merge with Qihoo.  *Id.* ¶ 96.  This "backdoor listing," or reverse merger, effectively allowed

Qihoo to list its main internet business on the Chinese stock market without the regulatory

hurdles associated with an initial public offering ("IPO").  *Id.* ¶ 97.

On February 28, 2018, Qihoo began trading on the Shanghai Stock Exchange.  *Id.* ¶ 100.

At the close of trading on that day, it had a market capitalization of 385 billion RMB, or

approximately $62 billion.  *Id.*  According to a *Bloomberg* news article, the value of the former

SJEC, with which Qihoo had merged, "soared as much as 550%" between the announcement of

the backdoor listing in November 2017 and Qihoo's commencement of trading pursuant to the

relisting on February 28, 2018.  *Id.* ¶ 101.  As a result of the relisting, Zhou's net worth grew

from approximately $2 billion to $13.6 billion; he became the 12th-richest person in China.  *Id.*;

*see also id.* ¶ 260 & n. 29.  Because the listing included only Qihoo's main businesses, its other

ventures—such as its mobile phone, healthcare, and property management businesses, *id.*

¶ 103—were not included in the listing and supplied separate value to the Buyer Group, *id.*

¶ 102.  For example, Qihoo's financial arm was valued at more than $2 billion in December

2018, when it conducted an IPO in the United States under the name "360 Finance."  *Id.*

### C.   Procedural History

This litigation began in the Central District of California.  On March 5, 2019, Altimeo

and ODS filed a complaint there, Dkt. 1, and, on March 18, 2019, moved for lead plaintiff and

lead counsel appointments, Dkts. 10–13.  On June 4, 2019, Qihoo and Chen moved to transfer

the case to this District.  Dkts. 33–35.  On July 1, 2019, the Honorable John A. Kronstadt, United

States District Judge, appointed Altimeo and ODS lead plaintiffs.  *See* Dkt. 42.  On August 30,

2019, plaintiffs filed the FAC, which, on October 11, 2019, Qihoo and Chen moved to dismiss.

Dkts. 57–59.  On October 24, 2019, Judge Kronstadt granted the motion to transfer venue to this

District and denied the motion to dismiss as moot.  Dkt. 60.  On October 30, 2019, the case was

transferred to this District and assigned to this Court.  Dkt. 61.  On November 15, 2019, the

parties filed a joint letter proposing next steps, in which Qihoo and Chen sought leave to file a

new motion to dismiss under Second Circuit law.  Dkt. 75.  On November 18, 2019, the Court

granted the request and set a briefing schedule.  Dkt. 76.

On December 23, 2019, defendants Qihoo and Chen[7] filed a motion to dismiss, Dkt. 77, a

memorandum of law, Dkt. 78, and the declaration of Brian Raphel, Esq., with attached exhibits,

Dkt. 79.  On January 31, 2020, plaintiffs filed a memorandum in opposition, and the declaration

of Michael Grunfeld, Esq., with an attached exhibit.  Dkt. 81.  On February 21, 2020, Qihoo and

Chen filed a reply.  Dkt. 83.

---

[7] As of that point, Zhou and Qi had not been successfully served.

On August 14, 2020, the Court granted the motion to dismiss the FAC in its entirety, with prejudice, finding that the FAC had not plausibly pled that Qihoo had a plan to relist during the period leading up to the Merger.  Dkt. 84.  On September 10, 2020, plaintiffs appealed.  Dkt. 87.  On November 24, 2021, the Second Circuit vacated the dismissal and remanded.  Dkt. 88.  On December 15, 2021, the Circuit's mandate issued.  Dkt. 90.

On January 20, 2022, the Court approved a revised case management plan proposed by plaintiffs, Qihoo, and Chen.  Dkt. 97.  Although the Court's (vacated) decision dismissing the case had not reached various grounds for dismissal that Qihoo and Chen had raised, the plan did not contemplate a renewed motion to dismiss by Qihoo and Chen.  It instead set, *inter alia*, a briefing schedule for plaintiffs' motion for class certification and for motions for summary judgment, and a discovery schedule accommodating those briefing schedules.  *Id.*

On February 1, 2022, the Court permitted plaintiffs to serve the remaining defendants, Zhou and Qi, by alternative means.  Dkt. 100.  On March 28, 2022, plaintiffs completed such service on Zhou, Dkt. 110, who, on April 1, 2022, appeared, Dkts. 108–09, and filed, with plaintiffs, a proposed stipulation that set a due date for his responsive pleading of April 29, 2022, Dkt. 110, which the Court approved on April 4, 2022, Dkt. 111.

On April 29, 2022, Zhou moved to dismiss the FAC, Dkt. 114, and filed a memorandum of law, Dkt. 115 ("Mem."), and declaration, with exhibits, in support, Xie Decl.[8]  On May 4, 2022, Qihoo and Chen moved for a stay of discovery, Dkt. 117, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), and Zhou submitted a letter in support, Dkt. 119.  On May 9, 2022, plaintiffs opposed the requests to stay discovery.  Dkt. 121.

---

[8] Qi has not answered or otherwise responded to the FAC.

On May 11, 2022, Qihoo and Chen replied. Dkt. 124. On May 25, 2022, the Court issued an order granting the motion to stay discovery, holding that the text of the PSLRA is "crystal clear" in mandating the stay of all discovery during the pendency of a motion to dismiss, even if some defendants are no longer so moving. Dkt. 126 at 3. On May 26, 2022, the Court stayed the briefing schedule for plaintiffs' anticipated motion for class certification, recognizing that discovery would be necessary to resolve that motion. Dkt. 127.

On June 10, 2022, plaintiffs opposed Zhou's motion to dismiss, Dkt. 128 ("Opp."), and filed a declaration, Dkt. 129 ("Grunfeld Decl."), and exhibits in support. Dkt. 130. On June 24, 2022, Zhou replied. Dkt. 136 ("Reply").[9]

## II.   Applicable Legal Standards

### A.   Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

---

[9] On June 16, 2022, the Clerk of the Court issued a Certificate of Default as to Qi. Dkt. 133; *see also* Dkts. 131–32. Plaintiffs have yet to move for a default judgment as to Qi, but state that they will do so after discovery as to damages. *See* Dkts. 134, 137, 139, 141, 143.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the PSLRA, 15 U.S.C. § 78u-4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### B.      Elements of Plaintiffs' Claims

Plaintiffs assert claims under §§ 10(b), 20A, and 20(a) of the Exchange Act, and Rule 10b-5.  FAC ¶¶ 312–39.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[]."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under § 10(b) of the Exchange Act, a complaint must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted).  A complaint must ultimately allege conduct involving manipulation or deception; § 10(b) does not cover "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (citation omitted) (quoting *ATSI Commc'ns*, 493 F.3d at 108).  If a plaintiff has

15

not adequately alleged a primary violation—that is, a viable claim under another provision of the Exchange Act—then the § 20(a) claims must be dismissed.  *See id.*

To state a claim for insider trading under § 20A of the Exchange Act, a plaintiff must plead (1) a predicate violation of the Exchange Act; (2) contemporaneous trading by defendant and plaintiff; and (3) that the defendant possessed "material, nonpublic information" at the time of the trading activity.  *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l, Inc.*, 967 F. Supp. 2d 771, 801 (S.D.N.Y. 2013).  Thus, for plaintiffs' claims under either § 20(a) or § 20A of the Exchange Act to survive the motion to dismiss, their complaint must adequately plead a *prima facie* violation of § 10(b).

### 1.   Pleading a Material Misrepresentation or Omission

#### a.   *False or Misleading Statements*

To survive a motion to dismiss, the complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'"  *Matrixx Initiatives*, 563 U.S. at 38 (emphasis omitted) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17.  The materiality requirement "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic*, 485 U.S. at 231–32).  As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976) (emphasis omitted).  The "materiality hurdle" is, therefore, "a meaningful pleading obstacle."  *In*

*re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013).  However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *ECA*, 553 F.3d at 197 (citation omitted).

As to alleged omissions, "[d]isclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2013) (noting that Section 10(b) and Rule 10b-5(b) do not create "an affirmative duty to disclose any and all material information").  An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (explaining that "pure omissions" of information, absent a duty to disclose, are not actionable; however, "half-truths"— "statements that are misleading . . . by virtue of what they omit to disclose"—are).

### b.     Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud.  Such statements of opinion can give rise to liability in two distinct ways.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were untrue.'"  *See Tongue v. Sanofi* ("*Sanofi II*"), 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)).  "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively

optimistic, [or] not borne out by subsequent events . . . ." *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).  "The Second Circuit has firmly rejected this 'fraud by hindsight' approach." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi II*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194).  To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.  As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Sanofi II*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 188–89).  "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189); *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

The Supreme Court has instructed that this second theory of liability for opinions, based on the omission of material facts that may render a statement of opinion actionable, should not

be given "an overly expansive reading." *See Sanofi II*, 816 F.3d at 210.  Rather, establishing

liability on such a theory "is no small task for an investor." *Omnicare*, 575 U.S. at 194.

"Reasonable investors understand that opinions sometimes rest on a weighing of competing

facts, . . . [and do] not expect that *every* fact known to an issuer supports its opinion statement."

*Id.* at 189–90 (emphasis in original).  A statement of opinion "is not necessarily misleading when

an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* at 189.  Statements of

opinion must also be considered in the context in which they arise.  An "investor takes into

account the customs and practices of the relevant industry," and "an omission that renders

misleading a statement of opinion when viewed in a vacuum may not do so once that statement

is considered, as is appropriate, in a broader frame." *Id.* at 190.

### 2.  Scienter

Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to

a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent

and *at least as compelling* as any opposing inference one could draw from the facts alleged,'"

and "the court must take into account plausible opposing inferences." *ATSI*, 493 F.3d at 99

(quoting *Tellabs*, 551 U.S. at 324) (alterations and emphasis in original).  The requisite mental

state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319

(internal quotation marks and citation omitted).

A complaint "may satisfy this requirement by alleging facts (1) showing that the

defendants had both motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  And

where a complaint does not sufficiently allege that defendants had a motive to defraud the public,

it "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d

Cir. 2001).  A complaint can plead recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  But "to adequately plead scienter, plaintiffs must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility."  *In re Sanofi Sec. Litig.* ("*Sanofi I*"), 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (quoting *Novak*, 216 F.3d at 308).  "The key, of course, is the honest belief of the management in the truth of information issued to the public."  *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir. 2009) (summary order).

### 3.   Reliance

"It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation," or "reliance," that is, "that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, [that is], that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis omitted).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—[for example], purchasing a common stock—based on that specific misrepresentation."  *In re Vivendi*, 838 F.3d at 256–57 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)).

