**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated, <br><br>                    Plaintiff, <br><br>       v. <br><br> QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI and ERIC X. CHEN, <br><br>                 Defendants. | Case No. 1:19-cv-10067-PAE <br><br><br> <u>Oral Argument Requested</u> |

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION**
**OR, IN THE ALTERNATIVE, TO CERTIFY FOR APPEAL**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     ARGUMENT ..................................................................................................... 5

        A.      The Court Should Reconsider Its Denial of Leave to Amend ............................... 5

                1.      Leave to Amend is "Freely" Given.................................................. 6

                2.      Plaintiffs' Proposed Amendments Are Not Futile ..................................... 8

                3.      There Is No Prejudice or Undue Delay.................................................... 11

        B.      In the Alternative, the Court Should Certify for Appeal its Loss Causation Ruling
                as to the Tenderers ...................................................................................... 12

                1.      The Loss Causation Ruling Raises a Controlling Question of Law ......... 12

                2.      There is Substantial Ground for Difference of Opinion ........................... 14

                3.      An Immediate Appeal Would Materially Advance the Litigation............ 25

III.    CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)............................................................................................4, 15

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) .......................................................................................23

*Baum v. Harman Int'l Indus.*,
  575 F. Supp. 3d 289 (D. Conn. 2021) ..............................................................17, 18

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019)..............................................18, 19, 20, 22

*Block v. First Blood Assocs.*,
  988 F.2d 344 (2d Cir. 1993)........................................................................................11

*Brown v. Papa Murphy's Holds.*,
  2021 WL 1574446 (W.D. Wash. Apr. 22, 2021)........................................16, 20

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA Inc.*,
  300 F. App'x 33 (2d Cir. 2008)....................................................................................7

*Clarex Ltd. v. Natixis Sec. Americas LLC*,
  2013 WL 3892898 (S.D.N.Y. July 29, 2013) (Engelmayer, J.)................................5

*Cox v. Blackberry Ltd.*,
  660 F. App'x 23 (2d Cir. 2016) ...................................................................................7

*Dura Pharms. v. Broudo*,
  544 U.S. 336 (2005).....................................................................................................22

*Enzo Biochem v. Harbert Disc. Fund*,
  2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021)...........................................................17

*Erickson v. Jernigan Cap., Inc.*,
  2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022) .................................................. *passim*

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  783 F.3d 395 (2d Cir. 2015)........................................................................................22

*Foman v. Davis*,
  371 U.S. 178 (1962).......................................................................................................6

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................20

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000)..................................................................................17

*Gray v. Wesco Aircraft Holds.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)......................................................17, 18, 19

*In re Air Crash at Georgetown, Guyana on July 30, 2011*,
    33 F. Supp. 3d 139 (E.D.N.Y. 2014) .................................................................12

*In re Bayou Hedge Fund Litig.*,
    2007 WL 2363622 (S.D.N.Y. Aug. 16, 2007).....................................................5, 6

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................................8

*In re DNTW Chartered Accts. Sec. Litig.*,
    96 F. Supp. 3d 155 (S.D.N.Y. 2015)....................................................................7

*In re Duplan Corp.*,
    591 F.2d 139 (2d Cir. 1978)...............................................................................25

*In re Envision Healthcare Corp.*,
    2019 WL 3494407 (D. Del. Aug. 1, 2019) .........................................................17

*In re Gen. Motors LLC Ignition Switch Litig.*
    427 F. Supp. 3d 374 (S.D.N.Y. 2019)........................................12, 13, 14, 25

*In re Hawker Beechcraft, Inc.*,
    2013 WL 6673607 (S.D.N.Y. Dec. 18, 2013) .....................................................13

*In re Hot Topic, Inc. Sec. Litig.*,
    2014 WL 7499375 (C.D. Cal. May 2, 2014) ................................................16, 19

*In re IPO Sec. Litig.*,
    214 F.R.D. 117 (S.D.N.Y. 2002) .........................................................................8

*In re Kingstown Ptnrs. Master Ltd*,
    2022 WL 1081333 (S.D.N.Y. Apr. 8, 2022).........................................................8

*In re Resolute Energy Corp. Sec. Litig.*,
    2021 WL 327385 (D. Del. Feb. 1, 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan.
    27, 2022) ......................................................................................................19, 21

*In re Scotts EZ Seed Litig.*,
    2017 WL 6398627 (S.D.N.Y. Aug. 31, 2017).....................................................12

*In re Willis Towers Watson PLC Proxy Litig.*,
  2020 WL 5361582 (E.D. Va. Sept. 4, 2020)..........................................................17

*Jt. Stock Co. v. Infomir LLC*,
  2017 WL 2988249 (S.D.N.Y. Mar. 27, 2017) .......................................................12

*Karp v. First Conn. Bancorp*,
  2019 WL 4643799 (D. Md. Sept. 24, 2019) ..........................................................17

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
  Amministrazione Straordinaria*,
  921 F.2d 21 (2d Cir. 1990)....................................................................................13

*Kuebler v. Vectren Corp.*,
  13 F.4th 631 (7th Cir. 2021) .............................................................................19, 21

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)....................................................................................4

*Lewis v. Termeer*,
  445 F. Supp. 2d 366 (S.D.N.Y. 2006)....................................................................16

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)............................................................................4, 6, 22

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970)........................................................................... *passim*

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*
  2018 WL 533912 (D. Or. Jan. 24, 2018) ...............................................................24

*Oliver Sch., Inc. v. Foley*,
  930 F.2d 248 (2d Cir. 1991)....................................................................................7

*Pitman v. Immunovant*,
  2023 WL 1995018 (E.D.N.Y. Feb. 14, 2023)......................................................7, 12

*Ronzani v. Sanofi S.A.*,
  899 F.2d 195 (2d Cir. 1990)....................................................................................6

*Tracinda Corp. v. DaimlerChrysler AG*,
  197 F. Supp. 2d 42 (D. Del. 2002)......................................................................5, 24

*Trahan v. Interactive Intel. Grp.*,
  308 F. Supp. 3d 977 (S.D. Ind. 2018) ...................................................................21

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011)....................................................................................6

**Statutes**

28 U.S.C. § 1292(b) ................................................................................................1, 11, 12, 25

**Rules**

Federal Rules of Civil Procedure Rule 8 ........................................................................22

Federal Rules of Civil Procedure Rule 9 ........................................................................22

Federal Rules of Civil Procedure Rule 15(a)(2) ........................................................1, 6

Federal Rules of Civil Procedure Rule 54(b) ..................................................................5

Local Civil Rule 6.3 ....................................................................................................1, 5

Lead Plaintiffs Altimeo Asset Management and ODS Capital LLC (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Support of Their Motion for Partial Reconsideration or, in the Alternative, to Certify for Appeal.[1]

## I.     INTRODUCTION

The Court, in its March 21, 2023 Order, granted in part and denied in part Defendant Zhou's motion to dismiss. MTD Opinion and Order (ECF No. 145). While the Court held that Plaintiffs adequately alleged several categories of false and misleading statements arising out of the Buyer Group's "concrete plan to profit significantly by relisting Qihoo in China" (MTD Order at 27), and that Plaintiffs adequately alleged reliance, economic loss, and loss causation for the shareholders that sold securities during the Class Period before the Merger closed (the "Sellers"), it held that Plaintiffs did not adequately allege economic loss and loss causation as to the shareholders that exchanged their shares for the Merger consideration (the "Tenderers").

