# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI and ERIC X. CHEN,<br><br>Defendants. | Case No. 1:19-cv-10067-PAE<br><br>**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Paul A. Engelmayer |

## **TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION .................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................................. 10

III.  PARTIES AND OTHER KEY ACTORS ................................................................. 11

    A.    Lead Plaintiffs ................................................................................................ 11

    B.    Defendants ...................................................................................................... 12

    C.    The Special Committee ................................................................................... 12

    D.    The Buyer Group ............................................................................................ 13

IV.   SUBSTANTIVE ALLEGATIONS ........................................................................... 15

    A.    Overview of Qihoo's Business ....................................................................... 15

    B.    History of the Merger ..................................................................................... 16

    C.    Defendants Zhou's and Qi's Stakes in the Company ..................................... 22

    D.    The Misleading Proxy Materials .................................................................... 24

        1.    Assurances That no Relisting was Contemplated and That There
              Were No Alternatives to the Merger ................................................... 25

        2.    False Reasons for the Merger and False Descriptions of the Merger
              Price as "Fair" .................................................................................... 25

    E.    The Shareholder Vote and Completion of the Merger .................................... 29

        1.    Dissenting From the Merger Was Difficult and Discouraged ................. 30

        2.    The Completion of the Merger .............................................................. 32

    F.    Qihoo's Backdoor Listing in China Following the Merger ............................ 32

    G.    The Buyer Group Planned to Relist Qihoo All Along ................................... 35

        1.    News Reports Have Revealed the Buyer Group's Intention to
              Relist Qihoo in China Following the Merger ....................................... 35

        2.    News Reports Have Revealed the Buyer Group's True Business
              Reasons for the Merger .......................................................................... 41

3.    A Confidential Witness Has Confirmed that Defendants Planned All Along to Relist Qihoo in China Following the Merger ...................... 47

4.    The Cayman Islands Appraisal Action Shows That Defendants Have Hid Information Related to the Company's True Value ................. 49

5.    Evidence From the Trial in the Appraisal Action Shows That Qihoo Was Undervalued in the Merger ...................................................... 54

6.    Qihoo's Value in Excess of the Merger Price Was Part of its Intrinsic or Fair Value ................................................................................ 73

7.    The Buyer Group Planned All Along to Relist Qihoo in China to Profit From the Higher Valuation That Would be Achieved After Qihoo Returned to China ............................................................................ 76

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ...................................................... 79

A.    The Announcement of the Merger ........................................................................ 82

B.    The Preliminary Proxy Materials ........................................................................ 83

1.    Statements Concerning Intention Not to Relist ...................................... 83

2.    Statements Concerning Lack of Alternatives to the Merger .................... 86

3.    False Representations that the Merger Was "Fair" ................................... 88

4.    Promotions of the Merger Price ................................................................ 92

5.    False and Misleading Reasons for the Merger ......................................... 93

6.    Defendants Specifically Guaranteed the Accuracy of Their Statements in the Proxy Materials and that They Complied With the Securities Laws ..................................................................................... 95

C.    The Amended Proxy Materials ............................................................................. 96

D.    The Second Amended Proxy Materials .............................................................. 101

E.    The Third Amended Proxy Materials ................................................................. 101

VI.    CONTROL PERSON ALLEGATIONS ............................................................................. 102

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................................... 104

A.    Defendants Zhou and Qi Had the Motive and Opportunity to Defraud the Class .................................................................................................................... 104

ii

B. Many Sources Show That a Primary Condition of the Merger Was That the Buyer Group Would Relist Qihoo in China After the Merger...................... 106

C. Defendant Zhou's Statements After the Merger Confirm His Intent to Defraud the Class.................................................................................................. 108

D. The Cayman Islands Appraisal Action Further Shows Defendants' Scienter .......................................................................................................... 109

E. Additional Allegations Regarding Qihoo's Knowledge ................................... 110

VIII. LOSS CAUSATION.................................................................................................... 110

IX. ALLEGATIONS OF INSIDER TRADING.................................................................... 113

X. NO SAFE HARBOR .................................................................................................... 117

XI. CLASS ACTION ALLEGATIONS ............................................................................. 118

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET AND AFFILIATED UTE PRESUMPTIONS ............................................... 121

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)............................................. 122

COUNT II (Violations of § 20A of the Exchange Act Against the Insider Trading Defendants) ...................................................................................................... 124

COUNT III (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)....................................................................................... 126

XIII. PRAYER FOR RELIEF ............................................................................................... 127

XIV. DEMAND FOR JURY TRIAL .................................................................................... 128

Lead Plaintiffs Altimeo Asset Management ("Altimeo") and ODS Capital LLC ("ODS," and, collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through Lead Plaintiffs' undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, (a) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (b) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Qihoo 360 Technology Co. Ltd. ("Qihoo" or the "Company"); (c) analysts' reports and advisories about the Company; (d) consultation with an expert in Chinese and United States M&A and capital markets transactions; (e) statements made by confidential witnesses; and (f) information readily obtainable on the Internet.  Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.      SUMMARY OF THE ACTION

1.      This action arises out of Defendants' scheme to depress the price of Qihoo American depositary shares ("ADS") and stock (together, "Qihoo Securities") in order to avoid paying a fair price to Qihoo Securityholders during a transaction to take the Company private in 2016 (the "Merger"). Defendants executed this scheme by publishing false and misleading statements about the Company in connection with the Merger.

2.      Qihoo describes itself as one of the leading internet companies in China. Defendants told the market that Qihoo had no plans at the time of the Merger to relist the

---

[1] Emphasis is added to quotations in this complaint unless noted otherwise below.

Company on any other stock exchange after the Merger and that they conducted the Merger because they wanted to run Qihoo as a private company.  That was demonstrably false because the group of investors that bought Qihoo in the Merger—led by Defendant Zhou—planned all along to relist Qihoo on the Chinese stock market following the Merger at a much higher value than what they paid to Qihoo Securityholders in the Merger.

3.      On June 17, 2015, Qihoo announced that it received a preliminary offer from a group led by Defendant Zhou to acquire the Company at a price of $77 per ADS or $51.33 per ordinary share. On December 18, 2015—the first day of the Class Period—Qihoo announced that the Company's Board of Directors, acting upon the recommendation of the Special Committee that the Board formed to evaluate the Merger, approved of the proposed transaction and entered into a definitive merger agreement.  The Merger was expected to close in the first half of 2016, subject to shareholder approval.  Qihoo would be acquired in an all-cash transaction that valued the Company at approximately $9.3 billion.

4.      Between January 11, 2016 and March 3, 2016, Defendants published the Proxy Materials that formed the basis for its shareholders to decide how to vote on the Merger.  On March 30, 2016, Qihoo announced that the Merger passed the shareholder vote that was held that day.  The Merger proceeded to close on July 15, 2016, at which point Qihoo became a privately held company and its ADS were no longer publicly traded on the New York Stock Exchange.

5.      Defendants authorized the filing with the SEC of materially false and misleading statements in the Proxy Materials in order to convince Qihoo Securityholders to vote in favor of the Merger.  Contrary to the Defendants' repeated reassurances about no substantial changes to Qihoo's structure following the Merger, several news reports have revealed that the Buyer Group that took Qihoo private in the Merger planned all along to relist the Company in China after the

2

Merger for multiple times what they paid to Qihoo Securityholders in the Merger.  Indeed, this plan was an essential condition for investors to be willing to buy Qihoo in the Merger.

6.      For example, the *Financial Times* reported on February 28, 2017 that materials used in fundraising for Qihoo's privatization in the Merger discussed the Company's subsequent return to the Chinese stock market.  This article stated that the financial return that investors in the Buyer Group would receive upon an "exit" (*i.e.*, a transaction allowing those investors to "exit" their position through a relisting) "may be as high as 5 [times]" the going-private price.

7.      This *Financial Times* article also disclosed that although the private marketing materials for investors participating in the Buyer Group "contain[ed] ambitious estimates of future net income and other performance metrics going out to 2019," Qihoo and its advisers told Qihoo Securityholders that were being asked to sell their shares in the Merger "that the company's prospects were not nearly that bright."

8.      Over the course of February and March 2022, a trial took place in the Cayman Islands Appraisal Action that arose out of the Merger. Substantial evidence that emerged at this trial shows that Qihoo's intrinsic value was higher than the Merger consideration.

9.      Those involved in the Merger, from Defendants Zhou and Qi, other Qihoo executives and members of the Buyer Group, and financial advisors involved in the Merger, all viewed Qihoo as undervalued when it was publicly listed in the United States. The purpose of their relisting plan was to capture Qihoo's increased value.

10.     For example, Defendant Zhou wrote an email on June 17, 2015, the same day that he made his offer to buy the Company for $77 per ADS, to all staff on Qihoo's internal email system, stating that "***many of us believe the current valuation of 360, which stands at USD 8 billion, fails to fully reflect the value of our company***."

3

11. Defendant Qi drafted an email to the Cyberspace Administration of China (which is part of the Chinese government) even earlier, on June 12, 2015, with the heading "Request for permission for 360's A-share relisting," in which he stated that Qihoo's "***market cap is expected to reach over 150 billion [RMB] after the A-share relisting.***" That came out to approximately $25 billion—as compared to the approximately $8 billion that Qihoo was valued at prior to Zhou's offer to buy the Company.

12. Huatai, a financial advisor to the Buyer Group, confirmed the view that Qihoo was undervalued in the United States in a November 24, 2015, email related to Qihoo's application for approval from China's National Development and Reform Commission on overseas investment, stating that "***Qihoo 360's current market cap of over [$]8 billion does not reflect the corporate value.***"

13. Similarly, China Renaissance, a member of the Buyer Group, valued Qihoo in July 2015 as being worth $51 billion upon relisting in China just four years after privatization. And CICC, a leading investment bank in China that sought to be involved in the transaction, conducted an analysis dated June 18, 2015, in which it ***valued Qihoo at approximately $60 billion if it were relisted "as is"***—in other words, without spinning off or liquidating any portions of the Company.

14. These sources unequivocally show that individuals and entities involved in the Merger and planned relisting firmly viewed Qihoo as being worth multiple times the approximately $8 billion that it was valued at in the United States before Zhou made his offer to purchase the Company. This alone is enough to strongly support the conclusion that Qihoo's intrinsic value exceeded the $77 per ADS deal price.

15.    Furthermore, evidence presented at the Appraisal Action Trial also shows multiple ways that the publicly disclosed information concerning Qihoo's valuation substantially understated its fair value.  While Plaintiffs do not yet have a complete record of all the ways Qihoo's valuation was understated, the Appraisal Action Trial has shown that the financial projections that Qihoo included in the Proxy for the Merger, and gave to J.P. Morgan which formed the basis of J.P. Morgan's fairness opinion, substantially understated Qihoo's value.

16.    A major source of this undervaluation was that Qihoo's projections assumed that the Company would spend $3.6 billion from 2016 through 2025 on building an entirely new Cloud computing business. This sum amounted to *over 60%* of the $5.9 billion in total capital expenditures ("capex") that Qihoo estimated for that time period.  Qihoo, however, did not disclose in the Proxy how its projected capital expenditures were allocated. The Company, curiously, did not even reference the business when it listed several business lines under its "emerging business" category in the projections.  Qihoo also was not able to produce *any internal documents* referencing its plan to build that substantial business, much less that it planned to spend $3.6 billion on it.

17.    Indeed, the *single* individual at Qihoo who prepared the projections, admitted under oath that the $3.6 billion figure was generated entirely by him, without review by anyone else at Qihoo, and was not based on any concrete expectations of actual capital expenditure spending.  Incredibly, and indicative of the entirely fabricated nature of this spending number, Qihoo did not project any corresponding revenue directly attributable to this Cloud computing business, even though this was an entirely new business.  The most straightforward—and certainly a plausible—inference to draw from these facts is that Qihoo did not actually plan to

5

create a new cloud business at a level of seriousness that merited allocating $3.6 billion to it in the Company's financial projections.

18.    That the Cloud computing capital expenditure projection was purely fictitious, is further emphasized by Qihoo's admission, in the Appraisal Action Trial that, just months after preparing the projections and before the Merger closed, the Company had no plans whatsoever to engage in that business.  This not only supports the overwhelming evidence that the spending should never have been projected, but also certainly shows that by the time shareholders tendered into the Merger, a correct account of Qihoo's intrinsic valuation would require removal of the Cloud computing business capital expenditure.

19.    Other ways in which Qihoo deflated its value in the Merger were also revealed in the Cayman Islands Appraisal Action.  This includes the Company's management allocating $300 million to building new offices even though contemporaneous internal documents showed that the project would cost, at most, $171 million.  Qihoo also failed entirely to account for its internet finance business that the Dissenters' expert valued at $821 million after accounting for contingencies that could lead to an even higher valuation.

20.    These sources plainly show that Qihoo's intrinsic value, had it remained a public company in the United States, was far higher than the Merger consideration. J.P. Morgan's discounted cash flow ("DCF") analysis that supported its opinion that a price of $77 per ADS was fair was based on these flawed inputs related to Qihoo's inflated capital expenditures and its failure to account for its internet finance business.  For example, as detailed herein, one can reconstruct and then adjust J.P. Morgan's DCF valuation, using its middle case assumptions, to show how its model would view Qihoo's intrinsic DCF value after adjusting for the issues just discussed.  That adjustment – which Plaintiffs do not submit is a perfect depiction of Qihoo's fair

6

value – provides strong support for the conclusion that Qihoo's fair valuation exceeded the Merger price of $77 per ADS.  Using this approach and just making the adjustments discussed above produces a valuation of approximately $14.273 billion, which is 36.9% greater than the valuation J.P. Morgan used in reaching its fairness opinion.  Upon discovery Plaintiffs expect to uncover additional facts that demonstrate Qihoo's intrinsic value exceeded $14.273 billion, and was closer to the estimates defendants' made as to Qihoo's expected value in the relisting, *e.g.*, $25 billion or more.

21.    Qihoo has offered alternative explanations for why it was worth multiple times the Merger consideration to the Buyer Group.[2] Some of these explanations are rebutted by evidence that was presented at the Appraisal Action Trial.  For example, Huatai noted that Qihoo's "proposed restructuring is essentially an internal adjustment within the corporation ***without any impact on 360's actual operations***" and CICC valued Qihoo at $60 billion "as is".  In other words, Qihoo's increased valuation was not a result of changes to its corporate structure that took place after the Merger, which were done to facilitate the relisting, but not to alter Qihoo's "actual operations".

22.    Other purported alternative bases for the greater valuation attested to by Qihoo, members of the Buyer Group, and advisors to the Buyer Group, do not negate the clear evidence of Qihoo's increased intrinsic value that was presented at the Appraisal Action Trial.  These sources of value are not mutually exclusive, particularly when considering the vast size of the discrepancy between the Merger consideration and the expected valuation upon relisting. For

---

[2] Lead Plaintiffs maintain, and preserve all appellate rights as to the argument, that all of Qihoo's increased value—whether as a result of its intrinsic value had it remained a public company in the United States or as a result of other sources that contributed to its value upon relisting to the Buyer Group—reflect Lead Plaintiffs' recoverable losses because they are entitled to the entire increased value that the Buyer Group attained after misrepresenting the nature of the Merger. Lead Plaintiffs, however, differentiate between these different sources of value based on the Court's prior rulings.

7

example, Defendant Qi valued Qihoo at $25 billion in his email to a Chinese government agency contemporaneous with Zhou's offer to buy the Company in a deal that valued Qihoo at $9.3 billion. Differentiating between these different sources of value will be a matter for discovery in this action, as it was in the Appraisal Action.

23.     For example, Defendant Zhou's statements to the Chinese media after the Merger indicate that he and the Buyer Group sought to capitalize after the Merger on Qihoo's increased business prospects that they did not disclose in the Proxy Materials to Qihoo Securityholders. Zhou had been told several years prior by senior Chinese government officials that Qihoo's internet security business provided important services related to Chinese national security interests that could not be fully realized when Qihoo had the foreign status of being listed in the United States.  In addition, taking Qihoo private and returning the Company to China was part of Zhou's plan to capitalize on his "big security" vision for the Company.  Zhou also described other previously undisclosed plans for the Company to Chinese media following the Merger, such as breaking the Company up into separate entities focused on its different business lines.

24.     Defendants failed to disclose to Qihoo Securityholders the Company's lucrative business prospects that would be available after it returned to China.  In addition, when Defendants were forced to provide more information on the reasons for the Merger because the SEC criticized Qihoo's Preliminary Proxy Materials for failing to give an adequate explanation of the reasons for the Merger, Defendants affirmatively misrepresented Qihoo's business prospects. Defendants responded to the SEC's comments by describing a business plan that failed to mention Zhou's strategy for Qihoo's security business in China and cautioned that Qihoo faced hurdles from an "economic slowdown" and increased government regulation in China.  These faulty assumptions, in turn, formed the basis for the key financial projections that

Qihoo gave to J.P. Morgan for it to use in its valuation analysis for the Merger. Determining the extent to which Qihoo's increased value is attributable to its increased business opportunities in China following the Merger versus its higher intrinsic value had it remained a public company in the United States will be a matter for discovery in this action. The evidence from the Appraisal Action Trial discussed below shows that there is far more evidence supporting Qihoo's higher intrinsic value.

25.    Other evidence also confirms Defendants' intent to defraud Qihoo's Securityholders by underpaying them for the Company in the Merger.  A confidential witness that worked in Qihoo's Public Relations department explained that Qihoo's employees knew since mid-2015 that Qihoo would be relisted on the Chinese stock market following the Merger. This witness specifically recalled a department meeting from that time period at which Defendant Qi expressly warned employees to keep that information secret because the Company did not want it to become public.

26.    At every turn, Qihoo has obstructed shareholders' efforts in the Appraisal Action to obtain essential information from the Merger process.  Qihoo has gone so far as to take positions that the Cayman Islands court described as downright "odd," such as claiming that Defendant Zhou—who founded one of the largest internet companies in China—does not use a computer.  Qihoo also took several inconsistent positions in the appraisal action, claiming that basic financial documents did not exist until it inexplicably found them after the dissenting shareholders brought the issue to the court's attention.

27.    Qihoo's relisting in the Chinese stock market following the Merger operated as a "backdoor listing" whereby Qihoo, in its surviving form after the Merger, combined with a shell company that was already listed on the Shanghai stock exchange.  This allowed Qihoo to return

to the Chinese stock market at a value that was multiple times the Merger price, to the detriment of Qihoo Securityholders, who unknowingly sold their Qihoo Securities during the Class Period at substantially deflated values.

28.     Qihoo included only its core business in its backdoor listing, leaving its other businesses as separate entities.  Even so, just that portion of Qihoo's assets was valued at over $60 billion immediately upon Qihoo's relisting in China.  The investors that bought Qihoo in the Merger—led by Defendants Zhou and Qi—therefore gained tens of billions of dollars in value by convincing Qihoo Securityholders to vote in favor of selling their stock and ADS at a substantially deflated price in the Merger. As *Bloomberg* reported on February 28, 2018, Qihoo's backdoor listing on the Chinese stock market increased Defendant Zhou's net worth from $2 billion to $13.6 billion, making him the 12th-richest person in China.

## II.    JURISDICTION AND VENUE

29.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

30.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. Defendants engaged in a scheme that violated United States securities law. In doing so, Defendants engaged in conduct that was directed toward the United States. Qihoo registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the New York Stock Exchange ("NYSE").  The Bank of New York Mellon, whose corporate headquarters and trust office from which the ADS program is administered, is located in New York, New York, served as the ADS Depositary for Qihoo's ADS.

31.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

32.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## III.    PARTIES AND OTHER KEY ACTORS

### A.    Lead Plaintiffs

33.    Altimeo is an independent portfolio management company based in France and approved by the French Financial Authority, with significant assets under management. Altimeo manages investment assets through separate funds and is authorized to bring legal action on their behalves. Prior to seeking appointment as Lead Plaintiff, Altimeo obtained valid assignments of the claims of the fund Altimeo Optimum.[3]

34.    Altimeo, through Altimeo Optimum, purchased 140,261 Qihoo securities (including ADS on the NYSE) during the Class Period and sold 79,613 Qihoo securities (including ADS on the NYSE) during that time. After accounting for Qihoo securities that Altimeo held prior to the start of the Class Period, it retained 61,500 Qihoo securities (including ADS) through the Merger. These 61,500 securities have now been paid in exchange for the Merger consideration.

35.    Lead Plaintiff ODS Capital LLC is a Florida limited liability company with its primary office and business address in Jupiter, Florida. ODS purchased a total of 86,300 ADS on the NYSE during the Class Period, sold at least 11,800 ADS during the Class Period, and

---

[3] As noted in Lead Plaintiffs' letter dated August 22, 2022, while Altimeo has ceased operations and transferred its rights and claims in this action to another entity, those claims will continue to be pursued in this action in the name of Altimeo Asset Management. *See* ECF No. 138.

11

retained 74,500 ADS through the Merger.  These 74,500 ADS have now been paid in exchange for the Merger consideration.  ODS's transactions in Qihoo's ADS were completed through a New York-based brokerage.

**B.      Defendants**

36.      Defendant Qihoo is incorporated under the laws of the Cayman Islands, with its principal executive offices located at Building 2, 6 Haoyuan, Jiuxianqiao Road, Chaoyang District, Beijing, People's Republic of China, 100015.  Prior to the Merger, Qihoo's common stock was not registered with the SEC.  Rather, Qihoo registered ADS that were listed and traded on the NYSE under the ticker symbol "QIHU."  The only public market for Qihoo Securities was for the Company's NYSE-listed ADS.  Each ADS was redeemable for 1.5 of Qihoo's Class A ordinary shares.  The Bank of New York Mellon, located at 101 Barclay Street, New York, NY 10286, served as the ADS Depositary for Qihoo's ADS

37.      Defendant Hongyi Zhou ("Zhou") is Qihoo's Co-Founder and served as its Chairman and Chief Executive Officer from August 2006 through the Merger.

38.      Defendant Xiangdong Qi ("Qi") is Qihoo's other Co-Founder and served as its President and a Director since the Company's inception in 2005 through the Merger.

39.      Defendant Eric X. Chen ("Chen") served as a Qihoo Director from January 2014 through the Merger. Chen was Chairman of the Special Committee that the Company appointed to evaluate the Merger.

40.      Qihoo 360 and the Individual Defendants are collectively referred to herein as "Defendants."

**C.      The Special Committee**

41.      On June 19, 2015, Qihoo's Board of Directors formed a special committee that consisted of directors that the Company described as "independent" to advise the Board about

12

the Merger, which was a potential going-private transaction (the "Special Committee").  The

Special Committee consisted of three members: Defendant Chen, who served as its Chairman,

and Dr. Ming Huang and Dr. Jianwen Liao.

42.     The Special Committee was instructed to "to consider, attend to and take any and

all actions in connection with the written proposal from the Buyer Group in connection with the

proposed" Merger.  The Board did not place any limitations on the Special Committee's ability

to investigate and assess the  Merger.

**D.     The Buyer Group**

43.     The group that purchased Qihoo in the Merger included investors known as the

"Parent Parties," the "Founder Securityholders," and 36 "Equity Investors" that are listed in

Exhibit B to the Merger Agreement.[4]  These parties together are referred to as the "Buyer

Group."

