UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALTIMEO ASSET MANAGEMENT and ODS
CAPITAL LLC, *individually and on behalf of all others
similarly situated*,

Plaintiffs,

-v-

QIHOO 360 TECHNOLOGY CO. LTD., HONGYI
ZHOU, XIANGDONG QI, *and* ERIC X. CHEN,

Defendants.

---

19 Civ. 10067 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This decision resolves lead plaintiffs' motion for reconsideration or, in the alternative, certification of an interlocutory appeal from the Court's March 21, 2023 decision. That ruling (the "March 2023 decision") denied in part and granted in part defendant Hongyi Zhou's motion to dismiss plaintiffs' First Amended Complaint ("FAC"). *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.* ("*Altimeo III*"), No. 19 Civ. 10067 (PAE), 2023 WL 2585942 (S.D.N.Y. Mar. 21, 2023).

In the FAC, Dkt. 53, lead plaintiffs Altimeo Asset Management and ODS Capital LLC ("ODS") (collectively, "plaintiffs") claimed that internet company Qihoo 360 Technology Co. Ltd. ("Qihoo") and three of its leaders carried out a scheme to depress the price of Qihoo's American depositary shares ("ADS") and stock (together, "Qihoo securities"), with the goal of enabling them to pay Qihoo shareholders an unfairly low price when they took the company private in 2016 (the "Go-Private Merger" or the "Merger"). Lead plaintiffs sued on behalf of a putative class comprised of owners of Qihoo securities who sold shares during the class period ("seller shareholders"), or who tendered those shares for the Merger consideration ("tenderer

shareholders").[1]  They alleged violations of §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act") and the implementing rule of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

On March 21, 2023, the Court sustained the FAC's claims on behalf of the seller shareholders.  However, as relevant to the instant motion, the Court dismissed the FAC's claims on behalf of the tenderer shareholders, finding that these failed to allege economic loss or loss causation as to those shareholders.  *Altimeo III*, 2023 WL 2585942, at *18–24.  The Court also denied plaintiffs' request for leave to amend the FAC to add allegations gleaned from a Cayman Islands appraisal action brought by non-class members who had dissented from the Merger.  *See id.* at *28 n.26 (citing Dkt. 128 at 6 n.4).

Plaintiffs now ask the Court to reconsider its denial of leave to amend in light of those additional allegations, as set out in plaintiffs' proposed Second Amended Complaint ("SAC"), Dkt. 157, Ex. A.  These additional allegations, plaintiffs argue, reveal that Qihoo's "intrinsic value" at the time of the Merger exceeded the Merger consideration of $77/ADS.  On that basis, they contend that the SAC adequately alleges economic loss and loss causation as to the tenderer shareholders.  Dkt. 150 ("Motion for Reconsideration" or "MTR Mem.").  In the alternative, plaintiffs seek certification of an appeal, under 28 U.S.C. § 1291(b), of the Court's dismissal of their claims alleging, as to the tenderer shareholders, economic loss and loss causation.  MTR Mem. at 1.

---

[1] Excluded from the putative class are: (1) defendants; (2) officers and directors of Qihoo during the Class Period; (3) members of the immediate family of individual defendants and directors and officers of Qihoo; (4) any entity in which defendants have a controlling interest; (5) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; and (6) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any of the above excluded persons.  Dkt. 157, Ex. A ("SAC") ¶ 373.

For the foregoing reasons, the Court denies the motion in its entirety.

## I.      Background

The Court incorporates its March 2023 decision by reference, and recounts here only the

facts and procedural history necessary to situate the reader. *See Altimeo III*, 2023 WL 2585942,

at *2–11.  The proposed SAC's additional allegations are discussed in full later in this opinion.

*See infra* Section II.C.3.

### A.      The FAC and SAC's Common Allegations[2]

Lead plaintiffs Altimeo and ODS owned Qihoo securities, including ADS purchased on

the New York Stock Exchange during the putative class period.[3]  As relevant here, both tendered

---

[2] Although the following factual allegations appear in both the FAC and the SAC, the Court, unless otherwise noted, cites to the SAC for consistency with the balance of this opinion.  For the purpose of resolving the motion for leave to amend, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court has also considered documents attached to the declaration of Hanyu Xie in support of Zhou's motion to dismiss, Dkt. 116 ("Xie Decl."), the declaration of Michael Grunfeld, Esq., in opposition, Dkt. 129, and the declaration of Nathan McClellan, Dkt. 59.  Because these documents were incorporated into the FAC by reference, or are matters of public record, they are properly considered on this motion.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit" (citation omitted)).  The Court has considered such documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made."  *Clark v. Kitt*, No. 12 Civ. 8061 (CS), 2014 WL 4054284, at *6 (S.D.N.Y. Aug. 15, 2014); *see Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents. . . ." (emphasis omitted)).

[3] The March 2023 decision discusses at greater length the American depositary receipt system— a means by which American investors hold and trade equity interests in foreign companies— while noting that the FAC did not identify the foreign stock exchange to which Qihoo's ADS corresponded.  *See Altimeo III*, 2023 WL 2585942, at *2 n.3.

shares in connection with the Go-Private Merger. *See* SAC ¶¶ 34–35; *see also* Dkt. 12-3 (certifications of Altimeo and ODS purchase and sales).

Qihoo is a Cayman Islands corporation that offers internet and cloud-based products— including internet and mobile security tools, an internet browser, a search engine, and a mobile app store—to hundreds of millions of customers. SAC ¶¶ 47–51. Zhou is Qihoo's co-founder and served as chairman and CEO during the class period. *Id.* ¶ 37. Qi is Qihoo's co-founder and served as president and director during the class period. *Id.* ¶ 38. Chen served as a Qihoo director from 2014 through the Merger, and acted as chairman of the special committee of independent directors that the Company appointed to evaluate the Merger. *Id.* ¶¶ 39, 41.

On June 17, 2015, Zhou, who had partnered with four investment companies (collectively, the "Buyer Group"), approached Qihoo's board with a preliminary non-binding proposal to acquire all of Qihoo's outstanding shares for $77.00 in cash per ADS and $51.33 in cash per Class A or Class B ordinary share. *Id.* ¶¶ 56–57. At the time, Qihoo was valued at approximately $8 billion. *Id.* ¶¶ 14, 181. The Merger offer valued Qihoo at approximately $9.3 billion. *Id.* ¶ 3.

Two days later, on June 19, 2015, Qihoo's board formed a special committee to evaluate the terms of the Buyer Group's proposal, negotiate with the Buyer Group or its representatives, and explore strategic alternatives. *Id.* ¶¶ 41, 59. Zhou was not a member of the committee. *Id.* The committee retained J.P. Morgan Securities to act as financial advisor in connection with its review of the Merger proposal, *id.* ¶ 60, and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") to act as legal counsel. *See* Dkt. 116, Ex. 2 ("Final proxy statement") at 30.

Heated negotiations over the terms of the Merger agreement followed. During the negotiation period, the Buyer Group repeatedly rejected the special committee's attempts to

negotiate a higher Merger price of $80.00 per ADS on December 9, *id.* at 35, and December 10, 2015, *id.* at 36. The Buyer Group, through its counsel, also rejected the special committee's attempts behalf through December 12 and 13, 2015, to seek a purchase price increase, generally. *Id.* at 37.

On December 16, 2015, J.P. Morgan gave the special committee its opinion that the Buyer Group's preliminary offer ($77.00 per ADS and $51.33 per ordinary share) was fair to Qihoo shareholders. SAC ¶ 63. J.P. Morgan's opinion was based on management projections provided to it by Alex Xu, Qihoo's co-CFO.[4] *Id.* ¶ 169. These projections (the "J.P. Morgan projections") contained a discounted cash flow ("DCF") analysis supporting the Merger offer of $77/ADS. *Id.* ¶ 20. DCF valuations "project[] the future profit of a business and then discount[] that future profit (*e.g.*, based on the time value of money) to derive the business'[s] present value." *Id.* ¶ 184. J.P. Morgan's DCF analysis valued Qihoo at $10.425 billion, *id.* ¶ 187,[5] and calculated the range of ADS equity values as between $68.43 and $91.61, Final proxy statement at 56.[6] The special committee and the Board approved the Merger the same day. SAC ¶ 64.

---

[4] J.P. Morgan's conclusions were also based on its review of, *inter alia*, the Merger Agreement, publicly available business and financial information about Qihoo and the broader industry, precedential transactions, and the financial and operating performance of comparable companies. SAC ¶ 67. J.P. Morgan considered the premiums paid in prior U.S.-listed Chinese take-private transactions, as well. *See* Final proxy statement at 46. *But see* SAC ¶ 227 (faulting J.P. Morgan for not comparing Qihoo to any companies listed on a Chinese stock exchange).

[5] The SAC states that J.P. Morgan's DCF analysis valued Qihoo at $10.242 billion, *see* SAC ¶ 187, but the chart below that text reflects a valuation of $10.425 billion—which is consistent with the SAC's later references to the J.P. Morgan DCF valuation, *see id.* ¶¶ 201, 208, 213. Accordingly, the Court uses the $10.425 billion number.

[6] Qihoo filed J.P. Morgan's valuation analysis with the SEC on February 8, 2016. SAC ¶ 187 n.50.

On December 18, 2015, the Board executed the Merger Agreement. *Id.* ¶ 75. Between January 11 and March 3, 2016, Qihoo published four successive versions of Proxy Materials (collectively, the "proxy materials") that sought to persuade shareholders to vote for the Merger. *Id.* ¶ 81.[7] The proxy materials reported J.P. Morgan's DCF analysis, including its range of ADS equity values. Final proxy statement at 56–57.

