**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT and ODS CAPITAL LLC, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI, and ERIC X. CHEN, <br><br> Defendants. | Case No. 19 Civ. 10067 (PAE) <br><br> **JURY TRIAL DEMANDED** |

### DEFENDANT HONGYI ZHOU'S ANSWER AND AFFIRMATIVE DEFENSES TO FIRST AMENDED CLASS ACTION COMPLAINT

LATHAM & WATKINS LLP
Eric F. Leon
Jason C. Hegt
Hanyu (Iris) Xie
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for Defendants Hongyi Zhou, Eric X. Chen, and Qihoo 360 Technology Co. Ltd.*

Defendant Hongyi Zhou ("Mr. Zhou"), by his attorneys, hereby responds to Lead Plaintiffs' First Amended Complaint ("FAC"), dated August 30, 2019.

## PRELIMINARY STATEMENT

Mr. Zhou contends that this lawsuit—including each and every claim asserted against him herein—is entirely without merit and that all of his actions were proper and complied with applicable law.

On March 21, 2023, the Court granted in part and denied in part Mr. Zhou's motion to dismiss the FAC ("MTD Order") (ECF No. 145). Specifically, the Court dismissed with prejudice all claims held by the Tenderer Shareholders (as defined therein) against all Defendants; dismissed § 20A insider trading claims against Qihoo 360 Technology Co. Ltd. ("Qihoo" or the "Company"), Mr. Zhou, and Xiangdong Qi ("Mr. Qi") (Count II); and dismissed § 10(b) misstatement/omission claims predicated on the Company's alleged misrepresentations regarding strategic alternatives to the Merger (Count I; FAC ¶ 159(b)). The only remaining claims in this action are claims held by the Seller Shareholders (as defined therein), including three categories of misstatement/omission claims against all Defendants regarding Qihoo's plan to relist, fairness of the Merger, and reasons for the Merger (Count I; FAC ¶¶ 159(a), (c)-(d)), as well as a control person claim (Count III). With respect to these remaining claims, the Court held that the Seller Shareholders may, *at most*, recover the difference between the price at which they sold their shares and the $77/ADS Merger consideration. On June 29, 2023, the Court affirmed the MTD Order (ECF No. 164). Mr. Zhou denies that Plaintiffs are entitled to any relief for their remaining claims.

This Answer is made as of the date it is signed. Mr. Zhou denies each and every allegation in the FAC, except as specifically herein admitted, and any factual averment admitted herein is admitted only to the specific fact alleged. Moreover, except to the extent expressly admitted

herein, Mr. Zhou specifically denies any allegations contained in the footnotes, the Table of Contents, the section headings and subheadings, or other portions of the FAC that are not contained within the specifically numbered paragraphs. With respect to any purported document cited to or quoted in the FAC, Mr. Zhou does not admit that the documents are relevant or admissible, and reserves all objections as to relevance and admissibility. Mr. Zhou reserves the right to change, supplement, and amend his Answer if and when new information is revealed to him.

Finally, Mr. Zhou herein answers all of the allegations that are potentially remaining in this lawsuit without conceding that that is the case. To the extent Mr. Zhou responds to any allegation, such response does not constitute any admission that the allegation is relevant to the remaining claims.

*    *    *    *    *

**INTRODUCTION:** Lead Plaintiffs Altimeo Asset Management ("Altimeo") and ODS Capital LLC ("ODS," and, collectively, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through Lead Plaintiffs' undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, (a) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (b) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Qihoo 360 Technology Co. Ltd. ("Qihoo" or the "Company"); (c) analysts' reports and advisories about the Company; (d) consultation with an expert in Chinese and United States M&A and capital markets transactions; (e) statements made by confidential witnesses; and (f) information readily obtainable on the Internet. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

**ANSWER:**

Mr. Zhou denies that the preliminary statement requires a response. To the extent a response is required, Mr. Zhou denies any allegations that Plaintiffs contend are embedded or implied by the preliminary statement.

## I.    SUMMARY OF THE ACTION

1.    This action arises out of Defendants' scheme to depress the price of Qihoo American depositary shares ("ADS") and stock (together, "Qihoo Securities") in order to avoid paying a fair price to Qihoo Securityholders during a transaction to take the Company private in 2016 (the "Merger"). Defendants executed this scheme by publishing false and misleading statements about the Company in connection with the Merger.

**ANSWER:**

Mr. Zhou admits that the Merger occurred in 2016 and resulted in the Company becoming a private entity. Paragraph 1 otherwise alleges legal conclusions, to which no response is required.

2.    Qihoo describes itself as one of the leading internet companies in China. Defendants told the market that Qihoo had no plans at the time of the Merger to relist the Company on any other stock exchange after the Merger and that they conducted the Merger because they wanted to run Qihoo as a private company. That was demonstrably false because the group of investors that bought Qihoo in the Merger—led by Defendant Zhou—planned all along to relist Qihoo on the Chinese stock market following the Merger at a much higher value than what they paid to Qihoo Securityholders in the Merger.

**ANSWER:**

Mr. Zhou admits that Qihoo describes itself as one of the leading internet companies in China. The remaining allegations in Paragraph 2 appear to refer to statements allegedly made in connection with the Merger, but do not reference any specific statements. Mr. Zhou admits that public statements were made regarding Qihoo's business plan prior to, and in connection with, the Merger, but denies that Paragraph 2 provides a complete and accurate recitation of the relevant statements. Mr. Zhou refers to those statements for a complete and accurate recitation of their contents. Mr. Zhou also states that the statements referenced in Paragraph 2 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou otherwise denies the allegations in Paragraph 2.

3.    On June 17, 2015, Qihoo announced that it received a preliminary offer from a group led by Defendant Zhou to acquire the Company at a price of $77 per ADS or $51.33 per ordinary share. On December 18, 2015—the first day of the Class Period—Qihoo announced that the Company's Board of Directors, acting upon the recommendation of the Special Committee that the Board formed to evaluate the Merger, approved of the proposed transaction and entered

- 3 -

into a definitive merger agreement.  The Merger was expected to close in the first half of 2016, subject to shareholder approval.  Qihoo would be acquired in an all-cash transaction that valued the Company at approximately $9.3 billion.

**ANSWER:**

Mr. Zhou admits that on June 17, 2015 and on December 18, 2015 respectively, Qihoo issued announcements containing some of the information referenced in Paragraph 3, but denies that the paraphrased language in Paragraph 3 is a complete and accurate recitation of the relevant statements made in those documents.  Mr. Zhou denies the remaining allegations in Paragraph 3 and incorporates by reference the full contents of the June 17, 2015 and the December 18, 2015 announcements as if attached hereto.

4.      Between January 11, 2016 and March 3, 2016, Defendants published the Proxy Materials that formed the basis for its shareholders to decide how to vote on the Merger.  On March 30, 2016, Qihoo announced that the Merger passed the shareholder vote that was held that day. The Merger proceeded to close on July 15, 2016, at which point Qihoo became a privately held company and its ADS were no longer publicly traded on the New York Stock Exchange.

**ANSWER:**

Mr. Zhou admits that between January 11, 2016 and March 3, 2016, Qihoo published the Proxy Materials with the Securities and Exchange Commission (the "SEC"), that on March 30, 2016, Qihoo issued an announcement that the Merger passed the shareholder vote that was held that day, that the Merger proceeded to close on July 15, 2016, that Qihoo became a privately held company as a result of the Merger, and that Qihoo's ADS were no longer publicly traded on the New York Stock Exchange ("NYSE").  Mr. Zhou denies the remaining allegations in Paragraph 4 and incorporates by reference the full contents of the Proxy Materials and the March 30, 2016 announcement as if attached hereto.

5.      Defendants authorized the filing with the SEC of materially false and misleading statements in the Proxy Materials in order to convince Qihoo Securityholders to vote in favor of the Merger.  Contrary to the Defendants' repeated reassurances about no substantial changes to Qihoo's structure following the Merger, several news reports have revealed that the Buyer Group that took Qihoo private in the Merger planned all along to relist the Company in China after the

Merger for multiple times what they paid to Qihoo Securityholders in the Merger. Indeed, this plan was an essential condition for investors to be willing to buy Qihoo in the Merger.

**ANSWER:**

Mr. Zhou admits that between January 11, 2016 and March 3, 2016, Qihoo published the Proxy Materials with the SEC containing some of the information referenced in Paragraph 5, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in those documents. Mr. Zhou also states that the paraphrased language in Paragraph 5 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials, and incorporates by reference the full contents of the Proxy Materials as if attached hereto. To the extent Paragraph 5 refers to news reports that Mr. Zhou did not author, those reports speak for themselves. Mr. Zhou refers to those reports for a complete and accurate statement of their contents, without conceding the accuracy of those reports. Other allegations in Paragraph 5 allege legal conclusions, to which no response is required. Mr. Zhou otherwise denies all remaining allegations in Paragraph 5.

6.       For example, the *Financial Times* reported on February 28, 2017 that materials used in fundraising for Qihoo's privatization in the Merger discussed the Company's subsequent return to the Chinese stock market. This article stated that the financial return that investors in the Buyer Group would receive upon an "exit" (i.e., a transaction allowing those investors to "exit" their position through a relisting) "may be as high as 5 [times]" the going-private price.

**ANSWER:**

Paragraph 6 purports to quote an article from the *Financial Times* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 6.

7.       This *Financial Times* article also disclosed that although the private marketing materials for investors participating in the Buyer Group "contain[ed] ambitious estimates of future net income and other performance metrics going out to 2019," Qihoo and its advisers told Qihoo

Securityholders that were being asked to sell their shares in the Merger "that the company's prospects were not nearly that bright."

**ANSWER:**

Paragraph 7 purports to quote an article from the *Financial Times* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 7.

8.      Defendant Zhou's statements to the Chinese media after the Merger confirm that he and the Buyer Group sought to capitalize after the Merger on Qihoo's increased business prospects that they did not disclose in the Proxy Materials to Qihoo Securityholders. Zhou had been told several years prior by senior Chinese government officials that Qihoo's internet security business provided important services related to Chinese national security interests that could not be fully realized when Qihoo had the foreign status of being listed in the United States. In addition, taking Qihoo private and returning the Company to China was part of Zhou's plan to capitalize on his "big security" vision for the Company. Zhou also described other previously undisclosed plans for the Company to Chinese media following the Merger, such as breaking the Company up into separate entities focused on its different business lines.

**ANSWER:**

Paragraph 8 purports to refer to Mr. Zhou's "statements to the Chinese media," but does not reference any specific statements. Mr. Zhou admits that he made certain statements to the Chinese media after the Merger, but denies that Paragraph 8 provides a complete and accurate translation of the relevant statements. Mr. Zhou refers to the news reports for a complete and accurate recitation of their contents, without conceding the accuracy of the contents reported. Mr. Zhou denies the remaining allegations in Paragraph 8.

9.      Defendants failed to disclose to Qihoo Securityholders the Company's lucrative business prospects that would be available after it returned to China. In addition, when Defendants were forced to provide more information on the reasons for the Merger because the SEC criticized Qihoo's Preliminary Proxy Materials for failing to give an adequate explanation of the reasons for the Merger, Defendants affirmatively misrepresented Qihoo's business prospects. Defendants responded to the SEC's comments by describing a business plan that failed to mention Zhou's strategy for Qihoo's security business in China and cautioned that Qihoo faced hurdles from an "economic slowdown" and increased government regulation in China. These faulty assumptions,

in turn, formed the basis for the key financial projections that Qihoo gave to J.P. Morgan for it to use in its valuation analysis for the Merger.

**ANSWER:**

Mr. Zhou admits that Defendants communicated with the SEC in relation to the Preliminary Proxy Materials containing some of the information referenced in Paragraph 9, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in those communications. Mr. Zhou also states that the paraphrased language in Paragraph 9 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials, and incorporates by reference the full contents of the Proxy Materials and Defendants' communications with the SEC as if attached hereto. The remaining allegations in Paragraph 9 allege legal conclusions, to which no response is required.

10. Other evidence also confirms Defendants' intent to defraud Qihoo's Securityholders by underpaying them for the Company in the Merger. A confidential witness that worked in Qihoo's Public Relations department explained that Qihoo's employees knew since mid-2015 that Qihoo would be relisted on the Chinese stock market following the Merger. This witness specifically recalled a department meeting from that time period at which Defendant Qi expressly warned employees to keep that information secret because the Company did not want it to become public.

**ANSWER:**

The first sentence in Paragraph 10 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegation. Mr. Zhou is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 10 and on that basis denies the allegations.

11. In addition, information has come out in an appraisal action in the Cayman Islands that involves the few Qihoo shareholders that dissented from the Merger in order to obtain fair value for their shares. At every turn, Qihoo has obstructed those shareholders' efforts to obtain essential information from the Merger process. Qihoo has gone so far as to take positions that the Cayman Islands court described as downright "odd," such as claiming that Defendant Zhou—who founded one of the largest internet companies in China—does not use a computer. Qihoo also took several inconsistent positions in the appraisal action, claiming that basic financial documents

did not exist until it inexplicably found them after the dissenting shareholders brought the issue to the court's attention.

**ANSWER:**

Paragraph 11 purports to characterize certain record in the Cayman Islands Appraisal Action, the record of which speaks for itself.  Mr. Zhou refers to that record for a complete and accurate statement of its contents.  Mr. Zhou denies the remaining allegations in Paragraph 11.

12.    Qihoo's relisting in the Chinese stock market following the Merger operated as a "backdoor listing" whereby Qihoo, in its surviving form after the Merger, combined with a shell company that was already listed on the Shanghai stock exchange.  This allowed Qihoo to return to the Chinese stock market at a value that was multiple times the Merger price, to the detriment of Qihoo Securityholders, who unknowingly sold their Qihoo Securities during the Class Period at substantially deflated values.

**ANSWER:**

Mr. Zhou denies the allegations in Paragraph 12.

13.    Qihoo included only its core business in its backdoor listing, leaving its other businesses as separate entities.  Even so, just that portion of Qihoo's assets was valued at over $60 billion immediately upon Qihoo's relisting in China.  The investors that bought Qihoo in the Merger—led by Defendants Zhou and Qi—therefore gained tens of billions of dollars in value by convincing Qihoo Securityholders to vote in favor of selling their stock and ADS at a substantially deflated price in the Merger.  As *Bloomberg* reported on February 28, 2018, Qihoo's backdoor listing on the Chinese stock market increased Defendant Zhou's net worth from $2 billion to $13.6 billion, making him the 12th-richest person in China.

**ANSWER:**

Paragraph 13 purports to quote an article from *Bloomberg* that Mr. Zhou did not author and which speaks for itself.  Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining allegations in Paragraph 13.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

**ANSWER:**

Paragraph 14 alleges legal conclusions, to which no response is required.

15.      This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  Defendants engaged in a scheme that violated United States securities law.  In doing so, Defendants engaged in conduct that was directed toward the United States.  Qihoo registered its ADS with the SEC pursuant to Section 12(b) of the Exchange Act and these securities traded on the New York Stock Exchange ("NYSE").  The Bank of New York Mellon, whose corporate headquarters and trust office from which the ADS program is administered, is located in New York, New York, served as the ADS Depositary for Qihoo's ADS.

**ANSWER:**

Paragraph 15 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 15.

16.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

**ANSWER:**

Paragraph 16 alleges legal conclusions, to which no response is required.

17.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

**ANSWER:**

Paragraph 17 alleges legal conclusions, to which no response is required.

## III.    PARTIES AND OTHER KEY ACTORS

### A.  Lead Plaintiffs

18.      Altimeo is an independent portfolio management company based in France and approved by the French Financial Authority, with significant assets under management.  Altimeo manages investment assets through separate funds and is authorized to bring legal action on their behalves.  Prior to seeking appointment as Lead Plaintiff, Altimeo obtained valid assignments of the claims of the fund Altimeo Optimum.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 18 and on that basis denies the allegations.

19.    Altimeo, through Altimeo Optimum, purchased 140,261 Qihoo securities (including ADS on the NYSE) during the Class Period and sold 79,613 Qihoo securities (including ADS on the NYSE) during that time.  After accounting for Qihoo securities that Altimeo held prior to the start of the Class Period, it retained 61,500 Qihoo securities (including ADS) through the Merger.  These 61,500 securities have now been paid in exchange for the Merger consideration.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 19 and on that basis denies the allegations.

20.    Lead Plaintiff ODS Capital LLC is a Florida limited liability company with its primary office and business address in Jupiter, Florida.  ODS purchased a total of 86,300 ADS on the NYSE during the Class Period, sold at least 11,800 ADS during the Class Period, and retained 74,500 ADS through the Merger.  These 74,500 ADS have now been paid in exchange for the Merger consideration.  ODS's transactions in Qihoo's ADS were completed through a New York-based brokerage.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 20 and on that basis denies the allegations.

**B.  Defendants**

21.    Defendant Qihoo is incorporated under the laws of the Cayman Islands, with its principal executive offices located at Building 2, 6 Haoyuan, Jiuxianqiao Road, Chaoyang District, Beijing, People's Republic of China, 100015.  Prior to the Merger, Qihoo's common stock was not registered with the SEC.  Rather, Qihoo registered ADS that were listed and traded on the NYSE under the ticker symbol "QIHU."  The only public market for Qihoo Securities was for the Company's NYSE-listed ADS.  Each ADS was redeemable for 1.5 of Qihoo's Class A ordinary shares. The Bank of New York Mellon, located at 101 Barclay Street, New York, NY 10286, served as the ADS Depositary for Qihoo's ADS[.]

**ANSWER:**

Mr. Zhou denies that the only public market for Qihoo Securities was for the Company's

NYSE-listed ADS.  Mr. Zhou admits the remaining allegations in Paragraph 21.

22.     Defendant Hongyi Zhou ("Zhou") is Qihoo's Co-Founder and served as its Chairman and Chief Executive Officer from August 2006 through the Merger.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 22.

23.     Defendant Xiangdong Qi ("Qi") is Qihoo's other Co-Founder and served as its President and a Director since the Company's inception in 2005 through the Merger.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 23.

24.     Defendant Eric X. Chen ("Chen") served as a Qihoo Director from January 2014 through the Merger.  Chen was Chairman of the Special Committee that the Company appointed to evaluate the Merger.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 24.

25.     Qihoo 360 and the Individual Defendants are collectively referred to herein as "Defendants."

**ANSWER:**

Paragraph 25 sets forth a defined term, to which no response is required.

**C.  The Special Committee**

26.     On June 19, 2015, Qihoo's Board of Directors formed a special committee that consisted of directors that the Company described as "independent" to advise the Board about the Merger, which was a potential going-private transaction (the "Special Committee").  The Special Committee consisted of three members:  Defendant Chen, who served as its Chairman, and Dr. Ming Huang and Dr. Jianwen Liao.

**ANSWER:**

Mr. Zhou admits that on June 19, 2015, Qihoo's Board of Directors formed a special committee to consider the Merger (the "Special Committee") and that the Special Committee consisted of three members:  Defendant Chen, who served as its Chairman, Dr. Ming Huang, and Dr. Jianwen Liao.  Mr. Zhou denies the remaining allegations in Paragraph 26.

- 11 -

27.     The Special Committee was instructed to "to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group in connection with the proposed" Merger.  The Board did not place any limitations on the Special Committee's ability to investigate and assess the Merger.

**ANSWER:**

Paragraph 27 appears to contain quoted phrases from Qihoo's Proxy Materials.  Mr. Zhou denies that these phrases are a complete and accurate recitation of the relevant statements made in those documents and refers to those documents for a complete and accurate statement of their contents.  Mr. Zhou denies the remaining allegations in Paragraph 27 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

### D.  The Buyer Group

28.     The group that purchased Qihoo in the Merger included investors known as the "Parent Parties," the "Founder Securityholders," and 36 "Equity Investors" that are listed in Exhibit B to the Merger Agreement.  These parties together are referred to as the "Buyer Group."

**ANSWER:**

Paragraph 28 purports to characterize information from the Merger Agreement.  Mr. Zhou denies that the paraphrased language in Paragraph 28 is a complete and accurate recitation of the relevant statements made in that document and refers to the Merger Agreement for a complete and accurate statement of its contents.  Mr. Zhou denies the remaining allegations in Paragraph 28 and incorporates by reference the full contents of the Merger Agreement as if attached hereto.

29.     The Parent Parties included Tianjin Qixin Zhicheng Technology Co., Ltd. (a limited liability company incorporated under the laws of the PRC, also called "Holdco"), Tianjin Qixin Tongda Technology Co., Ltd. (a limited liability company incorporated under the laws of the PRC ("Parent")), True Thrive Limited (an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Midco")), and New Summit Limited (an exempted company incorporated with limited liability under the laws of the Cayman Islands).

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 29.

30.     Global Village Associates Limited and Young Vision Group Limited (collectively, the "Founder Securityholders"), both British Virgin Islands companies, agreed in the Merger Agreement that they would vote their Qihoo Securities in favor of the Merger. The Founder Securityholders were holding vehicles for the Qihoo shares that Defendants Zhou (Global Village) and Qi (Young Vision) owned. Prior to the Merger, Global Village held 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares and Young Vision held 4,904,709 Class B ordinary shares in the Company.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 30.

31.     In the course of the Merger, Qihoo would continue as the surviving company and become a wholly owned subsidiary of Midco.  Upon the completion of the Merger, the surviving Company would become a private company beneficially owned solely by the Buyer Group.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 31.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A. Overview of Qihoo's Business**

32.     Qihoo was incorporated in the Cayman Islands on June 9, 2005 and continues to be registered there.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 32.

33.     On March 30, 2011, Qihoo listed its ADS on the New York Stock Exchange under the ticker "QIHU."  On April 4, 2011, the Company completed its initial public offering of 13,927,420 ADS.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 33.

34.     Qihoo describes itself as "a leading Internet company in China" that, as of December 2015, was:

- the No. 1 PC Internet security product provider in China, with 523 million monthly active users, representing a user penetration rate of 98%, according to iResearch;

- the No. 1 mobile security product provider in China, with over 868 million smartphone users;

- the No. 1 PC browser provider in China in terms of time spent usage, with 411 million monthly active users, representing a user penetration rate of 77.1%, according to iResearch; and

- the No. 1 Android mobile app store operator in China, with over 750 million smartphone users.

**ANSWER:**

The allegations in Paragraph 34 appear to refer to statements from Qihoo's 2016 Form 20-F.  Mr. Zhou admits that Qihoo's 2016 Form 20-F contains the phrases quoted and some of the information referenced in Paragraph 34, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou denies the remaining allegations in Paragraph 34 and incorporates by reference the full contents of Qihoo's 2016 Form 20-F as if attached hereto.

35.     Qihoo's core products include 360 Safe Guard and 360 Anti-Virus, Internet security products in China, and 360 Mobile Safe, a mobile security product in China.

**ANSWER:**

The allegations in Paragraph 35 appear to refer to statements from Qihoo's 2016 Form 20-F.  Mr. Zhou admits that Qihoo's 2016 Form 20-F contains some of the information referenced in Paragraph 35, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou denies the remaining allegations in Paragraph 35 and incorporates by reference the full contents of Qihoo's 2016 Form 20-F as if attached hereto.

36.     Qihoo also offers PC and mobile internet browsers; the 360 Personal Start-up Page (which is the default homepage of Qihoo's browsers and an access point to popular Internet services and applications); 360 Search (Qihoo's proprietary search engine and the default search engine of its browsers); and 360 Mobile Assistant (an Android app store for smartphones).

**ANSWER:**

The allegations in Paragraph 36 appear to refer to statements from Qihoo's 2016 Form 20-F.  Mr. Zhou admits that Qihoo's 2016 Form 20-F contains some of the information referenced in Paragraph 36, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou denies the remaining allegations in Paragraph 36 and incorporates by reference the full contents of Qihoo's 2016 Form 20-F as if attached hereto.

