**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI and ERIC X. CHEN,<br><br>　　　　　　　　　Defendants. | Case No. 1:19-cv-10067-PAE<br><br><br>Oral Argument Requested |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................................. 5

III. ARGUMENT: THE CLASS SHOULD BE CERTIFIED PURSUANT TO FRCP 23 ........... 7

    A.  Plaintiffs Satisfy the Rule 23(a) Requirements.............................................................. 8

        1.  The Proposed Class is so Numerous That Joinder is Impracticable ................. 8

        2.  Questions of Law or Fact Are Common to the Class ....................................... 9

        3.  Plaintiffs' Claims Are Typical of the Class ...................................................... 9

        4.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ........ 11

    B.  Plaintiffs Satisfy the Requirements of Rule 23(b)(3) ................................................. 12

        1.  Predominance is Satisfied ............................................................................... 12

            a)  Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption ....... 12

                (1) Qihoo's NYSE Listing Strongly Supports
                       Market Efficiency ................................................................... 14

                (2) The Five *Cammer* Factors Confirm Market Efficiency.......... 15

                (3) The *Krogman* Factors Further Demonstrate
                       Market Efficiency ................................................................... 19

            b)  Reliance is Presumed Under Affiliated Ute....................................... 20

        2.  Plaintiffs' Damages Model Matches Their Theory of Liability ..................... 20

        3.  A Class Action is Superior to Other Available Methods of Adjudication...... 24

    C.  The Court Should Appoint Class Counsel ................................................................... 25

IV. CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972)................................................................................................20

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).........................................................................................7, 11, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).........................................................................................2, 7, 12

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ...........................................................................................8

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000)..........................................................................................11

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)........................................................................................... *passim*

*Burke v. China Aviation Oil (Singapore) Corp.*,
   421 F. Supp. 2d 649 (S.D.N.Y. 2005)..................................................................14, 16

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... *passim*

*Carpenters Pens. Tr. v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).......................................................................................12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................... *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007).........................................................................................8

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).........................................................................................4, 20, 24

*Cromer Fin. Ltd. v. Berger*,
   205 F.R.D. 113 (S.D.N.Y. 2001) ...............................................................................12

*Darquea v. Jarden Corp.*,
   2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) .................................................................7

iii

*Davis v. Scottish Re Grp. Ltd.*,
   159 A.D. 3d 528 (1st Dep't 2018) ........................................................................20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) (*Halliburton I*)........................................................3, 8, 12, 13

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)..............................................................................................9

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   141 S. Ct. 1951 (2021)......................................................................................8, 12

*Halliburton Co. v. Erica P. John Fund., Inc.* (*Halliburton II*),
   573 U.S. 258 (2014)............................................................................................13

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holds.*,
   338 F.R.D. 205 (S.D.N.Y. 2021) ...........................................................................9

*In re Arakis Energy Corp. Sec. Litig.*,
   1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ........................................................10

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................21

*In re Beacon Assocs. Litig.*,
   282 F.R.D. 315 (S.D.N.Y. 2012) .........................................................................12

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................................24

*In re Diamond Foods, Inc., Sec. Litig.*,
   295 F.R.D. 240 (N.D. Cal. 2013)..........................................................................23

*In re Jernigan Cap., Inc. Sec. Litig.*,
   2023 U.S. Dist. LEXIS 102114 (S.D.N.Y. June 12, 2023)......................................21, 23, 24

*In re JPMorgan Chase & Co. Sec. Litig.*,
   2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)........................................................7

*In re Oxford Health Plans, Inc.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ...........................................................................9

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)...............................................................................3, 13

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) .........................................................................25

iv

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) .......................................................................................9

*In re SCOR Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)...............................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ................................................... *passim*

*In re Synchrony Fin. Sec. Litig.*,
   2023 WL 1503032 (D. Conn. Feb. 3, 2023) ...............................................................18, 19

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .....................................................................23

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) .................................................................................9, 24

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)..............................................................................................11

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ..........................................................................................8

*In re Willis Towers Watson PLC Proxy Litig.*,
   2020 WL 5361582 (E.D. Va. Sept. 4, 2020)......................................................................23

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................................2, 24

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ........................................................................4, 13, 18, 19

*Levie v. Sears Roebuck & Co.*,
   496 F. Supp. 2d 944 (N.D. Ill. 2007) ................................................................................10

*Lumen v. Anderson*,
   280 F.R.D. 451 (W.D. Mo. 2012)......................................................................................14

*Maywalt v. Parker & Parsley Petroleum Co.*,
   147 F.R.D. 51 (S.D.N.Y. 1993) ..........................................................................................2

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   328 F.R.D. 86 (S.D.N.Y. 2018) ........................................................................................19

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010)........................................................................................8, 9

*Moab Partners, L.P. v. Macquarie Infrastr. Corp.*,
2022 WL 17815767 (2d Cir. Dec. 20, 2022), *cert. granted*, 2023 WL 6319659
(U.S. Sept. 29, 2023)...............................................................................................20

*Pension Comm. of Univ. of Montreal Pen. Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006)......................................................................12

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................23, 25

*R&R adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ...........................................23

*R&R adopted*, 2023 U.S. Dist. LEXIS 163288 (S.D.N.Y. Sept. 14, 2023) ..............21, 24

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)...........................................................................4, 20, 23

*San Antonio Fire & Police Pension Fund v. Dole Food Co.*,
177 F. Supp. 3d 838 (D. Del. 2016).........................................................................21

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
341 F.R.D. 542 (S.D.N.Y. 2022) ..............................................................................10

*Smilovits v. First Solar, Inc.*,
295 F.R.D. 423 (D. Ariz. 2013) ................................................................................14

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015).......................................................................................20

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd.*, *Waggoner*, 875 F.3d..............................25

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)........................................................................................20

*Teamsters Local 445 Freight Div. Pens. Fund v. Bombardier*,
546 F.3d 196 (2d Cir. 2008).......................................................................................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...................................................................................................24

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................................. *passim*

**Statutes**

15 U.S.C. §78j(b) ......................................................................................................... *passim*

15 U.S.C. §78t(a) .................................................................................................1,6,12

