# EXHIBIT 1

M7JNALTC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ALTIMEO ASSET MANAGEMENT and
ODS CAPITAL,

                    Plaintiffs,

          v.                           19 Civ. 10067 (PAE)

QIHOO 360 TECHNOLOGY CO.,
LTD., *et al.*,

                    Defendants.        Telephone Conference

------------------------------x

                                       New York, N.Y.
                                       July 19, 2023
                                       9:30 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                       District Judge

                    APPEARANCES (Via Telephone)

POMERANTZ LLP
     Attorneys for Plaintiffs
BY:  MICHAEL GRUNFELD

LABATON & SUCHAROW LLP
     Attorneys for Plaintiffs
BY:  JAKE BISSELL-LINKS
     CAROL C. VILLEGAS

LATHAM & WATKINS
     Attorneys for Defendants
BY:  JASON C. HEGT
     HANYU ZIE

M7JNALTC

THE COURT:  All right.  Good morning, everyone.  This is Judge Engelmayer calling the case of Altimeo Asset Management*, et al.* v. Qihoo 360*, et al.*

Who do I have for the plaintiffs?

MR. GRUNFELD:  Good morning, your Honor, this is Michael Grunfeld from Pomerantz on behalf of the plaintiffs.

THE COURT:  Good morning.

And who joins you on the phone?

MR. BISSELL-LINKS:  Hi, your Honor.  This is Jake Bissell-Links from Labaton.  And with me is Carol Villegas from Labaton and we are additional counsel for the plaintiffs.

THE COURT:  Welcome to all of you.

Mr. Grunfeld, can I assume that you will be taking the lead on the call for the plaintiffs?

MR. GRUNFELD:  Yes, your Honor.

THE COURT:  Very good.

Who do I have for the defendants?

MR. HEGT:  Good morning, your Honor.

Jason Hegt, from Latham & Watkins for the defendants.

With me on the line is my colleague Iris Xie.

THE COURT:  Good morning.  Mr. Hegt and Ms. Xie.

Mr. Hegt, can I assume you will be taking the lead?

First of all, let me thank counsel for the very thoughtful and detailed case management plan you have given me. In the main it looks very good to me, so I have every reason to

expect that we will end this call with my signing off on that plan.

I have a number of questions for you which are really just aimed at making sure that together we are building a good mousetrap for the case, but thanks to you we are off to a good start.

The two main areas that my questions will be focused on involve foreign discovery and involve the scheduling issues that are implicated by class cert.

So let's take those in order.

With respect to discovery in general, before we focus on foreign, Mr. Grunfeld, give me a sense of, in general, for the most part what discovery is going to be most consequential to you?

MR. GRUNFELD:  Is your Honor asking in terms of the substance or in terms of the sources of discovery?

THE COURT:  Good clarification.  Really both.

MR. GRUNFELD:  So the parties have already made substantial progress in getting to agreement on the scope of discovery.  As far as what the plaintiffs are seeking, we are really seeking the internal communications and internal documents of Qihoo and the individual defendants on the relisting plan that is alleged to be at the center of the case and really all documents related to that.

One particular source of discovery that we think will

be particularly helpful and also should be particularly easy for the defendants to produce is the documents that were already produced in the Cayman Islands appraisal action because that's sort of a very definable set of documents that should, in our view, be able to just be able to be passed over to us since it's already been produced in another matter.

THE COURT:  Got it.  Okay.  That is very helpful.

Thinking about just timekeepers, if you will, and the challenges of e-discovery and the like, to what degree -- and I will turn to the defense in a moment, but I want to start with Mr. Grunfeld on this -- as you think about the people who are apt to be the most germane fact witnesses, as you understand it, to what degree are these people or their communications in the effective control of people who are defendants in this case?

MR. GRUNFELD:  Our understanding is that those communications are largely in the possession and control of Qihoo.  I can say this from a good base of knowledge because we've already made substantial progress on the scope of document custodians and even search terms.

I think especially on the custodians the parties are largely in agreement as to who the custodians will be, and my sense is that Qihoo has at least the work e-mails of those custodians in its possession.

THE COURT:  Do you envision any discovery from

custodians who are outside the control of Qihoo?

MR. GRUNFELD:  Yes, your Honor.  We have already served several third-party subpoenas and are in the process of pursuing those.

THE COURT:  Where I'm going is just the challenges that are alluded to in the case management plan from foreign discovery.

