UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>   v.<br><br>QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI and ERIC X. CHEN,<br><br>      Defendants. | Case No. 1:19-cv-10067-PAE |

## CO-LEAD PLAINTIFFS' RESPONSE TO THE COURT'S QUESTIONS IN THE MARCH 1, 2024 ORDER

Co-Lead Plaintiffs Altimeo Asset Management and ODS Capital LLC ("Plaintiffs") submit the following responses to the questions about the proposed settlement of this matter that the Court raised in its Order dated March 1, 2024 (the "Order," ECF No. 225).

**QUESTION 1:**

Why does the settlement include the claims of both the seller shareholders and the tenderer shareholders? Insofar as the Court has dismissed the claims of the latter, was consideration given to settling only the claims of the former? Or did the defense condition settlement on a global resolution?

**RESPONSE TO QUESTION 1:**

The Settlement includes the claims of both the Seller and Tenderer shareholders because it is common practice in securities class actions for defendants to seek "'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310 (3d Cir. 2011); *see also In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 866 (S.D.N.Y. 2018) (holding that "[i]n the Second Circuit, plaintiffs are entitled

to settle even entirely non-meritorious claims"), *aff'd*, 784 F. App'x 10 (2d Cir. 2019). This practice is firmly supported because "Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012).

When dismissed claims are included in a settlement, they should not be assessed on their merits (even as to whether they are "colorable"), because that would defeat the purpose of settlement and preclude class certification. *Sullivan*, 667 F.3d at 297, 305, 308-09. Even so, the Tenderer shareholders have claims worthy of being allocated a significant part of the Settlement Fund because they sold their shares in the Merger after Defendants are adequately alleged to have misrepresented "that the Buyer Group had a concrete plan to profit significantly by relisting Qihoo in China at some point after the Going-Private Merger." ECF No. 15 at 27. Although the Court held that the Tenderer shareholders' theory of loss causation was too speculative to survive a motion to dismiss, had they not settled, they could have appealed this issue following the resolution of the Seller shareholders' claims. There are two pending appeals in the Second Circuit addressing similar issues and there is a colorable chance that the Court will hold that loss causation may be alleged in this type of circumstances. *See Maso Capital Investments v. E-House (China) Holdings*, No. 2022-00355 (2d. Cir. Argued March 13, 2023); *In re Shanda Games Limited Securities Litigation*, No. 2022-03076 (2d. Cir. Argued Jan. 24, 2024).

Plaintiffs specifically accounted for the fact that the Settlement includes the claims of both the Seller and Tenderer shareholders. During settlement negotiations, Plaintiffs demanded a higher settlement amount for the inclusion of the Tenderer claims in addition to the Seller claims. It is also Plaintiffs' understanding, conversely, that Defendants would not have agreed to the Settlement without a global resolution.

**QUESTION 2:**

What, concretely, is the basis for allocating the Settlement Fund 75% to the seller shareholders and 25% to the tenderer shareholders? How was this allocation selected? Was it supported by economic data and if so, what? Were the amounts allocated to each group negotiated independently of each other or was a global figure settled upon and then allocated among the two groups? In all events, please explain in more detail why each settlement amount is fair to members of each group.

**RESPONSE TO QUESTION 2:**

The allocation of settlement funds between different groups should be approved where it does not raise any "fundamental conflict that goes to the very heart of the litigation." *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 867. There can be no objection to the adequacy of representation of different parts of a settlement class where "the lead plaintiffs are necessarily a part of [both] classes." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005). That is the case here because both Co-Lead Plaintiffs (1) sold Qihoo ADS during the Class Period before the Merger closed and (2) tendered Qihoo ADS in the Merger. *See* Amended Complaint (ECF No. 53) ¶¶ 19-20; ECF Nos. 12-3, 169-1 (Plaintiffs' PSLRA certifications). "[T]heir interests are, therefore, aligned with the interests of those classes." *Wal-Mart*, 396 F.3d at 111.