Alternatively, because limiting proof of reliance to this method would "place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market," a rebuttable presumption exists that, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business" and "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241–42, 245 (citation omitted); *see also In re Vivendi*, 838 F.3d at 257. This presumption is frequently termed the "fraud-on-the-market" theory of reliance. *Basic*, 485 U.S. at 241.

### 4.    Loss Causation

Loss causation, by contrast, "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 304 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). It "requires demonstrating that the *subject* of the fraudulent statement or omissions was the cause of the actual loss suffered." *In re Vivendi*, 838 F.3d at 261 (emphasis in original) (internal quotation marks omitted).

A complaint may establish loss causation by demonstrating, *inter alia*, "(1) a corrective disclosure or (2) a materialization of a concealed risk." *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 511 (2d Cir. 2010). To establish the latter, a plaintiff must make a factual allegation showing that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Id.* at 513. "[P]laintiffs need not allege that their entire loss was caused by the misstatements and omissions complained of." *In re Lehman Bros*, 799 F. Supp. 2d at 305. "To plead loss causation, the complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of . . .

21

that loss absent the fraud." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)) (emphasis omitted). But under either method, if "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, loss causation is established." *Lentell*, 396 F.3d at 174. By contrast, "if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Vivendi*, 838 F.3d at 261 (internal quotation marks omitted).

## III.   The FAC's § 10(b) Claims

The Court begins with the FAC's § 10(b) claims, which Zhou moves on various grounds to dismiss. First, he argues that—although the FAC has been held to plead plausibly that Qihoo's statements not disclosing a plan to relist are actionable, *see* FAC ¶ 159(a)—the other three sets of statements on which it bases its § 10(b) claims are not. These (1) presented the Go-Private Merger as "fair" to shareholders or in an otherwise positive light, (2) set out the reasons for the Merger, and (3) addressed the absence of strategic alternatives that would be more beneficial to Qihoo shareholders. *See id.* ¶ 159(b)–(d). Second, Zhou argues—with distinct analyses for the tenderer shareholders and the seller shareholders—that the FAC does not plausibly allege a causal link between Qihoo's actionable statement(s) and a shareholder loss. He formulates this argument alternatively as challenging the FAC's pleading of the elements of reliance, economic loss, and loss causation. *See* Mem. at 10–23. Plaintiffs disagree. *See* Opp. at 7–11.

The Court begins by assessing whether the above sets of statements are adequately pled as actionable.

### A.    The Alleged Misrepresentations and Omissions

The Second Circuit's decision reinstating the FAC turned on one set of misstatements

and omissions alleged in the FAC: those denying and not disclosing Qihoo's intention to relist.[10]

The Circuit did not reach the other three sets of misstatements and omissions alleged by the

FAC.  *See Altimeo II*, 19 F.4th at 151–52 & n.4.  The Court evaluates these in turn.

### 1.    Statements Presenting the Merger as "Fair"

The FAC alleges that the opinion statements in the proxy materials to the effect that the

Go-Private Merger was "fair" to shareholders, or otherwise portraying it in a favorable light, are

actionable.  *See* FAC ¶ 159(c); Opp. at 7–10.  The following statements are representative:

- "Each member of the Buyer Group believes that the Merger is fair to the
  Unaffiliated Holders."  Final Proxy Statement at 9; *see also* Amended Proxy
  Statement at 9; Second Amended Proxy Statement at 9.

- "The Buyer Group believes . . . that the Merger is both substantively and
  procedurally fair to the Unaffiliated Holders."  Final Proxy Statement at 51;
  *see also* Amended Proxy Statement at 51; Second Amended Proxy
  Statement at 51.

- "At a meeting on December 18, 2015, the Board (other than the [sic] Mr.
  Hongyi Zhou, Mr. Ziangdong Qi and Mr. Neil Nanpeng Shen, who

---

[10] The FAC at numerous points claims that Qihoo failed to disclose, or denied, an intention not to relist even though "the Buyer group [had] already planned to relist Qihoo at a far-higher valuation" in China post-transaction.  FAC ¶ 159(a); *see e.g., id.* ¶¶ 2 ("Defendants told the market that Qihoo had no plans at the time of the Merger to relist the Company on any other stock exchange after the Merger . . . . [even though] the group of investors that bought Qihoo in the Merger—led by Defendant Zhou—*planned all along* to relist Qihoo on the Chinese stock market following the Merger at a much higher value than what they paid to Qihoo Securityholders in the Merger." (emphasis added)), 5 ("Contrary to the Defendants' repeated reassurances about no substantial changes to Qihoo's structure following the Merger, several news reports have revealed that the Buyer Group that took Qihoo private in the Merger *planned all along* to relist the Company in China after the Merger for multiple times what they paid to Qihoo Securityholders . . . ." (emphasis added)), 152 ("Defendants . . . failed to disclose to Qihoo Securityholders[]the Buyer Group's plan to relist Qihoo in the Chinese stock market."), 159(a) ("These assurances provided to Qihoo Securityholders were false and misleading because when these statements were made, the Buyer Group *already planned to relist* Qihoo at a far-higher valuation." (emphasis added)); *see also id.* ¶¶ 71, 105, 110, 134, 159(b)–(d), 171, 199.

abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders. . . ."  Final Proxy Statement at iii; *see also* FAC ¶¶ 190 (same; preliminary proxy statement), 234 (same, amended proxy statement), 244 (same, second amended proxy statement), 246 (same, final proxy statement).

- "For the foregoing reasons, the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, and other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders." *Id.* ¶¶ 76, 194 (preliminary proxy statement), 234 (same, amended proxy statement), 244 (same, second amended proxy statement), 246 (same, final proxy statement).

- The proxy statements cited J.P. Morgan's opinion that the Merger was "fair," *id.* ¶ 200 (preliminary proxy statement), and "appended J.P. Morgan's written fairness opinion, which concluded that the Merger was fair from a financial point of view," *id.* ¶ 204; *see id.* ¶¶ 234 (same, amended proxy statement), 244 (same, second amended proxy statement), 246 (same, final proxy statement).

- As alleged, the proxy statements "stated that the Buyer Group believed the Merger was substantively and procedurally fair to unaffiliated Qihoo Securityholders based on the Buyer Group's knowledge and analysis of available information regarding the Company, as well as the factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board." *Id.* ¶¶ 210 (preliminary proxy statement), 234 (same, amended proxy statement), 244 (same, second amended proxy statement), 246 (same, final proxy statement).

Zhou is properly pled as accountable for these statements.  Although some purported to reflect the opinion of the special committee, of which Zhou was not a member, all were made in proxy materials that Zhou signed, *see, e.g.*, *id.* ¶¶ 166, 233, 243, 245, and to whose completeness and veracity he attested, *see id.* ¶¶ 227, 234, 244, 246; *see also id.* ¶ 229 (Merger Agreement

attestation).[11]  Separately, Zhou, as a member of the Buyer Group, stated in the proxy materials

that the fairness opinion was "believed to include all material factors considered," Final Proxy

Statement at 51, and that the Buyer Group had "fully informed" the Board "about the extent to

which the interests of the Buyer Group in the Merger differed from those of the Unaffiliated

Holders," *id.* at 50.

The statements are ones of opinion rather than fact.  *See ODS Cap. LLC v. JA Solar*

*Holdings Co.*, No. 18 Civ. 12083 (ALC), 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020)

(statements that merger was fair were opinion statements), *motion for relief from judgment*

*granted*, 2022 WL 3655525 (S.D.N.Y. Aug. 25, 2022); *In re Shanda Games Ltd. Sec. Litig.*

("*Shanda I*"), No. 18 Civ. 02463 (ALC), 2019 WL 11027710, at *7 (S.D.N.Y. Sept. 30, 2019)

(same), *adhered to on reconsideration sub nom. In re Shanda Ltd. Sec. Litig.*, 2020 WL 5813769

(S.D.N.Y. Sept. 30, 2020); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F.

Supp. 3d 48, 70 (S.D.N.Y. 2015) ("If the directors of Company X tell their shareholders that a

proposed merger offers a 'fair' price for Company X's shares, they have stated their opinion

about the deal."); *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 253 (S.D.N.Y.

2015) (same).  The parties agree that such statements can be actionable under *Omnicare*.[12]  They

---

[11] Zhou is wrong to argue, *see* Mem. at 11–12, that the fairness statements cannot be attributed to
him because they were made by others, and he was merely a signatory.  Even where a statement
was not authored by a defendant, "courts consistently hold that signatories of misleading
documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)."
*See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 154, 163–64 (S.D.N.Y. 2012)
(collecting cases).  In any event, the Buyer Group, of which Zhou *was* a member, repeatedly
represented in the proxy materials its opinion that the Merger was fair to shareholders.  *See, e.g.*,
Final Proxy Statement at 9, 47–51, in part based on the "factors considered by, and the analysis
and resulting conclusions of, the Special Committee and the Board," *see id.* at 47.

[12] It is undisputed that *Omnicare*'s analysis of the circumstances under which a statement of
opinion can be actionable applies here, notwithstanding that *Omnicare* applied § 11 of the

dispute, however, whether it is well pled that Zhou in fact believed the Merger was not fair,
*compare* Mem. at 12, *with* Opp. at 9, so as make his opinion statements to the contrary
actionable under *Omnicare*.  *See Sanofi II*, 816 F.3d at 210 ("[L]iability for making a false
statement of opinion may lie if . . . the speaker did not hold the belief she professed." (internal
quotation marks omitted)).

That, however, is not the only route to liability under *Omnicare* for an opinion statement.
As reviewed above, such a statement can also be actionable if the speaker failed to disclose a fact
that, had it been disclosed, would "conflict with what a reasonable investor would take from the
statement itself."  *Omnicare*, 575 U.S. at 189; *Abramson*, 965 F.3d at 177; *Sanofi II*, 816 F.3d at
210.  And here, as the Second Circuit has determined, Qihoo (and Zhou) failed to disclose a
concrete fact—the existence of a plan to relist Qihoo publicly, on a Chinese exchange, at a
higher valuation.  This fact, had it been disclosed, would likely conflict with what a reasonable
investor would take away from Zhou's assertion that the Go-Private Merger was "fair" to
shareholders.  *See, e.g.*, *ODS Cap. LLC*, 2020 WL 7028639, at *11 (opinion statement actionable
where defendant misrepresented and understated company's value to independent financial
advisor, and then expressly adopted advisor's opinion that merger was fair); *Lickteig v. Cerberus
Cap. Mgmt., L.P.*, No. 19 Civ. 5263 (GHW), 2020 WL 1989424, at *10–11 (S.D.N.Y. Apr. 26,
2020) (opinion statement actionable where board chairman publicly stated that multiple used to
calculate total enterprise value was "appropriate" and "reasonable," but privately stated
appropriate multiple was higher); *see also In re Wells Fargo & Co. Sec. Litig.*, No. 20 Civ.