Plaintiffs request that the Court reconsider its dismissal of the Tenderers' claims with prejudice and permit Plaintiffs to amend the Complaint, or to move for leave to amend, to add allegations from the trial in the Cayman Islands Appraisal Action showing that Qihoo's intrinsic value at the time of the Merger was greater than the Merger consideration.[2] In the alternative, Plaintiffs move to certify for interlocutory appeal under 28 U.S.C. § 1292(b) the issue of whether Plaintiffs have adequately alleged loss causation and economic loss for the Tenderers.

In dismissing the Tenders' claims, the Court held that they did not allege that Defendants misrepresented "any information about Qihoo's intrinsic economics" and did not allege how

---

[1] "¶ __" references herein are to paragraphs of the First Amended Complaint ("Complaint," ECF No. 53). Terms not defined herein have the same meaning as in the Complaint. Internal quotations marks and citations are omitted unless noted otherwise.

[2] Pursuant to Local Rule 6.3, Plaintiffs have not included a proposed second amended complaint, but will do so if "directed by the Court" under Rule 6.3 or if granted permission to file a motion for leave to amend under Rule 15(a)(2) of the Federal Rules of Civil Procedure.

Qihoo would have performed "in a continuing incarnation as a public entity" when the Merger was voted upon. MTD Order at 43, 47. It appears based on this ruling that the Court credited the theory that if Qihoo was worth more as a public company than the Merger consideration, so that continuing to hold shares in Qihoo would have been better than selling at the Merger price, then the Tenderers would have a cognizable theory of loss. However, the Court dismissed on a finding that the allegations supporting that theory were insufficient. This is precisely the sort of issue that could be readily cured through amendment, as Plaintiffs can present evidence to show that, based on Qihoo's financial metrics and expected future financial performance, tendering was worse for shareholders than continued ownership of Qihoo ADS.

Plaintiffs respectfully submit that even if the Court was not persuaded by evidence from the preliminary stages of the Appraisal Action that was available when the Complaint was filed in 2019, it should consider evidence that was presented at the trial in that action that ended in March 2022.[3] The whole purpose of the Appraisal Action—as with appraisal actions in general—was to determine Qihoo's "fair value" at the time of the Merger. Complaint ¶¶ 140-41. That assessment focused on Qihoo's financial projections, due diligence materials, and quarterly budgets and forecasts. *Id.* ¶¶ 143-48. This material plainly relates to Qihoo's intrinsic value based on its financial metrics. The Court, however, denied Plaintiffs' request for leave to amend, made in opposition to Zhou's motion, to add allegations from the Appraisal Action trial. The Court held this request was futile because "additional allegations about that post-Merger action could not plausibly allege reliance and loss causation" for the Tenderers. MTD Order at 60 n.26.

There is a tension between holding that amendment is futile without review of the new allegations and the Court's recognition that it could be cognizable to allege that investors would

---

[3] Plaintiffs continue to maintain that the allegations in the Complaint adequately allege loss causation but seek to add facts from the Appraisal Action trial to address the Court's ruling.

have been better off holding shares in Qihoo as "a continuing incarnation as a public entity." *Id.* at 47. **On the one hand**, the Court appears to recognize that Tenderers would have a cognizable theory if continuing to hold their shares would be better than tendering, and merely concluded that Plaintiffs did not allege sufficient facts to support this theory. **On the other hand**, by denying leave to amend, the Court appears to have held that evidence that Qihoo's intrinsic value was greater than the Merger price *could not possibly* support a viable theory of loss causation.

In light of this tension, Plaintiffs submit that the Court overlooked the relevance of potential new allegations of Qihoo's intrinsic value, and request that the Court permit amendment. If the Court denies leave to amend, and thereby confirms its holding as a rule that such evidence could never support a theory of cognizable loss, Plaintiffs submit this would raise an important legal issue that warrants interlocutory appellate review.

If the Court holds that allegations of intrinsic value cannot possibly support loss causation, that is at odds with other cases that clearly hold that loss causation is adequately alleged in the merger context based on allegations that plausibly show the company's fair value was higher than the merger price. Separate from the Court's ruling about Qihoo's intrinsic value in its continuing incarnation as a public entity, the Court based its dismissal on its determination that Plaintiffs did not allege how they would have profited had the truth been disclosed, such as by pointing to (i) a "superior opportunity to that offered by the Buyer Group [that] was then available to shareholders"; or how the Tenderers would have (ii) "renegotiated" with the Buyers for a higher deal price; or (iii) pursued their appraisal rights. MTD Order at 40-48 & 48 n.21.

The Court based its requirement that plaintiffs must show how they would have achieved greater value through an alternative transaction on the explanation that it is not enough to allege that a defendant's misstatements "induced a 'purchase-time value disparity' between the price

paid for a security and its 'true investment quality.'" MTD Order 47 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). *Lentell*, however, dealt with defrauded purchasers who allegedly purchased shares at inflated prices. The Court recognized that in contrast to that scenario, "in a non-traditional context such as this, the case law does not categorically preclude a plaintiff who cannot point to a corrective disclosure from pleading loss where such an inference rationally and plausibly follows from the pled facts." MTD Order at 52.

In contrast to the Court's standard, a long line of authority—from *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), through many Second Circuit and district court cases—addressing securities claims in the merger context holds that losses exist where the company's shares were undervalued in a merger based on "recognized methods of valuation" that account for the valuation of "future earnings power." *Infra* at 15-19. This constitutes an economic loss because the seller was defrauded into parting with their shares for less than they were worth, including based on their future earnings power that the seller was entitled to. These cases do not impose any requirement to demonstrate losses based on alternative transactions that would have been available in a counterfactual world. Rather, they simply assume that where plaintiffs adequately allege that the company's intrinsic or fair value was higher than the merger price, investors "would have demanded" a higher price, without requiring any independent showing of that alternative scenario. *Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627, at *4 (S.D.N.Y. Aug. 1, 2022). To the extent the Court disagrees with this standard, there is, at the very least, substantial ground for difference of opinion as to what standard applies to the element of loss causation for defrauded sellers in the merger context.

Under Plaintiffs' fair value measure of losses, their allegations—either based on the current Complaint or additional allegations from the Appraisal Action trial—would suffice, particularly because their pleading burden on loss causation is "not a heavy one." *Loreley Fin.*

*(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). The many cases discussed below held that plaintiffs adequately alleged that investors were defrauded into selling their shares for less than fair value based on allegations no stronger than those here.