---

[4] These equity investors include: 1. CITIC Guoan Information Industry Co., Ltd.; 2. Shen Zhen Ping An Real Estate Investment Co., Ltd; 3. Sunshine Life Insurance Company Ltd.; 4.    Taikang Life Insurance Co., Ltd.; 5. New China Capital International Management Limited; 6. Taiping Asset Management Co., Ltd.; 7. Jiangsu Huatai Ruilian M&A Fund (LLP); 8. Greenland Financial Holdings Group Co., Ltd.; 9. SIP Oriza Chongyuan M&A Fund Partnership (Limited Partnership); 10. Shanghai Sailing Merger and Acquisition Investment Fund Partnership (Limited Partnership); 11. Shanghai Sailing Boda Equity Investment Fund Partnership (Limited Partnership); 12. Fortune Fountain (Beijing) Holding Group Co., Ltd.; 13. Beijing ZGC Trinitas Venture Capital Investment Center (Limited Partnership); 14. Shanghai Mango Creative Equity Investment Fund; 15. Qiancai NO.1 Equity Investment Limited Partnership Enterprise; 16. Pearl River Life Insurance Co., Ltd.; 17. Hengdian Group Holdings Limited; 18. Jiangsu Gaoli Group; 19. Minsheng Royal Asset Management Co., Ltd.; 20. CCB International Capital Management (Tianjin) Ltd.; 21. China Merchants Wealth Asset Management Co., Ltd.; 22. Huarong Ruize Investment Management Co., Ltd.; 23. Beijing Sequoia Yi Yuan Equity Investment Center (Limited Partnership); 24. Golden Brick Silk Road Investment (Shenzhen) LLP; 25. CICC Jiatai (Tianjin) Equity Investment Fund, L.P.; 26. Shanghai Huasheng Lingfei Private Equity Fund Investment (LLP); 27. BR Wiston Capital; 28. Yi Capital Qiyuan Fund, L.P.; 29. Jiaxingyingfei Investment Center (Limited Partnership); 30. Jiaxing Yun Qi Internet Plus Venture Partners LLP; 31. Ruipu Wenhua (Tianjin) Investment Center (Limited Partnership); 32. Shanghai Trust Bridge Partners Investment Management LLC; 33. LTW Chuanfu Investment (Shenzhen) LLP; 34. Zhejiang Puhua Tianqin Equity Investment Management Co., Ltd.; 35. Tianjin Xinxin Qiyuan Investment Limited Partnership; and 36. Tianjin Xinxinsheng Investment Limited Partnership.

44. The Parent Parties included Tianjin Qixin Zhicheng Technology Co., Ltd. (a limited liability company incorporated under the laws of the PRC, also called "Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (a limited liability company incorporated under the laws of the PRC ("Parent")), True Thrive Limited (an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco")), and New Summit Limited (an exempted company incorporated with limited liability under the laws of the Cayman Islands).

45. Global Village Associates Limited and Young Vision Group Limited (collectively, the "Founder Securityholders"), both British Virgin Islands companies, agreed in the Merger Agreement that they would vote their Qihoo Securities in favor of the Merger. The Founder Securityholders were holding vehicles for the Qihoo shares that Defendants Zhou (Global Village) and Qi (Young Vision) owned. Prior to the Merger, Global Village[5] held 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares and Young Vision[6] held 4,904,709 Class B ordinary shares in the Company.

46. In the course of the Merger, Qihoo would continue as the surviving company and become a wholly owned subsidiary of Midco. Upon the completion of the Merger, the surviving Company would become a private company beneficially owned solely by the Buyer Group.

---

[5] Global Village is a British Virgin Islands company, which is wholly-owned by Fair Point International Limited ("Fair Point"), a British Virgin Islands company, which is wholly-owned by a revocable trust constituted under the laws of Singapore with Defendant Zhou and his wife as the settlers, Zhou as investment manager with sole voting and dispositive power, and certain family members of Mr. Zhou as the beneficiaries.

[6] Young Vision is a British Virgin Islands company, which is wholly-owned by East Line Holdings Limited ("East Line"), a British Virgin Islands company that is wholly-owned by Defendant Qi.

IV.    **SUBSTANTIVE ALLEGATIONS**

    A.    **Overview of Qihoo's Business**

47.    Qihoo was incorporated in the Cayman Islands on June 9, 2005 and continues to be registered there.

48.    On March 30, 2011, Qihoo listed its ADS on the New York Stock Exchange under the ticker "QIHU." On April 4, 2011, the Company completed its initial public offering of 13,927,420 ADS.

49.    Qihoo describes itself as "a leading Internet company in China" that, as of December 2015, was:

- the No. 1 PC Internet security product provider in China, with 523 million monthly active users, representing a user penetration rate of 98%, according to iResearch;

- the No. 1 mobile security product provider in China, with over 868 million smartphone users;

- the No. 1 PC browser provider in China in terms of time spent usage, with 411 million monthly active users, representing a user penetration rate of 77.1%, according to iResearch; and

- the No. 1 Android mobile app store operator in China, with over 750 million smartphone users.[7]

50.    Qihoo's core products include 360 Safe Guard and 360 Anti-Virus, Internet security products in China, and 360 Mobile Safe, a mobile security product in China.

51.    Qihoo also offers PC and mobile internet browsers; the 360 Personal Start-up Page (which is the default homepage of Qihoo's browsers and an access point to popular Internet services and applications); 360 Search (Qihoo's proprietary search engine and the default search engine of its browsers); and 360 Mobile Assistant (an Android app store for smartphones).

---

[7] Qihoo defined "monthly active users" as the "total number of unique users of or visitors to a given product/web service during a calendar month" and "user penetration rate" as "the number of monthly active users divided by the total monthly active Internet users in China for a given period of time."

15

52.     The Company's products and services are supported by its cloud-based security technology, which the Company describes as "one of the most advanced and robust technologies in the PC and mobile Internet security industry."  Qihoo offers its Internet and mobile security products free of charge.  It monetizes its large user base primarily through online marketing and Internet value-added services.  Qihoo leverages its large user base to develop open platforms on which third-party Internet product and service providers (such as game developers, e-commerce websites and software and application developers) offer their products and services. These open platforms allow Qihoo to monetize its large user base through online advertising—Qihoo's primary way of generating revenue.  Qihoo also generates revenue through revenue sharing arrangements with third parties; Internet value-added services; the sale of smart hardware and "internet of things" (or "IoT") devices; and other products and services (such as enterprise information security products and related services, and other technical services on an ad hoc project basis to enterprise customers).

53.     Although Qihoo maintained these various business lines, its core business  at the time of the Merger was its internet security business.

54.     In addition, in 2015, Qihoo started to participate in the emerging Internet finance sector in China.  This business provides third-party financial products, such as online financial products and crowd-funding, on Qihoo's online platform.

55.     Qihoo's revenues increased from $671.1 million in 2013 to $1,390.7 million in 2014 and $1,804.6 million in 2015. Its net income increased from $99.7 million in 2013 to $222.8 million in 2014 and $307.0 million in 2015.

**B.      History of the Merger**

56.     In early May 2015, Defendant Zhou discussed a possible acquisition of Qihoo with the investment funds Golden Brick Capital Private Equity Fund I L.P. ("Golden Brick")

16

and China Renaissance Holdings Limited.  Between late-May 2015 and mid-June 2015, he discussed the acquisition with Defendant Qi, representatives of CITIC Securities Co. Ltd., and Mr. Neil Nanpeng Shen, a Director of the Company and founding managing partner of Sequoia Capital China.[8]  These discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in China, the Company's long term strategic plans, and the structure, timetable, and pros and cons of a potential acquisition of the Company.

57.    On June 17, 2015, the Board received a preliminary non-binding proposal letter from Zhou, CITIC Securities, Golden Brick, China Renaissance and Sequoia Capital China, to acquire all of the Company's outstanding shares not owned by them or their affiliates, including Class A ordinary shares represented by ADS, for $77.00 in cash per ADS and $51.33 in cash per Class A or Class B ordinary share. These parties to the proposed transaction stated in their proposal that they were not interested in selling their shares in any other transaction involving the Company.

58.    On the same day, Qihoo issued a press release regarding its receipt of this acquisition proposal and filed the press release as an exhibit to a Form 6-K that it filed with the SEC.

---

[8] Prior to the Merger, Neil Nanpeng Shen, a Director of the Company and the Director and owner of Sequoia Capital China UR Holdings Limited, owned (i) 85,299 Class A ordinary shares in the form of ADSs held by Sequoia Capital China UR Holdings Limited and (ii) 670,972 Class A ordinary shares in the form of ADS that he held.  The Final Proxy Statement noted that Sequoia and Shen were affiliated with one member of the Buyer Group.  Beijing Sequoia Yi Yuan Equity Investment Center (Limited Partnership), a member of the Buyer Group, owned 0.5% of the Company prior to the Merger and owned 4% of the Company following the Merger.

59.     On June 19, 2015, Qihoo's Board of Directors formed the Special Committee. The Board appointed Defendant Chen as Chairman of the Special Committee and empowered the Special Committee to:

> [(i) investigate] the proposed transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate; (ii) evaluate the terms of the Proposal; (iii) discuss and negotiate with the Buyer Group and their representatives any terms of the proposed transaction and implement the proposed transaction as the Special Committee deems appropriate; (iv) explore any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company; (v) negotiate definitive agreements . . . subject, however, to the approval of the Board; (vi) report to the Board the recommendations and conclusions of the Special Committee . . . and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board; . . . and (viii) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsels, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate.

60.     On June 25, 2015, the Special Committee retained J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") as its financial advisor in connection with its review and evaluation of the Merger proposal.

61.     Between mid-August 2015 and mid-September 2015, representatives of the Buyer Group and its financial, legal and accounting advisors had various discussions with the management of the Company regarding the business, operations and financial performance of the Company and conducted legal, business, financial and accounting due diligence on the Company.

62.     On December 9, 2015, the Special Committee convened a telephonic meeting at which Alex Zuoli Xu, Qihoo's Co-CFO, and representatives of J.P. Morgan and other advisors to the Special Committee were present. Xu presented Qihoo management's projections for the Company's future financial performance for the fiscal years ending December 31, 2015 through December 31, 2025.  Thereafter, J.P. Morgan reported to the Special Committee that J.P. Morgan was in the process of completing its financial analyses with respect to the Company and the proposed transaction.

63.     On December 16, 2015, J.P. Morgan presented its financial analysis to the Special Committee. J.P. Morgan also gave the Special Committee its opinion that the $77.00 per ADS Merger consideration and the $51.33 per share Merger consideration was fair, from a financial point of view, to Qihoo Securityholders that were unaffiliated with the Buyer Group.

64.     The Special Committee and the Board approved the Merger that same day.  The Special Committee unanimously (a) determined that the Merger was fair to, and in the best interests of, the Company and its unaffiliated Securityholders, (b) approved and declared it advisable for the Company to enter into the Merger, and (c) recommended that the Board authorize and approve the Merger.

65.     The Board then held a telephonic meeting at which the Board, based on the unanimous recommendation of the Special Committee, (a) determined that the Merger was fair to and in the best interests of the Company and the unaffiliated Securityholders and it was advisable for the Company to enter into the Merger, (b) authorized and approved the execution, delivery and performance of the Merger, and (c) recommended the approval and authorization of the Merger to the shareholders of the Company and directed that the Merger be submitted to a vote of the shareholders for authorization and approval.

66.     On December 18, 2015, J.P. Morgan made another presentation to the Special Committee of J.P. Morgan's financial analysis and gave the Special Committee its fairness opinion again, after considering a revised share count that Qihoo's management corrected after realizing that they had misunderstood the meaning of certain share categories related to restricted shares and options.

67.     In conducting its financial analysis and providing its fairness opinion, J.P. Morgan (i) reviewed the Merger Agreement; (ii) reviewed certain publicly available business and financial information concerning the Company and the industries in which it operates; (iii) compared the proposed financial terms of the transaction with the publicly available financial terms of certain transactions involving companies that J.P. Morgan deemed relevant; (iv) compared the financial and operating performance of the Company with publicly available information concerning certain other companies that J.P. Morgan deemed relevant; (v) reviewed certain internal financial analyses and forecasts prepared by the management of the Company relating to its business; and (vi) performed other financial studies and analyses and considered other information that J.P. Morgan deemed appropriate.

68.     J.P. Morgan also held discussions with members of Company management with respect to certain aspects of the Merger, the past and current business operations of the Company, the financial condition and future prospects and operations of the Company, and certain other matters that it believed necessary or appropriate to its inquiry.

69.     In giving its analysis, however, J.P. Morgan did not independently verify these bases for its opinion.  Rather, J.P. Morgan stated:

> [W]e have relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with us by the Company or otherwise reviewed by or for [J.P. Morgan] . . . .  In relying on financial analyses and

20

forecasts provided to us or derived therefrom, we have assumed that they have been reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate. We express no view as to such analyses or forecasts or the assumptions on which they were based. . . . We have also assumed that the representations and warranties made by the Company and the Acquiror Group in the Agreement and the related agreements are and will be true and correct in all respects material to our analysis.

70.     Ultimately, J.P. Morgan based its opinion on its discounted cash flow ("DCF") analysis and on its comparison of Qihoo to the public trading multiples other companies that J.P. Morgan considered to be similar to Qihoo.  But, as the Proxy Materials noted, "none of the selected companies [for J.P. Morgan's "public trading multiples analysis"] reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company."

71.     The financial projections that Qihoo's management provided to J.P. Morgan were an essential input into both J.P. Morgan's DCF analysis and its public trading multiples analysis.

72.     In addition, the Proxy Materials explained that J.P. Morgan "also reviewed, solely for informational purposes, historical trading prices of the ADSs, certain precedent transactions and the premia paid in certain precedent U.S. listed Chinese take-private transactions (including, but not limited to, the privatization transactions of the companies listed below), but noted, and the Special Committee understood and acknowledged, that these are not valuation methodologies but were presented merely for informational purposes."

21

73.     At the conclusion of its December 18, 2015 meeting, the Special Committee reaffirmed the resolutions adopted at its December 16, 2015 meeting and unanimously resolved to approve and recommend that the Board approve the Merger.  The Special Committee "expressly adopted" J.P. Morgan's "analyses and opinion, among other factors considered, in reaching its determination as to the fairness of the Merger."

74.     The Board, in turn, acting on behalf of the Company, "considered the analyses and recommendation of the Special Committee and the factors examined by the Special Committee . . . and adopted such recommendations and analyses."  The Board approved the Merger and recommended that the Company's shareholders vote to approve the Merger.

75.     Later on December 18, 2015, the parties to the Merger executed the Merger Agreement and other transaction documents.  On the same day, the Company issued a press release announcing the execution of the Merger Agreement, and furnished the press release and the executed Merger Agreement to the SEC as exhibits to a Form 6-K that it filed that day.

76.     The total amount of funds that were expected to be necessary to complete the Merger was $9.4 billion, assuming that no shareholders exercised their rights to dissent from the Merger and seek appraisal in the Cayman Islands.

C.     **Defendants Zhou's and Qi's Stakes in the Company**

77.     Prior to the Merger, Defendant Zhou (including through Global Village) owned 17.3% of the Company and Defendant Qi (including through Young Vision) owned 8.1% of the Company.  Collectively, they owned 4,740,568 Class A ordinary shares and 41,263,812 Class B

22

ordinary shares, which represented approximately 25.4% in number and approximately 60.6% in voting rights of the Company's issued and outstanding ordinary shares.[9]

78.    In the Merger, 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision were cancelled without any monetary consideration paid for them.  Instead, Defendant Zhou would own substantial stakes in the Company following the Merger.[10]

79.    The Final Proxy Statement disclosed that Defendant Zhou would own 22.8% and Defendant Qi would own 2.2% of the Company following the Merger.   But the Final Proxy Statement also disclosed that an entity called Tianjin Xinxinsheng Investment Limited Partnership ("Xinxinsheng") would own 11.5% of the Company following the Merger.  It was only in Annex E that the Final Proxy Statement disclosed cryptically that Tianjin Qihoo Hesheng Equity Investment Management Limited Partnership (Limited Partnership) ("Qihoo Hesheng") is the general partner of Xinxinsheng; that Qihoo Hesheng is an investment company that shared the same address as Qihoo; that Tianqin Qihoo Xinsheng Equity Investment Management Limited ("Qihoo Xinsheng"), another investment company that shared the same address, is the general partner of Qihoo Hesheng; *and that Qihoo Xinsheng is 99% owned by Defendant Qi*.

80.    Defendants Zhou and Qi thus stood to substantially increase their stakes in the Company through the Merger.  They stood to profit even further by paying far less than what the

---

[9] Defendant Zhou's shares consisted of  (i) 112,500 Class A ordinary shares beneficially owned by Mr. Zhou in the form of ADS, (ii) 51,723 Class A ordinary shares held by Global Village, (iii) 1,785,565.5 Class A ordinary shares in the form of ADS held by Global Village, and (iv) 29,340,466 Class B ordinary shares held by Global Village.  Defendant Qi's shares consisted of (i) 2,790,780 Class A ordinary shares in the form of ADS held by Young Vision and (ii) 11,923,346 Class B ordinary shares held by Young Vision.

[10] To the extent that Defendants Zhou and Qi owned any shares that were not cancelled in the Merger, those shares would have been entitled to be exchanged for the Merger consideration, but the Proxy Materials did not state whether, or how many, shares fell into that category.

23

Company would be worth in their planned relisting of the Company in China following the Merger.

        **D.**        **The Misleading Proxy Materials**

81.        Between January 11, 2016 and March 3, 2016, Defendants published a series of Proxy Materials that encouraged Qihoo Securityholders to vote in favor of the Merger based on Defendants' false and misleading statements concerning their reasons for buying the Company and supposed fairness of the transaction to Qihoo Securityholders.

82.        On January 11, 2016, Defendants published the initial transaction statement for the Merger on Schedule 13E-3, which attached the Company's Preliminary Proxy Statement and other supporting documents for the Merger (collectively, the "Preliminary Proxy Materials").

83.        Defendants then published an amended version of the Proxy Materials on February 8, 2016 (the "Amended Proxy Materials," which included a revised proxy statement (the "Amended Proxy Statement")).  On February 26, 2016, Defendants published a second amended version of the Proxy Materials (the "Second Amended Proxy Materials") that included a further amended version of the proxy statement (the "Second Amended Proxy Statement").

84.        On March 3, 2016, Qihoo published a third amended version of the Proxy Materials (the "Third Amended Proxy Materials") that included the final version of the proxy statement that informed Qihoo Securityholders at the March 30, 2016 shareholder vote on the Merger (the "Final Proxy Statement").

85.        The Proxy Materials contained materially false and misleading statements and failed to provide all material information related to the Merger that was necessary to make the statements contained therein not misleading.  (*See infra* Section V for more information on Defendants' false and misleading statements.)

1. **Assurances That no Relisting was Contemplated and That There Were No Alternatives to the Merger**

86.     Defendants' most fundamental misleading action was hiding the Buyer Group's plan to relist Qihoo's core business in China following the Merger. To further this goal, the Proxy Materials expressly disclaimed the notion that any such transaction was already being contemplated.

87.     For example, the Proxy Materials assured Qihoo Securityholders that, among other things, "[i]f the merger is consummated, the Company will continue its operations as a privately held company beneficially owned solely by the Buyer Group"; and "the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets."

88.     The Proxy Materials also affirmed "that there was no viable alternative" to the Merger while omitting the alternative of relisting the Company's core business in the Chinese stock market, which the Buyer Group was already planning to do following the Merger.

2. **False Reasons for the Merger and False Descriptions of the Merger Price as "Fair"**

89.     The Final Proxy Statement included many supposed reasons that the Special Committee, the Board, and the Buyer Group gave for the Merger.  Nowhere did they disclose the business opportunities that Qihoo would have in China following the Merger or that the Buyer Group's primary reason for the Merger was so that it could relist the Company at a higher valuation in China.

90.     The Special Committee's and Board's reasons for the Merger included that

- as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance. Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii) monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics;

- the Company would no longer be subject to the regulatory requirements and costs of public companies;

- the Special Committee's and the Board's determinations that the Merger was fair to unaffiliated shareholders;

- the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger;

- the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion (see "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information); and

- the Special Committee's and J.P. Morgan's role in the Merger process

91.     The Proxy Materials stated that "[f]or the foregoing reasons, **the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the**

26

**Merger, are fair to, and in the best interests of, the Company and the Unaffiliated**

**Holders."** (Emphasis in original.)

92.     The Proxy Materials also described Qihoo management's assumptions, which

formed the basis for the financial projections that Qihoo provided to J.P. Morgan, as including

that:

> (i) users of personal computers, smart phones and broadband
> internet services and their penetration in China and elsewhere
> would continue in line with management's expectations, (ii) the
> Company would be able to successfully expand its product
> offering by developing and launching new PC and mobile
> products, (iii) the popularity of the Company's products would
> remain stable in the geographic markets in which the Company
> operated, (iv) the Company would be able to successfully
> implement its business plan to compete effectively in both its
> traditional business and emerging business, (v) the market for
> smartphone and IoT (internet of things) devices would develop in
> line with management's expectations, (vi) the Company's
> emerging business would develop successfully, driven by both
> further hardware penetration and increasing monetization from
> smartphone and IoT devices, and (vii) material costs and expenses
> would increase in connection with the Company's revenue
> increase. The Company's management also assumed that the
> overall economy in China will remain stable, and that there will be
> no material change in competition affecting the Company.

93.     In addition, the Buyer Group relied on "the factors considered by, and the analysis

and resulting conclusions of, the Special Committee and the Board" in concluding that "the

Merger is substantively and procedurally fair to the Unaffiliated Holders."

94.     The Buyer Group also stated that the reasons for the Merger included that:

> [T]he operating environment has become more challenging due to
> recent operating conditions and industry trends. There is greater
> competition against both domestic and multinational companies in
> many of the service areas in which the Company operates. These
> changes have increased the uncertainty and volatility inherent in
> the business models of companies similar to the Company. . . .
> Responding to current market challenges will require tolerance for
> volatility in the performance of the Company's business and a
> willingness to make business decisions focused on improving the

27

> Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

95. In addition, the Buyer Group "decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger."

96. Many of these explanations for why the Buyer Group sought to buy Qihoo in the Merger were omitted from the Preliminary Proxy Statement. Defendants added these explanations only after the SEC criticized the initial proxy for failing to provide an adequate explanation of these topics. (*See infra* Section V.C.) When the SEC forced Defendants to elaborate on their reasons for the Merger, however, Defendants gave these false and misleading explanations that failed to disclose their true reasons for the Merger, including the Buyer Group's intent to relist the Company in China following the Merger and the increased business opportunities that the Company would have after the Merger.

97. The Proxy Materials also falsely touted the Merger price and described it as "fair" to Qihoo's Securityholders that were unaffiliated with the Buyer Group. In fact, the Merger price was not fair because the Proxy Materials failed to disclose the Buyer Group's reasons for the Merger and how those plans affected Qihoo's true value at the time of the Merger. In addition, J.P. Morgan's analysis, which the Special Committee, the Board, and the Buyer Group relied on in determining that the Merger price was fair, was false and misleading because it was based on the Company's faulty financial projections and because it compared Qihoo to companies that did not actually provide a sound basis for comparison.