Shareholders who wanted to exercise their appraisal rights under Section 238 of Cayman Islands Companies Law had to commit to doing so before the vote on the Merger. SAC ¶¶ 103–07; *see Altimeo III*, 2023 WL 2585942, at *23 n.21. Three Qihoo securityholders—Blackwell Partners LLC-Series A, Crown Managed Accounts SPC, and Maso Capital Investments Limited (the "Dissenters")—initiated such an action in the Cayman Islands (the "appraisal action"). SAC ¶ 153. Plaintiffs in this action did not.

On March 30, 2016, the shareholders voted on the Go-Private Merger. *Id.* ¶ 101. For the Merger to pass, at least two thirds of the voting rights of the shares present and voting in person or by proxy had to vote for it. *Id.* ¶ 99. Approximately 99.8% of the total votes cast at the meeting were in favor of the Merger, thereby approving it. *Id.* ¶ 101. Pursuant to its terms, the Merger closed on July 15, 2016, at which point each share was exchanged for the right to receive $51.33 and each issued and outstanding ADS represented the right to receive $77. *Id.* ¶¶ 4, 108.

---

[7] The proxy materials were amended three times. The "preliminary proxy statement" was published on January 11, 2016, SAC ¶ 82, and is excerpted at Dkt. 116, Ex. 7; the "amended proxy statement" was published on February 8, 2016, SAC ¶ 83, and is excerpted at Dkt. 116, Ex. 8; the "second amended proxy statement" was published on February 26, 2016, SAC ¶ 83, and is excerpted at Dkt. 116, Ex. 9; and the "final proxy statement" was published on March 3, 2016, SAC ¶ 84, and is excerpted at Dkt. 116, Ex. 2. The final proxy statement included the materials provided to Qihoo shareholders at the March 30, 2016, shareholder vote on the Merger. SAC ¶ 84.

### B.   Procedural History

On August 14, 2020, this Court granted Qihoo and Chen's motion to dismiss the FAC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE), 2020 WL 4734989 (S.D.N.Y. Aug. 14, 2020) ("*Altimeo I*"), *vacated and remanded*, 19 F.4th 145 (2d Cir. 2021) ("*Altimeo II*"). The Court held that the FAC did not plausibly allege "that defendants, as of the Merger, had in place a concrete plan to relist," which was the factual premise on which its "claims of material misrepresentations and omissions all turn." *Id.* at *17. On November 24, 2021, the Second Circuit vacated the dismissal and remanded. *See Altimeo II*, 19 F.4th. The Circuit held that the FAC alleged facts plausibly supporting the inference that, as of the shareholder plan to approve the Go-Private Merger, defendants had had an undisclosed plan in place to relist. *Id.* at 149–51.

At the time of the Circuit's decision, Zhou had not been served. On February 1, 2022, the Court permitted plaintiffs to serve Zhou and Qi by alternative means. Dkt. 100.

On February 8, 2022, the appraisal action went to trial before the Grand Court of the Cayman Islands, Financial Services Division. SAC ¶ 167. The trial, which was conducted by video conference, was live-streamed over a publicly accessible video feed. *Id.* ¶ 167 & n.30. Among other evidence, Qihoo offered the expert testimony of valuation expert Jaime d'Almeida, *id.* ¶ 186 & n.48; the Dissenters offered that of James Nicholson, *id.* ¶ 191 & n.56. The trial concluded March 25, 2022. *Id.* ¶ 167. The appraisal action settled after trial, but before any ruling, for an undisclosed amount. *Id.* ¶ 218.

On March 28, 2022, plaintiffs served Zhou, Dkt. 110, who, on April 1, 2022, first appeared, Dkts. 108–09. On April 29, 2022, Zhou moved to dismiss the FAC, Dkt. 114, under

Rules 12(b)(6) and 9(b).[8]   On March 21, 2023, in the March 2023 Decision, the Court, as

relevant here, granted in part Zhou's motion to dismiss, dismissing all claims on behalf of the

tenderer shareholders and denying leave to amend as to those claims.  *See Altimeo III*, 2023 WL

2585942, at *28 n.26.

On April 4, 2023, plaintiffs moved for reconsideration of the March 2023 decision, *see

id.*, insofar as it had denied leave to amend.  Dkt. 149.  In the alternative, plaintiffs asked the

Court to certify an interlocutory appeal.  *Id.*  In support, plaintiffs filed a memorandum of law.

Dkt. 150 ("MTR Mem.").  On April 5, 2023, the Court, noting that plaintiffs had referred to a

SAC, ordered plaintiffs to file the proposed SAC reflecting the "new or amended allegations . . .

involving the Cayman Islands Appraisal Action, that plaintiffs state would form the basis for an

amended complaint."  Dkt. 151 at 1.

On April 5, 2023, plaintiffs requested an extension to draft the proposed SAC, Dkt. 154,

which the Court granted, Dkt. 156.  On April 12, 2023, plaintiffs filed the proposed SAC.  Dkt.

157, Ex. A.  On April 26, 2023, defendants opposed the motion for reconsideration or, in the

alternative, certification of an interlocutory appeal.  Dkt. 160 ("MTR Opp.").  On May 3, 2023,

plaintiffs replied.  Dkt. 161 ("MTR Reply").

## II.    Motion for Reconsideration

The Court resolves, in turn, plaintiffs' motions (1) for reconsideration of the denial of

leave to amend and (2) in the alternative, for certification of an interlocutory appeal.

Plaintiffs' motion for reconsideration is narrow.  They seek reconsideration only as to the

March 2023 decision's denial of leave to amend the FAC.  *See* MTR Mem. at 5–12.  Plaintiffs do

not challenge the substance of the March 2023 decision insofar as it ruled on the motion to

---

[8] Qi still has not answered or otherwise responded to the FAC.

dismiss. Thus, although preserving their argument that the FAC stated a claim as to the tenderer

shareholders, *see, e.g., id.* at 2 n.3, 4, plaintiffs do not seek reconsideration of the Court's central

holdings that, as to these shareholders, the FAC did not allege economic loss or loss causation.[9]

Even if the motion to reconsider were construed to challenge the dismissal of the FAC's

claims as to the tenderer shareholders, such a challenge would fail. That motion does not

identify overlooked facts, or legal authority, or errors applying the law to the facts as pled. *See*

*Montanile v. Nat'l Broad. Co.*, 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002) (under Local Rule 6.3,

movant must demonstrate that court overlooked controlling law or facts that might reasonably be

expected to alter outcome). And nothing in plaintiffs' motion to reconsider calls into doubt the

Court's assessment that the FAC failed to allege economic loss or loss causation as to those

shareholders. Plaintiffs' preservation of their position that the FAC stated claims as to these

shareholders does not reopen that question here. *See Evolution Fast Food Gen. P'ship v. HVFG,*

*LLC*, No. 15 Civ. 6624 (DAB), 2018 WL 1779377, at *2 (S.D.N.Y. Mar. 28, 2018) (motion to

reconsider not a vehicle to reargue issues already considered); *see Montanile*, 216 F. Supp. 2d at

342 (motion for reconsideration not a vehicle to secure rehearing on the merits with respect to

issues already decided). Accordingly, the Court declines to reconsider its March 2023 decision,

including insofar as it held that the FAC did not allege economic loss or loss causation as to the

tenderer shareholders.

Plaintiffs do, however, seek reconsideration of the Court's denial of leave to amend. In

its March 2023 decision, the Court determined that plaintiffs' sole basis for seeking leave to

---

[9] Even if plaintiffs' motion to reconsider arguably could be read otherwise, the case law directs reading such motions, where of ambiguous scope, narrowly. *See Montanile v. Nat'l Broad. Co.*, 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002) ("A Court must narrowly construe and strictly apply Local Rule 6.3, so as to avoid duplicative rulings on previously considered issues, and to prevent the rule from being used as a substitute for appealing a final judgment.").

amend—to add unspecified allegations relating to the Cayman Islands appraisal action—could not salvage the dismissed claims as to the tenderer shareholders because, as sparsely previewed, such allegations were insufficient to allege loss causation. *See Altimeo III*, 2023 WL 2585942, at *28 n.26.

In moving for reconsideration, plaintiffs claim to have uncovered new evidence from the appraisal action, ostensibly unavailable at the time the motion to dismiss the FAC was litigated. They claim that such material, as excerpted in the proposed SAC, would enable the tenderer shareholders to allege loss causation adequately, such that granting them leave to amend would not be futile. Defendants oppose this bid. They argue that plaintiffs' factual allegations drawn from the appraisal are not new, but had been available to plaintiffs well before litigation on the motion to dismiss. They argue that plaintiffs bear responsibility for electing not to include these factual allegations in the FAC or to seek, during briefing on the motion to dismiss, leave to amend the FAC to incorporate this information. MTR Opp. at 8–10. In any event, defendants argue the proposed SAC, if considered, still does not plausibly allege loss causation as to the tenderer shareholders. *Id.* at 11–15. On both points, defendants are correct.

A.     **Applicable Legal Standards for Motions for Reconsideration**

Plaintiffs' motion for reconsideration is governed by Federal Rules of Civil Procedure 59(e) and 60(b), and S.D.N.Y. Local Civil Rule 6.3. District courts "ha[ve] broad discretion in determining whether to grant a motion [for reconsideration]." *Baker v. Dorfman*, 239 F.3d 415, 427 (2d Cir. 2000). A motion to reconsider "is not a motion in which a movant may reargue those issues already considered when a party does not like the way the original motion was resolved." *Evolution Fast Food*, 2018 WL 1779377, at *2 (internal quotations marks omitted). "The major grounds for justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice.'" *In re Pishevar*, No. 19 Misc. 503 (JGK) (SDA), 2020 WL 1862586, at *2 (S.D.N.Y.