37.    The Company's products and services are supported by its cloud-based security technology, which the Company describes as "one of the most advanced and robust technologies in the PC and mobile Internet security industry."  Qihoo offers its Internet and mobile security products free of charge.  It monetizes its large user base primarily through online marketing and Internet value-added services.  Qihoo leverages its large user base to develop open platforms on which third-party Internet product and service providers (such as game developers, e-commerce websites and software and application developers) offer their products and services.  These open platforms allow Qihoo to monetize its large user base through online advertising—Qihoo's primary way of generating revenue.  Qihoo also generates revenue through revenue sharing arrangements with third parties; Internet value-added services; the sale of smart hardware and "internet of things" (or "IoT") devices; and other products and services (such as enterprise information security products and related services, and other technical services on an ad hoc project basis to enterprise customers).

**ANSWER:**

The allegations in Paragraph 37 appear to refer to statements from Qihoo's 2016 Form 20-F.  Mr. Zhou admits that Qihoo's 2016 Form 20-F contains the phrases quoted and some of the information referenced in Paragraph 37, but denies that these phrases and the paraphrased language in Paragraph 37 are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou denies the remaining allegations in Paragraph 37 and incorporates by reference the full contents of Qihoo's 2016 Form 20-F as if attached hereto.

38.    Although Qihoo maintained these various business lines, its core business at the time of the Merger was its internet security business.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 38.

39.    In addition, in 2015, Qihoo started to participate in the emerging Internet finance sector in China.  This business provides third-party financial products, such as online financial products and crowd-funding, on Qihoo's online platform.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 39.

40.    Qihoo's revenues increased from $671.1 million in 2013 to $1,390.7 million in 2014 and $1,804.6 million in 2015.  Its net income increased from $99.7 million in 2013 to $222.8 million in 2014 and $307.0 million in 2015.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 40.

**B.  History of the Merger**

41.    In early May 2015, Defendant Zhou discussed a possible acquisition of Qihoo with the investment funds Golden Brick Capital Private Equity Fund I L.P. ("Golden Brick") and China Renaissance Holdings Limited.  Between late-May 2015 and mid-June 2015, he discussed the acquisition with Defendant Qi, representatives of CITIC Securities Co. Ltd., and Mr. Neil Nanpeng Shen, a Director of the Company and founding managing partner of Sequoia Capital China.  These discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in China, the Company's long term strategic plans, and the structure, timetable, and pros and cons of a potential acquisition of the Company.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 41.

42.    On June 17, 2015, the Board received a preliminary non-binding proposal letter from Zhou, CITIC Securities, Golden Brick, China Renaissance and Sequoia Capital China, to acquire all of the Company's outstanding shares not owned by them or their affiliates, including Class A ordinary shares represented by ADS, for $77.00 in cash per ADS and $51.33 in cash per Class A or Class B ordinary share.  These parties to the proposed transaction stated in their proposal that they were not interested in selling their shares in any other transaction involving the Company.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 42.

43.     On the same day, Qihoo issued a press release regarding its receipt of this acquisition proposal and filed the press release as an exhibit to a Form 6-K that it filed with the SEC.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 43 and incorporates by reference the full contents of the June 17, 2015 press release as if attached hereto.

44.     On June 19, 2015, Qihoo's Board of Directors formed the Special Committee.  The Board appointed Defendant Chen as Chairman of the Special Committee and empowered the Special Committee to:

> [(i) investigate] the proposed transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate; (ii) evaluate the terms of the Proposal; (iii) discuss and negotiate with the Buyer Group and their representatives any terms of the proposed transaction and implement the proposed transaction as the Special Committee deems appropriate; (iv) explore any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company; (v) negotiate definitive agreements . . . subject, however, to the approval of the Board; (vi) report to the Board the recommendations and conclusions of the Special Committee . . . and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board; . . . and (viii) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsels, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate.

**ANSWER:**

Mr. Zhou admits that on June 19, 2015, Qihoo's Board of Directors formed the Special Committee.  The remaining allegations in Paragraph 44 appear to quote statements from the Proxy Materials.  Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 44 but denies that these phrases are a complete and accurate recitation of the relevant statements in the Proxy Materials.  Mr. Zhou incorporates by reference the full contents of the Proxy Materials as if attached hereto.

45.     On June 25, 2015, the Special Committee retained J.P. Morgan Securities (Asia Pacific) Limited ("J.P. Morgan") as its financial advisor in connection with its review and evaluation of the Merger proposal.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 45.

46.     Between mid-August 2015 and mid-September 2015, representatives of the Buyer Group and its financial, legal and accounting advisors had various discussions with the management of the Company regarding the business, operations and financial performance of the Company and conducted legal, business, financial and accounting due diligence on the Company.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 46.

47.     On December 9, 2015, the Special Committee convened a telephonic meeting at which Alex Zuoli Xu, Qihoo's Co-CFO, and representatives of J.P. Morgan and other advisors to the Special Committee were present.  Xu presented Qihoo management's projections for the Company's future financial performance for the fiscal years ending December 31, 2015 through December 31, 2025.  Thereafter, J.P. Morgan reported to the Special Committee that J.P. Morgan was in the process of completing its financial analyses with respect to the Company and the proposed transaction.

**ANSWER:**

By its terms, the allegations in Paragraph 47 call for information about events in which Mr. Zhou did not participate and of which any knowledge would be hearsay and/or speculation and, as such, he denies them.

48.     On December 16, 2015, J.P. Morgan presented its financial analysis to the Special Committee.  J.P. Morgan also gave the Special Committee its opinion that the $77.00 per ADS Merger consideration and the $51.33 per share Merger consideration was fair, from a financial point of view, to Qihoo Securityholders that were unaffiliated with the Buyer Group.

**ANSWER:**

By its terms, the allegations in Paragraph 48 call for information about events in which Mr. Zhou did not participate and of which any knowledge would be hearsay and/or speculation and, as such, he denies them.

- 18 -

49.     The Special Committee and the Board approved the Merger that same day.  The Special Committee unanimously (a) determined that the Merger was fair to, and in the best interests of, the Company and its unaffiliated Securityholders, (b) approved and declared it advisable for the Company to enter into the Merger, and (c) recommended that the Board authorize and approve the Merger.

**ANSWER:**

By its terms, the allegations in Paragraph 49 call for information about events in which Mr. Zhou did not participate and of which any knowledge would be hearsay and/or speculation and, as such, he denies them.

50.     The Board then held a telephonic meeting at which the Board, based on the unanimous recommendation of the Special Committee, (a) determined that the Merger was fair to and in the best interests of the Company and the unaffiliated Securityholders and it was advisable for the Company to enter into the Merger, (b) authorized and approved the execution, delivery and performance of the Merger, and (c) recommended the approval and authorization of the Merger to the shareholders of the Company and directed that the Merger be submitted to a vote of the shareholders for authorization and approval.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 50.

51.     On December 18, 2015, J.P. Morgan made another presentation to the Special Committee of J.P. Morgan's financial analysis and gave the Special Committee its fairness opinion again, after considering a revised share count that Qihoo's management corrected after realizing that they had misunderstood the meaning of certain share categories related to restricted shares and options.

**ANSWER:**

By its terms, the allegations in Paragraph 51 call for information about events in which Mr. Zhou did not participate and of which any knowledge would be hearsay and/or speculation and, as such, he denies them.

52.     In conducting its financial analysis and providing its fairness opinion, J.P. Morgan (i) reviewed the Merger Agreement; (ii) reviewed certain publicly available business and financial information concerning the Company and the industries in which it operates; (iii) compared the proposed financial terms of the transaction with the publicly available financial terms of certain transactions involving companies that J.P. Morgan deemed relevant; (iv) compared the financial and operating performance of the Company with publicly available information concerning certain other companies that J.P. Morgan deemed relevant; (v) reviewed certain internal financial analyses

and forecasts prepared by the management of the Company relating to its business; and (vi) performed other financial studies and analyses and considered other information that J.P. Morgan deemed appropriate.

**ANSWER:**

The allegations in Paragraph 52 appear to refer to statements from the Proxy Materials. Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 52, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements in the Proxy Materials. Mr. Zhou refers to those statements for a complete and accurate recitation of their contents. Mr. Zhou also states that the paraphrased language in Paragraph 52 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 52 and incorporates by reference the Proxy Materials as if attached hereto.

53.    J.P. Morgan also held discussions with members of Company management with respect to certain aspects of the Merger, the past and current business operations of the Company, the financial condition and future prospects and operations of the Company, and certain other matters that it believed necessary or appropriate to its inquiry.

**ANSWER:**

The allegations in Paragraph 53 appear to refer to statements from the Proxy Materials. Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 53, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements in the Proxy Materials. Mr. Zhou refers to those statements for a complete and accurate recitation of their contents. Mr. Zhou also states that the paraphrased language in Paragraph 53 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 53 and incorporates by reference the Proxy Materials as if attached hereto.

54.    In giving its analysis, however, J.P. Morgan did not independently verify these bases for its opinion. Rather, J.P. Morgan stated:

- [W]e have relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with us by the Company or otherwise reviewed by or for [J.P. Morgan] . . . In relying on financial analyses and forecasts provided to us or derived therefrom, we have assumed that they have been reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate. We express no view as to such analyses or forecasts or the assumptions on which they were based. . . . We have also assumed that the representations and warranties made by the Company and the Acquiror Group in the Agreement and the related agreements are and will be true and correct in all respects material to our analysis.

**ANSWER:**

The allegations in Paragraph 54 appear to quote statements from the Opinion of J.P. Morgan Securities (Asia Pacific) Limited that was attached as Annex C to each of the Proxy Statement ("J.P. Morgan Opinion"). Mr. Zhou admits that the J.P. Morgan Opinion contains the phrases quoted in Paragraph 54, but denies that these phrases are a complete and accurate recitation of the relevant statements in the J.P. Morgan Opinion. Mr. Zhou refers to those statements for a complete and accurate recitation of their contents. Mr. Zhou also states that the phrases in Paragraph 54 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 54 and incorporates by reference the Proxy Materials as if attached hereto.

55.    Ultimately, J.P. Morgan based its opinion on its discounted cash flow ("DCF") analysis and on its comparison of Qihoo to the public trading multiples other companies that J.P. Morgan considered to be similar to Qihoo. But, as the Proxy Materials noted, "none of the selected companies [for J.P. Morgan's "public trading multiples analysis"] reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted and some of the information referenced in Paragraph 55, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 55 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

56.    The financial projections that Qihoo's management provided to J.P. Morgan were an essential input into both J.P. Morgan's DCF analysis and its public trading multiples analysis.

**ANSWER:**

Mr. Zhou admits that the financial projections that Qihoo's management provided to J.P. Morgan were one of the inputs into J.P. Morgan's DCF analysis and public trading multiples analysis, but denies the remaining allegations in Paragraph 56.

57.    In addition, the Proxy Materials explained that J.P. Morgan "also reviewed, solely for informational purposes, historical trading prices of the ADSs, certain precedent transactions and the premia paid in certain precedent U.S. listed Chinese take-private transactions (including, but not limited to, the privatization transactions of the companies listed below), but noted, and the Special Committee understood and acknowledged, that these are not valuation methodologies but were presented merely for informational purposes."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 57, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that Proxy Materials. Mr. Zhou also states that the statements quoted in Paragraph 57 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 57 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

58.    At the conclusion of its December 18, 2015 meeting, the Special Committee reaffirmed the resolutions adopted at its December 16, 2015 meeting and unanimously resolved to approve and recommend that the Board approve the Merger. The Special Committee "expressly

adopted" J.P. Morgan's "analyses and opinion, among other factors considered, in reaching its determination as to the fairness of the Merger."

**ANSWER:**

The allegations in Paragraph 58 appear to refer to statements in the Proxy Materials.  Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 58, but denies the paraphrased language is a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that the statements referenced in Paragraph 58 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 58 and incorporates by reference the full contents of Qihoo's Proxy Materials as if attached hereto.

59.    The Board, in turn, acting on behalf of the Company, "considered the analyses and recommendation of the Special Committee and the factors examined by the Special Committee … and adopted such recommendations and analyses."   The Board approved the Merger and recommended that the Company's shareholders vote to approve the Merger.

**ANSWER:**

The allegations in Paragraph 59 appear to refer to statements in the Proxy Materials.  Mr. Zhou admits that the Proxy Materials contain the phrases quoted and some of the information referenced in Paragraph 59, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that the phrases and paraphrased language in Paragraph 59 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 59 and incorporates by reference the full contents of Qihoo's Proxy Materials as if attached hereto.

60.    Later on December 18, 2015, the parties to the Merger executed the Merger Agreement and other transaction documents.  On the same day, the Company issued a press release announcing the execution of the Merger Agreement, and furnished the press release and the executed Merger Agreement to the SEC as exhibits to a Form 6-K that it filed that day.

- 23 -

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 60 and incorporates by reference the full contents of the December 18, 2015 press release and the executed Merger Agreement as if attached hereto.

61.    The total amount of funds that were expected to be necessary to complete the Merger was $9.4 billion, assuming that no shareholders exercised their rights to dissent from the Merger and seek appraisal in the Cayman Islands.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 61.

### C. Defendants Zhou's and Qi's Stakes in the Company

62.    Prior to the Merger, Defendant Zhou (including through Global Village) owned 17.3% of the Company and Defendant Qi (including through Young Vision) owned 8.1% of the Company. Collectively, they owned 4,740,568 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represented approximately 25.4% in number and approximately 60.6% in voting rights of the Company's issued and outstanding ordinary shares.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 62.

63.    In the Merger, 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision were cancelled without any monetary consideration paid for them. Instead, Defendant Zhou would own substantial stakes in the Company following the Merger.

**ANSWER:**

Mr. Zhou admits that in the Merger, 3,534 Class A ordinary shares and 29,340,466 Class B ordinary shares held by Global Village, and 4,904,709 Class B ordinary shares held by Young Vision were cancelled without any monetary consideration paid for them, and that Mr. Zhou owned stakes in the Company following the Merger. Mr. Zhou denies the remaining allegations in Paragraph 63.

64.    The Final Proxy Statement disclosed that Defendant Zhou would own 22.8% and Defendant Qi would own 2.2% of the Company following the Merger. But the Final Proxy

Statement also disclosed that an entity called Tianjin Xinxinsheng Investment Limited Partnership ("Xinxinsheng") would own 11.5% of the Company following the Merger.  It was only in Annex E that the Final Proxy Statement disclosed cryptically that Tianjin Qihoo Hesheng Equity Investment Management Limited Partnership (Limited Partnership) ("Qihoo Hesheng") is the general partner of Xinxinsheng; that Qihoo Hesheng is an investment company that shared the same address as Qihoo; that Tianqin Qihoo Xinsheng Equity Investment Management Limited ("Qihoo Xinsheng"), another investment company that shared the same address, is the general partner of Qihoo Hesheng; *and that Qihoo Xinsheng is 99% owned by Defendant Qi.*

**ANSWER:**

Mr. Zhou admits that on March 3, 2016, Qihoo issued the Final Proxy Statement containing some of the information referenced in Paragraph 64, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Final Proxy Statement. Mr. Zhou refers to the Final Proxy Statement for a complete and accurate recitation of its contents. Mr. Zhou also states that the paraphrased language in Paragraph 64 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Final Proxy Statement.  Mr. Zhou denies the remaining allegations in 64 and incorporates by reference the full contents of the Final Proxy Statement as if attached hereto.

65.    Defendants Zhou and Qi thus stood to substantially increase their stakes in the Company through the Merger.  They stood to profit even further by paying far less than what the Company would be worth in their planned relisting of the Company in China following the Merger.

**ANSWER:**

Mr. Zhou denies the allegations in Paragraph 65.

### D.  The Misleading Proxy Materials

66.    Between January 11, 2016 and March 3, 2016, Defendants published a series of Proxy Materials that encouraged Qihoo Securityholders to vote in favor of the Merger based on Defendants' false and misleading statements concerning their reasons for buying the Company and supposed fairness of the transaction to Qihoo Securityholders.

**ANSWER:**

Mr. Zhou admits that between January 11, 2016 and March 3, 2016, Qihoo published a series of Proxy Materials containing some of the information referenced in Paragraph 66, but

denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the paraphrased language in Paragraph 66 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. The remaining allegations in Paragraph 66 allege legal conclusions, to which no response is required. Mr. Zhou incorporates by reference the full contents of the Proxy Materials as if attached hereto.

67. On January 11, 2016, Defendants published the initial transaction statement for the Merger on Schedule 13E-3, which attached the Company's Preliminary Proxy Statement and other supporting documents for the Merger (collectively, the "Preliminary Proxy Materials").

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 67.

68. Defendants then published an amended version of the Proxy Materials on February 8, 2016 (the "Amended Proxy Materials," which included a revised proxy statement (the "Amended Proxy Statement")). On February 26, 2016, Defendants published a second amended version of the Proxy Materials (the "Second Amended Proxy Materials") that included a further amended version of the proxy statement (the "Second Amended Proxy Statement").

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 68.

69. On March 3, 2016, Qihoo published a third amended version of the Proxy Materials (the "Third Amended Proxy Materials") that included the final version of the proxy statement that informed Qihoo Securityholders at the March 30, 2016 shareholder vote on the Merger (the "Final Proxy Statement").

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 69.

70. The Proxy Materials contained materially false and misleading statements and failed to provide all material information related to the Merger that was necessary to make the statements contained therein not misleading. (*See infra* Section V for more information on Defendants' false and misleading statements.)

**ANSWER:**

Paragraph 70 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 70.

> ### 1. Assurances That no Relisting was Contemplated and That There Were No Alternatives to the Merger

71.    Defendants' most fundamental misleading action was hiding the Buyer Group's plan to relist Qihoo's core business in China following the Merger.  To further this goal, the Proxy Materials expressly disclaimed the notion that any such transaction was already being contemplated.

**ANSWER:**

Paragraph 71 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 71.

72.    For example, the Proxy Materials assured Qihoo Securityholders that, among other things, "[i]f the merger is consummated, the Company will continue its operations as a privately held company beneficially owned solely by the Buyer Group"; and "the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 72, but

denies that the phrases are a complete and accurate recitation of the relevant statements made in

the Proxy Materials.  Mr. Zhou also states that the phrases quoted in Paragraph 72 were

accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's

Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 72 and incorporates by

reference the full contents of the Proxy Materials as if attached hereto.

73.    The Proxy Materials also affirmed "that there was no viable alternative" to the Merger while omitting the alternative of relisting the Company's core business in the Chinese stock market, which the Buyer Group was already planning to do following the Merger.

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 73 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

### 2. False Reasons for the Merger and False Descriptions of the Merger Price as "Fair"

74. The Final Proxy Statement included many supposed reasons that the Special Committee, the Board, and the Buyer Group gave for the Merger. Nowhere did they disclose the business opportunities that Qihoo would have in China following the Merger or that the Buyer Group's primary reason for the Merger was so that it could relist the Company at a higher valuation in China.

**ANSWER:**

Mr. Zhou admits that the Final Proxy Statement contains some of the information referenced in Paragraph 74, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Final Proxy Statement. Mr. Zhou also states that the paraphrased language in Paragraph 74 was accompanied by, and must be read with, risk factors and other explanatory language in the Final Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 74 and incorporates by reference the full contents of the Final Proxy Statement as if attached hereto.

75. The Special Committee's and Board's reasons for the Merger included that

- as a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance. Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the

Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii) monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics;

- the Company would no longer be subject to the regulatory requirements and costs of public companies;

- the Special Committee's and the Board's determinations that the Merger was fair to unaffiliated shareholders;

- the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger;

- the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by J.P. Morgan in preparing its opinion (see "Special Factors— Opinion of the Special Committee's Financial Advisor" beginning on page 53 for additional information); and

- the Special Committee's and J.P. Morgan's role in the Merger process[.]

**ANSWER:**

The allegations in Paragraph 75 appear to refer to statements in the Proxy Materials. Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 75, but denies that the paraphrased or quoted language is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the paraphrased or

- 29 -

quoted language was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in 75 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

76.    The Proxy Materials stated that "[f]or the foregoing reasons, **the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders**." (Emphasis in original.)

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 76, but denies that these phrases are a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 76 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

77.    The Proxy Materials also described Qihoo management's assumptions, which formed the basis for the financial projections that Qihoo provided to J.P. Morgan, as including that:

(i) users of personal computers, smart phones and broadband internet services and their penetration in China and elsewhere would continue in line with management's expectations, (ii) the Company would be able to successfully expand its product offering by developing and launching new PC and mobile products, (iii) the popularity of the Company's products would remain stable in the geographic markets in which the Company operated, (iv) the Company would be able to successfully implement its business plan to compete effectively in both its traditional business and emerging business, (v) the market for smartphone and IoT (internet of things) devices would develop in line with management's expectations, (vi) the Company's emerging business would develop successfully, driven by both further hardware penetration and increasing monetization from smartphone and IoT devices, and (vii) material costs and expenses would increase in connection with the Company's revenue increase.  The Company's management also assumed that the overall economy in China will remain stable, and that there will be no material change in competition affecting the Company.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 77, but denies that the paraphrased or quoted language is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the paraphrased or quoted language in Paragraph 77 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 77 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

78.     In addition, the Buyer Group relied on "the factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board" in concluding that "the Merger is substantively and procedurally fair to the Unaffiliated Holders."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 78, but denies that these phrases are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 78 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

79.     The Buyer Group also stated that the reasons for the Merger included that:

[T]he operating environment has become more challenging due to recent operating conditions and industry trends. There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. . . . Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term

profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 79, but denies that these phrases are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 79 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

80.    In addition, the Buyer Group "decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 80, but denies that these phrases are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 80 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

81.    Many of these explanations for why the Buyer Group sought to buy Qihoo in the Merger were omitted from the Preliminary Proxy Statement. Defendants added these explanations only after the SEC criticized the initial proxy for failing to provide an adequate explanation of these topics. (*See infra* Section V.C.) When the SEC forced Defendants to elaborate on their reasons for the Merger, however, Defendants gave these false and misleading explanations that failed to disclose their true reasons for the Merger, including the Buyer Group's intent to relist the Company in China following the Merger and the increased business opportunities that the Company would have after the Merger.

**ANSWER:**

Paragraph 81 alleges legal conclusions, to which no response is required.  Mr. Zhou also

states that the information referenced in Paragraph 81 was accompanied by, and must be read with,

risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the

remaining allegations in Paragraph 81 and incorporates by reference the full contents of the Proxy

Materials as if attached hereto.

82.    The Proxy Materials also falsely touted the Merger price and described it as "fair"
to Qihoo's Securityholders that were unaffiliated with the Buyer Group.  In fact, the Merger price
was not fair because the Proxy Materials failed to disclose the Buyer Group's reasons for the
Merger and how those plans affected Qihoo's true value at the time of the Merger.  In addition,
J.P. Morgan's analysis, which the Special Committee, the Board, and the Buyer Group relied on
in determining that the Merger price was fair, was false and misleading because it was based on
the Company's faulty financial projections and because it compared Qihoo to companies that did
not actually provide a sound basis for comparison.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in

Paragraph 82 (including the Company's belief that the Merger price was "fair"), but denies that

the paraphrased language in Paragraph 82 is a complete and accurate recitation of the relevant

statements made in the Proxy Materials.  Mr. Zhou also states that the paraphrased language in

Paragraph 82 was accompanied by, and must be read with, risk factors and other explanatory

language in Qihoo's Proxy Materials, and incorporates by reference the full contents of the Proxy

Materials as if attached hereto.  Mr. Zhou further states that the remaining allegations in Paragraph

82 are legal conclusions, to which no response is required.  To the extent a response to any

allegation is required, Mr. Zhou denies such allegation.