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

Lead Plaintiffs Altimeo Asset Management ("Altimeo") and ODS Capital LLC ("ODS" and, with Altimeo, "Plaintiffs") respectfully submit this memorandum in support of their motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following Class for claims under Sections 10(b) and 20(a) of the Exchange Act:

> All owners and former owners of Qihoo ADS, who sold their Qihoo ADS and were damaged thereby, during the period from December 18, 2015 through July 15, 2016, inclusive.[1]

Plaintiffs also seek the appointment of Lead Counsel, Pomerantz LLP ("Pomerantz"), as Class Counsel, with Labaton Sucharow LLP ("Labaton") continuing to serve as additional counsel for ODS.[2]

## I.    INTRODUCTION

Securities fraud cases are well suited for class treatment because they involve a large number of class members that were all injured by a common course of misconduct. As the Court noted at the initial case management conference, in "open market securities class actions" such as this one, the class is typically certified in the "ordinary course." (Declaration of Michael Grunfeld in Support of Motion for Class Certification ("Grunfeld Decl."), Ex. 1 (July 19, 2023 Tr. at 24:18-22)). The Class should be certified for the reasons that ordinarily apply in securities fraud cases.

Plaintiffs' claims arise out of Defendants' misstatements and omissions made in connection with Qihoo's privatization through the Merger that closed on July 15, 2016. These misstatements and omissions concerned (1) the Buyer Group's plan to relist Qihoo at multiple times the Merger price (2) the fairness of the Merger price, and (3) the reasons for the Merger. The questions of law

---

[1] Excluded from the Class are Defendants; current and former officers and directors of Qihoo 360 Technology Co. Ltd. ("Qihoo"); members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

[2] Terms not defined herein have the same meaning as in the First Amended Class Action Complaint ("Complaint," ECF No. 53) and ¶ _ references are to the Complaint unless noted otherwise. Citations and internal quotations marks are omitted, and emphases are added, unless noted otherwise.

and fact relevant to the merits of Plaintiffs' claims—related to Defendants' allegedly materially false and misleading statements that they made with scienter and that caused investors losses—are identical for every member of the proposed Class because they relate to Defendants' uniform course of conduct toward the entire Class.

Courts regularly certify securities fraud cases as class actions, recognizing that "certification should not become a mini-trial on the merits." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*7 (S.D.N.Y. July 10, 2019). The Supreme Court has warned against applying "atextual requirement[s]" not mandated by statute to the certification of federal securities claims. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013). Likewise, "the Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well-financed defendants would leave most investors "without any recourse").

This action satisfies all of the requirements for class certification under Rule 23(a)—numerosity; commonality; typicality; and adequacy of representation—for the same reasons that courts regularly certify securities fraud cases as class actions. **Numerosity** is satisfied based on the large number of Qihoo securityholders during the Class Period. (*See infra* at 8-9). **Typicality** and **adequacy** are satisfied because Plaintiffs are sophisticated institutional investors that sold their Qihoo securities during the Class Period and are therefore similarly situated to other Class Members, have vigorously pursued their claims throughout this litigation, and are represented by highly experienced counsel. (*See infra* at 9-12). Plaintiffs will therefore represent the interests of

2

the Class. **Commonality** is satisfied because Plaintiffs' claims are rooted in the Defendants' uniform course of conduct, as described above. (*See also infra* at 9).

This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and the superiority of a class action over other methods of adjudication. The Supreme Court has explained that "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*). Common questions predominate as to reliance here based on the fraud-on-the-market presumption established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). The Court ruled in its denial of Defendant Zhou's motion to dismiss as to the Seller shareholders that Plaintiffs "have properly invoked the rebuttable presumption of reliance at this stage" because the "seller shareholders sold their Qihoo shares at the price set by a presumptively efficient market" and "as pled, were typical 'investors who bought or sold stock at the price set by the market' and did so 'in reliance on the integrity of that price' and 'the belief that it reflects all public, material information.'" (ECF No. 145 at 51 (quoting *Halliburton Co. v. Erica P. John Fund., Inc.* (*Halliburton II*), 573 U.S. 258, 268 (2014) and *Basic*)).

Plaintiffs have now proven that the market for Qihoo securities during the Class Period was efficient. The burden to show market efficiency "is not an onerous one." *In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017). To make this showing, Plaintiffs submit with this motion the Expert Report of Dr. Zachary Nye, dated October 18, 2023. (Grunfeld Decl., Ex. 2 ("Nye Report")). Dr. Nye's analysis shows that the market for Qihoo's ADS during the Class Period satisfies all of the factors that courts use to assess market efficiency for purposes of class certification in securities class actions, as set out in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-

3

87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001). The Second Circuit has made clear that the *Cammer* and *Krogman* factors are just "tools" to help courts evaluate market efficiency and do not all need to be satisfied in order to find an efficient market. *Waggoner v. Barclays PLC*, 875 F.3d 79, 94, 97-98 (2d Cir. 2017). In this case, however, all of the *Cammer* and *Krogman* factors are satisfied. (*See infra* at 13-20). This makes sense because Qihoo was a multi-billion dollar company with over 90 million ADS that were heavily traded on the New York Stock Exchange and followed by prominent industry analysts. It is the prototypical type of company whose securities would trade in an efficient market. Indeed, at the initial case management conference, Defendants stated that they do not intend "to be challenging market efficiency." (Grunfeld Decl., Ex. 1 (July 19, 2023 Tr. at 17:8-12)).

Plaintiffs also explain below that their damages model is consistent with their theory of liability, which is all that is required at this stage. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015) (discussing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)). Defendants' misstatements led investors to believe that the Merger was less likely to be completed than it actually was, causing the market price of Qihoo securities to diverge from the Merger price. The Court explained this theory in its motion to dismiss decision, noting that "but for the suppression of the Buyer's Group's heady plans after taking Qihoo private, Qihoo's ADS price would have approached or been asymptotic to the exchange price of $77/ADS share throughout the class period, with consequent loss to shareholders who sold for below that price." (ECF No. 145 at 53-54). Dr. Nye explains that this theory of loss causation and damages is consistent with academic finance literature describing how share prices react while a proposed Merger is pending. (*See infra* at 21-23). Plaintiffs will show how this model applies in more detail when addressing merits issues at a later stage. They are not required to do so now because "plaintiffs are not required to

demonstrate either loss causation or damages for purposes of class certification." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015).