Walk me through from the plaintiffs' perspective the extent to which foreign discovery challenges are presented by any of the material you are anticipating seeking.

MR. GRUNFELD:  So the foreign discovery issues that are raised in the case management plan are really issues that defendants have raised.  From our perspective, we don't think any of those issues should prevent defendants from producing and complying with their discovery obligations under the U.S. laws.  Really the main effect that that has had from our perspective is that we were willing to give defendants a little more time than we otherwise would have to figure those items out, but from our view the main sources of discovery that we are seeking are in the defendants' possession, and they are required to comply with their U.S. discovery obligations.

THE COURT:  Okay.  Thank you.

With that segue, and with the focus remaining just on discovery, let me turn to Mr. Hegt.

Mr. Hegt, again, the challenges I want to get ahead of

here involve foreign discovery and the extent to which either discovery in your clients' possession and control has to go through some hoops before getting out or other discovery that you contend is outside your clients' custody and control.

Where does the foreign discovery issue arise here?

Is there anything wrong with what Mr. Grunfeld said?

MR. HEGT:  At the risk of agreeing with Mr. Grunfeld, which is not something I am normally in the business of doing, that is largely correct.

I think just to add a little bit more color on a couple of the points and to answer your Honor's question directly, we are in possession obviously of company e-mails for many of the relevant individuals, and so we have that.  It's not third parties that we need to go to.  The individual defendants have, you know, whatever noncompany communications they may have sent that are relevant, if any.

The most significant issue I think is going to be the various Chinese data security and privacy laws.  Just to give you both, number one, a sense of what that is and then, two --

THE COURT:  Before you do, let me just make sure that I understand where you're about to go.  The issue isn't your clients' custody and control.  It's that your dissemination of materials you contend is going to be implicated by these laws, right?

MR. HEGT:  That's right, your Honor.

M7JNALTC

THE COURT:  Go ahead.

MR. HEGT:  So there is a set of three different laws. It's the law on guarding state secrets, the PRC data security law, and the personal information protection law, two of which were enacted quite recently.

In sum and substance they really do three things.  One is that they prohibit the transfer of, quote, state secrets outside China.  Now, that is not expected to implicate a huge volume of documents here, but, you know, Qihoo does provide cybersecurity services to certain Chinese government entities, so, you know, it is possible, depending on the scope of the requests, some information will be swept up in broad terms that fall into that category.

Similarly, it restricts the transfer of important data, which is essentially national -- another phrase is national core data -- or personal information about Chinese nationals outside without assessment by a particular agency of the Chinese government.  So here, essentially in order to produce outside China, the production needs to be reviewed, with certain documents being sent to the PRC ministry of justice prior to production.

Your Honor mentioned hoops earlier.  There are indeed several hoops to jump through, although I want to be very clear the company intends on complying with its obligations under U.S. law to produce responsive information.  We are also, of

M7JNALTC

course, going to comply with applicable Chinese law.

So the company has already engaged -- Latham, although we have offices in China, we are not a local. We don't practice locally. So the company has already engaged a PRC law firm who has begun doing some review and will continue to review on a rolling basis to determine what needs to go to the PRC ministry of justice and to facilitate that process.

THE COURT: What's been the experience in other cases with situations where a company, as in Qihoo's situation, contends that it needs effectively PRC approval?

How has that gone?

MR. GRUNFELD: I think there's a range of outcomes depending on, you know, precisely what is requested. My hope here is that we can -- one way I have dealt often with this issue is to use responsiveness or use search terms, you know, as narrow tailoring around some of these Chinese privacy issues.

So, for example, you know, to take a completely different context, in a case in the biotech space where there was some concern about, you know, health data and other things, which quite obviously wasn't relevant to a securities litigation, you know, we were able to sort of run exclusionary searches and just agree with plaintiffs up front that, look, if we pull this set of terms out, we can avoid review of, you know, a substantial number of documents.

M7JNALTC

That's what I had hoped to do here, because I think if we run broad search terms we are certainly going to find things that are going to trigger this kind of review. But the core set of material that we are talking about or that I think we would be talking about, you know, in theory should not trigger some of these restrictions.

THE COURT: Is the reason the Chinese laws are implicated that the servers are in China or something else?