When that is the case, as it is here, a settlement should be approved where the plaintiffs "provide [a reasonable] explanation for" the treatment of the different claims. *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 867. Such a plan of allocation should be approved unless it "is obviously deficient or is not within the range of possible approval." *In re Portal Software, Inc.*

*Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at \*6 (N.D. Cal. Nov. 26, 2007) (internal quotation marks omitted).

The Plan of Allocation here is supported by the expected value of each set of claims. The maximum value of the Seller shareholders' claims is estimated to be $909.81 million. *See* Preliminary Approval Brief (ECF No. 223) at 17; Stipulation of Settlement (ECF No. 224-1) ¶ 71. The portion of the Settlement allocated to the Seller shareholders is well within the range that courts commonly approve, as explained in further detail in Plaintiffs' Preliminary Approval Brief. *See* ECF No. 223 at 17-19.

As for the Tenderer shareholders, Defendants' internal emails show that Qihoo was worth at least $25 billion at the time of the Merger. *See* Proposed Second Amended Complaint (ECF No. 157-1) ¶¶ 174, 181. That is $15.7 billion above the $9.3 billion that the Buyer Group paid to take Qihoo private. *Id.* ¶ 171. This $15.7 billion figure, however, must be adjusted for (1) the likelihood of prevailing on appeal; (2) the long delay before the Tenderer shareholders would be able to bring their appeal; and (3) the uncertainty involved in assessing Qihoo's fair value.

***First***, prevailing on appeal would be particularly difficult because the Court firmly rejected Plaintiffs' motion for reconsideration or certify for interlocutory appeal the Court's dismissal of the Tenderer shareholders' claims. ECF No. 164. ***Second***, the long delay before the Tenderer shareholders could even bring this appeal is also significant. Because any reasonable settlement had to have been a global resolution, if the Tenderer shareholders were not included in the Settlement, they would have had to wait years before they could appeal following the Seller shareholders obtaining a final judgment at trial. The litigation would likely have been especially prolonged because much of the evidence is located in China.

4

***Third***, the "task of enterprise valuation, even for a finance expert, is fraught with uncertainty." *Towerview LLC v. Cox Radio, Inc.*, CA No. 4809-VCP, 2013 WL 3316186, at *23 n. 171 (Del. Ch. June 28, 2013); *see also See Hicks v. Morgan Stanley*, No. 01- 10071, 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) (noting that "'battle of the experts' as to proper methods of valuation . . . creates a significant obstacle to plaintiffs in establishing liability"). For example, adjusting the specific inputs into the discounted cash flow analysis for Qihoo that Defendants are alleged to have misrepresented shows that Qihoo was worth $14.273 billion at the time of the Merger—only approximately $3.8 billion above Defendants' valuation of Qihoo. *See* Proposed Second Amended Complaint (ECF No. 157-1) ¶¶ 20, 213. While Plaintiffs would argue Qihoo was worth far more based on Qihoo's internal documents that were revealed in the trial of the Appraisal Action in the Cayman Islands, this endeavor is "fraught with uncertainty." *Towerview LLC*, 2013 WL 3316186, at *23. This means that even if the Tenderer shareholders prevailed on appeal, they would still face a more difficult path than the Seller shareholders of obtaining their full measure of damages. On the other hand, these significant hurdles that the Tenderer shareholders faced must be balanced against the large value of their claims.

For example, assuming the Tenderer shareholders have a ten percent chance of prevailing on appeal on their claim valued at $15.7 billion, that claim is currently worth $1.57 billion. But given the uncertainty inherent in the exercise of valuation, this measure could be cut down significantly, or even eliminated entirely, at a later stage of the litigation. Accounting for that significant risk and the long delay that the Tenderer shareholders would be subject to, allocating 25% of the Settlement to these claims (which values them at one-third of the $909.81 million that the Seller shareholders' claims are worth) is reasonable and fair.