---

Securities Act whereas this case involves § 10(b) of the Exchange Act.  *See, e.g.*, *Abramson*, 965
F.3d at 175 (applying *Omnicare* standard to § 10(b) claims); *Sanofi II*, 816 F.3d at 209; *Fresno
Cnty. Emps. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 n.5 (S.D.N.Y. 2017); *Sec. &
Exch. Comm'n v. Thompson*, 238 F. Supp. 3d 575, 601 & n.13 (S.D.N.Y. 2017).

04494 (GHW), 2021 WL 4482102, at *14 (S.D.N.Y. Sept. 30, 2021) (opinion statements actionable where executive's predicted timeline for compliance with a consent order contradicted by the fact that regulators had recently told company its compliance plans were insufficient); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583–84 (S.D.N.Y. 2016) (opinion statement actionable where defendant company expressed belief that regulatory proceedings were not likely to have any material impact, despite having received subpoenas from SEC and requests for information from Department of Justice); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 726–32 (S.D.N.Y. 2015) (opinion statement actionable where failure to disclose existence of federal civil investigative demand rendered opinion that company "believes it is in substantial compliance with all laws" materially misleading).

The withheld information here—that the Buyer Group had a concrete plan to profit significantly by relisting Qihoo in China at some point after the Going-Private Merger—is also fairly pled as material. It is more than merely "some fact cutting the other way" or "competing" with Zhou's fairness statements. *See Omnicare*, 575 U.S. at 189–90 (citing, as example of non-actionable omission, the fact that a single junior attorney expressed doubts about a practice's legality when six of his more senior colleagues gave it the stamp of approval). Rather, that the Buyers Group had a concrete plan to relist at a profit is a material fact whose omission made the claim that the Merger was fair to shareholders misleading to the reasonable investor. "When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *Abramson*, 965 F.3d at 176–77 (opinion statement actionable where defendant asserted no "major" studies showed survival rates in excess of 20 months, and plaintiffs alleged several studies to be considered "major" doing so); *see also In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289,

318 (S.D.N.Y. 2020) (opinion statements actionable where they omit material facts about the

issuer's knowledge).  That the opinion statements as to fairness were contained in formal SEC

filings made it all the more reasonable for an investor to rely on them.  *See Omnicare*, 575 U.S.

at 190 ("Investors do not, and are right not to, expect opinions contained in [SEC filings] to

reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in

daily life.").

Accordingly, the FAC alleges that Zhou's, and other defendants', "fairness" opinion

statements were actionably false or misleading.

### 2. Statements Concerning the Reasons for the Merger

For similar reasons, the statements in the proxy materials as to the reasons for the Merger

were also well pled as materially misleading.  *See* FAC ¶ 159(d).  The stated reasons were the

many operational benefits of private-company form and the Buyer Group's preference for taking

Qihoo private to garner these advantages[13]; the materials also noted the downsides of continued

---

[13] The final proxy statement, for example, set out the benefits of going private.  *See* Final Proxy Statement at 41–43; FAC ¶ 78 (Buyer Group relied on Special Committee and Board's reasons). These included: "The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company[]," Final Proxy Statement at 61; Qihoo management would have "greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance," *id.* at 42, 62; "the Company would no longer be subject to the Exchange Act and NYSE compliance and reporting requirements and the related direct and indirect costs and expenses, and may experience positive effects on profitability as a result of the elimination of such costs and expenses," including eliminating compliance costs of up to $4.5 million annually, *id.* at 41; "the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company[) was not] reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders," *id.* at 42; Qihoo would not be required to disclose "competitively sensitive" business information, pursuant to SEC reporting requirements, *id.* at 41–42; and "the Buyer Group believes that the operating environment has become more challenging . . . [and] strategies [to respond] would be most effectively implemented in the context of a private company structure," *id.* at 61.

public-company operations in China.[14]  Salient here, treating the secret relisting plan as well

pled, this articulation of the Buyer Group's reasons omitted a central reason to go private—to

enable Qihoo later to be revived as a public company listed on a Chinese stock exchange, at

presumably a significant profit.  *See* Opp. at 10–11; *see also* FAC ¶ 159(d) (stated reasons

"directly contradicted" true purpose).

Zhou seeks to separate the relisting from the stated benefits of going private, accusing

plaintiffs of "conflat[ing] two distinct concepts"—(1) the plan to relist Qihoo on the Chinese

stock exchange, and (2) the reasons for reorganizing elsewhere once private.  Mem. at 13.  But

such a compartmentalization miscasts the FAC, whose central thesis, as the Court noted in its

earlier decision, was that the Merger was motivated by the secret plan to relist at a profit.

Accepting that claim as well pled, the Buyer Group's articulation of the benefits for Qihoo of a

private existence omit the central reason for doing so—to enable the insiders later to turn a profit

through going public anew via a relisting.  Put differently, the Merger, as alleged, was the first

step in a two-step plan to later go public again, and leaving out the second part omitted a—if not

the—main reason to go private.  *See, e.g.*, FAC ¶ 105 (relisting plan was the "key term for

[Zhou's] participation in the Merger"); *id.* ¶ 265 (Merger based on plan later to relist); Opp. at 11

(Merger and relisting "part-and-parcel" of same plan).

It therefore is no consequence that the stated reasons for the Merger, viewed in isolation,

are not pled to have been "untrue."  Mem. at 13; *see id.* at 12–13 (arguing that FAC does not

---

[14] As to problems with doing business in China, the final proxy statement identified "the likely impact of the [People Republic of China's] anti-monopoly law on the viability of potential alternatives," Final Proxy Statement at 42; *see also* FAC ¶ 235 (amended proxy), and "the recent economic slowdown in China," Final Proxy Statement at 42.  The Buyer Group expressly adopted the "factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board" in reaching its fairness determination.  *See* Final Proxy Statement at 47.

allege "facts suggesting these statements were false or misleading"). Courts do not measure the "veracity of a statement or omission . . . by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman*, 706 F.3d at 153 (citation omitted). And statements, "although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Here, having chosen to articulate the Buyer Group's reasons for undertaking the Merger, Zhou had an obligation to describe the material reasons for doing so truthfully and completely. *Id.* at 179 ("Once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." (alteration omitted)). The omission from these reasons of the secret relisting plan towards which the Merger was a first step made the proxy materials' statement of reasons materially misleading. *See Altimeo II*, 19 F.4th at 151 ("We do not find those alleged negotiations [to relist] so obviously unimportant to a reasonable investor as to allow the dismissal of appellants' claims." (internal quotation marks omitted)); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it—or other statements made—materially misleading.").

Accordingly, the FAC adequately alleges that the statements in the proxy materials as to the reasons for the Merger, for which Zhou is properly held among those responsible, were materially misleading. *See, e.g.*, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305–08 (S.D.N.Y. 2013) (misstatements or omissions actionable where defendant made materially misleading statements about development schedule); *In re Am. Int'l Grp., Inc.*

*2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530–31 (S.D.N.Y. 2010) (misstatements or omissions actionable where plaintiffs alleged "plausibly and with particularity . . . a claim of concealment of . . . a significant decision taken by the Company . . . that would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal quotation marks omitted)); *cf. Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 408–09 (S.D.N.Y. 2019) (misstatements or omissions actionable where defendant failed to disclose internal trend or uncertainty that, as alleged, would have material impact on company's financial position).

### 3.    Statements Regarding the Lack of Strategic Alternatives

The FAC, finally, alleges that the proxy materials were false and misleading in stating that there were no viable alternatives to the Merger, because in fact, a backdoor listing was such an alternative.  FAC ¶¶ 159(b), 180–86.

The statements that the FAC contends were actionable on this theory include the following:

- "In the course of reaching their respective [fairness] determinations, the Special Committee and the Board considered . . . the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the perceived risks of that alternative), the range of potential benefits to its shareholders of the possible alternatives and timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account the likelihood of execution as well as business, competitive, industry, and market risks."  FAC ¶¶ 181, 234, 244, 246; *see also* Final proxy materials at 42.

- "The Special Committee['s] determin[ation] that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group . . . [after considering] other alternatives available to the Company to enhance shareholder value, including remaining as a public company."  FAC ¶¶ 183, 234, 244, 246; Final Proxy Statement at 68 (same).

Zhou counters that these statements were not misleading because relisting was not an alternative to the Merger, but, instead, as pled, was contingent on Qihoo's first going private. Mem. at 13–14.  That critique is correct.  The FAC does not allege that any strategic alternative to the Go-Private Merger was available to shareholders, let alone any alternative that presented "superior opportunities" to going private.  It does not, for example, plead facts contradicting the proxy materials' statement that no other buyers had proposed an alternative transaction with Qihoo between the date that it received the Merger proposal (June 17, 2015) and the go-shop period in which the special committee and its advisors had explored alternatives (February 1, 2016).  *See, e.g.*, Final Proxy Statement at 51; *id.* at 68 (discussing go-shop period).

The existence of a plan within the Buyer Group to eventually relist, which is well pled, does not make the proxy's statements about the lack of strategic alternatives for shareholders well pled.  These statements expressly presupposed Qihoo's "*continuing* to operate" or "*remaining* as a public company."  *See, e.g.*, *id.* at 42, 68; FAC ¶¶ 75 (final proxy statement), 181 (preliminary proxy statement), 183 (same), 235 (amended proxy materials), 244 (second amended proxy statement), 246 (final proxy statement) (emphasis added).  Their discussion of strategic alternatives was in that context.  And the FAC does not allege facts under which going private on different terms—for example, under which shareholders who were not members of the Buyer Group would have retained an interest in Qihoo—was ever an available option.  There are no facts pled suggesting that an alternative plan existed—let alone was viable—whereby all shareholders could have retained their interests in Qihoo once private so as to be able to capitalize on a future relisting.  The FAC instead consistently alleges that, under the plan, only the members of the Buyer Group stood to participate in Qihoo's relisting after being taken private.  *See, e.g.*, FAC ¶¶ 105–37, 152–58, 260, 264–65.