Yet another legal question well-suited for appellate review is whether Qihoo's greater value to the Buyer Group based on its "concrete plan to profit significantly by relisting" in China (MTD Order at 27) suffices regardless of whether that value was based on post-Merger events. The relisting plan, by itself, should suffice because Defendants misrepresented the "true nature of the transaction," which may have resulted in "a higher acquisition premium" if the truth was disclosed. *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 68 (D. Del. 2002) (loss causation supported where defendants misrepresented their post-merger plans).

Allowing an immediate appeal will significantly advance the resolution of this action. Otherwise, the Tenderers will have to wait the lengthy time, likely years in the future, that it will take for the Sellers to resolve their claims before the Tenderers can try to advance theirs.

## II.    ARGUMENT

### A.    The Court Should Reconsider Its Denial of Leave to Amend

Although "[t]he standard governing motions for reconsideration under S.D.N.Y. Local Civil Rule 6.3 is strict," reconsideration should be granted where "the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Clarex Ltd. v. Natixis Sec. Americas LLC*, 2013 WL 3892898, at *1 (S.D.N.Y. July 29, 2013) (Engelmayer, J.). Moreover, under Rule 54(b) of the Federal Rules of Civil Procedure, even if the Court "denied plaintiffs' request for leave to amend," because the Order did not resolve all claims and was not certified as a final judgment, it "is subject to revision at any time before the entry of judgment adjudicating all" claims in the action. *In re Bayou Hedge Fund Litig.*, 2007 WL 2363622, at *7 (S.D.N.Y.

Aug. 16, 2007). The Court's Order is therefore "subject to modification" and Plaintiffs should be permitted "to freely seek leave to amend" under Rule 15(a).

In opposition to Zhou's motion to dismiss, Plaintiffs stated that if the Court were to grant the motion, they "respectfully request leave to amend, including to add allegations based on evidence from the Appraisal Action trial." MTD Opposition (ECF No. 128, "MTD Opp.") at 25; *id.* at 6-7 n.4. The Court denied this request as futile and dismissed "all claims on behalf of the tenderer shareholders" with prejudice, holding that "[f]or the reasons reviewed at length above, additional allegations about that post-Merger action could not plausibly allege reliance and loss causation on the part of lead plaintiffs in their capacity as tenderer shareholders." *Id.* at 60 n.26 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding repleading was futile)).[4] Plaintiffs respectfully submit that it was premature to determine that any possible amendments to the Complaint showing Qihoo's fair value at the time of the Merger would be futile.

### 1.    Leave to Amend is "Freely" Given

Rule 15(a)(2) of the Federal Rules provides that a "court should freely give leave to amend when justice so requires" in order "to facilitate a proper decision on the merits." *See Foman v. Davis*, 371 U.S. 178, 181-82 (1962). "This permissive standard is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011). When "a motion to dismiss is granted, the usual practice is to grant leave to amend." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990). Leave to amend is particularly warranted in securities fraud cases because they "combine[] a complex commercial reality with a long, multi-prong complaint." *Loreley*, 797 F.3d at 191.

Courts readily allow plaintiffs to amend when they request doing so in opposition to a

---

[4] The parties' briefing on Zhou's MTD and the Court's Order analyzed the elements of "loss causation" and "economic loss" together. *See* MTD Order at 47. Plaintiffs do the same here.

motion to dismiss—or even when leave to amend is only requested "for the first time in a . . . motion for reconsideration." *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 26 (2d Cir. 2016) (vacating denial of leave to amend); *Pitman v. Immunovant*, 2023 WL 1995018, at *1, 3, 5-6 (E.D.N.Y. Feb. 14, 2023) (granting request, made in opposition to MTD, for leave to file a third amended complaint because "the preferred course is to grant leave to amend"); *In re DNTW Chartered Accts. Sec. Litig.*, 96 F. Supp. 3d 155, 170 (S.D.N.Y. 2015) (holding the "Court cannot find on the present record that any proposed amendment would be futile"); *see also City of Pontiac Gen. Employees' Ret. Sys. v. MBIA Inc.*, 300 F. App'x 33, 34 (2d Cir. 2008) (interpreting dismissal as "without prejudice" where appellants requested an opportunity to amend in their reply in response to MBIA's MTD); *cf. Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (holding complaint should not be dismissed with prejudice even where plaintiffs "did not precisely articulate a desire to" amend, where "the possibility exists that the defect can be cured and there is no prejudice to the defendant"). The basis for amending here is particularly strong because Plaintiffs pointed to a specific source that directly addresses the issue of Qihoo's fair value and that did not exist when Plaintiffs filed the Complaint.

The trial in the Appraisal Action was completed in March 2022 and settled by May 2022. *See* ECF No. 124 at 3 n.3; ECF No. 121 at 2, 3 n.2 (noting that closing arguments "recently took place and the trial revealed significant evidence of the Buyer Group's relisting plan and internal valuation of Qihoo" and that Plaintiffs have a transcript from February and March 2022). Plaintiffs cited these sources in opposition to Zhou's motion to dismiss as the basis for their request to amend. *See* MTD Opp. at 6-7 n.4, 25 (citing ECF No. 124 at 1, 3 n.3; ECF No. 121 at 1-2)). This evidence could not have been included in the Complaint because the Appraisal Action trial took place well after it was filed. ECF No. 53. Under these circumstances, Plaintiffs

should have the chance to replead based on evidence that was raised in the Appraisal Action.

At the very least, the Court should allow Plaintiffs to file a motion for leave to amend so that it can fully consider the basis for amendment. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *23 (S.D.N.Y. Mar. 24, 2023) (holding "Plaintiffs may move for leave to amend to explain further how any amendment would cure the defects identified above"); *In re IPO Sec. Litig.*, 214 F.R.D. 117, 125 (S.D.N.Y. 2002) (holding that where the alleged futility "is really an argument that the amendments would not permit the complaint to survive [an MTD], such argument would better be taken up on a motion to dismiss unless the amendments' futility is readily apparent").

## 2. Plaintiffs' Proposed Amendments Are Not Futile

The purpose of the Appraisal Action was to assess Qihoo's "fair value" at the time of the Merger. ECF No. 124 at 1 n.1 (Defendants describing the Appraisal Action as "focused on the valuation of the company as of a particular date"); Complaint ¶¶ 88, 140-41. Evidence on this topic that is sufficiently particular would satisfy the Court's loss causation analysis in the Order.

The Court held that "[t]here is no allegation that these advisors [to the Special Committee] were denied any information about Qihoo's intrinsic economics, as opposed to about the Buyers Group's relisting plan," and that Plaintiffs did not allege how Qihoo would have performed "in a continuing incarnation as a public entity, . . . when [the] Merger was voted upon." MTD Order at 43, 47. But the Appraisal Action dealt precisely with the issue of Qihoo's intrinsic economics at the time of the Merger. ECF No. 124 at 1 n.1; Complaint ¶¶ 140-46. Indeed, the purpose of "an appraisal proceeding" in the Cayman Islands "is to determine the fair value of the [company's] shares" as of the day before the merger. *In re Kingstown Ptnrs. Master Ltd*, 2022 WL 1081333, at *1 (S.D.N.Y. Apr. 8, 2022). The Court ruled that "additional allegations about that post-Merger action could not plausibly allege reliance and loss causation" for the Tenderers. MTD Order at 60 n.26. But although the Appraisal Action was a "post-Merger

action," the evidence presented in it concerned Qihoo's fair value at the time of the Merger.