E.        The Shareholder Vote and Completion of the Merger

98.        The shareholder vote on the Merger took place at the Company's extraordinary general meeting that was held on March 30, 2016.  As of the date of the Final Proxy Statement, the Buyer Group collectively beneficially owned 7,164,611 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represented approximately 26.8% in number and approximately 61.3% in voting rights of the Company's issued and outstanding ordinary shares.[11]  The Proxy Materials stated that at the close of business in the Cayman Islands on March 25, 2016, the record date for shareholders to be able to vote at the extraordinary general meeting, 180,839,445 Qihoo shares were expected to be issued and outstanding and entitled to vote.

99.        An affirmative vote of shareholders representing at least two-thirds of the voting rights of the shares present and voting in person or by proxy as a single class at the extraordinary general meeting was required for the Merger to pass.  Qihoo ADS holders who did not surrender their ADS as of March 25, 2016 could participate in the shareholder vote only by instructing the ADS Depositary (*i.e.*, The Bank of New York Mellon) how to vote their underlying shares on their behalf.

100.        For the Merger to be approved, assuming that all parties affiliated with the Buyer Group voted their shares in favor of the Merger, and that all shareholders would be present and voting in person or by proxy at the extraordinary general meeting, approximately 5.4% of the voting rights of all issued and outstanding shares would have to be voted in favor of the Merger by Qihoo Securityholders that were not members of the Buyer Group.  Only this amount of

_____

[11] These shares were primarily owned by Defendants Zhou and Qi (including through Global Village and Young Vision, respectively), who collectively beneficially owned approximately 25.4% in number and approximately 60.6% in voting rights of the Company's issued and outstanding shares.

29

unaffiliated shareholders was needed to approve the Merger because the Buyer Group specifically rejected a provision in the Merger agreement that would have required the approval of shareholders representing more than 50% of the voting rights of the shares that were not beneficially owned by the Buyer Group (a "majority of the minority" condition).

101.    Holders of 32,592,419 Class A ordinary shares and 41,818,346 Class B ordinary shares attended the March 30, 2016 extraordinary general meeting in person or by proxy. These shares represented approximately 41.0% of the Company's total ordinary shares outstanding at the close of business in the Cayman Islands on the record date of March 25, 2016. These shares were entitled to an aggregate of 241,684,149 votes, or 69.3% of the total outstanding votes on the record date. Approximately 99.8% of the total votes cast at the meeting were in favor of the Merger.  The Merger therefore passed.

102.    Had Defendants disclosed the Buyer Group's true intentions for Qihoo following the Merger—including their plan to relist Qihoo in China after the Merger at multiples times the amount paid to the Buyer Group. Qihoo's true value, and Qihoo's business opportunities in China following the Merger—more shareholders would have attended the extraordinary meeting (either in person or by proxy) and voted against the Merger or would have dissented from the Merger and exercised their appraisal rights in the Cayman Islands.

### 1.    Dissenting From the Merger Was Difficult and Discouraged

103.    Qihoo Securityholders had a right to dissent from the Merger and to exercise their appraisal rights "to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law."  But Defendants warned in the Proxy Materials that dissenting was a very risky proposition because "[t]he fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do

30

not exercise Dissenter Rights with respect to their Shares. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural requirements of the Cayman Islands Companies Law, you will lose your Dissenter Rights." Defendants further warned that "[t]he provisions of Section 238 of the Cayman Islands Companies Law are technical and complex. If you fail to comply strictly with the procedures set forth in Section 238, you will lose your Dissenter rights. You should consult your Cayman Islands legal counsel if you wish to exercise Dissenter rights."[12]

104. And dissenting was even more difficult because, as Defendants warned in the Proxy Materials, "THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO." According to the Proxy Materials, in order to validly dissent, ADS holders were required to go through extra complicated procedural steps and bear the extra costs of doing so.

105. These steps included their surrendering ADS to the ADS Depositary; paying the ADS Depositary's fees required for cancelling ADS; providing instructions for the registration of the underlying shares in the Company's register of members; certifying that they held ADS as of the ADS record date and would not give voting instructions for their ADS before 5:00 pm (New York City time) on March 23, 2016; and becoming registered holders of shares before the March 30, 2016 shareholder vote on the Merger.

106. Investors were told that, only after all of these difficult and costly steps, could ADS holders object to and dissent from the shareholder vote, if they "comply with the

---

[12] These steps are recounted here to explain what investors were told, but are not necessarily indicative of Lead Plaintiffs' position as to the actual steps necessary to exercise appraisal rights under the applicable law.

31

procedures and requirements for exercising dissenters' rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law."

107.    The false and misleading Proxy Materials that Defendants issued in connection with the Merger convinced most Qihoo Securityholders that there was no reason for them to take the risk and burden of dissenting from the Merger.

### 2.    The Completion of the Merger

108.    The Merger closed on July 15, 2016, which was called the "Effective Time" of the Merger.  At the Effective Time, each Share issued and outstanding immediately prior to the Effective Time was cancelled and ceased to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS represented the right to receive $77.00 (other than shares or ADS owned by the Buyer Group or shareholders that dissented from the Merger).  The Proxy Materials explained that after the Effective Time, the ADS Depositary would send ADS holders a check for the Per ADS Merger Consideration in exchange for the cancellation of their ADS.

109.    The ADS Depositary would have the requisite funds because "[p]rior to the Effective Time, the Parent Parties and the Company shall establish procedures with the Paying Agent and the ADS Depositary to ensure that (i) the Paying Agent will transmit to the ADS Depositary an amount in cash equal to (a) the number of ADSs issued and outstanding immediately prior to the Effective Time multiplied by (b) the Per ADS Merger Consideration and (ii) the ADS Depositary will distribute the aggregate of the Per ADS Merger Consideration to the ADS holders upon surrender by them of the ADSs."

### F.    Qihoo's Backdoor Listing in China Following the Merger

110.    After the Merger was completed, Qihoo conducted a complicated restructuring of its business to prepare for its relisting. Qihoo sought to include only its main businesses, including its core internet security business, in the company that would be relisted in China

through the backdoor listing. Qihoo therefore had to restructure its organization to separate its many other businesses, such as its financial, health care, property management, and mobile phone businesses. This restructuring culminated in Qihoo putting its main businesses into an entity called 360 Technology Co. Ltd. and maintaining its other businesses as separate entities.

111.    On November 2, 2017, an elevator-manufacturing company called SJEC that was listed on the Shanghai Stock Exchange under code 601313 announced that it would be conducting a backdoor listing with Qihoo. SJEC announced that Defendant Zhou, through companies that he controlled that owned Qihoo following the Merger, would merge with SJEC and that Zhou would control the listed company following the backdoor listing. On November 6, 2017, Defendant Zhou discussed this plan with the media.

112.    Conducting a backdoor listing, also known as a reverse merger, would allow Qihoo to have its business publicly listed on the Chinese stock market without having to meet the criteria for conducting an independent initial public offering.

113.    Through the backdoor listing, Tianjin Qixin Zhicheng Technology Co., Ltd. ("Tianjin Qixin"), which was the Holdco entity that participated in the Merger, would become SJEC's controlling shareholder, with Defendant Zhou as its controlling individual. Zhou would therefore control the Company following the backdoor listing. Including through his interest in Tianjin Qixin and his direct interest in the Company, Zhou would control 63.7% of SJEC and would own 23.4% of the Company's equity following the backdoor listing.

114.    On November 20, 2017, SJEC announced that the asset restructuring necessary for Qihoo's backdoor listing was approved by SJEC's shareholders. On February 2, 2018, SJEC completed its asset restructuring.

33

115.    On February 28, 2018, Qihoo began trading on the Shanghai stock exchange in its new form after being combined with SJEC.  It began trading under the name 360 Security Technology Inc., under the new code 601360.  This marked the completion of Qihoo's return to the Chinese capital markets.  At the close of trading that day, Qihoo, in its newly public form, had a market capitalization of 385 billion RMB, or approximately $62 billion.

116.    *Bloomberg* reported on February 28, 2018 that the value of the former SJEC—the shell company that Qihoo used for its backdoor listing—"soared as much as 550 percent since" the announcement of the backdoor listing in November 2017.[13]  This increased Defendant Zhou's net worth from approximately $2 billion (which itself was higher than the value of his pre-Merger stake in the Company) to $13.6 billion, making him the 12th-richest person in China.

117.    Moreover, as explained above, only Qihoo's main businesses were included in the backdoor listing.  Its other businesses remained separate and therefore provided the Buyer Group with even more value.  For example, Qihoo's financial arm conducted an IPO in the United States in December 2018 under the name 360 Finance and was worth over $2 billion at the time of its IPO.

118.    Qihoo also had other businesses—including its mobile phone, healthcare, and property management businesses—that were not included in the backdoor listing.

119.    As the dissenting shareholders in the Cayman Islands appraisal action have noted, Qihoo's market capitalization of over $60 billion immediately upon relisting only a portion of its assets in China was over $50 billion more than the amount that it was valued in the Merger.

---

[13] Venus Feng and Blake Schmidt, "Tech Mogul Gets $12 Billion Richer Just by Leaving New York," *Bloomberg* (Feb. 28, 2018).

G.    **The Buyer Group Planned to Relist Qihoo All Along**

1.    **News Reports Have Revealed the Buyer Group's Intention to Relist Qihoo in China Following the Merger**

120.    Several news articles have reported on a secret plan that Defendant Zhou had with the investors that bought Qihoo in the Merger.  A key term for their participation in the Merger was that Qihoo would relist in the public markets in China shortly after the Company's privatization in the United States.  This was how the investors that formed the Buyer Group planned to profit off of their investment.  Because the plan was to relist Qihoo in China so soon after the Merger, the members of the Buyer Group expected to profit from the higher value that the Company would achieve in its relisting in the Chinese stock market.  Defendants Zhou and Qi needed to line up a large number of investors to be able to raise enough funds to take Qihoo private at the $9.3 billion Merger price.  Their secret promise to relist Qihoo in the Chinese stock market at a higher value after its privatization is what incentivized those investors to participate in the Merger.

121.    A November 12, 2015 article from the Chinese publication *CN Stock* reported in Chinese that the author had obtained from an undisclosed source a copy of Qihoo's privatization plan, which confidentially indicated to investors participating in the Buyer Group that Qihoo planned to return to the Chinese stock market following the Merger.  The plan also stated that the relisting would take up to one-and-a-half years to complete.[14]

122.    That timeline that *CN Stock* reported is consistent with Qihoo's actual relisting that was announced in November 2017, which was less than one-and-a-half years after the Merger closed.  It also makes sense that this is how long it took for Qihoo to conduct its relisting

---

[14] "Qihoo 360 Privatization Plan Exposed: Backdoor A-share Listing or Directly into Strategic Emerging Industries Board," Shao Hao, *Shanghai Security News · CN Stock*, December 11, 2015, http://company.cnstock.com/company/scp_dsy/tcsy_rdgs/201512/3650366.htm.

because it is consistent with the amount of time that it typically takes for parties to reach agreement on a backdoor listing. The announcement of a relisting agreement in China, as SJEC and Qihoo announced in early November 2017, is a significant step that can be achieved only after a lengthy period of deal-making.

123. An expert in Chinese and United States M&A and capitals market transactions has explained the work that would ordinarily be required before reaching this type of agreement. It typically takes companies at least a full year on the quickest possible timeline, and usually longer, from the time they first start to consider a backdoor listing until they reach agreement with a shell company to conduct a reverse merger. The steps involved for a company seeking to merge into a shell company include:

(a) **Hiring a financial advisor (or investment bank) and a legal advisor** to advise on the process, including finding and reaching agreements with these advisors;

(b) **Identifying potential shell companies**, because companies must meet certain criteria to even be eligible to serve as potential hosts for a backdoor listing;

(c) **Reaching a preliminary agreement with a shell company,** which will likely not be the first one that is contacted, and then takes a substantial amount of time for the potential shell companies to consider the offer and for the parties to negotiate terms;

(d) **Conducting auditing and compliance work** to make sure that the company seeking relisting will be able to conform its accounting standards to the required format on a going-forward basis;

(e) **Both sides to the transaction performing due diligence on each other;**

(f)     **Conducting regulatory assessments** to ensure that the company seeking relisting meets the regulatory requirements of the target market, which are substantial on the Shanghai stock exchange;

(g)     **Negotiating the transaction terms** that will be set out in the parties' agreement to conduct the relisting; and

(h)     **Conducting corporate restructurings** that need to be done for the parties to be able to execute the backdoor listing in their desired structure.

124.    Qihoo's fundamental restructuring of its businesses was particularly complex and would have required a significant amount of time to complete following the Merger.  In addition to the usual restructuring needed to allow Qihoo and SJEC to merge—which itself is complex and time-consuming—Qihoo needed to separate its core businesses that would be included in the relisting from its other businesses that would be excluded.  In addition, Qihoo needed to ensure that the ownership interests of the many parties to the Merger, including Defendants Zhou and Qi, the 36 Equity Investors that participated in the Buyer Group, and the corporate entities that were created for purposes of the Merger, were all structured properly before their interests could be merged with SJEC in the backdoor listing.  Even though Qihoo's backdoor listing with SJEC was not announced until November 2, 2017, that timing is entirely consistent with the Buyer Group's already planning in 2015 to relist Qihoo after the Merger.

125.    Other news reports confirm that the members of the Buyer Group planned to relist Qihoo in China as part of their agreement to participate in the Merger.  On December 29, 2015, *Tencent Technology* reported in Chinese that it obtained Qihoo's privatization plan from Huatai United Securities, which was the main underwriter for Qihoo's privatization in the Merger.  This

37

article also reported that Qihoo planned to return to the Chinese A-shares market through a backdoor listing.[15]

126.   These articles in Chinese publications did not alert Qihoo Securityholders of the backdoor listing because these rumored reports were not definitive statements of the Buyer Group's intent.  Moreover, because these statements were made in Chinese publications, they were not accessible to ADS holders, whose securities traded on the NYSE in the United States. In addition, after these articles were published, between January 2016, when Qihoo published the Preliminary Proxy Materials, and March 30, 3016, when Qihoo's shareholders voted on whether to approve the Merger, the Proxy Materials firmly disclaimed any pre-existing plan to relist Qihoo in China.  The purpose of the Proxy Materials was to provide Qihoo Securityholders with the information they needed to decide whether to vote in favor of the Merger.  Qihoo's investors were entitled to take Defendants at their word when they denied any plan to relist the Company in China.  The news reports from late 2015 do, however, show when put in the context of all of the other evidence described herein, that the Buyer Group intended when they formed their agreement to participate in the Merger to relist the Company in China following the Merger.

127.   On June 23, 2016, after Qihoo's shareholders voted to approve the Merger, a Chinese language article from the publication *Netease* explained that Qihoo told the media that it "had reached an agreement on the currency exchange plan with the State Administration of Foreign Exchange."  The article commented that these developments paved the way for the Company's relisting in China.[16]

---

[15] "360 Plans to Return to A-share at the End of Next Year," Lei Jianping, *Tencent Technology*, December 29, 2015, https://wxn.qq.com/cmsid/TEC2015122900991105.

[16] "360 Privatization to Close in Two Weeks? Currency Exchange Plan Details Exposed," Zhang Ning, *NetEase Technology*, June 23, 2016, http://tech.163.com/16/0623/17/BQ8VHGU400097U7R.html.

128.    On August 3, 2016—after Qihoo was delisted from the NYSE on July 15, 2016—the newspaper *Caixin* reported in Chinese on the Company's relisting plans.  This article described a documented plan to relist "as of last year"—indicating that the Buyer Group had already planned to relist the Company while the Merger process was still underway, and well before Defendants first issued the Proxy Materials in January 2016.  This article also described Qihoo's plan to split its main businesses from its other businesses so that its core 360 security and 360 search businesses would be taken public in China while its other businesses (including finance, desktop, mobile services, and healthcare) would be excluded from the relisting plan. The article explained how this would aid in the relisting by removing entities that might face more regulatory hurdles or that were still in early stages, clearing the way for the newly listed company to focus on Qihoo's core businesses.  Qihoo, however, declined to comment for this article on its plans for after its return to China following the Merger.  This article confirms the other similar reports that the private promotional materials that Qihoo used to solicit investors in the Buyer Group secretly advertised that there would be a relisting after the Merger.[17]

129.    Defendant Zhou, however, continued to deny the Buyer Group's relisting plan. On August 22, 2016, Zhou gave an extensive interview to Chinese media in which he discussed his plans for Qihoo following the Merger.  On August 25, 2016, *Caixin* reported that in Defendant Zhou's August 22 interview, which was one of his first public comments since the

---

[17] "Qihoo 360 Splits and Divests Assets; Privatization Investors Facing Exit Risk," Qu Yunxu and Wang Qionghui, *Caixin*, August 3, 2016, http://m.companies.caixin.com/zknews/2016-08-03/100973792.html.

Merger closed the prior month, he "threw cold water on that talk" of relisting the Company in China.[18]

130.    Contrary to Zhou's protestations, however, a February 28, 2017 *Financial Times* article explained that while Qihoo was taken private at a valuation of approximately $9.3 billion, "[m]arketing materials from the fundraising 'for the privatization of Qihoo 360 and return of A shares' seen by the FT state that the return to investors assuming an exit in 2019 'may be as high as 5 [times]' and contain ambitious estimates of future net income and other performance metrics going out to 2019." This article further explained that Qihoo's minority shareholders "say that conversations with Qihoo 360 and its advisers before privatisation suggested that the company's prospects were not nearly that bright. A spokesperson for Qihoo 360 declined to respond to several email queries."[19]

131.    But Defendant Zhou continued to deny the relisting plan up until it was announced on November 2, 2017. On November 6, 2017, *Pandaily* reported (translating an article that *CBN* had published on November 3, 2017) that "[i]n spite of his straightforward reputation," and the constant questions he received about Qihoo's relisting, Defendant Zhou "was tight-lipped about which company he bought" as a vehicle for Qihoo's backdoor listing until SJEC's November 2, 2017 announcement that Qihoo would conduct its reverse merger with SJEC.[20]

---

[18] Caixin, "Closer Look: Qihoo Retirees From Public View After Record Privatization" (Aug. 25, 2016), https://www.caixinglobal.com/2016-08-25/closer-look-qihoo-retires-from-public-view-after-record-privatization-101011396.html.

[19]*Financial Times*, "Cayman Lawsuits Challenge Valuations of Delisted Chinese Companies" (Feb. 28, 2017), https://www.ft.com/content/ed8768f4-fd1a-11e6-8d8e-a5e3738f9ae4.

[20] *Pandaily*, Zhou Hongyi Makes Bold Move: Qihoo 360 Returns to Chinese Index Via Shell Company (Nov. 6, 2017), https://pandaily.com/zhou-hongyi-makes-bold-move-qihoo-360-returns-chinese-index-via-shell-company/.

### 2.     News Reports Have Revealed the Buyer Group's True Business Reasons for the Merger

132.    After the Merger was completed, Defendant Zhou gave a much more fulsome explanation of his and the Buyer Group's reasons for taking Qihoo private.  These factors explain substantial business opportunities that Qihoo had as a result of its returning to China after the Merger.  Those opportunities made Qihoo a much more valuable Company upon its relisting in China but were not disclosed in the Proxy Materials to Qihoo's Securityholders.

133.    On August 16, 2016, *Netease* reported in Chinese that Defendant Zhou stated that Qihoo would soon become a "pure domestic company."  Zhou explained that the reason why Qihoo resolutely planned to return to the domestic market was that "a few years ago, Chinese government leaders had talked to [Zhou] and hoped that the company could return back to China since many government agencies were using Qihoo's products.  In order to protect domestic cyber security, Qihoo should become a pure domestic company."  In addition, Qihoo had started to get involved in China's military industry and it would not be appropriate for a foreign enterprise to be involved in those businesses.  Defendant Zhou also claimed that several Chinese government agencies provided a lot of support to Qihoo's plan.[21]

134.    On August 22, 2016, the publication *The Paper* reported in Chinese that Defendant Zhou stated in his interview that day that Qihoo was splitting up its business units as part of a strategy that he decided on prior to the Company's privatization in the Merger.  Defendant Zhou denied that this step was part of a relisting plan.  Rather, he explained that having Qihoo's different business lines organized as smaller firms would allow them to better

---

[21] "Zhou Hongyi: 360 Will Soon Become a Solely Domestic Company," Cui Yuxian, *NetEase Technology*, August 16, 2016, http://tech.163.com/16/0816/13/BUJGV91E00097U7R.html.

41

innovate more new products and would better incentivize the management from different levels with stock options.[22]

135.    Defendant Zhou also stated emphatically in this interview that Qihoo had no plans for a backdoor listing in the Chinese stock market.  He said that "countless people" were contacting him every day to recommend shell companies for a backdoor listing, but that he was not considering that at all and that he did not speak to anyone about a backdoor listing.  Zhou gave several reasons for his firm stance against a backdoor listing.  He claimed his priority was to focus on Qihoo's business.

136.    In addition, as Zhou claimed according to an article published by *Caixin* on August 25, 2016, "I don't understand Chinese stock markets and the speculation repels me."  He dispelled questions about when Qihoo would be returning to the Chinese stock market because he claimed that "[t]here is still a lot of uncertainty hanging over doing business at home, we don't know how to do it."[23]

137.    In the August 22, 2016 interview discussed in *The Paper,* Zhou reiterated China's national security concerns as a prime reason for Qihoo's privatization, as opposed to having conducted the privatization so that the Company could relist in the Chinese stock market.  Zhou also specifically denied seeking to "arbitrage" the higher valuation that the Company could achieve on the Chinese stock market.

---

[22] "Zhou Hongyi's Communication Meeting Memoir: 360 Not Talking to Anyone about Backdoor Listing Now," Zhang Ning, *The Paper*, August 22, 2016, http://m.thepaper.cn/renmin_prom.jsp?contid=1517693&from=renmin

[23] "Closer Look: Qihoo Retires from Public View after Record Privatization," *Caixin*, August 25, 2016, https://www.caixinglobal.com/2016-08-25/closer-look-qihoo-retires-from-public-view-after-record-privatization-101011396.html

138.    Zhou also described in this August 22, 2016 interview the control that he exerted over the Merger process.  He explained that there were strict requirements for investors to be part of the Buyer Group, including that they cooperate with his plans for the Company.  Members of the Buyer Group were required to use their own funds for the Merger rather than raise funds from outside investors.

139.    The November 6, 2017 *Pandaily* article noted above also explained Zhou's reasons for relisting Qihoo in China and why he was willing to incur $3 billion in debt and to mortgage Qihoo's headquarters and trademarks to complete the Merger.  As Zhou explained, he no longer wanted Qihoo listed in the United States because "[a] few years ago," the head of a Chinese government department had spoken to Zhou "several times and made the country's expectations clear.  China had started to realize the importance of network security as a component of national security" and Qihoo played a key role in that area. "Qihoo 360 had more than 360 million customers and provided security protection software and solutions for many sensitive organizations including the government, institutions of foreign affairs, scientific research institutes of national defense and banks. . . .  It was considered unsafe to put China's core enterprise security, national security and infrastructure security in the hands of a foreign-invested company."