Apr. 14, 2020) (quoting *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 558, 560

(S.D.N.Y. 2011)).  The standard governing motions for reconsideration "is strict,

and reconsideration will generally be denied unless the moving party can point to controlling

decisions or data that the court overlooked." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684

F.3d 36, 52 (2d Cir. 2012) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir.

1995)); *see also* S.D.N.Y. Local Rule 6.3 (requiring the movant to "set[] forth concisely the

matters or controlling decisions which counsel believes the court has overlooked").

   "These standards on motions for reconsideration apply in full force to a motion for

reconsideration of a denial of leave to replead." *In re Gildan Activewear, Inc. Sec. Litig.*, No. 08

Civ. 5048 (HB), 2009 WL 4544287, at *2 (S.D.N.Y. Dec. 4, 2009) (internal quotation marks

omitted) (citing *In re Refco Cap. Markets, Ltd. Brokerage Customer Sec. Litig.*, Nos. 06 Civ.

643, 07 Civ. 8686, 07 Civ. 8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008); *see

also Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir.1991)

("[O]nce judgment is entered the filing of an amended complaint is not permissible until

judgment is set aside or vacated pursuant to Fed. R. Civ. P. 59(e) or 60(b).").

### B.    Whether Newly Discovered Evidence Justifies Reconsideration

   Plaintiffs move for reconsideration on the basis of what they claim is newly discovered

evidence that fortifies their theory of loss causation.  Plaintiffs do not argue that reconsideration

is merited on other grounds—for example, a change in controlling law or a need to prevent clear

error or manifest injustice.  But contrary to plaintiffs' characterization, the evidence on which

they rely—testimony during the appraisal action—does not qualify as "newly discovered."  Far

from it, the testimony was publicly available and accessible to, and demonstrably accessed by,

plaintiffs long before the briefing on Zhou's motion to dismiss.

For evidence to be considered "newly discovered" on a motion for reconsideration, it must be evidence that was "truly newly discovered or could not have been found by due diligence." *Space Hunters, Inc. v. United States*, 500 F. App'x 76, 81 (2d Cir. 2012) (quoting *United States v. Potamkin Cadillac Corp.*, 697 F.2d 491, 493 (2d Cir. 1983) (internal quotations marks and alterations omitted)); *see, e.g.*, *Pettiford v. City of Yonkers*, No. 14 Civ. 6271 (JCM), 2020 WL 1989419, at *2 (S.D.N.Y. Apr. 27, 2020) (same); *Lima LS PLC v. Nassau Reinsurance Grp. Holdings, L.P.*, 160 F. Supp. 3d 574, 578 (S.D.N.Y. 2015) (same). That standard is not met here. Plaintiffs admit that the SAC's additional allegations all come directly from the live stream of the appraisal action. *See* SAC ¶ 167 & n.30. That action began and ended before Zhou had even been served. *Compare* SAC ¶ 167 (appraisal trial completed March 25, 2022), *with* Dkt. 110 (Zhou served on March 28, 2022). And Zhou did not file his motion to dismiss until a month later, on April 29, 2022. *See* Dkts. 114–15. Plaintiffs, for their part, did not file their opposition to Zhou's motion to dismiss until June 10, 2022, some 10 weeks after the appraisal trial concluded. *See* Dkt. 128–30. Plaintiffs do not contend that this testimony was undiscoverable. On the contrary, even before the motion to dismiss was filed, plaintiffs, on the docket of this case, had cited to aspects of the ongoing appraisal trial. They cited such evidence as a basis to lift the stay of discovery that the Court had entered pending resolution of the motion to dismiss.[10]

Important, too, is that plaintiffs had every opportunity during litigation on the motion to dismiss to seek immediate leave to amend, so as to incorporate information learned during the

---

[10] Specifically, on March 9, 2022, plaintiffs referenced "significant evidence" revealed in the appraisal action as a basis to oppose the reimposition of a stay of discovery during the pendency of the motion to dismiss. Dkt. 121. In doing so, plaintiffs did not suggest that they intended to seek leave to amend the FAC. They argued only that the evidence's recent production in the appraisal action—and its "read[y] availab[ility]"—weighed against a discovery stay. *Id.* at 2.

appraisal action, including as ostensibly relevant to loss causation, and to spare the parties and the Court needless work litigating a motion to dismiss the FAC.  Natural opportunities to seek such leave were presented by (1) the submission by the parties, on April 1, 2022, of a joint proposed briefing schedule on Zhou's motion to dismiss, Dkt. 110, which the Court approved, Dkt. 111; (2) Zhou's motion to dismiss the FAC, filed April 29, 2022, which centrally argued a failure to allege loss causation, on grounds prefiguring the Court's eventual decision, Dkts. 114–16; and (3) plaintiffs' opposition to that motion, filed June 10, 2022, in which plaintiffs had every incentive to marshal all available evidence supporting loss causation, or to alert the Court that evidence not cited in the FAC stood to fortify plaintiffs' pleadings so as to warrant immediate amendment, *see, e.g.*, Dkts. 128–30.  Instead, plaintiffs in their opposition brief did no more than make two cursory references to the fact that the appraisal trial had recently settled and request leave to amend in the event the motion to dismiss were granted. *See* Dkt. 128 at 6 n.4, 25.  But plaintiffs did not therein propose to add an amendment based on evidence from the appraisal trial, or note how any such evidence fortified elements of their claims.

Under these circumstances, plaintiffs cannot fairly claim to have come upon new evidence, so much as to have strategically warehoused existing evidence to deploy in the event of a dismissal.  It was not until their motion for reconsideration—filed more than a year after the close of the appraisal action trial—that plaintiffs came forward with an explanation of the nature of the amendment they envisioned or why evidence from the appraisal action would ostensibly fortify their claims.  Plaintiffs have not explained such coyness, or their failure to seek to amend earlier, or to disclose the nature of the proposed amendment.  The effect has been needlessly occasioned plenary briefing—and resolution—of challenges to a pleading that plaintiffs claim to have appreciated at all relevant times to be, from their perspective, factually materially

incomplete. *See Space Hunters*, 500 F. App'x at 81 (affirming denial of motion for reconsideration in light of plaintiffs' "fail[ure] to provide a convincing explanation" for delay in offering evidence that had been available for preceding eight years); *Pettiford*, 2020 WL 1989419, at * 2 (denying motion for reconsideration of denial of leave to amend to add futile claim; November 2019 deposition testimony not "newly discovered" when order issued in February 2020); *Lima*, 160 F. Supp. 3d at 579 (same, where documents were previously available for review); *see also In re Gildan Activewear, Inc. Sec. Litig.*, 2009 WL 4544287, at *4–5 (no reconsideration of denial of leave to amend where plaintiffs had multiple opportunities to add additional allegations and, when they did request to amend, gave no indication of how they would do so).

Accordingly, the SAC's added allegations do not qualify as "newly discovered" evidence.  They are not properly before the Court on the motion for reconsideration.  *See, e.g., Brkic v. Dumbo Moving & Storage, Inc.*, No. 22 Civ. 07029 (CM), 2023 WL 1069889, at *3 (S.D.N.Y. Jan. 27, 2023) ("Newly discovered evidence must not have been available prior to entry of the judgment leading to reconsideration.  Evidence of which a party was aware is by definition not 'newly discovered.'" (internal quotation marks and alterations omitted)); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14 Civ. 04394 (AJN) (BCM), 2018 WL 1088020, at *2 (S.D.N.Y. Feb. 12, 2018) (denying motion for reconsideration where plaintiff identified no overlooked facts in underlying application, but only evidence that was "well known to it" when it briefed the initial issue); *Pettiford*, 2020 WL 1989419, at *2 (denying motion for reconsideration of denial of leave to amend where evidence not newly discovered); *Kopperl v. Bain*, No. 09 Civ. 01754 (CSH), 2016 WL 310719, at *3–4 (D. Conn. Jan. 26, 2016) (evidence from deposition conducted prior to court's order was not "newly discovered"); *Merrill Lynch,*

*Pierce, Fenner & Smith Inc. v. Young*, No. 91 Civ. 2923 (CSH), 1997 WL 163454, at *1 (S.D.N.Y. Apr. 4, 1997) (evidence not newly discovered for purposes of motion for reconsideration where "the evidence upon which plaintiffs now rely was . . . publicly available").

### C.    Whether the Proposed Amendment Would Be Futile

In any event, even if considered in full, the proposed SAC does not cure the substantive shortcomings of the FAC—namely, its failure to plausibly allege loss causation as to the tenderer shareholders.

### 1.    Applicable Legal Standards for Motions for Leave to Amend

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Where, however, there has been undue delay, bad faith, or dilatory motive on the part of the movant, the movant has repeatedly failed to cure deficiencies by previous amendments, or the amendment would be futile, denial of leave to amend has "long been held proper." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (citing *Foman*, 371 U.S. at 182).

"Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). "In assessing whether the proposed complaint states a claim, [courts] consider the proposed amendments along with the remainder of the complaint, accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief." *Id.* (internal quotation marks, alterations, and citation omitted). But "where a plaintiff is unable to allege any fact sufficient to

support its claim, a complaint should be dismissed with prejudice." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

Relevant here, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*ECA*"). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

16

Second, such a complaint must comply with the pleading requirements of the Private

Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b).  *See ECA*, 553 F.3d at 196.  In

particular, where a plaintiff's claims depend upon allegations that the defendant has made an

untrue statement of material fact or that the defendant omitted a material fact necessary to make

a statement not misleading, the plaintiff "shall specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements

. . . were false and misleading; they must demonstrate with specificity why and how that is so."

*Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  In addition, the plaintiff "shall, with

respect to each act or omission . . . state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

### 2.    The Bases for the March 2023 Decision's Dismissal of the Tenderer Shareholders' Claims

In its March 2023 decision, as relevant here, the Court assumed, *arguendo*, that the FAC

plausibly pled reliance by the tenderer shareholders on the theory that the votes from at least

some of the shareholders were required for approval of the Merger; these shareholders would

have voted down the Merger had the plan to relist been revealed and related misstatements not

made; and the exchange of shares through the Merger at $77/ADS would not have occurred.

*Altimeo III*, 2023 WL 2585942, at *18–19.

However, even assuming reliance based on such a theory, the Court found the FAC's

allegations far too speculative and conclusory to allege economic loss or loss causation.  *Id.* at

*20.  The FAC alleged that, after the Merger failed, the tenderer shareholders would have

received more than $77/ADS through one of two mechanisms: either (1) Qihoo would have

remained public and the market, "inspired by the Buyer Group's disclosure of its (foiled)

17

intended plan to relist after taking Qihoo private, would have driven the stock price above $77/ADS," or (2) the tenderer shareholders would have demanded, as part of a renegotiated going-private transaction, a higher merger consideration price—and the Buyer Group would have conceded. *Id.* at *20. The Court noted that "[t]he assembled case law, to say the least, has not looked kindly on similarly attenuated theories of economic loss when articulated in securities fraud lawsuits." *Id.* at *21 (collecting cases).

The Court held that the FAC's allegations were similarly too speculative to state a claim. As to the premise that the Buyer Group would have agreed to a Merger consideration exceeding $77/ADS, the Court pointed to the fact that the special committee did, in fact, repeatedly try— and failed—to negotiate a higher price per ADS during the period leading up to the Merger, and to secure superior offers, with the help of estimable financial and legal advisors. *Id.* at *21. And the FAC had not pled facts "that these advisors were denied any information about Qihoo's intrinsic economics, as opposed to the Buyer Group's relisting plan," and it did not provide a factual basis to infer the Buyer Group was willing to consider a price above $77/ADS, or "that an outside bidder would have emerged with a higher bid had it had a clearer forecast of the Buyer Group's long-term plans." *Id.*

The Court also put aside, as overly speculative, the FAC's allegations as to how the market would have valued Qihoo's ADS had the company remained a public company in the United States. Insofar as the FAC alleged that Qihoo's market value in the United States would have risen to match its allegedly higher values—months later, and after restructuring and relisting—on the Chinese stock market, that was "too remote to plausibly plead loss or loss causation." *Id.* at *22. The allegation that Qihoo's furnishing of $92 million to a Cayman Islands court, as security to cover the appraisal action, showed the market value of the shares was

higher than the $77/ADS offered also fell short. *Id.* at *23. "[T]he FAC does not allege that the $92 million in security represented any party's actual assessment of the value of the shares at issue, let alone the factual basis for such an assessment," and "[w]ithout other allegations, this sum could easily instead have reflected a cautious set-aside to cover a worst-case scenario in which these shareholders' claims were validated in full." *Id.* Likewise, the FAC's quotation of an "anonymous valuation expert hired by the dissenting shareholders," who "opined that their share value was between $124.40 and $290.49 per share . . . based on discounted cash flow valuation and a capitalization of earnings," lacked any factual basis or identifying details that would tend to support the expert's reliability. *Id.* Finally, for similar reasons, the Court determined that additional allegations from the Cayman Islands appraisal action could not plausibly save the tenderer shareholders' claims and denied leave to amend as futile. *Id.* at *28 n.26.

### 3.    The Proposed SAC's Additional Allegations

The proposed SAC reiterates the allegations from the FAC.  It also adds allegations from the appraisal action trial bearing on Qihoo's "intrinsic value."  These, it alleges, cure the deficiencies as to loss causation.  The SAC draws all such allegations from a transcript of the live video feed of the appraisal trial between February 8 and March 25, 2022. *See* SAC ¶ 167 n.30. The additional allegations can be grouped into four categories.

#### *i.     Zhou's June 17, 2015 Email*

First, the proposed SAC alleges that on June 17, 2015, Zhou emailed all staff on Qihoo's internal email system with the subject, "Seize the opportunities to write a new chapter, a letter of all 360ers from Zhou." *Id.* ¶ 171.  The email stated:  "[M]any of us believe the current valuation of 360, which stands at USD 8 billion, fails to fully reflect the value of our company." *Id.*  The SAC alleges that, at the appraisal action trial, non-party Xu testified that "many of [Qihoo's

19

senior management]" agreed with Zhou's June 17, 2015 email that Qihoo was undervalued in the U.S. *Id.* ¶ 172. Xu testified that he "ha[d]n't run . . . through the numbers yet, so [he] just generally fe[lt] that [Qihoo was] undervalued." *Id.* ¶ 173.

### ii.    *Statements to Chinese Government Agencies*

Next, the proposed SAC points to two emails sent to Chinese governmental agencies. First, on June 12, 2015, defendant Qi emailed the Cyberspace Administration of China, "which is part of the Chinese government." *Id.* ¶ 174. The message's subject line was, "Request for permission for 360's A-share relisting," and its body stated, "360's domestic relisting is feasible." *Id.* The email also stated that Qihoo's "market cap is expected to reach over 150 billion [RMB] after the A-share relisting," or $25 billion. *Id.* (alteration in original). The SAC alleges that Qihoo "provid[ed] this information to show the Chinese government that it would have 'no difficulty in repaying' its loans." *Id.*

Second, on November 24, 2015, the Buyer Group's financial advisor, Huatai, sent an email to China's National Development and Reform Commission in connection with Qihoo's application for an overseas investment. *Id.* ¶ 179. In it, Huatai stated that "Qihoo 360's current market cap of over $8 billion does not reflect the corporate value." *Id.* (alteration omitted). The SAC alleges that Xu testified at the appraisal action trial that the National Development and Reform Commission "is a very important body that one would not purposely lie to." *Id.*

### iii.    *Alternative Projections of Qihoo's Future Value*

The proposed SAC also alleges that, on June 18, 2015, a Chinese investment bank "pitching to be involved in Qihoo's relisting" valued Qihoo at $60 billion if it were relisted "as

20

is."[11]  *Id.* ¶ 177.  It alleges that China Renaissance, which was part of the Buyer Group, had an alternative set of financial projections from those presented to the special committee by J.P. Morgan.  *Id.* ¶ 176.  These projections, dated July 28, 2015, "showed that China Renaissance thought if they exited their investment four years after privatization [Qihoo] would be worth $51 billion."  *Id.*  The China Renaissance projections also included "an option that Qihoo would be relisted through a backdoor listing" with an elevator company—which is, the SAC underscores, "what ultimately occurred."  *Id.*  The SAC alleges that China Renaissance's projections reflect "that those with inside knowledge of [Qihoo] understood its intrinsic value [to be] far greater than the Merger price" in 2015, because "[i]t is implausible that Qihoo could be expected to grow over five times the amount that it was valued at in the Merger in just four years."  *Id.*

*iv.*      *Alleged Flaws in J.P. Morgan's DCF Analysis*

Finally, the proposed SAC alleges that J.P. Morgan's projections miscalculated Qihoo's value in two ways.  It alleges that, in the information it provided to J.P. Morgan, Qihoo (1) inflated its anticipated capital expenditures, so as to depress Qihoo's value as calculated in J.P. Morgan's DCF analysis, and (2) omitted information about its valuable anticipated internet finance business.  *Id.* ¶¶ 210–13.  The proposed SAC alleges higher valuations for Qihoo, which it states are based on the recalculations of its value, using the corrected inputs, performed by the dissenters' expert in the appraisal action.  *Id.* ¶ 20.  The Dissenters' expert used a "reconstruct[ed] and . . . adjust[ed]" version of J.P. Morgan's DCF valuation.  *Id.*  Specifically:

*Inflated capital expenditures*:  The proposed SAC alleges that the J.P. Morgan projections undervalued Qihoo by considering expenditures on a fictional cloud computing business, *id.*

---

[11] The SAC alleges that, on July 29, 2015, CICC emailed "high-level Qihoo employees Zhang Fan [General Counsel] and Yao Yu [Vice President] discussing 'direct A-shares listings' and 'a brief overview of a share listing through a reverse takeover.'"  *Id.* ¶ 177.

21

¶¶ 185–203, and unnecessary office buildings, *see id.* ¶¶ 204–09.  As presented to the special committee, *id.* ¶ 187, and shareholders, *see, e.g.,* Final proxy statement at 57 (charting past expenditures alongside anticipated expenditures), the J.P. Morgan projections reflected $5.9 billion in total projected capital expenditures from 2016 through 2025, SAC ¶ 185.  These projections valued Qihoo at $10.425 billion.  *Id.* ¶ 187; *see supra* note 5.  The J.P. Morgan projections predicted a "marked increase from the amount of Qihoo's expenditures leading up to 2016."  SAC ¶ 187; *see* Final proxy statement at 57 (charting past expenditures alongside anticipated expenditures).  Xu testified in the appraisal action trial that "the primary reason for the very steep increase in [capital expenditures] as shown in the projections is the assumption[] . . . that Qihoo would have spent [a] very large amount of money on a new office building Xianjing and on a new public Cloud services offering."  SAC ¶ 186.  He attributed $3.6 billion in capital expenditures to the cloud computing business, *id.* ¶ 188, and $300 million to the office building, *id.* ¶ 205.