**E.  The Shareholder Vote and Completion of the Merger**

83.    The shareholder vote on the Merger took place at the Company's extraordinary
general meeting that was held on March 30, 2016.  As of the date of the Final Proxy Statement,
the Buyer Group collectively beneficially owned 7,164,611 Class A ordinary shares and
41,263,812 Class B ordinary shares, which represented approximately 26.8% in number and

approximately 61.3% in voting rights of the Company's issued and outstanding ordinary shares. The Proxy Materials stated that at the close of business in the Cayman Islands on March 25, 2016, the record date for shareholders to be able to vote at the extraordinary general meeting, 180,839,445 Qihoo shares were expected to be issued and outstanding and entitled to vote.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 83, but denies that the paraphrased language in this paragraph is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the paraphrased language in Paragraph 83 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 83 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

84.    An affirmative vote of shareholders representing at least two-thirds of the voting rights of the shares present and voting in person or by proxy as a single class at the extraordinary general meeting was required for the Merger to pass. Qihoo ADS holders who did not surrender their ADS as of March 25, 2016 could participate in the shareholder vote only by instructing the ADS Depositary (*i.e.*, The Bank of New York Mellon) how to vote their underlying shares on their behalf.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 84.

85.    For the Merger to be approved, assuming that all parties affiliated with the Buyer Group voted their shares in favor of the Merger, and that all shareholders would be present and voting in person or by proxy at the extraordinary general meeting, approximately 5.4% of the voting rights of all issued and outstanding shares would have to be voted in favor of the Merger by Qihoo Securityholders that were not members of the Buyer Group. Only this amount of unaffiliated shareholders was needed to approve the Merger because the Buyer Group specifically rejected a provision in the Merger agreement that would have required the approval of shareholders representing more than 50% of the voting rights of the shares that were not beneficially owned by the Buyer Group (a "majority of the minority" condition).

**ANSWER:**

Mr. Zhou admits that, in order for the Merger to be approved, assuming that all parties affiliated with the Buyer Group (as that term is defined in the Proxy Materials) voted their shares

- 34 -

in favor of the Merger, and that all shareholders would be present and voting in person or by proxy at the extraordinary general meeting, approximately 5.4% of the voting rights of all issued and outstanding shares owned by shareholders other than members of the Buyer Group would have to vote in favor of the Merger. Mr. Zhou further admits that the Merger Agreement did not include a "majority of the minority" condition. Mr. Zhou denies the remaining allegations in Paragraph 85.

86. Holders of 32,592,419 Class A ordinary shares and 41,818,346 Class B ordinary shares attended the March 30, 2016 extraordinary general meeting in person or by proxy. These shares represented approximately 41.0% of the Company's total ordinary shares outstanding at the close of business in the Cayman Islands on the record date of March 25, 2016. These shares were entitled to an aggregate of 241,684,149 votes, or 69.3% of the total outstanding votes on the record date. Approximately 99.8% of the total votes cast at the meeting were in favor of the Merger. The Merger therefore passed.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 86.

87. Had Defendants disclosed the Buyer Group's true intentions for Qihoo following the Merger—including their plan to relist Qihoo in China after the Merger at multiples times the amount paid to the Buyer Group. Qihoo's true value, and Qihoo's business opportunities in China following the Merger—more shareholders would have attended the extraordinary meeting (either in person or by proxy) and voted against the Merger or would have dissented from the Merger and exercised their appraisal rights in the Cayman Islands.

**ANSWER:**

Paragraph 87 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 87.

### 1. Dissenting From the Merger Was Difficult and Discouraged

88. Qihoo Securityholders had a right to dissent from the Merger and to exercise their appraisal rights "to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law." But Defendants warned in the Proxy Materials that dissenting was a very risky proposition because "[t]he fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the Merger Agreement if they do not exercise Dissenter Rights with respect to their Shares. These procedures are complex and you should consult your Cayman Islands legal counsel. If you do not fully and precisely satisfy the procedural

requirements of the Cayman Islands Companies Law, you will lose your Dissenter Rights." Defendants further warned that "[t]he provisions of Section 238 of the Cayman Islands Companies Law are technical and complex. If you fail to comply strictly with the procedures set forth in Section 238, you will lose your Dissenter rights. You should consult your Cayman Islands legal counsel if you wish to exercise Dissenter rights."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted and some of the information referenced in Paragraph 88, but denies that these phrases and the paraphrased language in this paragraph are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases and the paraphrased language in Paragraph 88 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 88 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

89. And dissenting was even more difficult because, as Defendants warned in the Proxy Materials, "THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTERS' RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO." According to the Proxy Materials, in order to validly dissent, ADS holders were required to go through extra complicated procedural steps and bear the extra costs of doing so.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted and some of the information referenced in Paragraph 89, but denies that these phrases and the paraphrased language in this paragraph are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases and the paraphrased language in Paragraph 89 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 89 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

90. These steps included their surrendering ADS to the ADS Depositary; paying the ADS Depositary's fees required for cancelling ADS; providing instructions for the registration of

the underlying shares in the Company's register of members; certifying that they held ADS as of the ADS record date and would not give voting instructions for their ADS before 5:00 pm (New York City time) on March 23, 2016; and becoming registered holders of shares before the March 30, 2016 shareholder vote on the Merger.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 90, but denies that the paraphrased language in this paragraph is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that Paragraph 90 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 90 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

91. Investors were told that, only after all of these difficult and costly steps, could ADS holders object to and dissent from the shareholder vote, if they "comply with the procedures and requirements for exercising dissenters' rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 91, but denies that the paraphrased language in this paragraph is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 91 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

92. The false and misleading Proxy Materials that Defendants issued in connection with the Merger convinced most Qihoo Securityholders that there was no reason for them to take the risk and burden of dissenting from the Merger.

**ANSWER:**

Paragraph 92 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 92.

- 37 -

## 2. The Completion of the Merger

93.     The Merger closed on July 15, 2016, which was called the "Effective Time" of the Merger.  At the Effective Time, each Share issued and outstanding immediately prior to the Effective Time was cancelled and ceased to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS represented the right to receive $77.00 (other than shares or ADS owned by the Buyer Group or shareholders that dissented from the Merger).  The Proxy Materials explained that after the Effective Time, the ADS Depositary would send ADS holders a check for the Per ADS Merger Consideration in exchange for the cancellation of their ADS.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 93.

94.     The ADS Depositary would have the requisite funds because "[p]rior to the Effective Time, the Parent Parties and the Company shall establish procedures with the Paying Agent and the ADS Depositary to ensure that (i) the Paying Agent will transmit to the ADS Depositary an amount in cash equal to (a) the number of ADSs issued and outstanding immediately prior to the Effective Time multiplied by (b) the Per ADS Merger Consideration and (ii) the ADS Depositary will distribute the aggregate of the Per ADS Merger Consideration to the ADS holders upon surrender by them of the ADSs."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted in Paragraph 94, but denies that these phrases are a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that the phrases quoted in Paragraph 94 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 94 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

## F. Qihoo's Backdoor Listing in China Following the Merger

95.     After the Merger was completed, Qihoo conducted a complicated restructuring of its business to prepare for its relisting.  Qihoo sought to include only its main businesses, including its core internet security business, in the company that would be relisted in China through the backdoor listing.  Qihoo therefore had to restructure its organization to separate its many other businesses, such as its financial, health care, property management, and mobile phone businesses.  This restructuring culminated in Qihoo putting its main businesses into an entity called 360 Technology Co. Ltd. and maintaining its other businesses as separate entities.

**ANSWER:**

Mr. Zhou admits that Qihoo restructured its business after the Merger, and that as a result

of such restructuring, certain aspects of its business were moved into a new entity called 360

Technology Co. Ltd. ("360 Technology").  Mr. Zhou denies the remaining allegations in Paragraph

95.

96.     On November 2, 2017, an elevator-manufacturing company called SJEC that was
listed on the Shanghai Stock Exchange under code 601313 announced that it would be conducting
a backdoor listing with Qihoo.  SJEC announced that Defendant Zhou, through companies that he
controlled that owned Qihoo following the Merger, would merge with SJEC and that Zhou would
control the listed company following the backdoor listing.  On November 6, 2017, Defendant Zhou
discussed this plan with the media.

**ANSWER:**

Mr. Zhou admits that on or about November 2, 2017, SJEC, Corp. made an announcement

containing some of the information referenced in Paragraph 96, but denies that the paraphrased

language in this paragraph is a complete and accurate recitation of the relevant statements made in

that announcement.  Mr. Zhou also admits that on or about November 6, 2017, SJEC, Corp. hosted

a press conference, during which Mr. Zhou made certain statements.  Mr. Zhou refers to SJEC,

Corp.'s November 2, 2017 announcement and its November 6, 2017 press conference for a

complete and accurate recitation of the relevant statements made therein.  Mr. Zhou denies the

remaining allegations in Paragraph 96.

97.     Conducting a backdoor listing, also known as a reverse merger, would allow Qihoo
to have its business publicly listed on the Chinese stock market without having to meet the criteria
for conducting an independent initial public offering.

**ANSWER:**

Paragraph 97 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 97.

98.     Through the backdoor listing, Tianjin Qixin Zhicheng Technology Co., Ltd.
("Tianjin Qixin"), which was the Holdco entity that participated in the Merger, would become

- 39 -

SJEC's controlling shareholder, with Defendant Zhou as its controlling individual. Zhou would therefore control the Company following the backdoor listing. Including through his interest in Tianjin Qixin and his direct interest in the Company, Zhou would control 63.7% of SJEC and would own 23.4% of the Company's equity following the backdoor listing.

**ANSWER:**

Mr. Zhou states that details of the listing are a matter of public record, which speaks for itself. Mr. Zhou also states that Paragraph 98 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 98.

99.     On November 20, 2017, SJEC announced that the asset restructuring necessary for Qihoo's backdoor listing was approved by SJEC's shareholders. On February 2, 2018, SJEC completed its asset restructuring.

**ANSWER:**

Mr. Zhou admits that on November 20, 2017, SJEC, Corp. issued an announcement, which speaks for itself. Mr. Zhou refers to that announcement for a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou denies the remaining allegations in Paragraph 99.

100.    On February 28, 2018, Qihoo began trading on the Shanghai stock exchange in its new form after being combined with SJEC. It began trading under the name 360 Security Technology Inc., under the new code 601360. This marked the completion of Qihoo's return to the Chinese capital markets. At the close of trading that day, Qihoo, in its newly public form, had a market capitalization of 385 billion RMB, or approximately $62 billion.

**ANSWER:**

Mr. Zhou states that details of 360 Technology's listing and its share price are a matter of public record, which speaks for itself. Mr. Zhou denies the remaining allegations in Paragraph 100.

101.    *Bloomberg* reported on February 28, 2018 that the value of the former SJEC—the shell company that Qihoo used for its backdoor listing—"soared as much as 550 percent since" the announcement of the backdoor listing in November 2017. This increased Defendant Zhou's net worth from approximately $2 billion (which itself was higher than the value of his pre-Merger stake in the Company) to $13.6 billion, making him the 12th-richest person in China.

**ANSWER:**

Paragraph 101 purports to quote an article from *Bloomberg* that Mr. Zhou did not author

and which speaks for itself.  Mr. Zhou refers to that article for a complete and accurate statement

of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining

allegations in Paragraph 101.

102.    Moreover, as explained above, only Qihoo's main businesses were included in the backdoor listing.  Its other businesses remained separate and therefore provided the Buyer Group with even more value.  For example, Qihoo's financial arm conducted an IPO in the United States in December 2018 under the name 360 Finance and was worth over $2 billion at the time of its IPO.

**ANSWER:**

Mr. Zhou states that details of 360 Technology's listing and 360 Finance, Inc.'s initial

public offering ("IPO") are a matter of public record, which speaks for itself.  Mr. Zhou denies the

remaining allegations in Paragraph 102.

103.    Qihoo also had other businesses—including its mobile phone, healthcare, and property management businesses—that were not included in the backdoor listing.

**ANSWER:**

Mr. Zhou states that details of 360 Technology's listing are a matter of public record, which

speaks for itself.  Mr. Zhou denies the remaining allegations in Paragraph 103.

104.    As the dissenting shareholders in the Cayman Islands appraisal action have noted, Qihoo's market capitalization of over $60 billion immediately upon relisting only a portion of its assets in China was over $50 billion more than the amount that it was valued in the Merger.

**ANSWER:**

Mr. Zhou states that details regarding the Company's market capitalization are a matter of public record, which speaks for itself.  Mr. Zhou denies the remaining allegations in Paragraph 104.

### G.  The Buyer Group Planned to Relist Qihoo All Along

#### 1.  News Reports Have Revealed the Buyer Group's Intention to Relist Qihoo in China Following the Merger

105.    Several news articles have reported on a secret plan that Defendant Zhou had with the investors that bought Qihoo in the Merger.  A key term for their participation in the Merger was that Qihoo would relist in the public markets in China shortly after the Company's privatization in the United States.  This was how the investors that formed the Buyer Group planned to profit off of their investment.  Because the plan was to relist Qihoo in China so soon after the Merger, the members of the Buyer Group expected to profit from the higher value that the Company would achieve in its relisting in the Chinese stock market.  Defendants Zhou and Qi needed to line up a large number of investors to be able to raise enough funds to take Qihoo private at the $9.3 billion Merger price.  Their secret promise to relist Qihoo in the Chinese stock market at a higher value after its privatization is what incentivized those investors to participate in the Merger.

**ANSWER:**

Paragraph 105 purports to refer to "news articles," which speak for themselves.  Mr. Zhou refers to those articles for a complete and accurate statement of their contents, without conceding the accuracy of those articles.  Mr. Zhou otherwise denies all allegations in Paragraph 105.

106.    A November 12, 2015 article from the Chinese publication *CN Stock* reported in Chinese that the author had obtained from an undisclosed source a copy of Qihoo's privatization plan, which confidentially indicated to investors participating in the Buyer Group that Qihoo planned to return to the Chinese stock market following the Merger.  The plan also stated that the relisting would take up to one-and-a-half years to complete.

**ANSWER:**

Paragraph 106 purports to refer to a Chinese article from *CN Stock* that Mr. Zhou did not author and which speaks for itself.  Mr. Zhou denies that the phrases in Paragraph 106 are a complete and accurate translation of the article and refers to that article for a complete and accurate

statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 106.

107. That timeline that *CN Stock* reported is consistent with Qihoo's actual relisting that was announced in November 2017, which was less than one-and-a-half years after the Merger closed. It also makes sense that this is how long it took for Qihoo to conduct its relisting because it is consistent with the amount of time that it typically takes for parties to reach agreement on a backdoor listing. The announcement of a relisting agreement in China, as SJEC and Qihoo announced in early November 2017, is a significant step that can be achieved only after a lengthy period of deal-making.

**ANSWER:**

Paragraph 107 purports to refer to a Chinese article from *CN Stock* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou denies that the phrases in Paragraph 107 are a complete and accurate translation of the article and refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou also states that Paragraph 107 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 107 or is without knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies the allegations.

108. An expert in Chinese and United States M&A and capitals market transactions has explained the work that would ordinarily be required before reaching this type of agreement. It typically takes companies at least a full year on the quickest possible timeline, and usually longer, from the time they first start to consider a backdoor listing until they reach agreement with a shell company to conduct a reverse merger. The steps involved for a company seeking to merge into a shell company include:

   a) **Hiring a financial advisor (or investment bank) and a legal advisor** to advise on the process, including finding and reaching agreements with these advisors;
   b) **Identifying potential shell companies**, because companies must meet certain criteria to even be eligible to serve as potential hosts for a backdoor listing;
   c) **Reaching a preliminary agreement with a shell company**, which will likely not be the first one that is contacted, and then takes a substantial amount of time for the potential shell companies to consider the offer and for the parties to negotiate terms;
   d) **Conducting auditing and compliance work** to make sure that the company seeking relisting will be able to conform its accounting standards to the required format on a going-forward basis;

- 43 -

e) Both sides to the transaction performing due diligence on each other;

f) **Conducting regulatory assessments** to ensure that the company seeking relisting meets the regulatory requirements of the target market, which are substantial on the Shanghai stock exchange;

g) **Negotiating the transaction terms** that will be set out in the parties' agreement to conduct the relisting; and

h) **Conducting corporate restructurings** that need to be done for the parties to be able to execute the backdoor listing in their desired structure.

**ANSWER:**

To the extent Paragraph 108 purports to refer to an undisclosed "expert," Mr. Zhou is without knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies the allegations. Mr. Zhou denies the remaining allegations in Paragraph 108.

109. Qihoo's fundamental restructuring of its businesses was particularly complex and would have required a significant amount of time to complete following the Merger. In addition to the usual restructuring needed to allow Qihoo and SJEC to merge—which itself is complex and time-consuming—Qihoo needed to separate its core businesses that would be included in the relisting from its other businesses that would be excluded. In addition, Qihoo needed to ensure that the ownership interests of the many parties to the Merger, including Defendants Zhou and Qi, the 36 Equity Investors that participated in the Buyer Group, and the corporate entities that were created for purposes of the Merger, were all structured properly before their interests could be merged with SJEC in the backdoor listing. Even though Qihoo's backdoor listing with SJEC was not announced until November 2, 2017, that timing is entirely consistent with the Buyer Group's already planning in 2015 to relist Qihoo after the Merger.

**ANSWER:**

Mr. Zhou admits that the restructuring of Qihoo's business after the Merger was complex. Mr. Zhou denies the remaining allegations in Paragraph 109.

110. Other news reports confirm that the members of the Buyer Group planned to relist Qihoo in China as part of their agreement to participate in the Merger. On December 29, 2015, *Tencent Technology* reported in Chinese that it obtained Qihoo's privatization plan from Huatai United Securities, which was the main underwriter for Qihoo's privatization in the Merger. This article also reported that Qihoo planned to return to the Chinese A-shares market through a backdoor listing.

**ANSWER:**

Paragraph 110 purports to refer to a Chinese article from *Tencent Technology* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou denies that the phrases in Paragraph

- 44 -

110 are a complete and accurate translation of the article and refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 110.

111. These articles in Chinese publications did not alert Qihoo Securityholders of the backdoor listing because these rumored reports were not definitive statements of the Buyer Group's intent. Moreover, because these statements were made in Chinese publications, they were not accessible to ADS holders, whose securities traded on the NYSE in the United States. In addition, after these articles were published, between January 2016, when Qihoo published the Preliminary Proxy Materials, and March 30, 3016, when Qihoo's shareholders voted on whether to approve the Merger, the Proxy Materials firmly disclaimed any pre-existing plan to relist Qihoo in China. The purpose of the Proxy Materials was to provide Qihoo Securityholders with the information they needed to decide whether to vote in favor of the Merger. Qihoo's investors were entitled to take Defendants at their word when they denied any plan to relist the Company in China. The news reports from late 2015 do, however, show when put in the context of all of the other evidence described herein, that the Buyer Group intended when they formed their agreement to participate in the Merger to relist the Company in China following the Merger.

**ANSWER:**

Mr. Zhou denies the allegations in Paragraph 111 or is without knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies the allegations.

112. On June 23, 2016, after Qihoo's shareholders voted to approve the Merger, a Chinese language article from the publication *Netease* explained that Qihoo told the media that it "had reached an agreement on the currency exchange plan with the State Administration of Foreign Exchange." The article commented that these developments paved the way for the Company's relisting in China.

**ANSWER:**

Paragraph 112 purports to refer to a Chinese article from *Netease* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou denies that the phrases quoted or referenced in Paragraph 112 are a complete and accurate translation of the article and refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 112.

113. On August 3, 2016—after Qihoo was delisted from the NYSE on July 15, 2016— the newspaper *Caixin* reported in Chinese on the Company's relisting plans. This article described a documented plan to relist "as of last year"—indicating that the Buyer Group had already planned

to relist the Company while the Merger process was still underway, and well before Defendants first issued the Proxy Materials in January 2016. This article also described Qihoo's plan to split its main businesses from its other businesses so that its core 360 security and 360 search businesses would be taken public in China while its other businesses (including finance, desktop, mobile services, and healthcare) would be excluded from the relisting plan. The article explained how this would aid in the relisting by removing entities that might face more regulatory hurdles or that were still in early stages, clearing the way for the newly listed company to focus on Qihoo's core businesses. Qihoo, however, declined to comment for this article on its plans for after its return to China following the Merger. This article confirms the other similar reports that the private promotional materials that Qihoo used to solicit investors in the Buyer Group secretly advertised that there would be a relisting after the Merger.

**ANSWER:**

Paragraph 113 purports to refer to a Chinese article from *Caixin* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou denies that the phrases in Paragraph 113 are a complete and accurate translation of the article and refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 113.

114.    Defendant Zhou, however, continued to deny the Buyer Group's relisting plan. On August 22, 2016, Zhou gave an extensive interview to Chinese media in which he discussed his plans for Qihoo following the Merger. On August 25, 2016, *Caixin* reported that in Defendant Zhou's August 22 interview, which was one of his first public comments since the Merger closed the prior month, he "threw cold water on that talk" of relisting the Company in China.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on August 22, 2016 containing some of the information referenced in Paragraph 114, but denies that the paraphrased language in Paragraph 114 is a complete and accurate translation of the relevant statements made in that interview. Paragraph 114 also purports to refer to an article from *Caixin* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 114.

115.    Contrary to Zhou's protestations, however, a February 28, 2017 *Financial Times* article explained that while Qihoo was taken private at a valuation of approximately $9.3 billion, "[m]arketing materials from the fundraising 'for the privatization of Qihoo 360 and return of A shares' seen by the FT state that the return to investors assuming an exit in 2019 'may be as high as 5 [times]' and contain ambitious estimates of future net income and other performance metrics going out to 2019." This article further explained that Qihoo's minority shareholders "say that conversations with Qihoo 360 and its advisers before privatisation suggested that the company's prospects were not nearly that bright.  A spokesperson for Qihoo 360 declined to respond to several email queries."

**ANSWER:**

Paragraph 115 purports to quote an article from the *Financial Times* that Mr. Zhou did not author and which speaks for itself.  Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining allegations in Paragraph 115.

116.    But Defendant Zhou continued to deny the relisting plan up until it was announced on November 2, 2017.  On November 6, 2017, *Pandaily* reported (translating an article that CBN had published on November 3, 2017) that "[i]n spite of his straightforward reputation," and the constant questions he received about Qihoo's relisting, Defendant Zhou "was tight-lipped about which company he bought" as a vehicle for Qihoo's backdoor listing until SJEC's November 2, 2017 announcement that Qihoo would conduct its reverse merger with SJEC.

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 116, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews.  Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article.  Mr. Zhou also states that the phrases in Paragraph 116 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 116.

### 2. News Reports Have Revealed the Buyer Group's True Business Reasons for the Merger

117.   After the Merger was completed, Defendant Zhou gave a much more fulsome explanation of his and the Buyer Group's reasons for taking Qihoo private. These factors explain substantial business opportunities that Qihoo had as a result of its returning to China after the Merger. Those opportunities made Qihoo a much more valuable Company upon its relisting in China but were not disclosed in the Proxy Materials to Qihoo's Securityholders.

**ANSWER:**

Mr. Zhou denies the allegations in Paragraph 117.

118.   On August 16, 2016, *Netease* reported in Chinese that Defendant Zhou stated that Qihoo would soon become a "pure domestic company." Zhou explained that the reason why Qihoo resolutely planned to return to the domestic market was that "a few years ago, Chinese government leaders had talked to [Zhou] and hoped that the company could return back to China since many government agencies were using Qihoo's products. In order to protect domestic cyber security, Qihoo should become a pure domestic company." In addition, Qihoo had started to get involved in China's military industry and it would not be appropriate for a foreign enterprise to be involved in those businesses. Defendant Zhou also claimed that several Chinese government agencies provided a lot of support to Qihoo's plan.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on or about August 16, 2016 containing some of the phrases quoted in Paragraph 118, but denies that the phrases are a complete and accurate translation of the relevant statements made in that interview. Mr. Zhou refers to the *Netease* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 118.

119.   On August 22, 2016, the publication *The Paper* reported in Chinese that Defendant Zhou stated in his interview that day that Qihoo was splitting up its business units as part of a strategy that he decided on prior to the Company's privatization in the Merger. Defendant Zhou denied that this step was part of a relisting plan. Rather, he explained that having Qihoo's different business lines organized as smaller firms would allow them to better innovate more new products and would better incentivize the management from different levels with stock options.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on August 22, 2016 containing some of the phrases quoted in Paragraph 119, but denies that these phrases are a complete and accurate translation of the relevant statements made in that interview. Mr. Zhou refers to the *The Paper* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 119.