The Class should be certified for all of these reasons and those described further below.

## II.    STATEMENT OF FACTS

Plaintiff Altimeo filed the initial complaint in this action on March 5, 2019, and Plaintiffs filed the operative Complaint on August 30, 2019. (ECF Nos. 1, 53). The Complaint alleges that the Buyer Group, led by Defendants Zhou and Qi—Qihoo's founders, top executives, Directors, and largest shareholders—bought Qihoo from its public shareholders for $9.3 billion in the Merger in July 2016. Zhou and Qi then turned around and relisted the main part of Qihoo's business, through a "backdoor listing" in China, for over $60 billion, in a deal that was announced in November 2017. ¶¶ 22-23, 62-63, 93, 96-100. Plaintiffs allege Defendants made false and misleading statements when announcing the Merger and in the Proxy about the (1) Buyer Group's plans for Qihoo after the Merger, (2) fairness of the Merger price, and (3) reasons for the Merger.

***Defendants misrepresented the Buyer Group's plans for Qihoo after the Merger.*** Defendants falsely represented that the Buyer Group did "***not have any current plans, proposals or negotiations***" at the time of the Merger to relist Qihoo in China. ¶¶ 72-73, 159(a)-(b), 170; *see also* ¶¶ 168, 172-85, 235-36. While the Court initially granted Defendants' motion to dismiss on August 14, 2020 (ECF No. 84), Plaintiffs appealed and on November 24, 2021, the Second Circuit ruled that the Complaint adequately alleges "that the statement in the Proxy Materials that 'the Buyer Group does not have any current plans' to relist Qihoo—as well as its omission of any such plan—was misleading." (ECF No. 88 at 10-11). These "allegations create a plausible inference that a concrete plan was in place at the time Qihoo issued the Proxy Materials." *Id.*

The Second Circuit's ruling was based on news articles "report[ing] that a privatization plan was provided to the Buyer Group that involved relisting the company on the Chinese stock

5

market," the timing of the relisting, and a confidential witness who attended a meeting where Defendant Qi discussed the plan. *Id.*; *see also* ¶¶ 106-16, 134-37. The Second Circuit further held that Defendants' misstatements were adequately alleged to be material based on the allegation that "negotiations [for the relisting] were ongoing—or had already happened—at the time of the shareholder vote" on the Merger. (ECF No. 88 at 13). This Court then explained, in denying Defendant Zhou's subsequent motion to dismiss as to the Seller Class, that Defendants misrepresented the Buyer Group's "concrete plan to profit significantly by relisting Qihoo in China," which was their "central reason to go private." (ECF No. 145 at 27, 29).[3] Moreover, the Court held that the Complaint adequately alleges that, in light of the Buyer Group's undisclosed relisting plan, Defendants materially misrepresented the Merger as "fair" to Qihoo's shareholders and the reasons for the Merger. (ECF No. 145 at 23-30).

In addition, the Court held that the Complaint adequately alleges scienter and loss causation as to the Seller shareholders and claims under Section 20(a). (*Id.* at 33-34 n.15, 50-58 & nn.24-25). As the Court ruled, scienter is adequately pled as to Zhou based on his "economic self-interest in the Going-Private Merger" and because "[h]aving adequately alleged a secret relisting plan orchestrated by Zhou aimed at garnering him great private profit, the FAC has adequately pled that Zhou either understood that Qihoo's public statements were inaccurate on account of this omission or was 'highly unreasonable' in failing to appreciate that possibility." (ECF No. 145 at 33-34 n.15, 57 n.24). The allegations, moreover, support both "primary liability on Zhou's part" and "Zhou's secondary liability, based on his control over the allegedly actionable filings, as Qihoo's chairman

---

[3] The evidence that was presented at the Cayman Islands Appraisal Action—which will be produced in merits discovery here—shows even further that the Buyer Group, led by Defendants Zhou and Qi, had a concrete plan during the Class Period to relist Qihoo following the Merger. (*See* ECF No. 157-1 ¶¶ 170-79). Although the Court denied Plaintiffs leave to amend the Complaint to add that evidence in aid of their fair value measure of loss causation, the Court did not rule on whether the evidence presented there supports the relisting plan because that was already held to have been adequately alleged.

and CEO." (*Id.* at 56-57). Furthermore, the Court held that reliance and loss causation are adequately alleged. (*Id.* at 51-56).

Since the Court denied Zhou's motion to dismiss as to the Seller shareholders on March 21, 2023 (ECF No. 145), on June 29, 2023, it denied Plaintiffs' motion for reconsideration or to certify for appeal as to the tenderer shareholders and ordered that "[t]his case will now proceed to discovery" as to the seller shareholders "on the misstatements and omissions found viable." (ECF No. 164 at 42). The case is now in discovery, and this motion is being filed, according to the case management plan and scheduling order in place in this action. (ECF No. 178).

## III.    ARGUMENT: THE CLASS SHOULD BE CERTIFIED PURSUANT TO FRCP 23

To certify a class, the Court must determine whether the four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). The Court must also determine whether the action can proceed under Fed. R. Civ. P. 23(b). *Id.* "The preponderance of the evidence standard applies" to Plaintiffs' evidence. *Teamsters Local 445 Freight Div. Pens. Fund v. Bombardier*, 546 F.3d 196, 202 (2d Cir. 2008).

"Because of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008). If a court is in doubt as to whether to certify a class in a securities action, it should "err on the side of granting class certification." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015).

While courts must conduct a "rigorous" analysis to determine whether the elements of Rule 23 have been met, that is not a "license to engage in free-ranging merits inquiries." *Amgen*, 568 U.S. at 465-66. "A motion for class certification should not become a mini-trial on the merits; the question . . . is whether Plaintiff meets Rule 23's requirements." *Signet*, 2019 WL 3001084, at

*7. While the Court may consider whether a market was efficient to support a presumption of reliance, it should not decide merits issues such as scienter, materiality, or loss causation. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) (holding "materiality should be left to the merits stage"); *Halliburton I*, 563 U.S. at 813-15; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 81, 102 (2d Cir. 2023) ("Class certification litigation provides no forum to relitigate materiality.").