MR. HEGT: It's both. The servers are in China and that the company is just a Chinese regulated entity at this point. So it is, you know, both listed -- as is very prominent given the facts in this case -- listed on the Chinese stock exchange. It is a Chinese government contractor. Just there are a number of restrictions on its operations in China about the export of data outside the country.

THE COURT: Got it.

Are there servers that have the same material that are outside of China?

MR. HEGT: No. Not to our knowledge.

THE COURT: Okay.

So what's the time frame on being able to present such as issues as may inevitably have to get presented to the PRC?

What's the time frame on that?

MR. HEGT: So I believe it will be rolling, and I think before discovery was paused, PRC counsel had made some

M7JNALTC

progress in getting through an initial set.  I don't have an exact time frame today.  I think one of the questions we will have to work through is, you know, whether it is more efficient in terms of securing approval to do it on a small-batch rolling basis or to go in with, you know, here we're done, and here, you know, there are a couple of dozen documents we would like approval on or whatever the case may be.

My sense from our earlier discussions is we want to get a little bit further into the review so we have some sense of what we will be presenting to the government and, you know, can manage them in a way that gets approval as quickly as possible.

THE COURT:  The schedule that you jointly proposed, though, builds in what I take it the defense believes is likely, but not certainly, sufficient time?

MR. HEGT:  It does.  It builds in, assuming --yes is the right answer to that.  There is, of course, a substantial element here that's out of our control, which is, to state the obvious, we don't control any arms of the Chinese government whose approval we need.  But based on our experience in other cases, you know, we are cautiously optimistic we've built in the time we need.

THE COURT:  From your experience, is there any value to some form of a court order from the judge in the U.S. litigation that can be instructive or encouraging of a prompt

M7JNALTC

resolution by the PRC?

Is there any value to that?

Has that assisted the process of moving things along in other cases?

MR. HEGT:  So I think what we typically do is say there is a court order in the sense that there will be a scheduling order, and there's going to be, or there is here a protective order already.  You know, I don't know whether this is true, but I, you know, have heard people speculate that in fact, you know, additional prodding from U.S. authorities is actually counterproductive to sometimes getting speedy resolution.

So I think we should have what we need from the case management order and the protective order.  But, you know, look, I think this is going to be something that's top of mind for everyone as we go through the process, and we can revisit if we're told by our PRC counsel that it would be helpful.

THE COURT:  I don't presume to have any idea about how one would micromanage this process to maximize the chance of getting speedy complete production, but what I would say is please keep Mr. Grunfeld and his colleagues up to speed on what you are hearing with respect to how to manage the process vis-a-vis the PRC.

I say that because there may come some point at which somebody needs to raise an issue with me, and I want to make

M7JNALTC

sure we don't have a situation where the plaintiffs are in the dark until the last minute about what you are hearing from the PRC. I'm sure there is a way in which you can convey what you are hearing to plaintiffs without exposing the actual, if you will, privileged communications from within the defense group, including U.S. and PRC lawyers. But please keep the plaintiffs up to speed on the challenges and the strategy that you have with respect to getting PRC approval.

Okay?

MR. HEGT: Yes, your Honor. Will do.

MR. GRUNFELD: Your Honor, if I could jump in for a moment.

THE COURT: Sorry. Is that Mr. Grunfeld?

MR. GRUNFELD: Yes, your Honor.

THE COURT: All right. Because it is a phone call, the court reporter doesn't recognize the voices. I was going to get to you. There are only two speakers, but you have to, if you are going to speak, begin with your name because otherwise it is a confusing for the court reporter.

Go ahead, Mr. Grunfeld.

MR. GRUNFELD: Thank you. This is Michael Grunfeld.

So, thank you, your Honor, for raising all these issues. These are some of the key items on our mind, and we certainly plan to be in regular correspondence with the defendants.

M7JNALTC

I just wanted to point to one item on the schedule, which is the reason why we scheduled a status conference placeholder in November of this year is specifically for this reason, which is that we want to make sure that things are proceeding smoothly and we thought that would be a good time to have a status conference in case there are any issues that make sense to be raised.

I also would note that we are sensitive to these issues, and we're willing to give defendants a reasonable amount of time to address them, but these issues are not unique to China.  Other countries also have specific discovery regimes, and our understanding at this early stage is that the general rule is that defendants who are subject to U.S. litigation still have to comply with U.S. discovery laws.

So if we have a sense that things are proceeding smoothly and there's a schedule in place, we are amenable to that.  But if it gets to a point where things seem to be at a standstill with the Chinese government and there's no telling if approval will come in a month or a year or longer, we would likely want to seek relief from your Honor.