Balancing these types of considerations, courts regularly approve settlements that allocate similar amounts to dismissed claims. *See In re Reliance Sec. Litig.*, No. 98-288 (PJW), 2002 WL 35645209, at *13 (D. Del. Feb. 8, 2002) (approving plan of allocation awarding proceeds according to lower end of valuation range for claim that was dismissed on summary judgment and rejecting objection that the dismissed claim should have been apportioned a lower amount because of its small chance of being reversed on appeal); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302 MRP, 2013 WL 6577020, at *6, 17 (C.D. Cal. Dec. 5, 2013) (approving plan of allocation apportioning 35% of settlement proceeds to two categories of dismissed claims); *In re Portal Software*, 2007 WL 4171201, at *6 (approving of plan of allocation awarding five percent of net settlement proceeds to dismissed Exchange Act claims).

Moreover, the inclusion of both the Seller and Tenderer shareholders' claims was specifically negotiated for, as explained in response to Question 1 above. Lead Counsel did not discuss with Defendants the allocation between the Seller and Tenderer shareholders because— as is standard in securities class action settlements—the Settling Defendants were concerned primarily with obtaining a global resolution and "shall have no role in the development of, and will take no position with respect to, the Plan of Allocation." Stipulation of Settlement (ECF No. 224-1) ¶ 27. Lead Counsel, however, specifically considered the Settlement Amount to be a fair for the resolution of all claims in this Action based on the considerations described above, as well as for the reasons explained in Lead Plaintiffs' Motion for Preliminary Approval of the Settlement. ECF No. 223.

**QUESTION 3:**

As to both sets of shareholders, there is a different recovery estimated depending on whether the class member held an ADS or a Class A ordinary share. Please explain the basis for this difference.

**RESPONSE TO QUESTION 3:**

The recovery for ADS and Class A ordinary shares is equivalent, based on their relative worth. Every two Qihoo ADS represents three Class A ordinary shares. ECF No. 224-1, Ex. A-1 n.1.[1] The Merger consideration of $77 per ADS and $51.33 per Class A ordinary share reflects this ratio. (ECF No. 224-1, Ex. A-1 at 15 n. 5).[2] Qihoo ADS and Class A ordinary share are economically equivalent, subject to this ratio. The recovery for ADS and Class A ordinary shares in the Plan of Allocation reflects this ratio for both sub-funds. ECF No. 224-1, Ex. A-1 at 15-16. Sub-Fund 1 (for the Seller shareholders) applies the $77 per ADS and $51.33 per Class A ordinary share Merger consideration that Qihoo applied in the Merger. *Id.* Sub-Fund 2 (for the Tenderer Shareholders) applies a Merger Consideration Amount that is simply the actual Merger consideration for each type of security multiplied by five. *Id.*[3]

---

[1] The Proxy for the Merger that Qihoo filed with the SEC states: "The Company's ADSs, every two representing three Class A ordinary shares, are currently listed on the NYSE under the symbol 'QIHU.'" March 3, 2016 Proxy (ECF No. 116-2) at 9.

[2] The Proxy for the Merger that Qihoo filed with the SEC states: "If the Merger is consummated, at the effective time of the Merger (the 'Effective Time'), each Share issued and outstanding immediately prior to the Effective Time will be cancelled and cease to exist in exchange for the right to receive $51.33 and each issued and outstanding ADS will represent the right to receive $77.00." March 3, 2016 Proxy (ECF No. 116-2), Cover Letter to Shareholders at (i).

[3] Only Qihoo ADS, not Class A ordinary shares, traded on the New York Stock Exchange during the Class Period. As the Court has noted, "[t]o trade on an American stock exchange, a foreign corporation must issue and deposit ADS with an American financial institution." ECF No. 145 at 3-4 n.3. Settlement Class Members are therefore generally expected to be holders of ADS. Class A ordinary shares are included in the Settlement in case any Qihoo shareholders who otherwise qualify for the Settlement held Class A ordinary shares.

**QUESTION 4:**

As to the recovery for tenderer shareholders, was there consideration given to differentiating among tenderer shareholders within the settlement formula (other than that between holders of ADS versus Class A ordinary shares)? If so, what bases for differentiation were considered, and what was the basis for the decision not to differentiate?