Further, as Zhou correctly notes, the plan within the Buyer Group eventually to relist, as pled, presupposed that Qihoo had first gone private, under the control of the Buyer Group. The FAC does not plead that there was a plan explored or viable under which Qihoo, while retaining the same shareholders, could skip from existing as one public company to relisting as another. The FAC's theory that the proxy materials omitted an alternative available *to shareholders* thus lacks factual support. An investor reading a proxy statement addressing shareholders' current "alternatives" to going private would not reasonably expect the speaker to identify, as among these alternatives, the future internal agenda or plan of the Buyer Group.

Accordingly, the FAC does not allege that the statements concerning alternatives to the Merger were false or materially misleading. The FAC's § 10(b) claims based on this theory thus must be dismissed. *See, e.g., Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.,* 300 F. Supp. 3d 551, 577–78 (S.D.N.Y. 2018) (dismissing claim where complaint did not allege statements' factual falsity), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 761 (S.D.N.Y. 2018) (dismissing claim where "there [was] no theory under which the defendants may be held liable for [their] statements").

**B.    Causation**

The Court has sustained the FAC's claims of misstatements or omissions as to proxy material statements (1) not disclosing the Buyer Group's intention to relist; (2) presenting the Go-Private Merger as "fair" or in an otherwise positive light; and (3) setting out the reasons for the Merger. The Court next evaluates the FAC's allegations as to causation.[15]

---

[15] As to the § 10(b) element of scienter, Zhou does not challenge the FAC. *See* Mem. at 11 n.4 (adopting Qihoo and Chen's memorandum of law, but only as to other issues (citing Dkt. 78 at 7–11)); Reply (no reference to scienter); *see also Ohr Somayach/Joseph Tanenbaum Educ. Ctr.*

To state a § 10(b) claim, the FAC must viably allege plaintiffs' reliance, economic loss, and loss causation. *Suez Equity Invs., L.P.*, 250 F.3d at 95. The Court considers these "closely allied concepts" together. *See Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir. 1992) (comparing transaction causation and loss causation), *cert. denied*, 508 U.S. 909 (1993). The Court does so by evaluating first the causation allegations bearing on claims by tenderer shareholders and then the allegations bearing on claims by seller shareholders.

At the threshold, the Court notes the obvious: that the familiar methodology by which courts evaluate the alleged cause of a plaintiff's loss in a § 10(b) case does not readily apply here. In the paradigmatic case involving a public issuer's falsely positive statement(s) or nondisclosure of negative information, causation of loss is typically pled and established by either the drop of a security's public trading price following (1) a "corrective disclosure" or (2) the "materialization of a concealed risk." *In re Omnicom Grp.*, 597 F.3d at 511. Because Qihoo was taken private before later events—the Buyer Group's backdoor relisting of Qihoo more than 17 months later—exposed the proxy materials as misleading for not disclosing such a plan, there was no point at which Qihoo's trading price on a public exchange dropped on account of the revelation of bad news. On the contrary, it was not bad news that the proxy materials allegedly suppressed, but rather the favorable fact that the Buyers Group had a concrete plan eventually to relist Qihoo at a profit. Analysis of the adequacy of the FAC's pleading of reliance, loss, and loss causation thus requires tailoring the § 10(b) analysis to the idiosyncratic sequence of events

*v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) (noting that "[a]rguments not raised in a party's brief are deemed waived" and thereby refusing to consider argument first raised after motion-to-dismiss briefing). Nor would such an argument as to Zhou be tenable. Having adequately alleged a secret relisting plan orchestrated by Zhou aimed at garnering him great private profit, the FAC has adequately pled that Zhou either understood that Qihoo's public statements were inaccurate on account of this omission or was "highly unreasonable" in failing to appreciate that possibility. *Sanofi I*, 87 F. Supp. 3d at 534 (citing *Novak*, 216 F.3d at 308).

pled here.  *Cf. In re Vivendi*, 838 F.3d at 262 (specific corrective disclosure not required where complaint's theory of loss causation "rested on the revelation of the truth").

### 1.    Tenderer Shareholders

The FAC alleges as to the tenderer shareholders that, relying on the proxy materials' misstatements and omissions, these persons agreed to exchange their shares for the consideration ($77/ADS) offered in the Merger, but that this price was artificially deflated as a result of the non-disclosure of the Buyer Group's plan eventually to relist at a higher price.  *See, e.g.*, FAC ¶¶ 282–84, 320–21; *see also* Opp. at 15, 21.  Zhou disputes that the FAC articulated a viable theory of reliance as to these shareholders.  *See* Mem. at 14–15.  In any event, he argues, the FAC's allegation that these shareholders suffered a loss, caused by defendants' misstatements and omissions, is conclusory and too speculative to satisfy the operative pleading standards.  *Id.* at 16–23.

The Court assumes, *arguendo*, that the FAC plausibly pleads reliance by the tenderer shareholders on its principal theory: that votes from at least some of these shareholders were required for approval of the Merger; that these shareholders would have voted down the Merger had the plan to relist been revealed and the related misstatements not been made; and that the exchange of shares pursuant to the Merger, including ADS shares for $77 apiece, would not have occurred.  *See* Opp. at 11–12 (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)).  There is case authority supporting in concept such a theory of transaction causation—that, but for the actionable misstatements and omissions, the shareholder approval and ensuing exchange of outstanding shares for cash would have not occurred.  "Where there has been a finding of materiality, a shareholder has made a sufficient showing of casual relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential

link in the accomplishment of the transaction." *Mills*, 396 U.S. at 385 (§ 14(a) claim); *see also Minzer v. Keegan*, 218 F.3d 144, 149 n.2 (2d Cir. 2000) (*Mills* "reliev[ed] plaintiffs of the difficult burden of proving that, properly informed, shareholders would have defeated the transaction in question."); *Grace v. Rosenstock*, 228 F.3d 40, 48 (2d Cir. 2000) (applying *Mills* and *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), to § 10(b) claim).[16]

Zhou argues that *Mills* does not apply to a shareholder's "deci[sions] to buy or sell securities in reliance on [proxy materials]." Reply at 4. But the context of the tenderer shareholders—who by definition did not buy or sell, but held, through to the date when shares were exchanged for cash—does not implicate that issue. And *Mills* squarely applies where a complaint alleges that misstatements in a proxy statement affected the outcome of shareholder *voting*. *See, e.g.*, FAC ¶ 282. The FAC so alleges here. It alleges that an "affirmative vote of shareholders representing at least two-thirds of the voting rights of the shares present and voting in person or by proxy as a single class . . . was required for the Merger to pass." *Id.* ¶ 84. And it alleges that, but for the misleading statements, including that the Merger consideration was fair, the votes needed to secure approval would not have been cast. *See, e.g.*, *id.* ¶¶ 66, 87, 282–83, 320.

To be sure, the Buyer Group needed few minority shareholder votes to clear the requirement of two-thirds participation of shareholders in voting, given the Group's control of more than 60% of outstanding shares. *See id.* ¶ 83 & n.8 (Buyer Group owned approximately

---

[16] *Mills* left open "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." 396 U.S. at 385 n.7. Seven years later, the Court answered that question in the negative, holding that, where minority votes were not required for approval of a freeze-out merger, minority shareholders had failed to show that material misrepresentations in proxy materials caused their injury. *See Va. Bankshares*, 501 U.S. at 1108.

61.3% in voting rights of issued and outstanding ordinary shares; Zhou and Qi collectively

owned approximately 60.6% of voting rights).   Assuming a quorum, the turnout of minority

shareholder voting "no" would have had to have been overwhelming to deny the Buyer Group

the two-thirds support it required.[17]   Nonetheless, the Court, mindful of *Mills* and of plaintiffs'

lessened burden at the pleading stage, assumes *arguendo* the plausibility of the FAC's

transaction-causation thesis that, but for the proxy materials' misstatements and omissions, lead

plaintiffs would have voted "no"; their tenderer shareholder peers would have followed suit in

overwhelming numbers; the Merger would have been blocked; and the exchange of shares for

$77/ADS apiece would not have occurred.[18]

---

[17] In the vote that occurred, 69.3% of voting shares participated, whether in person or by proxy. FAC ¶ 86.  Of these, nearly 90% would have been comprised of the Buyer Group, assuming their complete participation (61.3% of the participating shares).  *Id.* ¶ 83.  And 99.8% of votes were cast in favor of the Merger.  *See id* ¶ 86.  Had 100% of shareholders participated, the Buyer Group would have needed affirmative votes from an additional 5.4% of shareholders, a figure representing approximately 14% of non–-Buyer Group shares.  *See id* ¶ 85; Opp. at 4 n.2.

[18] The FAC articulates a series of alternative theories of reliance and causation with respect to the tenderer shareholders.  Each, however, is problematic.

First, the FAC posits that these shareholders relied on the proxy materials' misstatements in declining to sell their ADS before the $77/ADS share exchange in the Merger.  FAC ¶ 310.  This theory fails because Qihoo's stock price never reached $77/ADS before the Merger.  *See infra* note 19.  A plaintiff who held ADS through the Merger's completion on July 15, 2016, and received $77/ADS in exchange, cannot claim to have experienced a loss for failure to sell earlier.  And, even if the decision to hold until the Merger date in favor of the looming offer of $77/ADS share had plausibly caused a loss, the FAC, for the reasons covered immediately below in connection with the FAC's next theory, does not plead individualized reliance, and cannot rely on the presumption of reliance, in connection with such a decision.

Second, the FAC posits that the tenderer shareholders relied on the misstatements in declining to exercise their appraisal rights during the class period.  *Id.* ¶¶ 87, 282, 320.  This claim would have potential for an individual investor who had attested to actual reliance on the proxy materials in making these decisions.  But plaintiffs have forsworn any claim of individual reliance, no doubt recognizing that a § 10(b) liability theory requiring proof of an individual

plaintiff's reliance would cripple a bid for class certification.  *See* Dkt. 40 at 8 ("The Complaint expressly disclaims any individual reliance by the plaintiffs[].").