Furthermore, this evidence is consistent with the allegations in the Complaint. The Court distinguished between (1) Qihoo's "intrinsic value" based on how it could perform as a public company at the time of the Merger and (2) the Buyer Group's potential to profit through its relisting plan. These are not mutually exclusive. Even if the projections in the Proxy were flawed in part because Defendants disclosed false assumptions that did not account for Qihoo's business opportunities following the Merger (Complaint ¶ 131), the Complaint also raises fundamental questions about the basic accuracy of the projections disclosed in the Proxy. The Complaint discusses in detail how the dissenters in the Appraisal Action—whose whole purpose was to assess Qihoo's "fair value" at the time of the Merger—uncovered abundant information relating to Qihoo's fair value based on its financial performance. Complaint ¶¶ 140-51. The evidence that was presented at the Appraisal Action trial was based on discovery that Qihoo produced in that action, which goes beyond the evidence from the preliminary stages that was available when Plaintiffs filed the Complaint in 2019.

The Complaint shows the type of additional evidence from Qihoo's records that was the subject of discovery in the Appraisal Action. This includes (i) Qihoo's financial projections that formed the basis for the fairness opinion and projections in the Proxy, (ii) due diligence materials that were provided to one of the financiers for the Merger, (iii) Special Committee documents, and (iv) Qihoo's quarterly budgets and forecasts. *Id.* ¶¶ 143-48. The Appraisal Action also addressed expert "valuation analysis on a discounted cash flow valuation and a capitalization of earnings, which the [Appraisal Action] court noted 'are both very well recognized analyses – routinely performed by experts in share valuations, share valuation disputes and fair value proceedings.'" *Id.* ¶ 140 n.26. This type of evidence relates to Qihoo's intrinsic value based on

its financial performance and projections at the time of the Merger. It is also the type of evidence that the Supreme Court, Second Circuit, and district courts hold should be considered when assessing a company's value in securities claims arising out of a merger. MTD Opp. at 17.

Even if the Court determined that allegations based on the preliminary stages of the Appraisal Action were not specific enough, they plainly relate to the topic of Qihoo's intrinsic value based on its financial metrics. *See* MTD Order at 44, 48 (holding allegations from preliminary stages of Appraisal Action did not allege "factual basis" for assessment that "market value" was higher than Merger consideration and "secondhand allegation about an unidentified party-retained expert's bottom-line conclusion" did not suffice). Plaintiffs should have the opportunity to add further evidence from the Appraisal Action trial that speaks directly to the issue of Qihoo's value "in a continuing incarnation as a public entity." *Id.* at 47.

Moreover, the Complaint alleges that Qihoo was also worth more at the time of the Merger based on "Zhou's plan to split up Qihoo's business into separate entities so that each separate business line could grow faster by focusing just on its core competency and growth trajectory." Complaint ¶¶ 132-33. Qihoo's shareholders at the time of the Merger could have benefited from spinning off its businesses that existed at the time, as evidenced by the fact that Qihoo relisted its finance business in the United States for over $2 billion. *Id.* ¶ 102.

The Court also noted that evidence from the Appraisal Action "could not plausibly allege reliance," in addition to loss causation, as to the Tenderers. MTD Order at 60 n.26. But the Court "assume[d], *arguendo*, that the FAC plausibly pleads reliance by the tenderer shareholders" under *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970). MTD Order at 35-37. The element of

reliance (or transaction causation) is therefore not an impediment to repleading.[5]

Lastly, the Court's assessment of the role of the Special Committee does not change the significance of the additional evidence here. MTD Order at 42-43. Having a special committee advised by well-known financial firms is standard practice in going-private transactions involving large companies. If Plaintiffs can plead loss causation by adequately alleging that the Company's value was higher than what Defendants represented was fair, that would not be negated by the existence of a special committee and financial advisor, especially if (as here) there is no basis to conclude that the committee's advisor knew the information that Defendants misrepresented.[6] Otherwise, executives could easily evade liability when taking their companies private by hiring advisors that they keep in the dark about the company's fair value.

### 3.     There Is No Prejudice or Undue Delay

The Court should also reconsider its denial of leave to replead because Zhou did not even suggest in his motion to dismiss briefing that Defendants could satisfy their burden of showing that Plaintiffs' proposed amendments would cause them prejudice or are the result of undue delay. *See Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). There is no prejudice to Defendants because discovery has been stayed while Zhou's motion was pending and the discovery that Plaintiffs seek already includes evidence from the Appraisal Action. *See* ECF

---

[5] To the extent that the Court's assessment of the causal chain that it discussed in its reliance analysis supported its dismissal of the Tenderers' claims, Plaintiffs request that the Court certify that issue for appeal under 28 U.S.C. § 1292(b). *See infra* at 14, 20 n.16.

[6] Just because the Buyer Group rejected the special committee's requests for a higher deal price (MTD Order at 43), that does not mean that the Buyers would have refused to offer a higher price if shareholders rejected the Merger. While the Buyer Group's refusal to offer a higher price might mean that one particular type of alternative was not available, it does not show what Qihoo was actually worth. When the Buyers declined the Special Committee's request for a higher price, the Buyers could still see if the committee would describe the current deal as fair. On the other hand, if shareholders rejected the Merger, the only way the Buyers could complete it would be to offer a higher price. Plaintiffs are not required to plead evidence of such counterfactual scenarios for the reasons explained below. The point here is just that the Buyer Group's refusal to offer a higher price to the Special Committee does not negate all of the other evidence that Plaintiffs have alleged that the deal price was not fair.

Nos. 121 at 2-3, 126; *Jt. Stock Co. v. Infomir LLC*, 2017 WL 2988249, at *1 (S.D.N.Y. Mar. 27, 2017). There also was no "undue delay" because Plaintiffs' amendments are based on evidence that was revealed in March 2022 and Plaintiffs raised it in opposition to Zhou's motion. *See Immunovant*, 2023 WL 1995018, at *6 (holding "no undue delay because Plaintiff raised the request in its omnibus opposition to" the MTDs). Zhou, in particular, cannot claim any undue delay when he did not appear in this action until over three years after it started. ECF No. 108.

Plaintiffs thus respectfully request the Court reconsider its dismissal with prejudice of the Tenderers' claims so they can file a second amended complaint, or at least make a motion for leave to do so, with further evidence of Qihoo's fair value from the trial in the Appraisal Action.