140.    Zhou also explained that Qihoo was "different from entertainment and social companies that are listed in the US" and that Qihoo "offered network security and solutions to many sensitive departments.  If Qihoo 360 were a foreign company, it couldn't receive the necessary qualifications.  So we returned to China to play a more important role in network security."

141.    These sensitive business plans were also why Zhou limited the types of investors that could participate in the Buyer Group that took Qihoo private in the Merger.  Zhou required that investors cooperate with his plan to "focus on domestic development" following the Merger.  In addition, his requirement that investors use their own funds to participate in the Merger limited the types of investors that could participate in the Buyer Group.  According to *Pandaily*, "Zhou said [Qihoo] turned down a lot of investors who wanted to take advantage of the opportunity and make a fortune."

142.    Similarly, the February 28, 2018 *Bloomberg* article noted above cited Zhou's November 2017 statements "aligning himself with China's national interest" as "among the reasons he moved the listing to his homeland, where the Communist Party has been tightening the country's 'cybersecurity sovereignty.'"

143.    In addition, the November 6, 2017 *Pandaily* article discussed Zhou's vision for Qihoo following the Merger.  Although Zhou had in the past been "reluctant to discuss Internet security in-depth," at the China Internet security conference in September 2017, he finally disclosed his vision for Qihoo's core security business.  Zhou emphasized "big security," comparing his idea to Jack Ma's (the founder of Alibaba) vision of "new retail."  *Pandaily* explained:

> "We are in a big security era," Zhou said in an interview. Cyber security is not just the security of the network itself, but also national security, social security, infrastructure security, urban security and personal safety.  "Security is big. The public understanding of what Qihoo 360 does should go beyond free antivirus services and phone blocking. In fact, Qihoo 360 can play an important role in industrial security, social security, national security, cyber-attack and defense," Zhou said. The integration of the military and the people is also an opportunity for Zhou. The biggest benefit of Qihoo 360's privatisation was identity.

144.    None of these plans that Zhou had for Qihoo's growth were disclosed to Qihoo Securityholders in connection with the Merger.  To the contrary, the Proxy Materials portrayed Qihoo as facing significant business risks without disclosing the great opportunity that Qihoo had to expand its security business once it returned to China and was no longer a U.S.-listed Company.

145.    In particular, the Proxy Materials described the "business risks" of "increased competition and government regulation" as the "primary detriments" to the Buyer Group in conducting the Merger.  The Proxy Materials also stated that it was particularly important for Qihoo to become a private company so that it could have "greater flexibility" in facing "new challenges," including that "the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies" and "the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics."

146.    Similarly, when the Proxy Materials disclosed the projections that Qihoo provided to J.P. Morgan that formed the basis for J.P. Morgan's valuation and fairness opinion, those projections were based on the Company continuing in line with its  current plan and did not account for the increased business opportunities that Zhou knew would exist after the Company was no longer listed in the United States.  For example, these projections assumed that "the popularity of the Company's products would remain stable in the geographic markets in which the Company operated."  Defendants made no mention of being able to substantially expand its security business in China—including in coordination with the Chinese government and other national security interests—once it returned to China and would no longer be considered a foreign company.  As the *Financial Times* reported on February 28, 2017, potential investors in

45

the Merger were told that Qihoo would be relisted following the Merger for multiple times its present value based on "ambitious estimates of future net income and other performance metrics going out to 2019," but Qihoo's minority shareholders reported "that conversations with Qihoo 360 and its advisers before privatization suggested that the company's prospects were not nearly that bright."[24]

147.    The Proxy Materials also did not mention Zhou's plan to split up Qihoo's business into separate entities so that each separate business line could grow faster by focusing just on its core competency and growth trajectory.  The articles discussed above, however, make clear that this was part of Zhou's plan all along.  In addition, the November 6, 2017 *Pandaily* article quoted Zhou as saying, "[i]n the future, we will split all businesses requiring a second startup."  The article explained that "[a]fter the split, the branches will be subsidiaries under Qihoo 360 Group, with independent accounting, and staffing."  According to Zhou, "[i]f you have the same criteria for mature and innovative businesses in a company, innovative businesses will never develop."

148.    Zhou's plan to split up Qihoo's business lines was sure to increase the value of each unit for the reasons that Zhou explained.  In addition, it is well known that when companies spin-off subsidiaries, the new subsidiaries are worth more than when they were wholly owned by the parent company.  A 2012 paper by well-known professors of corporate finance that analyzed ten equity carveouts in Asia, Europe, and the United States, confirms this phenomenon.[25]

---

[24] *Financial Times*, "Cayman Lawsuits Challenge Valuations of Delisted Chinese Companies" (Feb. 28, 2017), https://www.ft.com/content/ed8768f4-fd1a-11e6-8d8e-a5e3738f9ae4.

[25] Eckbo and Thorburn, *Foundations and Trends in Finance*, NOW, Vol. 7, No. 3 (2012).

Recent papers on corporate restructuring show similar results.[26]  Reasons for this phenomenon include that breaking up a company tends to lower information asymmetry and allows the more-focused companies that result to raise capital at a lower rate.  Yet the Proxy Materials did not mention Zhou's plan to breakup Qihoo's separate business lines.  The Proxy Materials also did not disclose the Company's financial results or projections for its individual business lines that would be separated into different entities following the Merger.

### 3.    A Confidential Witness Has Confirmed that Defendants Planned All Along to Relist Qihoo in China Following the Merger

149.    A confidential witness that worked in Qihoo's Public Relations department at its Beijing headquarters from 2014 through 2017 ("CW1") has explained that Defendants planned all along to relist the Company in China following the Merger.  CW1 reported to a senior editor in the department, who reported to Qu Bing.  Qu was a Vice President, was in charge of Qihoo's Public Relations department, and reported to Defendant Qi.[27]

150.    CW1 explained that by April 2015, employees in CW1's department were informally discussing that Qihoo would be relisted in China.  By mid-2015, everyone in the department knew of this plan.  In mid-2015, CW1 attended a department meeting where Defendant Qi directed the attendees that they needed to keep a low profile concerning the relisting plan and should "not release this information outside the company."[28]  CW1 had a clear

---

[26] *See* Apostolos Dasilas & Stergios Leventis, *The Performance of European Equity Carve-outs*, J. Fin. Stability, Vol. 34 (2018); Alexandros P. Prezas & Karen Simonyan, *Corporate Divestitures: Spin-offs vs. Sell-offs*, J. Corp.  Fin., Vol. 34 (2015).

[27] According to ifeng.com, an established Chinese online media platform, Qu Bing joined Qihoo as a Vice President in February 2011.  She reportedly played an instrumental role in Qihoo's privatization and relisting.  *See* "360's Vice President Qu Bing Resigned – Previously Facilitated 360 Privatization and A-share Listing," Liu Zhengwei, *Ifeng Tech*, December 12, 2018, https://tech.ifeng.com/c/7iZSlEneaRM.  Discussions of Chinese language publications such as this article are based on English translations from the original versions.

[28] This timing is consistent with the Proxy Statement's disclosure that Zhou began to discuss the Merger with investors in the Buyer Group in early May 2015.

memory of this specific meeting.  Defendant Qi told attendees not to release any information about the relisting through Qihoo's media platform or discuss the matter internally.  Defendant Qi gave this instruction because the Public Relations department was responsible for Qihoo's media platform and news releases, so it was important for its members to know what could and could not be reported.  CW1 also explained that in addition to not announcing the relisting plan outside the Company, employees were instructed not to discuss it internally because there was a small community of internet companies in China with employees switching frequently between them.  If employees discussed the relisting internally, it could cause a leak of the information to others in the industry.  CW1 also noted that employees knew since at least late 2015 that Qihoo would be relisted through a backdoor listing rather than through an IPO.

151.    CW1 also described Defendant Zhou as being in charge of the privatization and relisting plan because of his large ownership stake in the Company.  In addition, CW1 recalled discussing the Company's plans with a senior employee in the Public Relations department, who confirmed that after privatization, Qihoo would return to mainland China and get relisted.  CW1 also explained that Qihoo sought to complete its privatization as quickly as possible because that needed to be done before the relisting could occur. Qihoo therefore pledged its headquarters in Beijing and the Company's trademarks as collateral to overcome funding constraints and secure loans from China Merchants Bank.

152.    CW1 also explained that as the relisting approached, Qihoo's leaders wanted to avoid public disclosure of the relisting and instructed employees to try to use their media connections to get articles with the identity of the shell company (SJEC) deleted from the internet.  Lastly, CW1 described how Qihoo's employees were confident that the value of the

Chinese shell company that Qihoo would merge into would increase dramatically as a result of the backdoor listing.

### 4. The Cayman Islands Appraisal Action Shows That Defendants Have Hid Information Related to the Company's True Value

153. Three Qihoo Securityholders (Blackwell Partners LLC-Series A, Crown Managed Accounts SPC, and Maso Capital Investments Limited) dissented from the Merger and sought appraisal in the Cayman Islands (the "Appraisal Action"). Together, these three investors owned a total of 329,097 of the Company's Class A ordinary shares. At the Merger price, these shares were entitled to receive a total of approximately $16.9 million had their owners participated in the Merger rather than dissenting.

154. While the Appraisal Action is still pending and much of the evidence from it is not publicly available, several interim court rulings show the extent to which Defendants have hidden Qihoo's true value from its Securityholders and underpaid them in the Merger.

155. Even though the dissenters' shares were worth only $16.9 million at the Merger price, Qihoo agreed in October 2016 to pay $92 million to the Cayman Islands court to be held "as security for payment by the Company to the Dissenting Shareholders of the fair value of the shares of the Dissenting Shareholders." In a January 26, 2017 decision assessing the dissenters' request for an "interim payment" (to them rather than to the court), the Grand Court of the Cayman Islands took note of the fact that Qihoo chose to make this $92 million payment even before seeing the report of the dissenters' valuation expert that valued the dissenters' shares at between $41 million and $95.6 million in total (or between $124.4 per share and $290.49 per share—far higher than the Merger price).[29] The Cayman Islands court credited the dissenters'

---

[29] The dissenters' expert based his valuation analysis on a discounted cash flow valuation and a capitalization of earnings, which the court noted "are both very well recognized analyses – routinely performed by experts in share valuations, share valuation disputes and fair value proceedings."

argument "that it is nigh inconceivable that such a substantial sum would have been paid into Court without anxious consideration by [Qihoo] and without the benefit of expert advice as to quantum."

156.   Even with this $92 million held as security against an eventual judgment, the Grand Court of the Cayman Islands determined that Qihoo was required to pay the dissenting shareholders an interim payment equal to the Merger price while the Appraisal Action is pending.  The court explained that it ordered this payment because it determined that the dissenters at trial would "receive at least this Merger Price."  YThe court also determined that "[o]n any view the Dissenters in these proceedings will receive from the Petitioner a substantial sum as fair value for their shares."

157.   In addition, Qihoo has impeded at every turn the dissenters' efforts in the Appraisal Action to obtain the Company's internal data that would show its true value.  Qihoo failed to provide many categories of information that it had agreed to disclose in an October 25, 2016 Consent Order.  The dissenters therefore filed a Summons with the Grand Court of the Cayman Islands seeking to compel the production of relevant information.  The Court ruled on July 27, 2017 that Qihoo had taken "inconsistent positions" and a "cavalier approach to previous aspects of the discovery process."  In many instances, the Company changed entirely its response to certain requests for key documents, first claiming that no responsive documents existed and then finding relevant materials after the dissenters issued their Summons.

158.   For example, there were inconsistencies in Alex Zuoli Xu's (the Company's Co-Chief Financial Officer) responses concerning the sources of information for the 2025 Projections of the Company's future financial results that formed the basis for J.P. Morgan's valuation and fairness opinion.  First the Company said that J.P. Morgan prepared the 2025

Projections "based on their understanding of the Company's business, street consensus and see side analysis."  Then, when pressed further, Xu said that was not correct and that he was the only person at Qihoo that communicated with J.P. Morgan about the 2025 Projections, based on his familiarity with the Company, but that he did not have any notes or records of what he told them. And then in affidavits, Xu and the Company took yet another position, claiming that Xu used his laptop and was logged into the Company's system when he met with J.P. Morgan.  Furthermore, although the Company claimed that Xu was the only person that communicated with J.P. Morgan in connection with the 2025 Projections, documents that were subsequently produced showed that several other people were also included in correspondence between the Company and J.P. Morgan.  The Company grudgingly ended up agreeing to search the emails of several employees—including Defendant Zhou—for relevant correspondence.  The court, however, determined that those efforts were not sufficient and the emails of all of the Company's Directors should be searched.

159.    The Cayman Islands court also found the difficulties that the dissenters raised related to Qihoo's financial projections that the Company provided to J.P. Morgan in its analysis of the Merger "hard to reconcile without full or complete discovery," which the Company was not providing.  These projections are among the most important pieces of information that formed the basis for J.P. Morgan's valuation analysis. Yet, Qihoo was not forthcoming with this information in the Appraisal Action.

160.    The court in the Appraisal Action also noted other striking instances in which Qihoo withheld evidence.  Qihoo first claimed that the virtual data room containing the due diligence materials that were provided to one of the financiers for the Merger no longer existed.

But it turned out that the Company did have possession of the data room archive and "no explanation has been given as to when the Company came to be in possession of it, or how."

161.    As another example of the Company's discovery delinquencies, the court "found it strange that, at least initially, the Company has sought to distance itself from the documents available to the Special Committee." The dissenters sought the Special Committee's documents as a key source of information that would shed light on the Company's true value.

162.    Qihoo also initially stated on three separate occasions in the Cayman Islands discovery process that it did not create quarterly budgets or forecasts. But after the dissenters filed their Summons seeking evidence, the Company ended up finding and providing 431 documents relating to its quarterly budgets from 2012 through 2016.

163.    Because of the Company's insufficient discovery responses, the court in the Appraisal Action granted the dissenters' requests to compel Qihoo to undertake various discovery efforts, including that the Company better preserve its electronic information, that it provide the specific discovery requested, and that a forensic expert be jointly appointed by the parties to monitor the Company's compliance with its electronic discovery obligations. And because the dissenters "largely succeeded on their application" to compel Qihoo to produce information, the Court awarded the dissenters a major portion of their costs of the application (which the Court later determined to be 80% of their costs).

164.    The Court of Appeal of the Cayman Islands then denied Qihoo leave to appeal the lower court's discovery order. In an October 9, 2017 decision, the Court of Appeal agreed with the lower court's analysis of Qihoo's blatant discovery failures. For example, the appellate court noted "instances where the Company had claimed not to have certain categories of documents, but had subsequently disclosed them." The appellate court also noted the unusual nature of the

remedies issued here based on the Company's particularly obstructive behavior. The appellate court explained that although ordering a forensic audit is "intrusive and exceptional," the lower court "had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the Company complied with its disclosure obligations." The appellate court stressed that forensic experts "are to be regarded as exceptional remedies, not common currency in section 238 petitions," because of the potential strain they might place on a company. Qihoo's egregious behavior justified putting such an intrusive expert in place.

165. Discovery in the Cayman Islands appraisal action was originally scheduled to be completed by November 18, 2016. Because of the delays caused by Qihoo's recalcitrance, discovery has continued into 2019. Furthermore, Qihoo's disruptive tactics did not stop after the court appointed the forensic auditor to oversee discovery. As the dissenters explained in a subsequent motion raising Qihoo's continued manipulation of the discovery process, Qihoo claimed that because of "eye issues," Defendant Zhou did not have a computer or any electronic devices and that he never used a computer since he founded the Company in 2006. The dissenters explained the absurdity of this contention for several reasons—including that Qihoo, which Zhou founded, is one of the leading internet companies China; Zhou stated in his 2017 autobiography, "I've been using computers for 30 years" and "[a]s long as I can sleep and [have] a space for my computer I'm ok"; a recent video showed Zhou in his office with a large computer screen and keyboard on his desk; and Zhou practiced archery despite claiming to have poor eyesight. In a December 19, 2018 ruling, the Grand Court of the Cayman Islands described Zhou's alleged eye issues as "quite incredible" and "odd."

166. That same ruling also discussed a situation whereby, in the course of collecting evidence for discovery, a leading member of Qihoo's finance team instructed the group to delete

53

certain information from their computers before providing them for imaging in the discovery

audit.  Moreover, a company employee had stated that she should have removed the "Destruction

Instruction" from the relevant materials before she provided them to the discovery monitor.

Although the Court did not view these issues as being so severe as to merit a judgment that

discovery should stop and the Company could not rely on any factual evidence at trial, the court

described this situation as "unfortunate, (even peculiar)."

### 5.    Evidence From the Trial in the Appraisal Action Shows That Qihoo Was Undervalued in the Merger

167.    The trial in the Appraisal Action was held in the Grand Court of the Cayman

Islands, Financial Services Division, over video conference, from February 8, 2022 through March

25, 2022, including 16 days of trial during that time, before the Honorable Raj Parker (the

"Appraisal Action Trial").  Lead Plaintiffs commissioned the services of Hudson Court Reporting

& Video, a well-known court reporting service based in the United States, to produce a transcript

of the Appraisal Action Trial based on a live video feed of the trial.[30]

168.    Documents and testimony from the Appraisal Action Trial show that Qihoo's fair

value was substantially higher than the Merger consideration of $77 per ADS as of the time that

the Proxy was issued, and at all relevant times during the Merger process.

169.    Alex Xu ("Xu"), Qihoo's Co-CFO who provided Qihoo's management

projections to J.P. Morgan, testified extensively at the Appraisal Action Trial.[31]  He was the only

---

[30] The evidence from the Appraisal Action Trial described below is from this transcript.

[31] This is the same person as Alex Zuoli Xu referenced above, though in the Appraisal Action Trial, he was referenced as just Alex Xu.

Qihoo employee that testified at the trial.[32] Xu confirmed that Defendants Zhou and Qi were "the senior management team" that "controlled Qihoo."[33]

**a.    Defendants Viewed Qihoo's Fair Value as Higher Than the Merger Consideration**

170.    Emails that were submitted as evidence at the Appraisal Action Trial show unequivocally that Defendants Zhou and Qi, as well as others in Qihoo's senior management and the Buyer Group, viewed Qihoo's value as significantly higher than the Merger consideration. They expressly planned to relist Qihoo in China following the Merger to capture that greater value.

171.    On June 17, 2015, the same day that Defendant Zhou made his offer to buy the Company for $77 per ADS, he wrote an email to all staff on Qihoo's internal email system, with the subject "Seize the opportunities to write a new chapter, a letter of all 360ers from Zhou."[34]  The email stated that "***many of us believe the current valuation of 360, which stands at USD 8 billion, fails to fully reflect the value of our company***."[35]  That amount, $8 billion, was around the market capitalization of Qihoo before Zhou's offer, which valued Qihoo at approximately $9.3 billion.[36]

172.    Xu confirmed in his testimony, when discussing Zhou's reference in this email to "many of us," that Zhou discussed his view that Qihoo was undervalued in the U.S. with other members of Qihoo's senior management, including Xu. Moreover, Xu agreed that Qihoo was undervalued in the U.S.

---

[32] Zhou and Qi did not testify at the trial because Qihoo declined to put them forth as witnesses.

[33] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[34] Qihoo was often referred to internally as "360," as its full name was Qihoo 360 Technology Co. Ltd.

[35] Appraisal Action Trial on February 8, 2022 and February 10 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[36] The Merger consideration of $77 per ADS "represent[ed] a premium of 16.6% to the closing price of the Company's ADSs on June 16, 2015." *Supra* ¶ 234.

173.     Zhou sent this email on June 17, 2015, months before J.P. Morgan conducted its valuation analysis or Qihoo's Special Committee declared the Merger fair in December 2015. Even so, Xu testified that "at that point," when Zhou stated the Company was undervalued in June 2015, Xu thought the Company was worth exactly the Merger price of $77 per share. He then clarified that "[o]bviously at that point I don't have an idea because I haven't run . . . through the number[s] yet, so I just generally feel that we are undervalued." Xu stated that he then arrived at the precise figure of $77 per share as Qihoo's value on December 7, 2015 (which was when he made the projections that formed the basis for J.P. Morgan's fairness opinion).[37]

174.     Another email, that Defendant Qi drafted on June 12, 2015—before Zhou even made his offer to take Qihoo private—was sent to the Cyberspace Administration of China (which is part of the Chinese government) with the heading "Request for permission for 360's A-share relisting."  This email stated expressly that "Qihoo plans to relist in the U.S. and pursue" an "A-share relisting." The email explained that "360's domestic relisting is feasible." It also stated that given Qihoo's "***market cap is expected to reach over 150 billion [RMB] after the A-share relisting.***" That came out to ***approximately $25 billion***. Qihoo was providing this information to show the Chinese government that it would have "no difficulty in repaying" its loans. The email also stated that "[w]e see no major legal or regulatory obstacle to implementing this plan and there have been many successful precedents to follow." In addition, the email stated that Zhou and Qi wanted to retain absolute control of the Company following relisting.[38] This email shows that, consistent with Zhou's view that many in Qihoo's management believed that Qihoo was

---

[37] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[38] Appraisal Action Trial on February 8, 2022 and February 17, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

undervalued in the U.S., Qi valued the Company at $25 billion, which was over three times its value in the U.S. before Zhou made his offer to buy the Company at a valuation of $9.3 billion.

175.    Other documents submitted at the Appraisal Action Trial confirmed that the Buyer Group and others associated with Qihoo's planned relisting valued the Company substantially higher than the Merger consideration.

176.    A set of financial projections prepared by China Renaissance—part of the Buyer Group—dated July 28, 2015, showed that ***China Renaissance thought if they exited their investment four years after privatization the Company would be worth $51 billion***. Even though this was over seven months before the Final Proxy, this document included an option that Qihoo would be relisted through a backdoor listing. This document even included a note input manually that the reverse or backdoor listing would be with an elevator company, which is what ultimately occurred. [39] And while this valuation was assuming a relisting four years after privatization, it reflects a member of the Buyer Group's valuation of Qihoo at the outset of the Merger process. It is implausible that Qihoo could be expected to grow over five times the amount that it was valued at in the Merger in just four years, and the far more reasonable inference is that those with inside knowledge of the Company understood its intrinsic value was far greater than the Merger price.

177.    Similarly, CICC, which was a leading Chinese investment bank pitching to be involved in Qihoo's relisting, conducted an analysis dated June 18, 2015, in which it ***valued Qihoo at approximately $60 billion if it were relisted "as is"***—in other words, without any post-privatization change, such as spinning off or liquidating any portions of the Company—as

---

[39] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

compared to the Merger valuation of approximately $9 billion[40] CICC also sent an email dated July 29, 2015, to high-level Qihoo employees Zhang Fan (the Company's General Counsel) and Yao Yu (a Vice President at the Company) discussing "direct A-shares listings" and "a brief overview of a share listing through a reverse takeover."[41] This correspondence is just one example that shows that Qihoo itself was involved in the relisting plan and knowledgeable persons valued Qihoo at multiple times the value that would be paid through the Merger consideration.