In fact, the SAC alleges, the cloud computing business and the associated capital expenditure must have been fictitious because Qihoo "was not able to produce any documents referencing" it.  *Id.* ¶ 190.  It alleges that Xu "made up the number" Qihoo would spend on the fictional business.  *Id.* ¶ 191 (no internal documents discussing program); *see also id.* ¶¶ 192–95.  And, the SAC alleges, even if Qihoo had once contemplated a cloud computing business, it had "definitively decided not to launch the supposed potential business" by "early 2016"—that is, "well before the Merger closed."  *Id.* ¶ 192.

The SAC also points to the fact that the J.P. Morgan projections did not distinctly address the cloud computing business in addressing the company's future revenue streams.  *See id.* ¶¶ 195–96; *see also id.* ¶ 194 ("Xu agreed that he could not point to any particular line items at

all in the projections provided to J.P. Morgan that show the benefit of the new cloud business."
(internal quotation marks omitted)).  Instead, the projections broadly distinguished between
revenue from "traditional" and "emerging" business.  *Id.* ¶ 197.  They defined "emerging"
businesses to "include enterprise security business, smartphone and other hardware and
hardware-enabled value-added services, and international business."  *Id.*  On this basis, the SAC
alleges, Qihoo manipulated the J.P. Morgan projections to include the costs associated with the
invented cloud computing business—but not any associated revenue.  *Id.* ¶ 200 (The "most
obvious, and certainly a plausible, explanation is that there was no revenue in the projections that
Qihoo gave to J.P. Morgan . . . attributable to the new cloud business.").  "A reasonable
valuation of Qihoo," the SAC alleges, would therefore "remove the Cloud computing capital
expenditure from the projections, while leaving the projected revenue levels unchanged."  *Id.*
Doing so, according to the SAC, results in a "corrected" valuation of Qihoo at $13.299 billion,
*id.* ¶ 201, which in turn results in an ADS valuation exceeding $100/ADS, *id.* ¶ 201 & n.72.

   As to the $300 million capital expenditure on new office buildings, the SAC alleges this
number was "grossly inflated."  *Id.* ¶ 204.  It points to Zhou's statement in a March 2015
earnings call that "with the system [Qihoo] had in place, 'you don't necessarily need to add in or
building [sic] a massive number of headcounts to run a successful kind of business down the
road.'"  *Id.* ¶ 205.  The SAC also quotes the Dissenters' expert in the appraisal action, who
testified that "no documents evincing Qihoo's obvious space needs or headcount were provided
[in discovery]" in that action.  *Id.* ¶ 206.  "The only internal document that Qihoo had . . . was an
email sent from the infrastructure department to [Zhou], two days after the management
projections were made in December 2015, stating that the total capital expenditure for the new
buildings was only $171 million, spread out over a[n unspecified] number of years."  *Id.* ¶ 207;

*see also id.* ¶ 208 n.80 (years unspecified). "Thus," the SAC alleges, "the expense was erroneously projected in two ways that would deflate Qihoo's valuation—first, by simply inflating the number by $129 million . . . and second, by pulling that expense forward in time, which exaggerates its impact on valuation." *Id.* Based on this, the SAC "correct[s]" J.P. Morgan's model and reduces the capital expenditure "to track spending $171 million on the office space over five years (instead of $300 [million] over two years)," to result in a valuation of $10.582 billion. *Id.* ¶ 208 & n.80 (selected five years as "a reasonable assumption").

The SAC alleges that, were both the cloud computing business and office building expenditures reduced consistent with the Dissenters' expert's calculations, "the total valuation changes to $14.452 billion, which is 29% greater than J.P. Morgan's valuation of $10.425 billion" using the reconstructed DCF analysis. *Id.*

*Unaccounted-for internet finance business*: The proposed SAC further alleges that Qihoo's "intrinsic or fair value was far greater than publicly represented, and greater than the Merger consideration," because J.P. Morgan's valuation omitted "an internet finance business that was not publicly known." *Id.* ¶ 210. "Qihoo was in the process of launching this internet finance business as of June 16, 2015, but [the] investment analysts did not know of it as of that time (or as of the valuation date of March 30, 2016)." *Id.* ¶ 211.[12] The Dissenters' expert valued the undisclosed internet finance business at approximately $821 million in January 2016. *Id.* ¶ 212. This valuation was "based on a pending acquisition and fundraising," for which "[t]he

---

[12] The SAC references a "valuation date of March 30, 2016" in discussing the alleged shortcomings of the J.P. Morgan projections. SAC ¶ 211. In arguing that Qihoo's intrinsic value exceeded the Merger consideration, however, the SAC points to "the intrinsic value of Qihoo at the time of the Merger," without specifying a date. *See, e.g., id.* ¶¶ 178, 203, 209, 218. Because the SAC's allegations are speculative and conclusory regardless of the date used, the Court need not parse the SAC's intended meaning in using the term "at the time of the Merger."

dissenters' expert account[ed]." *Id.* "[W]hen all of these steps came, the business was ultimately worth approximately 13 billion RMB (or approximately $2 billion)." *Id.* ¶ 212 & n.3. The SAC alleges that, were "the value of th[e] otherwise unaccounted for internet finance business" added, and all other values held constant, the reconstructed DCF analysis values Qihoo at $11.246 billion. *Id.* ¶ 213.

The proposed SAC alleges that if all three changes were made—that is, if the DCF analysis were rerun with the capital expenditures reduced to account for the false computing and office costs, and with the internet finance business's value added—the "total valuation of [Qihoo] is $14.273 billion, which is 36.9% greater than J.P. Morgan's valuation of $10.425 billion." *Id.* Under this analysis, the valuation of each ADS ranges from $84.60/ADS up to $111.78/ADS. *Id.* ¶ 213 n.84. The SAC also points to the Dissenters' expert's new DCF analysis—which incorporated his opinion that "the overall [capital expenditure] plans" Xu included in the projections did not "look[] sensible." *Id.* ¶ 220. That DCF analysis, "[o]verall, . . . yielded a total intrinsic valuation of $213.25 per share." *Id.* ¶ 221.

The SAC alleges that its valuations "make clear that Qihoo was worth substantially more than the Merger consideration based on its intrinsic value had it remained a public company in the United States rather than being taken private in the Merger." *Id.* ¶ 214. The valuation differentials are not, the SAC alleges, attributable to "[a]lternative explanations," *id.* ¶ 215, such as "business opportunities that [Qihoo] had in China after it was no longer a public company in the U.S.," *id.* ¶ 216, or differences between how the U.S. and Chinese markets valued technology businesses, *id.* ¶ 217. And "even if [] some portion of Qihoo's higher value resulted from factors outside of its intrinsic value," the SAC alleges, "the evidence . . . confirms that those factors were not the sole cause of Qihoo's higher value." *Id.* ¶ 219 (emphasis omitted). "At least *some*

significant portion of Qihoo's valuation difference is plainly . . . attributable to the Company's intrinsic economics in its form as a public company in the United States before the Merger." *Id.* (emphasis added).

### 4. Analysis

Even with the above additional allegations, the SAC fails to plausibly allege loss causation as to the tenderer shareholders.[13]

The SAC's theory of loss causation proceeds from the premise that "Qihoo was worth substantially more than the Merger consideration . . . had it remained a public company in the United States rather than being taken private in the Merger." *See id.* ¶ 214. Accordingly, it alleges, when shareholders approved the Merger and the tenderer shareholders tendered their shares for $77/ADS, they suffered losses, because, but for the Merger, Qihoo's share price eventually would have risen above $77/ADS. MTR Mem. at 2; *see also id.* ("Plaintiffs can present evidence to show that, based on Qihoo's financial metrics and expected future financial performance, tendering was worse for shareholders than continued ownership of Qihoo ADS."). Like the FAC, the SAC alleges two mechanisms by which ensuing events would have resulted in them receiving more than $77/ADS: (1) shareholders would have voted down the proposed Merger, the ADSs' market price eventually would have risen given the favorable assessments and information not shared with J.P. Morgan, and the tenderer shareholders eventually would have sold their shares at a price above $77/ADS, *see id.* at 8–12; or (2) shareholders would have demanded, and ultimately received, an offer from the Buyer Group exceeding $77/ADS, *id.* at 11 n.6. Under either course of events, plaintiffs argue, the tenderer shareholders have plausibly

---

[13] The Second Circuit has yet to decide whether plaintiffs must plead loss causation with the specificity required by Rule 9(b), or whether Rule 8(a)'s standard governs. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020). Because the proposed SAC falls short under either standard, the Court does not have occasion to address that question.

alleged economic loss and loss causation.[14]  Defendants counter that the SAC does not plausibly

allege that the market and J.P. Morgan had undervalued Qihoo, such that the company's intrinsic

value exceeded $77/ADS at the time the tenderer shareholders tendered, MTR Opp. at 15–18;

that the SAC does not plausibly allege that defendants' misstatements caused these shareholders

to tender their shares below Qihoo's intrinsic value, *id.* at 14–15; and that even if an

undervaluation were plausibly alleged, the SAC's theories of how shareholders eventually would

have recovered more than $77/ADS do not give rise to a viable theory of loss and loss causation,

*id.* at 11–13.

     The Court evaluates the SAC's alternative theories of loss causation in turn.