120.    Defendant Zhou also stated emphatically in this interview that Qihoo had no plans for a backdoor listing in the Chinese stock market. He said that "countless people" were contacting him every day to recommend shell companies for a backdoor listing, but that he was not considering that at all and that he did not speak to anyone about a backdoor listing. Zhou gave several reasons for his firm stance against a backdoor listing. He claimed his priority was to focus on Qihoo's business.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on August 22, 2016 containing some of the phrases quoted in Paragraph 120, but denies that these phrases are a complete and accurate translation of the relevant statements made in that interview. Mr. Zhou denies the remaining allegations in Paragraph 120.

121.    In addition, as Zhou claimed according to an article published by *Caixin* on August 25, 2016, "I don't understand Chinese stock markets and the speculation repels me." He dispelled questions about when Qihoo would be returning to the Chinese stock market because he claimed that "[t]here is still a lot of uncertainty hanging over doing business at home, we don't know how to do it."

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 121, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Caixin* article for a complete

- 49 -

and accurate recitation of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining allegations in Paragraph 121.

122.    In the August 22, 2016 interview discussed in *The Paper*, Zhou reiterated China's national security concerns as a prime reason for Qihoo's privatization, as opposed to having conducted the privatization so that the Company could relist in the Chinese stock market.  Zhou also specifically denied seeking to "arbitrage" the higher valuation that the Company could achieve on the Chinese stock market.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on August 22, 2016 containing some of the phrases quoted in Paragraph 122, but denies that these phrases are a complete and accurate translation of the relevant statements made in that interview.  Mr. Zhou refers to the *The Paper* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining allegations in Paragraph 122.

123.    Zhou also described in this August 22, 2016 interview the control that he exerted over the Merger process.  He explained that there were strict requirements for investors to be part of the Buyer Group, including that they cooperate with his plans for the Company.  Members of the Buyer Group were required to use their own funds for the Merger rather than raise funds from outside investors.

**ANSWER:**

Mr. Zhou admits that he gave an interview to certain media reporters on August 22, 2016 containing some of the phrases quoted in Paragraph 123, but denies that these phrases are a complete and accurate translation of the relevant statements made in that interview.  Mr. Zhou refers to the *The Paper* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article.  Mr. Zhou denies the remaining allegations in Paragraph 123.

124.    The November 6, 2017 *Pandaily* article noted above also explained Zhou's reasons for relisting Qihoo in China and why he was willing to incur $3 billion in debt and to mortgage Qihoo's headquarters and trademarks to complete the Merger.  As Zhou explained, he no longer

wanted Qihoo listed in the United States because "[a] few years ago," the head of a Chinese government department had spoken to Zhou "several times and made the country's expectations clear. China had started to realize the importance of network security as a component of national security" and Qihoo played a key role in that area. "Qihoo 360 had more than 360 million customers and provided security protection software and solutions for many sensitive organizations including the government, institutions of foreign affairs, scientific research institutes of national defense and banks. . . . It was considered unsafe to put China's core enterprise security, national security and infrastructure security in the hands of a foreign-invested company."

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 124, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 124.

125. Zhou also explained that Qihoo was "different from entertainment and social companies that are listed in the US" and that Qihoo "offered network security and solutions to many sensitive departments. If Qihoo 360 were a foreign company, it couldn't receive the necessary qualifications. So we returned to China to play a more important role in network security."

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 125, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 125.

126. These sensitive business plans were also why Zhou limited the types of investors that could participate in the Buyer Group that took Qihoo private in the Merger. Zhou required that investors cooperate with his plan to "focus on domestic development" following the Merger. In addition, his requirement that investors use their own funds to participate in the Merger limited the types of investors that could participate in the Buyer Group. According to *Pandaily*, "Zhou said [Qihoo] turned down a lot of investors who wanted to take advantage of the opportunity and make a fortune."

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 126, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 126.

127.    Similarly, the February 28, 2018 *Bloomberg* article noted above cited Zhou's November 2017 statements "aligning himself with China's national interest" as "among the reasons he moved the listing to his homeland, where the Communist Party has been tightening the country's 'cybersecurity sovereignty.'"

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 127, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Bloomberg* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 127.

128.    In addition, the November 6, 2017 *Pandaily* article discussed Zhou's vision for Qihoo following the Merger. Although Zhou had in the past been "reluctant to discuss Internet security in-depth," at the China Internet security conference in September 2017, he finally disclosed his vision for Qihoo's core security business. Zhou emphasized "big security," comparing his idea to Jack Ma's (the founder of Alibaba) vision of "new retail." *Pandaily* explained:

> "We are in a big security era," Zhou said in an interview. Cyber security is not just the security of the network itself, but also national security, social security, infrastructure security, urban security and personal safety. "Security is big. The public understanding of what Qihoo 360 does should go beyond free antivirus services and phone blocking. In fact, Qihoo 360 can play an important role in industrial security, social security, national security, cyber-attack and defense," Zhou said. The integration of the military and the people is also an opportunity for Zhou. The biggest benefit of Qihoo 360's privatisation was identity.

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 128, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews.  Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 128.

129.    None of these plans that Zhou had for Qihoo's growth were disclosed to Qihoo Securityholders in connection with the Merger.  To the contrary, the Proxy Materials portrayed Qihoo as facing significant business risks without disclosing the great opportunity that Qihoo had to expand its security business once it returned to China and was no longer a U.S.-listed Company.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 129, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that the paraphrased language in Paragraph 129 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou also states that Paragraph 129 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in 129 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

130.    In particular, the Proxy Materials described the "business risks" of "increased competition and government regulation" as the "primary detriments" to the Buyer Group in conducting the Merger.  The Proxy Materials also stated that it was particularly important for Qihoo to become a private company so that it could have "greater flexibility" in facing "new challenges," including that "the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies" and "the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the phrases quoted and information referenced in Paragraph 130, but denies that these phrases and the paraphrased

- 53 -

language are a complete and accurate recitation of the relevant statements made in the Proxy

Materials.  Mr. Zhou also states that the phrases and paraphrased language in Paragraph 130 were

accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's

Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 130 and incorporates by

reference the full contents of the Proxy Materials as if attached hereto.

131.    Similarly, when the Proxy Materials disclosed the projections that Qihoo provided
to J.P. Morgan that formed the basis for J.P. Morgan's valuation and fairness opinion, those
projections were based on the Company continuing in line with its current plan and did not account
for the increased business opportunities that Zhou knew would exist after the Company was no
longer listed in the United States.  For example, these projections assumed that "the popularity of
the Company's products would remain stable in the geographic markets in which the Company
operated."  Defendants made no mention of being able to substantially expand its security business
in China—including in coordination with the Chinese government and other national security
interests—once it returned to China and would no longer be considered a foreign company.  As
the *Financial Times* reported on February 28, 2017, potential investors in the Merger were told
that Qihoo would be relisted following the Merger for multiple times its present value based on
"ambitious estimates of future net income and other performance metrics going out to 2019," but
Qihoo's minority shareholders reported "that conversations with Qihoo 360 and its advisers before
privatization suggested that the company's prospects were not nearly that bright."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in

Paragraph 131, but denies that the paraphrased language is a complete and accurate recitation of

the relevant statements made in the Proxy Materials.  Mr. Zhou also states that the paraphrased

language in Paragraph 131 was accompanied by, and must be read with, risk factors and other

explanatory language in Qihoo's Proxy Materials.  Paragraph 131 also purports to refer to an article

from the *Financial Times* that Mr. Zhou did not author and which speaks for itself.  Mr. Zhou

refers to that article for a complete and accurate statement of its contents.  Mr. Zhou denies the

remaining allegations in Paragraph 131 and incorporates by reference the full contents of the Proxy

Materials as if attached hereto.

132.    The Proxy Materials also did not mention Zhou's plan to split up Qihoo's business
into separate entities so that each separate business line could grow faster by focusing just on its

core competency and growth trajectory. The articles discussed above, however, make clear that this was part of Zhou's plan all along. In addition, the November 6, 2017 *Pandaily* article quoted Zhou as saying, "[i]n the future, we will split all businesses requiring a second startup." The article explained that "[a]fter the split, the branches will be subsidiaries under Qihoo 360 Group, with independent accounting, and staffing." According to Zhou, "[i]f you have the same criteria for mature and innovative businesses in a company, innovative businesses will never develop."

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 132, but denies that these phrases are a complete and accurate translation of the relevant statements made in those interviews. Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article. Mr. Zhou denies the remaining allegations in Paragraph 132 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

133.    Zhou's plan to split up Qihoo's business lines was sure to increase the value of each unit for the reasons that Zhou explained. In addition, it is well known that when companies spin-off subsidiaries, the new subsidiaries are worth more than when they were wholly owned by the parent company. A 2012 paper by well-known professors of corporate finance that analyzed ten equity carveouts in Asia, Europe, and the United States, confirms this phenomenon. Recent papers on corporate restructuring show similar results. Reasons for this phenomenon include that breaking up a company tends to lower information asymmetry and allows the more-focused companies that result to raise capital at a lower rate. Yet the Proxy Materials did not mention Zhou's plan to breakup Qihoo's separate business lines. The Proxy Materials also did not disclose the Company's financial results or projections for its individual business lines that would be separated into different entities following the Merger.

**ANSWER:**

Paragraph 133 purports to cite an article authored by Apostolos Dasilas and Stergios Leventis and an article authored by Eckbo and Thorburn, and those articles speak for themselves. Mr. Zhou refers to the articles for a complete and accurate statement of their contents, without conceding their accuracy. Mr. Zhou denies the remaining allegations in Paragraph 133 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

### 3. A Confidential Witness Has Confirmed that Defendants Planned All Along to Relist Qihoo in China Following the Merger

134.    A confidential witness that worked in Qihoo's Public Relations department at its Beijing headquarters from 2014 through 2017 ("CW1") has explained that Defendants planned all along to relist the Company in China following the Merger.  CW1 reported to a senior editor in the department, who reported to Qu Bing.  Qu was a Vice President, was in charge of Qihoo's Public Relations department, and reported to Defendant Qi.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 134 and on that basis denies the allegations.

135.    CW1 explained that by April 2015, employees in CW1's department were informally discussing that Qihoo would be relisted in China.  By mid-2015, everyone in the department knew of this plan.  In mid-2015, CW1 attended a department meeting where Defendant Qi directed the attendees that they needed to keep a low profile concerning the relisting plan and should "not release this information outside the company."  CW1 had a clear memory of this specific meeting.  Defendant Qi told attendees not to release any information about the relisting through Qihoo's media platform or discuss the matter internally.  Defendant Qi gave this instruction because the Public Relations department was responsible for Qihoo's media platform and news releases, so it was important for its members to know what could and could not be reported.  CW1 also explained that in addition to not announcing the relisting plan outside the Company, employees were instructed not to discuss it internally because there was a small community of internet companies in China with employees switching frequently between them. If employees discussed the relisting internally, it could cause a leak of the information to others in the industry.  CW1 also noted that employees knew since at least late 2015 that Qihoo would be relisted through a backdoor listing rather than through an IPO.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 135 and on that basis denies the allegations.

136.    CW1 also described Defendant Zhou as being in charge of the privatization and relisting plan because of his large ownership stake in the Company.  In addition, CW1 recalled discussing the Company's plans with a senior employee in the Public Relations department, who confirmed that after privatization, Qihoo would return to mainland China and get relisted.  CW1 also explained that Qihoo sought to complete its privatization as quickly as possible because that needed to be done before the relisting could occur.  Qihoo therefore pledged its headquarters in Beijing and the Company's trademarks as collateral to overcome funding constraints and secure loans from China Merchants Bank.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 136 and on that basis denies the allegations.

137.   CW1 also explained that as the relisting approached, Qihoo's leaders wanted to avoid public disclosure of the relisting and instructed employees to try to use their media connections to get articles with the identity of the shell company (SJEC) deleted from the internet. Lastly, CW1 described how Qihoo's employees were confident that the value of the Chinese shell company that Qihoo would merge into would increase dramatically as a result of the backdoor listing.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 137 and on that basis denies the allegations.

### 4.   The Cayman Islands Appraisal Action Shows That Defendants Have Hid Information Related to the Company's True Value

138.   Three Qihoo Securityholders (Blackwell Partners LLC-Series A, Crown Managed Accounts SPC, and Maso Capital Investments Limited) dissented from the Merger and sought appraisal in the Cayman Islands (the "Appraisal Action").  Together, these three investors owned a total of 329,097 of the Company's Class A ordinary shares.  At the Merger price, these shares were entitled to receive a total of approximately $16.9 million had their owners participated in the Merger rather than dissenting.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 138.

139.   While the Appraisal Action is still pending and much of the evidence from it is not publicly available, several interim court rulings show the extent to which Defendants have hidden Qihoo's true value from its Securityholders and underpaid them in the Merger.

**ANSWER:**

Paragraph 139 purports to refer to certain "interim court rulings" in the Cayman Islands

Appraisal Action, which rulings speak for themselves.  Mr. Zhou refers to these rulings for a

complete and accurate statement of their contents.  Mr. Zhou denies the remaining allegations in

Paragraph 139.

140.    Even though the dissenters' shares were worth only $16.9 million at the Merger price, Qihoo agreed in October 2016 to pay $92 million to the Cayman Islands court to be held "as security for payment by the Company to the Dissenting Shareholders of the fair value of the shares of the Dissenting Shareholders."  In a January 26, 2017 decision assessing the dissenters' request for an "interim payment" (to them rather than to the court), the Grand Court of the Cayman Islands took note of the fact that Qihoo chose to make this $92 million payment even before seeing the report of the dissenters' valuation expert that valued the dissenters' shares at between $41 million and $95.6 million in total (or between $124.4 per share and $290.49 per share—far higher than the Merger price).  The Cayman Islands court credited the dissenters' argument "that it is nigh inconceivable that such a substantial sum would have been paid into Court without anxious consideration by [Qihoo] and without the benefit of expert advice as to quantum."

**ANSWER:**

Paragraph 140 purports to refer to decisions in the Cayman Islands Appraisal Action, which

decisions speak for themselves.  Mr. Zhou refers to these decisions for a complete and accurate

statement of their contents.  Mr. Zhou denies the remaining allegations in Paragraph 140.

141.    Even with this $92 million held as security against an eventual judgment, the Grand Court of the Cayman Islands determined that Qihoo was required to pay the dissenting shareholders an interim payment equal to the Merger price while the Appraisal Action is pending. The court explained that it ordered this payment because it determined that the dissenters at trial would "receive at least this Merger Price."  The court also determined that "[o]n any view the Dissenters in these proceedings will receive from the Petitioner a substantial sum as fair value for their shares."

**ANSWER:**

Paragraph 141 purports to refer to decisions in the Cayman Islands Appraisal Action, which

decisions speak for themselves.  Mr. Zhou refers to these decisions for a complete and accurate

statement of their contents.  Mr. Zhou denies the remaining allegations in Paragraph 141.

142.    In addition, Qihoo has impeded at every turn the dissenters' efforts in the Appraisal Action to obtain the Company's internal data that would show its true value.  Qihoo failed to provide many categories of information that it had agreed to disclose in an October 25, 2016 Consent Order.  The dissenters therefore filed a Summons with the Grand Court of the Cayman Islands seeking to compel the production of relevant information.  The Court ruled on July 27, 2017 that Qihoo had taken "inconsistent positions" and a "cavalier approach to previous aspects of the discovery process."  In many instances, the Company changed entirely its response to certain

requests for key documents, first claiming that no responsive documents existed and then finding relevant materials after the dissenters issued their Summons.

**ANSWER:**

Paragraph 142 purports to refer to decisions in the Cayman Islands Appraisal Action, which decisions speak for themselves. Mr. Zhou refers to these decisions for a complete and accurate statement of their contents. Mr. Zhou denies the remaining allegations in Paragraph 142.

143. For example, there were inconsistencies in Alex Zuoli Xu's (the Company's Co-Chief Financial Officer) responses concerning the sources of information for the 2025 Projections of the Company's future financial results that formed the basis for J.P. Morgan's valuation and fairness opinion. First the Company said that J.P. Morgan prepared the 2025 Projections "based on their understanding of the Company's business, street consensus and see side analysis " Then, when pressed further, Xu said that was not correct and that he was the only person at Qihoo that communicated with J.P. Morgan about the 2025 Projections, based on his familiarity with the Company, but that he did not have any notes or records of what he told them. And then in affidavits, Xu and the Company took yet another position, claiming that Xu used his laptop and was logged into the Company's system when he met with J.P. Morgan. Furthermore, although the Company claimed that Xu was the only person that communicated with J.P. Morgan in connection with the 2025 Projections, documents that were subsequently produced showed that several other people were also included in correspondence between the Company and J.P. Morgan. The Company grudgingly ended up agreeing to search the emails of several employees—including Defendant Zhou—for relevant correspondence. The court, however, determined that those efforts were not sufficient and the emails of all of the Company's Directors should be searched.

**ANSWER:**

Paragraph 143 purports to refer to certain of Qihoo's actions and representations in the Cayman Islands Appraisal Action, the record of which speaks for itself. Mr. Zhou refers to this record for a complete and accurate statement of its contents. Mr. Zhou denies the remaining allegations in Paragraph 143.

144. The Cayman Islands court also found the difficulties that the dissenters raised related to Qihoo's financial projections that the Company provided to J.P. Morgan in its analysis of the Merger "hard to reconcile without full or complete discovery," which the Company was not providing. These projections are among the most important pieces of information that formed the basis for J.P. Morgan's valuation analysis. Yet, Qihoo was not forthcoming with this information in the Appraisal Action.

**ANSWER:**

Paragraph 144 purports to refer to decisions in the Cayman Islands Appraisal Action, which decisions speak for themselves. Mr. Zhou refers to these decisions for a complete and accurate statement of their contents. Mr. Zhou denies the remaining allegations in Paragraph 144.

145. The court in the Appraisal Action also noted other striking instances in which Qihoo withheld evidence. Qihoo first claimed that the virtual data room containing the due diligence materials that were provided to one of the financiers for the Merger no longer existed. But it turned out that the Company did have possession of the data room archive and "no explanation has been given as to when the Company came to be in possession of it, or how."

**ANSWER:**

Paragraph 145 purports to refer to certain court findings in the Cayman Islands Appraisal Action, the record of which speaks for itself. Mr. Zhou refers to this record for a complete and accurate statement of its contents. Mr. Zhou denies the remaining allegations in Paragraph 145.

146. As another example of the Company's discovery delinquencies, the court "found it strange that, at least initially, the Company has sought to distance itself from the documents available to the Special Committee." The dissenters sought the Special Committee's documents as a key source of information that would shed light on the Company's true value.

**ANSWER:**

Paragraph 146 purports to refer to certain court findings in the Cayman Islands Appraisal Action, the record of which speaks for itself. Mr. Zhou refers to this record for a complete and accurate statement of its contents. Mr. Zhou denies the remaining allegations in Paragraph 146.

147. Qihoo also initially stated on three separate occasions in the Cayman Islands discovery process that it did not create quarterly budgets or forecasts. But after the dissenters filed their Summons seeking evidence, the Company ended up finding and providing 431 documents relating to its quarterly budgets from 2012 through 2016.

**ANSWER:**

Paragraph 147 purports to refer to certain of Qihoo's statements and actions in the Cayman Islands Appraisal Action, the record of which speaks for itself. Mr. Zhou refers to this record for

a complete and accurate statement of its contents.  Mr. Zhou denies the remaining allegations in Paragraph 147.

148.    Because of the Company's insufficient discovery responses, the court in the Appraisal Action granted the dissenters' requests to compel Qihoo to undertake various discovery efforts, including that the Company better preserve its electronic information, that it provide the specific discovery requested, and that a forensic expert be jointly appointed by the parties to monitor the Company's compliance with its electronic discovery obligations.  And because the dissenters "largely succeeded on their application" to compel Qihoo to produce information, the Court awarded the dissenters a major portion of their costs of the application (which the Court later determined to be 80% of their costs).

**ANSWER:**

Paragraph 148 purports to refer to certain court findings in the Cayman Islands Appraisal Action, the record of which speaks for itself.  Mr. Zhou refers to this record for a complete and accurate statement of its contents.  Mr. Zhou denies the remaining allegations in Paragraph 148.

149.    The Court of Appeal of the Cayman Islands then denied Qihoo leave to appeal the lower court's discovery order.  In an October 9, 2017 decision, the Court of Appeal agreed with the lower court's analysis of Qihoo's blatant discovery failures.  For example, the appellate court noted "instances where the Company had claimed not to have certain categories of documents, but had subsequently disclosed them."  The appellate court also noted the unusual nature of the remedies issued here based on the Company's particularly obstructive behavior.  The appellate court explained that although ordering a forensic audit is "intrusive and exceptional," the lower court "had ample grounds for concluding that a forensic audit was the only practical way of ensuring that the Company complied with its disclosure obligations."  The appellate court stressed that forensic experts "are to be regarded as exceptional remedies, not common currency in section 238 petitions," because of the potential strain they might place on a company.  Qihoo's egregious behavior justified putting such an intrusive expert in place.

**ANSWER:**

Paragraph 149 purports to refer to certain findings by the Court of Appeal of the Cayman Islands, which speak for themselves.  Mr. Zhou refers to these findings for a complete and accurate statement of their contents.  Mr. Zhou denies the remaining allegations in Paragraph 149.

150.    Discovery in the Cayman Islands appraisal action was originally scheduled to be completed by November 18, 2016.  Because of the delays caused by Qihoo's recalcitrance, discovery has continued into 2019.  Furthermore, Qihoo's disruptive tactics did not stop after the court appointed the forensic auditor to oversee discovery.  As the dissenters explained in a subsequent motion raising Qihoo's continued manipulation of the discovery process, Qihoo

claimed that because of "eye issues," Defendant Zhou did not have a computer or any electronic devices and that he never used a computer since he founded the Company in 2006. The dissenters explained the absurdity of this contention for several reasons—including that Qihoo, which Zhou founded, is one of the leading internet companies China; Zhou stated in his 2017 autobiography, "I've been using computers for 30 years" and "[a]s long as I can sleep and [have] a space for my computer I'm ok"; a recent video showed Zhou in his office with a large computer screen and keyboard on his desk; and Zhou practiced archery despite claiming to have poor eyesight. In a December 19, 2018 ruling, the Grand Court of the Cayman Islands described Zhou's alleged eye issues as "quite incredible" and "odd."

**ANSWER:**

Paragraph 150 purports to refer to certain motions and rulings in the Cayman Islands Appraisal Action and Mr. Zhou's 2017 autobiography, which speak for themselves. Mr. Zhou refers to the court record and the autobiography for a complete and accurate statement of their contents. Mr. Zhou denies the remaining allegations in Paragraph 150.

151. That same ruling also discussed a situation whereby, in the course of collecting evidence for discovery, a leading member of Qihoo's finance team instructed the group to delete certain information from their computers before providing them for imaging in the discovery audit. Moreover, a company employee had stated that she should have removed the "Destruction Instruction" from the relevant materials before she provided them to the discovery monitor. Although the Court did not view these issues as being so severe as to merit a judgment that discovery should stop and the Company could not rely on any factual evidence at trial, the court described this situation as "unfortunate, (even peculiar)."

**ANSWER:**

Paragraph 151 purports to refer to certain representations and rulings in the Cayman Islands Appraisal Action, which speak for themselves. Mr. Zhou refers to the court record for a complete and accurate statement of its contents. Mr. Zhou denies the remaining allegations in Paragraph 151.