A.      **Plaintiffs Satisfy the Rule 23(a) Requirements**

1.      **The Proposed Class is so Numerous That Joinder is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but only that the difficulty of joining all class members makes use of the class action appropriate. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). Numerosity is generally satisfied above "40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010) (citing *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997)). In securities fraud cases relating to nationally listed "corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007).

During the Class Period, Qihoo's ADSs were listed on the New York Stock Exchange ("NYSE") and traded under the ticker symbol "QIHU." Nye Report ¶ 11.[4] The total number of Qihoo ADSs issued and outstanding ranged from approximately 98.3 million to 99.9 million. *Id.* ¶ 25. There appears to be at least thousands of geographically dispersed members of the proposed Class, who can be readily determined from securities brokerage records. The proposed Class thus

---

[4] Each ADS was redeemable for 1.5 of Qihoo's Class A ordinary shares. Nye Report ¶ 11. The NYSE was the only listing exchange for the Company's Class A ordinary shares. *Id.* ¶ 35 n.58.

consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable, and therefore satisfies the numerosity requirement of Rule 23(a).  *See Menkes*, 270 F.R.D. at 90.

### 2.    Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) (commonality is "applied permissively" in securities fraud litigation).

Here, where alleged misstatements were made to the Class as a whole, common questions of law and fact include whether: (i) Defendants' statements were materially false and misleading; (ii) they were made with scienter; (iii) the price of Qihoo's securities was artificially deflated during the Class Period; and (iv) Defendants' misrepresentations and omissions caused Class members to suffer economic losses. ¶ 305. This case, as with most securities fraud class actions, thus "raises common questions of law and fact." *Signet*, 2019 WL 3001084, at *8; *see also Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holds.*, 338 F.R.D. 205, 215 (S.D.N.Y. 2021) (holding "Plaintiffs will eventually need to prove the elements of falsity, materiality, and loss causation on the merits, but those elements are considered common issues").

### 3.    Plaintiffs' Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class. The "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Signet*, 2019 WL 3001084, at *8 (quoting *In re Flag Telecom Holdings,*

9

*Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). In a securities class action, which focuses on Defendants' "dissemination of" the alleged misstatements, "the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." *Id.*

Plaintiffs satisfy the typicality requirement because they each sold Qihoo securities during the Class Period and their claims derive from the same legal theories and "course of events" as all other Class Members. This is a "seller" case, where Class Members were harmed when they sold Qihoo securities during the Class Period at artificially ***deflated*** prices. The Class includes Qihoo ADS holders who sold their securities at artificially deflated prices from December 18, 2015 through July 15, 2016. ¶¶ 298-99. Both Plaintiffs sold Qihoo securities during the Class Period at prices that were artificially deflated below the Merger price of $77 per ADS. ¶¶ 19-20; ECF No. 12-3; ECF No. 169-1.

Moreover, it does not matter when Class Members sold their securities during the Class Period relative to Plaintiffs because, whether framed as a matter of typicality or adequacy, "[c]ourts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, ***relate to damages and do not warrant denial of class certification***." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 548 (S.D.N.Y. 2022) (rejecting "Defendants' argument that Plaintiffs cannot represent the class because class members purchased securities at different times" as "wholly unpersuasive"); *In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (holding "[s]light factual discrepancies between the claims of various plaintiffs are insufficient to bar" certification on typicality grounds); *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944, 951 (N.D. Ill. 2007) (certifying a seller class).

####     4.        Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is met. The focus of this inquiry is "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. A conflict will not prevent a plaintiff from meeting the Rule 23(a)(4) adequacy element unless it is "fundamental, and speculative conflict[s] should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001).

Here, Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 625-26, and no actual or potential conflicts exist. Plaintiffs and all Class Members suffered damages from selling Qihoo securities at artificially deflated prices during the Class Period. They have been injured by the identical misstatements that Defendants made. Furthermore, each Plaintiff has been actively involved in this litigation and understands its duties as a potential Class Representative. Each Plaintiff moved to be appointed Lead Plaintiff, where they attested to their willingness to serve as representatives for the proposed Class, and has filed certifications attesting to their willingness to serve as representative parties. (ECF No. 11 at 9; ECF No. 12-3; ECF No. 169-1). Plaintiffs' ability to oversee this litigation is also demonstrated by their status as sophisticated investors and their prior experience as lead plaintiffs in other securities class actions.[5] In addition, Plaintiffs have engaged highly qualified and experienced counsel, who will adequately represent the Class. *See infra* Section III.C.

---

[5] Plaintiffs have served as Lead Plaintiffs or filed complaints in the cases referenced in their certifications filed pursuant to the Private Securities Litigation Reform Act of 1995. ECF Nos. 12-3, 169-1.

**B.**    **Plaintiffs Satisfy the Requirements of Rule 23(b)(3)**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

**1.**    **Predominance is Satisfied**

The Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625. "Predominance is satisfied if resolution of some of the legal or factual questions . . . can be achieved through generalized proof" and these issues are "more substantial" than those "subject only to individualized proof." *Signet*, 2019 WL 3001084, at *9. Plaintiffs will prove the elements of their Sections 10(b)[6] and 20(a) claims on a common basis.[7] The Court's ruling on Zhou's motion to dismiss shows the common nature of the elements of falsity, materiality, loss causation, and scienter—all of which focus on Defendants' uniform alleged misconduct. (ECF No. 145 at 22-31, 33-34 n.15, 50-57 & n.24).[8]

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. Reliance (or transaction causation) can be shown on a common basis for the following reasons.