THE COURT:  That's fine.  And we will take that up.  I thought the idea of the status conference made sense and I intend to plug in the date of November 15 at 10 a.m. for that conference.

Let's turn to the second issue I had to raise which

M7JNALTC

involves class cert.

Let me begin with the obvious question:  Mr. Grunfeld, based on what you know, does the material you are going to be seeking that would be produced from China, in other words, that is subject to the need for PRC approval, is any of that germane to the class cert. process?

MR. GRUNFELD:  No, your Honor.  We are not dependent on that material for class cert.  We intend our motion for class certification to be reliant on the usual sources in a motion for class certification in a securities class action in terms of market efficiency and things like that.  So we are not dependent on those materials from China for our motion for class certification.

THE COURT:  Okay.

Mr. Hegt, same question to you, is there any reason to think that materials that you would need Chinese government approval to disseminate are going to play a role in -- assuming you oppose class cert. -- that opposition?

MR. HEGT:  I think it's very unlikely.  I mean, without seeing the opposition, it is a little hard to say for sure, but my guess, just based on our discussions to date, is that we won't be using any company documents that are in China.

THE COURT:  Okay.  So to the extent that the schedule, if you will, front loads class cert., that portion of the schedule is impervious to any difficulties that you run into

with the PRC as to outgoing discovery, barring something unexpected?  Right, Mr. Hegt?

MR. HEGT:  Yes.  That was certainly my understanding when we put the schedule together.

THE COURT:  Okay.

Let me just ask you, without binding you to it, just so that I can get an early preview, Mr. Hegt, do you expect to oppose class cert. and, again without limiting you in any way, if so, what would the heart of the opposition be based on?

MR. HEGT:  I think there are probably two key issues.

One is going to be related to the two lead plaintiffs. I think there was an issue raised in the motion to dismiss briefing of in-and-out trading and whether in-and-out traders or transactions that were -- essentially sales that were made before any of the alleged false statements can be part of the class.

So, for example, here, you know, we are only looking at selling shareholders.  I don't have the exact date of the class period in front of me, but the class period, at least as proposed in the complaint, extends to prior to the publication of the alleged misleading -- the first publication of the alleged misleading statement.  So I think there will be some scope issues around who can be in the class and what class period can be covered in light of the statements and claims that were made.

M7JNALTC

THE COURT:  Would that argument, though, tend to prune the class or to defeat class cert.?

MR. HEGT:  I think it would prune the class.

THE COURT:  What's the second argument?

MR. HEGT:  The other argument I think is similar in nature and I think it would go toward unique defenses relevant to the two named plaintiffs here.

THE COURT:  Okay.  So essentially, we are looking at Rule 23(a) issues, not predominant superiority as you're seeing it right now?

MR. HEGT:  Yes.  I think that's right.

THE COURT:  Just help me.  Just walk me through this. This is the U.S. ADR market.  It's a silly question, but does the ADR market literally track a Chinese market, or is it independent but with indicative or influential force as to the trading as to the pricing on the Chinese market?

MR. HEGT:  So I believe it is the latter.  I think in part that's due -- and, again, this will be, I think, the subject of presumably expert testimony, so I don't want to get ahead of that, but I believe that is due in part to time differences.  So, you know, there's almost no overlapping trading hours, and so, you know, there are often events that will occur in the U.S. that would affect the stock price that perhaps, even if there otherwise would have been a one-to-one ratio because the underlying asset shares in the company stock

M7JNALTC

are the same, you know, there's different macro factors at play given that there are completely different trading hours.

THE COURT:  Got it.

So, to put it a different way, to the extent it might have been germane hypothetically to a class cert. motion, the efficiencies of the market really deals with the rather familiar ADR market and not on overseas market?

MR. HEGT:  We will be reacting to I think, you know, what plaintiffs put forward in terms of market efficiency, but sitting here today, without sort of seeing any of that data, I think that's right.  So my sense is that, you know, we are not going to be challenging market efficiency at this point.

THE COURT:  Again, not binding you, but that's helpful to understand.

Okay.  I have nothing further on class cert.  Just before moving off of discovery, let me just pause and ask an open-ended question beginning with the plaintiff:  Any tricky, challenging issues that you see involving discovery beyond the foreign discovery issue that has been covered that I ought to know about?