**RESPONSE TO QUESTION 4:**

There is no reason to differentiate among Tenderer shareholders. Aside from the difference between ADS versus Class A ordinary shares noted above, all Tenderer shareholders are similarly situated in that they all tendered their Qihoo shares for the exact same Merger consideration at the same time, after the Merger closed on July 15, 2016.

The only difference between Tenderer shareholders is when they purchased their shares. That factor, however, does not matter for the "non-traditional" claims in this case, which allege "that the share prices were undervalued between the actionable statements and the scheduled exchange," with a "consequent loss to shareholders who sold for below that price." ECF No. 145 at 52-54. The Court therefore held, in denying Defendant Zhou's motion to dismiss, that "there is no basis to distinguish plaintiffs' trades at different points in the class period, because each trade, on the FAC's theory, was actionable." *Id.* at 56. Because the Tenderer shareholders were defrauding into *selling* their shares at an artificially deflated price after Defendants made all of the statements alleged to have been false and misleading, and they all tendered their shares at the same time and at the same price, there is basis for differentiating among Tenderer shareholders.

Moreover, even if there were some basis for distinguishing between different Tenderer shareholders, any benefit would be outweighed by "the substantial administrative costs" that doing so would add to the claims process. *See In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 869

(holding "the substantial administrative costs of differentiating between" claimants supported treating them equally). The approach taken by the Plan of Allocation is fair and reasonable in light of these considerations. It is certainly "within the range of possible approval." *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at \*6.

**QUESTION 5:**

As to the recovery for seller shareholders, was there consideration given to alternative formulas for measuring entitlement to recovery? If so, what were these, and what was the basis for the decision to use the formula chosen?

**RESPONSE TO QUESTION 5:**

The formula for recovery for the Seller shareholders was chosen because it is in line with the Court's ruling on loss causation in its denial of Defendant Zhou's motion to dismiss.

That ruling held that "the FAC's theory is plausible that, but for the suppression of the Buyer's Group's heady plans after taking Qihoo private, Qihoo's ADS price would have approached or been asymptotic to the exchange price of \$77/ADS share throughout the class period, with consequent loss to shareholders who sold for below that price." ECF No. 145 at 53-54. The Plan of Allocation tracks this theory for the Seller shareholders by calculating their loss amount as the Merger consideration minus the price at which they sold their shares during the Settlement Class Period. ECF No. 224-1, Ex. A-1 at 15. This loss formula naturally accounts for different sale dates by limiting their losses to the difference between the Merger price and the sale price.

In addition, as explained in connection with the Tenderer shareholders in response to Question 4 above, there is no reason to differentiate between Seller shareholders based on when they purchased their shares because "[a]s pled, any sale by lead plaintiffs during the class period

was at a loss relative to the price at which Qihoo ADS would have traded had the proxy been non-misleading. On the facts, there is no basis to distinguish plaintiffs' trades at different points in the class period, because each trade, on the FAC's theory, was actionable." ECF No. 145 at 56.

The loss formula for the Seller shareholders could, alternatively, have made their loss the difference between (1) Qihoo's maximum fair value (rather than the actual Merger consideration) and (2) their sale price—as the Plan of Allocation does for the Tenderer shareholders. This alternative, however, would not be expected to alter the total amount of Settlement Funds allocated to the Seller shareholders because their claims are expected to exhaust the 75% of the Settlement that is allocated to them. Moreover, this alternative loss formula would be less fair to the Seller shareholders because it would deviate from the claims that the Court upheld, which is the basis for giving the Seller shareholders a larger portion of the Settlement Fund. In particular, this alternative formula would minimize the impact of different sale prices by making a much larger portion of the recovery of the Seller shareholders attributable to Qihoo's alleged maximum fair value that the Court ruled as to the Tenderer shareholders was overly speculative.[4] Lastly, using Qihoo's maximum fair value in the loss