Plaintiffs instead invoke the fraud-on-the-market presumption, Opp. at 14, that the typical "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price" and "the belief that it reflects all public, material information," *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (quoting *Basic*, 485 U.S. at 246–47).  But that theory does not apply to decisions other than to buy or sell shares at the price set by an efficient market.  And the tenderer shareholders' decision to hold and then exchange their shares for a privately negotiated above-market price was not of this nature.  *See ODS Cap. LLC*, 2020 WL 7028639, at *14 ("While the Court does not hold that a go private transaction could never be treated as efficient, Plaintiffs allegations here regarding the Tenderer Shareholders fail to demonstrate the open and developed market that would support market efficiency under the *Basic* presumption."); *Shanda I*, 2019 WL 11027710, at *9 ("[I]n light of the factors typically considered in determining whether a market is efficient, the Court concludes that the forced sale of shares through a merger does not constitute an efficient market.  This is because the share price was negotiated as opposed to being driven by trading volume or external analysis or reporting."); *see also Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021) (*Basic* presumption requires efficient market).  And to the extent the FAC passingly claims that every tenderer shareholder individually consulted and relied upon the market price in evaluating the merits of the Merger, the adequacy of the exchange price, and the wisdom of pursuing the appraisal process, that claim is conclusory and, as it is unsupported by concrete allegations, implausible.  *See* Opp. at 15 (citing FAC ¶ 310); FAC ¶ 310 ("Lead Plaintiffs also in fact did rely on that market price when engaging in [deciding whether, and how, to vote their Qihoo securities, whether to sell their Qihoo securities, whether to hold those Qihoo securities, or whether to seek appraisal.]"); *Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012) (summary order) (court evaluating a complaint "must first ignore mere conclusory statements") (internal quotation marks omitted)).

Third, plaintiffs theorize that the negotiated Merger price was based upon a market price that had been depressed by fraudulent statements, and thus was artificially low.  *See, e.g.*, Opp. at 14.  But the series of events pled in plaintiffs' FAC contradicts that theory.  As alleged, the Merger price was privately negotiated between the Buyer Group and the special committee, and executed, *before* any materially misleading public statements were made.  *See* FAC ¶¶ 41–60, 308; *see also Halliburton Co.*, 573 U.S. at 278 ("[I]f the plaintiff did not buy or sell the stock *after* the misrepresentation was made . . . then he could not be said to have acted in reliance on a fraud-tainted price." (emphasis added)).  And the FAC does not explain how the negotiated price, which was set far above the then-prevailing market price for Qihoo stock, was set by an efficient market.  *See* FAC ¶ 162 ($77/ADS represented a premium of 16.6% relative to closing price of ADS on last day of trading before announcement of receipt of going-private proposal, and of 32.7% relative to average closing price of ADS during the 30 trading days beforehand); *see also ODS Cap. LLC*, 2020 WL 7028639, at *14; *Shanda I*, 2019 WL 11027710, at *9; *Sable v. Southmark/Envicon Cap. Corp.*, 819 F. Supp. 324, 339 (S.D.N.Y. 1993) ("[T]here is no such

However, even assuming that, but for Qihoo's actionable misstatements and omissions, the exchange of shares, including ADS shares for $77 apiece through the Merger, would not have occurred, the FAC's theory that plaintiffs thereby suffered a demonstrable loss, and one causally attributable to these misstatements, is far too speculative and conclusory to plausibly state a § 10(b) claim.

The $77/ADS share price set by the Merger—and the corresponding price for Qihoo shares traded on the Shanghai Stock Exchange, *see supra* note 3—reflected a 16.6% premium over the ADS price on June 16, 2015, the last trading day prior to the announcement that Qihoo had received the Buyer Group's going-private proposal. It reflected a 32.7% premium over the ADS's average closing price the 30 days prior, Press Release at 1; FAC ¶ 162. Qihoo's stock price thereafter rose to approach the Merger consideration price of $77/ADS share —but never reached or exceeded it.[19]

---

justification for a presumption of reliance here, because the partnerships were offered privately and were not traded actively in a large public market.").

Fourth, plaintiffs suggest that the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which recognized a presumption of reliance in omission cases, applies here, presumably to the decision by tenderer shareholders to hold and not sell. *See* FAC ¶ 307. *Affiliated Ute* does not apply here. Second Circuit precedent has limited its reach solely to pure-omission cases, which, as noted, this is not, given the ostensible affirmative misstatements the FAC alleges. *See Schwab v. E*TRADE Fin. Corp.*, 752 F. App'x 56, 59 (2d Cir. 2018) ("*Affiliated Ute* applies only when [its] original rationale . . . is present: when there are 'no positive statements,' and 'reliance as a practical matter is impossible to prove.'"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93, 95–96 (2d Cir. 2017) (*Affiliated Ute* does not apply to affirmative misstatements, or to misstatements "whose only omission is the truth that the statement misrepresents"). In any event, *Affiliated Ute* did not involve a decision to hold existing shares in favor of a privately negotiated above-market offer, and plaintiffs have not cited any case authority extending it to this situation.

[19] The closing price of Qihoo's ADS on the NYSE on June 16, 2015, the last trading date before the Company's announcement that it had received a going-private proposal, was $66.05/ADS. Final Proxy Statement at 17. In the months leading up to the Merger's announcement, Qihoo's ADS had traded well below $77/ADS. Its closing price averaged approximately $69.98 in June,

This price activity—with the ADS price jumping to approach the Merger consideration but never exceeding it—logically reflects that, were the Merger approved, each share would been exchanged for that precise sum, but that the market slightly discounted that sum to capture the possibility that the Merger would not reach completion. Salient here, nothing in the Qihoo's stock price activity at any point approaching the Merger suggests any appetite to value the stock above that level.

The FAC's economic loss and loss causation theory begins, as noted, with the premise that the tenderer shareholders would have turned out in force to vote down the Merger. Plaintiffs do not posit that the stock price, upon the Merger's rejection, would have dropped towards the levels seen pre-announcement. They instead imagine that ensuing events would have resulted in them receiving more than $77/ADS, along one of two lines. Either the tenderer shareholders would have demanded, as part of a renegotiated going-private transaction, a higher price per-ADS than the $77/ADS that they received, and the Buyer Group would have said uncle and acceded to these demands. Or, alternatively, Qihoo would have remained public and, prior to the point at which the tenderer shareholders otherwise would have sold, the market, inspired by the Buyer's Group's disclosure of its (foiled) intended plan to relist after taking Qihoo private,

---

$63.09 in July, $58.97 in August, $46.67 in September, $54.12 in October, $63.30 in November, and $71.14 in the days of December before the Merger's announcement on December 18, 2015. *See* Grunfeld Decl., Ex. B. The day of the announcement, Qihoo's ADS price rose to $73.00, then fell in January, when the average closing price was $71.06. *Id.* On January 11, 2016, when the preliminary proxy statement issued, Qihoo's ADS dropped from $69.99/ADS to $69.88/ADS, before rising to $70.83/ADS the next day. On February 8, 2016, when amended proxy statement issued, Qihoo's ADS dropped from $70.21/ADS to $68.63/ADS, rising to $68.83/ADS the following day. On February 26, 2016, the date of the second amended proxy statement, Qihoo's ADS rose from $71.45/ADS to $72/ADS; it fell the next day to $71.88/ADS. On March 3, 2016, the date the final proxy statement issued, Qihoo's ADS increased from $73.95/ADS to $74.81/ADS, before falling to $74.59/ADS the following day. Over the course of 2016, Qihoo's ADS price increased gradually toward of $77/ADS—albeit with periodic dips—before peaking at $76.92/ADS the day before the Merger's completion. *Id.*

would have driven the stock price above $77/ADS share, at which point these shareholders would have sold. Either way, however, plaintiffs' logic relies on a chain of inferences far too speculative and distended to support a plausible theory of loss and loss causation under § 10(b).

The assembled case law, to say the least, has not looked kindly on similarly attenuated theories of economic loss when articulated in securities fraud lawsuits. *See, e.g.*, *In re Resolute Energy Corp. Sec. Litig.*, No. 21-1412, 2022 WL 260059, at *2–3 (3d Cir. Jan. 27, 2022) (no economic loss where appellant offered only speculative allegations that true market value was higher than merger consideration, let alone higher than the 15% premium on market value offered as merger consideration); *Kuebler v. Vectren Corp.*, 13 F.4th 631, 646 (7th Cir. 2021) (no economic loss where "plaintiffs' allegations amount—at most—to speculation that if the omitted [information] had been disclosed, they would have been able to determine that the value of their shares exceeded $72.00"); *Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 37 (2d Cir. 2021) (no economic loss where plaintiffs alleged initial projections predicted higher implied value of shares than allegedly misleading "updated" projections, and hypothetical bidders would have offered more than actual bidders); *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020) ("The suggestion that the analysts' opinions of what the shares might be worth were different from what was actually received, let alone that they represented the shares' true value, is too speculative to plead with particularity that shareholders experienced losses—or to plead with particularity that the required causal relationship existed between [defendant's] purported misrepresentations or omissions and those losses."); *In re Resolute Energy Corp. Sec. Litig.*, No. 19 Civ. 77 (RGA), 2021 WL 327385, at *4 (D. Del. Feb. 1, 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022) (§ 14(a) claim) (complaint did not allege economic loss and loss causation "simply by alleging that the . . . stock was undervalued

at the time of the merger (no matter how precisely, if not plausibly, he puts a number on it)");
*ODS Cap. LLC*, 2020 WL 7028639, at \*15 (no economic loss where allegations that defendant
depressed price during class period were "bel[]ied by the fact that [the] stock price rose or
remained roughly the same during the class period"; allegation that stock was rising less than it
should have was too speculative); *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1011 (S.D.
Ind. 2019) ("That there *might* have been a better future prospect at some point in time had the
shareholders held on to their shares is too speculative to state a claim . . . ." (emphasis in
original)), *aff'd*, 13 F.4th 631 (2021); *Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977,
1000 (S.D. Ind. 2018) (no economic loss absent allegation of a definite, immediately available,
superior alternative to the merger consideration; dismissing where alleged economic loss
depended on marketplace eventually valuing stock at higher than merger consideration at some
indeterminate future date when plaintiff still held his shares and was willing to sell them); *cf.*
*Beck v. Dobrowski*, 559 F.3d 680, 684 (7th Cir. 2009) (dismissing complaint where plaintiffs
alleged that, but for misleading proxy solicitation, shareholders would have rejected buyout and
thereafter reaped unspecified economic benefits of continuing to own shares); *In re E-House Sec.*
*Litig.*, No. 20 Civ. 2943 (ER), 2021 WL 4461777, at \*16 & n.11 (S.D.N.Y. Sept. 29, 2021) (no
loss causation where plaintiffs alleged fair value exceeded merger consideration because parallel
projections implied higher valuation, but share prices consistently rose during class period);
*Haideri v. Jumei Int'l Holding Ltd.*, No. 20 Civ. 02751 (EMC), 2021 WL 4170791, at \*23–24
(N.D. Cal. Sept. 14, 2021) (complaint's allegations about "true value" held unacceptably
speculative given lack of competing offers before or after tender offer).