**B.**    **In the Alternative, the Court Should Certify for Appeal its Loss Causation Ruling as to the Tenderers**

If the Court does not reconsider its dismissal of the Tenderers' claims with prejudice, it should certify its ruling on loss causation and economic loss for appeal under 28 U.S.C. § 1292(b).[7] Under 28 U.S.C. § 1292(b), a district court should certify an order for immediate appellate review where it "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion," and [3] "an immediate appeal . . . may materially advance the ultimate termination of the litigation." "District courts must weigh each of those factors and determine whether, taken together, certification of interlocutory appeal is appropriate." *In re Gen. Motors LLC Ignition Switch Litig. ("In re GM")*, 427 F. Supp. 3d 374, 391 (S.D.N.Y. 2019). The Court's loss causation ruling satisfies all three of these criteria. !

**1.**    **The Loss Causation Ruling Raises a Controlling Question of Law**

A question is controlling if it "could significantly affect the conduct of the action," *In re*

---

[7] "Neither § 1292(b) nor the Federal Rules . . . specify a deadline" to seek interlocutory appeal, holding only that the movant's timing must be "reasonable". *In re Air Crash at Georgetown, Guyana on July 30, 2011*, 33 F. Supp. 3d 139, 154 (E.D.N.Y. 2014). The timing here is reasonable because Plaintiffs make this motion just 14 days after the Court's MTD Order.

*Scotts EZ Seed Litig.*, 2017 WL 6398627, at *1 (S.D.N.Y. Aug. 31, 2017), or if its resolution "will have precedential value for a significant number of cases," *In re Hawker Beechcraft, Inc.*, 2013 WL 6673607, at *4 (S.D.N.Y. Dec. 18, 2013). "[T]he resolution of an issue need not necessarily terminate an action to be controlling." *In re GM*, 427 F. Supp. 3d at 392 (quoting *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990)).

The Court's loss causation ruling is controlling because it ended the litigation for the Tenderers. In the context of complex class actions, the ruling "not only may be controlling but, for all intents and purposes, may also be final." *In re GM*, 427 F. Supp. 3d at 392.

In addition, the Court's loss causation ruling raises questions of law that impact many other cases arising out of mergers. The Court held (in line with the Second Circuit) that the Buyer Group had a "concrete plan to profit significantly by relisting Qihoo in China" and that this was "a central reason to go private." MTD Order at 27, 29. But the Court ruled that this does not support loss causation because Plaintiffs did not show how they would have profited had the truth been disclosed, such as by pointing to (i) a "superior opportunity to that offered by the Buyer Group [that] was then available to shareholders"; or how the Tenderers would have (ii) "renegotiated" with the Buyer Group for a higher deal price; (iii) obtained greater value if Qihoo remained public; or (iv) pursued their appraisal rights. *Id.* at 40-48 & 48 n.21.[8]

If the Court holds that it would be futile for Plaintiffs to replead evidence from the Appraisal Action trial, that raises the legal question of whether the type of evidence at issue here

---

[8] *See also* MTD Order at 42-43, 45-47 (discussing lack of "allegation of a definite, immediately available, superior alternative to the merger consideration" or "the special committee's assessment that superior alternatives to the Merger did not then exist," and rejecting the inference that the "tenderer shareholders could have negotiated a price with the Buyer Group above the Merger consideration" or how Qihoo would have performed "in a continuing incarnation as a public entity"); *id.* at 48 n.21 (holding that Plaintiffs did not allege that "but for the proxy's misstatements, all tenderer shareholders—or Lead Plaintiffs, specifically—would have exercised their appraisal rights").

is ever legally sufficient or, on the other hand, whether plaintiffs must plead a "superior alternative transaction" or specific counterfactual scenarios to support loss causation. The basic facts at issue are readily apparent from the pleadings and the Court's ruling. The key question (if Plaintiffs are not permitted to replead) is what legal standard applies to the element of loss causation for claims arising out of mergers. *See In re GM*, 427 F. Supp. 3d at 392 (holding appeal of summary judgment ruling based on expert reports raised question of law). Whether plaintiffs must specifically allege what would have happened if the truth was disclosed and the Merger did not take place, or rather, whether those counterfactual steps are presumed where plaintiffs allege that the company was worth more than the Merger consideration, raises a legal question that the Second Circuit should address.[9]

The Court also described the assumption that shareholders would have voted against the Merger had they known the truth as a "shaky premise," which the Court "credited only *arguendo*." MTD Order at 44. While the Court credited this premise in its reliance analysis, the issue of whether, in light of *Mills*, that premise may be viewed as "shaky" and detract from the plausibility of the causal chain for loss causation purposes is also a significant legal question. *See Mills*, 396 U.S. at 385 (holding as to reliance, that "there is no need to supplement" allegations that a proxy was misleading with "proof of whether the defect actually had a decisive effect on voting," because that would involve the "impracticalities of determining how many votes were affected").

## 2.    There is Substantial Ground for Difference of Opinion

Plaintiffs respectfully submit that there is, at the very least, a substantial ground for

---

[9] As Plaintiffs argued in opposition to Zhou's motion, the "long causal chain that he asserts would have to occur . . . appl[ies] to all seller cases arising out of going-private transactions" and "none of the causal steps that Zhou raises change the core issue of whether Plaintiffs sold their Qihoo securities at artificially deflated prices." MTD Opp. at 21-22. Plaintiffs also argued that there is no requirement to specifically allege what the Buyer Group would have offered had they disclosed the truth because "it stands to reason that if Defendants disclosed the truth, they would have been forced to offer a higher Merger price." *Id.* at 21 n.22; *id.* at 22 (arguing that "courts recognize that 'the forfeiture of appraisal rights' supports a claim").

difference of opinion with the Court's loss causation ruling. The bedrock law in this area provides that damages in securities cases alleging that a company was undervalued in a merger are based on the difference between the company's fair value and what shareholders received. Cases consistently hold that this measure of damages is adequately alleged based on evidence that plausibly shows that the company was worth more than the deal price. The cases addressing this scenario do not require plaintiffs to plead a specific better alternative transaction or the counterfactual steps that would have to take place to obtain higher value. They hold instead that loss causation is adequately alleged based on the type of allegations that Plaintiffs raise here.

         *a)*       ***There is Substantial Ground for Difference of Opinion as to Whether Plaintiffs Must Plead a Specific Alternative Transaction***

Many cases stand for the proposition that where plaintiffs are defrauded into selling securities in a merger, they are entitled to receive damages based on "the fairness of the terms of the merger at the time it was approved." *Mills*, 396 U.S. at 378, 389; *see* MTD Opp. at 15-17. These authorities do not require plaintiffs to allege a specific alternative transaction that was available instead of the merger. Rather, they hold that the plaintiffs suffered losses where there is a "defect in the proxy solicitation" and "the merger resulted in a reduction of the earnings or earnings potential of their holdings." *Mills*, 396 U.S. at 389.