178.    In addition, on November 3, 2015, Huatai, which was the Buyer Group's financial advisor, sent an email, including to Qihoo employees, concerning the delisting and relisting transaction, in which it noted that "the proposed restructuring is essentially an internal adjustment within the corporation without any impact on 360's actual operations."[42] This shows that the purpose of the restructuring that was planned at the time of the Merger was to facilitate the planned relisting, but it was not intended to alter Qihoo's basic business operations. This strengthens the conclusion that the far higher valuations articulated by Qihoo, China Renaissance and CICC corresponded to the intrinsic value of Qihoo at the time of the Merger, as opposed to a value it could only hope to achieve through operational changes.

179.    Huatai then confirmed its view that Qihoo was undervalued in the United States, by stating in an email on November 24, 2015, in connection with Qihoo's application for approval from China's National Development and Reform Commission on overseas investment, that "***Qihoo 360's current market cap of over [$]8 billion does not reflect the corporate***

---

[40] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[41] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs. This email was sent to Yao and Zhang.

[42] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

*value.*"[43] Xu testified that this governmental body is tasked with central planning of the national economy on mainland China and is a very important body that one would not purposely lie to.[44]

180.    All of this written evidence from the Appraisal Action Trial shows that key participants in the Merger and planned relisting—including Defendants Zhou and Qi, other Qihoo executives and participants in the Buyer Group, and key financial advisors—all viewed Qihoo as substantially undervalued by the public markets in the United States.

181.    Indeed, there is *no doubt* that Qihoo's valuation was greater than its pre-deal announcement public trading valuation of $8 billion – as this was expressly admitted by Zhou and Xi.  The only question is whether the $9 billion Merger valuation fully provided for that undervaluation.  The express statements by Qi that it would relist at a valuation of at least $25 billion, along with the other knowledgeable views regarding its near-term relisting valuation (i.e., CICC's valuation of $60 billion and China Renaissance's valuation of $51 billion) compellingly suggest that the fair valuation was greater than $9 billion, regardless of whether the entirety of those expected relisting values reflect Qihoo's intrinsic pre-Merger value.  It would simply defy common sense to expect a valuation gap of that magnitude to be entirely driven by relisting – especially when CICC stated its valuation considered the company "as is."  Additionally, numerous facts from the Appraisal Action Trial demonstrate that the public disclosures prior to the Merger understated Qihoo's intrinsic value, and thus support the conclusion that the higher valuations attested to by Qi, China Renaissance, and CICC are highly probative of Qihoo's real pre-Merger intrinsic value.

---

[43] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[44] Appraisal Action Trial on February 8, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

b.      **Specific Facts Demonstrating That Qihoo's Intrinsic Value Was Greater Than the Value Set by the Merger Price**

182.    The following evidence shows that Qihoo's financial metrics and intrinsic value were artificially deflated in the projections that Qihoo's management included in the Proxy and that formed the basis of J.P. Morgan's valuation and fairness opinion.

183.    Qihoo's higher intrinsic value, as a continuing public company in the United States, was the major issue addressed by the Appraisal Action Trial. The Proxy included financial projections for 2016 through 2025 that Qihoo's were publicly represented as Qihoo's management projections.[45]  These projections were provided to J.P. Morgan and formed the key factual basis for J.P. Morgan's Discounted Cash Flow ("DCF") analysis that formed the basis of its fairness opinion.  As noted above, J.P. Morgan did not independently verify these projections, but rather assumed their accuracy.

184.    A DCF valuation is considered the gold standard in assessing the intrinsic or fair value of shares.  In summary: a DCF projects the future profit of a business and then discounts that future profit (*e.g.*, based on the time value of money) to derive the business' present value.  The logic of a DCF valuation is relevant here, because DCF *directly* speaks to the "intrinsic" value of continued shareholdings.  One reason to buy a share, is of course, that one might later sell it at a profit.  But DCF valuation recognizes that shares also carry an "intrinsic" value, because the shareholder has certain rights which (in essence) includes a right to the increase in the equity value of the corporation.  That right can lead to direct profit through future dividends – but whether or not the company actually distributes its profit to shareholders, the underlying logic of DCF recognizes that investors directly or indirectly receive a share of the

---

[45] While the projections also included 2015, that year was nearly complete as of December 18, 2015, the date of J.P. Morgan's fairness opinion and the Special Committee's approval of the Merger as fair.

company's profit and thus the intrinsic value of share ownership can largely be measured by looking at the expected future profits of a company and discounting that value to determine the present value.[46]

### i.      The Cloud Computing Capital Expenditure

185.    Qihoo's management projections included $5.9 billion in total projected capital expenditures from 2016 through 2025. These expenses were a marked increase from the amount of Qihoo's expenditures leading up to 2016. For example, Qihoo's capital expenditures for 2014 were just $170 million and its projected amount for 2015 was just $200.

186.    Xu agreed "that the primary reason for the very steep increase in capex as shown in the projections is the assumption[] in the projections that Qihoo would have spent very large amounts of money on a new office building Xianjing and on a new public Cloud services offering."[47] Similarly, Qihoo's valuation expert, Jaime d'Almeida,[48] agreed that "the very steep

---

[46] This point can be illustrated with a simple example.  If Danielle owns 50% of the equity shares in a café, and is approached by another restauranter interested in buying her interest in the café, Danielle would be expected to ask herself how much profit she expects the café to generate over the next several years and how much she would value receiving a cash offer for her interest in the café today, as opposed for waiting for that expected future profit. This line of thinking is what DCF captures – and the form of thinking holds true regardless of whether Danielle is expecting to benefit from that Café's future profit by receiving the money directly (*e.g.*, through dividends) or by the café reinvesting the profit, such that whenever she next thinks about selling, at that time, the expected cash flows would be even greater.  The intrinsic value of her equity interest in the café, depends on its expected future cash flows, as that is the value she derives from owning the equity. She might translate that intrinsic value to cash through a sale or she may continue owning the shares. For the avoidance of doubt, this simple example is not meant to suggest that, if someone offered her an amount greater than the amount corresponding to the café's future cash flows, one could not reasonably state that *the pending offer* sets a floor as to the immediate intrinsic value of her shares, since in that scenario the existence of the offer presents her an alternative immediate opportunity to realize the offer price through her share ownership (*i.e.*, by selling).

[47] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[48] d'Almeida is the principal of d'Almeida Consulting LLC, where he describes himself as having "managed hundreds of valuation engagements" with "over 25 years of experience in economic and valuation analysis and consulting, and has provided both deposition and trial testimony on valuation and damages issues." *See* http://www.dalmeidallc.com/.

increase in capex is the take-private projection that Qihoo would have spent a significant amount on a new office building in Tianjin and on a new public Cloud services."[49]

187.    The projections in the Proxy simply listed Qihoo's projected capital expenditures as a single line item per year, without breaking out how these funds would be allocated. J.P. Morgan's valuation analysis, which formed the basis for its opinion that a Merger price of $77 per ADS was fair, based on a total Company value of $10.242 billion, was based on these projections that Qihoo provided to J.P. Morgan.[50] J.P. Morgan's "management case" DCF analysis simply incorporated the capital expenditure figures from Qihoo's projections:

## DCF analysis – management case

### Discounted cash flow (US$mm)

| | Historical | | | | | | Management projections | | | | | | | | | Terminal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (FY ended December 31) | 2012A | 2013A | 2014A | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | year |
| Revenue | 329 | 671 | 1,391 | 1,806 | 3,630 | 4,819 | 6,255 | 7,657 | 8,948 | 9,646 | 10,143 | 10,543 | 10,890 | 11,221 | 11,557 |
| Growth % | | 104.0% | 107.2% | 29.9% | 101.0% | 32.7% | 29.8% | 22.4% | 16.9% | 7.8% | 5.2% | 3.9% | 3.3% | 3.0% | 3.0% |
| EBITDA (Non-GAAP) | 116 | 267 | 437 | 544 | 667 | 1,046 | 1,680 | 1,996 | 2,282 | 2,433 | 2,528 | 2,609 | 2,682 | 2,755 | 2,837 |
| Margin % | 35.2% | 39.8% | 31.4% | 30.1% | 18.4% | 21.7% | 26.9% | 26.1% | 25.5% | 25.2% | 24.9% | 24.8% | 24.6% | 24.6% | 24.6% |
| D&A | 16 | 43 | 83 | 104 | 140 | 198 | 420 | 450 | 480 | 492 | 504 | 516 | 528 | 540 | 600 |
| EBIT (Non-GAAP) | 99 | 224 | 355 | 440 | 527 | 848 | 1,260 | 1,546 | 1,802 | 1,941 | 2,024 | 2,093 | 2,154 | 2,215 | 2,237 |
| Margin % | 30.2% | 33.4% | 25.5% | 24.4% | 14.5% | 17.6% | 20.1% | 20.2% | 20.1% | 20.1% | 20.0% | 19.9% | 19.8% | 19.7% | 19.4% |
| Tax rate | | | | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% | 17.9% |
| - Tax expense | | | | 79 | 95 | 152 | 226 | 278 | 324 | 348 | 363 | 376 | 387 | 398 | 402 |
| EBIAT | | | | 361 | 432 | 696 | 1,034 | 1,269 | 1,479 | 1,592 | 1,661 | 1,718 | 1,767 | 1,818 | 1,836 |
| + D&A | | | | 104 | 140 | 198 | 420 | 450 | 480 | 492 | 504 | 516 | 528 | 540 | 600 |
| - CapEx | | | | 200 | 500 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| - Change in NWC | | | | 11 | (164) | (26) | (6) | (6) | (43) | (24) | (17) | (14) | (12) | (11) | (11) |
| Unlevered free cash flow | | | | 254 | 237 | 320 | 860 | 1,125 | 1,402 | 1,508 | 1,582 | 1,647 | 1,707 | 1,769 | 1,847 |

### Firm Value (US$mm)

| | | Terminal growth rate | | |
|---|---|---|---|---|
| | | 2.5% | 3.0% | 3.5% |
| | 12.5% | 11,415 | 11,749 | 12,121 |
| WACC | 13.5% | 10,170 | 10,425 | 10,705 |
| | 14.5% | 9,141 | 9,338 | 9,553 |

### Implied per ADS price (US$ / ADS[1])

| | | Terminal growth rate | | |
|---|---|---|---|---|
| | | 2.5% | 3.0% | 3.5% |
| | 12.5% | 86.12 | 88.72 | 91.61 |
| WACC | 13.5% | 76.44 | 78.42 | 80.60 |
| | 14.5% | 68.43 | 69.97 | 71.64 |

### 2016E P / E

| | | Terminal growth rate | | |
|---|---|---|---|---|
| | | 2.5% | 3.0% | 3.5% |
| | 12.5% | 22.5x | 23.2x | 23.9x |
| WACC | 13.5% | 19.9x | 20.4x | 21.0x |
| | 14.5% | 17.8x | 18.2x | 18.7x |

### Implied premium to per ADS offer price

| | | Terminal growth rate | | |
|---|---|---|---|---|
| | | 2.5% | 3.0% | 3.5% |
| | 12.5% | 11.9% | 15.2% | 19.0% |
| WACC | 13.5% | (0.7%) | 1.8% | 4.7% |
| | 14.5% | (11.1%) | (9.1%) | (7.0%) |

Source: Management projections as of December 3, 2015
Note: As of June 30, 2015 balance sheet data; cash number adjusted for cash spent on share repurchase post June 30, 2015; unconsolidated investment and minority investment adjusted for full consolidation of Coolpad E-Commerce Inc, the smartphone JV with Coolpad (adjustment data provided by management)
[1] Share count information as of November 30, 2015 provided by management

QIHOO 360                                            6                                    J.P.Morgan

---

[49] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[50] J.P. Morgan's valuation analysis is included in its Presentation to Special Committee, dated December 18, 2015, which Qihoo filed with the SEC on February 8, 2016.

188.    Xu agreed at the Appraisal Action Trial that the Management Projections in the Proxy included $3.6 billion in capital expenditures for 2016 through 2025, total, just for a Cloud computing business that Qihoo supposedly planned to build. He confirmed that this was for a new "enterprise facing public Cloud service as opposed to its existing consumer facing Cloud storage offer[ing]."[51] Qihoo stated in response to discovery requests in the Appraisal Action that this "related to a plan to start offering Cloud computing services 'In a form similar to that offered by Amazon.com, i.e., a comprehensive evolving Cloud computing platform.'"[52]  In other words, the Cloud computing expenses corresponded to a supposed entirely new business, and therefore would not be accretive to revenue in any of the existing business lines.

189.    The Cloud computing capital expenditure included spending of $200 million per year for 2016 and 2017 and $400 million per year from 2018 through 2025.[53]

190.    Despite Qihoo allocating $3.6 billion to a new cloud business, it, astonishingly, was not able to produce any documents referencing this planned business. Xu testified, consistent with seven affidavits that he provided concerning the status of discovery, that he was never shown any documents showing that Qihoo planned to spend $3.6 billion on this new cloud business. He also could not point to a single internal Qihoo document referencing this new business at all or showing that the Company ever decided to invest anything—let alone $3.6 billion—in it.[54] Qihoo did not

---

[51] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[52] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[53] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[54] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs. Xu's awareness of Qihoo's documents is significant because Xu was responsible for both generating Qihoo's projections and Qihoo's discovery efforts in the Appraisal Action. At the Appraisal Action Trial, Xu discussed seven affidavits that he provided concerning Qihoo's discovery efforts. *See also supra* ¶158.

produce any documents corroborating the $3.6 billion in capital expenditures that Xu included in the projections.

191.    Xu explained that Qihoo first decided that it would spend $3.6 billion on the new cloud business on December 7, 2015, "when we made the 2025 projection with JPMorgan."  This is an incredible admission, as it literally admits that Xu made up the number, which was not backed by anything but Xu's assertion that, at the time, he personally made the projections.  This estimate was not even shared with Qihoo's Board of Directors. Xu stated that the $3.6 billion figure "was not discussed" by anyone else in Qihoo's management "because it's from me [*i.e.*, Xu]."[55] Indeed, in response to a discovery request from the Dissenters' expert—James Nicholson[56]—Xu responded that Qihoo "***does not have any internal or external data or analysis in relation to the Cloud capex.***"[57] There were no internal documents discussing the nature of the program and there was "no contemporaneous document" detailing or analyzing the proposed $3.6 billion expenditure.[58] Both Qihoo's and the Dissenters' expert also did not see any internal Qihoo documents referencing the Company's new cloud business.[59]

192.    While there is no document showing Qihoo ever actually contemplated launching the Cloud computing business — and direct testimony that the $3.6 billion in allocated capital

---

[55] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[56] Nicholson is a Senior Managing Director, Head of Asia Economic & Financial Consulting, at FTI Consulting, with over 25 years' experience as a consultant in matters of finance, strategy, and economics, with a specialty in "the identification and valuation of lost profits, and the valuation of businesses, financial assets including shareholdings, other assets, and wasted costs." *See* https://www.fticonsulting.com/experts/james-nicholson.

[57] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[58] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[59] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

expenditure was just made up by Xu when making the projections — it is certainly clear that well before the Merger closed, Qihoo had definitively decided not to launch the supposed potential business. Specifically, Xu admitted that by "early 2016," Qihoo had "decided not to enter into the public Cloud business because [it] didn't believe that [it] had sufficient resources, experience, and capital funding to sustain trialing and pursuing a public Cloud in such a competitive environment of leading internet players."[60] Qihoo's expert described this decision as having been made "around March or early April 2016."[61] Additionally, the Dissenters' counsel referenced the decision as having been made before March 30, 2016, without any objection from Qihoo's witnesses.[62] It therefore appears to have been made before the shareholder vote on the Merger that took place on March 30, 2016, and it is certain that Qihoo has determined not to enter into the supposed potential Cloud computing business by the close of the Merger.

193.    Consistent with the obvious conclusion that Qihoo had never actually meaningfully anticipated launching the Cloud computing business, is the corresponding lack of any documentation related to the decision to abandon this supposed $3.6 billion project. Xu agreed that there was "no contemporaneous document of any description showing when the Company decided not to pursue the new public Cloud service."[63] He stated that Zhou and Qi "controlled Qihoo" as part of its "senior management team" and therefore would have been the ones to make that decision, but Xu could not point to any documents discussing that decision.[64] He also could

---

[60] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[61] Appraisal Action Trial on February 15, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[62] Appraisal Action Trial on February 10, 2022 and February 15, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[63] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[64] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

not remember the date of the supposed meeting when that decision was made or who attended it other than "the sort of the big head."[65]

194.    In addition to the lack of any evidence concerning the existence or cost of Qihoo's supposed new cloud business, the Company also did not produce any evidence of the purported benefits of the purported endeavor. Xu agreed that he "could not point to any particular line items at all" in the projections provided to J.P. Morgan that "show the benefit" of the new cloud business.[66] In other words, while Xu claimed that removing the $3.6 billion in capital expenditures from Qihoo's projections would require removing the amount of projected revenue that was attributable to this new business, he could not point to any specific revenue line item or amount that corresponded to that expenditure beyond the amorphous contention that "the nature of a Cloud service is to support online business."[67]

195.    Qihoo's expert also did not see any Qihoo documents showing how the proposed $3.6 billion capital expenditure would impact any of Qihoo's business lines.[68] He did not see any "capital expenditure plans nor the revenue plans necessarily" and "there was no line item" in the projections for it "so it's not explicitly identified."[69]

196.    The Dissenters' expert also could not identify a line item of revenue or any benefit associated with the cloud capital expenditure. He emphasized that "there's not a single document of any kind that goes to the existence of this plan or its potential benefit." The Dissenters' expert

---

[65] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[66] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[67] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[68] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[69] Appraisal Action Trial on February 14, 2022 and February 15, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

was "sufficiently skeptical" of the purported cloud capital expenditure projections that he concluded that "it was not a real plan" and "was never a serious number." He therefore excluded the $3.6 billion in capital expenditures for the cloud business from his DCF analysis, but did not find any reason to exclude any revenue associated with it.[70]

197.    Qihoo's failure to attribute any revenue to its supposed new cloud business is particularly telling because the management projections included in the Proxy and provided to J.P. Morgan break revenue into revenue from Qihoo's "Traditional business" and its "Emerging business." Qihoo described its "emerging business" as "include[ing] enterprise security business, smartphone and other hardware and hardware-enabled value-added services, and international business." It did not mention its new cloud business, on which it purportedly planned to spend $3.6 billion through 2025, as one of its emerging businesses.  Furthermore, in addition to not being described as one of Qihoo's emerging businesses, the proxy made no mention of the purported new $3.6 billion cloud business anywhere else in the Proxy.

198.    Based on all of this evidence, the most obvious conclusion, and certainly a plausible one, is that Qihoo did not actually plan to spend $3.6 billion on a new cloud services business from 2016 through 2025. Indeed, Qihoo did not produce any internal documents showing that it even planned this business at all or that it made the decision to abandon it in early 2016. The plausibility that Qihoo had simply made up the $3.6 billion in Cloud services expenditure is significantly strengthened by Qihoo's demonstrated deceit more generally, including its egregious denials of its relisting plan and its misconduct in discovery in the Appraisal Action.

199.    One would expect Qihoo to have internal documents on such a significant new business considering that its expected capital expenditure on it was 61% of Qihoo's total expected

---

[70] Appraisal Action Trial on February 22, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

capital expenditures from 2016 through 2025 and was between 40% and 19% of its total expected net income every year from 2016 through 2025.[71]

200. In addition, the most obvious, and certainly a plausible, explanation is that there was no revenue in the projections that Qihoo gave to J.P. Morgan and included in the Proxy that were attributable to the new cloud business. A reasonable valuation of Qihoo, would remove the Cloud computing capital expenditure from the projections, while leaving the projected revenue levels unchanged.

201. While Plaintiffs do not concede that the assumptions in J.P. Morgan's DCF were reasonable, it is highly probative that — holding those assumptions constant — and correcting the Capital Expenditure on Cloud computing alone generates a valuation far exceeding the Merger price. Specifically, if one reconstructs J.P. Morgan's model — such that it produces the same purported valuation of $10.425 billion — and then reduces the capital expenditure to remove the projected Cloud computing spending, this results in a valuation of $13.299 billion — which is approximately 27.6% greater than valuation J.P. Morgan found when reaching its fairness opinion.[72] For the avoidance of doubt, that is not to say this precisely measures Qihoo's intrinsic, but it strongly supports the conclusion that the Company's intrinsic value was far greater than the $77 per ADS Merger price.

---

[71] These figures as a portion of net income are calculated by dividing the expected cloud capital expenditure ($200 million in 2016 and 2017 and $400 million in the remaining years through 2025) by Qihoo's projected net income each of those years.

[72] The J.P. Morgan DCF valuation slide in the presentation attached to the Form 13E-3 appears to conduct some adjustments to either the share outstanding count or the firm value figure they derive before calculating the per ADS valuation. If one follows J.P. Morgan's approach – by dividing the listed firm value by the listed implied value per ADS – a revised firm value of $13.299 billion results in a per ADS valuation of $100.04. If one instead divides the revised firm value by the outstanding share figure J.P. Morgan lists on page 2 of its presentation, one gets a per ADS value of $104.14. Either approach is obviously far greater than the $77 per ADS Merger consideration.

202.    Qihoo's intrinsic value, had it remained a public company listed in the United States, therefore was substantially higher than what J.P. Morgan, the Special Committee, and Defendants described as "fair" based on the Company's projections that substantially deflated Qihoo's value by increasing its capital expenditures by $3.6 billion.

203.    Notably, while Plaintiffs firmly contend that the evidence herein strongly demonstrates the Cloud computing capital expenditure was entirely fictitious, one need not reach this conclusion to reasonably conclude that at the time of the Merger, Qihoo's intrinsic value should be calculated without the Cloud computing capital expenditure, as there is no dispute that Qihoo had determined not to engage in that spending by the time the Merger occurred.

> **ii.    Qihoo's Improperly Allocated $300 Million in Capital Expenditures for New Office Buildings**

204.    Evidence from the Appraisal Action Trial also shows that $300 million of Qihoo's $5.9 billion in estimated capital expenditures for 2016 through 2025 was for new office buildings that the Company did not appear to need. At best, this projected capital expenditure was grossly inflated from Qihoo's actual expense for the project.

205.    Xu confirmed that the Management Projections in the Proxy included $300 million in capital expenditures for the construction of a new office building in Tianjin, China.[73] These expenses included $100 million in 2016 and $200 million in 2017.[74] Qihoo made these projections despite Defendant Zhou emphasizing on a March 10, 2015 earnings call that Qihoo did not need a significant amount of additional headcount to successfully run its business.[75] Zhou specifically

---

[73] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[74] Appraisal Action Trial on February 10, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[75] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

stated that with the system the Company had in place, "you don't necessarily need to add in or building a massive number of headcounts to run a successful kind of business down the road."[76]

206.    The Dissenters' expert specifically noted that "no documents evidencing Qihoo's obvious space needs or headcount were provided [in discovery] and Qihoo said that it doesn't have any internal or external digital analysis in relation to the projection of building capital expenditure."[77] This is corroborated by Qihoo's response to the expert's request for information showing the analysis underlying this capital expenditure, which directly stated that "[o]ur client did not have the internal or external data which you seek."[78] Qihoo's expert even confirmed that the Company did not produce any documents supporting the $300 million figure for this building project that it included in the projections in the Proxy. He also acknowledged that internal documents stated that the project was expected to cost only $171.[79]

207.    The only internal document that Qihoo had on this $300 million capital expenditure was an email sent from the infrastructure department to Defendant Zhou, two days after the management projections were made in December 2015, stating that the total capital expenditure for the new buildings was only $171 million, spread out over a number of years.  Thus, the expense was erroneously projected in two ways that would deflate Qihoo's valuation — first, by simply inflating the number by $129 million (i.e., inflating the projects cost by 75.4%) and second, by pulling that expense forward in time, which exaggerates its impact on valuation.