     *Loss-causation by missing out on eventual market-price appreciation*:  As to the theory

that, had Qihoo remained a public company, its market price eventually would have risen above

$77/ADS at some point following which plaintiffs would have sold their shares, this theory of

loss-causation is not viable, even assuming that the proposed merger would have been voted

down.  That is so for two reasons.  First, the SAC's new allegations do not plausibly support a

valuation exceeding the already above-market price—$9.3 billion—at which the Merger was

executed, *see, e.g.*, SAC ¶ 3, let alone the valuation yielded by J.P. Morgan's DCF analysis

($10.425 billion) that informed the Merger price, *see id.* ¶ 187; *supra* note 3.  Second, the SAC's

notion that, had the tenderer shareholders voted down the Merger, the market price for Qihoo's

ADS would have risen to its significantly higher valuations is contradicted by how the market, in

---

[14] The SAC does not allege that, had defendants' misleading statements been known, lead
plaintiffs would have exercised their appraisal rights.  Instead, like the FAC, it only vaguely and
conclusorily suggests that some tenderer shareholders would have done so, *see* SAC ¶¶ 102, 354.
These allegations do not adequately plead loss causation via the appraisal process, for the same
reasons stated in the March 2023 Decision.  *See Altimeo*, 2023 WL 2585942, at *19 n.18, *23
n.21.

fact, valued Qihoo prior to the Merger's announcement.  *See Altimeo III*, 2023 WL 2585942, at
*20 n.19.

As to the SAC's claim that information undisclosed to J.P. Morgan would have revealed
a higher intrinsic value, the first category of such information (Zhou's June 2015 email and Xu's
related testimony) is easily put aside.  Zhou and Xu's subjective and generally stated beliefs in
June 2015 that the U.S. market undervalued Qihoo by an unspecified amount do not speak to
whether the company's true value, in fact, exceeded $9.3 or $10.425 billion.  *See* SAC ¶¶ 171–
73; *id.* ¶ 173 (Xu testifying in appraisal action that, at that point, he had not "run through the
numbers yet, so [he] just generally fe[lt] that [Qihoo] was undervalued" (internal alterations
omitted)).  On the contrary, Zhou and Xu's statements are consistent with the Buyer Group's
offer to purchase Qihoo for $9.3 billion—a figure well ($1.3 billion) above Qihoo's market value
at the time.  *Id.* ¶ 171.  That Zhou, who led the Buyer Group, viewed Qihoo as undervalued at the
time is especially unilluminating.  The market knew he was a member of the Buyer Group.  And
as defendants note, "[e]very buyer" presumably believes, as reason for purchase, "he or she is
obtaining good value and will be able to extract even more value from the company in the
future."  MTR Opp. at 16.

The SAC next relies upon two alleged statements to Chinese government agencies: an
opinion by the Buyer Group's financial advisor, Huatai, that "Qihoo's . . . current market cap of
over [$]8 billion does not reflect the corporate value," SAC ¶ 179, and a rosy prediction by Qi of
financial success upon Qihoo's relisting on a Chinese stock exchange, *see id.* ¶ 174.  These
opinion statements, made in support of the later relisting application, do not plausibly plead that
Qihoo's market value *as a public company* exceeded the above-market Merger price at the time
of the Merger.  Both statements were made in connection with relisting applications—and,

therefore, premised on scenarios in which Qihoo was successfully taken private and significantly reshaped. *Id.* ¶¶ 174, 178–79. And Huatai's statement does not offer any specifics as to what Qihoo's true value *was*, let alone that it exceeded the Merger consideration at the time of the Merger. And Qi's projection that Qihoo's "market cap is expected to reach over 150 billion [RMB]," or $25 billion, after relisting lacks key details. Qi offers no timeline for this prediction, nor does he describe the corporate structure that it envisioned. These forward-looking projections do not speak to Qihoo's valuation as a public company in the United States as of March 30, 2016.

The SAC next relies on two sets of alternative projections, but each is problematic for similar reasons. The China Renaissance projections predict that, were Qihoo relisted on a Chinese exchange through a reverse listing with an elevator company, "[its] investment four years after privatization [Qihoo] would be worth $51 billion." *Id.* ¶ 176. But these projections assume a wholly different lifecycle for the company than does the SAC's theory of loss causation: It envisions Qihoo four years in the future, after going private, restructuring with another company, and relisting on a new exchange. The SAC's statement that "[i]t is implausible that Qihoo could be expected to grow over five times the amount that it was valued at in the Merger in just four years" is conclusory. *Id.* The separate allegation that a "leading Chinese investment bank" valued "Qihoo at approximately $60 billion if it were relisted 'as is'" similarly is inadequate to allege that the company's value at the time of the Merger exceeded the Merger consideration. *See id.* ¶ 177. Although the SAC alleges "as is" means "without any post-privatization change, such as spinning off or liquidating any portions of the Company," such a privatization and relisting would, by definition, entail restructuring. *Id.* And the SAC does not unpack the bank's calculations—such as why it valued Qihoo so far above its United

States market price—beyond noting that the figure came from the bank's "pitch[] to be involved in Qihoo's relisting." *Id.* And the "pitch" context itself suggests motivation to render an optimistic projection. *Id.*

The only category of allegations in the SAC bearing on Qihoo's valuation as of the Merger date is its claim that J.P. Morgan, in valuing the company, was supplied inaccurate information about Qihoo's capital expenditures and the status of its internet financing business.[15] But these allegations are too thinly pled. Qihoo's failure, in the appraisal action, to produce documents specifically corroborating the cloud computing business's anticipated cost, *id.* ¶¶ 192–93, does not, without more, plausibly give rise to the inference that that anticipated business was fictitious. And the SAC's argument that the cloud-computing business was wholly invented because Qihoo's expert could not identify a line item specifying its predicted revenue, *id.* ¶ 194, is equally implausibly pled: The at-issue revenue projections did not delineate between individual revenue streams at all, but only between "traditional" and "emerging" businesses broadly, *id.* ¶ 16, and therefore the absence of the line item at issue cannot be read as the smoking gun the SAC depicts. As to Qihoo's alleged inflation of its building expenditures, Zhou's general comment that Qihoo "did not need a significant amount of additional headcount," *id.* ¶ 205, does not speak to the scale of additional office space that Qihoo did, in fact, require. Nor is an email stating Qihoo would spend $171 million "spread out over" an unspecified "number of years" on office buildings, *id.* ¶ 207, inconsistent with a $300 million estimate over the J.P. Morgan projections' 10-year time frame. Similarly, the SAC's allegations faulting J.P.

---

[15] The SAC does not allege that the market was actionably misled about these statements. The basis for the SAC's section 10(b) claim remains principally—as in the portions of the FAC that have been sustained—that the market was misled about the existence of a relisting plan on the part of the buyers.

Morgan's projections—and, by extension, Qihoo—for failing to account for an internet financing business for which Qihoo had not fundraised, let alone acquired, do not plausibly plead that false data was given to J.P. Morgan as to this business. *Id.* ¶ 212.  The SAC's assertion that the internet financing business was worth $821 million specifically—based on the Dissenters' expert's review of unspecified documents using an equally unspecified methodology—is also too conclusory to hold weight.

It follows that the proposed SAC's allegations that J.P. Morgan valuations were skewed by the alleged falsehoods fed to it are implausibly pled, as is the SAC's assertion that, had J.P. Morgan been given correct information, its valuations would have far exceeded the Merger consideration.  The SAC's reliance on reconstructed, alternative projections for its allegations as to Qihoo's actual value is all the more problematic given J.P. Morgan's qualification that its DCF analysis and projections were not "guarantee[s] of performance" and were, instead, "based on numerous assumptions and estimates."  Final proxy statement at 52.  As defendants note, J.P. Morgan's projections reflected the uncertainty of future business decisions—such as, for example, the value of an unacquired internet finance business.  MTR Opp. at 18.  Such projections are, by nature, speculative, and the "choice put to [the tenderer shareholders] was not between the Merger and the achievement of . . . any set of projections[]."  *Gray v. Wesco Aircraft Holdings, Inc.* ("*Gray I*"), 454 F. Supp. 3d 366, 404–05 (S.D.N.Y. 2020) (same), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) ("*Gray II*"); *id.* at 405 ("As a matter of law, Plaintiff was not entitled to rely on the Initial Management Projections or any set of projections as a promise that Wesco would achieve those results.  They were not guaranteed results.  It follows, as a matter of plain logic, that the difference between the Merger Consideration and the imputed value of

Wesco stock based on the Initial Management Projections is not 'actual damages' to plaintiff on account of the misrepresentation.").

In light of these shortcomings, the SAC's proposed valuation of the company—based on the premise that Qihoo achieved the valuations alleged by the Dissenters in the appraisal action—only speculatively pleads that Qihoo's valuation exceeded the Merger price or J.P. Morgan's valuation. *See* SAC ¶¶ 182–213. The Merger price itself was set considerably above the market's valuation of the company. Before the Merger's announcement, Qihoo traded far below $77/ADS; $77/ADS represented a 32.7% premium on the average closing price of Qihoo's ADS in the 30-day period prior to its receipt of the Merger offer. *Id.* ¶ 288. And the average closing prices in the months before the Merger announcement remained far below $77/ADS, dipping as low as $46.67/ADS. *See Altimeo III*, 2023 WL 2585942, at *20 n.19 (listing average closing prices). The SAC does not offer a coherent factual basis to conclude that, had the relisting plan been disclosed and the Merger then failed to win approval, the United States market would have upwardly revised its valuation of Qihoo dramatically to reflect its alleged true value.