> **5. The Buyer Group Planned All Along to Relist Qihoo in China to Profit From the Higher Valuation That Would be Achieved After Qihoo Returned to China**

152. The *Pandaily* and *Bloomberg* articles discussed above noted that another reason why Zhou sought to relist Qihoo in China was that technology companies are generally valued more in the Chinese stock market than in the United States. As *Bloomberg* explained, "China's richer tech valuations may have been a draw." *Pandaily* similarly noted that based on this

valuation difference, "once Qihoo 360 returned to the [Chinese] A-share [stock market], its market value would grow many times over."  Consultation with the expert in Chinese and United States M&A and capital markets transactions noted above confirms this phenomenon.  Defendants, however, failed to disclose to Qihoo Securityholders, the Buyer Group's plan to relist Qihoo in the Chinese stock market.

**ANSWER:**

Paragraph 152 purports to quote articles from *Pandaily* and *Bloomberg*, which Mr. Zhou did not author and which speak for themselves.  Mr. Zhou refers to those articles for a complete and accurate statement of their contents, without conceding the accuracy of those articles. Paragraph 152 also alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 152.

153.    Qihoo's increased value after it relisted in China was not solely a result of the higher valuation of technology companies in the Chinese stock market.  In the Proxy Materials for the Merger, however, Defendants, also misrepresented Qihoo's true business opportunities once it would return to China.  Those undisclosed opportunities would contribute to its increased valuation after it relisted in China through its backdoor listing with SJEC.

**ANSWER:**

Mr. Zhou denies that the paraphrased language in Paragraph 153 is a complete and accurate recitation of the relevant statements in the Proxy Materials.  Mr. Zhou also states that the paraphrased language in Paragraph 153 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Paragraph 153 also alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 153 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

154.    The Buyer Group's plans for Qihoo following the Merger also highlight the inadequacy of J.P. Morgan's analysis of the Company in connection with the Merger.  J.P. Morgan based its assessment on its DCF analysis and its "public trading multiples analysis."  Both of these valuation methods were based on the financial projections that the Company provided to J.P. Morgan and disclosed in the Proxy Materials.  Those projections, however, failed to account for Qihoo's increased business opportunities that Defendants knew about but failed to disclose at the time of the Merger.

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain some of the information referenced in Paragraph 154, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the paraphrased language in Paragraph 154 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Paragraph 154 also alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 154 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

155.    In addition, J.P. Morgan's comparison of Qihoo to the public trading multiples of other companies failed to compare Qihoo to companies that were focused on internet security or to any companies that were listed on a Chinese stock exchange. J.P. Morgan selected four companies for comparison because, according to J.P. Morgan, "they represent the main publicly traded peers in China's internet industry with operations and businesses that, for purpose of J.P. Morgan's analysis, may be considered similar to that of the Company." But J.P. Morgan acknowledged that "none of the selected companies reviewed is identical to the Company. Accordingly, a complete analysis of the results of the following calculations cannot be limited to a quantitative review of such results and involves complex considerations and judgments concerning the differences in the financial and operating characteristics of the selected companies compared to the Company's and other factors that could affect the public trading value of the selected companies and the Company."

**ANSWER:**

Mr. Zhou admits that the Proxy Materials contain the phrases quoted and some of the information referenced in Paragraph 155, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that these phrases and the paraphrased language were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Paragraph 155 also alleges legal conclusions, to which no response is required. Mr. Zhou denies

the remaining allegations in Paragraph 155 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

156.   As Defendant Zhou explained in the *Pandaily* article discussed above, Qihoo is "different from entertainment and social companies that are listed in the US" because Qihoo "offered network security and solutions" that implicate sensitive areas such as national security interests.  J.P. Morgan, however, compared Qihoo to Tencent, Baidu, Kingsoft, and Cheetah Mobile, which focus on entertainment and social products and that do not dominate the Chinese internet security market in the way that Qihoo does.

**ANSWER:**

Mr. Zhou admits that he gave certain interview(s) containing some of the phrases quoted in Paragraph 156, but denies that these phrases are a complete and accurate translation of the relevant statements made in that interview.  Mr. Zhou refers to the *Pandaily* article for a complete and accurate recitation of its contents, without conceding the accuracy of that article.  Mr. Zhou also admits that the Proxy Materials contain some of information referenced in Paragraph 156, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in the Proxy Materials.  Mr. Zhou also states that these phrases and the paraphrased language were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 156 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

157.   Moreover, Tencent was over 18 times the size of Qihoo at the time of J.P. Morgan's analysis and Baidu was over 7 times larger.  Their vast differences in size meant that they were likely to have far less room for growth, and therefore were deserving of a lower price-to-earnings trading multiple than was Qihoo, even aside from the fact that they focused on different industries. In contrast, *Bloomberg*'s "trading comps" for internet security companies as of Qihoo's June 17, 2015 announcement of the Merger proposal show a median price-to-earnings ratio of 107.4 and an average multiple of 361.79, with Tencent falling well below those levels:



**ANSWER:**

Paragraph 157 purports to refer to *Bloomberg*'s "trading comp," which speaks for itself. Mr. Zhou refers to *Bloomberg*'s "trading comp" for a complete and accurate statement of its contents, without conceding the accuracy of *Bloomberg*'s "trading comp." Mr. Zhou denies the remaining allegations in Paragraph 157.

158.    J.P. Morgan's valuation analysis therefore did not provide an accurate assessment of Qihoo's value.    That analysis was particularly misleading in light of Defendants' misrepresentations and omissions concerning 1 - their plans to relist Qihoo in China following the Merger and 2 - the Company's true business opportunities once it returned to China.

**ANSWER:**

Paragraph 158 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 158.

V.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

159.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions.  The specific false and misleading statements are detailed below and reference is made therein to the following subparagraphs, which explain the reasons those statements are false and misleading.

a)    **Statements Concerning Intention Not to Relist**.  Defendants made statements throughout the Proxy Materials stating clearly that there were no plans in place for Qihoo to undergo a transaction following the Merger that would cause the Company's structure to be changed in any way, such as through relisting Qihoo on a Chinese stock exchange.    These assurances provided to Qihoo Securityholders were false and misleading because when these statements were made, the Buyer Group already planned to relist Qihoo at a far-higher valuation.

b)    **Statements That There Were No Viable Alternatives to the Merger.**  Defendants made statements throughout the Proxy Materials stating clearly that there were no alternatives to the Merger that would be more beneficial to Qihoo Securityholders.  These statements were false and misleading because they did not mention the alternative of relisting Qihoo on a Chinese stock exchange or paying Qihoo Securityholders fair value in light of that alternative plan.

c)    **Statements That Presented the Transaction in a Positive Light, or As "Fair**."  These statements were false and misleading because they conveyed that the Merger consideration of $77 per ADS or $51.33 per ordinary share was a fair price for the Qihoo Securities when, in fact, the Qihoo Securities were undervalued, causing the Merger price to be unfair.  These statements were also false and misleading because the fairness assessment of the Merger price was based on Qihoo's financial projections and J.P. Morgan's financial analysis that failed to consider the increased business opportunities that Qihoo would have after it returned to China; Qihoo's value after its business lines were broken up into separate entities; and how Qihoo's post-Merger businesses would be valued on the Chinese stock market, where the Buyer Group already planned during the Merger process to relist Qihoo following the Merger.  In fact, Defendants disclosed more positive financial projections privately to members of the Buyer Group when Defendant Zhou solicited investors to participate in the Merger than what Defendants disclosed publicly in the Proxy Materials.  Defendants' statements concerning the fairness of the Merger were also false and misleading because J.P. Morgan compared Qihoo to an improper set of peer companies that did not account for Qihoo's business prospects following the Merger.

d)    **Statements Concerning the Reasons for the Merger**.  To justify conducting the Merger without revealing the Buyer Group's true motivation of relisting Qihoo at a higher valuation, Defendants stated in the Proxy Materials that the Buyer Group preferred for Qihoo to be a private company so that it would not face the pressures associated with the public markets.  They stated that being a private company would allow Qihoo to maximize its long-term value.  These statements were false because the Buyer Group did not intend for Qihoo to

remain a private Company.  Rather, they planned all along to relist the Company at a higher valuation in China.  Those steps, which returned Qihoo to the public market in China, directly contradicted Defendants' statements that Qihoo would be better served as a private company.  Defendants also exaggerated the business risks that Qihoo faced in China and failed to disclose its true business opportunities following the Merger, so that the Buyer Group could capitalize on taking the Company private when investors did not have accurate information concerning the Company's true value.

**ANSWER:**

Mr. Zhou states that the claim the allegations in Paragraph 159(b) support has been dismissed from the case, thus no response is required.  Paragraph 159 also alleges legal conclusions, to which no response is required.  Mr. Zhou also states that the statements referenced in Paragraph 159 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 159 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

160.    To the extent that it is determined that any of the statements detailed below are statements of opinions, these opinion statements were false and misleading.  Statements conveying that the Merger was fair or advisable, even if opinions, were false and misleading because they were not actually held by Defendants and failed to disclose information that a reasonable shareholder would assume formed the basis for them.  Rather, these statements were part of a fraudulent scheme to deprive Qihoo Securityholders of the fair value of their securities.

**ANSWER:**

Paragraph 160 alleges legal conclusions, to which no response is required.  Mr. Zhou also states that the statements referenced in Paragraph 160 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 160 and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

**A.  The Announcement of the Merger**

161.    On December 18, 2015, Qihoo issued a press release announcing that the Company had agreed to the Merger.  Qihoo filed this press release with the SEC that same day with an accompanying Form 6-K that was signed by its Chief Financial Officer, Alex Zuoli Xu.

**ANSWER:**

Mr. Zhou admits the allegations in Paragraph 161 and incorporates by reference Qihoo's

December 18, 2015 press release.

162.    This announcement promoted the Merger by disclosing the deal price and pointing to a premium as compared to Qihoo's recent trading price, without also disclosing that the Qihoo Securities were worth far more than that deal price.  In particular, the press release explained that:

> Pursuant to the terms of the merger agreement, at the effective time of the merger, each of the Company's class A and class B ordinary shares issued and outstanding immediately prior to the effective time of the merger (the "Shares") will be cancelled and cease to exist in exchange for the right to receive US$51.33 in cash without interest, and each American Depositary Share ("ADS") of the Company, every two ADSs representing three class A ordinary shares, will be cancelled in exchange for the right to receive US$77.00 in cash without interest . . . .  The merger consideration represents a premium of 16.6% to the closing price of the Company's ADSs on June 16, 2015, the last trading day prior to the Company's announcement of its receipt of a 'going-private' proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a 'going-private' proposal.

**ANSWER:**

Mr. Zhou admits that on December 18, 2015, Qihoo issued a press release containing the

phrases quoted in Paragraph 162, but denies that these phrases are a complete and accurate

recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases

quoted in Paragraph 162 were accompanied by, and must be read with, risk factors and other

explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in

Paragraph 162 and incorporates by reference the full contents of the December 18, 2015 press

release as if attached hereto.

163.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 163 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 163.

164.    The deal announcement further stated that the Merger had been approved by the Board upon recommendation by the Special Committee and that the Board recommended shareholders approve the Transaction .  Specifically, the press release explained:

> The Company's board of directors (the 'Board'), acting upon the unanimous recommendation of a committee of independent and disinterested directors established by the Board (the "Special Committee"), approved the merger agreement and the merger and resolved to recommend that the Company's shareholders vote to authorize and approve the merger agreement and the merger.  The Special Committee negotiated the terms of the merger agreement with the assistance of its financial and legal advisors.

**ANSWER:**

Mr. Zhou admits that on December 18, 2015, Qihoo issued a press release containing the phrases quoted in Paragraph 164, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases quoted in Paragraph 164 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials.  Mr. Zhou denies the remaining allegations in Paragraph 164 and incorporates by reference the full contents of the December 18, 2015 press release as if attached hereto.

165.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 165 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 165.

### B.  The Preliminary Proxy Materials

166.    On January 11, 2016, Qihoo filed with the SEC the Preliminary Proxy Materials on Form 13E-3 explaining the proposed Merger to Qihoo Securityholders.  The Preliminary Proxy Statement was included as an exhibit to the Schedule 13E-3 Transaction Statement and was directed to "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the Schedule 13E-3 Transaction Statement and the Preliminary Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

**ANSWER:**

Mr. Zhou admits that on January 11, 2016, Qihoo filed the Preliminary Proxy Materials with the SEC on Form 13E-3 and that the Preliminary Proxy Statement was included as an exhibit to the Schedule 13E-3 Transaction Statement.  Mr. Zhou denies the remaining allegations in Paragraph 166 and incorporates by reference the Preliminary Proxy Materials as if attached hereto.

167.    The Preliminary Proxy Materials included the misleading statements or omissions described in the following sections (1) through (6).

**ANSWER:**

Paragraph 167 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 167.

### 1.  Statements Concerning Intention Not to Relist

168.    The Preliminary Proxy Statement described the Company's plans following the Merger as follows, stating that there were no present plans or proposals involving changes to the Company's structure:

> If the Merger is consummated, the Company will continue its operations as a privately held company beneficially owned solely by the Buyer Group and, as a result of the Merger, ADSs will no longer be listed on the NYSE and the ADS program for the Shares will terminate.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 168, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 168 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 168 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

169.    These statements were false and misleading for the reasons stated in ¶ 159(a).

**ANSWER:**

Paragraph 169 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 169.

170.    The Preliminary Proxy Statement also warranted, with the following language, that the Buyer Group did not have any plans at the time to conduct any extraordinary transactions that would change the Company's corporate structure after the Merger:

> The Buyer Group has advised the Company that, except as set forth in this proxy statement, the Buyer Group does not have any current plans, proposals or negotiations that relate to or would result in an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, relocation of any material operations, or sale or transfer of a material amount of the Company's assets.  However, subsequent to the consummation of the Merger, the Surviving Company's management and Board will continuously evaluate and review the Surviving Company's entire business and operations from time to time, and may propose or develop plans and proposals, including any of the foregoing actions, including the possibility of relisting the Surviving Company or a substantial part of its business on another internationally recognized stock exchange.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 170, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 170 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 170 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

171.    These statements were false and misleading for the reasons stated in ¶ 159(a). Although Defendants referenced the possibility of considering a potential relisting after the Merger, these statements were false and misleading because such a relisting was not just a possibility that the Buyer Group might consider in the future, but rather, was the Buyer Group's pre-established plan and its whole reason for the Merger.

**ANSWER:**

Paragraph 171 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 171.

172.    The Preliminary Proxy Statement also included a section called "Plans for the Company after the Merger."  The Preliminary Proxy Statement stated expressly in that section:

> Following the consummation of the Merger, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that it will (i) cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent and, through Parent, beneficially owned by the Buyer Group and (ii) have substantially more debt than it currently has.  The Buyer Group currently plans to repay the debt incurred to finance the Merger using the operating cash flow of the Surviving Company in accordance with the terms of the definitive documentation applicable to the Term Facility and Bridge Facility (as defined in the section entitled "Special Factors—Financing of the Merger").

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 172, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 172 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 172 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

173.    These statements were false and misleading for the reasons stated in ¶ 159(a).

**ANSWER:**

Paragraph 173 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 173.

174.    The Preliminary Proxy Statement further stated that the primary detriments of the Merger to the Buyer Group included that "[a]n equity investment in Holdco and Parent by the Buyer Group following the Merger will involve substantial risk resulting from the limited liquidity

of such an investment" and that "[f]ollowing the Merger, there will be no trading market for the Surviving Company's equity securities."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 174, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 174 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 174 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

175. These statements were false and misleading for the reasons stated in ¶ 159(a).

**ANSWER:**

Paragraph 175 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 175.

176. In addition, the Preliminary Proxy Statement described "a variety of potentially negative factors concerning the Merger Agreement and the Merger" that the Special Committee and the Board considered on behalf of Qihoo Securityholders that were unaffiliated with the Buyer Group. This list included that "the Unaffiliated Holders will have no on-going equity participation in the Company following the Merger, and they will cease to participate in the Company's future earnings or growth, if any, or to benefit from increases, if any, in the value of Shares and ADSs, and will not participate in any potential future sale of the Company to a third party or any potential recapitalization of the Company, which could include a dividend to shareholders."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 176, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 176 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy

Statement. Mr. Zhou denies the remaining allegations in Paragraph 176 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

177. These statements were false and misleading for the reasons stated in ¶ 159(a), particularly because neither this specific factor nor the long list of detriments to Qihoo Securityholders that the Preliminary Proxy Statement listed, mentioned that the Buyer Group already planned to relist the Company in the Chinese stock market at a much higher valuation.

**ANSWER:**

Paragraph 177 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 177.

178. In addition, the Preliminary Proxy Statement described "[t]he representations and warranties made by Parent Parties to the Company" as including "the absence of undisclosed agreements or arrangements involving the Equity Investors, the Parent Parties, the Founder Security holders, the Guarantors or any of their respective affiliates, in each case relating to the Merger."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 178, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 178 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 178 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

179. These statements were false and misleading for the reasons stated in ¶ 159(a), particularly because the Buyer Group had an undisclosed agreement to relist Qihoo in China at a higher valuation after the Merger.

**ANSWER:**

Paragraph 179 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 179.

### 2. Statements Concerning Lack of Alternatives to the Merger

180. The Preliminary Proxy Statement also discussed in great detail "Alternatives to the Merger," which did not mention the alternative of relisting the Company in China.

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 180.

181. In particular, the Preliminary Proxy Statement said that "[i]n the course of reaching their respective [fairness] determinations, *the Special Committee and the Board considered . . . the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the perceived risks of that alternative), the range of potential benefits to its shareholders of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account the likelihood of execution as well as business, competitive, industry and market risks.*"

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 181.

182. These statements were false and misleading for the reasons stated in ¶ 159(b).

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 182.

183.    The section titled "Alternatives to the Merger" described "***the Special Committee['s] determin[ation] that there was no viable alternative transaction to the proposed transaction of the Company with the Buyer Group***." This description explained that in addition to considering potential acquisitions by other parties, "***the Special Committee also considered other alternatives available to the Company to enhance shareholder value, including remaining as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value***, after considering factors such as the forecasts of future financial performance prepared by management, the offer premium implied by the Merger Consideration, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market."

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 183.

184.    These statements were false and misleading for the reasons stated in ¶ 159(b)-(d).

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 184.

185.    In addition, the Preliminary Proxy Statement described the Special Committee's mandate as specifically including "explor[ing] any alternatives to the proposed transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company" and "report[ing] to the Board the recommendations and conclusions of the Special Committee with respect to the proposed transaction and/or any alternative transaction and any recommendation as to whether the final terms of the proposed transaction or any alternative transaction are fair to and in the best interests of the minority shareholders of the Company and should be approved."

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 185.

186.    These statements were false and misleading for the reasons stated in ¶ 159(b)-(c).

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 186.

### 3.    False Representations that the Merger Was "Fair"

187.    The Preliminary Proxy Statement included many false and misleading assertions that the Merger was "fair" or in the best interests of Qihoo Securityholders who were unaffiliated with the Buyer Group.

**ANSWER:**

Paragraph 187 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 187.

188.    Defendants announced that the Special Committee declared the Merger to be fair. According to the Preliminary Proxy Statement:

> At a meeting on December 18, 2015, the Special Committee, after consultation with its financial advisor and legal counsels and due consideration, unanimously reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) *determined that the Merger, on the terms and subject to the conditions set forth in the Merger Agreement, is fair to, and in the best interests of, the Company and its Unaffiliated Holders*, (b) approved and declared it advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended that the Board authorize and approve the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 188, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 188 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 188 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

189.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 189 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 189.

190.    Qihoo's Board of Directors, in turn, determined that the Merger was fair and recommended that it be approved. According to the Preliminary Proxy Statement:

> At a meeting on December 18, 2015, the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen, who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, reaffirmed its resolutions previously adopted at its meeting on December 16, 2015, and (a) *determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders* and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, (b) authorized and approved the execution, delivery and performance of the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information and phrases quoted in Paragraph 190, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 190 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 190 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

191.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 191 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 191.

192.    The Preliminary Proxy Statement also affirmed that "[e]ach member of the Buyer Group believes that the Merger is fair to the Unaffiliated Holders."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted in Paragraph 192, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases in Paragraph 192 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 192 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

193.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 193 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 193.

194.   At the conclusion of the section titled "Reasons for the Merger and Recommendation of the Special Committee and the Board," the Preliminary Proxy Statement stated that **"[f]or the foregoing reasons, the Special Committee and the Board believe that the Merger Agreement, the Plan of Merger, the other transaction documents and the transactions contemplated thereby, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Holders.**"  (Emphasis in original).

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted in Paragraph 194, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases in Paragraph 194 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 194 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

195.   These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 195 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 195.

196.   The Preliminary Proxy Statement also stated that J.P. Morgan's financial analyses and fairness opinion formed a basis for the Special Committee's determination that the Merger was fair to unaffiliated Qihoo Securityholders and its recommendation that the Merger should be approved.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 196, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the

paraphrased language in Paragraph 196 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 196 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

197.    In addition, the Preliminary Proxy Statement stated as one of the "Reasons for the Merger and Recommendation of the Special Committee and the Board," that the Special Committee considered "the financial analyses reviewed and discussed with the Special Committee by representatives of J.P. Morgan, as well as the written opinion of J.P. Morgan rendered to the Special Committee on December 18, 2015 as to the fairness, from a financial point of view, of the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the Merger, as of December 18, 2015."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 197, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the paraphrased language in Paragraph 197 was accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 197 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

198.    The unanimous recommendation of the Special Committee, in turn, formed the basis for the Board's determination that the Merger was fair to unaffiliated Qihoo Securityholders and its decision to approve and recommend the Merger.

**ANSWER:**

Mr. Zhou admits that the Board (excluding Mr. Zhou, Defendant Qi, and Mr. Neil Nanpeng Shen, who abstained from the vote; and Mr. William Mark Evans, who was not present) acted upon the unanimous recommendation of the Special Committee in determining that the Merger

was fair to unaffiliated Qihoo Securityholders and in deciding to approve and recommend the Merger. Mr. Zhou denies the remaining allegations in Paragraph 198.

199. These statements referenced in ¶¶ 196-98 were false and misleading for the reasons stated in ¶ 159(c), particularly because J.P. Morgan's analysis was based on Qihoo's financial projections that did not account for Qihoo's true business prospects in China following the Merger and because J.P. Morgan compared Qihoo to companies that did not reflect those opportunities.

**ANSWER:**

Paragraph 199 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 199.

200. The Preliminary Proxy Statement also included J.P. Morgan's opinion that the Merger was "*fair*." While these statements were in some sense originally made by J.P. Morgan, they are attributable to Defendants for two reasons: first, they are part of the Preliminary Proxy Statement, which was included with the Preliminary Proxy Materials that were signed by the Defendants referenced in ¶ 166; and second, Defendants relied on J.P. Morgan's analysis as a basis for their conclusion that the Merger was fair to the unaffiliated Qihoo Securityholders and Defendants' recommendation that the Merger should be approved.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 200, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the paraphrased language in Paragraph 200 was accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 200 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

201. These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 201 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 201.

202.    The Preliminary Proxy Statement also prominently displayed the projections that formed the basis for J.P. Morgan's valuation analysis.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement includes the projections that formed the basis for J.P. Morgan's valuation analysis.  Mr. Zhou denies the remaining allegations in Paragraph 202 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

203.    These statements were false and misleading for the reasons stated in ¶ 159(c)-(d).

**ANSWER:**

Paragraph 203 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 203.

204.    The Preliminary Proxy Statement also appended J.P. Morgan's written fairness opinion, which concluded that the Merger was fair from a financial point of view, stating specifically that "[o]n the basis of and subject to the foregoing, it is our opinion as of the date hereof that the Per Share Merger Consideration and the Per ADS Merger Consideration to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented by ADSs) in the proposed Transaction is fair, from a financial point of view, to such Unaffiliated Holders."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted and some of the information referenced in Paragraph 204, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 204 were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 204 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

205.    These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 205 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 205.

206.    The Final Proxy Statement described J.P. Morgan's DCF analysis and its comparison of Qihoo to other companies in J.P. Morgan's "Public Trading Multiples Analysis".

**ANSWER:**

Mr. Zhou admits that the Final Proxy Statement contains some of the information referenced in Paragraph 206, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the paraphrased language in Paragraph 206 was accompanied by, and must be read with, risk factors and other explanatory language included in the Final Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 206 and incorporates by reference the full contents of the Final Proxy Statement as if attached hereto.