*a)*    *Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption*

The reliance element of Plaintiffs' Section 10(b) claim will be established on a common

---

[6] The elements of a claim for securities fraud under Section 10(b) are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Carpenters Pens. Tr. v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

[7] Section 20(a) requires control of the primary violator and an underlying violation by a controlled entity. *Pension Comm. of Univ. of Montreal Pen. Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006). Control can be proven class-wide. *See In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[8] Courts routinely find that these elements can be proven with common evidence. *See Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception [reliance], there is no dispute that each element necessary to establish liability . . . is common"). The Supreme Court has held that neither materiality nor loss causation need to be proven at the class certification stage. *Amgen*, 568 U.S. at 466-68; *Goldman*, 141 S. Ct. at 1959 (materiality); and *Halliburton I*, 563 U.S. at 813-15 (loss causation).

basis under the "fraud on the market" theory established in *Basic*. This presumption of class-wide reliance provides that a class representative in a Section 10(b) case may "invoke[e] a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. The *Basic* presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Halliburton II*, 573 U.S. at 272. It follows that "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point." *Id.* (emphasis in original). Furthermore, the fraud-on-the-market presumption of reliance is a "common sense" proposition for securities traded in a well-developed market. *Basic*, 485 U.S. at 246.

To invoke the *Basic* presumption, a plaintiff must show only three prerequisites: (1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and (3) the relevant transaction took place between the misrepresentations and when the truth was revealed. *Halliburton I*, 563 U.S. at 811. Plaintiffs plainly satisfy the first and third of these requirements because Defendants made all of the alleged misstatements in public documents filed with the SEC. *See* Complaint § V. In addition, Plaintiffs sold Qihoo securities after these misstatements, but before the truth was revealed. ¶¶ 19-20, 279-84, 298-99; ECF No. 145 at 52.

The second *Basic* prerequisite, the burden to show market efficiency, "is not an onerous one." *In re Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017). The Second Circuit has "declined to adopt a particular test for market efficiency," but references the *Cammer* and *Krogman* factors as "tools" to help courts evaluate the issue. *Waggoner*, 875 F.3d at 94-95, 97-98 (citing *Cammer*, 711 F. Supp. at 1286-87, and *Krogman*, 202 F.R.D. at 474); *see also Carpenters*, 310 F.R.D. at 83

13

(holding "[t]he vast majority of courts have used the *Cammer* factors as an analytical tool rather than as a checklist"). The accompanying expert report of Dr. Zachary Nye explains how these factors prove that Qihoo securities traded in an efficient market during the Class Period.

### (1)    Qihoo's NYSE Listing Strongly Supports Market Efficiency

Throughout the Class Period, Qihoo's ADS were listed on the NYSE under the ticker "QIHU," with each ADS representing 1.5 Class A ordinary shares of Qihoo stock. Nye Report ¶ 11. The NYSE is a "national securities exchange" registered with the SEC. *Id.* ¶ 19.[9] It seeks to ensure the timely disclosure of information that may affect security values and to efficiently maintain an orderly securities market. *Id.* A security's listing on a national exchange such as the NYSE means that financial information about that company is readily available to investors and trading prices and volumes are available throughout the trading day. *Id.* ¶ 20.[10] The market for securities traded on the NYSE is therefore widely recognized as efficient. *Id.* ¶ 21.[11]

The fact that Qihoo ADSs were listed and traded on a major exchange such as the NYSE supports the conclusion that they traded in an efficient market throughout the Class Period. Congress, the Supreme Court, and *Cammer* all recognize that such well-developed markets are generally efficient in reflecting publicly-available information in the prices of securities. *See Basic*, 485 U.S. at 245-46 (noting that in "drafting [the 1934] Act, Congress expressly relied on the premise that securities markets are affected by information"); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 430-31 (D. Ariz. 2013) (same); *Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D.

---

[9] During the Class Period, the NYSE listed between 2,424 and 2,330 companies, with a median and mean market cap of $2.4 billion and $11.7 billion, respectively. Nye Report ¶ 19.

[10] Qihoo's ADSs also traded on the NASDAQ, another major national securities exchange that "is recognized as maintaining an efficient market." Nye Report ¶ 21; *Burke v. China Aviation Oil (Singapore) Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005).

[11] Investor orders in NYSE-listed securities must be filled at the best price immediately available in any market. Prices on national exchanges like the NYSE reflect a consensus opinion as to a security's value. Nye Report ¶ 20.

Mo. 2012) (*Basic* "recognized the NYSE" was efficient). Similarly, *Cammer* noted that "there should be a presumption—probably conditional for class determination—that certain markets are developed and efficient for virtually all the securities traded there: [including] the New York and American Stock Exchanges." 711 F. Supp. at 1292; *see also Carpenters*, 310 F.R.D. at 81.

### (2)    The Five *Cammer* Factors Confirm Market Efficiency

Dr. Nye's analysis of the *Cammer* factors and other indicia of market efficiency further demonstrate that Qihoo ADSs traded in an efficient market during the Class Period.

**Factor One—Weekly Trading Volume:** A large weekly trading volume "implies significant investor interest in the company [which] implies a likelihood that many investors are executing trades on the basis of newly available . . . corporate information." *Cammer*, 711 F. Supp. at 1286; Nye Report ¶ 24. During the Class Period, the average weekly trading volume of Qihoo ADS on the NYSE was 9.8% of shares outstanding, nearly *five times* the 2% level required for a "strong presumption" of market efficiency under *Cammer*. Nye Report ¶ 25.

**Factor Two—Analyst Coverage:** Analyst coverage of a stock implies that information about the company is rapidly reflected in the stock price. *Cammer*, 711 F. Supp. at 1286; Nye Report ¶¶ 27-32. During the Class Period, at least 6 well-known investment firms followed Qihoo and over 30 analyst reports on Qihoo were published. Nye Report ¶ 29. Financial information about Qihoo was also disseminated via media coverage, conferences, trade magazines, Company presentations and SEC filings. *Id.* ¶ 30. News articles appeared in 38 major publications. *Id.* Furthermore, Qihoo's SEC filings were publicly available online at no cost. *Id.* ¶ 31. This volume of analyst and news coverage, as well as dissemination of information, further shows that Qihoo's securities traded in an efficient market during the Class Period. *Id.* ¶ 32.