MR. GRUNFELD:  This is Michael Grunfeld.

Your Honor, at this point nothing that I foresee beyond the foreign discovery issues.  As we noted in what we submitted to the Court, we are pretty far along in negotiating the parameters of discovery with defendants.  I would say we're

M7JNALTC

more than halfway there, but there are a couple of issues that we still need to discuss further and could end up raising to the Court in a discovery motion.  But, you know, I think it's premature at this stage to raise those, because I'm hoping that we will be able to reach agreement with defendants.

THE COURT:  As am I.

Mr. Hegt, anything from you?

MR. HEGT:  No, your Honor.  Nothing from our side.

THE COURT:  All right.  Look, hopefully that level of collegiality sticks, but in the event you are unable to work something out, just take a look at my individual rules regarding discovery disputes, which aim to achieve a streamlined letter briefing process and a quick resolution so as not to turn this into an expensive sinkhole.  Just be attentive to the procedures I have in my individual rules.

The next topic I want to take up involves defendant Qi.

Plaintiff, you indicated that you are, Mr. Grunfeld, reflecting on when to advance your effort to get a default judgment against him.

MR. GRUNFELD:  That's right, your Honor.

Our current thinking, and we have been continuing to look into it since we submitted our letter, our current thinking is that it probably makes sense to wait until after class certification, a class is hopefully certified so that

when we move for default against him it will be on behalf of the class that is already certified rather than having to address that in the context of the motion for default while that's proceeding on a parallel track, but if your Honor thinks that is not a concern, we could do that even earlier.

THE COURT:  That does sound like it makes sense, right?  Because otherwise there is a risk that there would be an asymmetry between the scope of the liability, the period forming the basis of liability, if you will, in the default judgment as opposed to what you are pursuing against the appearing defendants, right?

MR. GRUNFELD:  That's the idea, your Honor.

THE COURT:  Yes.  Look, it is up to you what to try, but that sounds right.  That sounds sensible to me.

Okay.  Mr. Hegt, anything on that point?

MR. HEGT:  No, your Honor, other than just so we don't have a view on the timing other than just to note that at the appropriate time when the motion is made I do think the appearing defendants, you know, will likely just want to be heard briefly on what the contours of the judgment of a default should look like, by that I mean, you know, not useable in any way against the appearing defendants.  There are some provisions in the PSLRA regarding contribution and judgment reduction.  We just want to make sure that in any default judgment none of that would be disturbed with respect to the

M7JNALTC

appearing defendants' rights.

THE COURT:  All right.  Look, it is obviously sensible that you have an opportunity to be heard, but let's make sure that you and Mr. Grunfeld and his team are in communication to the extent that you can work those things out before I need to get involved.  That all is sensible.

Next topic.  I have only got two more to go.

The next topic involves an event that will be well down the road.  Under my individual rules the one type of motion that I require a premotion conference for is summary judgment.  Ordinarily, I will key the premotion letters as to such motions to the end of fact discovery, because ordinarily liability issues in 90 percent of cases turn only on fact rather than expert discovery.  But in 10 percent of cases, there is something about the manner of proof as to liability that implicates expert discovery, you know, examples being market definition in antitrust cases or sometimes Lanham Act confusion issues or things like that involve expertise.

It is not obvious to me that this is such a case, but I may have that wrong.  Let me ask you, Mr. Grunfeld, whether from your perspective expert evidence is going to play any part in the briefing of summary judgment?

MR. GRUNFELD:  I am not sure at this point, but I think there is a good chance that it would.  So that's why, at least at this stage, we put the motion for summary judgment to

M7JNALTC

be after the completion of expert discovery.

THE COURT:  Mr. Hegt?

MR. HEGT:  I think that's right.  I mean, you know, on this particular case on all of the issues that are likely summary judgment, there are issues where plaintiff carries the burden.  So, you know, I think it is a little bit more of a question of whether they would have expert testimony on some of those or not, but I think in other cases we've seen that.  So we wanted to avoid a situation where we begin summary judgment briefing and then, midway through, the landscape on those topics changes -- I'm mainly thinking about causation changes -- because there's expert testimony happening in parallel.

THE COURT:  All right.  Look, given what you have said I am happy to keep the schedule intact, which has summary judgment motions tripped off of expert discovery.  What I want to do is, without changing your schedule, cram into that period, though, an opportunity for a quick exchange of letters and a conference with me.