---

[4] Compare, for example, the recoveries of two shareholders that sold for (1) $74 per ADS and (2) $70 per ADS on different days during the Settlement Class Period. Under the Plan of Allocation in the Settlement, Shareholder 1's recognized loss (or "Seller Loss Amount") is $3 (*i.e.*, $77 minus $74) and Shareholder 2's recognized loss is $7 (*i.e.*, $77 minus $70). If these were the only two claims, Shareholder 1 would receive 30% of the funds allocated to the Seller shareholders and Shareholder 2 would receive 70% of the funds. This makes sense based on the Court's reasoning in the motion to dismiss decision because the Seller shareholders were damaged by selling below the Merger price. Under the alternative formula comparable to the one applied to the Tenderer shareholders, Shareholder 1's recognized loss would be $388 (*i.e.*, the $385 that is part of the formula for the Tenderer shareholders plus $3 to account for Shareholder 1's lower sale price) and Shareholder 2's recognized loss would be $392 (*i.e.*, $385 plus $7). Under this alternative formula, Shareholder 1 would receive 49.7% of the funds allocated to the Seller shareholders and Shareholder 2 would receive 50.3% of the funds. This alternative

formula for the Seller shareholders would not make sense because it would be much more difficult to argue each of the approximately 223 million Qihoo ADS that were sold during the Class Period is subject to that full measure of damages, as compared to the approximately 95 million ADS that shareholders decided to tender in exchange for the Merger consideration. *See* ECF No. 224-1, Ex. A-1 at 2 (providing share counts).

Furthermore, it would not make sense to differentiate between Seller shareholders based on their purchase dates under Plaintiffs' theory of the case, for the reasons explained in response to Question 4 above. The loss formula for the Seller shareholders in the Plan of Allocation is therefore fair and reasonable.

**QUESTION 6:**

Paragraph 13 of the "Proposed Plan of Allocation of the Net Settlement Fund" provides that in the "unlikely event" that the Net Settlement Fund fully covers the valid claims of either tenderer or seller shareholders, any excess would be applied to the net settlement fund for the other group. Would this necessarily require a second round of distributions to that group, with attendant administration costs? Or could the determination that there is excess funding precede the distributions, so as to enable a single payment to be made to each group? If a second round of distributions were required, what is the estimate of the administration costs occasioned by this second round?

**RESPONSE TO QUESTION 6:**

This provision does not require a second round of distributions. The Claims Administrator will calculate the Recognized Seller Claims (for the Seller shareholders) and the

---

formula eliminates the significance of the sale price in the damages calculation that was a core part of the Court's motion to dismiss ruling.

12

Recognized Merger Claims (for the Tenderer shareholders) for all Authorized Claimants before making any distributions from the Net Settlement Fund. The Claims Administrator will be able to determine at that point whether there are any excess funds for either group (which is very unlikely) and reallocate those excess funds to the other group, if necessary, before making any distributions from the Net Settlement Fund.


Dated:  March 8, 2024                                    Respectfully submitted,


                                                          **POMERANTZ LLP**

                                                          /s/ *Michael Grunfeld*
                                                          Jeremy A. Lieberman
                                                          Michael Grunfeld
                                                          600 Third Avenue, 20th Floor
                                                          New York, New York 10016
                                                          Telephone:  (212) 661-1100
                                                          Facsimile:  (212) 661-8665
                                                          jalieberman@pomlaw.com
                                                          mgrunfeld@pomlaw.com

                                                          *Lead Counsel for Co-Lead Plaintiffs*
                                                          *Altimeo Asset Management, ODS*
                                                          *Capital LLC, and the Settlement Class*

                                                          **LABATON SUCHAROW LLP**

                                                          Carol C. Villegas
                                                          Jake Bissell-Linsk
                                                          140 Broadway
                                                          New York, New York 10005
                                                          Telephone: (212) 907-0700
                                                          Facsimile: (212) 818-0477
                                                          Email: cvillegas@labaton.com
                                                                    jbissell-linsk@labaton.com

                                                          *Additional Counsel for Co-Lead Plaintiff*
                                                          *ODS Capital LLC*