In evaluating the plausibility of the FAC's theory that the tenderer shareholders stood to
profit above \$77/share had the Merger been rejected, the Court begins with a key fact the FAC

elides:  The special committee did, in fact, repeatedly try to negotiate a higher price per ADS during the period leading up to the Merger Agreement, and to secure superior offers, before determining that the $77/ADS share price was fair to shareholders.  *See* Final Proxy Statement at 35–37 (seeking $80/ADS).  The committee did so with the help of estimable financial and legal advisors.  *Id.*  There is no allegation that these advisors were denied any information about Qihoo's intrinsic economics, as opposed to about the Buyers Group's relisting plan.  *See, e.g.*, FAC ¶¶ 9 (defendants failed to disclose relisting plan to J.P. Morgan), 56 (financial projections provided to J.P. Morgan did not account for relisting plan).  The Buyer Group, however, repeatedly rejected the special committee's requests for a superior price.  Final Proxy Statement at 35–37.  The FAC does not plead any facts suggesting that the Buyer Group was willing to consider a price above $77/ADS, or that an outside bidder would have emerged with a higher bid had it had a clearer forecast of the Buyer Group's longer-term plans.

Quite the contrary, the FAC conspicuously lacks any allegations suggesting that a superior opportunity to that offered by the Buyer Group was then available to shareholders.  The special committee had expressly opined that no such opportunity was available.  Final Proxy Statement at 43; *compare Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 299 (D. Conn. 2021) (loss causation adequately pled where complaint alleged that the defendant issuer had received a specific offer for its shares that was higher than merger consideration), *with Kuebler*, 13 F.4th at 647 (no economic loss pled where, *inter alia*, "plaintiffs do not even allege the existence of a viable superior offer"), *and Trahan*, 308 F. Supp. at 1000 (no loss causation where complaint did not allege a "definite, immediately available, superior alternative to the [m]erger consideration" such as a "higher competing offer").

The FAC instead alleges a superior recovery to $77/ADS share based on a series of assumptions. These begin, of course, with the shaky premise, which the Court has credited only *arguendo*, that, had the relisting plan been revealed, the minority shareholders would have voted against the Merger in sufficient numbers to block it. The FAC alleges, based on four data points or allegations, that such a recovery plausibly awaited the tenderer shareholders had the Merger been rejected by dissatisfied tenderer shareholders.

First, the FAC points to news articles asserting that "technology companies are generally valued more in the Chinese stock market than in the United States." FAC ¶ 152. Second, the FAC notes that, after Qihoo relisted more than 17 months later in China as part of the "backdoor" relisting, its share value was higher than that offered in the Merger. *Id.* ¶¶ 279 ("The far higher price that the Company was valued at in its relisting shows that the Class members did not receive fair value for their shares in the Merger."), 283 ("Class members who held their Qihoo securities through the close of the Class Period . . . [were] deprived of the fair value of their securities through the fraudulent depression of the[ir] value . . . as evidenced by the fact that only a portion of Qihoo's assets have been valued at multiple times the Merger price since Qihoo's relisting in China."). Third, the FAC points to a February 28, 2017 news article asserting that internal projections disclosed to the Buyer Group predicted a return "as high as 5" times the Merger price by 2019. *See id.* ¶¶ 6, 115. Fourth, the FAC argues that the money that Qihoo set aside in October 2016 for a Cayman Islands appraisal action with respect to the shares of dissenting shareholders (those who elected not to exchange their shares at the Merger price), and an undated valuation expert opinion in that proceeding, supports a higher share valuation than that offered in the Merger. *Id.* ¶¶ 138–52.

The first three grounds can be addressed together—and are easily put aside.  The general proposition that the Chinese stock market tends to value tech companies higher than other markets does not say anything about Qihoo.  Qihoo was already publicly traded in China.  And this generality about valuations on the Chinese stock market does not support the inference that tenderer shareholders could have negotiated a price with the Buyer Group above the Merger consideration or that the valuation of Qihoo shares would have jumped above $77/ADS upon the voting down of the Merger, let alone in reasonably short order.  The FAC's apparent premise that Qihoo, while remaining publicly traded, had the option somehow to "re-list" in China at a higher per-share valuation, while presumably securing the benefits the Buyer Group perceived of going private before relisting, is unexplained.  The FAC's thesis to this effect is inconsistent with the special committee's assessment that superior alternatives to the Merger did *not* then exist—a proposition the FAC does not factually rebut.

As for the FAC's comparison to Qihoo's valuation upon its relisting 17 months later, it is too remote to plausibly plead loss or loss causation.  In the intervening period—between the Merger's close on July 15, 2016, and 360 Security Technology Inc.'s listing on the Shanghai Stock Exchange on February 28, 2018—the company had been restructured.  It had "conducted a complicated restructuring of its business" to separate its main internet security business from its non-core operations, including its financial,[20] health care, property management, and mobile phone businesses, *see* FAC ¶ 95; created a new entity, 360 Technology Co. Ltd., into which it put, among other entities, its core internet security business, *id.*; and merged 360 Technology with an elevator manufacturing company, *id.* ¶ 96, whose assets were also restructured in the

---

[20] During the reorganization, Qihoo separated its "financial arm," which conducted an initial public offering in the United States in December 2018 under the name 360 Finance.  FAC ¶ 102.

course of the reverse merger, *id.* ¶ 99.  By the time of the relisting, the company, restructured and renamed 360 Technology, had become significantly more profitable.  *See id.* ¶¶ 100–04.  It is guesswork to imagine that the changes during Qihoo's 17-month stint in private hands would have transpired and had the same market effect after the Merger's hypothetical rejection, such that a public Qihoo that had remained listed on the NYSE, as of February 28, 2018, would have mirrored the company that was relisted on the Shanghai Stock Exchange.  *See id.* ¶ 100 (date that Qihoo began trading on Shanghai Stock Exchange after reverse merger with SJEC).  It is also conjectural to assume that the benefits of the backdoor relisting process, which freed Qihoo from the complex and uncertain regulatory and IPO process, would have been available to Qihoo in the alternative series of events that the FAC posits.  *See Erica P. John Fund, Inc.*, 563 U.S. at 812–13 (loss causation inadequately alleged where loss "could instead be the result of other intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" (internal quotation marks omitted)); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,* 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (loss causation inadequately alleged where complaint did not allege facts to disaggregate precipitous drop in market from corrective disclosures); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008) (loss causation inadequately alleged where complaint did not allege losses resulting from materialization of the risk defendants concealed, rather than from intervening causes); *Collier v. Aksys Ltd.*, No. 04 Civ. 1232 (MRK), 2005 WL 1949868, at *13 (D. Conn. Aug. 15, 2005), *aff'd*, 179 F. App'x 770 (2d Cir. 2006) (seven months after defendants' revelation was a "virtual lifetime in the market" and too remote to link losses to earlier misrepresentations); *see also In re the Bear Stearns Cos., Inc. Sec.*, No. 08 MDL 1963 (RWS), 2016 WL 4098385, at *13–14 (S.D.N.Y. July 25, 2016)

(dismissing "leakage" theory of loss causation, where plaintiff offered no allegations of trading on allegedly leaked news); *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (five-year interval between alleged misrepresentations and bank's losses too remote to allege proximate cause for Racketeer Influenced and Corrupt Oganizations violation; external market factors could have caused those losses).

Finally, the February 2017 news article's general reports that more "ambitious estimates of future net income and other performance metrics going out to 2019" had existed at the time of the Merger, FAC ¶ 131, do not speak to the practical options available to Qihoo, in a continuing incarnation as a public entity, at the time when Merger was voted upon. *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) ("Sentiment simply is not enough to sufficiently plead loss causation" and "[s]peculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact" (citation omitted)).

In sum, whether the pleading defect is cast in terms of economic loss or loss causation, the FAC's theory that events following the rejection of a Merger would have transpired so as to reward plaintiffs for their shares at a price exceeding $77/ADS, for example, while imaginable, is far too contingent and anchored in guesswork to support a viable § 10(b) claim. *See Lentell*, 396 F.3d at 174 (holding, as to loss causation: "It is not enough to allege that a defendant's misrepresentations and omissions induced a 'purchase-time value disparity' between the price paid for a security and its 'true investment quality'"); *id.* (loss causation not pled where the "connection is attenuated, or plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered" (internal quotation marks omitted)).

The FAC's allegations based on the Cayman Islands appraisal action also do not carry the day for the tenderer shareholders. The FAC notes that Qihoo, in October 2016, furnished $92 million to a Cayman Islands court, as security to cover the appraisal action brought by dissenting shareholders who sought an appraisal of the fair value of their shares. FAC ¶ 140. Because these shares would have been valued at $16.9 million at the Merger consideration price, *id.*, plaintiffs argue that the market value of the shares necessarily must have been higher than the $77/ADS offered. *See* Opp. at 17–18. But the FAC does not allege that the $92 million in security represented any party's actual assessment of the value of the shares at issue, let alone the factual basis for such an assessment. Without other allegations, this sum could easily instead have reflected a cautious set-aside to cover a worst-case scenario in which these shareholders' claims were validated in full.

The FAC also alleges that an anonymous valuation expert hired by the dissenting shareholders opined that their share value was between $124.40 and $290.49 per share. *See* FAC ¶ 140. But the FAC does not set out the factual bases for that secondhand opinion beyond stating it was "based on discounted cash flow valuation and a capitalization of earnings," *id.* ¶ 140 n.26, nor provide any information as to the identity, qualifications, or methodology of the expert that would tend to support his or her reliability. Plaintiffs do not even claim to have read, let alone independently evaluated for rigor and accuracy, the expert's report. This secondhand allegation about an unidentified party-retained expert's bottom-line conclusion does not make plausible the FAC's loss-causation thesis that, had the Merger been voted down, the tenderer shareholders would have non-speculatively received more than the $77/ADS share that they in fact garnered.[21]

---

[21] The FAC does not allege that, but for the proxy's misstatements, all tenderer shareholders—or Lead Plaintiffs, specifically—would have exercised their appraisal rights. At most, it makes the

vague allegation that, but for the misstatements, some tenderer shareholders would have declined the $77/ADS offer in favor of an appraisal proceeding.  FAC ¶¶ 87 ("more shareholders" would have done so if fully informed), 320 (tenderer shareholders would have "avoided [accepting Merger consideration] either by voting against the Merger or objecting to and dissenting from the Merger and seeking their appraisal rights"); *see also id.* ¶ 282 ("Defendants' false and misleading statements concealed the true value of Qihoo Securities and therefore prevented Qihoo Securityholders from making an informed decision as to whether they should dissent and seek appraisal.").  Further undermining the plausibility of a claim that tenderer shareholders would have widely availed themselves of this option, the FAC notes the "difficult and costly" procedural steps an ADS shareholder would have had to undertake to have a right to participate in an appraisal.  *See id.* ¶ 91; *see generally id.* ¶¶ 88–92 (heading).  The final proxy materials provided:

> ADS holders will not have the right to exercise dissenters' rights and receive payment of the fair value of the Shares underlying their ADSs.  The ADS Depositary will not exercise or attempt to exercise any dissenters' rights with respect to any of the Shares that it holds, even if an ADS holder requests the ADS Depositary to do so.  ADS holders wishing to exercise dissenters' rights must surrender their ADSs to the ADS Depositary for delivery of Shares, pay the ADS Depositary's fees required for the cancellation of their ADSs, provide instructions for the registration of the corresponding Shares in the Company's register of members, and certify that they hold the ADSs as of the ADS Record Date and have not given, and will not give, voting instructions as to their ADS before 5:00 p.m. (New York City time) on _____, 2016, and become registered holders of Shares before the vote to authorize and approve the Merger is taken at the extraordinary general meeting.  Thereafter, such former ADS holders must comply with the procedures and requirements for exercising dissenters' rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law.  If the Merger is not consummated, the Company will continue to be a public company in the United States and ADSs will continue to be listed on the NYSE.  Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs.  As a result, if a former ADS holder has surrendered his, her or its ADSs to exercise dissenters' rights and the Merger is not consummated and such former ADS holder wishes to be able to sell his, her or its Shares on a stock exchange, such former ADS holder will need to deposit his, her or its Shares into the Company's ADS program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS Depositary for the issuance of ADSs ($5.00 for each 100 ADSs (or portion thereof) issued) and applicable Share transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

Final Proxy Statement at 27; *see also id.* at v (same).

49

In sum, the FAC's allegations as to loss and loss causation—that but for the allegedly actionable features of the proxy materials, lead plaintiffs would have obtained more than $77/ADS share—are too speculative to state a plausible claim. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005) (complaint must plausibly plead actual economic loss); *Lentell*, 396 F.3d at 174–75 (affirming dismissal, for failure to allege loss causation, where complaint offered no factual allegations supporting inference that subject of false statements caused decline in stock value); *C.D.T.S. v. UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *7–8 (S.D.N.Y. Dec. 13, 2013) (dismissing as too speculative loss causation theory that revelation of a "rogue trader's" loss caused stock price decline), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015); *Janbay*, 2012 WL 1080306, at *16 (dismissing where loss causation allegations too speculative); *In re AIG Advisor Grp.*, No. 06 Civ. 1625 (JG), 2007 WL 1213395, at *10 (E.D.N.Y. Apr. 25, 2007) ("[P]laintiffs' hypothesis that they would have gotten a better deal on a different investment is too speculative to support a pleading of loss causation."), *aff'd sub nom. In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495 (2d Cir. 2009).

The Court accordingly grants Zhou's motion to dismiss the § 10(b) claims of the tenderer shareholders.  Because this same deficiency equally inheres in these shareholders' § 10(b) claims as brought against Qihoo and Chen, the Court dismisses these shareholders' claims against those defendants as well.

### 2.    Seller Shareholders

The seller shareholders' theory of loss is more succinctly put.  The FAC alleges that these persons sold Qihoo shares during the class period at prices artificially deflated on account of the misrepresentations and omissions in the proxy materials.  But for defendants' fraud, the FAC alleges, these sales would have been at higher prices, or the sellers would have held onto their

shares through to the exchange date and secured $77/ADS share.  FAC ¶¶ 280, 319; *see also id.* ¶ 281 ("[B]ut for the fraud, the market price for Qihoo Securities would have more closely reflected their true value.").  Zhou does not challenge the adequacy of the FAC's pleading of reliance as to the seller shareholders.  *See* Mem. at 14–15 (disputing reliance only as to the tenderer shareholders); Reply at 3–5 (same).  He argues, instead, that the FAC inadequately pleads that these shareholders suffered a cognizable economic loss because the market price of Qihoo securities generally rose during the class period, *see* Mem. at 16–17, and that any theory of loss causation is unduly speculative, *see id.* at 23–24.

Briefly, as to reliance, the seller shareholders—as all agree—have properly invoked the rebuttable presumption of reliance at this stage.  The seller shareholders sold their Qihoo shares at the price set by a presumptively efficient market.  *See Basic*, 485 U.S. at 241–42.  Unlike the tenderer shareholders, these shareholders were, as pled, were typical "investor[s] who b[ought] or s[old] stock at the price set by the market" and did so "in reliance on the integrity of that price" and "the belief that it reflects all public, material information."  *Halliburton Co.*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246–47); *see also ODS Cap.* LLC, 2020 WL 7028639, at *13 (reliance undisputed as to seller shareholders who sold ADS during class period); FAC ¶¶ 281, 308–11.

Zhou's argument disputing the FAC's claim of economic loss, and of loss causation, makes two points why dismissal is required:  (1) As of the Merger exchange, there had been no paradigmatic corrective disclosure sending the stock price south, Mem. at 19–21, and (2) Qihoo's stock price, with some variation, generally rose from the day the Merger was announced on December 18, 2015, through the date of the Merger exchange on July 15, 2016, *id.*

at 23–24.  Thus, Zhou posits that the seller shareholders, rather than plausibly pleading loss, if anything profited.  *See* Xie Decl., Ex. 4; Mem. at 17.

As to Zhou's first point, the case law does not require the revelation of defendants' fraud to manifest in a corrective disclosure, specifically, for a § 10(b) claim to survive a motion to dismiss.  *See, e.g.*, *In re Vivendi*, 838 F.3d at 262 (specific corrective disclosure not required where complaint's theory of loss causation "rested on the revelation of the truth"); *id.* at 262 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282–83 (S.D.N.Y. 2008) ("In order to form an adequate basis for loss causation, a given disclosure need not emanate from a particular source, take a particular form, or be of a particular quality." (internal quotation marks and alterations omitted) (citation omitted)); *In re Winstar Commc'ns*, No. 01 Civ. 11522 (GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (no specific requirements as to how truth reaches the public).  And as discussed above, the events pled here depart from the common paradigm of a § 10(b) case in which insiders fraudulently inflate a stock price, and shareholder loss is occasioned and proven by a corrective disclosure.  This case presupposes, instead, that insiders depressed the price of Qihoo securities pending a go-private insider buyout.  In that paradigm, there is no illogic in the premise that the share prices were undervalued between the actionable statements and the scheduled exchange.  And, in a non-traditional context such as this, the case law does not categorically preclude a plaintiff who cannot point to a corrective disclosure from pleading loss where such an inference rationally and plausibly follows from the pled facts.

As to the fact that Qihoo's ADS price generally rose during the class period, that is not inconsistent with the FAC's theory that the ADS price increased less between December 18, 2015 and July 15, 2016 than it would have had the Buyer Group's plan to relist been revealed. The relisting plan implied optimism about Qihoo's potential and about the likelihood that the Merger would reach completion, assuring ADS shareholders $77/ADS.  *Cf. Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40–41 (2d Cir. 2012) (recovery of stock price after disclosure did not, at pleading stage, make implausible the inference of loss, because price rebounds could have represented market reactions to unrelated gains).  *Contra, e.g.*, *ODS Cap. LLC*, 2020 WL 7028639, at *15 (recognizing that plaintiffs could argue that stock rose less than it should have due to misleading statements, but determining allegations insufficient); *Collier*, 2005 WL 1949868, at *11 (same).  The inference reasonably follows from the FAC that, but for the proxy materials' misstatements, the stock's price would have more closely hugged the $77/ADS share price during the months between the announcement and the completion of the Merger, whereas in fact, the price dipped to a close of $67.83 during that period, and often closed little above $70/ADS share during significant portions of that period.  Grunfeld Decl., Ex. B; *see supra* note 19.[22]  The FAC reasonably alleges that the market, alerted to the relisting plan, would have had greater confidence that the Go-Private Merger would reach fruition, leading shareholders to be more confident and more apt to hesitate before selling at prices meaningfully below the exchange price.  Although discovery will test such premises, the FAC's theory is plausible that, but for the suppression of the Buyer's Group's heady plans after taking Qihoo private, Qihoo's ADS price would have approached or been asymptotic to the exchange price of

---

[22] A closer review of Qihoo's stock price activity during the class period reflects a more complex portrait than that painted by Zhou of a consistent rise.  The ADS stock price, in fact, dropped on the days the preliminary and amended proxy statements were filed.  *See* Grunfeld Decl., Ex. B.

$77/ADS share throughout the class period, with consequent loss to shareholders who sold for below that price.

In this respect, the FAC's theories of loss and loss causation as between the tenderer and seller shareholders are usefully contrasted. The tenderer shareholders received the $77/ADS share offered in connection with the Merger—reflecting a significant appreciation over the price at which Qihoo was trading before the announcement of the Merger. The tenderer shareholders' theory of loss accordingly imagines a chain of events starting with the vote-down of the Merger, and leading, through a series of conjectural events, and potentially playing out over a period of months or years, to broad sunlit uplands for such shareholders, whom it posits would, by some means, have eventually secured more than $77/ADS share. The Court has held that theory of loss and causation impermissibly conjectural. Not so for the seller shareholders. Their theory plays out over a shorter period, beginning with the announcement of the Merger on December 18, 2015 and ending with the completion of the Merger on July 15, 2016. It does not require conjuring unpredictable events after the exchange date. And it does not require imagination to conjure the mechanism of a share-price increase. The premise is simply that, had the market been fully informed of the Buyer Group's intentions, there would have been heightened market confidence that the $77/ADS share offer would materialize on the Merger date and the ADS price would have more closely approached the Merger price during the class period. The chain of causation for the seller shareholders is, in sum, short and plausible. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (loss causation is "at bottom . . . a consideration properly analyzed under *proximate cause*" and "the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss" (emphasis in original) (quotation marks omitted)); *Lentell*, 396 F.3d at 174 ("Loss causation is a

fact-based inquiry and the degree of difficulty in pleading will be affected by the circumstances . . . .").

Zhou separately moves to dismiss as to the subset of "in-and-out" traders who had both bought *and* sold Qihoo securities at artificially deflated prices.[23]   Zhou notes decisions barring such in-and-out traders from serving as lead plaintiffs, because they had sold their shares before any corrective disclosure and resulting stock price drop and, on these shares, could not have suffered a cognizable loss.   *See* Mem. at 23–24 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009); *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617–18 (S.D.N.Y. 2015); and *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 273 (S.D.N.Y. 2015)).