For example, in *Affiliated Ute Citizens of Utah v. United States*, the Supreme Court held that the value of the plaintiffs' shares was not restricted "to actual sale prices in a market" that was "somewhat influenced by [defendants'] improper activities" that depressed the market price of the shares. 406 U.S. 128 at 155-56 (1972). Instead, the shares were properly valued based on factors such as the value of natural resources on the land at issue and "opinion evidence as to" the share value. *Id.* The Second Circuit has consistently applied this standard, holding that value should be determined based on "recognized methods of valuation" that require expert testimony to

account for the valuation of "future earnings power." MTD Opp. at 16-17 (citing cases).[10]

District courts assessing securities claims alleging that shares were undervalued in a merger also do not require a specific alternative transaction. These cases hold that loss causation is adequately alleged where plaintiffs point to evidence that plausibly suggests the shares were undervalued in the merger. For example in *Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022), plaintiffs alleged that defendants failed to disclose that Extra Space, a leading self-storage REIT "was participating in the transaction through a $300 million investment, which accounted for one third of the approximate $900 million [transaction] value." *Id.* at *1.[11] The court did not reference any allegation that Extra Space valued the company more than the merger price or that its investment was available to shareholders as an alternative to the merger. Rather, the alleged "economic loss was the higher price the stockholders would have demanded had they known about the Extra Space deal." *Id.* at *4; *see also Lewis v. Termeer*, 445 F. Supp. 2d 366, 371 (S.D.N.Y. 2006) (holding loss causation supported by allegation that transaction consideration "did not reflect the true value").

Many other cases confirm that loss causation is adequately alleged based on information showing that the company was worth more to the buyer group than they disclosed in the proxy materials for the merger. *See In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *10 (C.D. Cal. May 2, 2014) (loss causation well-pled upon allegations that "intrinsic value" of shares exceeded merger price); *Brown v. Papa Murphy's Holds.*, 2021 WL 1574446, at *4 (W.D. Wash.

---

[10] To the extent the Court's Order suggests that Plaintiffs must show counterfactual events whereby they would have received more dollars for their shares, this either rejects the ability to allege loss causation based on intrinsic value or misconstrues the nature of intrinsic valuation. A share is not merely worth what a future buyer would pay in a hypothetical scenario; it is a fractional interest in the economic future of the business. This future-economic-value principle is exactly what discounted cash flow valuation assesses. To the extent the Court disagrees with the role of this view of valuation in establishing loss causation, that is a legal issue that poses a foundational question that warrants appellate review.

[11] *Erickson* was decided after Defendant Zhou's motion to dismiss was fully briefed and is consistent with the many other cases that Plaintiffs cite.

Apr. 22, 2021) (misstatements led to "undervalued" offer); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *9, 11 (E.D. Va. Sept. 4, 2020) (measuring damages "by the difference between the Merger consideration and the true value"); *Karp v. First Conn. Bancorp*, 2019 WL 4643799, at *4 (D. Md. Sept. 24, 2019) (loss causation supported by allegations that "plausibly suggest that [the] shares were worth more than the merger consideration."); *In re Envision Healthcare Corp.*, 2019 WL 3494407, at *8 (D. Del. Aug. 1, 2019) (complaint adequately alleged that misstatements "led the stockholders to accept the Merger as a fair transaction").[12]

Most of these cases make no mention of an alternative transaction available at the time of the merger and none of them include that as a crucial factor. They simply require that the plaintiffs plausibly allege that the company was worth more than the merger price. Indeed, the district court in *Gray v. Wesco* held expressly that there is no requirement that "Plaintiff must plead the immediate availability of an alternative, more favorable transaction to the" merger because that "appears to impose too high a burden on the plaintiff who votes in favor of a merger based on a misleading proxy." *Gray v. Wesco Aircraft Holds.*, 454 F. Supp. 3d 366, 407 (S.D.N.Y. 2020). Rather, the plaintiff's inability "to point to a specific merger or other transaction Wesco forewent as a result of the merger vote should not in itself be fatal to its claim of loss causation; ***it is not logically or legally impossible that the decision to be acquired could cause a loss compared to the decision to remain independent***." *Id.* (emphasis added). The Second Circuit agreed when it affirmed because its decision "implies that a claim should not be rejected as 'too speculative' when it takes account of projections that <u>are</u> 'sufficiently likely.'" *Baum v. Harman Int'l Indus.*, 575 F. Supp. 3d 289, 300 (D. Conn. 2021) (quoting *Wesco*). !

---

[12] While some of these cases dealt with §14(a), the same loss causation standard applies under §10(b). *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000) (equating loss causation under §§10(b) and 14(a)); *Enzo Biochem v. Harbert Disc. Fund*, 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021) (applying §10(b) standard to §14(a)); *Envision*, 2019 WL 3494407, at *8.

While the Court cited *Baum* as supporting its reasoning based on the lack of "allegations suggesting that a superior opportunity to that offered by the Buyer Group was then available to shareholders" (MTD Order at 43), *Baum* strongly supports Plaintiffs. *Baum* firmly held that "in cases brought by minority shareholders" who were cashed-out in a merger, "courts have applied a measure of damages that compares the value of what the plaintiff received and the fair value of the shares." *Baum*, 575 F. Supp. 3d at 299. The court noted the allegation "that Harman received an offer to pay a higher price than Samsung paid" as merely one factor that distinguished the case from *Wesco. Id*. But this was not dispositive. Indeed, the company's financial advisor in *Baum* determined that the alternative offer of $115 per share that consisted of a mix of cash and stock was not as attractive as Samsung's $112 all-cash offer, after the alternative bidder refused to increase the cash portion of its offer. *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 76 (D. Conn. 2019).[13] Rather, the *Baum* court's main basis for distinguishing *Wesco* was that the plaintiffs' allegations were "predicated on projections that were not 'sufficiently likely'" to come to fruition. *Baum*, 575 F. Supp. 3d at 300. The plaintiffs in *Wesco* simply did not allege any facts suggesting that the earlier, higher projections were more accurate than the later, lower ones that formed the basis for the fairness opinion after the company suffered a decline in performance. Moreover, the alternative bidders in *Wesco* had "access to confidential information," which made their bids more relevant to the company's fair value than the publicly available information that the plaintiffs cited. *Baum*, 575 F. Supp. 3d at 298 (discussing *Wesco*).[14]

---

[13] The fact that the board in *Baum* engaged in several rounds of negotiations through which Samsung increased its initial offer, from $106 per share to $112 per share, did not prevent the court from holding that loss causation was adequately alleged. *Baum*, 408 F. Supp. 3d at 76.