---

[76] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[77] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[78] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[79] Appraisal Action Trial on February 14, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

208.    While Plaintiffs do not concede that the assumptions in J.P. Morgan's DCF were reasonable, it is highly probative that — holding those assumptions constant — and correcting the Capital Expenditure on Cloud computing alone generates a valuation exceeding the Merger price. Specifically, if one reconstructs J.P. Morgan's model — such that it produces the same purported valuation of $10.425 billion — and then adjusts the capital expenditure to track spending $171 million on the office space over five years[80] (instead of $300 over two years), results in a valuation of $10.582 billion, which is 1.5% greater than J.P. Morgan's valuation of $10.425 billion.  If one adjusts the capital expenditure for both the Cloud computing expense and the office space, the total valuation changes to $13.452 billion, which is 29% greater than J.P Morgan's valuation of $10.425 billion.[81]

209.    Notably, while Plaintiffs firmly contend that the evidence herein strongly demonstrates the projected office expenditure was exaggerated when the projections were prepared, one need not reach this conclusion to reasonably conclude that at the time of the Merger, Qihoo's intrinsic value should be calculated with these adjustments to the office expense, as the December 2015 email is the more reliable indicator of the actual office expense, and predates the close of the Merger.

           **c.**        **Qihoo's Internet Finance Business Was Not Included in the Merger Consideration**

---

[80] The Appraisal Action Trial did not specify the precise number of years, beyond noting it would be a number of years, so the selection of five years reflects a reasonable assumption.

[81] The J.P. Morgan DCF valuation slide in the presentation attached to the Form 13E-3 appears to conduct some adjustments to either the share outstanding count or the firm value figure they derive before calculating the per ADS valuation.  If one follows J.P. Morgan's approach – by dividing the listed firm value by the listed implied value per ADS – a revised firm value of $13.452 billion results in a per ADS valuation of $101.20.  If one instead divides the revised firm value by the outstanding share figure J.P. Morgan lists on page 2 of its presentation, one gets a per ADS value of $105.35.  Either approach is obviously far greater than the $77 per ADS Merger consideration.

210.    Another reason that Qihoo's intrinsic or fair value was greater than publicly represented, and greater than the Merger consideration, is that Qihoo was in the process of launching an internet finance business that was not publicly known and whose value was not included in the management projections or J.P. Morgan's fairness analysis.

211.    Qihoo's expert in the Appraisal Action Trial agreed that Qihoo was in the process of launching this internet finance business as of June 16, 2015, but that investment analysts did not know of it as of that time (or as of the valuation date of March 30, 2016). Qihoo initially did not even disclose documents about this business to its expert, and produced them only after the Cayman Islands court's discovery rulings noted above.[82]

212.    The Dissenters' expert explained that the documents concerning Qihoo's internet finance business that it eventually produced demonstrated that Qihoo considered the value of the business to be approximately $821 million in January 2016. Yet, despite the immense value of the internet finance business, Defendants did not mention it in the Proxy and Qihoo's expert attributed no value to it. This $821 million valuation was documented in an email that Zhou was copied on, dated January 29, 2016, that described the financial status of this business. While this valuation was based on a pending acquisition and fundraising, those further steps do not explain why Qihoo and its expert discounted the value of this business to *zero*. The Dissenters' expert already accounted for these contingencies – *i.e.*, the $821 million valuation is a conservative estimate accounting for these contingencies – and when all of these steps came, the business was ultimately worth approximately 13 billion RMB (or approximately $2 billion).[83]

---

[82] Appraisal Action Trial on February 15, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[83] Appraisal Action Trial on February 15, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs. 13 billion RMB was approximately $2 billion based on exchange rates in early 2016. As noted above, Qihoo ended up listing 360 Finance at a valuation of approximately $2 billion in

213.    Here, modifying the valuation put forward by J.P. Morgan simply requires adding $821 million to the final number J.P. Morgan reached.  Thus, without conceding that the assumptions in J.P. Morgan's DCF were reasonable, it is highly probative that — holding those assumptions constant — and adding in the value of this otherwise unaccounted for internet finance business, results in a valuation exceeding the Merger price.  Specifically, just making this adjustment for the internet finance business results in a valuation of $11.246 billion, which is 7.9% greater than J.P. Morgan's valuation of $10.425 billion.  If one adjusts for the Cloud computing capital expenditure (as shown in ¶201), the office building capital expenditure (as shown in ¶208), and the value of the internet finance business, the total valuation is $14.273 billion, which is 36.9% greater than J.P. Morgan's valuation of $10.425 billion.[84]

### 6.    Qihoo's Value in Excess of the Merger Price Was Part of its Intrinsic or Fair Value

214.    The evidence discussed above makes clear that Qihoo was worth substantially more than the Merger consideration based on its intrinsic value had it remained a public company in the United States rather than being taken private in the Merger.

215.    Alternative explanations, separate from Qihoo's intrinsic value, for Qihoo's higher value cannot plausibly account for the entirety of its extreme valuation difference that Defendants

---

December 2018. Evidence shows that 360 Finance is the same as the internet finance business referenced here because 360 Finance is a "digital consumer finance platform" that completed its Series A funding in July 2016. *See* https://www.crunchbase.com/organization/360-finance.

[84] The J.P. Morgan DCF valuation slide in the presentation attached to the Form 13E-3 appears to conduct some adjustments to either the share outstanding count or the firm value figure they derive before calculating the per ADS valuation.  If one follows J.P. Morgan's approach – by dividing the listed firm value by the listed implied value per ADS – a revised firm value of $11.246 billion results in a per ADS valuation of $84.60.  If one instead divides the revised firm value by the outstanding share figure J.P. Morgan lists on page 2 of its presentation, one gets a per ADS value of $88.07.  If one instead follows the same approach for a total valuation of $14.273 billion, the respective results are $107.37 and $111.78.  Under any analysis the result is obviously far greater than the $77 per ADS Merger consideration.

Zhou and Qi, other Qihoo executives and members of the Buyer Group, and financial advisors all attested to. (*See supra* ¶¶21-22). Moreover, such explanations cannot overcome the specific evidence discussed above related to Qihoo's intrinsic value.

216.    For example, Qihoo's higher value could not have resulted solely from business opportunities that it had in China after it was no longer a public company in the U.S. Qihoo's expert in the Appraisal Action Trial acknowledged that Qihoo may have had some government contracts in China even before it delisted from the U.S. While he stated that his understanding was that Qihoo would be able to generate more business from the government after it delisted, he did not specify the value of any such business.[85]

217.    Similarly, Qihoo's much higher value could not have resulted solely from valuation differences between the United States and China because such an extreme valuation discrepancy would violate the basic economic principal of market efficiency.

218.    The purpose of the Appraisal Action was to determine Qihoo's fair value at the time of the Merger, not upon its subsequent relisting. The Appraisal Action settled after trial for an undisclosed amount. This fact alone, especially considering the Appraisal Action court already determined that the dissenters would "receive at least [the] merger price" (*see* ¶156), and certainly along with all of the other evidence presented at the trial and discussed above, further confirms—and certainly plausibly supports the conclusion—that Qihoo's intrinsic value was significantly higher than the Merger price.

219.    Furthermore, even if even some portion of Qihoo's higher value resulted from factors outside of its intrinsic value, the evidence discussed above confirms that those factors were not the ***sole cause*** of Qihoo's higher value. At least some significant portion of Qihoo's valuation

---

[85] Appraisal Action Trial on February 17, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

difference is plainly—and certainly plausibly—attributable to the Company's intrinsic economics in its form as a public company in the United States before the Merger.

220.    The valuation analysis conducted by the Dissenters' expert in the Appraisal Action exemplifies this approach. The Dissenters' expert removed the $3.6 billion in capital expenditures for the new cloud business that Xu included in the management projections and reduced the capital expenditures for Qihoo's building project from $300 million to $171 million, for the reasons explained above.[86] But this valuation also took steps in the other direction. The Dissenters' expert "didn't think the overall capex plans" that Xu included in the projections "looked sensible." After removing the sums for the cloud business and building project, the remaining amount of capital expenditures were below what the Dissenters' expert would expect as necessary to maintain and replace Qihoo's capital base. He therefore increased these capital expenditures starting in 2016, by $1.7 billion total over the course of the projections.[87] The Dissenter's expert also accounted for the $821 million associated with Qihoo's internet finance business.

221.    Overall, the DCF analysis that the Dissenter's expert conducted yielded a total intrinsic valuation of $213.25 per share, as compared to the $77 per ADS Merger consideration. The Dissenter' expert also separately calculated the "special value" for the Buyer Group that was associated with the Merger's added relisting value to the Buyer Group beyond the Company's intrinsic value.  Plaintiffs submit that opinion of this expert, with the full benefit of discovery, strongly supports the modest conclusion that the intrinsic value was greater than $77 per ADS, regardless of whether one fully accepts the expert's analysis.

---

[86] Appraisal Action Trial on February 22, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

[87] Appraisal Action Trial on February 22, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

222.    Further emphasizing that the Dissenter's expert's valuation of $213.25 is indicative of Qihoo's stand-alone value, is the fact that the Dissenter's expert reached a "negotiated value" of $249.05 per share, which assumed that in a negotiation, shareholders and the Buyer Group would split the difference between the intrinsic value of $213.25 per share and the added special value to the Buyer Group of $284.86 per share.[88]

223.    Discovery will be needed to fully assess Qihoo's intrinsic and other values in this action. The point here is just that the clear additional value that Qihoo had over the Merger consideration can be attributed to both its intrinsic value had it remained a public company in the United States and additional value associated with the relisting.

**7.      The Buyer Group Planned All Along to Relist Qihoo in China to Profit From the Higher Valuation That Would be Achieved After Qihoo Returned to China**

224.    The *Pandaily* and *Bloomberg* articles discussed above noted that another reason why Zhou sought to relist Qihoo in China was that technology companies are generally valued more in the Chinese stock market than in the United States. As *Bloomberg* explained, "China's richer tech valuations may have been a draw." *Pandaily* similarly noted that based on this valuation difference, "once Qihoo 360 returned to the [Chinese] A-share [stock market], its market value would grow many times over." Consultation with the expert in Chinese and United States M&A and capital markets transactions noted above confirms this phenomenon. Defendants, however, failed to disclose to Qihoo Securityholders, the Buyer Group's plan to relist Qihoo in the Chinese stock market.

225.    Qihoo's increased value after it relisted in China was not solely a result of the higher valuation of technology companies in the Chinese stock market.  In the Proxy Materials

---

[88] Appraisal Action Trial on February 22, 2022, pursuant to transcription of trial commissioned by Lead Plaintiffs.

for the Merger, however, Defendants, also misrepresented Qihoo's true business opportunities once it would return to China. Those undisclosed opportunities would contribute to its increased valuation after it relisted in China through its backdoor listing with SJEC.

226.    The Buyer Group's plans for Qihoo following the Merger also highlight the inadequacy of J.P. Morgan's analysis of the Company in connection with the Merger. J.P. Morgan based its assessment on its DCF analysis and its "public trading multiples analysis." Both of these valuation methods were based on the financial projections that the Company provided to J.P. Morgan and disclosed in the Proxy Materials. Those projections, however, failed to account for Qihoo's increased business opportunities that Defendants knew about but failed to disclose at the time of the Merger.

227.    In addition, J.P. Morgan's comparison of Qihoo to the public trading multiples of other companies failed to compare Qihoo to companies that were focused on internet security or to any companies that were listed on a Chinese stock exchange. J.P. Morgan selected four companies for comparison because, according to J.P. Morgan, "they represent the main publicly traded peers in China's internet industry with operations and businesses that, for purpose of J.P. Morgan's analysis, may be considered similar to that of the Company." But J.P. Morgan acknowledged that "none of the selected companies reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company."

228. As Defendant Zhou explained in the *Pandaily* article discussed above, Qihoo is "different from entertainment and social companies that are listed in the US" because Qihoo "offered network security and solutions" that implicate sensitive areas such as national security interests. J.P. Morgan, however, compared Qihoo to Tencent, Baidu, Kingsoft, and Cheetah Mobile, which focus on entertainment and social products and that do not dominate the Chinese internet security market in the way that Qihoo does.

229. Moreover, Tencent was over 18 times the size of Qihoo at the time of J.P. Morgan's analysis and Baidu was over 7 times larger. Their vast differences in size meant that they were likely to have far less room for growth, and therefore were deserving of a lower price-to-earnings trading multiple than was Qihoo, even aside from the fact that they focused on different industries.[89] In contrast, Bloomberg's "trading comps" for internet security companies as of Qihoo's June 17, 2015 announcement of the Merger proposal show a median price-to-earnings ratio of 107.4 and an average multiple of 361.79, with Tencent falling well below those levels:

---

[89] A price-to-earnings ratio is a key financial metric that measures a company's share price relative to its earnings per share. A higher ratio generally suggests that investors expect the company to experience a greater amount of future growth.



230.    J.P. Morgan's valuation analysis therefore did not provide an accurate assessment of Qihoo's value.  That analysis was particularly misleading in light of Defendants' misrepresentations and omissions concerning 1 - their plans to relist Qihoo in China following the Merger and 2 - the Company's true business opportunities once it returned to China.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

231.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions.  The specific false and misleading statements are detailed

79

Case 1:19-cv-10067-PAE   Document 157-1   Filed 04/12/23   Page 85 of 135

below and reference is made therein to the following subparagraphs, which explain the reasons those statements are false and misleading.[90]

     (a)    **Statements Concerning Intention Not to Relist.**  Defendants made statements throughout the Proxy Materials stating clearly that there were no plans in place for Qihoo to undergo a transaction following the Merger that would cause the Company's structure to be changed in any way, such as through relisting Qihoo on a Chinese stock exchange.  These assurances provided to Qihoo Securityholders were false and misleading because when these statements were made, the Buyer Group already planned to relist Qihoo at a far-higher valuation.

     (b)    **Statements That There Were No Viable Alternatives to the Merger.** Defendants made statements throughout the Proxy Materials stating clearly that there were no alternatives to the Merger that would be more beneficial to Qihoo Securityholders. These statements were false and misleading because they did not mention the alternative of relisting Qihoo on a Chinese stock exchange or paying Qihoo Securityholders fair value in light of that alternative plan.

     (c)    **Statements That Presented the Transaction in a Positive Light, or As "Fair."**  These statements were false and misleading because they conveyed that the Merger consideration of $77 per ADS or $51.33 per ordinary share was a fair price for the Qihoo Securities when, in fact, the Qihoo Securities were undervalued, causing the Merger price to be unfair.  These statements were also false and misleading because the fairness assessment of the Merger price was based on Qihoo's financial projections and J.P. Morgan's financial analysis that failed to consider the increased business opportunities that Qihoo would have after it

---

[90] Where parts of a statement are ***bolded and italicized*** in this section, those excerpts are alleged to be false and misleading.

returned to China; Qihoo's value after its business lines were broken up into separate entities; and how Qihoo's post-Merger businesses would be valued on the Chinese stock market, where the Buyer Group already planned during the Merger process to relist Qihoo following the Merger.  In fact, Defendants disclosed more positive financial projections privately to members of the Buyer Group when Defendant Zhou solicited investors to participate in the Merger than what Defendants disclosed publicly in the Proxy Materials.  Defendants' statements concerning the fairness of the Merger were also false and misleading because J.P. Morgan compared Qihoo to an improper set of peer companies that did not account for Qihoo's business prospects following the Merger.

        (d)      **Statements Concerning the Reasons for the Merger.** To justify conducting the Merger without revealing the Buyer Group's true motivation of relisting Qihoo at a higher valuation, Defendants stated in the Proxy Materials that the Buyer Group preferred for Qihoo to be a private company so that it would not face the pressures associated with the public markets. They stated that being a private company would allow Qihoo to maximize its long-term value. These statements were false because the Buyer Group did not intend for Qihoo to remain a private Company. Rather, they planned all along to relist the Company at a higher valuation in China.  Those steps, which returned Qihoo to the public market in China, directly contradicted Defendants' statements that Qihoo would be better served as a private company. Defendants also exaggerated the business risks that Qihoo faced in China and failed to disclose its true business opportunities following the Merger, so that the Buyer Group could capitalize on taking the Company private when investors did not have accurate information concerning the Company's true value.

81

232.    To the extent that it is determined that any of the statements detailed below are statements of opinions, these opinion statements were false and misleading. Statements conveying that the Merger was fair or advisable, even if opinions, were false and misleading because they were not actually held by Defendants and failed to disclose information that a reasonable shareholder would assume formed the basis for them. Rather, these statements were part of a fraudulent scheme to deprive Qihoo Securityholders of the fair value of their securities.

A.    **The Announcement of the Merger**

233.    On December 18, 2015, Qihoo issued a press release announcing that the Company had agreed to the Merger.  Qihoo filed this press release with the SEC that same day with an accompanying Form 6-K that was signed by its Chief Financial Officer, Alex Zuoli Xu.

234.    This announcement promoted the Merger by disclosing the deal price and pointing to a premium as compared to Qihoo's recent trading price, without also disclosing that the Qihoo Securities were worth far more than that deal price. In particular, the press release explained that:

> Pursuant to the terms of the merger agreement, at the effective time of the merger, each of the Company's class A and class B ordinary shares issued and outstanding immediately prior to the effective time of the merger (the "Shares") will be cancelled and cease to exist in exchange for the right to receive US$51.33 in cash without interest, and each American Depositary Share ("ADS") of the Company, every two ADSs representing three class A ordinary shares, will be cancelled in exchange for the right to receive US$77.00 in cash without interest . . . .  The merger consideration represents a premium of 16.6% to the closing price of the Company's ADSs on June 16, 2015, the last trading day prior to the Company's announcement of its receipt of a 'going-private' proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a 'going-private' proposal.

235.    These statements were false and misleading for the reasons stated in ¶ 231(c).

236.    The deal announcement further stated that the Merger had been approved by the Board upon recommendation by the Special Committee and that the Board recommended shareholders approve the Transaction. Specifically, the press release explained:

> The Company's board of directors (the 'Board'), acting upon the unanimous recommendation of a committee of independent and disinterested directors established by the Board (the "Special Committee"), approved the merger agreement and the merger and resolved to recommend that the Company's shareholders vote to authorize and approve the merger agreement and the merger. The Special Committee negotiated the terms of the merger agreement with the assistance of its financial and legal advisors.

237.    These statements were false and misleading for the reasons stated in ¶ 231(c).

**B.    The Preliminary Proxy Materials**

238.    On January 11, 2016, Qihoo filed with the SEC the Preliminary Proxy Materials on Form 13E-3 explaining the proposed Merger to Qihoo Securityholders.  The Preliminary Proxy Statement was included as an exhibit to the Schedule 13E-3 Transaction Statement and was directed to "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the Schedule 13E-3 Transaction Statement and the Preliminary Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

239.    The Preliminary Proxy Materials included the misleading statements or omissions described in the following sections (1) through (6).

**1.    Statements Concerning Intention Not to Relist**

240.    The Preliminary Proxy Statement described the Company's plans following the Merger as follows, stating that there were no present plans or proposals involving changes to the Company's structure:

> If the Merger is consummated, the Company will continue its operations as a privately held company beneficially owned solely by the Buyer Group and, as a result of the Merger, ADSs will no

longer be listed on the NYSE and the ADS program for the Shares will terminate.

241.    These statements were false and misleading for the reasons stated in ¶ 231(a).

242.    The Preliminary Proxy Statement also warranted, with the following language, that the Buyer Group did not have any plans at the time to conduct any extraordinary transactions that would change the Company's corporate structure after the Merger:

> The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets.  However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange.

243.    These statements were false and misleading for the reasons stated in ¶ 231(a). Although Defendants referenced the possibility of considering a potential relisting after the Merger, these statements were false and misleading because such a relisting was not just a possibility that the Buyer Group might consider in the future, but rather, was the Buyer Group's pre-established plan and its whole reason for the Merger.

244.    The Preliminary Proxy Statement also included a section called "Plans for the Company after the Merger."  The Preliminary Proxy Statement stated expressly in that section:

> Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have

84

substantially more debt than it currently has. The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

245.    These statements were false and misleading for the reasons stated in ¶ 231(a).

246.    The Preliminary Proxy Statement further stated that the primary detriments of the Merger to the Buyer Group included that "[a]n equity investment in Holdco and Parent by the Buyer Group following the Merger will involve substantial risk resulting from the limited liquidity of such an investment" and that "[f]ollowing the Merger, there will be no trading market for the Surviving Company's equity securities."

247.    These statements were false and misleading for the reasons stated in ¶ 231(a).

248.    In addition, the Preliminary Proxy Statement described "a variety of potentially negative factors concerning the Merger Agreement and the Merger" that the Special Committee and the Board considered on behalf of Qihoo Securityholders that were unaffiliated with the Buyer Group.  This list included that "the Unaffiliated Holders will have no on-going equity participation in the Company following the Merger, and they will cease to participate in the Company's future earnings or growth, if any, or to benefit from increases, if any, in the value of Shares and ADSs, and will not participate in any potential future sale of the Company to a third party or any potential recapitalization of the Company, which could include a dividend to shareholders."

249.    These statements were false and misleading for the reasons stated in ¶ 231(a), particularly because neither this specific factor nor the long list of detriments to Qihoo Securityholders that the Preliminary Proxy Statement listed, mentioned that the Buyer Group already planned to relist the Company in the Chinese stock market at a much higher valuation.

85

250.    In addition, the Preliminary Proxy Statement described "[t]he representations and warranties made by Parent Parties to the Company" as including "the absence of undisclosed agreements or arrangements involving the Equity Investors, the Parent Parties, the Founder Security holders, the Guarantors or any of their respective affiliates, in each case relating to the Merger."

251.    These statements were false and misleading for the reasons stated in ¶ 231(a), particularly because the Buyer Group had an undisclosed agreement to relist Qihoo in China at a higher valuation after the Merger.

### 2.    Statements Concerning Lack of Alternatives to the Merger

252.    The Preliminary Proxy Statement also discussed in great detail "Alternatives to the Merger," which did not mention the alternative of relisting the Company in China.