The SAC instead, like the FAC, imagines an "alternate reality" involving a significantly changed market perception that is inherently conjectural. That this vision does not viably plead loss causation is supported by *Gray II.*, which, in affirming *Gray I*, 454 F. Supp. 3d, similarly found loss causation implausibly pled where the complaint did not plausibly allege that the tenderer shareholders "faced a genuine choice between the Merger and the achievement" of the alternative projection alleged. 847 F. App'x at 37. The plaintiffs there alleged that the company's shares were intrinsically worth more than the merger consideration offered, but the Circuit found this claim "too speculative to plead economic loss." *Id.* Given the reality that,

"[b]efore news of a possible merger, the shares were trading [below the merger consideration]," the Circuit stated, "the complaint fails to allege that the [higher] projections were sufficiently likely, or that the shareholders faced a genuine choice" between the Merger and those projections. *Id.* at 37–38. It therefore affirmed the district court's dismissal of the complaint as overly conjectural, *id.*, insofar as it was based on an "alternate reality" in which, following rejection of a merger, "Wesco achieved all of the results that [alternate valuation] projected," *see Gray I*, 454 F. Supp. 3d at 404; *see, e.g., In re GTx, Inc. S'holders Litig.*, No. 19 Civ. 3239 (AT), 2020 WL 3439356, at *5 (S.D.N.Y. June 23, 2020) (no loss causation where "plaintiffs rely on a hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different," and "[t]o permit Plaintiffs to recover on the assumption that had the [c]ompany remained independent, GTx would have achieved a hypothetically higher stock value, would improperly result in the windfall damages prohibited by Second Circuit precedent" (internal quotation marks and alterations omitted)); *see also In re Resolute Energy Corp. Sec. Litig.*, No. 19 Civ. 77 (RGA), 2021 WL 327385, at *2 (D. Del. Feb. 1, 2021) ("virtually impossible to plausibly allege that if the merger had been voted down, Resolute stock would have been trading at over $35 per share" where, "as a factual matter," it was trading at about $30 per share immediately before the merger was announced), *aff'd*, No. 21-1412, 2022 WL 260059 (3d Cir. Jan. 27, 2022).[16]

---

[16] The proposed SAC is speculative in another respect. Even if it had alleged that Qihoo's intrinsic value at the time of the Merger exceeded the Merger consideration, the SAC does not allege a point at which the market would have alerted to that intrinsic value and at which the tenderer shareholders—who had foresworn their appraisal rights, *see supra* note 14—would have realized the difference. Plaintiffs appear to allege, on the one hand, that the tenderer shareholders would have each decided, at an indeterminate future date, to sell their shares at some higher price. In the alternative, plaintiffs claim that no such sale was required, because "[a] share is not merely worth what a future buyer would pay in a hypothetical scenario; it is a

*Loss causation based on prospect of higher price paid by Buyer Group*: As to the theory that the Buyer Group would ultimately have upped the Merger consideration, this theory, like the similar one in the FAC, remains conjectural. Like the FAC, the SAC alleges that the Buyer Group would have been forced to accede to shareholders' demand for a higher price because, with the Merger having failed, the Group stood to lose a significant financial opportunity. But as the Court canvassed in the March 2023 decision, courts have been skeptical of pleadings that imagined different transactions that might have been reached or terms offered, had the truth been revealed. *See Altimeo III*, 2023 WL 2585942, at *21 (collecting cases).[17] Plaintiffs seek to distinguish the SAC from the FAC on the ground that the SAC now alleges that J.P. Morgan was denied information about Qihoo's intrinsic economics, *see id.* (noting absence of such allegations), but that allegation is ill pled for the reasons above, and, in any event, does not make concrete the claim that a still-higher, above-market offer from the Buyers would have resulted from rejection of the Merger. As noted, the special committee did negotiate aggressively with the Buyer Group for superior Merger consideration, but the Buyer Group rejected those demands without exhibiting willingness to increase the price offered. And the special committee was

---

fractional interest in the economic future of the business," MTR Mem. at 16 n.10, but the SAC does not allege the mechanism, other than a sale, by which these shareholders would have secured that gain.

[17] *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42 (D. Del. 2002), on which plaintiffs rely, *see* MTR Mem. at 5, 24–25, is distinguishable. In *Tracinda*, the material misstatements misled shareholders as to the fundamental nature of the transaction. *See Tracinda*, 197 F. Supp. 2d at 58–59. "Plaintiffs exchanged their Chrysler shares in what was purported to be a 'merger of equals,'" but it was "revealed after the transaction . . . that Chrysler had been treated instead as a division of the combined entity," and that, as alleged, this fact was "known beforehand and concealed from the Chrysler shareholders to secure their votes." *Kocourek v. Shrader*, 391 F. Supp. 3d 308, 333 (S.D.N.Y. 2019) (distinguishing *Tracinda* on this ground). Here, the SAC does not allege that the Merger was other than as described: a going-private transaction. It claims only that the $77/ADS offer was too low.

unable to attract an alternative bidder at a competitive price. *Id.* The proposed SAC thus does

not plead facts from which to infer, non-speculatively, that the tenderer shareholders "faced a

genuine choice between the Merger and the achievement of" a higher merger consideration via

the Buyer Group. *Gray II*, 847 F. App'x at 37 (internal quotation marks omitted); *compare*

*Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 299 (D. Conn. 2021) (loss causation

adequately pled where complaint alleged that defendant issuer had received an offer for its shares

that was higher than the one ultimately received), *with Kuebler v. Vectren Corp.*, 13 F.4th 631,

647 (7th Cir. 2021) (no economic loss pled where, *inter alia*, "plaintiffs do not even allege the

existence of a viable superior offer"), *and Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d

977, 1000 (S.D. Ind. 2018) (no loss causation where complaint did not allege a "definite,

immediately available, superior alternative to the Merger consideration" such as a "higher

competing offer").[18]

    Accordingly, the SAC does not plead loss causation as to the tenderer shareholders. The

Court therefore denies the motion for reconsideration of the denial of leave to amend, because

---

[18] *Erickson v. Jernigan Capital, Inc.*, No. 20 Civ. 9575 (MKV), 2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022), *see* MTR Mem. at 16, 20–21, is inapposite. Plaintiffs there alleged that they had approved the going-private transaction at an unfairly low price based on defendants' misleading representation in proxy materials that "the principal reason for the proposed acquisition . . . at the proposed price was 'the limited interest other [companies] operating in the self-storage sector would likely have in acquiring [defendants'] portfolio." *Erickson*, 2022 WL 3028627, at *1. After the transaction had closed, defendants disclosed that a leading self-storage company, Extra Space, had funded a third of it, in exchange for defendants' portfolio and a seat on the board of the surviving company. *Id.* In their lawsuit under section 14(a) of the Securities Act, plaintiffs alleged that the proxy materials were misleading in claiming limited interest by others in the company's portfolio, and that, had the truth been disclosed, they would have voted differently. *Id.* at *4. *Erickson* is distinct on multiple grounds, including, as relevant here, that the undisclosed facts directly spoke to the likelihood of an alternative transaction. *See id.* (distinguishing *Gray II*, because "there, the plaintiff's own allegations about 'what potential buyers in fact offered'" contradicted his allegations that he could have received more for them).

the proposed amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).[19]

## III.    Motion for Certification of an Interlocutory Appeal

Plaintiffs alternatively seek certification of an interlocutory appeal as to whether the tenderer shareholders adequately alleged economic loss and loss causation. MTR Mem. at 12–25. They depict the Court's dismissal of the tenderer shareholders' claims in the FAC and SAC, and a denial of leave to amend via the FAC, as raising the broad question of whether a plaintiff "must plead a 'superior alternative transaction' or specific counterfactual scenarios to support loss causation." *Id.* at 14; *see id.* at 13–14. Defendants counter that the Court's findings here of inadequate pleadings as to loss causation turn on a case-specific factual allegations, do not implicate a controlling question of law, and were clearly correct under governing precedent, and that an appeal would delay resolution of this lawsuit, in which the selling shareholders' claims are poised to move forward to discovery. MTR Opp. at 18–24. Defendants are correct.

### A.    Applicable Legal Standards

28 U.S.C. § 1292(b) provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and

---

[19] Plaintiffs note that leave to amend may be granted after denial of a motion to dismiss, but such leave may be—and frequently is—denied where the proposed amendment would be futile. *See Loreley*, 797 F.3d at 190 ("Our opinion today . . . leaves unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay . . . and futility—none of which were a basis for the denial here."); *see, e.g., Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (TPG), 2017 WL 4082306, at *4 (S.D.N.Y. Sept. 13, 2017) (denying motion for reconsideration of denial of leave to amend as futile, as to Item 303 claim); *Singh v. Schikan*, No. 14 Civ. 5450 (NRB), 2015 WL 4111344, at *3 (S.D.N.Y. June 25, 2015) (same: "Even were we inclined to grant plaintiffs' request, such a request would nevertheless be denied as futile."); *cf. In re Refco Cap. Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2008 WL 4962985, at *5 (S.D.N.Y. Nov. 20, 2008) (granting motion for reconsideration and permitting amendment, and simultaneously denying amended complaint as futile), *aff'd sub nom. Cap. Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012).

that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.  The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b) (emphasis in original).

Section 1292(b) "permits a district court, in its discretion, to certify an interlocutory appeal where the decision at issue (1) involves a controlling question of law (2) as to which there is substantial ground for a difference of opinion and (3) as to which an immediate appeal may materially advance the ultimate termination of the litigation." *See Capri Sun GmbH v. Am. Beverage Corp.*, No. 19 Civ. 1422 (PAE) (VF), 2022 WL 3137131, at *3 (S.D.N.Y. Aug. 5, 2022); *Chavez v. Occidental Chem. Corp.*, 300 F. Supp. 3d 517, 537 (S.D.N.Y. 2018) (citing *Mejia v. Time Warner Cable Inc.*, No. 15 Civ. 6445 (JPO), 2017 WL 5513638, at *2 (S.D.N.Y. Nov. 17, 2017); and *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 46–47 (1995)), *vacated and remanded on other grounds*, 8 F.4th 91 (2d Cir. 2021)).  "The movant bears the burden of demonstrating that all three of the substantive criteria are met." *Dill v. JPMorgan Chase Bank, N.A.*, No. 19 Civ. 10947 (KPF), 2021 WL 3406192, at *3 (S.D.N.Y. Aug. 4, 2021); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 73 F. Supp. 3d 382, 393 (S.D.N.Y. 2014) (citations omitted).  Where a movant fails to satisfy any one of the three statutory criteria, the court may not certify the appeal. *See Dill*, 2021 WL 3406192, at *7; *Ferring B.V. v. Allergan, Inc.*, 343 F. Supp. 3d 284, 288 (S.D.N.Y. 2018) ("A District Court must carefully evaluate the statutory criteria to determine whether all three exist."); *S.E.C. v. Straub*, No. 11 Civ. 9645 (RJS), 2013 WL 4399042, at *2 (S.D.N.Y. Aug. 5, 2013) ("These three criteria are conjunctive, not

disjunctive, and courts may only certify an interlocutory appeal where all three are satisfied." (internal quotation marks omitted)).