207.    These statements were false and misleading for the reasons stated in ¶ 159(c)-(d).

**ANSWER:**

Paragraph 207 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 207.

208.    The Preliminary Proxy Statement also warranted that its list of factors that the Buyer Group considered in determining that the Merger was fair and in the interests of Qihoo shareholders was believed by the Buyer Group "to include all material factors considered."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 208, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the

paraphrased language in Paragraph 208 was accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 208 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

209.    These statements were false and misleading for the reasons stated in ¶ 159(c)-(d).

**ANSWER:**

Paragraph 209 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 209.

210.    In addition, the Preliminary Proxy Statement stated that the Buyer Group believed the Merger was substantively and procedurally fair to unaffiliated Qihoo Securityholders based on the Buyer Group's "knowledge and analysis of available information regarding the Company, as well as the factors considered by, and the analysis and resulting conclusions of, the Special Committee and the Board."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted and some of the information referenced in Paragraph 210, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and paraphrased language in Paragraph 210 were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 210 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

211.    In particular, the Preliminary Proxy Statement stated that the Buyer Group believed the Merger was substantively and procedurally fair to unaffiliated Qihoo Securityholders because, among other reasons:

- the Special Committee determined that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, are fair to and in the best interests of the Company and the Unaffiliated Holders;

- the Board (other than Mr. Hongyi Zhou, Mr. Xiangdong Qi and Mr. Neil Nanpeng Shen who abstained from the vote, and Mr. William Mark Evans, who was not present), acting upon the unanimous recommendation of the Special Committee, (a) determined that the Merger as contemplated in the Merger Agreement and the Plan of Merger is fair to and in the best interests of the Company and the Unaffiliated Holders and it is advisable for the Company to enter into the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; (b) authorized and approved the Merger Agreement, the Plan of Merger, the other transaction documents, and the transactions contemplated thereby, including the Merger; and (c) recommended the approval and authorization of the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, to the shareholders of the Company and directed that the Merger Agreement, the Plan of Merger and the transactions contemplated thereby, including the Merger, be submitted to a vote of the shareholders of the Company for authorization and approval;

- the Special Committee retained and was advised by independent legal counsels and independent financial advisor, all of whom are experienced in advising committees such as the Special Committee in similar transactions;

- notwithstanding that the Buyer Group may not rely upon the opinion provided by the financial advisors to the Special Committee, the Special Committee having received from its financial advisor an opinion, dated December 18, 2015, stating that, as of such date and based upon and subject to the factors, assumptions, and limitations set forth therein, the Per Share Merger Consideration of $51.33 and the Per ADS Merger Consideration of $77.00 to be paid to the Unaffiliated Holders (other than Unaffiliated Holders of Excluded Shares, including Excluded Shares represented in ADSs) in the Merger was fair, from a financial point of view, to such Unaffiliated Holders; and

- the Board was fully informed about the extent to which the interests of the Buyer Group in the Merger differed from those of the Unaffiliated Holders.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 211, but denies that this paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the paraphrased language in Paragraph 211 was accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 211 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

212.    These statements were false and misleading for the reasons stated in ¶ 159(c)-(d).

**ANSWER:**

Paragraph 212 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 212.

### 4.  Promotions of the Merger Price

213.    The Preliminary Proxy Statement promoted the Merger by touting the Merger consideration of $77.00 per ADS and $51.33 per common share to Qihoo Securityholders.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 213, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou denies the remaining allegations in Paragraph 213 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

214.    The Preliminary Proxy Statement further promoted the Merger by describing the Merger consideration as a favorable premium to the recent price of Qihoo Securities and the Special Committee's and the Board's conclusion that "that it could take a considerable period of time before the trading price of the ADSs would reach and sustain at least the per ADS Merger consideration of US$77.00, as adjusted for present value, and the possibility that such value might never be obtained."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted and some of the information referenced in Paragraph 214, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and paraphrased language in Paragraph 214 were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 214

and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

215. These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 215 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 215.

216. The Preliminary Proxy Statement also touted the Merger price by describing it as a premium over recent trading prices while failing to disclose how it compared to the price that the Company would actually be worth on the Chinese market. In particular, the first reason that the Special Committee, the Board, and the Buyer Group all gave in support of the fairness of the Merger was that "the Per ADS Merger Consideration of $77.00 represents a premium of 16.6% over the Company's closing price of $66.05 per ADS as quoted by the NYSE on June 16, 2015, the last trading date immediately prior to the Company's announcement on June 17, 2015 that it had received a going-private proposal, and a premium of 32.7% to the average closing price of the Company's ADSs during the 30 trading days prior to its receipt of a 'going-private' proposal."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the information referenced in Paragraph 216, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the paraphrased language in Paragraph 216 was accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 216 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

217. These statements were false and misleading for the reasons stated in ¶ 159(c).

**ANSWER:**

Paragraph 217 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 217.

### 5.  False and Misleading Reasons for the Merger

218.  The Preliminary Proxy Statement included many false and misleading statements concerning the reasons for the Merger.

**ANSWER:**

Paragraph 218 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 218.

219.  The Preliminary Proxy Statement stated that one of the substantive factors that supported the Special Committee's and the Board's recommendation of the Merger and the conclusion that it was fair to unaffiliated Qihoo Securityholders was that as "a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted and some of the information referenced in Paragraph 219, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the phrases and the paraphrased language in Paragraph 219 were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 219 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

220.  These statements were false and misleading for the reasons stated in ¶ 159(c)-(d).

**ANSWER:**

Paragraph 220 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 220.

221.  Similarly, the Preliminary Proxy Statement explained that the Buyer Group's "Purposes and Reasons for the Merger" included that "[t]he Buyer Group believes the operating environment has become more challenging due to recent operating conditions and industry trends.

There is greater competition against both domestic and multinational companies in many of the service areas in which the Company operates. These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business and a willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would be most effectively implemented in the context of a private company structure. As a privately held entity, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the public market's valuation of the Company and its emphasis on short-term period-to-period performance. . . . The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company as described above and because the Buyer Group was able to obtain debt financing in connection with the Merger."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted in Paragraph 221, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 221 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

222.    These statements were false and misleading for the reasons stated in ¶ 159(d).

**ANSWER:**

Paragraph 222 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 222.

223.    In addition, the Preliminary Proxy Statement listed as "primary benefits of the Merger to the Buyer Group" that:

- The Surviving Company will no longer have continued pressure to meet quarterly forecasts set by analysts. In contrast, as a publicly traded company, the Company currently faces pressure from investment analysts to make decisions that may produce better short-term results, but may not maximize equity value in the long term;

- The Surviving Company will have more freedom to focus on long-term strategic planning in a highly competitive business with increasing competition and regulation;

- The Surviving Company will have more flexibility to change its capital spending strategies without public market scrutiny or analysts' quarterly expectations;

- The Surviving Company will be able to introduce new products and services or change its pricing strategies to attract customers without public market scrutiny or the pressure to meet short-term forecasts.

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains some of the phrases quoted in Paragraph 223, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 223 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

224. These statements were false and misleading for the reasons stated in ¶ 159(d).

**ANSWER:**

Paragraph 224 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 224.

225. The Preliminary Proxy Statement also stated that the "primary detriments of the Merger to the Buyer Group" included "[t]he business risks facing the Company, including increased competition and government regulation, will be borne by the Buyer Group."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted in Paragraph 225, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary

Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 225 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

226.    These statements were false and misleading for the reasons stated in ¶ 159(d).

**ANSWER:**

Paragraph 226 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 226.

### 6. Defendants Specifically Guaranteed the Accuracy of Their Statements in the Proxy Materials and that They Complied With the Securities Laws

227.    Each Defendant affirmed in the Schedule 13e-3 Transaction Statement that they signed when filing the Preliminary Proxy Materials that "after due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct."

**ANSWER:**

Mr. Zhou admits that the Preliminary Proxy Statement contains the phrases quoted in Paragraph 227, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Preliminary Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 227 and incorporates by reference the full contents of the Preliminary Proxy Statement as if attached hereto.

228.    These statements were false and misleading for the reasons stated in ¶ 159(a)-(d).

**ANSWER:**

Paragraph 228 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 228.

229.    In addition, the Merger Agreement, which was included with the Preliminary Proxy Statement that each Defendant signed, warranted that "[e]ach of the Parent Parties and the Company agrees, as to it and its respective Affiliates, directors, officers, employees, agents or Representatives, that *none of the information supplied or to be supplied by any Parent Party or the Company, as applicable, expressly for inclusion or incorporation by reference in the Proxy*

- 93 -

*Statement, the Schedule 13E-3 or any other documents filed or to be filed with the SEC in connection with the transactions contemplated hereby, will, as of the time such documents (or any amendment thereof or supplement thereto) are mailed to the holders of Company Shares and at the time of the Company Shareholders Meeting or any adjournment thereof, contain any untrue statement of a material fact, or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."*

**ANSWER:**

Mr. Zhou admits that the Merger Agreement contains the phrases quoted in Paragraph 229, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Merger Agreement.  Mr. Zhou denies the remaining allegations in Paragraph 229 and incorporates by reference the full contents of the Merger Agreement as if attached hereto.

230.    These statements were false and misleading for the reasons stated in ¶ 159(a)-(d).

**ANSWER:**

Paragraph 230 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 230.

231.    The Merger Agreement further warranted that "[i]f at any time prior to the Effective Time, any event or circumstance relating to the Parent Parties or the Company, or their respective officers or directors, should be discovered which should be set forth in an amendment or a supplement to the Proxy Statement or the Schedule 13E-3 so that such document would not include any misstatement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, the Party discovering such event or circumstance shall promptly inform the other Parties and an appropriate amendment or supplement describing such event or circumstance shall be promptly filed with the SEC and disseminated to the shareholders of the Company to the extent required by Law."

**ANSWER:**

Mr. Zhou admits that the Merger Agreement contains the phrases quoted in Paragraph 231, but denies that the phrases are a complete and accurate recitation of the relevant statements made

in that document.  Mr. Zhou also states that the statements in Paragraph 231 were accompanied

by, and must be read with, risk factors and other explanatory language included in the Merger

Agreement.  Mr. Zhou denies the remaining allegations in Paragraph 231 and incorporates by

reference the full contents of the Merger Agreement as if attached hereto.

232.    These statements were false and misleading for the reasons stated in ¶ 159(a)-(d).

**ANSWER:**

Paragraph 232 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 232.

### C.  The Amended Proxy Materials

233.    On February 8, 2016, Qihoo filed the Amended Proxy Materials with the SEC as
an amendment to Qihoo's earlier-filed Form 13E3.  The Amended Proxy Statement was included
as an exhibit to the Amended Schedule 13E-3 Transaction Statement that was filed on February 8,
2016 and was directed to all "Shareholders of Qihoo 360 Technology Co. Ltd."  Both the Amended
Schedule 13E-3 Transaction Statement and the Amended Proxy Statement were signed by
Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

**ANSWER:**

Mr. Zhou admits that on February 8, 2016, Qihoo filed the Amended Proxy Materials with

the SEC on Form 13E-3, and that the Amended Proxy Statement was included as an exhibit to the

Amended Schedule 13E-3 Transaction Statement.  Mr. Zhou denies the remaining allegations in

Paragraph 233 and incorporates by reference the Amended Proxy Materials as if attached hereto.

234.    The Amended Proxy Materials continued Defendants' fraudulent scheme by
reproducing the false and misleading statements that were originally included in the Preliminary
Proxy Materials, as described in Section V.B above.  In addition, the Amended Proxy Materials
added the following additional false and misleading statements about topics that Defendants were
forced to discuss after the SEC criticized the Preliminary Proxy Statement for failing to provide
Qihoo Securityholders with sufficient information concerning key aspects of the Merger.

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Materials contain some of the information

referenced in Paragraph 234, but denies that the paraphrased language is a complete and accurate

recitation of the relevant statements made in those documents.  Mr. Zhou also states that Paragraph 234 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 234 and incorporates by reference the full contents of the Amended Proxy Materials as if attached hereto.

235.     As in the Preliminary Proxy Statement, the Amended Proxy Statement said that "[i]n the course of reaching their respective [fairness] determinations, the Special Committee and the Board considered . . . the possible alternatives to the Merger."  The Amended Proxy Statement, however, added further detail to this disclosure by stating:

> In the course of reaching their respective [fairness] determinations, the Special Committee and the Board considered . . . the possible alternatives to the Merger (including the possibility of continuing to operate the Company as an independent publicly traded company and the possibility of a sale of the company to another buyer or group of buyers), the perceived potential benefits and risks of the possible alternatives and the timing and the likelihood of accomplishing the goals of such alternatives, and the assessment by the Special Committee that none of these alternatives was reasonably likely to present superior opportunities for the Company or to create greater value for its shareholders than the Merger, taking into account (i) the likelihood of being consummated, given the size of and required funding for any potential alternative transaction , the percentage ownership held by the Buyer Group and their express statement regarding their unwillingness to sell their shares in any other transaction involving the Company, and general timing consideration, (ii) the business, competitive, industry and market risks, (iii) the likely impact of the PRC anti-monopoly law on the viability of potential alternatives, and (iv) the absence of any proposals made by any unsolicited potential buyers since the announcement of the proposed transaction on June 17, 2015."

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement contains the phrase quoted in Paragraph 235, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Amended Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 235 and incorporates by reference the full contents of the Amended Proxy Statement as if attached hereto.

236.     Defendants added these new statements to the Amended Proxy Statement because the SEC had found their disclosures in the Preliminary Proxy Statement on this topic to be deficient.  In a February 4, 2016 letter commenting on the Preliminary Proxy Materials, the SEC

specifically directed Defendants to "disclose any transaction alternatives considered, aside from the possibility of continuing to operate the Company as an independent publicly traded company, and the reason(s) for their rejection." Defendants' revision in the Amended Proxy Materials continued to be false and misleading for the reasons stated in ¶ 159(b) and (d), particularly because Defendants purported to "disclose any transaction alternatives considered" and discussed specific factors that affected that analysis, but failed to disclose the alternative of relisting Qihoo on the Chinese stock market.

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement contains some of the information referenced in Paragraph 236, but denies that the paraphrased language is a complete and accurate recitation of the relevant statements made in that document. Mr. Zhou also states that the paraphrased language in Paragraph 236 was accompanied by, and must be read with, risk factors and other explanatory language included in the Amended Proxy Statement. Mr. Zhou also states that Paragraph 236 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 236 and incorporates by reference the full contents of the Amended Proxy Statement as if attached hereto.

237. Also, as in the Preliminary Proxy Statement, the Amended Proxy Statement stated that one of the substantive factors that supported the Special Committee's and the Board's recommendation of the Merger and the conclusion that it was fair to unaffiliated Qihoo Securityholders was that as "a privately held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressure created by the public equity market's emphasis on short-term period-to-period financial performance." The Amended Proxy Statement, however, elaborated that:

> Such flexibility is particularly important given the Company's belief that the operating environment has changed significantly since the Company's initial public offering, and the new challenges that the Company faces in the marketplace, including, among other things, (i) the Company faces increased competition in the Company's industry from internet security product and service providers and PRC-based internet companies; (ii) the Company is required to make significant capital expenditures as well as continuous and substantial investments in the Company's technological and other resources to compete in the market and strengthen its market position, and to improve its products and technology, particularly in new product and service initiatives; (iii) monetization and long-term success of the Company's emerging business, such as IoT and smartphone business remain unproven; and (iv) the recent economic slowdown in China and expected sustained macroeconomic challenges place pressure on the Company's revenue growth and other key financial and operating metrics.

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement contains the phrases quoted in Paragraph 237, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that the paraphrased language in Paragraph 237 was accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Amended Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 237 and incorporates by reference the full contents of the Amended Proxy Statement as if attached hereto.

238.    Defendants added these new statements to the Amended Proxy Statement because the SEC had found their disclosures in the Preliminary Proxy Statement on this topic to be deficient.  The SEC's February 4, 2016 letter commenting on the Preliminary Proxy Statement noted "that many of the factors cited in support of the transaction have existed for some time and should have been reasonably foreseeable prior to the company's initial public offering in 2011." The SEC therefore directed Defendants to revise the Proxy Statement "to provide expanded disclosure regarding the reasons behind each filing person's choice to engage in the transaction at this time as opposed to any other time in the Company's public company history.  Refer to Item 1013(c) of Regulation M-A."  Defendants' revisions to the Amended Proxy Statement continued to be false and misleading for the reasons stated in ¶ 159(d), particularly because Defendants now provided specific reasons that purportedly favored Qihoo operating as a private company but failed to disclose the Buyer Group's true reasons for the Merger and plans for the Company after the Merger.

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement and Qihoo's communications with the SEC contain the phrases quoted and some of the information referenced in Paragraph 238, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in those documents.  Mr. Zhou also states that the phrases and paraphrased language in Paragraph 238 were accompanied by, and must be read with, risk factors and other explanatory language included in the Amended Proxy Statement.  Mr. Zhou also states that part of the claim supported by these allegations has been dismissed from the case, thus no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 238 and incorporates

by reference the full contents of the Amended Proxy Statement and Qihoo's communications with the SEC as if attached hereto.

239. Also in response to the SEC's critiques in its February 4, 2016 letter, the Amended Proxy Statement significantly modified the disclosures surrounding the financial projections that Qihoo provided to J.P. Morgan. The SEC noted that the financial projections in the Preliminary Proxy Statement were merely summarized and directed Qihoo to "disclose the full projections, including all preliminary and final projections." The SEC also directed Qihoo to "revise to identify the 'numerous assumptions and estimates as to future events made by the Company's management' in preparing the disclosed financial projections. Your revised disclosure should summarize the material assumptions underlying any limitations upon the projected figures disclosed."

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement and Qihoo's communications with the SEC contain the phrases quoted and some of the information referenced in Paragraph 239, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in those documents. Mr. Zhou also states that the phrases and paraphrased language in Paragraph 239 were accompanied by, and must be read with, risk factors and other explanatory language included in the Amended Proxy Statement. Mr. Zhou denies the remaining allegations in Paragraph 239 and incorporates by reference the full contents of the Amended Proxy Statement and Qihoo's communications with the SEC as if attached hereto.

240. In response to these comments, Defendants provided more categories of financial projections in the Amended Proxy Statement and disclosed:

> In preparing these projections, the Company's management necessarily made certain assumptions about future financial factors affecting the Company's business, including, primarily, that (i) users of personal computers, smart phones and broadband internet services and their penetration in China and elsewhere would continue in line with management's expectations, (ii) the Company would be able to successfully expand its product offering by developing and launching new PC and mobile products, (iii) the popularity of the Company's products would remain stable in the geographic markets in which the Company operated, (iv) the Company would be able to successfully implement its business plan to compete effectively in both its traditional business and emerging business, (v) the market for smartphone and IoT (internet of things) devices would develop in line with management's expectations, (vi) the Company's emerging business would develop successfully, driven by both further hardware penetration and increasing

monetization from smartphone and IoT devices, and (vii) material costs and expenses would increase in connection with the Company's revenue increase.  The Company's management also assumed that the overall economy in China will remain stable, and that there will be no material change in competition affecting the Company.

**ANSWER:**

Mr. Zhou admits that the Amended Proxy Statement contains the phrases quoted in Paragraph 240, but denies that these phrases are a complete and accurate recitation of the relevant statements made in that document.  Mr. Zhou also states that these phrases were accompanied by, and must be read with, risk factors and other explanatory language included in the Amended Proxy Statement.  Mr. Zhou denies the remaining allegations in Paragraph 240 and incorporates by reference the full contents of the Amended Proxy Statement as if attached hereto.

241.    Defendants' revised disclosures surrounding Qihoo's financial projections continued to be false and misleading for the reasons stated in ¶ 159(c), particularly because these disclosures now provided specific assumptions underlying Qihoo's business performance following the Merger but failed to disclose Qihoo's true business opportunities that it would have after it returned to China.

**ANSWER:**

Paragraph 241 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 241.

242.    Other than the additional false and misleading statements discussed in this Section V.C, the Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Preliminary Proxy Materials, as described in Section V.B above.

**ANSWER:**

Paragraph 242 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 242.

### D.  The Second Amended Proxy Materials

243.    On February 26, 2016, Qihoo filed the Second Amended Proxy Materials with the SEC as an amendment to Qihoo's earlier-filed Form 13E3.  The Second Amended Proxy Statement was included as an exhibit to the Second Amended Schedule 13E-3 Transaction Statement that

- 100 -

was filed on February 26, 2016 and was directed to all "Shareholders of Qihoo 360 Technology Co. Ltd." Both the Second Amended Schedule 13E-3 Transaction Statement and the Second Amended Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

**ANSWER:**

Mr. Zhou admits that on February 26, 2016, Qihoo filed the Second Amended Proxy Materials with the SEC on Form 13E-3, and that the Second Amended Proxy Statement was included as an exhibit to the Second Amended Schedule 13E-3 Transaction Statement. Mr. Zhou denies the remaining allegations in Paragraph 243 and incorporates by reference the full contents of the Second Amended Proxy Materials as if attached hereto.

244.    The Second Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Amended Proxy Materials, as described in Section V.C above.

**ANSWER:**

Paragraph 244 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 244.

### E.  The Third Amended Proxy Materials

245.    On March 3, 2016, Qihoo filed with the SEC the Third Amended Proxy Materials on Form 13E-3 explaining the proposed Merger to Qihoo Securityholders. The Final Proxy Statement was included as an exhibit to the Third Amended Schedule 13E-3 Transaction Statement and was directed to "Shareholders of Qihoo 360 Technology Co. Ltd." Both the Third Amended Schedule 13E-3 Transaction Statement and the Final Proxy Statement were signed by Defendants Chen (on behalf of Qihoo), Zhou, and Qi.

**ANSWER:**

Mr. Zhou admits that on March 3, 2016, Qihoo filed the Third Amended Proxy Materials with the SEC on Form 13E-3, and that the Final Proxy Statement was included as an exhibit to the Third Amended Schedule 13E-3 Transaction Statement. Mr. Zhou denies the remaining allegations in Paragraph 245 and incorporates by reference the Third Amended Proxy Materials as if attached hereto.

- 101 -

246.    The Third Amended Proxy Materials continued Defendants' fraudulent scheme by reproducing the false and misleading statements that were originally included in the Amended and Second Proxy Materials, as described in Sections V.B-C above.

**<u>ANSWER:</u>**

Paragraph 246 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 246.

## VI.    <u>CONTROL PERSON ALLEGATIONS</u>

247.    The Individual Defendants, by virtue of their senior positions at Qihoo, directly participated in the management and oversight of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and knowing inactions.

**<u>ANSWER:</u>**

Paragraph 247 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 247 or is without knowledge or information sufficient to form a belief about the truth of certain allegations and on that basis denies the allegations, except admits that Mr. Zhou and Mr. Qi held senior positions at Qihoo and participated in the management of the Company.

248.    As Qihoo's Chairman, CEO, and Co-Founder, Defendant Zhou was closely involved in all aspects of the Company's business operations.

**<u>ANSWER:</u>**

Mr. Zhou admits that he served as Qihoo's Chairman, CEO, and Co-Founder and assumed the duties and roles in relation to those positions.  Mr. Zhou denies the remaining allegations in Paragraph 248.

249.    Defendant Qi also had control over Qihoo and all aspects of its business, as its President and Director since its inception in 2005, as well as its Co-Founder.

**ANSWER:**

Paragraph 249 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 249, except admits that Mr. Qi served as President and Director since Qihoo's inception in 2005, is a Co-Founder of Qihoo, and assumed the duties and roles in relation to those positions.

250.    Defendant Zhou and Qi also had control over Qihoo during the Class Period through their ownership stakes.  Prior to the Merger, Defendant Zhou (including through Global Village) owned 17.3% of the Company's outstanding ordinary shares and 42.7% of its voting rights. Defendant Qi (including through Young Vision) owned 8.1% of the Company's outstanding ordinary shares and 17.9% of its voting rights. Collectively, Zhou and Qi owned 4,740,568 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represented approximately 25.4% of its outstanding ordinary shares and approximately 60.6% of the Company's voting rights.