**Factor Three—Market Makers and the Potential for Arbitrage:** The third *Cammer* factor concerns the existence of market makers and arbitrageurs who can react quickly to news

15

and facilitate trading through the incorporation of new information into securities prices. Nye Report ¶ 33. The high number of market makers, the lack of short-selling constraints, and the fact that investors could have exploited arbitrage opportunities during the Class Period support a finding of market efficiency. *Id.* ¶¶ 33-43. Qihoo ADSs traded on the NYSE, which uses a single designated market-maker ("DMM") to maintain a competitive and efficient market for the securities assigned to that firm. *Id.* ¶ 34. Qihoo ADSs also traded on other national securities markets, including NASDAQ, which had over 80 active market makers for Qihoo. *Id.* ¶¶ 33-36. Qihoo's substantial number of market makers, including the NYSE's DMM, supports a finding of market efficiency. *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers support efficiency).

The existence of arbitrageurs (sophisticated investors who act rapidly to take advantage of security pricing discrepancies) also supports this factor. Nye Report ¶ 37. Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency. *Id.* The level of short interest and the tightness of bid/ask spreads suggest that arbitrage activity for the Company's securities was prevalent during the Class Period. *Id.* ¶¶ 37-40.[12]

Qihoo's low "bid/ask" spread demonstrates low transaction costs, which correspond to the ability to exploit arbitrage opportunities and therefore show that Qihoo ADSs traded in an efficient market. Nye Report ¶¶ 42-43, 59. During the Class Period, Qihoo ADSs on the NYSE had an average bid-ask spread of $0.02/0.02% which was smaller than the average spread of a random sample of stocks listed on the NYSE of $0.06%/0.12%. *Id.*

Institutional ownership is another indicator of arbitrage activity insofar as institutional investors are generally considered to be sophisticated investors that have ready access to

---

[12] During the Class Period, the average short interest for companies listed in the U.S. as a percentage of float was 4.14%, as compared to 6.34% for Qihoo ADSs. Nye Report ¶ 39. In a short sale, an investor sells a stock they do not own and purchases it back in the future. Short sales allow arbitrageurs to convey their opinion that the security's price will drop in the future, helping the market value the security accurately. *Id.*

16

minute-by-minute financial news. *Id.* ¶ 40. Institutions held over 42% of Qihoo's public float during the Class Period and over 320 institutional investors held Qihoo ADS at the end of each quarter. *Id.* ¶ 41. Furthermore, the fact that institutional holdings were nearly 8 times the short interest in Qihoo ADS indicates that short selling was not constrained. *Id.*

**Factor Four—S-3 Eligibility:** *Cammer* found that a company's eligibility to file a short-form registration statement, *i.e.*, Form S-3, supports a finding of an efficient market. 711 F. Supp. at 1285. The SEC's view is that S-3 eligible companies—those that disclose financial information to the SEC and issue press releases to the public—disseminate key information to the marketplace, and that, therefore, the market operates efficiently for them. Nye Report ¶ 44-46.

A Form F-3 for foreign issuers contains essentially identical requirements as, and is the functional equivalent to, the Form S-3 used by U.S. issuers. *Id.* ¶ 47. Qihoo did not need to file a Form F-3 because the only registration statements that it filed were those related to its IPO in 2011. But Qihoo's two most recent annual reports on Forms 20-F stated that it met the definition of a "large accelerated filer" under Rule 12b-2 of the Exchange Act. *Id.* ¶ 48. The SEC's public float and reporting history requirements for an accelerated filer are virtually identical to the Form S-3 filing requirements. *Id.* Dr. Nye explains that Qihoo's having "(i) met the SEC's definition of a large accelerated filer; and (ii) adhered to all of the aforementioned Form F-3/S-3 requirements . . . , supports [the] conclusion that the market for Qihoo ADSs was efficient." *Id.* ¶ 49. This is because it is not the fact of having filed a Form F-3/S-3 that supports market efficiency, but rather, that the form's underlying requirements show that the market operates efficiently by regularly disseminating key financial information to the market. *Id.* ¶¶ 44-46.

**Factor Five—Cause and Effect Relationship of Unexpected Material News:** *Cammer* Factor 5 involves showing how a security's price reacts to new, material information by

"illustrat[ing], over time, a cause and effect relationship between the company disclosures and resulting movements in stock price." 711 F. Supp. at 1291; Nye Report ¶ 50. The Second Circuit has held that a plaintiff seeking to show market efficiency need not always present direct evidence of price reaction through event studies. *Waggoner*, 875 F. 3d at 97. Such evidence is not required where plaintiffs overwhelmingly show the other four *Cammer* factors support market efficiency, as Plaintiffs have done here. Nonetheless, Dr. Nye has demonstrated a cause-and-effect relationship between the price of Qihoo ADSs and news about the Company. *See In re Synchrony Fin. Sec. Litig.*, 2023 WL 1503032, at *10 (D. Conn. Feb. 3, 2023) (holding "the fifth *Cammer* factor is not required to find market efficiency" where the other *Cammer* and *Krogman* factors support market efficiency, but "Plaintiffs' evidence of price impact adds further support").

Dr. Nye employed an event study to determine the impact of new material information on Qihoo's ADS price. Nye Report ¶¶ 51-54.[13] Out of the 16 events that he examined, 7 (*i.e.*, 44%) are associated with a statistically significant Company-specific return at or above the 95% confidence level and one is statistically significant at the 89.7% confidence level. *Id.* ¶ 55 & n.98. At the 95% level of confidence, a statistically significant return is expected to occur 5% of the time. *Id.* ¶ 55. Thus, one should expect a random sample of 16 days to contain 0.8 days with a return that is statistically significant at the 95% confidence level. *Id.* Given that Dr. Nye's sample contains more than eight times as many statistically significant dates at or above the 95% confidence level, as compared to what is expected from a randomly selected 16-day sample, his analysis confirms that Qihoo's ADS price typically reacted more strongly on event dates than

---

[13] In an efficient market, a stock price is expected to respond to news. An event study tests this response through: "the *a priori* definition and selection of events to study; identification of a study period; estimation of a regression model to remove noncompany-specific effects from the security's return; testing for statistical significance; and interpretation of empirical results." Nye Report ¶ 51. Consistent with event study literature, Dr. Nye examined dates on which Qihoo released financial results and news pertaining to the Merger. *Id.* ¶¶ 53-54.

non-event dates. *Id.* He also found that although directionality is not required, his review shows "that the direction of the Company-specific returns observed on each event date [were] consistent with that expected in an efficient market, providing additional evidence of efficiency." *Id.* ¶ 56.