Here's why:  I find that my engaging with counsel in advance of summary judgment motion almost invariably results in getting a narrowing of the issues in dispute and better briefing and, frankly, more efficient briefing.

Sometimes people just take issues out of dispute. Sometimes I will raise something that would have become a

hiccup and required supplemental briefing.  I will invariably be able to get counsel to submit joint stipulated facts as a predicate to the briefing of summary judgment, which means that your 56.1 statements and oppositions are correspondingly shorter.  There are a host of process benefits to everybody from that exchange.

So right now you've got summary judgment motions due 42 days after the completion of expert discovery.  I am assuming that everyone will know the case backwards and forwards such that if I were to ask, that, for example, any premotion letter in anticipation of summary judgment be submitted a week after the end of expert discovery and any opposition be due a week later with a conference before the Court about a week after that, a premotion conference, Mr. Grunfeld, I take it that doesn't disturb anybody's well-laid plans?

MR. GRUNFELD:  No.  I think that is actually a good idea and would be helpful to potentially narrow the issues.

THE COURT:  All right.

Mr. Hegt?

MR. HEGT:  Yes, we agree as well.

THE COURT:  All right.  So I am going to just caret in by hand, without putting in specific dates, just simply the idea that the premotion letters will be one week and one week following the expert discovery date.  I will simply write in

M7JNALTC

that a premotion conference to be held shortly thereafter, not knowing when that's going to fall given the fact that your schedule is by that point not keyed to specific calendar dates. We'll schedule it closer to the event, but I will caret in that concept.  The final topic I have is settlement.

Mr. -- I'm sorry.  Go ahead.

Who was that?

Somebody seemed to be about to speak.

Mr. Grunfeld, was that you?

MR. GRUNFELD:  That was not me.

THE COURT:  Mr. Hegt?

MR. HEGT:  No, not me, your Honor.

THE COURT:  Okay.  All right.

In any event, we will caret that in.

The final topic I wanted to take up involves settlement.  Counsel, you have indicated in the case management plan that you propose the use of a privately retained mediator. That's fine.  I don't have a view on that.  I am mindful that, given this being a securities class action, there's a pool of mediators who are familiar with this particular area of law and are commonly used.

I will just say that our magistrate judges are whizzes at settling cases, including class actions.  So if at any point you want me to refer this either to the magistrate judge or to our mediation program, I would, of course, be delighted to do

so.  Just send me a joint letter without giving me any content.

Counsel, Mr. Grunfeld, is it your expectation that realistically there will not be discussions until class cert. has been resolved?

MR. GRUNFELD:  I think there might be discussions before then.  I don't want to waive any settlement privilege or anything like that.  The parties are very tentatively discussing things, but we haven't engaged a mediator or gotten to that stage at this point.

THE COURT:  Mr. Hegt, anything to add?

MR. HEGT:  No.  We are discussing -- there are discussions.

THE COURT:  I will simply say this.  I have had many securities class actions settle.  Some settle later on, after class cert., and some settle earlier, including based on counsel's assessments, you know, in open market cases of the likelihood of class cert.

I realize the fact pattern here is somewhat unusual relative to many open market securities class actions, but in the ordinary course, where there aren't unusual wrinkles and where the plaintiffs have been wisely chosen, if counsel are aware, those cases often do result in certified classes.  I have no idea if there will be distinguishing factors here.  I urge you at least have that conversation among yourselves, because, among other things, if you are able to get to yes

M7JNALTC

sooner rather than later, you're saving everybody what could be substantial costs and burdens.

All right.  With that, I'm happy, with the light modifications I have made, to approve the case management plan which will issue today.

Let me just around the horn and see if anybody has any other than issues to raise.

Mr. Grunfeld?

MR. GRUNFELD:  No, your Honor.

Thank you very much.

THE COURT:  Mr. Hegt?

MR. HEGT:  Nothing, your Honor.

We appreciate the time today.

THE COURT:  Very good.  Good luck.

Again, thank you for the very thoughtful material submitted in advance of this conference and the obvious preparation and forethought which went into it, which made for a much easier process than usual.  Again, it's a product of all the preparation that you all did.  So, many thanks.

Have a good summer, everyone.

I look to hearing from you down the road.

Thank you.

MR. GRUNFELD:  Thank you, your Honor.

MR. HEGT:  Thank you, your Honor.

(Adjourned)