Those cases are inapposite for multiple reasons.   For one, the issue before the Court is whether the FAC states a claim as to seller shareholders—not whether, on a motion for class certification, Altimeo and ODS Capital would be suitable class representatives.   *See, e.g.*, *In re Flag Telecom Holdings*, 574 F.3d at 39–40 (excluding in-and-out traders as class representatives because they were subject to unique defenses and, therefore, failed typicality test under Rule 23); *In re Puda Coal Sec. Inc. Litig.*, No. 11 Civ. 2598 (KBF), 2013 WL 5493007, at *18 (S.D.N.Y. Oct. 1, 2013) (same) (collecting cases).   For another, as noted, the paradigm which those cases reflect, involving inflated share valuations exposed by a corrective disclosure, is not before the Court.   That paradigm informs the decisions that have disdained lead-plaintiff service by such persons.   Here, by contrast, throughout the class period, the stock's price is alleged to have been artificially low on account of the non-disclosure of the Buyer Group's relisting plans.   As pled,

---

[23] Both lead plaintiffs may fall in this category.   Altimeo's first purchase appears to have been after the preliminary proxy statement's issuance.   *See* Ex. 12-3, at 4 (citing Bates-stamped page number).   ODS Capital's first purchase was after the final proxy statement issued.   *See id.* at 7.

any sale by lead plaintiffs during the class period was at a loss relative to the price at which Qihoo ADS would have traded had the proxy been non-misleading.  On the facts, there is no basis to distinguish plaintiffs' trades at different points in the class period, because each trade, on the FAC's theory, was actionable.  *Cf., e.g.*, *Gordon v. Sonar Cap. Mgmt. LLC*, No. 11 Civ. 9665 (JSR), 2014 WL 3900560, at *3 (S.D.N.Y. Aug. 1, 2014) (denying motion to dismiss where allegations about in-and-out trading require prematurely resolution of factual issues); *Gordon v. Sonar Cap. Mgmt. LLC*, 962 F. Supp. 2d 525, 530 (S.D.N.Y. 2013) ("It is possible that the market-distorting effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation." (internal quotation marks omitted)).

For these reasons, the FAC adequately alleges reliance, loss, and loss causation as the seller shareholders.  The Court denies Zhou's motion to dismiss plaintiffs' claims to the extent based on this capacity.

## IV.    The FAC's Section 20(a) Claim

The Court next considers the FAC's claims against Zhou under § 20(a) for control person liability.  The parties treat these claims as derivative of the § 10(b) claims.  Zhou argues that, to the extent the FAC has not plausibly alleged a predicate § 10(b) claim, its § 20(a) claim fails, *see* Mem. at 24 n.11; plaintiffs do not reference the § 20(a) claim at all.

The Court accordingly sustains both the § 10(b) and the § 20(a) claims against Zhou, the latter to the extent the § 10(b) claims have been held plausibly pled.  The FAC properly alleges primary liability on Zhou's part as to those claims of the seller shareholders that the Court has

sustained.[24]   The FAC also properly alleges Zhou's secondary liability, based on his control over

the allegedly actionable filings, as Qihoo's chairman and CEO.  FAC ¶ 22.  It further alleges that

Zhou, who owned a 17.3% stake in Qihoo before the Merger, *id.* ¶¶ 250, 260 n.29, initiated and

orchestrated the Merger as CEO, *see, e.g.*, *id.* ¶¶ 41–43, and signed the proxy materials on

Qihoo's behalf, *see, e.g.*, *id.* ¶ 258.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 772

(S.D.N.Y. 2017) ("it follow[ed]" that defendant was secondarily liable under § 20(a), as person

who had had control over fillings, after he had been found primarily liable); *In re Lululemon Sec.*

*Litig.*, 14 F. Supp. 3d 553, 575 (S.D.N.Y. 2014) ("Courts in the Second Circuit have found that a

primary violation combined with a sufficient level of control constitutes culpable

participation."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).[25]   And there is no impediment to the twin

theories of primary and secondary liability by Zhou proceeding to discovery.  *See In re Refco,*

---

[24] The FAC's allegations clearly justify imputing responsibility to Zhou for Qihoo's alleged misrepresentations and omissions and scienter on his part, including based on his knowledge of Qihoo's and the Buyer Group's false denials of a relisting plan and his economic self-interest in the Going-Private Merger.  Zhou will be at liberty to pursue, at summary judgment or trial, his argument that his interests were sufficiently adverse to Qihoo's so as not to support scienter.  But at this stage, the FAC's theory that Zhou purported to act on behalf of Qihoo's interests but with scienter is patently plausible.  *See Shanda I*, 2019 WL 11027710, at *8 (adverse interest exception did not apply where agents could not be said to have "totally abandoned the interests of the corporation"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015) (adverse interest exception did not apply where fraud operated on the public, not on the corporation); *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013) (same).

[25] Zhou has not contested that he is a controlling person within the meaning of the statute.  *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 399–400 (S.D.N.Y. 2012) (denying motion to dismiss as to § 20(a) claim where defendant did not contest such and complaint had alleged primary § 10(b) violation and scienter); *Freudenberg*, 712 F. Supp. 2d at 205 (same, where complaint alleged defendant oversaw defendant company's capital market endeavors, held multiple officer posts, directly participated in company's purchase of risk loans, and spoke directly to investors during conference calls); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 262–63 (S.D.N.Y. 2005) (collecting cases) (control alleged where defendant was Chairman of Board, signed annual reports, owned majority of voting power of defendant company's stock, directed defendant company's affairs, and caused defendant company to engage in the alleged fraud).

*Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007) ("[A]lthough a defendant ultimately may not be held liable as both a primary violator and a controlling person, pleading such alternative theories of liability is permissible." (alterations omitted)).

## V.    The FAC's Section 20A Claim

Finally, the Court addresses the FAC's § 20A insider trading claim.  Zhou argues that the § 20A claim fails because it does not state a separate § 10(b) insider trading claim.  *See* Mem. at 24 n.12.  Plaintiffs counter that § 20A need not contain a freestanding insider trading claim but need only allege facts plausibly pleading "a predicate violation."  Opp. at 24.

Regardless, the FAC's § 20A claim fails because it does not plead a predicate insider trading violation of the Exchange Act, as it must to survive, in addition to pleading "sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff."  *Gruber v. Gilbertson*, No. 16 Civ. 9727 (WHP), 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019); *see also id.* at *3 ("[Section] 20A merely requires that an underlying violation of § 10(b) occurred."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 309 (same).

The basis of the FAC's claim of an insider trading violation is Zhou's "purchase" of the Qihoo securities through the Merger.  *See* FAC ¶¶ 285–95, 323–29 (alleging § 20A claim "on behalf of . . . all members of the Class who sold Qihoo Securities through the Merger and contemporaneously with these Defendants' purchase of those securities in connection with the Merger"); Opp. at 24–25.  To plead such a violation under §10(b), a complaint must adequately allege economic loss and loss causation.  *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747 (2d Cir. 1992), *as amended* (2d Cir. 1992) (plaintiff, to recover for § 10(b) insider trading violation, had to "show[] that the violation caused the plaintiff's alleged economic loss, [that is], loss causation"); *cf. Dirks v. S.E.C.*, 463 U.S. 646, 667 n.27 (1983) (economic losses must be caused by defendant's fraud to allege insider trading under § 10(b); mere losses or

damages alone is not enough, because "as market values fluctuate and investors act on inevitably incomplete or incorrect information, there always are winners and losers"); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) ("The language of § 20A makes clear that . . . Congress sought to alter the remedies available in insider trading cases, and *only* in insider trading cases." (emphasis in original) (citation omitted)) (declining to apply § 20A where predicate violations were under §§ 11 and 12(2) of the Securities Act).  For the reasons covered above, the FAC has not plausibly—but instead has only speculatively—pled such a loss as to the tenderer shareholders, the only shareholders remaining as of the time of the Merger.  And the seller shareholders who had relinquished their ADS shares prior to the point of the Merger—and who, by definition, could not have traded with Zhou at the point of the Merger—cannot claim a cognizable loss at Zhou's hands, either.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 664 (S.D.N.Y. 2007) ("Not all violations of the Exchange Act can serve as predicate violations for purposes of § 20A.").

Accordingly, because the FAC has not plausibly pled a primary insider trading violation, its § 20A claim against Zhou must be dismissed.  *See, e.g.*, *Feiner Fam. Tr. v. VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009) (dismissing § 20A claim where complaint did not allege scienter element under § 10(b)); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 & n.7 (S.D.N.Y. 2019) (same, where complaint did not allege actionable misstatements or omissions or scienter), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020); *City of Taylor Gen. Emps. Ret. Sys.*, 967 F. Supp. 2d at 800 (same); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 308–09 (same, for failure to allege scienter).

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Zhou's motion to dismiss the FAC.

The Court grants the motion to dismiss as to (1) the § 10(b) claims based on defendants' statements concerning strategic alternatives to the Merger, (2) all claims on behalf of the tenderer shareholders, and (3) the § 20A claim. These claims are dismissed with prejudice, as to all defendants.[26]

The Court otherwise denies the motion to dismiss. Specifically, as to the seller shareholders, the Court denies the motion to dismiss (1) the § 10(b) claims based on defendants' statements regarding their intention to relist, the Merger's fairness, and their reasons for pursuing it; and (2) the § 20(a) claim against Zhou.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 114 and 130.

This case will now proceed to discovery as to plaintiffs' claims on behalf of the seller shareholders, on the misstatements and omissions described above. The Court schedules an in-person case management conference on April 5, 2023 at 11:30 a.m. in Courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, New York, New York 10007. All conferences with the Court are scheduled for a specific time; there is no other matter scheduled

---

[26] Plaintiffs have requested leave to amend to add allegations relating to the Cayman Islands appraisal action. Opp. at 6 n.4; FAC ¶¶ 138–52. For the reasons reviewed at length above, additional allegations about that post-Merger action could not plausibly allege reliance and loss causation on the part of lead plaintiffs in their capacity as tenderer shareholders. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court does not have occasion here to consider whether discovery from the Cayman Islands appraisal action may have a proper purpose with respect to the claims of seller shareholders, which survive in this litigation.

for that time, and counsel are directed to appear promptly.  All pretrial conferences must be attended by the attorney who will serve as principal trial counsel.

The Court directs the parties file by March 31, 2023 a joint letter outlining a proposed agenda for the conference, a joint proposed case management plan for discovery, and a proposed briefing schedule for class certification.  The Court also directs the parties to email to EngelmayerNYSDChambers@nysd.uscourts.gov, no later than 24 hours before the conference, the names of any counsel who wish to enter an appearance at the conference with the names of lead counsel designated with an asterisk.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 21, 2023
       New York, New York