[14] The existence of a "go shop" process here does not confirm the fairness of the Merger price because the Special Committee contacted only three "potential strategic bidders" and the Proxy did not provide any information on what they considered. It is not surprising that these three unnamed parties did not explore an alternative transaction if they were provided the same false information as Plaintiffs, as well as the hurdles they would face given the limited 45-day "go

The other cases that the Court cited as requiring "that a superior opportunity to that offered by the Buyer Group was then available to shareholders," like *Wesco*, dealt with situations where there was no independent reason to conclude that the merger price was not fair. *See* MTD Order at 43 (citing *Kuebler v. Vectren Corp.*, 13 F.4th 631, 642, 646 (7th Cir. 2021) (holding "plaintiffs do not allege plausible error with the disclosed discount rate ranges," the company's management "had no motive to conceal the company's value," and omitted information was not material); *Trahan v. Interactive Intel. Grp.*, 308 F. Supp. 3d 977, 988, 1000 (S.D. Ind. 2018) (plaintiff failed to allege any omitted information was material, complaint was based "entirely on the Proxy," and all of the alleged "defects were patent on the face of the Proxy")).[15]

On the other hand, courts regularly hold that loss causation is adequately pled based on allegations that plausibly support the inference that the projections that formed the basis for a fairness opinion artificially deflated the company's value. *See Baum*, 408 F. Supp. 3d at 88 (discussing *Blount* and *Hot Topic*); *supra* at 15-17. If the Court does not allow Plaintiffs to replead with evidence from the Appraisal Action trial, there is, at the very least, a substantial ground for difference of opinion as to whether the type of evidence raised there could plausibly allege loss causation even if Plaintiffs have not alleged a superior alternative transaction.

### b)     There is Substantial Ground for Difference of Opinion as to Whether Plaintiffs Are Required to Show Counterfactuals

The Court also ruled that the inference that if the truth was revealed, the Tenderers would have successfully renegotiated a higher deal price was "far too speculative and distended." MTD

---

shop" period and the $112.5 million termination fee that would be owed. MTD Opp. at 24. Moreover, the Special Committee did not conduct a pre-signing market check and Zhou and Qi made clear that they were "unwilling[] to sell their shares in any other transaction involving the Company." (Xie Declaration, Ex. 2 (Proxy, ECF No. 116-2) at 31, 35, 42.) It therefore makes sense that the Special Committee did not receive alternative offers. If such a cursory process could insulate defendants from liability, that would require that a specific alternative transaction was available no matter how egregious the defendants' misconduct.

[15] *See also infra* at 20-21 (explaining that *Erickson* discounted *Kuebler* and *Resolute Energy* as "out-of-circuit authority" that do not require pleading "far more specific information").

Order at 40-41. But the cases cited above do not require any such counterfactual pleading. Instead, they **assume** that where plaintiffs adequately allege that the company was worth more than the merger price, investors "would have demanded [a higher price] had they known" the truth. *Erickson*, 2022 WL 3028627, at *4; *cf. Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (holding "it is not necessary [for materiality] to assert that the investor would have acted differently if an accurate disclosure was made").

Similarly, the Court held that Plaintiffs did not adequately allege that "but for the proxy's misstatements, all tenderer shareholders—or Lead Plaintiffs, specifically—would have exercised their appraisal rights." MTD Order at 48 n.21. This is another counterfactual that Plaintiffs are not required to show. Rather, the "the forfeiture of appraisal rights" by itself supports a claim. *Wilson*, 979 F.2d at 931-33; *Papa Murphy's*, 2021 WL 1574446, at *4 (same).[16]

The cases that the Court cited as addressing "similarly attenuated theories of economic loss" do not require plaintiffs to plead specifically how they would have renegotiated a higher price with the buyers. Rather, these cases dealt with factual allegations that did not support the inference that the company was undervalued in the merger. At the very least, there is substantial ground for difference of opinion with "out-of-circuit authority" that does not support "the proposition that a plaintiff must offer far more specific information about economic loss at the pleading stage." *Erickson*, 2022 WL 3028627, at *4 (distinguishing *Kuebler* and *Resolute*

---

[16] The Court also described the assumption that shareholders would have voted against the Merger if they knew the truth as a "shaky premise" that it "credited only *arguendo*." MTD Order at 44. While the Court credited this premise in its reliance analysis, to the extent that its view of this premise as "shaky" contributed to the conclusion that the inference of loss causation was too speculative, under *Mills* that should not detract from the plausibility of the causal chain for loss causation purposes. *See supra* at 14. Courts assess the role of shareholder votes under the element of reliance and analyze loss causation under the separate inquiry into whether "shareholders were misled into approving [a merger] that undervalued the company." *Baum*, 408 F. Supp. 3d at 92.

*Energy*).[17] The facts here, where Plaintiffs have adequately alleged that Defendants made materially false and misleading statements with scienter, and pointed to significant information about the Merger that Defendants knew and did not disclose in the Proxy but that was subsequently revealed in independent sources, is significantly different than cases where plaintiffs argued that a company was undervalued based "entirely on the Proxy" and all of the alleged "defects were patent on the face of the Proxy." *Trahan*, 308 F. Supp. 3d at 988.

If the Court agrees that loss causation can be pled based on facts showing that a company was undervalued in a merger without requiring further allegations concerning what would have happened had the truth been disclosed, but finds that the allegations here do not suffice, it should permit Plaintiffs to amend the complaint to add factual allegations from the trial in the Appraisal Action concerning Qihoo's intrinsic at the time of the Merger. On the other hand, if the Court holds that such repleading would be futile, then it should certify for interlocutory appeal the issue of whether Plaintiffs must plead a superior alternative transaction or counterfactual scenarios showing how Plaintiffs would have achieved greater value if the truth was disclosed.

### c)    *Plaintiffs Adequately Allege Loss Causation*

If there is no requirement to show the counterfactual scenarios discussed above, Plaintiffs' current allegations in the Complaint suffice to plead loss causation under the light pleading burden that applies. Although the Second Circuit has not stated definitively whether loss causation pleadings must meet the standard set by Rule 8 or 9 of the Federal Rules, "the vast

---

[17] *See* MTD Order at 41-42 (citing *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *4 (D. Del. Feb. 1, 2021)*, aff'd*, 2022 WL 260059, at *2 (3d Cir. Jan. 27, 2022) (holding plaintiff did not explain why "Resolute was undervalued"); *In re Ocera Theraps., Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020) (holding analysts' opinions that did not differ significantly from the deal price, and an unsupported earlier set of projections, did not suffice); *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1011 (S.D. Ind. 2019) (*see supra* at 19); *Beck v. Dobrowski*, 559 F.3d 680, 684-85 (7th Cir. 2009) (competing offers were within 1% of each other and slightly higher offer would take longer to complete and involved less cash); *In re E-House Sec. Litig.*, 2021 WL 4461077, at *16 & n.11 (S.D.N.Y. Sept. 29, 2021) (appeal pending, No. 22-355 (2d Cir.)); and *Haideri v. Jumei Int'l Holding*, 2021 WL 4170791, at *24 (N.D. Cal. Sept. 14, 2021) (plaintiff did not allege information supporting a higher valuation)).

majority of courts in this [Circuit] have required that [pleading] loss causation only meet the notice requirements of Rule 8." *Loreley*, 797 F.3d at 183. Moreover, regardless of which rule applies, the burden of pleading loss causation "is not a heavy one." *Id.* at 187.[18] Plaintiffs need only provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms. v. Broudo*, 544 U.S. 336, 347 (2005). The pleading stage is not the time to test the strength of the allegations, because plaintiffs "need only allege sufficient facts to raise a reasonable inference" in support of their loss causation theory. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015).