253.    In particular, the Preliminary Proxy Statement said that "[i]n the course of reaching their respective [fairness] determinations, *the Special Committee and the Board considered . . . the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the perceived risks of that alternative), the range of potential benefits to its shareholders of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account the likelihood of execution as well as business, competitive, industry and market risks."*

254.    These statements were false and misleading for the reasons stated in ¶ 231(b).

255.    The section titled "Alternatives to the Merger" described "*the Special Committee['s] determin[ation] that there was no viable alternative transaction to the proposed*

86

*transaction of the Company with the Buyer Group.*"  This description explained that in addition to considering potential acquisitions by other parties, "*the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value*, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market."

256.    These statements were false and misleading for the reasons stated in ¶ 231(b)-(d).

257.    In addition, the Preliminary Proxy Statement described the Special Committee's mandate as specifically including "explor[ing] any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company" and "report[ing] to the Board the recommendations and conclusions of the Special Committee with respect to the proposed transaction and/or any alternative transaction and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved."

258.    These statements were false and misleading for the reasons stated in ¶ 231(b)-(c).

### 3.    False Representations that the Merger Was "Fair"

259.    The Preliminary Proxy Statement included many false and misleading assertions that the Merger was "fair" or in the best interests of Qihoo Securityholders who were unaffiliated with the Buyer Group.

260.    Defendants announced that the Special Committee declared the Merger to be fair. According to the Preliminary Proxy Statement:

> At a meeting on December 18, 2015, the Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) ***determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of, the Company and its Unaffiliated Holders,*** (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger.

261.    These statements were false and misleading for the reasons stated in ¶ 231(c).

262.    Qihoo's Board of Directors, in turn, determined that the Merger was fair and recommended that it be approved.  According to the Preliminary Proxy Statement:

> At a meeting on December 18, 2015, the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) ***determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders*** and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, (b) authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions

88

contemplated thereby, including the Merger, and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

263.    These statements were false and misleading for the reasons stated in ¶ 231(c).

264.    The Preliminary Proxy Statement also affirmed that "[e]ach member of the Buyer Group believes that the Merger is fair to the Unaffiliated Holders."

265.    These statements were false and misleading for the reasons stated in ¶ 231(c).

266.    At the conclusion of the section titled "Reasons for the Merger and Recommendation of the Special Committee and the Board," the Preliminary Proxy Statement stated that "**[f]or the foregoing reasons, the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders.**"  (Emphasis in original).

267.    These statements were false and misleading for the reasons stated in ¶ 231(c).

268.    The Preliminary Proxy Statement also stated that J.P. Morgan's financial analyses and fairness opinion formed a basis for the Special Committee's determination that the Merger was fair to unaffiliated Qihoo Securityholders and its recommendation that the Merger should be approved.

269.    In addition, the Preliminary Proxy Statement stated as one of the "Reasons for the Merger and Recommendation of the Special Committee and the Board," that the Special Committee considered "the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial

89

point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015."

270. The unanimous recommendation of the Special Committee, in turn, formed the basis for the Board's determination that the Merger was fair to unaffiliated Qihoo Securityholders and its decision to approve and recommend the Merger.

271. These statements referenced in ¶¶ 268-70 were false and misleading for the reasons stated in ¶ 231(c), particularly because J.P. Morgan's analysis was based on Qihoo's financial projections that did not account for Qihoo's true business prospects in China following the Merger and because J.P. Morgan compared Qihoo to companies that did not reflect those opportunities.

272. The Preliminary Proxy Statement also included J.P. Morgan's opinion that the Merger was "*fair*." While these statements were in some sense originally made by J.P. Morgan, they are attributable to Defendants for two reasons: first, they are part of the Preliminary Proxy Statement, which was included with the Preliminary Proxy Materials that were signed by the Defendants referenced in ¶ 238; and second, Defendants relied on J.P. Morgan's analysis as a basis for their conclusion that the Merger was fair to the unaffiliated Qihoo Securityholders and Defendants' recommendation that the Merger should be approved.

273. These statements were false and misleading for the reasons stated in ¶ 231(c).

274. The Preliminary Proxy Statement also prominently displayed the projections that formed the basis for J.P. Morgan's valuation analysis.

275. These statements were false and misleading for the reasons stated in ¶ 231(c)-(d).

276.    The Preliminary Proxy Statement also appended J.P. Morgan's written fairness opinion, which concluded that the Merger was fair from a financial point of view, stating specifically that "[o]n the basis of and subject to the foregoing, it is our opinion as of the date hereof that the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed Transaction is fair, from a financial point of view, to such Unaffiliated Holders."

277.    These statements were false and misleading for the reasons stated in ¶ 231(c).

278.    The Final Proxy Statement described J.P. Morgan's DCF analysis and its comparison of Qihoo to other companies in J.P. Morgan's "Public Trading Multiples Analysis".

279.    These statements were false and misleading for the reasons stated in ¶ 231(c)-(d).

280.    The Preliminary Proxy Statement also warranted that its list of factors that the Buyer Group considered in determining that the Merger was fair and in the interests of Qihoo shareholders was believed by the Buyer Group "to include all material factors considered."

281.    These statements were false and misleading for the reasons stated in ¶ 231(c)-(d).

282.    In addition, the Preliminary Proxy Statement stated that the Buyer Group believed the Merger was substantively and procedurally fair to unaffiliated Qihoo Securityholders based on the Buyer Group's "knowledge and analysis of available information regarding the Company, as well as the factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board."

283.    In particular, the Preliminary Proxy Statement stated that the Buyer Group believed the Merger was substantively and procedurally fair to unaffiliated Qihoo Securityholders because, among other reasons:

91

- the Special Committee determined that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are fair to and in the best interests of the Company and the Unaffiliated Holders;

- the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval;

- the Special Committee retained and was advised by independent legal counsels and independent financial advisor, all of whom are experienced in advising committees such as the Special Committee in similar transactions;

- notwithstanding that the Buyer Group may not rely upon the opinion provided by the financial advisors to the Special Committee, the Special Committee having received from its financial advisor an opinion, dated December 18, 2015, stating that, as of such date and based upon and subject to the factors, assumptions, and limitations set forth therein, the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented in ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders; and

- the Board was fully informed about the extent to which the interests of the Buyer Group in the Merger differed from those of the Unaffiliated Holders.

284. These statements were false and misleading for the reasons stated in ¶ 231(c)-(d).

### 4.    Promotions of the Merger Price

285. The Preliminary Proxy Statement promoted the Merger by touting the Merger consideration of $77.00 per ADS and $51.33 per common share to Qihoo Securityholders.

286. The Preliminary Proxy Statement further promoted the Merger by describing the Merger consideration as a favorable premium to the recent price of Qihoo Securities and the Special Committee's and the Board's conclusion that "that it could take a considerable period of

92

time before the trading price of the ADSs would reach and sustain at least the per ADS Merger consideration of US$77.00, as adjusted for present value, and the possibility that such value might never be obtained."

287.    These statements were false and misleading for the reasons stated in ¶ 231(c).

288.    The Preliminary Proxy Statement also touted the Merger price by describing it as a premium over recent trading prices while failing to disclose how it compared to the price that the Company would actually be worth on the Chinese market.   In particular, the first reason that the Special Committee, the Board, and the Buyer Group all gave in support of the fairness of the Merger was that "the Per ADS Merger Consideration of $77.00 represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by the NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a 'going-private' proposal."

289.    These statements were false and misleading for the reasons stated in ¶ 231(c).

### 5.    False and Misleading Reasons for the Merger

290.    The Preliminary Proxy Statement included many false and misleading statements concerning the reasons for the Merger.

291.    The Preliminary Proxy Statement stated that one of the substantive factors that supported the Special Committee's and the Board's recommendation of the Merger and the conclusion that it was fair to unaffiliated Qihoo Securityholders was that as "a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance."

292.    These statements were false and misleading for the reasons stated in ¶ 231(c)-(d).

293.    Similarly, the Preliminary Proxy Statement explained that the Buyer Group's "Purposes and Reasons for the Merger" included that "[t]he Buyer Group believes the operating environment has become more challenging due to recent operating conditions and industry trends. There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance. . . .  The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger."

294.    These statements were false and misleading for the reasons stated in ¶ 231(d).

295.    In addition, the Preliminary Proxy Statement listed as "primary benefits of the Merger to the Buyer Group" that:

- The Surviving Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from investment analysts to make decisions that may

produce better short-term results, but may not maximize equity value in the long term;

- The Surviving Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation;

- The Surviving Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations;

- The Surviving Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts.

296.    These statements were false and misleading for the reasons stated in ¶ 231(d).

297.    The Preliminary Proxy Statement also stated that the "primary detriments of the Merger to the Buyer Group" included "[t]he business risks facing the Company, including increased competition and government regulation, will be borne by the Buyer Group."

298.    These statements were false and misleading for the reasons stated in ¶ 231(d).

**6.      Defendants Specifically Guaranteed the Accuracy of Their Statements in the Proxy Materials and that They Complied With the Securities Laws**

299.    Each Defendant affirmed in the Schedule 13e-3 Transaction Statement that they signed when filing the Preliminary Proxy Materials that "after due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct."

300.    These statements were false and misleading for the reasons stated in ¶ 231(a)-(d).

301.    In addition, the Merger Agreement, which was included with the Preliminary Proxy Statement that each Defendant signed, warranted that "[e]ach of the Parent Parties and the Company agrees, as to it and its respective Affiliates, directors, officers, employees, agents or Representatives, that ***none of the information supplied or to be supplied by any Parent Party or the Company, as applicable, expressly for inclusion or incorporation by reference in the Proxy***

95

***Statement, the Schedule 13E-3 or any other documents filed or to be filed with the SEC in connection with the transactions contemplated hereby, will, as of the time such documents (or any amendment thereof or supplement thereto) are mailed to the holders of Company Shares and at the time of the Company Shareholders Meeting or any adjournment thereof, contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.***"

302.    These statements were false and misleading for the reasons stated in ¶ 231(a)-(d).

303.    The Merger Agreement further warranted that "[i]f at any time prior to the Effective Time, any event or circumstance relating to the Parent Parties or the Company, or their respective officers or directors, should be discovered which should be set forth in an amendment or a supplement to the Proxy Statement or the Schedule 13E-3 so that such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the Party discovering such event or circumstance shall promptly inform the other Parties and an appropriate amendment or supplement describing such event or circumstance shall be promptly filed with the SEC and disseminated to the shareholders of the Company to the extent required by Law."

304.    These statements were false and misleading for the reasons stated in ¶ 231(a)-(d).

C.    **The Amended Proxy Materials**

305.    On February 8, 2016, Qihoo filed the Amended Proxy Materials with the SEC as an amendment to Qihoo's earlier-filed Form 13E3. The Amended Proxy Statement was included as an exhibit to the Amended Schedule 13E-3 Transaction Statement that was filed on February 8, 2016 and was directed to all "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the

Amended Schedule 13E-3 Transaction Statement and the Amended Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

306.     The Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary Proxy Materials, as described in Section V.B above.  In addition, the Amended Proxy Materials added the following additional false and misleading statements about topics that Defendants were forced to discuss after the SEC criticized the Preliminary Proxy Statement for failing to provide Qihoo Securityholders with sufficient information concerning key aspects of the Merger.

307.     As in the Preliminary Proxy Statement, the Amended Proxy Statement said that "[i]n the course of reaching their respective [fairness] determinations, the Special Committee and the Board considered . . . the possible alternatives to the Merger."  The Amended Proxy Statement, however, added further detail to this disclosure by stating:

> In the course of reaching their respective [fairness] determinations, the Special Committee and the Board considered . . . the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account (i) the likelihood of being consummated, given the size of and required funding for any potential alternative transaction, the percentage ownership held by the Buyer Group and their express statement regarding their unwillingness to sell their shares in any other transaction involving the Company, and general timing consideration, (ii) the business, competitive, industry and market risks, (iii) the likely impact of the PRC anti-monopoly law on the viability of potential alternatives, and (iv) the absence of any proposals made by any unsolicited potential buyers since the announcement of the proposed transaction on June 17, 2015."

308.    Defendants added these new statements to the Amended Proxy Statement because the SEC had found their disclosures in the Preliminary Proxy Statement on this topic to be deficient.  In a February 4, 2016 letter commenting on the Preliminary Proxy Materials, the SEC specifically directed Defendants to "disclose any transaction alternatives considered, aside from the possibility of continuing to operate the Company as an independent publicly traded company, and the reason(s) for their rejection."  Defendants' revision in the Amended Proxy Materials continued to be false and misleading for the reasons stated in ¶ 231(b) and (d), particularly because Defendants purported to "disclose any transaction alternatives considered" and discussed specific factors that affected that analysis, but failed to disclose the alternative of relisting Qihoo on the Chinese stock market.

309.    Also, as in the Preliminary Proxy Statement, the Amended Proxy Statement stated that one of the substantive factors that supported the Special Committee's and the Board's recommendation of the Merger and the conclusion that it was fair to unaffiliated Qihoo Securityholders was that as "a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance."  The Amended Proxy Statement, however, elaborated that:

> Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii)

98

monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics.

310.    Defendants added these new statements to the Amended Proxy Statement because the SEC had found their disclosures in the Preliminary Proxy Statement on this topic to be deficient.  The SEC's February 4, 2016 letter commenting on the Preliminary Proxy Statement noted "that many of the factors cited in support of the transaction have existed for some time and should have been reasonably foreseeable prior to the company's initial public offering in 2011." The SEC therefore directed Defendants to revise the Proxy Statement "to provide expanded disclosure regarding the reasons behind each filing person's choice to engage in the transaction at this time as opposed to any other time in the Company's public company history. Refer to Item 1013(c) of Regulation M-A."  Defendants' revisions to the Amended Proxy Statement continued to be false and misleading for the reasons stated in ¶ 231(d), particularly because Defendants now provided specific reasons that purportedly favored Qihoo operating as a private company but failed to disclose the Buyer Group's true reasons for the Merger and plans for the Company after the Merger.

311.    Also in response to the SEC's critiques in its February 4, 2016 letter, the Amended Proxy Statement significantly modified the disclosures surrounding the financial projections that Qihoo provided to J.P. Morgan.  The SEC noted that the financial projections in the Preliminary Proxy Statement were merely summarized and directed Qihoo to "disclose the full projections, including all preliminary and final projections." The SEC also directed Qihoo to "revise to identify the 'numerous assumptions and estimates as to future events made by the Company's management' in preparing the disclosed financial projections.  Your revised

99

disclosure should summarize the material assumptions underlying any limitations upon the

projected figures disclosed."

312.    In response to these comments, Defendants provided more categories of financial

projections in the Amended Proxy Statement and disclosed:

> In preparing these projections, the Company's management necessarily made certain assumptions about future financial factors affecting the Company's business, including, primarily, that (i) users of personal computers, smart phones and broadband internet services and their penetration in China and elsewhere would continue in line with management's expectations, (ii) the Company would be able to successfully expand its product offering by developing and launching new PC and mobile products, (iii) the popularity of the Company's products would remain stable in the geographic markets in which the Company operated, (iv) the Company would be able to successfully implement its business plan to compete effectively in both its traditional business and emerging business, (v) the market for smartphone and IoT (internet of things) devices would develop in line with management's expectations, (vi) the Company's emerging business would develop successfully, driven by both further hardware penetration and increasing monetization from smartphone and IoT devices, and (vii) material costs and expenses would increase in connection with the Company's revenue increase. The Company's management also assumed that the overall economy in China will remain stable, and that there will be no material change in competition affecting the Company.

313.    Defendants' revised disclosures surrounding Qihoo's financial projections

continued to be false and misleading for the reasons stated in ¶ 231(c), particularly because these

disclosures now provided specific assumptions underlying Qihoo's business performance

following the Merger but failed to disclose Qihoo's true business opportunities that it would have

after it returned to China.

314.    Other than the additional false and misleading statements discussed in this Section

V.C, the Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the

false and misleading statements that were originally included in the Preliminary Proxy Materials, as described in Section V.B above.

**D.    The Second Amended Proxy Materials**

315.    On February 26, 2016, Qihoo filed the Second Amended Proxy Materials with the SEC as an amendment to Qihoo's earlier-filed Form 13E3. The Second Amended Proxy Statement was included as an exhibit to the Second Amended Schedule 13E-3 Transaction Statement that was filed on February 26, 2016 and was directed to all "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the Second Amended Schedule 13E-3 Transaction Statement and the Second Amended Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

316.    The Second Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Amended Proxy Materials, as described in Section V.C above.

**E.    The Third Amended Proxy Materials**

317.    On March 3, 2016, Qihoo filed with the SEC the Third Amended Proxy Materials on Form 13E-3 explaining the proposed Merger to Qihoo Securityholders.  The Final Proxy Statement was included as an exhibit to the Third Amended Schedule 13E-3 Transaction Statement and was directed to "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the Third Amended Schedule 13E-3 Transaction Statement and the Final Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

318.    The Third Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Amended and Second Proxy Materials, as described in Sections V.B-C above.

101

## VI.   CONTROL PERSON ALLEGATIONS

319.   The Individual Defendants, by virtue of their senior positions at Qihoo, directly participated in the management and oversight of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and knowing inactions.

320.   As Qihoo's Chairman, CEO, and Co-Founder, Defendant Zhou was closely involved in all aspects of the Company's business operations.

321.   Defendant Qi also had control over Qihoo and all aspects of its business, as its President and Director since its inception in 2005, as well as its Co-Founder

322.   Defendant Zhou and Qi also had control over Qihoo during the Class Period through their ownership stakes.  Prior to the Merger, Defendant Zhou (including through Global Village) owned 17.3% of the Company's outstanding ordinary shares and 42.7% of its voting rights.  Defendant Qi (including through Young Vision) owned 8.1% of the Company's outstanding ordinary shares and 17.9% of its voting rights.  Collectively, Zhou and Qi owned 4,740,568 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represented approximately 25.4% of its outstanding ordinary shares and approximately 60.6% of the Company's voting rights.

323.   Defendants Zhou and Qi also had control over the Buyer Group and Parent Parties through their positions as the individuals with the largest stakes in Qihoo in those groups both before and after the Merger.

102

324.    As a Qihoo Director and Chairman of the Special Committee, Defendant Chen had considerable ability to control the Company during the Class Period.

325.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Qihoo, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Qihoo, the Special Committee, the Board, and the Buyer Group during the Class Period.  The Individual Defendants were undoubtedly provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.

326.    Moreover, the Individual Defendants signed SEC filings that contained the material misstatements or omissions at issue here. Accordingly, they are responsible for the accuracy of the public statements detailed herein.

327.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information. Each of the Individual Defendants were culpable for this deceit insofar as they acted with the requisite scienter, as explained throughout, and especially in the following Section.

328.    The Individual Defendants are further liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

103

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

329.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. Furthermore, Defendants Zhou and Qi had the motive and opportunity to commit the fraud.

### A.    Defendants Zhou and Qi Had the Motive and Opportunity to Defraud the Class

330.    As Qihoo's CEO, Chairman of the its Board, and Co-Founder of the Company in the case of Defendant Zhou, and as its President, Director, and Co-Founder in the case of Defendant Qi, it is clear that Zhou and Qi had the opportunity to commit the fraudulent acts described herein.  They had the ability to influence the information contained in the Proxy Materials and the information that management provided to J.P. Morgan. Zhou and Qi also signed the Proxy Materials and had the ability to influence their preparation.  They also had the ability to vote their 60% voting interest in favor of the Merger.

331.    In addition, Defendant Zhou led the Merger by initiating the transaction, coordinating the Buyer Group's participation, and formulating the Buyer Group's plan for the Company following the Merger.

332.    As the leading member of the Buyer Group who would own 22.8% of the Company following the Merger, Defendant Zhou had an enormous financial motive for the Merger to be completed at as low a transaction price as possible. By deflating the value of the

104

Qihoo Securities through the fraudulent scheme described herein, Zhou was able to reduce the amount of money he needed to spend to acquire Qihoo. By defrauding Qihoo Securityholders, Zhou received a windfall from them of over $11 billion.  As Bloomberg reported on February 28, 2018, when Qihoo's backdoor listing was completed, Defendant's Zhou's stake in the Company increased from $2 billion to $13.6 billion, making him China's 12th-richest person.  And Zhou profited even further because his stake in the Company prior to the Merger was worth only $1.6 billion.[91]  He reaped enormous rewards by increasing his share of the Company following the Merger and then having the valuation of that stake increase *over sixfold* because of the Company's increased value after its backdoor listing in China.  Ultimately, Zhou was motivated to see to it that the Merger be completed at the agreed-upon transaction price so that he could capitalize on the deflated share price and reap billions in profits when the private Company would then be relisted in China as a public company with a far higher value.

333.    Moreover, the backdoor listing included only Qihoo's core businesses.  Zhou—and the other members of the Buyer Group—profited even further by retaining stakes in Qihoo's other valuable assets that were not included in the relisting.

334.    Defendant Zhou also stood personally to gain through the completion of the Merger because the transaction would give him private control over the Company's affairs.

335.    Defendant Qi also received enormous financial benefits from the Merger.  Prior to the Merger he owned 8.1% of the Company.  After the Merger, he owned 2.2% of the Company directly and also owned and controlled Tianjin Xinxinsheng Investment Limited Partnership, which owned 11.5% of the Company following the Merger.  Defendant Qi thus also benefited

---

[91] This $1.6 billion figure is based on Zhou's 17.3% stake in the Company prior to the Merger and the $9.3 billion price for the entire Company.

from the Company's exponential increase in value following the Merger and from his increasing his stake in the Company through the Merger.[92]

336.    The other members of the Buyer Group had the same motive to commit fraud. They would own the remainder of the Company following the Merger that Defendants Zhou and Qi did not own. They therefore also stood to reap profits by completing the Merger at a deflated price so that they could then sell their shares at higher prices when the Company would be relisted in China. The other members of the Buyer Group also signed the Proxy Materials and had the opportunity to influence the statements contained therein supporting the Merger.

**B.    Many Sources Show That a Primary Condition of the Merger Was That the Buyer Group Would Relist Qihoo in China After the Merger**

337.    Many reports described above state clearly that the secret marketing materials that Defendant Zhou used to solicit investors to participate in the Buyer Group in 2015—before Defendants issued any of the Proxy Materials—made Qihoo's backdoor listing in China following the Merger an explicit private condition to the Merger.  Investors knew that they would be able to profit enormously if Qihoo would be relisted in China following the Merger. This precondition, which Defendants failed to disclose in the Proxy Materials, incentivized investors to participate in the Buyer Group and allowed Defendant Zhou to complete the Merger.

338.    Defendant Qi, as Qihoo's President, second-largest shareholder, and Co-Founder, was also apprised of this key undisclosed deal term.  As the Proxy Statement explains, "[b]etween late-May 2015 and mid-June 2015, the Chairman had discussions with Mr. Xiangdong Qi, co-founder and a director and president of the Company," and other members of

---

[92] All of the calculations in this Section are provided just for demonstrative purposes based on the information currently available and do not preclude Lead Plaintiffs from offering other assessments of Qihoo's true value, or of Zhou's and Qi's improper gains, after Lead Plaintiffs have had the opportunity for discovery in this Action.

the Buyer Group "regarding the possibility of acquiring the Company. The discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in the PRC, the Company's long term strategic plans, and the structure, timetable, pros and cons of a potential acquisition of the Company."