Certification is "strongly disfavored," *Adar Bays, LLC v. Aim Expl., Inc.*, 310 F. Supp. 3d 454, 456 (S.D.N.Y. 2018), and reserved for "exceptional circumstances," *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990). Even when the elements of section 1292(b) are satisfied, the "district court retain[s] unfettered discretion to deny certification." *Dill*, 2021 WL 3406192, at *4; *see, e.g., In re Barrick Gold Sec. Litig.*, No. 13 Civ. 3851 (SAS), 2015 WL 3486045, at *3 (S.D.N.Y. June 2, 2015) (same) (citation omitted), *abrogated on other grounds*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017).

Ultimately, "[t]he institutional efficiency of the federal court system is among the chief concerns underlying Section 1292(b). The efficiency of both the district court and the appellate court are to be considered, and the benefit to the district court of avoiding unnecessary trial must be weighed against the inefficiency of having the Court of Appeals hear multiple appeals in the same case." *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 226–27 (S.D.N.Y. 2000) (citing *Forsyth v. Kleindienst*, 599 F.2d 1203 (3d Cir. 1979), *cert. denied*, 453 U.S. 913 (1981); and *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 631 (2d Cir. 1991)).

**B.      Discussion**

Plaintiffs argue that the first and third requirements of § 1292(b)—a controlling question of law as to which an immediate appeal would materially advance the litigation—are "closely connected." MTR Mem. at 25. The Court, accordingly, considers these together. *See Capri Sun GmbH*, 2022 WL 3137131, at *3–4; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 393 (S.D.N.Y. 2019); *Credit Bancorp, Ltd.*, 103 F. Supp. 2d at 227.

Contrary to plaintiffs' characterization, this case does not present a pure question of law, let alone a controlling one. It presents instead an application of law to the unique set of facts pled in the FAC and, now, in the similar proposed SAC. It is thus a weak candidate for certification. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 Civ. 6561 (LGS), 2023 WL 395225, at *3 (S.D.N.Y. Jan. 25, 2023) ("Disputes concerning the application of the law to the specific facts of a case typically are not appropriate for an interlocutory appeal."); *In re: Barnett*, No. 16 Civ. 436 (NSR), 2016 WL 3944482, at *3 (S.D.N.Y. July 18, 2016) ("[U]sing § 1292(b) to resolve questions concerning the application of law to facts is problematic for the termination of a litigation, as such questions 'are generally not suitable for certification under § 1292(b).'"); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (collecting cases) ("[Q]uestions regarding application of the appropriate law to the relevant facts are generally not suitable for certification under § 1292(b).").

The Court's findings that loss causation and economic loss were inadequately pled turned on the specific allegations of the FAC and SAC—lengthy pleadings that incorporated extensive exhibits. As the discussions in the March 2023 and today's decisions reflect, these turned on the fact-bound determinations that the pleadings did not plausibly allege (1) that Qihoo's intrinsic value exceeded the Merger price at the time of the Merger; and (2) a mechanism—other than the appraisal process, which plaintiffs have chosen to eschew—by which plaintiffs could have secured that price, including by virtue of a superior offer from the Buyers or via market appreciation. On neither point has the Court held it conceptually impossible for a person in plaintiffs' position—a tenderer shareholder challenging a Merger based on actionable proxy statements preceding the Merger vote—to recover. The Court's determination instead has been that the facts pled here do not permit a viable claim. Plaintiffs' depiction of the Court's

dismissal of the FAC (or, by extension, proposed SAC) as connoting that no plaintiff alleging an intrinsic value above a merger price could state a claim, *see* MTR Mem. at 3, mischaracterizes the Court's pleadings-based analysis.

In these circumstances, this case does not present a question worthy of certification. For certification, "the legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law." *In re: Barnett*, 2016 WL 3944482, at *2; *see also S.E.C. v. Gruss*, No. 11 Civ. 2420 (RWS), 2012 WL 3306166, at *2 (S.D.N.Y. Aug. 13, 2012) ("'[Q]uestion of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and clearly without having to study the record." (internal quotation marks omitted)); *Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647, 652 (S.D.N.Y. 2022) (denying certification on challenge to court's assessment of sufficiency of allegations: "[A]n issue is not a legal one just because [a party] says it is."); *cf. In re: Barnett*, 2016 WL 3944482, at *3 ("[A] litigant who is dissatisfied with a court ruling, may not utilize § 1292(b) as a means for securing early resolution of disputes concerning whether the [court] properly applied the law to the facts."); *In re Winstar Commc'ns*, No. 01 Civ. 3014 (GBD), 2006 WL 1559251, at *2 (S.D.N.Y. June 7, 2006) (same); *cf. Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187 (2d Cir. 2001) ("While loss causation is easily defined, its application to particular facts has often been challenging.").

Nor would an immediate appeal materially advance the ultimate termination of the litigation. "[A]s to the third requirement, the use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation." *Capri Sun GmbH*, 2022 WL 3137131, at *3 (internal quotation marks omitted). But this case is at an early stage—discovery has not

begun. A reversal by the Second Circuit, restoring the tenderer shareholders' claims, so to be litigated alongside those of the seller shareholders, would not hasten that litigation. To the contrary, given the likelihood of an affirmance, an interlocutory appeal would materially delay the forward progress of the claims of the seller shareholders, as it does not make good sense to commence discovery as to such plaintiffs while the tenderer shareholders' appeal pends. Given the likely duration of such appeal, the process would likely delay the start of discovery as to the seller shareholders by a year or more. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d at 531–35 (denying certification where appeal would not advance ultimate termination of litigation); *Sussman v. I.C. Sys., Inc.*, No. 12 Civ. 0181 (ER), 2013 WL 5863664, at *3 (S.D.N.Y. Oct. 30, 2013) (same, where case would still proceed as to remaining claims); *cf. In re S. Afr. Apartheid Litig.*, 624 F. Supp. 2d 336, 342 (S.D.N.Y. 2009) (same, noting time-sensitive nature of discovery in action that had been pending for seven years as to event that had occurred 20 years prior). If anything, certifying appeal would slow the instant litigation, and introduce uncertainty as to its progress as to the seller shareholders. Under these circumstances, efficiencies do not favor the certification of an interlocutory appeal. *See Credit Bancorp, Ltd.*, 103 F. Supp. 2d at 226; *see, e.g., Capri Sun GmbH*, 2022 WL 3137131, at *6 (denying motion for interlocutory appeal where efficiencies did not favor it).[20]

---

[20] Although not necessary for this decision, the third § 1292(b) factor also disfavors certification. Plaintiffs have not identified a substantial ground for difference of opinion over a question of law. "A substantial ground for difference of opinion exists when (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Capri Sun GmbH*, 2022 WL 3137131, at *7 (internal quotation marks omitted). Here, as noted, the Court's decisions have not turned on a controlling question of law, but instead on fact-bound applications of law. Plaintiffs have not identified case authority showing those determinations to be faulty.

41

Accordingly, the Court declines to certify appeal under § 1292(b). *See, e.g., Capri Sun GmbH*, 2022 WL 3137131, at *8; *Hermès Int'l*, 590 F. Supp. 3d at 652 (denying certification where assessment of pleadings involved an application of law to alleged facts); *Dill*, 2021 WL 3406192, at *7 (denying certification where no controlling question of law presented); *In re Barnett*, 2016 WL 3944482, at *3 (denying certification where no controlling legal issue raised, but merely disagreement with application of law to facts); *see also id.* at *1 (even where elements of § 1292(b) are met, district court has broad discretion to deny certification); *In re Barrick Gold Sec. Litig.*, 2015 WL 3486045, at *3 (same).

## CONCLUSION

For the foregoing reasons, the Court denies the motion for reconsideration or, in the alternative, certification of an interlocutory appeal. The Clerk of Court is respectfully directed to terminate the motion pending at docket 149.

This case will now proceed to discovery as to plaintiffs' claims on behalf of the seller shareholders, on the misstatements and omissions found viable. The Court schedules an in-person case management conference on July 6, 2023 at 3 p.m. in Courtroom 1305 at the Thurgood Marshall U.S. Courthouse, 40 Centre Street, New York, New York 10007. All conferences with the Court are scheduled for a specific time; there is no other matter scheduled for that time, and counsel are directed to appear promptly. All pretrial conferences must be attended by the attorney who will serve as principal trial counsel.

The Court directs the parties to file by July 5, 2023 at noon revised versions of: (1) the joint letter outlining a proposed agenda for the conference, (2) the joint proposed case management plan for discovery, and (3) the proposed briefing schedule for class certification. The Court also directs the parties to email to EngelmayerNYSDChambers@nysd.uscourts.gov,

no later than 24 hours before the conference, the names of any counsel who wish to enter an appearance at the conference with the names of lead counsel designated with an asterisk.

    SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated:  June 29, 2023
       New York, New York