**ANSWER:**

Mr. Zhou admits that prior to the Merger, Mr. Zhou (including through Global Village) owned 17.3% of the Company's outstanding ordinary shares and 42.7% of its voting rights; Mr. Qi (including through Young Vision) owned 8.1% of the Company's outstanding ordinary shares and 17.3% of its voting rights.  Mr. Zhou further admits that prior to the Merger, collectively, Mr. Zhou and Mr. Qi owned 4,740,568 Class A ordinary shares and 41,263,812 Class B ordinary shares, which represented approximately 25.4% of the Company's outstanding ordinary shares and approximately 60.6% of its voting rights.  Mr. Zhou also states that Paragraph 250 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 250.

251.    Defendants Zhou and Qi also had control over the Buyer Group and Parent Parties through their positions as the individuals with the largest stakes in Qihoo in those groups both before and after the Merger.

**ANSWER:**

Paragraph 251 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 251 or is without knowledge or information sufficient to

form a belief about the truth of the remaining allegations in Paragraph 251 and on that basis denies the allegations.

252.    As a Qihoo Director and Chairman of the Special Committee, Defendant Chen had considerable ability to control the Company during the Class Period.

**ANSWER:**

Paragraph 252 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 252 or is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 251 and on that basis denies the allegations.

253.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Qihoo, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Qihoo, the Special Committee, the Board, and the Buyer Group during the Class Period. The Individual Defendants were undoubtedly provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations that were being made were then materially false and/or misleading.

**ANSWER:**

Paragraph 253 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 253 or is without knowledge or information sufficient to form a belief about the truth of certain allegations and on that basis denies the allegations, except admits that he reviewed certain reports and press releases before they were issued by the Company.

254.    Moreover, the Individual Defendants signed SEC filings that contained the material misstatements or omissions at issue here. Accordingly, they are responsible for the accuracy of the public statements detailed herein.

- 104 -

**ANSWER:**

Paragraph 254 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 254, except admits that the Individual Defendants signed

certain SEC filings.

255.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information.  Each of the Individual Defendants were culpable for this deceit insofar as they acted with the requisite scienter, as explained throughout, and especially in the following Section.

**ANSWER:**

Paragraph 255 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 255.

256.    The Individual Defendants are further liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**ANSWER:**

Paragraph 256 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 256.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

257.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein.  The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions.  The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter.  Furthermore, Defendants Zhou and Qi had the motive and opportunity to commit the fraud.

**ANSWER:**

Paragraph 257 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 257.

**A.   Defendants Zhou and Qi Had the Motive and Opportunity to Defraud the Class**

258.    As Qihoo's CEO, Chairman of the its Board, and Co-Founder of the Company in the case of Defendant Zhou, and as its President, Director, and Co-Founder in the case of Defendant Qi, it is clear that Zhou and Qi had the opportunity to commit the fraudulent acts described herein.   They had the ability to influence the information contained in the Proxy Materials and the information that management provided to J.P. Morgan. Zhou and Qi also signed the Proxy Materials and had the ability to influence their preparation.   They also had the ability to vote their 60% voting interest in favor of the Merger.

**ANSWER:**

Mr. Zhou admits that he was Qihoo's CEO, Chairman of the Board, and Co-Founder; Mr. Qi was Qihoo's President, Director, and Co-Founder; and Mr. Zhou and Mr. Qi signed certain Proxy Materials and collectively held 60% of the voting interest.  Paragraph 258 otherwise alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 258.

259.    In addition, Defendant Zhou led the Merger by initiating the transaction, coordinating the Buyer Group's participation, and formulating the Buyer Group's plan for the Company following the Merger.

**ANSWER:**

Mr. Zhou admits that he was a member of the Buyer Group but denies the oversimplified characterizations of the Buyer Group's activities as alleged in Paragraph 259.

260.    As the leading member of the Buyer Group who would own 22.8% of the Company following the Merger, Defendant Zhou had an enormous financial motive for the Merger to be completed at as low a transaction price as possible.  By deflating the value of the Qihoo Securities through the fraudulent scheme described herein, Zhou was able to reduce the amount of money he needed to spend to acquire Qihoo.  By defrauding Qihoo Securityholders, Zhou received a windfall from them of over $11 billion.  As *Bloomberg* reported on February 28, 2018, when Qihoo's backdoor listing was completed, Defendant's [sic] Zhou's stake in the Company increased from $2 billion to $13.6 billion, making him China's 12th-richest person. And Zhou profited even further because his stake in the Company prior to the Merger was worth only $1.6 billion.  He reaped enormous rewards by increasing his share of the Company following the Merger and then having the valuation of that stake increase over sixfold because of the Company's increased value after its backdoor listing in China.  Ultimately, Zhou was motivated to see to it that the Merger be completed at the agreed-upon transaction price so that he could capitalize on the deflated share price and reap billions in profits when the private Company would then be relisted in China as a public company with a far higher value.

**ANSWER:**

Paragraph 260 purports to quote an article from *Bloomberg* that Mr. Zhou did not author

and which speaks for itself.  Mr. Zhou refers to that article for a complete and accurate statement

of its contents, without conceding the accuracy of that article.  Mr. Zhou also admits that he owned

22.8% of the Company following the Merger but otherwise denies the remaining allegations in

Paragraph 260.

261.    Moreover, the backdoor listing included only Qihoo's core businesses.  Zhou—and
the other members of the Buyer Group—profited even further by retaining stakes in Qihoo's other
valuable assets that were not included in the relisting.

**ANSWER:**

Mr. Zhou admits that certain portions of Qihoo's business were separated from the

Company before relisting.  Mr. Zhou denies the remaining allegations in Paragraph 261.

262.    Defendant Zhou also stood personally to gain through the completion of the Merger
because the transaction would give him private control over the Company's affairs.

**ANSWER:**

Paragraph 262 alleges legal conclusions to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 262.

263.    Defendant Qi also received enormous financial benefits from the Merger.  Prior to
the Merger he owned 8.1% of the Company.  After the Merger, he owned 2.2% of the Company
directly and also owned and controlled Tianjin Xinxinsheng Investment Limited Partnership,
which owned 11.5% of the Company following the Merger.  Defendant Qi thus also benefited
from the Company's exponential increase in value following the Merger and from his increasing
his stake in the Company through the Merger.

**ANSWER:**

Mr. Zhou states that Paragraph 263 appears to be based on the Company's SEC filings,

which speak for themselves.  Mr. Zhou refers to those documents for a complete and accurate

statement of their contents.  Mr. Zhou denies the remaining allegations in Paragraph 263 or is

without knowledge or information sufficient to form a belief about the truth of certain allegations in Paragraph 263 and on that basis denies the allegations.

264.    The other members of the Buyer Group had the same motive to commit fraud. They would own the remainder of the Company following the Merger that Defendants Zhou and Qi did not own. They therefore also stood to reap profits by completing the Merger at a deflated price so that they could then sell their shares at higher prices when the Company would be relisted in China. The other members of the Buyer Group also signed the Proxy Materials and had the opportunity to influence the statements contained therein supporting the Merger.

**ANSWER:**

Mr. Zhou admits that members of the Buyer Group signed certain Proxy Materials. Certain remaining allegations in Paragraph 264 allege legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 264 or is without knowledge or information sufficient to form a belief about the truth of certain allegations in Paragraph 264 and on that basis denies the allegations.

### B. Many Sources Show That a Primary Condition of the Merger Was That the Buyer Group Would Relist Qihoo in China After the Merger

265.    Many reports described above state clearly that the secret marketing materials that Defendant Zhou used to solicit investors to participate in the Buyer Group in 2015—before Defendants issued any of the Proxy Materials—made Qihoo's backdoor listing in China following the Merger an explicit private condition to the Merger. Investors knew that they would be able to profit enormously if Qihoo would be relisted in China following the Merger. This precondition, which Defendants failed to disclose in the Proxy Materials, incentivized investors to participate in the Buyer Group and allowed Defendant Zhou to complete the Merger.

**ANSWER:**

Paragraph 265 alleges legal conclusions to which no response is required. To the extent a response is required, Mr. Zhou states that the reports referenced above speak for themselves and refers to those reports for a complete and accurate statement of their contents, without conceding the accuracy of those reports. Mr. Zhou denies the remaining allegations in Paragraph 265.

266.    Defendant Qi, as Qihoo's President, second-largest shareholder, and Co-Founder, was also apprised of this key undisclosed deal term. As the Proxy Statement explains, "[b]etween late-May 2015 and mid-June 2015, the Chairman had discussions with Mr. Xiangdong Qi, co-

founder and a director and president of the Company," and other members of the Buyer Group "regarding the possibility of acquiring the Company. The discussions concerned, among other things, recent market trends, recent activities of other U.S. public companies with primary operations in the PRC, the Company's long term strategic plans, and the structure, timetable, pros and cons of a potential acquisition of the Company."

**ANSWER:**

Mr. Zhou admits that Mr. Qi was Qihoo's President, second-largest shareholder, and Co-Founder. Mr. Zhou also admits that the Proxy Materials contain some of the information referenced and phrases quoted in Paragraph 266, but denies that these phrases and the paraphrased language are a complete and accurate recitation of the relevant statements made in the Proxy Materials. Mr. Zhou also states that the phrases and paraphrased language in Paragraph 266 were accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's Proxy Materials. Mr. Zhou denies the remaining allegations in Paragraph 266 or is without knowledge or information sufficient to form a belief about the truth of certain allegations in Paragraph 266 and on that basis denies the allegations, and incorporates by reference the full contents of the Proxy Materials as if attached hereto.

267. In addition, CW1 confirms that Defendant Qi knew about the plan to relist Qihoo after the Merger and led the effort to keep that information secret. CW1 describes a Public Relations department meeting in mid-2015 at which Qi directed the attendees not to disclose the relisting plan outside the company and to refrain from discussing it even within the Company. CW1 also described Qihoo's leaders as instructing employees to use their media connections to squelch articles referencing Qihoo's conducting a backdoor listing through SJEC.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 267 and on that basis denies the allegations.

268. CW1 also described Defendant Zhou as being in charge of the privatization and relisting plan because of his large ownership stake in the Company. In addition, CW1 described the fact that Qihoo would be relisted through a backdoor listing rather than through an IPO as common knowledge within the Company since late 2015.

**ANSWER:**

Mr. Zhou is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 268 and on that basis denies the allegations.

269.    Defendant Chen, by virtue of his role as a Chairman of the Special Committee and a Qihoo Director, would also have been apprised of the backdoor listing plans that were included in marketing materials that were given to the Buyer Group during the Merger process that he was so heavily involved in.

**ANSWER:**

Mr. Zhou admits that Defendant Chen served as the Chairman of the Special Committee.

Mr. Zhou denies the remaining allegations in Paragraph 269 or is without knowledge or

information sufficient to form a belief about the truth of those allegations and on that basis denies

the allegations.

270.    In addition, the Special Committee was given broad authority to take whatever steps it deemed necessary to assess the fairness of the Merger, including by considering alternatives to the Merger, reviewing Qihoo's financial projections and business prospects, and hiring advisors to assist its efforts.  The Special Committee was instructed to "to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group in connection with the proposed" Merger.  For example, on December 9, 2015, the Special Committee had a telephonic meeting at which Qihoo's Co-CFO presented Qihoo management's projections for the Company's future financial performance for the fiscal years ending December 31, 2015 through December 31, 2025.  Furthermore, the Board did not place any limitations on the Special Committee's ability to evaluate the Merger.  Defendant Chen therefore had access to all of the Company's and Buyer Group's information concerning their relisting plan, true financial projections, and their vision for Qihoo's business in China after the Merger.

**ANSWER:**

Paragraph 270 appears to quote statements from Qihoo's Proxy Materials.  Mr. Zhou denies

that these quoted phrases are a complete and accurate recitation of the relevant statements made in

those documents and refers to those statements for a complete and accurate statement of their

contents.  Mr. Zhou also states that the phrases and information referenced in Paragraph 270 were

accompanied by, and must be read with, risk factors and other explanatory language in Qihoo's

Proxy Materials.  Mr. Zhou admits that on December 9, 2015, the Special Committee had a

telephonic meeting, but otherwise denies the remaining allegations in Paragraph 270 or is without knowledge or information sufficient to form a belief about the truth of certain allegations in Paragraph 270 and on that basis denies the allegations.

### C. Defendant Zhou's Statements After the Merger Confirm His Intent to Defraud the Class

271.    After the Merger closed, Defendant Zhou explained to the Chinese media his true reasons for taking Qihoo private and his vision for the Company in its new form. Zhou explained that as an internet security company, Qihoo had a role to play in Chinese national security interests, including for the military and other government functions. Zhou also described his vision of "big security" in China that Qihoo would be able to pursue now that it was no longer considered to have foreign connections. Zhou made clear that this vision was supported by senior Chinese government officials, including through conversations that he had going back several years—well before Defendants issued the Proxy Materials that failed to disclose these business opportunities.

**ANSWER:**

Paragraph 271 purports to quote or reference statements made by Mr. Zhou to "the Chinese media." Mr. Zhou admits that he gave certain interview(s) to the Chinese media, but denies that the phrases or paraphrased language in Paragraph 271 are a complete and accurate translation of his interview(s). Mr. Zhou refers to the news reports for a complete and accurate recitation of their contents, without conceding their accuracy. Mr. Zhou denies the remaining allegations in Paragraph 271.

272.    Zhou also explained after the Merger his plan to break-up Qihoo into separate entities so that its different business units would have better growth prospects.

**ANSWER:**

Paragraph 272 purports to quote or reference statements made by Mr. Zhou to "the Chinese media." Mr. Zhou admits that he gave certain interview(s) to the Chinese media, but denies that the phrases or paraphrased language in Paragraph 272 are a complete and accurate translation of his interview(s). Mr. Zhou refers to the news reports for a complete and accurate recitation of their

- 111 -

contents, without conceding their accuracy. Mr. Zhou denies the remaining allegations in

Paragraph 272.

273. Defendants deliberately failed to disclose these substantial new business opportunities in the Proxy Materials. Instead, they described Qihoo as continuing on its current course and disclosed supposed negative factors that they claimed would pose hurdles to the Company's future business in China. As the *Financial Times* reported on February 28, 2017, private marketing materials told potential members of the Buyer Group in 2015 that Qihoo would be relisted following the Merger for multiple times its current value "and contain[ed] ambitious estimates of future net income and other performance metrics going out to 2019." On the other hand, Qihoo's minority shareholders reported "that conversations with Qihoo 360 and its advisers before privatisation suggested that the company's prospects were not nearly that bright." The fact that Defendants disclosed a more favorable assessment of Qihoo's prospects in private to the Buyer Group than what they disclosed publicly in the Proxy Materials further shows their deliberate attempt to mislead Qihoo's Securityholders in connection with the Merger.

**ANSWER:**

Paragraph 273 purports to quote an article from the *Financial Times* that Mr. Zhou did not author and which speaks for itself. Mr. Zhou refers to that article for a complete and accurate statement of its contents, without conceding the accuracy of that article. The remaining allegations in Paragraph 273 allege legal conclusions, to which no response is needed.

274. Moreover, the fact that Defendants initially said as little as possible in the Preliminary Proxy Statement about their reasons for the Merger, and added more-detailed false and misleading explanations only after the SEC forced them to give some non-generic explanation, further highlights their deliberate efforts to mislead Qihoo's Securityholders about the Buyer Group's true reasons for the Merger.

**ANSWER:**

Mr. Zhou denies the allegations in Paragraph 274.

**D. The Cayman Islands Appraisal Action Further Shows Defendants' Scienter**

275. The proceedings in the Cayman Islands Appraisal Action also show Defendants' scienter in misrepresenting Qihoo's true value in connection with the Merger. Qihoo's repeated obstructive behavior has caused that action to be delayed by several years and prevented the dissenting shareholders from obtaining Qihoo's documents that show its true value during the Merger. The Grand Court of the Cayman Islands determined that Qihoo's implausible excuses and delay tactics in that action—including Defendant Zhou's claim that he does not use a computer and Qihoo's repeated concealment of essential categories of documents that the Company in fact possessed—defy credulity.

- 112 -

**ANSWER:**

Paragraph 275 alleges legal conclusions, to which no response is required. Mr. Zhou also states that the record from the Appraisal Action speaks for itself and refers to that record for a complete and accurate recitation of the relevant statements made therein. Mr. Zhou denies the remaining allegations in Paragraph 275.

276. Other aspects of the Appraisal Action also show Defendants' knowledge that they misrepresented Qihoo's true value in the Merger. These include Qihoo's willingness to pay $92 million to the court as security for the dissenters' judgment, which the court determined must have been based on Qihoo's careful consideration of the Company's true value; the court's determination that the dissenters were likely to receive at least the Merger consideration at the conclusion of the action; and the appellate court's explanation that Qihoo's recalcitrance justified the lower court's extraordinary intervention in the discovery process.

**ANSWER:**

Paragraph 276 alleges legal conclusions, to which no response is required. Mr. Zhou also states that the record from the Appraisal Action speaks for itself and refers to that record for a complete and accurate recitation of the relevant statements made therein. Mr. Zhou denies the remaining allegations in Paragraph 276.

277. The Appraisal Action also highlights the importance of the Special Committee's role—and documents—in determining Qihoo's fair value.

**ANSWER:**

Mr. Zhou states that the record from the Appraisal Action speaks for itself and refers to that record for a complete and accurate recitation of the relevant statements made therein. Mr. Zhou denies the remaining allegations in Paragraph 277.

### E.  Additional Allegations Regarding Qihoo's Knowledge

278. Qihoo has the knowledge of its employees and representatives. It therefore knew of the fraud insofar as any of the Individual Defendants knew of the fraud. Furthermore, several of Qihoo's other high-ranking employees and Directors (in addition to the Individual Defendants) would have known that the backdoor listing was a crucial condition for the Buyer Group to participate in the Merger and that Qihoo's business prospects and valuation were much better than what was disclosed in the Proxy Materials. For example, the Proxy Materials and the Cayman

Islands Appraisal Action highlight the role that Alex Zuoli Xu (Qihoo's Co-CFO)—who made Qihoo's December 18, 2015 announcement of the Merger—played in working on and providing the financial projections to J.P. Morgan that formed the basis for J.P. Morgan's fairness opinion and valuation analysis.

**ANSWER:**

Paragraph 278 alleges legal conclusions, to which no response is required.  Mr. Zhou also states that the Proxy Materials and the record from the Appraisal Action speak for themselves and refers to that record for a complete and accurate recitation of the relevant statements.  Mr. Zhou denies the remaining allegations in Paragraph 278.

## VIII.   LOSS CAUSATION

279.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of Qihoo Securities and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein.  This course of conduct misled the Class members and caused them to sell their shares at a depressed price.  The far higher price that the Company was valued at in its relisting shows that the Class members did not receive fair value for their shares in the Merger.  Class members who sold their Qihoo Securities during the Class Period were damaged thereby because they sold their shares at prices that were lower than the true value of the Company (i.e., Class members suffered damages under the federal securities laws).

**ANSWER:**

Paragraph 279 contains legal conclusions to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 279.

280.    Those Class members who sold their Qihoo Securities during the Class Period and prior to the Merger being completed on July 15, 2016 suffered economic loss because their Securities were sold at a depressed value.  Defendants' fraud caused Qihoo's ADS to trade at artificially deflated levels throughout the Class Period and caused the holders of Qihoo Securities to be deprived of the true value of their shares.  According to data on *Bloomberg*, the closing price of Qihoo's ADS on each date during the Class Period ranged from $65.11 per ADS to $76.92 per ADS.  The Class members who sold their Qihoo Securities prior to the completion of the Merger on July 15, 2016, were deprived of the fair value of their shares through this fraudulent depression of the price of their securities by Defendants' false and misleading statements and omissions.

- 114 -

**ANSWER:**

Paragraph 280 contains legal conclusions to which no response is required. To the extent Paragraph 280 purports to allege trading prices for Qihoo's ADS, Mr. Zhou states that these are a matter of public record, which speak for themselves. To the extent a response is required, Mr. Zhou denies the remaining allegations in Paragraph 280.

281.    With respect to those Class members who sold their Qihoo Securities prior to July 15, 2016, but for the fraud, the market price for Qihoo Securities would have more closely reflected their true value, including because the ability to dissent from the Merger and seek appraisal as a remedy would have prevented the deal price from serving as a ceiling limiting the upper-price of the Qihoo Securities.

**ANSWER:**

Paragraph 281 contains legal conclusions to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 281.

282.    In addition, Defendants' false and misleading statements caused Qihoo Securityholders to (1) vote in favor of the Merger and (2) forego their right to dissent prior to the shareholder vote and to exercise their appraisal rights. Defendants' false and misleading statements concealed the true value of Qihoo Securities and therefore prevented Qihoo Securityholders from making an informed decision as to whether they should dissent and seek appraisal. Defendants' descriptions in the Proxy Materials of how difficult it would be for Qihoo Securityholders to cancel their ADS and register their corresponding shares before they would be able to exercise their dissenting rights further deterred them from dissenting absent knowledge of Defendants' fraud.

**ANSWER:**

Paragraph 282 contains legal conclusions to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 282.

283.    Class members who held their Qihoo Securities through the close of the Class Period ultimately sold their Qihoo Securities in the Merger for either $77 per ADS or $51.33 per common share. Each of these holders of Qihoo Securities was deprived of the fair value of their securities through the fraudulent depression of the value of their securities by Defendants' false and misleading statements and omissions. These securities were worth far more than the transaction price, as evidenced by the fact that only a portion of Qihoo's assets have been valued at multiple times the Merger price since Qihoo's relisting in China.

**ANSWER:**

Mr. Zhou admits that the Merger consideration was either $77 per ADS or $51.33 per common share. The remaining allegations in Paragraph 283 allege legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the remaining allegations in Paragraph 283.

284.    Members of the Class both sold ADS during the Class Period at a deflated price and were injured thereby, and were injured by their holding ADS through the close of the Merger and ultimately selling those ADS by tendering them for the deflated Merger consideration.

**ANSWER:**

Paragraph 284 contains legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 284.

IX.    **ALLEGATIONS OF INSIDER TRADING**

285.    Defendants Qihoo, Zhou, and Qi (the "Insider Trading Defendants," i.e., all Defendants other than Chen) engaged in insider trading to the detriment of the Class members, who were forced to tender their shares in the Merger or who voluntarily sold their shares contemporaneously with these Defendants. Through this insider trading, these Defendants are liable under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, as explained in Count 2 below. Furthermore, to the extent that Qihoo is liable for insider trading, Defendants Zhou and Qi are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and as expressly permitted by Section 20A(b)(3) of the Exchange Act, 15 U.S.C. § 78t–1(b)(3), as explained in Count 3 below.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 285.

286.    According to a Schedule 13E-3 filed by Qihoo with the SEC on July 15, 2016, the Merger "became effective" on that day. This is referred to by Qihoo as the "Effective Time." Qihoo explained that as of the Effective Time, each share of its stock, including shares represented by ADS, "was cancelled and ceased to exist in exchange for the right to receive $51.33 ('Per Share Merger Consideration') and each issued and outstanding ADS represent the right to receive $77.00, in each case, in cash, without interest and net of any applicable withholding taxes."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the

case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the

allegations in Paragraph 286.

287.    Through the Merger, the Insider Trading Defendants purchased the shares that were sold by Class members through the Merger.  As described in the Proxy Materials, and in further detail in Section 3.2 of the Merger Agreement, which was approved at the extraordinary shareholders meeting held on March 30, 2016, the Parent Parties in the Merger were responsible for depositing the Merger funds with a "Paying Agent."  After the Effective Time, upon surrendering of a share certificate for cancellation, "or upon receipt by the Paying Agent of confirmation by the Company that the uncertificated Shares have been canceled, each holder of the Shares will be entitled to receive in exchange therefor an amount in cash equal to the product of the number of Shares multiplied by the Per Share Merger Consideration."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the

case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the

allegations in Paragraph 287.