Dr. Nye's event study thus shows "that Qihoo's ADS price reflected the information disclosed to the market, and promptly responded to . . . new, material unexpected information," establishing "that the market for Qihoo ADSs was efficient" during the Class Period." *Id.* ¶ 57.

### (3)    The *Krogman* Factors Further Demonstrate Market Efficiency

In addition to *Cammer*, courts often consider: (1) the market capitalization of the company; (2) the big-ask spread of the stock; and (3) the percentage of stock not held by insiders to determine market efficiency. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (citing *Krogman*, 202 F.R.D. at 474).

Qihoo's market capitalization was as high as $9.96 billion during the Class Period. Nye Report ¶ 58. By comparison, the median market capitalization of the 1,538 companies listed on the NYSE was $2.25 billion at the start of the Class Period, while the median market capitalization of NASDAQ companies was $292.05 million. *Id.* ¶ 59. As of the start of the Class Period, Qihoo's market capitalization was greater than 79.4% and 95.2% of NYSE and NASDAQ stocks. *Id.* In addition, Qihoo's public float was, on average, 94.0% of Class A shares outstanding, showing a high percentage of shares that were not held by insiders. *Id.* ¶ 61. Finally, Qihoo's average and median bid-ask spreads were smaller than those of a random sample of NYSE stocks. *See supra* at 16-17. Qihoo's high market capitalization, large public float, and low bid-ask spread all support a finding of market efficiency.

In sum, ***all*** of the *Cammer* and *Krogman* factors support the conclusion that the market for

Qihoo's ADSs during the Class Period was efficient.[14] Using these factors as an "analytical tool rather than as a checklist" even further supports this finding. *Carpenters*, 310 F.R.D. at 83.

### b) Reliance is Presumed Under *Affiliated Ute*

In addition to the fraud-on-the-market presumption under *Basic*, an independent presumption of reliance applies under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), for claims premised on material omissions. Defendants had duties under Cayman Islands law to disclose information about the relisting plan and Qihoo's financial condition. ¶¶ 293-94, 315, 327; *Davis v. Scottish Re Grp. Ltd.*, 159 A.D. 3d 528, 529 (1st Dep't 2018) (describing Cayman duty to disclose "sufficient information"). This duty supports the *Affiliated Ute* presumption because "a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015); *Moab Partners, L.P. v. Macquarie Infrastr. Corp.*, 2022 WL 17815767, at *1 (2d Cir. Dec. 20, 2022) (same), *cert. granted*, 2023 WL 6319659 (U.S. Sept. 29, 2023).

### 2. Plaintiffs' Damages Model Matches Their Theory of Liability

The Supreme Court held in *Comcast*, 569 U.S. at 27, that "'at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case[.]'" *Signet*, 2019 WL 3001084, at *19. *Comcast* does not require "that damages are capable of measurement on a classwide basis." *Roach*, 778 F.3d at 402. Damages calculations are also not required to "be so precise at this juncture" as to "account for variations in inflation over time." *Waggoner*, 875 F.3d at 106.

All that is required is that plaintiffs "show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780

---

[14] Dr. Nye also explains that his market-efficiency analysis is the same if the Class Period starts on January 11, 2016—when Qihoo issued the initial Proxy for the Merger—rather than when it announced the Merger the prior month, on December 18, 2015. Nye Report ¶ 3 n.2.

F.3d 70, 88 (2d Cir. 2015). Indeed, "plaintiffs are not required to establish loss causation—let alone proffer a damages model—on class certification." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016); *In re Jernigan Cap., Inc. Sec. Litig.*, 2023 U.S. Dist. LEXIS 102114, at *26 (S.D.N.Y. June 12, 2023) (holding "Defendants' arguments go to merits issues and causation, not whether the damages match the theory of liability or whether common issues predominate"), *R&R adopted*, 2023 U.S. Dist. LEXIS 163288 (S.D.N.Y. Sept. 14, 2023).

Damages here are consistent with Plaintiffs' theory of liability and, while not necessary for class certification, can be calculated on a class-wide basis using a common methodology. *Cf. Jernigan*, 2023 U.S. Dist. LEXIS 102114, at *26 (holding "to the extent Defendants suggest that damages must be capable of measurement on a classwide basis to obtain class certification, that is not the law"). This is a seller case, where damages are based on investors selling their securities at artificially deflated prices. *See San Antonio Fire & Police Pension Fund v. Dole Food Co.*, 177 F. Supp. 3d 838, 839-40 (D. Del. 2016) (addressing "the sale of shares at an artificially depressed price"). As the Court has explained, in contrast to cases where plaintiffs allege that they bought securities whose prices were artificially inflated as a result of defendants' fraud, "[t]his case presupposes, instead, that insiders depressed the price of Qihoo securities pending a go-private insider buyout. In that paradigm, there is no illogic in the premise that the share prices were undervalued" during the Class Period. (ECF No. 145 at 52). Plaintiffs' losses are tied to their theory of liability because Defendants' misstatements about "[t]he relisting plan implied optimism about Qihoo's potential and about the likelihood that the Merger would reach completion, assuring ADS shareholders $77/ADS. The inference reasonably follows from the FAC that, but for the proxy materials' misstatements, the stock's price would have more closely hugged the $77/ADS share

21

price during the [Class Period], whereas in fact, the price dipped to a close of $67.83 during that period." (*Id.* at 52-53). In other words:

> [T]the market, alerted to the relisting plan, would have had greater confidence that the Go-Private Merger would reach fruition, leading shareholders to be more confident and more apt to hesitate before selling at prices meaningfully below the exchange price. . . . [B]ut for the suppression of the Buyer's Group's heady plans after taking Qihoo private, Qihoo's ADS price would have approached or been asymptotic to the exchange price of $77/ADS share throughout the class period, with consequent loss to shareholders who sold for below that price.

(*Id.* at 53-54). As the District Court concluded, "[t]he chain of causation for the seller shareholders is, in sum, short and plausible." (*Id.* at 54).