The type of evidence alleged here is similar to, or even stronger than, the type of allegations that other courts typically hold to adequately support loss causation in the merger context. Courts hold that allegations of alternative, better projections support loss causation where there is reason to conclude that the better projections are more accurate than the ones that were used as the basis for the fairness opinion. Such allegations are "comparatively more compelling" where the more favorable projections "were not even included in the Proxy statement." *Blount*, 2017 WL 1055966, at *8. That is the case here, where the Proxy made no mention of the more "ambitious" projections of future net income and other performance metrics going out to 2019 that Defendants used to market the Merger to the Buyer Group. MTD Order at 47; Complaint ¶¶ 115.  The "economic incentive [that Zhou and Qi had] to make the acquisition look more attractive" by deflating the projections in the Proxy further supports the reliability of the secret projections disclosed only to the Buyer Group. *Baum*, 408 F. Supp. 3d at 87.

The Court concluded, after describing the counterfactual scenarios that it required to plead loss causation, that these alternate projections did not support loss causation because

---

[18] To the extent that the difference between applying the Rule 8 versus Rule 9 standard matters here, that is yet another reason to certify for interlocutory appeal.

Plaintiffs did not allege how they could have been achieved in Qihoo's "continuing incarnation as a public entity," as opposed to through the Buyer Group's post-Merger changes. MTD Order at 47. But the existence of a secret set of projections containing more ambitious financial metrics than what was disclosed in the proxy is far more evidence than is alleged in other cases, where courts uphold allegations of loss causation even where both sets of competing projections were publicly disclosed. The allegations here are "comparatively more compelling." *Blount*, 2017 WL 1055966, at *8. While the projections in the Proxy understated Qihoo's value in part because they did not account for Qihoo's increased business opportunities following the Merger (Complaint ¶ 131), the Complaint also raises fundamental questions about the basic accuracy of the projections as a matter of Qihoo's intrinsic value at the time of the Merger. *See supra* at 9-10 (discussing fair value assessment in the Appraisal Action and Zhou's plan to increase Qihoo's value by splitting up the Company's businesses into separate entities).[19] The "alternate explanation" that the secret projections related *exclusively* to post-Merger activities that were not available to current shareholders is, at best, an "alternative theory of causation, but at the pleading stage Plaintiffs' causal allegations suffice." *Blount*, 2017 WL 1055966, at *12.

These allegations together surpass the type of evidence that courts require to support the inference that a company was undervalued in a merger. For example, in *Erickson*, just the fact that defendants failed to disclose a $300 million investment that accounted for one-third of the transaction price by itself made the deal price "inadequate". 2022 WL 3028627, at *4. The court did not address how the $300 million investment related to the company's intrinsic value,

---

[19] The sheer size of the discrepancy between the Merger price and Qihoo's relisting of its main business 17 months later for over $50 billion more than the Merger price also contributes to the inference that Qihoo was undervalued in the Merger, even if some time passed and the company was restructured to capture **additional value** from its other current businesses. *See* Complaint ¶¶ 102-04; *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (crediting materiality of allegation "the relisting was announced a mere sixteen months after the Merger").

because just the fact of Extra Space's interest adequately alleged that the company was "far more valuable" than the merger price. *Id.* And in *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, the court held that a proxy that failed to account for the company's "acquisition strategy" misrepresented its value even though the plaintiffs did not point to any specific future acquisitions planned at the time and the defendants argued that "there plainly was (and is) great inherent uncertainty in forecasting the financial impact of hypothetical future acquisitions." 2017 WL 4453561, at *9 (D. Or. Oct. 3, 2017), *adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018). So too here, the very fact that the Buyer Group had a "concrete plan to profit significantly by relisting Qihoo in China" supports the inference that Qihoo was worth more than the Merger price. MTD Order at 27, 29. All of the other allegations of Qihoo's higher value at the time of the Merger support the inference even more.

### d) *Qihoo's Higher Value to the Buyer Group Suffices*

Lastly, there is, at the very least, substantial ground for difference of opinion on the independent question of whether the allegation that Qihoo was worth more than the Merger price to the Buyer Group based on its plan to relist at a significant profit, regardless of whether that value was based on the Company's value had it remained public, suffices to support loss causation. The court in *Tracinda* held that "had Defendants revealed the allegedly true nature of the transaction as a take-over, Plaintiffs would have sought and perhaps more importantly, Defendants may have been willing to pay, a higher acquisition premium." 197 F. Supp. 2d at 68 (rejecting argument that "damages for the 'lost opportunity' to negotiate a better merger deal are speculative"). The allegations in *Tracinda* were based on Daimler misrepresenting its purchase of Chrysler as a "merger of equals" instead of as a takeover. *Id.* at 73. This decidedly relates to the buyer's post-merger plans that were not available to Chrysler as a standalone company, but still supported loss causation. Plaintiffs therefore may support the allegation of "economic loss"

24

based on "the higher price the stockholders would have demanded" if they knew the truth. *Erickson*, 2022 WL 3028627, at *4 (holding the fact that Extra Space was willing to make a $300 million investment in the company supported allegation that it was "far more valuable" than the merger price).

### 3.    An Immediate Appeal Would Materially Advance the Litigation

The critical question in determining whether an immediate appeal would materially advance the ultimate termination of the litigation under 28 U.S.C. § 1292(b) is whether it might "substantially accelerat[e] the disposition of the" case. *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978). This issue is "closely connected" to "the questions of whether there is a controlling issue of law" and is also satisfied when a "reversal after trial might well require a new trial." *In re GM*, 427 F. Supp. 3d at 393.

If the issues discussed above related to loss causation for the Tenderers are not taken up for appeal now, that will substantially delay the resolution of their claims. There is a long road ahead for the Sellers, through class certification, discovery, summary judgment, and trial. Absent interlocutory review, after all of these steps, Plaintiffs will still be able to appeal the Court's ruling as to the Tenderers. If that appeal succeeds, the Tenderers' case will then proceed through the litigation process, likely extending this litigation by years. Determining now whether the Tenderers' claims can proceed alongside the Sellers' claims will be far more efficient.

### III.    CONCLUSION

For the reasons explained above, Plaintiffs respectfully request that the Court (i) reconsider its dismissal with prejudice of the Tenderers' claims and allow Plaintiffs to replead, or seek leave to amend, to add evidence from the Appraisal Action trial or, in the alternative, (ii) certify for interlocutory appeal under 28 U.S.C. § 1292(b) the issues raised in its ruling on loss causation and economic loss for the Tenderers' claims.

Dated: April 4, 2023

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld*
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
        mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiffs
Altimeo Asset Management and ODS
Capital LLC*

**LABATON SUCHAROW LLP**

Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
        dschwartz@labaton.com
        jbissell-linsk@labaton.com

*Additional Counsel for Lead Plaintiff
ODS Capital LLC*