339.   In addition, CW1 confirms that Defendant Qi knew about the plan to relist Qihoo after the Merger and led the effort to keep that information secret.  CW1 describes a Public Relations department meeting in mid-2015 at which Qi directed the attendees not to disclose the relisting plan outside the company and to refrain from discussing it even within the Company. CW1 also described Qihoo's leaders as instructing employees to use their media connections to squelch articles referencing Qihoo's conducting a backdoor listing through SJEC.

340.   CW1 also described Defendant Zhou as being in charge of the privatization and relisting plan because of his large ownership stake in the Company.  In addition, CW1 described the fact that Qihoo would be relisted through a backdoor listing rather than through an IPO as common knowledge within the Company since late 2015.

341.   Defendant Chen, by virtue of his role as a Chairman of the Special Committee and a Qihoo Director, would also have been apprised of the backdoor listing plans that were included in marketing materials that were given to the Buyer Group during the Merger process that he was so heavily involved in.

342.   In addition, the Special Committee was given broad authority to take whatever steps it deemed necessary to assess the fairness of the Merger, including by considering alternatives to the Merger, reviewing Qihoo's financial projections and business prospects, and hiring advisors to assist its efforts.  The Special Committee was instructed to "to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group in

connection with the proposed" Merger.  For example, on December 9, 2015, the Special Committee had a telephonic meeting at which Qihoo's Co-CFO presented Qihoo management's projections for the Company's future financial performance for the fiscal years ending December 31, 2015 through December 31, 2025.  Furthermore, the Board did not place any limitations on the Special Committee's ability to evaluate the Merger.  Defendant Chen therefore had access to all of the Company's and Buyer Group's information concerning their relisting plan, true financial projections, and their vision for Qihoo's business in China after the Merger.

### C.    Defendant Zhou's Statements After the Merger Confirm His Intent to Defraud the Class

343.    After the Merger closed, Defendant Zhou explained to the Chinese media his true reasons for taking Qihoo private and his vision for the Company in its new form.  Zhou explained that as an internet security company, Qihoo had a role to play in Chinese national security interests, including for the military and other government functions.  Zhou also described his vision of "big security" in China that Qihoo would be able to pursue now that it was no longer considered to have foreign connections.  Zhou made clear that this vision was supported by senior Chinese government officials, including through conversations that he had going back several years—well before Defendants issued the Proxy Materials that failed to disclose these business opportunities.

344.    Zhou also explained after the Merger his plan to break-up Qihoo into separate entities so that its different business units would have better growth prospects.

345.    Defendants deliberately failed to disclose these substantial new business opportunities in the Proxy Materials.  Instead, they described Qihoo as continuing on its current course and disclosed supposed negative factors that they claimed would pose hurdles to the Company's future business in China.  As the *Financial Times* reported on February 28, 2017,

108

private marketing materials told potential members of the Buyer Group in 2015 that Qihoo would be relisted following the Merger for multiple times its current value "and contain[ed] ambitious estimates of future net income and other performance metrics going out to 2019."  On the other hand, Qihoo's minority shareholders reported "that conversations with Qihoo 360 and its advisers before privatisation suggested that the company's prospects were not nearly that bright."  The fact that Defendants disclosed a more favorable assessment of Qihoo's prospects in private to the Buyer Group than what they disclosed publicly in the Proxy Materials further shows their deliberate attempt to mislead Qihoo's Securityholders in connection with the Merger.

346.    Moreover, the fact that Defendants initially said as little as possible in the Preliminary Proxy Statement about their reasons for the Merger, and added more-detailed false and misleading explanations only after the SEC forced them to give some non-generic explanation, further highlights their deliberate efforts to mislead Qihoo's Securityholders about the Buyer Group's true reasons for the Merger.

**D.    The Cayman Islands Appraisal Action Further Shows Defendants' Scienter**

347.    The proceedings in the Cayman Islands Appraisal Action also show Defendants' scienter in misrepresenting Qihoo's true value in connection with the Merger.  Qihoo's repeated obstructive behavior has caused that action to be delayed by several years and prevented the dissenting shareholders from obtaining Qihoo's documents that show its true value during the Merger.  The Grand Court of the Cayman Islands determined that Qihoo's implausible excuses and delay tactics in that action—including Defendant Zhou's claim that he does not use a computer and Qihoo's repeated concealment of essential categories of documents that the Company in fact possessed—defy credulity.

109

348.    Other aspects of the Appraisal Action also show Defendants' knowledge that they misrepresented Qihoo's true value in the Merger.  These include Qihoo's willingness to pay $92 million to the court as security for the dissenters' judgment, which the court determined must have been based on Qihoo's careful consideration of the Company's true value; the court's determination that the dissenters were likely to receive *at least* the Merger consideration at the conclusion of the action; and the appellate court's explanation that Qihoo's recalcitrance justified the lower court's extraordinary intervention in the discovery process.

349.    The Appraisal Action also highlights the importance of the Special Committee's role—and documents—in determining Qihoo's fair value.

E.    **Additional Allegations Regarding Qihoo's Knowledge**

350.    Qihoo has the knowledge of its employees and representatives. It therefore knew of the fraud insofar as any of the Individual Defendants knew of the fraud. Furthermore, several of Qihoo's other high-ranking employees and Directors (in addition to the Individual Defendants) would have known that the backdoor listing was a crucial condition for the Buyer Group to participate in the Merger and that Qihoo's business prospects and valuation were much better than what was disclosed in the Proxy Materials.  For example, the Proxy Materials and the Cayman Islands Appraisal Action highlight the role that Alex Zuoli Xu (Qihoo's Co-CFO)— who made Qihoo's December 18, 2015 announcement of the Merger—played in working on and providing the financial projections to J.P. Morgan that formed the basis for J.P. Morgan's fairness opinion and valuation analysis.

VIII.   **LOSS CAUSATION**

351.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of Qihoo Securities and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the

110

facts detailed herein. This course of conduct misled the Class members and caused them to sell their shares at a depressed price. The far higher price that the Company was valued at in its relisting shows that the Class members did not receive fair value for their shares in the Merger. Class members who sold their Qihoo Securities during the Class Period were damaged thereby because they sold their shares at prices that were lower than the true value of the Company (i.e., Class members suffered damages under the federal securities laws).

352. Those Class members who sold their Qihoo Securities during the Class Period and prior to the Merger being completed on July 15, 2016 suffered economic loss because their Securities were sold at a depressed value. Defendants' fraud caused Qihoo's ADS to trade at artificially deflated levels throughout the Class Period and caused the holders of Qihoo Securities to be deprived of the true value of their shares. According to data on Bloomberg, the closing price of Qihoo's ADS on each date during the Class Period ranged from $65.11 per ADS to $76.92 per ADS.  The Class members who sold their Qihoo Securities prior to the completion of the Merger on July 15, 2016, were deprived of the fair value of their shares through this fraudulent depression of the price of their securities by Defendants' false and misleading statements and omissions.

353. With respect to those Class members who sold their Qihoo Securities prior to July 15, 2016, but for the fraud, the market price for Qihoo Securities would have more closely reflected their true value, including because the ability to dissent from the Merger and seek appraisal as a remedy would have prevented the deal price from serving as a ceiling limiting the upper-price of the Qihoo Securities.

354. In addition, Defendants' false and misleading statements caused Qihoo Securityholders to (1) vote in favor of the Merger and (2) forego their right to dissent prior to the

111

shareholder vote and to exercise their appraisal rights.  Defendants' false and misleading statements concealed the true value of Qihoo Securities and therefore prevented Qihoo Securityholders from making an informed decision as to whether they should dissent and seek appraisal. Defendants' descriptions in the Proxy Materials of how difficult it would be for Qihoo Securityholders to cancel their ADS and register their corresponding shares before they would be able to exercise their dissenting rights further deterred them from dissenting absent knowledge of Defendants' fraud.

355.    Class members who held their Qihoo Securities through the close of the Class Period ultimately sold their Qihoo Securities in the Merger for either $77 per ADS or $51.33 per common share. Each of these holders of Qihoo Securities was deprived of the fair value of their securities through the fraudulent depression of the value of their securities by Defendants' false and misleading statements and omissions. These securities were worth far more than the transaction price, as evidenced by the fact that only a portion of Qihoo's assets have been valued at multiple times the Merger price since Qihoo's relisting in China.

356.    Members of the Class both sold ADS during the Class Period at a deflated price and were injured thereby, and were injured by their holding ADS through the close of the Merger and ultimately selling those ADS by tendering them for the deflated Merger consideration.

357.    In summary, Plaintiffs allege that Plaintiffs and Class Members suffered losses, based on three theories:  **First**, Class members who sold shares for less than the Merger price of $77 per ADS suffered losses of an amount no less than the difference between their sale price and the Merger price, based on the prospect that fulsome disclosures would have alerted investors to the fact that the Merger was either essentially certain to close at $77, unless investors

112

could achieve an even greater valuation than accepting that $77.[93] **Second**, investors who sold

Qihoo shares at less than the intrinsic or fair value[94] of those ADS, suffered an immediate loss

equal to the fair value of their ADS minus the price at which they sold.  This loss occurs

regardless of whether the investor had another alternative transaction through which they could

have sold their shares for more dollars than they actually received, because owning a security

provides an investor with economic value independent of an immediate opportunity to sell that

security.[95]  **Third**, by hiding truthful information concerning Qihoo's fair value and Defendants'

plan to relist Qihoo, Defendants created an informational environment wherein investors would

tend to misjudge Defendants' willingness to pay a Merger price in excess of the $77 offer if the

deal or otherwise deprived investors of information relevant to their ability to take action (*e.g.*,

seek appraisal) to convert their ADS to an amount of dollars equal to or more comparable to the

fair value of those ADS.[96]

## IX.    **ALLEGATIONS OF INSIDER TRADING**

358.    Defendants Qihoo, Zhou, and Qi (the "Insider Trading Defendants," *i.e.*, all

Defendants other than Chen) engaged in insider trading to the detriment of the Class members,

who were forced to tender their shares in the Merger or who voluntarily sold their shares

contemporaneously with these Defendants. Through this insider trading, these Defendants are

---

[93] This is the theory of loss that the District Court credited as sufficiently pled in its March 21, 2022 Order and Judgment (ECF No. 145).

[94] As used herein, the terms intrinsic and fair value have an interchangeable meaning, corresponding to the value of the asset (the ADS) held by the investor.

[95] Plaintiffs submit that the District Court's March 21, 2022 Order and Judgment (ECF No. 145), seems to have preserved the viability of this theory of loss, but found the prior Amended Complaint did not adequately provide sufficient factual support to plausibly show that the ADS' fair value exceeded the Merger price of $77 per ADS, and as such new allegations have been added within this document to support that showing.

[96] Plaintiffs believe, on the facts previously alleged, the District Court's March 21, 2022 Order and Judgment (ECF No. 145) rejected this theory of loss.  Plaintiffs primarily preserve this allegation as may be relevant in any subsequent appeal.

liable under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, as explained in Count 2 below. Furthermore, to the extent that Qihoo is liable for insider trading, Defendants Zhou and Qi are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and as expressly permitted by Section 20A(b)(3) of the Exchange Act, 15 U.S.C. § 78t–1(b)(3), as explained in Count 3 below.

359.    According to a Schedule 13E-3 filed by Qihoo with the SEC on July 15, 2016, the Merger "became effective" on that day. This is referred to by Qihoo as the "Effective Time." Qihoo explained that as of the Effective Time, each share of its stock, including shares represented by ADS, "was cancelled and ceased to exist in exchange for the right to receive $51.33 ('Per Share Merger Consideration') and each issued and outstanding ADS represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes."

360.    Through the Merger, the Insider Trading Defendants purchased the shares that were sold by Class members through the Merger.  As described in the Proxy Materials, and in further detail in Section 3.2 of the Merger Agreement, which was approved at the extraordinary shareholders meeting held on March 30, 2016, the Parent Parties in the Merger were responsible for depositing the Merger funds with a "Paying Agent."  After the Effective Time, upon surrendering of a share certificate for cancellation, "or upon receipt by the Paying Agent of confirmation by the Company that the uncertificated Shares have been canceled, each holder of the Shares will be entitled to receive in exchange therefor an amount in cash equal to the product of the number of Shares multiplied by the Per Share Merger Consideration."

361.    These documents also explained that "[p]rior to the Effective Time, the Parent Parties and the Company shall establish procedures with the Paying Agent and the ADS

114

Depositary [*i.e.*, The Bank of New York Mellon] to ensure that (i) the Paying Agent will transmit to the ADS Depositary an amount in cash equal to (a) the number of ADSs issued and outstanding immediately prior to the Effective Time multiplied by (b) the Per ADS Merger Consideration and (ii) the ADS Depositary will distribute the aggregate of the Per ADS Merger Consideration to the ADS holders upon surrender by them of the ADSs."

362.    The Proxy Materials further explained that for registered holders of Qihoo ADS as of the Effective Time, "the ADS Depositary will send you a check for the Per ADS Merger Consideration, without interest and net of any applicable withholding taxes, for each ADS evidenced by the ADRs, in exchange for the cancellation of your ADRs after the consummation of the Merger. If you hold your ADSs in un-certificated form (that is, without an ADR) and are not a member of the Buyer Group, the ADS Depositary will automatically send you a check for the Per ADS Merger Consideration, without interest and net of any applicable withholding taxes, in exchange for the cancellation of each of your ADSs after the consummation of the Merger."

363.    Qihoo Securityholders whose ADS were held in "street name" by the Securityholder's broker, bank or other nominee at the Depository Trust Company ("DTC") would "not be required to take any action to receive the merger consideration for [their] ADSs as the ADS Depositary will arrange for the surrender of the ADSs and the remittance of the merger consideration to DTC (the clearance and settlement system for the ADSs) for distribution by DTC to [the Securityholder's] broker, bank or other nominee on [their] behalf."  Qihoo Securityholders were further instructed, "[i]f have any questions concerning the receipt of the merger consideration, please contact your broker, bank or other nominee."

364.    The Proxy Materials further explained that "[a]fter the merger is consummated, you will be sent a form of letter of transmittal with detailed written instructions for exchanging

115

your Share certificates for the merger consideration. Please do not send in your certificates now. Similarly, you should not send in the ADRs that represent your ADSs at this time. Promptly after the merger is consummated, the ADS Depositary will call for the surrender of all ADRs for delivery of the merger consideration. ADR holders will receive a form of letter of transmittal and written instructions from the ADS Depositary relating to the foregoing."

365. At the Effective Time, upon purchasing the shares thereafter, and at all times during the Class Period, Defendants were in possession of material non-public information about the Buyer Group's plans to relist the Company's subsidiaries following the Merger at far-higher valuations. Furthermore, Defendants were aware of the truth regarding each of the misstatements described herein and were aware of the material omissions detailed herein.

366. By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with Qihoo's investors.

367. Moreover, Cayman Islands corporations, like Qihoo, have a duty to provide investors with sufficient information to adequately understand the Merger that they are called upon to consider.

368. By failing to disclose the material non-public information prior to trading, the Insider Trading Defendants caused selling investors in Qihoo Securities to suffer economic losses. In addition, by trading with Qihoo Securityholders who were acting in reliance on the material misrepresentations made by Defendants described throughout this Amended Complaint, they caused selling investors in Qihoo Securities to suffer economic loss. By purchasing the

116

Qihoo Securities from Lead Plaintiffs and other Class members, Defendants experienced an unlawful and unjust enrichment, since they were able to acquire these securities for less than their fair value.

## X.   NO SAFE HARBOR

369.   The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Amended Complaint. As the Company acknowledged in the Proxy Materials, the Merger was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Merger are not subject to the PSLRA's safe harbor. *See* 15 U.S.C.A. § 78u-5(b)(E).

370.   Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.  First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor. Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

XI.    **CLASS ACTION ALLEGATIONS**

371.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners and former owners of Qihoo Securities who sold shares, and were damaged thereby, during the period from December 18, 2015 through July 15, 2016, inclusive, and all owners and former owners of Qihoo Securities who owned shares as of the Effective Time of the Merger and have tendered those shares for the Merger consideration, except as excluded below (the "Class").

372.    For the avoidance of doubt, the Class includes those Qihoo Securityholders who held Qihoo ADS on July 15, 2016 or purchased Qihoo ADS any time after December 18, 2015, redeemed those ADS for Qihoo common stock during the Class Period, and then tendered those shares for the Merger consideration, in accordance with the instructions that Defendants provided in connection with the Merger.

373.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of the Individual Defendants and the directors and officers of Qihoo; (iii) any entity in which Defendants have a controlling interest; (iv) any person who was an officer or director of Qihoo during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph.

374.    The members of the Class are so numerous that joinder of all members is impracticable. Qihoo stated in the Proxy Materials that it was expected to have 180,839,445 shares outstanding as of March 25, 2016 (the record date for determining the shareholders entitled to vote on the Merger).  Qihoo's ADS actively traded on the NYSE.

375.    While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed

118

Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained either by Qihoo or by Qihoo's ADS Depository and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

376.    Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

377.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

378.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, without limit:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)    whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

119

(e)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    whether defendants acted with the intent to defraud class members regarding the true value of the Qihoo Securities;

(g)    whether Defendants' fraudulent conduct depressed the price of Qihoo Securities during the Class Period;

(h)    whether the Insider Trading Defendants were in possession of material non-public information at the time of the Merger;

(i)    whether Class members sold their Qihoo Securities contemporaneously with the Insider Trading Defendants' purchase of those shares;

(j)    whether the Individual Defendants were controlling persons of Qihoo;

(k)    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(l)    whether and to what extent Qihoo Securityholders suffered losses due to Defendants' fraudulent conduct.

379.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET AND AFFILIATED UTE PRESUMPTIONS

380.   Lead Plaintiffs and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

381.   In the alternative, Lead Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   Qihoo's ADS were actively traded on the NYSE, an informationally efficient market, under the ticker symbol "QIHU," throughout the Class Period;

(d)   Qihoo's ADS traded at high volumes during the Class Period;

(e)   as the sponsor of its ADS, which are registered with the SEC, Qihoo filed periodic public reports with the SEC;

(f)   Qihoo communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(g)   the Qihoo Securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force

121

and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(h)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Qihoo Securities; and

(i)     without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class sold Qihoo Securities between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

382.    As a result of the foregoing, the market for Qihoo Securities promptly digested current information regarding Qihoo from publicly available sources and reflected such information in Qihoo's ADS price.

383.    Lead Plaintiffs are not only entitled to a presumption that they relied on the market price when deciding whether, and how, to vote their Qihoo Securities, whether to sell their Qihoo Securities, whether to hold those Qihoo Securities, or whether to seek appraisal; Lead Plaintiffs also in fact did rely on that market price when engaging in those activities.

384.    Under these circumstances, all sellers of Qihoo Securities during the Class Period suffered similar injury through their sale of Qihoo stock and ADS at artificially deflated prices and the presumption of reliance applies.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

385.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

122

386.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

387.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

388.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose (under both United States and Cayman Islands law) and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

389.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who sold Qihoo Securities.

390.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially deflate and maintain the prices of Qihoo Securities; and (iii) cause Lead Plaintiffs and members of the Class to sell Qihoo Securities at artificially deflated prices.

391.    Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents

123

that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

392.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying, directly or indirectly, on those statements or upon the integrity of the market price for Qihoo stock and ADS, Lead Plaintiffs and other members of the Class sold Qihoo Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have sold Qihoo Securities at such artificially deflated prices.

393.    The members of the Class that sold their Qihoo Securities in the Merger would have avoided doing so either by voting against the Merger or objecting to and dissenting from the Merger and seeking their appraisal rights under Cayman Islands law.

394.    By selling the Qihoo Securities at these artificially deflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

395.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of  § 20A of the Exchange Act Against the Insider Trading Defendants)

396.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

397.    This Count is asserted pursuant to Section 20A of the Exchange Act against the Insider Trading Defendants (*i.e.*, Defendants Qihoo, Zhou, and Qi), on behalf of Lead Plaintiffs

and all members of the Class who sold Qihoo Securities through the Merger and contemporaneously with these Defendants' purchase of those securities in connection with the Merger that was completed on July 15, 2016.

398. As alleged herein, the Insider Trading Defendants bought the Qihoo Securities while knowingly in possession of material positive and non-public information concerning the Company. Among this information was the knowledge that the Proxy Materials understated Qihoo's true value and omitted the fact that the Buyer Group was already planning to relist Qihoo following the Merger.

399. Lead Plaintiffs held many of their Qihoo Securities until the close of the Class Period. By doing so, they sold those Qihoo Securities to the Insider Trading Defendants through the Merger. These Defendants' purchase and Lead Plaintiffs' sale were contemporaneous within the meaning of Section 20A of the Exchange Act. Numerous members of the Class also sold Qihoo Securities contemporaneously with these Defendants' purchase in connection with the Merger.

400. By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with Qihoo's investors.

401. Accordingly, under Section 20A of the Exchange Act, these Defendants' purchase of the Qihoo Securities while knowingly in possession of material, positive, and non-public information during the Class Period makes them liable to Lead Plaintiffs and the Class for all profits gained and losses avoided as a result of such stock sales.

402.    The Insider Trading Defendants are required to account for all such stock sales and disgorge their profits or ill-gotten gains.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act
Against The Individual Defendants)**

403.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

404.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

405.    As alleged above, Qihoo violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (i) making false and misleading statements and omitting material information in connection with the purchase and sale of the Qihoo Securities and (ii) participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

406.    Also as alleged above, Qihoo violated Section 20A of the Exchange Act by purchasing the Class members' Qihoo Securities through the Merger and while in possession of material non-public information.

407.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Qihoo is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

408.    As set forth above, the Individual Defendants were controlling persons of Qihoo during the Class Period, due to their senior executive positions with the Company, positions on

126

the Board, significant control over the Company's Securities, and control over the Merger. Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations and the Merger process.

409.    By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Qihoo, including the content of its public statements with respect to, among other things, the Merger.

410.    The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who sold Qihoo Securities during the Class Period.

411.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Qihoo Securities, Lead Plaintiffs and other members of the Class sold Qihoo Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have sold Qihoo Securities at such artificially deflated prices.  By selling the Qihoo Securities at these artificially deflated prices the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

412.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiffs and the members of the Class as controlling persons of Qihoo in violation of Section 20(a) of the Exchange Act.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully demand judgment against Defendants as follows:

127

(a)     Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as the class representatives, and appointing Pomerantz LLP as class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)     Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

(d)     Awarding Lead Plaintiffs and the Class prejudgment and post-judgment interest, as well as their reasonable costs and expenses incurred in this action, including but not limited to reasonable attorneys' fees, expert fees, and other costs; and

(e)     Granting such other and further relief as the Court deems just and proper.

## XIV.    **DEMAND FOR JURY TRIAL**

Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 12, 2023

Respectfully submitted,
**POMERANTZ LLP**

By: */s/ Michael Grunfeld*
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiffs Altimeo Asset Management and ODS Capital LLC and the Proposed Class*

128

**LABATON SUCHAROW LLP**

By: */s/ Carol C. Villegas*
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
Email: dschwartz@labaton.com
Email: jbissell-linsk@labaton.com

*Additional Counsel for Lead Plaintiff*
*ODS Capital LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

/s/ Michael Grunfeld
Michael Grunfeld