288.    These documents also explained that "[p]rior to the Effective Time, the Parent Parties and the Company shall establish procedures with the Paying Agent and the ADS Depositary [i.e., The Bank of New York Mellon] to ensure that (i) the Paying Agent will transmit to the ADS Depositary an amount in cash equal to (a) the number of ADSs issued and outstanding immediately prior to the Effective Time multiplied by (b) the Per ADS Merger Consideration and (ii) the ADS Depositary will distribute the aggregate of the Per ADS Merger Consideration to the ADS holders upon surrender by them of the ADSs."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the

case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the

allegations in Paragraph 288.

289.    The Proxy Materials further explained that for registered holders of Qihoo ADS as of the Effective Time, "the ADS Depositary will send you a check for the Per ADS Merger Consideration, without interest and net of any applicable withholding taxes, for each ADS evidenced by the ADRs, in exchange for the cancellation of your ADRs after the consummation of the Merger. If you hold your ADSs in un-certificated form (that is, without an ADR) and are

- 117 -

not a member of the Buyer Group, the ADS Depositary will automatically send you a check for the Per ADS Merger Consideration, without interest and net of any applicable withholding taxes, in exchange for the cancellation of each of your ADSs after the consummation of the Merger."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 289.

290. Qihoo Securityholders whose ADS were held in "street name" by the Securityholder's broker, bank or other nominee at the Depository Trust Company ("DTC") would "not be required to take any action to receive the merger consideration for [their] ADSs as the ADS Depositary will arrange for the surrender of the ADSs and the remittance of the merger consideration to DTC (the clearance and settlement system for the ADSs) for distribution by DTC to [the Securityholder's] broker, bank or other nominee on [their] behalf." Qihoo Securityholders were further instructed, "[i]f have any questions concerning the receipt of the merger consideration, please contact your broker, bank or other nominee."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 290.

291. The Proxy Materials further explained that "[a]fter the merger is consummated, you will be sent a form of letter of transmittal with detailed written instructions for exchanging your Share certificates for the merger consideration. Please do not send in your certificates now. Similarly, you should not send in the ADRs that represent your ADSs at this time. Promptly after the merger is consummated, the ADS Depositary will call for the surrender of all ADRs for delivery of the merger consideration. ADR holders will receive a form of letter of transmittal and written instructions from the ADS Depositary relating to the foregoing."

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 291.

292. At the Effective Time, upon purchasing the shares thereafter, and at all times during the Class Period, Defendants were in possession of material non-public information about the

- 118 -

Buyer Group's plans to relist the Company's subsidiaries following the Merger at far-higher valuations. Furthermore, Defendants were aware of the truth regarding each of the misstatements described herein and were aware of the material omissions detailed herein.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 292.

293.    By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with Qihoo's investors.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 293.

294.    Moreover, Cayman Islands corporations, like Qihoo, have a duty to provide investors with sufficient information to adequately understand the Merger that they are called upon to consider.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 294.

295.    By failing to disclose the material non-public information prior to trading, the Insider Trading Defendants caused selling investors in Qihoo Securities to suffer economic losses. In addition, by trading with Qihoo Securityholders who were acting in reliance on the material misrepresentations made by Defendants described throughout this Amended Complaint, they caused selling investors in Qihoo Securities to suffer economic loss. By purchasing the Qihoo Securities from Lead Plaintiffs and other Class members, Defendants experienced an unlawful and unjust enrichment, since they were able to acquire these securities for less than their fair value.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 295.

## X.    NO SAFE HARBOR

296.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Amended Complaint. As the Company acknowledged in the Proxy Materials, the Merger was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Merger are not subject to the PSLRA's safe harbor. See 15 U.S.C.A. § 78u-5(b)(E).

**ANSWER:**

Paragraph 296 alleges legal conclusions, to which no response is required.

297.    Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following. First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor. Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

**ANSWER:**

Paragraph 297 alleges legal conclusions, to which no response is required.

## XI.    CLASS ACTION ALLEGATIONS

298.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners and former owners of Qihoo Securities who sold shares, and were damaged thereby, during the period from December 18, 2015 through July 15, 2016, inclusive, and all owners and former owners of Qihoo Securities who owned shares as of the Effective Time of the Merger and have tendered those shares for the Merger consideration, except as excluded below (the "Class").

**ANSWER:**

Mr. Zhou admits that Lead Plaintiffs purport to bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, but denies that Lead Plaintiffs state legally cognizable claims under the federal law, or any other statute, rule, or the common law, denies that Lead Plaintiffs' claims are properly certifiable as a class, and otherwise denies any and all remaining allegations in Paragraph 298. Mr. Zhou also states that the Tendering Shareholders' claims have been dismissed from the case, thus Lead Plaintiffs can no longer bring a class action on behalf of these shareholders.

299.    For the avoidance of doubt, the Class includes those Qihoo Securityholders who held Qihoo ADS on July 15, 2016 or purchased Qihoo ADS any time after December 18, 2015, redeemed those ADS for Qihoo common stock during the Class Period, and then tendered those shares for the Merger consideration, in accordance with the instructions that Defendants provided in connection with the Merger.

**ANSWER:**

Paragraph 299 merely defines the proposed class and contains no factual allegations for which a response is required. To the extent any further response is required, Mr. Zhou denies the allegations in Paragraph 299.

300.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of the Individual Defendants and the directors and officers of Qihoo; (iii) any entity in which Defendants have a controlling interest; (iv) any person who was an officer or director of Qihoo during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph.

**ANSWER:**

Paragraph 300 merely defines the proposed class and contains no factual allegations for which a response is required. To the extent any further response is required, Mr. Zhou denies the allegations in Paragraph 300.

301.    The members of the Class are so numerous that joinder of all members is impracticable. Qihoo stated in the Proxy Materials that it was expected to have 180,839,445 shares

- 121 -

outstanding as of March 25, 2016 (the record date for determining the shareholders entitled to vote on the Merger). Qihoo's ADS actively traded on the NYSE.

**ANSWER:**

The first sentence of Paragraph 301 alleges legal conclusions, to which no response is required. Mr. Zhou admits that Qihoo's ADS traded on the NYSE and states that the Proxy Materials speak for themselves. Mr. Zhou denies the remaining allegations in Paragraph 301 and incorporates by reference the Proxy Materials as if attached hereto.

302. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained either by Qihoo or by Qihoo's ADS Depository and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

**ANSWER:**

Paragraph 302 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 302.

303. Lead Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

**ANSWER:**

Paragraph 303 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 303.

304. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

**ANSWER:**

Paragraph 304 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 304.

305.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)   whether the statements made to the investing public during the Class Period contained material misrepresentations;

c)   whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

d)   whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

e)   whether Defendants knew or recklessly disregarded that their statements were false and misleading;

f)   whether defendants acted with the intent to defraud class members regarding the true value of the Qihoo Securities;

g)   whether Defendants' fraudulent conduct depressed the price of Qihoo Securities during the Class Period;

h)   whether the Insider Trading Defendants were in possession of material non-public information at the time of the Merger;

i)   whether Class members sold their Qihoo Securities contemporaneously with the Insider Trading Defendants' purchase of those shares;

j)   whether the Individual Defendants were controlling persons of Qihoo;

k)   whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972); and

l)   whether and to what extent Qihoo Securityholders suffered losses due to Defendants' fraudulent conduct.

**ANSWER:**

Paragraph 305 alleges legal conclusions, to which no response is required.  Mr. Zhou denies

the remaining allegations in Paragraph 305.

306.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**ANSWER:**

Paragraph 306 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 306.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET AND AFFILIATED UTE PRESUMPTIONS

307.    Lead Plaintiffs and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

**ANSWER:**

Paragraph 307 alleges legal conclusions, to which no response is required. Mr. Zhou denies the remaining allegations in Paragraph 307.

308.    In the alternative, Lead Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b) the omissions and misrepresentations were material;

c) Qihoo's ADS were actively traded on the NYSE, an informationally efficient market, under the ticker symbol "QIHU," throughout the Class Period;

d) Qihoo's ADS traded at high volumes during the Class Period;

e) as the sponsor of its ADS, which are registered with the SEC, Qihoo filed periodic public reports with the SEC;

f) Qihoo communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

g) the Qihoo Securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

h) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Qihoo Securities; and

i) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class sold Qihoo Securities between the time Defendants misrepresented or failed to disclose material facts

and the end of the Class Period, at which time the truth had not yet been revealed.

**ANSWER:**

Paragraph 308 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 308.

309.    As a result of the foregoing, the market for Qihoo Securities promptly digested current information regarding Qihoo from publicly available sources and reflected such information in Qihoo's ADS price.

**ANSWER:**

Paragraph 309 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 309.

310.    Lead Plaintiffs are not only entitled to a presumption that they relied on the market price when deciding whether, and how, to vote their Qihoo Securities, whether to sell their Qihoo Securities, whether to hold those Qihoo Securities, or whether to seek appraisal; Lead Plaintiffs also in fact did rely on that market price when engaging in those activities.

**ANSWER:**

Paragraph 310 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 310.

311.    Under these circumstances, all sellers of Qihoo Securities during the Class Period suffered similar injury through their sale of Qihoo stock and ADS at artificially deflated prices and the presumption of reliance applies.

**ANSWER:**

Paragraph 311 alleges legal conclusions, to which no response is required.  Mr. Zhou denies the remaining allegations in Paragraph 311.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

312.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

- 125 -

**ANSWER:**

Paragraph 312 alleges legal conclusions, to which no response is required. To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 312.

313.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

**ANSWER:**

Paragraph 313 alleges legal conclusions, to which no response is required. To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 313.

314.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

**ANSWER:**

Paragraph 314 alleges legal conclusions, to which no response is required. To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 314.

315.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose (under both United States and Cayman Islands law) and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**

Paragraph 315 alleges legal conclusions, to which no response is required. To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 315.

316.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who sold Qihoo Securities.

**ANSWER:**

Paragraph 316 alleges legal conclusions, to which no response is required. To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 316.

- 126 -

317.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially deflate and maintain the prices of Qihoo Securities; and (iii) cause Lead Plaintiffs and members of the Class to sell Qihoo Securities at artificially deflated prices.

**ANSWER:**

Paragraph 317 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 317.

318.    Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

**ANSWER:**

Paragraph 318 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 318.

319.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying, directly or indirectly, on those statements or upon the integrity of the market price for Qihoo stock and ADS, Lead Plaintiffs and other members of the Class sold Qihoo Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have sold Qihoo Securities at such artificially deflated prices.

**ANSWER:**

Paragraph 319 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 319.

320.    The members of the Class that sold their Qihoo Securities in the Merger would have avoided doing so either by voting against the Merger or objecting to and dissenting from the Merger and seeking their appraisal rights under Cayman Islands law.

**ANSWER:**

Paragraph 320 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 320.

321.    By selling the Qihoo Securities at these artificially deflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

**ANSWER:**

Paragraph 321 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 321.

322.    By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:**

Paragraph 322 alleges legal conclusions, to which no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 322.

## COUNT II

### (Violations of § 20A of the Exchange Act Against the Insider Trading Defendants)

323.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 323.

324.    This Count is asserted pursuant to Section 20A of the Exchange Act against the Insider Trading Defendants (i.e., Defendants Qihoo, Zhou, and Qi), on behalf of Lead Plaintiffs and all members of the Class who sold Qihoo Securities through the Merger and contemporaneously with these Defendants' purchase of those securities in connection with the Merger that was completed on July 15, 2016.

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 324.

325.    As alleged herein, the Insider Trading Defendants bought the Qihoo Securities while knowingly in possession of material positive and non-public information concerning the Company.  Among this information was the knowledge that the Proxy Materials understated Qihoo's true value and omitted the fact that the Buyer Group was already planning to relist Qihoo following the Merger.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 325.

326.    Lead Plaintiffs held many of their Qihoo Securities until the close of the Class Period.  By doing so, they sold those Qihoo Securities to the Insider Trading Defendants through the Merger.  These Defendants' purchase and Lead Plaintiffs' sale were contemporaneous within the meaning of Section 20A of the Exchange Act.  Numerous members of the Class also sold Qihoo Securities contemporaneously with these Defendants' purchase in connection with the Merger.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required.  To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 326.

327.    By virtue of possessing material non-public information, the Insider Trading Defendants had a duty to either disclose that information before trading on the basis of that information or abstain from trading.  By trading while in possession of such information, they violated this duty and infringed upon the relationship of trust and confidence that they had with Qihoo's investors.

- 129 -

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 327.

328. Accordingly, under Section 20A of the Exchange Act, these Defendants' purchase of the Qihoo Securities while knowingly in possession of material, positive, and non-public information during the Class Period makes them liable to Lead Plaintiffs and the Class for all profits gained and losses avoided as a result of such stock sales.

**ANSWER:**

Mr. Zhou states that the claim supported by these allegations has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 328.

329. The Insider Trading Defendants are required to account for all such stock sales and disgorge their profits or ill-gotten gains.

**ANSWER:**

Mr. Zhou states that the claim supported by this allegation has been dismissed from the case, thus no response is required. To the extent a response is required, Mr. Zhou denies the allegation in Paragraph 329.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

330. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

**ANSWER:**

Paragraph 330 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 330.

331. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

**ANSWER:**

Paragraph 331 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 331.

332.    As alleged above, Qihoo violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by (i) making false and misleading statements and omitting material information in connection with the purchase and sale of the Qihoo Securities and (ii) participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

**ANSWER:**

Paragraph 332 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 332.

333.    Also as alleged above, Qihoo violated Section 20A of the Exchange Act by purchasing the Class members' Qihoo Securities through the Merger and while in possession of material non-public information.

**ANSWER:**

Paragraph 333 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 333.

334.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Qihoo is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

**ANSWER:**

Paragraph 334 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 334.

335.    As set forth above, the Individual Defendants were controlling persons of Qihoo during the Class Period, due to their senior executive positions with the Company, positions on the Board, significant control over the Company's Securities, and control over the Merger.  Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations and the Merger process.

- 131 -

**ANSWER:**

Paragraph 335 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 335.

336. By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Qihoo, including the content of its public statements with respect to, among other things, the Merger.

**ANSWER:**

Paragraph 336 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 336.

337. The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiffs and the other members of the Class who sold Qihoo Securities during the Class Period.

**ANSWER:**

Paragraph 337 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 337.

338. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Qihoo Securities, Lead Plaintiffs and other members of the Class sold Qihoo Securities at artificially deflated prices during the Class Period. But for the fraud, Lead Plaintiffs and members of the Class would not have sold Qihoo Securities at such artificially deflated prices. By selling the Qihoo Securities at these artificially deflated prices the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

**ANSWER:**

Paragraph 338 alleges legal conclusions, to which no response is required. To the extent a response is required, Mr. Zhou denies the allegations in Paragraph 338.

339. By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiffs and the members of the Class as controlling persons of Qihoo in violation of Section 20(a) of the Exchange Act.

**ANSWER:**

Paragraph 339 alleges legal conclusions, to which no response is required.  To the extent a

response is required, Mr. Zhou denies the allegations in Paragraph 339.

## XIII.   PRAYER FOR RELIEF

340.   WHEREFORE, Lead Plaintiffs respectfully demand judgment against Defendants
as follows:

    a)   Determining that this action is a proper class action maintained under Rule 23
of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as the class
representatives, and appointing Pomerantz LLP as class counsel pursuant to
Rule 23(g);

    b)   Determining and declaring that Defendants violated the Exchange Act by
reason of the acts and omissions alleged herein;

    c)   Requiring Defendants to pay damages sustained by Lead Plaintiffs and the
Class by reason of the acts and transactions alleged herein;

    d)   Awarding Lead Plaintiffs and the Class prejudgment and post-judgment
interest, as well as their reasonable costs and expenses incurred in this action,
including but not limited to reasonable attorneys' fees, expert fees, and other
costs; and

    e)   Granting such other and further relief as the Court deems just and proper.

**ANSWER TO PRAYER FOR RELIEF**

Mr. Zhou denies that Plaintiffs are entitled to any relief.

## XIV.   DEMAND FOR TRIAL BY JURY

Pursuant to the Federal Rule of Civil Procedure 38, Mr. Zhou demands a jury trial of all

issues triable by jury under applicable law.

**DEFENSES AND AFFIRMATIVE DEFENSES**

Mr. Zhou asserts the following defenses and affirmative defenses to the FAC without

assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiffs

and members of the purported Class.  The labeling of a defense below as an "affirmative" defense

indicates only that Mr. Zhou intends to assert that defense in this matter.  It does not indicate that

Mr. Zhou contends that he bears the burden of proving any or all of the elements of that particular

defense.  Indeed, many of the defenses listed below are best interpreted as anticipated failures of proof by Plaintiffs rather than a defense for which Mr. Zhou bears the burden of proof or persuasion.

## FIRST AFFIRMATIVE DEFENSE

The FAC and each purported claim for relief fail to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because matters Plaintiffs claim to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain and, as such, the alleged "truth" regarding such matters was available to Plaintiffs and members of the purported Class.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are not actionable as to the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by the Defendants that are forward-looking statements and are accompanied by meaningful cautionary statements, such that they fall within the Safe Harbor provision of the Private Securities Litigation Reform Act, as codified at 15 U.S.C. §77z-2(c)(1)(A) or (c)(2).

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are not actionable as to the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by the Defendants that are forward-looking statements and which Plaintiffs fail to prove were made with actual knowledge that the statements were false or misleading, such that they fall within the Safe

Harbor provision of the Private Securities Litigation Reform Act, as codified at 15 U.S.C. §77z-2(c)(1)(B).

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs and members of the purported Class failed to act reasonably to mitigate their damages, if any.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' and the members of the purported Class's alleged damages are subject to being offset by the amounts they have recovered from other Defendants or third parties in connection with the claims alleged in the FAC and by the amounts they received in connection with the sale of their Qihoo securities.

## SEVENTH AFFIRMATIVE DEFENSE

Any recovery for damages allegedly incurred by Plaintiffs and members of the purported Class, if any, is subject to offset in an amount including, but not limited to, any tax benefits actually received by Plaintiffs or the purported Class members throughout their investments.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs and members of the purported Class would have acquired Qihoo ADS even if, when acquired, Class members had known of the allegedly untrue statements of material fact, misleading statements, or other wrongful conduct upon which Mr. Zhou's purported liability rests.

## NINTH AFFIRMATIVE DEFENSE

Mr. Zhou acted at all times in good faith and did not directly or indirectly induce any act or acts alleged to constitute a violation of law, and every act or omission alleged in the FAC was done or omitted in good faith conformity with the rules and regulations of the SEC, and therefore,

pursuant to Section 23(a) of the Securities Exchange Act of 1934, there is no liability for any act or omission so alleged.

## TENTH AFFIRMATIVE DEFENSE

Any damage, loss, or liability sustained by Plaintiffs and members of the purported Class must be reduced, diminished, and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Mr. Zhou under the principles of equitable allocation, recoupment, set-off, proportionate responsibility, and comparative fault.

## ELEVENTH AFFIRMATIVE DEFENSE

If a false or misleading statement was made, or if any material fact required to be stated or necessary to make any statement not misleading was omitted, which Mr. Zhou denies, Plaintiffs and some or all of the members of the purported Class were aware of that misstatement or omission and/or did not rely upon it in selling or holding Qihoo securities.

## TWELFTH AFFIRMATIVE DEFENSE

Qihoo's publicly filed documents contained sufficient cautionary language to bespeak caution with respect to the subject matter of each misrepresentation or omission alleged in the FAC.

## THIRTEENTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are not actionable because the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by Qihoo or Mr. Zhou were general statements of corporate optimism on which no reasonable investor would rely.

### FOURTEENTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are not actionable because the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by Defendants were statements of opinion.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' and members of the purported Class's claims against Defendants are barred, in whole or in part, because the purported misstatements or omissions alleged in the FAC that are attributed to Defendants did not affect the market price of Qihoo securities.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' and members of the purported Class's claims against Defendants are barred, in whole or in part, because Plaintiff and members of the purported Class lack standing to assert their claims against Defendants.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs and members of the purported Class are precluded from recovering attorneys' fees or experts' fees from Mr. Zhou under applicable provisions of law.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Under any theory of liability, Plaintiffs and members of the purported Class may not recover damages based on undervaluation in the value of Qihoo securities that resulted from factors other than the alleged material devices, schemes, or artifices to defraud, misstatements or omissions, acts, practices, or courses of business, which are cited in the FAC.

### NINETEENTH AFFIRMATIVE DEFENSE

Other parties not named in the FAC may be indispensable parties to this action.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' and members of the purported Class's claims against Defendants are barred in whole or in part because of the comparative and/or contributory negligence of Plaintiffs, members of the purported Class, or other persons.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

This action is not properly maintainable as a class action.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' and members of the purported Class's claims are barred, in whole or in part, to the extent that the damages sought exceed those permitted under the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The claims alleged in the FAC are barred, in whole or in part, because any misrepresentations or omissions alleged in the FAC were not material.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are barred, in whole or in part, because Defendants reasonably relied in good faith on the professional judgments, opinions, and advice of legal and finance professionals, and had no reasonable grounds to believe and did not believe that any statements made by them were materially false or misleading.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are barred, in whole or in part, because no act or omission by Defendants was the cause-in-fact or the proximate cause of any damage alleged by Plaintiffs and members of the purported Class.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are barred, in whole or in part, because Mr. Zhou had no duty to disclose any facts allegedly not disclosed.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The claims alleged in the FAC are barred, in whole or in part, because the alleged misstatements and omissions attributed to Mr. Zhou in the FAC were not made in connection with the purchase or sale of any securities by Plaintiffs and members of the purported Class.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Mr. Zhou is not liable to Plaintiffs because none of the statements for which Mr. Zhou is allegedly responsible contains any material misrepresentations or omissions.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs and the members of the purported Class did not suffer any damages, because the purported misstatements or omissions alleged in the FAC did not affect the market price of Qihoo securities.  Factors other than the alleged untrue statements of material fact, omissions of material fact, misleading statements, or other wrongful conduct caused their alleged losses.

### THIRTIETH AFFIRMATIVE DEFENSE

The claims asserted in the FAC are barred or fail, in whole or in part, because Mr. Zhou made a reasonable investigation of the facts and had reasonable grounds to believe, and did believe, that the Company's SEC filings, press releases, conference calls, investor presentations, and other communications did not contain an untrue statement and did not omit any material fact at the time those documents were issued or became effective.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs and the members of the purported Class did not suffer any damages, because the purported misstatements or omissions alleged in the Complaint did not affect the market price of

Qihoo securities.  Factors other than the allegedly untrue statements of material fact, omissions of material fact, misleading statements, or other wrongful conduct caused their alleged losses.

*     *     *

Mr. Zhou lacks sufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available to him.  Mr. Zhou therefore expressly reserves the right to plead additional affirmative and other defenses that may become available or apparent during pretrial proceedings in this action and/or required by any further amendments to the FAC.

**WHEREFORE**, Mr. Zhou prays this Court enter judgment as follows:

1. That judgment be entered in favor of Mr. Zhou;

2. That Plaintiffs and the purported Class take nothing from Mr. Zhou by their FAC, and that the same be dismissed with prejudice;

3. For costs, attorneys' fees, expert witness fees, and court hearing costs incurred herein; and

4. For such other and further relief as this Court deems just and proper.

- 141 -

Dated:  August 3, 2023
        New York, New York

Respectfully Submitted,

**LATHAM & WATKINS LLP**

/s/ Jason C. Hegt
Eric F. Leon
Jason C. Hegt
Hanyu (Iris) Xie
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  eric.leon@lw.com
Email:  jason.hegt@lw.com
Email:  iris.xie@lw.com

*Attorneys for Defendants Hongyi Zhou,
Eric X. Chen, and Qihoo 360 Technology
Co. Ltd.\**

*\* Foregoing answer served solely on
behalf of Defendant Hongyi Zhou*