Plaintiffs have now further supported this theory of loss causation. Dr. Nye explains that Plaintiffs' losses, as discussed in the Court's decision, are consistent with academic finance literature describing how share prices react while a proposed merger is pending. Nye Report ¶ 65. In particular, "following a takeover announcement, the target share price is determined by three factors: the offer price, the probability of the bid's success, and the expected post-takeover price if it fails." *Id.* For example, "under Plaintiffs' theory of liability, the disclosure of allegedly corrective information would have informed investors that the Merger was virtually certain to be completed"—a merits issue not to be decided here—which would have caused Qihoo's ADS price to increase to the offer price of $77/ADS. *Id.* ¶ 64. Per-share damages are then easily calculated using "the daily levels of price deflation present in Qihoo ADSs during the Class Period" based on this model—which is the difference between the value of Qihoo ADSs had the truth been disclosed and Class members' sale prices—and "can be commonly applied to each Class member's actual trading activity to mechanically calculate" each of their damages. *Id.* ¶¶ 65-66 & n.125.

This shows that damages here are consistent with Plaintiffs' theory of liability and (while not required) can be calculated on a class-wide basis using a common methodology. Plaintiffs need

22

not show anything more because "plaintiffs are not required to demonstrate either loss causation or damages for purposes of class certification." *Carpenters*, 310 F.R.D. at 99; *see also In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at \*19 (E.D.N.Y. Jan. 11, 2022) (approving plaintiffs' expert who "has not yet computed damages or conducted a loss causation analysis"), *R&R adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022); *Signet*, 2019 WL 3001084, at \*20 (rejecting "loss causation argument in disguise"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018) (rejecting defendants' argument that goes "beyond the Rule 23 inquiry"). Plaintiffs are therefore not required to proffer a damages model at this stage that is "so precise" as to "account for variations in inflation over time." *Waggoner*, 875 F.3d at 106; *Pirnik*, 327 F.R.D. at 47 (same).

Moreover, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach*, 778 F.3d at 405. This is especially true for securities fraud cases, where the process of computing damages is "virtually a mechanical task." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013); *see also Carpenters*, 310 F.R.D. at 74 (holding "[i]ssues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases").

These principles apply with equal force where, as here, Plaintiffs allege that a company's share price was artificially deflated while a proposed merger was pending. *See Jernigan*, 2023 U.S. Dist. LEXIS 102114, at \*19 (addressing damages measured as "the difference in the price received for the shares . . . and the value the shareholders should have received absent the materially misleading Proxy"); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at \*11 (E.D. Va. Sept. 4, 2020) (holding in seller case that "Plaintiff's ability to prove loss causation and the amount of damages" are issues that "are not to be decided for the purposes of determining class certification" and that "whether Plaintiff needs to establish any of the assumptions upon which

23

[their expert's] damages model is based is a merits question"). There is no requirement at this stage that damages "be calculated with absolute precision." *Jernigan*, 2023 U.S. Dist. LEXIS 102114, at *20, *R&R adopted*, 2023 U.S. Dist. LEXIS 163288, at *11 (holding that "require[ing] something close to an exact calculation of damages . . . is premature at the certification stage").

Plaintiffs have satisfied *Comcast* because their theory of loss causation and damages is consistent with their theory of liability.

### 3.      A Class Action is Superior to Other Available Methods of Adjudication

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Signet*, 2019 WL 3001084, at *20. "Courts have long recognized that[] class actions are a particularly appropriate and desirable" method for adjudicating securities claims. *Veeco Instruments*, 235 F.R.D. at 240. Securities suits "easily satisfy the superiority requirement." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999).

A class action is superior to other available methods of adjudication here, under the criteria set out in Rule 23(b)(3), because: (i) otherwise there would be potentially thousands of individual cases arising out of the same set of facts that would be prohibitively expensive  for investors to pursue individually (*see WorldCom*, 219 F.R.D. at 304); (ii) Plaintiffs are not aware of any other litigation seeking the redress sought by the Seller shareholders; (iii) concentrating litigation in this forum through a class action is an important way for investors to redress the injuries they suffered as a result of Defendants' misconduct, will help achieve the statutory objective of maintaining "the integrity of domestic capital markets" (*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320 n.4 (2007)), is an efficient use of judicial resources, and prevents the risk of inconsistent rulings (*see In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008)); and (iv) there are no manageability concerns because the procedures for administering class actions of this size and complexity are well established.

24

## C.    The Court Should Appoint Class Counsel

Under Rule 23(g)(1)(A), when appointing Class Counsel, a court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs have retained Pomerantz to represent them and the proposed Class and Labaton as additional counsel for ODS. Both firms satisfy the requirements of Rule 23(g)(1)(A). They have each litigated securities fraud cases for decades on behalf of institutional and individual investors in class and individual actions. (*See* Grunfeld Decl., Exs. 3-4). "Courts in this Circuit have previously approved the Pomerantz firm as lead plaintiffs' counsel in securities class actions on a number of occasions." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 328 (S.D.N.Y. 2016), *aff'd.*, *Waggoner*, 875 F.3d at 79; *see also Pirnik*, 327 F.R.D. at 49; *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 362 (S.D.N.Y. 2016) (finding "the Pomerantz firm has both the skill and resources to represent the Classes adequately"). Counsel's knowledge of the applicable law and strenuous pursuit of the Class's interests are also shown by their efforts here, including their successful appeal of the initial dismissal of this action, their defeat of Defendant Zhou's motion to dismiss, and their vigorous pursuit of discovery from Defendants. (ECF Nos. 88, 97-100, 111, 121, 145).

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class as defined herein; (2) appointing Plaintiffs as the Class Representatives; (3) appointing Pomerantz as Class Counsel and Labaton as additional counsel for ODS; and (4) granting such other relief as the Court deems just and proper.

25

Dated: October 18, 2023

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld* _____
Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiffs
Altimeo Asset Management and ODS
Capital LLC*

**LABATON SUCHAROW LLP**

*/s/ Carol C. Villegas* _____
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Email: cvillegas@labaton.com
          dschwartz@labaton.com
          jbissell-linsk@labaton.com

*Additional Counsel for Lead Plaintiff
ODS Capital LLC*

26