**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ALTIMEO ASSET MANAGEMENT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QIHOO 360 TECHNOLOGY CO. LTD., HONGYI ZHOU, XIANGDONG QI and ERIC X. CHEN,<br><br>Defendants. | Case No. 1:19-cv-10067-PAE |

**DECLARATION OF MICHAEL GRUNFELD IN SUPPORT OF: (I) LEAD PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARDS TO LEAD PLAINTIFFS**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................2

II.   PROSECUTION OF THE ACTION ........................................................................5

      A.    Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel ................................................................................................................5

      B.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint........................................................................................................6

      C.    Defendants' Motions To Dismiss The Complaint And Plaintiffs' Response ..........7

      D.    Plaintiffs Motion For Class Certification And Related Depositions; Discovery .....9

      E.    Mediation Efforts, Settlement Negotiations, And Preliminary Approval Of The Settlement ......................................................................................................9

III.  THE RISKS OF CONTINUED LITIGATION ...................................................10

      A.    Risks In Proving Liability........................................................................11

      B.    Risks In Proving Loss Causation And Damages .....................................12

      C.    Risks Faced In Obtaining And Maintaining Class Action Status .........................15

      D.    Other Risks..............................................................................................17

      E.    The Settlement Is Reasonable In Light Of Potential Recovery In The Action......18

IV.   -LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER........................................................................................20

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ...........................23

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES ......................................................................................26

      A.    The Fee Application........................................................................................26

            1.    The Favorable Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Class Action .....................27

            2.    The Magnitude And Complexity Of The Action ....................................30

            3.    The Significant Risks Borne By Plaintiffs' Counsel ...............................31

4.      The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Plaintiffs' Counsel, And The Standing And Caliber Of Defendants' Counsel.......................................................................................... 32

5.      The Requested Fee In Relation To The Settlement ................................. 33

6.      Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ................... 33

7.      The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request............................................................................................................. 34

8.      Lead Plaintiffs Support Their Counsel's Fee Request.............................. 34

    B.      Payment Of The Requested Litigation Expenses  Is Fair And Reasonable...........35

    C.      PSLRA Awards For Lead Plaintiffs ...................................................................37

VII.    CONCLUSION.................................................................................................................39

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Dawn M. Cody, dated June 20, 2024 ("Initial Mailing Decl.") |
| 2 | Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) |
| 3 | Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024) |
| 4 | Declaration on Behalf of Pomerantz LLP |
| 5 | Declaration on Behalf of Labaton Keller Sucharow LLP |
| 6 | Table of Peer Law Firm Billing Rates |
| 7 | Declaration of Bernard Delattre on behalf of Lead Plaintiff Altimeo Asset Management (the "Delattre Decl.") |
| 8 | Declaration of Hilary Shane on behalf of Lead Plaintiff ODS Capital LLC (the "Shane Decl.") |

I, Michael Grunfeld, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a partner at Pomerantz LLP ("Pomerantz"), which is Court-appointed Lead Counsel for Court-appointed Lead Plaintiffs Altimeo Asset Management ("Altimeo") and ODS Capital LLC ("ODS," together with Altimeo, "Lead Plaintiffs" or "Plaintiffs") in this action (the "Action").[1]    I have personal knowledge of the matters set forth herein based on my close supervision and involvement in all aspects of the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.    I respectfully submit this Declaration in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $29,750,000 settlement (the "Settlement") that the Court preliminarily approved by Order, dated March 12, 2024 (the "Preliminary Approval Order") (ECF No. 228); as well as final approval of the proposed plan for allocating the proceeds of the Settlement to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.    I also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees in the amount of 33.33% of the Settlement Fund, which equates to $9,915,675, plus interest earned at the same rate as the Settlement Fund; payment of Plaintiffs' Counsel's expenses in the amount of $662,654.21; and awards to Lead Plaintiffs (in the amount of $60,000 to ODS and $60,000 to Altimeo), in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement

---

[1] Unless defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated February 12, 2024 (the "Stipulation").  ECF No. 224-1.

[2] Pomerantz was assisted in its representation of Plaintiffs and the Settlement Class by Labaton Keller Sucharow LLP ("Labaton").  Pomerantz and Labaton are referred to herein as "Plaintiffs' Counsel."

Class during the course of this lengthy and hard-fought litigation (the "Fee and Expense Application").

4.    As part of the Preliminary Approval Order, the Court directed that notice of the Settlement be disseminated to the Settlement Class. *See* ECF No. 228.  Pursuant to the Preliminary Approval Order, Angeion Group ("Angeion"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail, email, and/or publication.

5.    In total, to date, more than 26,900 copies of the Notice and Claim Form have been disseminated to potential Settlement Class Members and, to date, no requests for exclusion have been received and no objections have been filed with the Court or received by Lead Counsel. *See* Declaration of Dawn M. Cody, dated June 20, 2024 ("Initial Mailing Decl."), attached hereto as Exhibit 1.

## I.    INTRODUCTION

6.    This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and Sections 20(a) and 20A of the Exchange Act.  Lead Plaintiffs asserted claims against Defendant Qihoo 360 Technology Co. Ltd. ("Qihoo" or the "Company"), and Defendants Hongyi Zhou ("Zhou"), Eric X. Chen ("Chen"), and Xiangdong Qi ("Qi") (collectively, the "Individual Defendants," and, together with Qihoo, the "Defendants").

7.    On March 5, 2019, Lead Plaintiff Altimeo filed an initial complaint against all Defendants, under Section 10(b) of the Exchange Act, and also asserting claims against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 1.  On August 30, 2019, Plaintiffs filed and served the First Amended Class Action Complaint (the "Complaint"), alleging the same claims against all Defendants and adding additional detail as a result of Plaintiffs'

ongoing investigation. ECF No. 53. Among other things, the Complaint alleged that Defendants violated Section 10(b) of the Exchange Act by making certain statements that Plaintiffs alleged were false and misleading. This included, *inter alia*, statements regarding: (i) Defendants' intention to relist the Company on another stock exchange after completion of the Merger; (ii) the lack of strategic alternatives that would be more beneficial to Qihoo securityholders; (iii) the fairness of the consideration exchanged in the Merger and otherwise presenting the Merger in a positive light; and (v) the reasons for the Merger. The Complaint further alleged that the prices of Qihoo's securities were artificially depressed during the Class Period as a result of Defendants' alleged misstatements.

8. The proposed Settlement provides for the resolution of all claims in the Action, and related claims, in exchange for a cash payment of $29,750,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Lead Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class, considering the significant risks in continued litigation.

9. The Settlement was reached after nearly five years of contested litigation. Lead Counsel's efforts involved, among other things: (i) drafting the initial complaint in the Action and moving for the appointment of Lead Plaintiffs and Lead Counsel; (ii) conducting a comprehensive investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Qihoo filings with the U.S. Securities and Exchange Commission ("SEC"), public reports concerning Qihoo, interviews with former employees and other potential witnesses with relevant information, and consultation with experts; (iii) drafting the 121-page Complaint; (iv) briefing Defendants' motion to dismiss; (v) successfully briefing an appeal of the Court's dismissal of the case; (vi) successfully briefing a motion for alternative service on certain Defendants and

3

completing such service; (vii) taking appropriate steps to enforce a default judgment against Defendant Qi; (viii) successfully briefing Defendant Zhou's subsequent motion to dismiss; (ix) moving the Court to reconsider, or grant permission to seek interlocutory appeal as to, certain aspects of Zhou's motion to dismiss that the Court granted, which motion also required the drafting of a proposed Second Amended Complaint with substantial additional allegations and financial analysis; (x) moving for class certification; (xi) preparing for the depositions of Lead Plaintiffs and Plaintiffs' class certification expert, as well as defendant the depositions of Lead Plaintiff ODS and Plaintiffs' class certification expert; and (xii) otherwise engaging in complex discovery efforts, which included managing issues concerning internationally located documents and briefing several motions to compel.

10.    On September 28, 2023, the Parties' held a full-day mediation before former United States District Judge Layn R. Phillips.  In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement.  After continued discussions following the mediation, the Parties reached an agreement in principle to settle the Action.

11.    Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a very favorable outcome for the Settlement Class and is in the best interests of its Members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

4

12.     In addition, Lead Plaintiffs seek approval of the proposed Plan of Allocation, which is discussed below.  Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis, as described further below, based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of all Plaintiffs' Counsel, seek approval of the request for attorneys' fees and payment of Litigation Expenses, as set forth herein and in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Lead Plaintiffs ("Fee Brief").  As discussed in detail in the accompanying Fee Brief, the requested 33.33% fee is well within the range of percentage awards granted by courts in this Circuit in comparable complex litigation.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested Litigation Expenses of $662,654.21 and the requested awards to each Lead Plaintiff pursuant to the PSLRA are also fair and reasonable under the circumstances of this Action.  Accordingly, for the reasons set forth in the Fee Brief, and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and payment of expenses be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Commencement Of The Action And Appointment Of Lead Plaintiffs And Lead Counsel

14.     On January 17, 2019, Plaintiff ODS filed an initial class action complaint in this District. *ODS Cap. LLC v. Qihoo 360 Tech. Co.*, No. 1:19-cv-501-PAE (S.D.N.Y. Jan. 17, 2019),

5

ECF No. 1.[3]  On March 5, 2019, Altimeo filed a complaint in the Central District of California pleading substantially similar allegations.  *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 2:19-cv-01619-JAK-JC (C.D. Cal. Mar. 5, 2019), ECF No. 1.  On June 4, 2019, Defendants moved to transfer the case to the Southern District of New York.  *Id.*, ECF Nos. 33-35.  On July 1, 2019, the Court in California—the Honorable John A. Kronstadt—appointed Altimeo and ODS as Lead Plaintiffs and approved their selection of Pomerantz LLP as Lead Counsel.  *Id.*, ECF No. 42.  The action was transferred to this Court on October 30, 2019.  ECF No. 61.

### B.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint

15.    Following Lead Counsel's appointment, counsel conducted a comprehensive investigation into Qihoo's alleged wrongful acts, which included, among other things: (i) reviewing and analyzing (a) Qihoo's filings with the SEC, (b) research reports prepared by securities and financial analysts, and news and industry articles, concerning Qihoo, and (c) other publicly available material related to Qihoo; (ii) conducting an extensive investigation (with the aid of a private investigator) that involved, *inter alia*, interviews of former Qihoo employees and other potential witnesses with relevant information; (iii) working with a damages and loss causation expert to analyze Qihoo's stock price movements; and (iv) working with an expert in Chinese and United States mergers & acquisitions and capital markets transactions.

16.    On August 30, 2019, Plaintiffs filed the 121-page Complaint, which asserted claims against all Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Sections 20(a) and 20A of the Exchange Act.  ECF No. 53.

---

[3] This initial action was ultimately voluntarily dismissed. *Id.*, ECF No. 39.

17.    Among other things, the Complaint alleged that Defendants violated Section 10(b) by making certain statements that Plaintiffs allege were false and misleading.  This includes, *inter alia*, statements regarding: (i) Defendants' intention to relist the Company on another stock exchange after completion of the Merger; (ii) the lack of strategic alternatives that would be more beneficial to Qihoo securityholders; (iii) the fairness of the consideration exchanged in the Merger and otherwise presenting the Merger in a positive light; and (iv) the reasons for the Merger.

18.    In addition to alleging that these and other statements were false and misleading, the Complaint alleged that the prices of Qihoo's securities were artificially deflated during the Class Period as a result of Defendants' allegedly false and misleading statements.

**C.    Defendants' Motions To Dismiss The Complaint And Plaintiffs' Response**

19.    On December 23, 2019, Defendants filed their Motion to Dismiss the Complaint ("Motion to Dismiss").  ECF Nos. 77-79.  On January 31, 2020, Lead Plaintiffs filed their opposition to Defendants' Motion to Dismiss and on February 21, 2020, Defendants filed their reply in further support of their Motion.  ECF Nos. 81, 83.

20.    On August 14, 2020, the Court dismissed the Complaint on the grounds the Complaint failed to "plead adequately its necessary factual allegation: that defendants, as of the Merger, had in place a concrete plan to relist Qihoo."  ECF No. 84 at 37.  The Court explained: "Because the [Complaint's] claims of material misrepresentations and omissions all turn on this factual premise, it fails to adequately allege this element of the [Section 10(b) claim]."  *Id.*

21.    Lead Plaintiffs appealed the Court's decision dismissing the Complaint.  ECF No. 87; Second Circuit Appeal No. 20-3074. The appeal was fully briefed as of January 19, 2021. Lead Plaintiffs raised substantial issues in the appeal concerning the Court's rulings that the Complaint did not adequately plead that, at the time of Defendants alleged false and misleading statements, Defendants had undisclosed plans to relist Qihoo.

7

22.     On November 24, 2021, the Second Circuit vacated the Court's dismissal of the Complaint and remanded the case to the district court for further proceedings. The Second Circuit found that Lead Plaintiffs adequately alleged that Defendants made material misstatements and omissions because the allegations in the Complaint "create a plausible inference that a concrete [relisting] plan was in place at the time Qihoo issued the Proxy Materials."  ECF No. 88 at 11.

23.     Immediately following resolution of this appeal, the Parties began negotiating complex discovery issues involving Defendants' internationally located documents.

24.     Plaintiffs also briefed a motion for leave to complete alternative international service on Defendants Qi and Zhou, and completed such service.  ECF Nos. 99-100, 112.

25.     On April 29, 2022, Defendant Zhou filed a second motion to dismiss the Complaint (ECF Nos. 114-16), which Lead Plaintiffs opposed (ECF No. 128).  On March 21, 2023, the Court granted in part and denied in part Zhou's motion to dismiss.  Most notably, the Court ruled that loss causation was only adequately alleged as to those who sold shares at a price lower than the Merger price—and for such sellers, limited to the difference between their sale price and the Merger price.  This ruling dismissed claims by those who held shares until the Merger closed (the "Tenderer claims" or "Tenderer Class") and preserved claims for those who sold before the Merger closed (the "Seller claims" or "Seller Class").  ECF No. 145.

26.     Lead Plaintiffs then moved for the Court to reconsider, or grant permission to seek interlocutory appeal as to, certain aspects of Defendant Zhou's motion to dismiss that the Court granted.  ECF Nos. 149-50.  In connection with the motion to reconsider, and at the Court's instruction, Plaintiffs prepared a Second Amended Complaint, which incorporated allegations based on the extensive factual information contained in the transcript that Plaintiffs commissioned

8

from the trial of the related Appraisal Action. Plaintiffs filed a proposed Second Amended Complaint on April 12, 2023.  ECF No. 157.

**D.      Plaintiffs Motion For Class Certification And Related Depositions; Discovery**

27.      On October 18, 2023, Lead Plaintiffs filed a motion for class certification.  ECF Nos. 186-88.  In connection with that motion, Plaintiffs defended the depositions of Plaintiff ODS (on December 1, 2023) and Plaintiffs' class certification expert (on November 30, 2023).

28.      In addition, Plaintiffs served and responded to various demands for the production of documents and interrogatories; engaged in meet-and-confer correspondence with respect to discovery requests; pursued third-party discovery including discovery from financial institutions that analyzed Qihoo's ADRs; negotiated search terms for electronically stored information ("ESI") and document custodians; successfully briefed three motions to compel (ECF Nos. 184, 196, 206-07) spanning issues related to class certification and merits discovery, which provided Plaintiffs with significant victories limiting the scope of Defendants' requests and requiring Defendants to produce documents that they would not have otherwise produced; and produced over 2,000 of their own documents.  Plaintiffs also reviewed the 2,582 pages of the transcript from the trial of the Appraisal Action in the Cayman Islands, which spanned 16 days and covered substantial factual information that Qihoo produced in that action, informing Plaintiffs of the content of key documents that Defendants would have produced here.

**E.      Mediation Efforts, Settlement Negotiations, And Preliminary
Approval Of The Settlement**

29.      On September 28, 2023, the Parties' held a full-day mediation before former United States District Judge Layn R. Phillips.  In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement concerning liability and damages.

30.    After continued discussions following the mediation, the Parties reached an agreement in principle to settle the Action. The Parties thereafter memorialized the substantive terms of the settlement in a confidential Term Sheet to Settle the Action on December 21, 2023.

31.    Thereafter, the Parties ultimately executed the Stipulation, dated February 12, 2024. ECF No. 224-1.  On the same day, Lead Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Class Action Settlement.  ECF Nos. 222-24.

32.    On March 12, 2024, the Court issued the Preliminary Approval Order.  ECF No. 228.

## III.    THE RISKS OF CONTINUED LITIGATION

33.    The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a non-reversionary cash payment of $29.75 million.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through continued litigation to a jury trial, followed by additional inevitable appeals.  Before trial and a potentially litigated verdict, the most immediate risks faced by the Settlement Class are related to Lead Plaintiffs' pending motion for class certification, specifically with respect to Defendants' anticipated challenge to Plaintiffs' ability to invoke the fraud-on-the-market presumption of reliance in their opposition to Plaintiffs' class certification motion.  Even if Plaintiffs prevailed on this issue, the Parties would then face a lengthy and expensive discovery process on the merits involving parties located in China, summary judgment motions, motions *in limine*, trial, and inevitable appeals. There was no guarantee that Plaintiffs and the Settlement Class would surmount these hurdles and, even if they did, later achieve any recovery, let alone one greater than $29.75 million.

A.    **Risks In Proving Liability**

34.    When the Settlement was reached, Plaintiffs had successfully opposed, in part, Defendant Zhou's motion to dismiss the Complaint.  However, the fact that Plaintiffs overcame Defendant Zhou's motion to dismiss in part as to the Seller Class, was not a guarantee of ultimate success.

35.    Defendants were expected to continue to maintain that Lead Plaintiffs' contention that Defendants engaged in deceit concerning Qihoo's valuation and the post-Merger plans for Qihoo was unfounded.

36.    Particularly, Defendants were expected to contest the existence of concrete plans to engage in undisclosed post-Merger transactions.  Defendants likely would have argued that any such plans were speculative as opposed to material, and coupled this argument with assertions that the Merger documents did disclose the possibility of such transactions.  While Lead Plaintiffs believe the evidentiary record would have provided strong support for the allegations that the post-Merger plans were concrete and material, and that the Merger-documents' references to the possibility (as opposed to plans) for such transactions was insufficient, this issue would have been fiercely contested by Defendants through documents and testimony.

37.    Additionally, Defendants were likely to argue that any higher valuation was speculative and represented the results of potential post-Merger developments.  While Lead Plaintiffs strongly believe documentary evidence would persuasively show that the internal valuations were higher than publicly disclosed, and that this higher valuation reflected then-present conditions of Qihoo's business (as opposed to value increases unlocked by the Merger), Defendants would have certainly challenged the strength of this evidence and argued for their own alternative position through both documents and testimony.

11

38.     While Plaintiffs believe they effectively demonstrated that Defendants made materially false and misleading statements in violation of the federal securities laws, Defendants also would have argued at summary judgment and trial, based on their contentions noted above, that their statements are inactionable because they are too general and/or not objectively verifiable, that Defendants publicly warned of risks, the truth was on the market, and/or their statements are not otherwise false and misleading based on the factual record.

39.     In addition, the burden and risk of successfully proving Lead Plaintiffs' theory of liability was more difficult than in a typical case due to the international nature of the dispute. While Lead Plaintiffs were successfully pursuing document discovery, that process was more challenging than normal due to the documents existing internationally.  Likewise, obtaining testimony—especially testimony from Qihoo employees who were not Defendants in the case— would prove challenging because the vast majority of such witnesses were located in China.

40.     Defendants would likely have challenged Lead Plaintiffs' allegations at summary judgment, at trial, and through appeals, and at each step Lead Plaintiffs would risk the prospect of the Class receiving no recovery in the case.

41.     In addition, Defendants argued that the alleged false and misleading statements were not made with the requisite state of mind (i.e., scienter) to support the securities fraud claims alleged.  While Plaintiffs strongly disagreed with this assertion, had the litigation continued there is simply no guarantee that the trier of fact would have adopted Plaintiffs' view of the case.  Indeed, scienter is commonly regarded to be the most difficult element to prove in a securities fraud claim.

**B.      Risks In Proving Loss Causation And Damages**

42.     Even assuming that Lead Plaintiffs overcame the risk of establishing Defendants' liability, as discussed above, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.  These issues would have been hotly contested

by Defendants, particularly in the context of class certification and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings, and appeals.

43.    This case raises complicated issues with respect to the central theory of loss causation.  As for the Seller claims, the theory of loss causation credited as adequately pled would face several complexities.  The Court credited the notion that those who sold before the Merger suffered losses because the stock price was trading at a discount to the Merger price, and that this discount would not have existed—or would have been far smaller—if the truth had been known.  However, Defendants would have argued that truthful disclosure would not necessarily have resulted in Qihoo's stock trading at exactly the Merger price, and that modeling the price at which it would have traded would require speculation.  Plaintiffs would have presented expert testimony showing that the price would have been essentially asymptotic with the Merger price, but this would have resulted in a hard fought and particularly sophisticated battle of the experts.

44.    Additionally, Defendants would have raised challenges concerning which Class Members suffered injury under this Seller Class theory.  For example, they would have raised arguments that those purchasing shares after one or more of the false statements and then selling were differently situated from those who purchased shares before the false statements.  Likewise, Defendants would have argued that damages should be offset or "net" against any gains Class Members achieved through selling during the Class Period.  Each of these issues would raise complexity, particularly because cases involving claims by those who sold shares at deflated prices (as opposed to those who purchased shares at inflated prices) are relatively uncommon, meaning there was greater risk and uncertainty concerning how such issues would be decided.

45.    Furthermore, one of Lead Plaintiffs' theories of damages was rejected by the Court in ruling on Defendant Zhou's motion to dismiss.  That theory was that Plaintiffs should be entitled

to receive the difference between the fair value of their shares (i.e., an appraised value of those shares) and the prices they received upon selling.  This theory of damages, if credited, could have resulted in a far higher damages award than the theory permitted by the Court.  However, Lead Plaintiffs would have needed to win an appeal to pursue this theory.  Winning such an appeal would pose substantial challenges, and even if successful would require expense and delay as the additional damages theory was litigated.  Lead Plaintiffs would likely not even be permitted to bring this appeal as to the Tenderer Class until after a trial on the claims brought by the Seller Class, in which Lead Plaintiffs would need to win on liability issues that overlap between the two classes.

46. In addition, in order to prevail on the Tenderer claims, Lead Plaintiffs would also be required to prove that the fair value of the Qihoo shares was higher than the Merger price, and Defendants would have fiercely disputed that issue with expert testimony.

47. Altogether, the battle of the experts here would be much more uncertain than in a typical stock-drop case, where damages are based only on the amount that a company's stock fell in connection with the revelation of the fraud, rather than also on the value of the company or on context specific variations in Qihoo's stock price during the pendency of the Merger.

48. Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that damages were only a fraction of the amount claimed by Plaintiffs.  Thus, the amount of damages that the class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as

evidence by the Court at trial. These issues could have seriously affected Plaintiffs' ability to successfully prosecute the Action.

49. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment, trial, or appeal, they could have dramatically limited—if not eliminated—any potential recovery by the class.

**C.     Risks Faced In Obtaining And Maintaining Class Action Status**

50. In deciding a motion for class certification, the class would face the risk of arguments by Defendants grounded on the reliance element of Lead Plaintiffs' claims and on any potential factual dissimilarity of claims asserted by Plaintiffs and putative class members. If successful, the defense would mandate individual lawsuits, many with minimal amounts of damages accrued. Even if a class were certified over Defendants' objection, it would face multiple challenges with respect to proving the class-wide nature of Defendants' securities law violations at trial.

51. To be entitled to class certification, Lead Plaintiffs must show that common issues predominate over individual ones. If not for Defendants' consent to certify the Settlement Class, Plaintiffs would have to meet their burden by showing that Qihoo Securities traded on an efficient market, entitling seller shareholders to the presumption of reliance on Defendants' materially false statements. Under *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014), Defendants would have been permitted to rebut the presumption by proving that there was no price impact. While it is not unusual for courts to certify securities class actions, it is not automatic. The law governing certification of securities class actions has been in constant flux, as evidenced by *Halliburton* and the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021).

52.     Defendants would certainly have argued that there was no "price impact" from their allegedly false and misleading statements on the price of Qihoo shares while the Merger was pending.  For example, Defendants argued in their motion to dismiss that Plaintiffs did not offer any factual basis for their assertion that statements about the relisting plans or the fairness of the proposed transaction price depressed Qihoo's ADS price while the Merger was pending, that any higher price would have been available had the disclosures been different, or that any buyer would have paid more when Qihoo was a public company.  At the depositions of Plaintiffs' class certification expert and Lead Plaintiff ODS, Defendants then asked many questions about the cause of movements in the price of Qihoo's ADS on various days throughout the Class Period.  Thus, Defendants would certainly have advanced challenging arguments concerning whether the statements had "price impact" sufficient to rely on the fraud-on-the-market doctrine.

53.     In addition, Defendants would likely have argued that market efficiency could not be proven in the context of the Merger, as necessary to invoke the fraud on the market doctrine. While Lead Plaintiffs would have persuasively argued the same market mechanisms relevant to market efficiency apply to the period prior to the Merger closing, Defendants would have argued that the market dynamics changed due to the pending merger.  This dispute would have resulted in a complex battle of the experts, the result of which would have been uncertain.

54.     Moreover, even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.

55.     In sum, without a settlement, even assuming the evolving law does not change further, the Settlement Class risked that certification would be denied.  Further, even if the Court

16

were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings.

### D.    Other Risks

56.    Lead Plaintiffs also would have had to continue pursuing a default judgment against Defendant Qi had the litigation continued.  Further, Lead Plaintiffs would have had to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this Action.

57.    Plaintiffs would have had to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial.  Each of these several stages of litigation presents significant risks in complex class actions such as this one.  Lead Counsel knows from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

58.    Even if Plaintiffs succeeded in proving all the elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed.  An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay.  Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

59.    Additionally, even if Plaintiffs fully prevailed in securing a final judgment through any potential appeals, collection on that judgment would itself pose serious risks.  Qihoo is based in China and no longer operates within the United States, and the Individual Defendants are also based outside the United States.  Furthermore, Qihoo has undergone substantial corporate transformations that may have frustrated judgment collection efforts.  As a result, actually securing payment for the Class, in the absence of settlement, posed serious risks in terms of both

17

successfully collecting on the judgment and the risks that any collection would require substantial additional delay and expense.

**E.      The Settlement Is Reasonable In Light Of Potential Recovery In The Action**

60.      In addition to the risks of litigation discussed above, the Settlement is also fair, reasonable, and adequate in light of the potential recovery of available damages.  The appropriate model for estimating damages was highly contested by the Parties, more so than is often the case in securities class actions.

61.      If Plaintiffs had fully prevailed on each of their claims at summary judgment and after a jury trial—assuming the Court certified the same class period as the Settlement's Class Period, and if the Court and jury accepted Plaintiffs' damages theory—total potential maximum damages for Qihoo shareholders that sold their ADS or shares during the Class Period were estimated by Lead Plaintiffs to be approximately $909.81 million.  This figure assumes damages are equal to the difference between the Merger price and the price at which investors sold shares during the Class Period, and includes all sales during the Class Period, regardless of purchase price or time of purchase.

62.      However, this calculation of maximum recoverable damages was subject to likely legal challenges, even assuming liability was proven.  For example, if "netting" principles were applied, where damages were "offset" based the investor's purchase price (such that for purchases made during the Class Period, investors could recover only where they subsequently sold those shares at a loss and would be limited to recovering the amount of that loss rather than the full difference between the Merger price and sale price), then maximum damages for the Seller Class would be less than $425 million.  Likewise, if damages were limited to those who held shares before the Class Period, then damages would be limited to less than $250 million for the Seller Class, if not eliminated entirely.

18

63.     Under the maximum damages scenario ($909.81 million), the $22.3125 million of the $29.75 million Settlement that is allocated to these Seller shareholders represents a recovery of approximately 2.45%.  If the lower number described in the prior paragraph were used to estimate damages ($250 million), then the $22.3125 million of the $29.75 million Settlement that is allocated to these Seller shareholders represents a recovery of approximately 8.93%.

64.     As such, under even the maximum damages scenario the Settlement falls within the range that courts commonly approve and is greater than the median recovery of 1.8% of estimated damages for all securities class actions settled in 2023.  *See* Ex. 2 (Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review*, at 26 (Fig. 22) (NERA Jan. 23, 2024))*; see also* Final Approval Motion at 15-16.

65.     Additionally, the Settlement is substantially greater than the median value of securities class action settlements in actions asserting claims under Section 10(b) of the Exchange Act.  For the period from 2014 through 2022, the median settlement in securities class actions was $10.4 million, and the median settlement was $15 million in 2023.  *See* Ex. 3 (Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis*, at 4 (Cornerstone Research 2024).

66.     The Settlement also allocates 25% to the Tenderer Class (*i.e.*, Settlement Class Members that tendered, cancelled, or exchanged shares in the Merger).  (*See* Ex. 1-A at 12).  As explained in response to the Court's questions on Lead Plaintiffs' Motion for Preliminary Approval of the Settlement, these shareholders are receiving a smaller portion of the Settlement and of their estimated damages because their claims were previously dismissed on loss causation grounds.  *See* ECF No. 226 at 3-6.  Although the court held that the Tenderer shareholders' theory of loss causation was too speculative to survive a motion to dismiss, had they not settled, they could have

19

appealed this issue following the resolution of the Seller shareholders' claims. The allocation of the Settlement to the Tenderer shareholders is fair based on a balancing of the maximum value of their claims against: (1) the difficulty of prevailing on appeal; (2) the long delay before the Tenderer shareholders would be able to bring their appeal; and (3) the uncertainty involved in assessing Qihoo's fair value. *Id.* at 4-6.

IV.    **CO-LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER**

67.    Pursuant to the Preliminary Approval Order, Lead Counsel and the Court-approved Claims Administrator, Angeion, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

68.    The Preliminary Approval Order directed that the Notice and Claim Form be mailed to potential Settlement Class Members and set a deadline of 28 calendar days before the final Settlement Hearing for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement.

69.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Angeion to disseminate copies of the Notice and Claim Form and to publish the Summary Notice. Contemporaneously with the mailing of the Notice, Lead Counsel instructed Angeion to post downloadable copies of the Notice and Claim Form online at www.QihooSecuritiesSettlement.com (the "Settlement Website").

70.    The Notice, attached as Exhibit A to the Initial Mailing Declaration, provides potential Settlement Class Members with information about the terms of the Settlement and contains, among other things: (i) a summary of the Settlement, including the $29.75 million Settlement Amount; (ii) the proposed Plan of Allocation; (iii) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 33.4%

20

of the Settlement Fund (*i.e.*, $9,936,500, plus interest), as well as Litigation Expenses, which may include an application for reimbursement to Plaintiffs for their costs and expenses related to their representation of the Settlement Class; (iv) that any Settlement Class Member could object to the Settlement, Plan of Allocation, or requested attorneys' fees and Litigation Expenses; (v) an explanation of the reasons for the Settlement; (vi) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than July 5, 2024; (vii) that objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application must be filed with the Court no later than July 5, 2024; and (viii) that the deadline for submitting a Claim Form is August 8, 2024.

71.    As detailed in the Initial Mailing Declaration, Angeion mailed the Notice to potential Settlement Class Members, as well as banks, brokerage firms, and other third-party nominees whose clients may be Settlement Class Members.  Ex. 1 at 2-4.  To disseminate the Notice, beginning on April 2, 2024, Angeion mailed a copy of the Notice to the individuals and organizations identified in the Company's transfer agent records. *See id.* ¶8.  In addition, Angeion maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees.  On March 26, 2024, Angeion caused the Notice to be mailed to the 2,435 nominees and institutional groups contained in the Angeion master mailing list.  *Id.* ¶5.  The Notice directed those who held and/or sold Qihoo Securities during the Class Period, for the beneficial interest of a person or entity other than themselves, to either: (i) within ten (10) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Notice to forward to all such beneficial owners and within ten (10) calendar days of receipt of those Notices forward them to all such beneficial owners; or (ii) within ten (10) calendar days of receipt of the Notice, provide a list of the names and mailing

addresses of all such beneficial owners to Angeion. Nominees were also directed to provide email addresses, to the extent available. *Id.* ¶9.

72.    As of June 19, 2024, 24,494 potential Settlement Class Members have been mailed copies of the Notice. *See id.* ¶ 11.

73.    On April 9, 2024, in accordance with the Preliminary Approval Order, Angeion caused the Summary Notice to be published once in *The Wall Street Journal* and to be transmitted over *PR Newswire*. *See id.* ¶ 13, Exs. C-D (confirmations of publications).

74.    Lead Counsel also caused Angeion to establish the dedicated Settlement Website, which became operational on March 26, 2024, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; an online claim filing portal; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order. *Id.* ¶¶ 14-16.

75.    Angeion maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form. Angeion promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries. *Id.* ¶ 17.

76.    As set forth above, the Notice and Summary Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is July 5, 2024, and that the deadline to request exclusion from the Settlement Class is July 5, 2024. To date, no requests for exclusion have been received. *Id.* ¶ 20.

77.     In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the amount of attorneys' fees and expenses referenced in the Notice have been entered on this Court's docket or have otherwise been received by Lead Counsel or Angeion.  *Id.* ¶ 21.  Lead Counsel will file reply papers by July 25, 2024, which will address any objections that may be received.  Lead Counsel's reply papers will include a supplemental declaration from Angeion addressing whether any requests for exclusion have been received.

## V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

78.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than August 8, 2024. As set forth in the Notice, the Net Settlement Fund will be distributed among eligible Settlement Class Members according to the Plan of Allocation approved by the Court.  Lead Counsel believes that the proposed Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

79.     The proposed Plan of Allocation was created with the assistance of a consulting damages expert and is designed to distribute the proceeds of the Net Settlement Fund fairly and equitably to Settlement Class Members.  The Plan of Allocation is set forth on pages 11 to 14 of the Notice.  *See* Initial Mailing Decl. Ex. A (Notice).  As described in the Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be

23

paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

80.    The Plan of Allocation calls for the Net Settlement fund to be allocated into two Sub-Funds based on whether the security was sold or tendered/cancelled/exchanged in the Merger. Under the Plan of Allocation, a "Seller Loss Amount" will be calculated for each sale of Qihoo Securities during the Class Period and a "Merger Consideration Amount" will be calculated for each tender, cancellation or exchange of Qihoo Securities in exchange for the right to receive the Merger consideration, that are listed in the Claim Form and for which adequate documentation is provided.  Settlement proceeds available for Qihoo ADSs and ordinary shares sold during the Class Period may recover up to a maximum of 75% of the Net Settlement Fund.  Initial Mailing Decl. Ex. A (Notice) at 12.  Settlement proceeds available for Qihoo ADSs and ordinary shares that were tendered, cancelled, or exchanged in the Merger may recover up to a maximum of 25% of the Net Settlement Fund.  *Id.*

81.    The Seller Loss Amount calculated for the Seller Class will be the difference between the Merger consideration price and the price at which the security was sold.

82.    The Merger Consideration Amount for the Tenderer Class is $385.00 per ADS, and $256.65 per Class A ordinary share, for each such security tendered, canceled, or exchanged in the Merger.

83.    Under the Plan of Allocation, if a Seller Loss Amount is calculated to a negative number (a gain), the Seller Loss Amount is zero.  However, if a Claimant's recognized loss in one Sub-Fund is zero, they may still recover from a different Sub-Fund where their total recognized loss is positive.  In the event the Net Settlement Fund is sufficient to pay 100% of the recognized

losses in one or more of the Sub-Funds, any excess amount will be applied proportionally to pay the balance of the remaining recognized losses in the other Sub-Fund.

84.     The Recognized Seller Claims calculated for the Seller Class will be the sum of their Seller Loss Amounts for each share sold during the Class Period.

85.     The Recognized Merger Claims calculated for the Tenderer Class will be the sum of the Merger Consideration Amounts for each share tendered, canceled or exchanged in the Merger.

86.     The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the Claimant's total Recognized Seller Claims or Recognized Merger Claims, as compared to the total recognized claims of all Claimants within each Sub-Fund.

87.     In sum, the Plan of Allocation will fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Qihoo Securities that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

88.     To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or the Claims Administrator, or posted on the Court's docket.  *See* Initial Mailing Decl. ¶ 21.

89.     The Claims Administrator will process claims under the guidance of Lead Counsel, allow claimants an opportunity to cure any deficiencies or request the Court to review their denial, and mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund (per the Plan of Allocation).

**VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES**

90.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33.33% of the Settlement Fund (or $9,915,675, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel also requests payment of Litigation Expenses from the Settlement Fund in the amount of $662,654.21 in expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action.  Finally, Plaintiffs request compensatory awards of $60,000 for Lead Plaintiff ODS and $60,000 for Lead Plaintiff Altimeo in connection with their representation of the Settlement Class, as authorized by the PSLRA.  The total Litigation Expenses amount of $662,654.21 is below the maximum expense amount of $1,100,000 set forth in the Notice.  The legal authorities supporting Lead Counsel's request for an award of attorneys' fees and Litigation Expenses are set forth in the accompanying Fee Brief, filed concurrently herewith.  The primary factual bases for the requested fee and Litigation Expenses are summarized below.

**A.    The Fee Application**

91.    Lead Counsel is applying for a percentage-of-the-common-fund fee award to compensate Plaintiffs' Counsel for the services they rendered on behalf of the Settlement Class. As discussed below and in the Fee Brief, based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair, reasonable, and adequate and should be approved.

26

1. **The Favorable Outcome Achieved Is The Result Of The Significant Time And Labor That Plaintiffs' Counsel Devoted To The Class Action**

92. Plaintiffs' Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class. As previously described above (*see supra* ¶¶ 14-32), Plaintiffs' Counsel, among other things:

- drafted the initial complaint in the Action (ECF No. 1) and moved for the appointment of Lead Plaintiffs and Lead Counsel (ECF No. 11);

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) Qihoo's filings with the SEC, (ii) research reports prepared by securities and financial analysts, and news and industry articles, concerning Qihoo, and (iii) other publicly available material related to the Company; (b) retaining and working with private investigators, who interviewed former Company employees; (c) working with a damages and loss causation expert to analyze Qihoo's stock price movements; and (d) working with an expert in Chinese and United States mergers & acquisitions and capital markets transactions;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 121-page Amended Complaint (ECF No. 53);

- briefed Defendants Qihoo and Chen's motion to dismiss (ECF Nos. 81);

- successfully appealed to the Second Circuit the Court's dismissal of the case when it granted that motion to dismiss (ECF No. 88);

- successfully moved to serve Defendants Zhou and Qi pursuant to Rule 4(f)(3) of the Federal Rules of Civil Procedure (ECF Nos. 99-100);

- took appropriate steps to preserve a potential default judgment against Defendant Qi (ECF Nos. 131-34, 137, 139, 141, 143, 158, 162, 180);

- opposed Defendant Zhou's subsequent motion to dismiss, obtaining the denial of the motion as to claims brought by the Seller Class (ECF No. 128);

- moved for the Court to reconsider, or grant permission to seek interlocutory appeal as to, certain aspects of Zhou's motion to dismiss that the Court granted (ECF Nos. 149-50, 161);

- reviewed the extensive factual information contained in the transcript that Plaintiffs commissioned from the trial of the Appraisal Action (ECF No. 157-1);

- engaged in substantial discovery efforts, including serving and responding to various demands for the production of documents and interrogatories; engaging in meet-and-confer correspondence; pursuing third-party discovery; negotiating search terms for electronically stored information ("ESI") and document custodians; successfully briefed three motions to compel (ECF Nos. 184, 189, 196,

27

206-07, 214-15); and produced over 2,000 of their own documents;

- moved for class certification (ECF Nos. 186-88);

- prepared Plaintiffs and their class certification expert for depositions;

- defended the depositions of Plaintiff ODS and Plaintiffs' class certification expert;

- engaged in a mediation process overseen by a highly experienced third-party mediator, former United States District Judge Layn R. Phillips, which involved an exchange of comprehensive written submissions, a full-day formal mediation session, and extensive follow-up after that session;

- negotiated a detailed confidential settlement term sheet with Settling Defendants' counsel, which was executed on December 21, 2023;

- drafted and negotiated the terms of the Stipulation (including the exhibits thereto) (ECF No. 224-1) and Supplemental Agreement with Settling Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the Preliminary Approval Motion and supporting papers (ECF Nos. 222-24);

- responded to the Court's questions in response to the Preliminary Approval Motion (ECF No. 226);

- oversaw the implementation of the notice process; and

- drafted this Motion for Final Approval and supporting papers.

93.    Attached hereto are declarations in support of the request for an award of attorneys' fees and payment of Litigation Expenses. *See* Declaration on Behalf of Pomerantz (Ex. 4) and Declaration on Behalf of Labaton (Ex. 5).

94.    Included with these declarations are schedules that summarize the time spent prosecuting this Action by each firm, as well as each firm's Litigation Expenses by category (the "Fee and Expense Schedules"). The attached declarations and the Fee and Expense Schedules report the amount of time spent by attorneys and professional support staff of each firm and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.[4] The schedules

---

[4] Time expended in preparing the Fee and Expense Application has not been included.

were prepared from daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

95. The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of a lodestar cross-check. Additionally, the rates of Plaintiffs' Counsel attorneys (ranging from $425-$925 per hour for non-partners and $750-$1,325 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Exhibit 6 attached hereto (table of peer law firm billing rates).

96. As set forth above and in detail in Exhibits 4 and 5, Plaintiffs' Counsel have collectively expended a total of 4,339.81 hours in the investigation and prosecution of the Action. The resulting total lodestar is $3,377,423. The requested fee amount of 33.33% of the Settlement Fund equals $9,915,675 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a reasonable 2.94 multiplier of Plaintiffs' Counsel's lodestar.

97. Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, and will oversee the distribution process. No additional compensation will be sought for this work, other than expenses incurred with respect to claims administration and expenses for any other necessary activities to conclude the administration.

98. As detailed above, throughout this litigation, Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by lawyers and other personnel on this case. Experienced attorneys at Pomerantz and Labaton were involved with drafting, reviewing and/or editing pleadings, court

29

filings, and the mediation submissions; communicating with Plaintiffs; engaging in discovery efforts; the mediation process; and negotiating the terms of the Settlement, Term Sheet, and Stipulation, among other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the Litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Litigation.

99. Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, Plaintiffs' Counsel respectfully submits that the requested fee is reasonable and should be approved.

### 2. The Magnitude And Complexity Of The Action

100. Securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this Action presented many novel and complex issues, including drafting the Amended Complaint and proposed Second Amended Complaint that would comply with the rigorous pleading standards of the PSLRA despite the PSLRA's automatic stay of discovery; contesting two motions to dismiss; briefing an appeal of the Court's dismissal of the case; moving the Court to reconsider, or grant permission to seek interlocutory appeal as to, certain aspects of Zhou's motion to dismiss that the Court granted; moving for class certification; and engaging in complex discovery efforts, including defending the depositions of Plaintiff ODS and Plaintiffs' class certification expert and briefing three motions to compel, among other substantial discovery efforts.

101.    Moreover, at each step of the way, Lead Plaintiffs and their counsel were opposed by Defendants' sophisticated and well-resourced counsel at Latham & Watkins LLP and Dechert LLP.

102.    Additionally, the mediation and settlement process in this Action was hard-fought. The Parties zealously advocated their positions throughout, including exchanging mediation statements, engaging in a full-day mediation, and conducting rigorous follow-up negotiations.

### 3.    The Significant Risks Borne By Plaintiffs' Counsel

103.    This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis.  From the outset, there was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one were covered.  With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel received no compensation for this case during the course of the Action and collectively incurred $662,654.21 in litigation-related expenses.

104.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed above (*see* ¶¶ 33-59), from the outset, this Litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Indeed, this case was initially dismissed, and it was revived only as a result of Lead Counsel's successful appeal.

105.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigations like this one is never assured.  Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement.  On the contrary, it takes

hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

**4.      The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Plaintiffs' Counsel, And The Standing And Caliber Of Defendants' Counsel**

106.    As demonstrated by the firm resumes of Pomerantz and Labaton, attached to Exhibits 4 and 5 as Exs. C, Plaintiffs' Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation.    Indeed, Plaintiffs' Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country.  *See* Ex. 4-C, 5-C. Plaintiffs' Counsel enjoy a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. For example, Pomerantz served as lead counsel in: *In re Petrobras Securities Litigation*, No. 1:14-cv-9662-JSR (S.D.N.Y.) ($3 billion recovery); *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 1:12-cv-9350-NRB-KNF (S.D.N.Y.) ($135 million settlement); *Pirnik v. Fiat Chrysler Automobiles N.V.*, No. 1:15-cv-07199-JMF  (S.D.N.Y) ($110 million settlement); and *In re Comverse Technology, Inc. Securities Litigation*, No. 1:06-CV-1825-NGG-RER (E.D.N.Y.) ($225 million settlement). *See* Ex. 4-C.  Labaton  has also served as lead counsel in a number of high profile matters:  *In re Am. Int'l Grp, Inc. Sec. Litigation*, No. 1:04-cv-8141-DAB (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Securities Litigation*, No. 2:03-cv-1500-KOB-TMP (N.D. Ala.) (representing Michigan Retirement System, New Mexico State Investment Council, and the Educational Retirement Board of New Mexico and securing settlements of more than $800 million); *In re Countrywide Securities Litigation*, No.

2:07-cv-5295-MRP-MAN (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Securities Litigation*, No. 2:08-cv-397-ES-JAD (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 5-C. Plaintiffs' Counsel's experience, collectively, enabled the successes they achieved throughout this litigation and added valuable leverage in the settlement negotiations.

107.    Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Settling Defendants were represented by Latham & Watkins LLP and Dechert LLP, two well-known international law firms that vigorously represented the interests of their clients throughout the Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade the Settling Defendants to settle the case on terms that Plaintiffs' Counsel believe are highly favorable to the Settlement Class.

### 5.    The Requested Fee In Relation To The Settlement

108.    The amount of the fee requested (33.33%) in relation to the Settlement Amount ($29.75 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee Brief § III(C)(1).

### 6.    Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

109.    Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take

33

an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in consideration of the risks undertaken in prosecuting a particular securities class action. Relatedly, it is a long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7.    The Reaction Of The Settlement Class Supports Lead Counsel's Fee Request

110.    As noted above, as of June 19, 2024, 26,929 copies of the Notice have been disseminated advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33.4% of the Settlement Fund. Initial Mailing Decl. ¶ 11 & Ex. A (Notice) at 2, 9. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire*. *Id*. ¶ 13 & Exs. C-D (confirmation of Summary Notice publications). To date, no objections to the maximum potential attorneys' fees request set forth in the Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by July 25, 2024.

### 8.    Lead Plaintiffs Support Their Counsel's Fee Request

111.    As set forth in their respective declarations submitted, Lead Plaintiffs have concluded that their counsel's requested fees are fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 7 (Declaration of Bernard Delattre on behalf of Altimeo (the "Delattre Decl.")) ¶ 13; Ex. 8 (Declaration of Hilary Shane on behalf of ODS (the "Shane Decl.")) ¶ 6. Lead Plaintiffs have been involved throughout this lengthy litigation and the Settlement of the Action, and their endorsement of Lead Counsel's

fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

112.    In sum, Plaintiffs' Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 33.33% of the Settlement Fund, resulting in a multiplier of 2.94, is fair and reasonable, and is supported by the fee awards courts, including this Court, have granted in other comparable cases.

### B.    Payment Of The Requested Litigation Expenses Is Fair And Reasonable

113.    Plaintiffs' Counsel seek a total $662,654.21 in litigation expenses, reasonably and necessarily incurred in connection with commencing, litigating, and settling the claims asserted in the Action.

114.    From the commencement of this Action, Plaintiffs' Counsel understood that they might not recover their litigation expenses.  Accordingly, Plaintiffs' Counsel were motivated to take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the Action.

115.    As set forth in the Fee and Expense Schedules, Plaintiffs' Counsel's Litigation Expenses total $662,654.21.  *See* Exs. 4 and 5.  These expenses are detailed in Plaintiffs' Counsel's declarations, which identify the specific category of expense—*e.g.*, expert and consultant fees, mediation fees, travel costs, online/computer research, and photocopying.  *See* Exs. 4-B and 5-B. As attested to, these expenses are reflected on the books and records maintained by each firm.

These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of counsel's expenses. *See* Exs. 4 ¶ 6; Ex 5 ¶ 6.

116.    The largest component of expenses, $465,361.12 or approximately 70.2% of the total Litigation Expenses, was expended on the fees of Lead Plaintiffs' experts. *See* Ex. 4 ¶5a, Ex. 5 ¶5(f).  As noted above, Plaintiffs' Counsel consulted with experts in the fields of (i) market efficiency, loss causation, and damages, (ii) Chinese and United States mergers & acquisitions and capital markets transactions, and (iii) service of process in the Cayman Islands and China. Plaintiffs' Counsel utilized these experts in connection with preparing the Complaint, serving the foreign Defendants, in preparation for mediation, moving for class certification, and in connection with the development of the proposed Plan of Allocation.  These experts were essential to the prosecution of the Action.

117.    Another large component of expenses, $44,860, or approximately 6.8% of the total expenses, was expended in connection with the mediation session and discussions facilitated by Judge Phillips.  Ex. 4 ¶5a, Ex. 5 ¶5(f).

118.    Plaintiffs' Counsel also incurred expenses totaling $26,778.64, or approximately 4% of the total expenses, on deposition and court reporting costs.  Ex. 4 ¶5e.

119.    The other Litigation Expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in complex international litigation and routinely paid by clients in non-contingent cases.  These Litigation Expenses included, among other things: (i) the use of online research databases to research many of the factual allegations alleged in the complaints and to research and support Lead Plaintiffs' legal arguments; (ii) filing fees; (iii) domestic and international service of process; (iv) translation services; and (v) work-related transportation and meals; (vi) photocopying; and (vii) postage and delivery expenses.

36

120.    All of the Litigation Expenses, which total $662,654.21, were necessary to the successful prosecution and resolution of the claims against Defendants.

121.    To date, no objection has been raised as to expenses.  If any objection to the request for Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

### C.    PSLRA Awards For Lead Plaintiffs

122.    Finally, as stated above, Lead Plaintiffs respectfully request PSLRA awards in the amount of $60,000 for Altimeo and $60,000 for ODS, pursuant to 15 U.S.C. § 78u-4(a)(4), for the reasonable costs directly incurred, including the time and effort expended by Altimeo and ODS in connection with representing the Settlement Class.  *See* Delattre Decl. ¶¶ 4-9, 12; Shane Decl. ¶¶ 4, 9-10.  Lead Counsel respectfully submits that the amounts requested by Lead Plaintiffs are consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

123.    As set forth in its declaration, Lead Plaintiff Altimeo, an institutional asset manager, has been engaged in this Action for more than five years.  Its senior managers have participated in discussions concerning the prosecution of the Action, the strengths and risks of the asserted claims, and potential settlement.  In particular, throughout the course of the Action, Altimeo (a) reviewed the key pleadings and briefing filed in the Action; (b) regularly consulted with Lead Counsel regarding the progress of and strategy for the case; (c) compiled its trading data and completed its certification in connection with its motion to be appointed Co-Lead Plaintiff; (d) participated in extensive discovery efforts and expended substantial effort to collect documents in response to Defendants' document requests leading to the production of over 1,900 documents; (e) prepared for its deposition in connection with Plaintiffs' motion for class certification; (f) conferred with Lead Counsel regarding the mediations and settlement negotiations; (g) and evaluated and

37

approved the proposed Settlement with Defendants and the Plan of Allocation. *See* Delattre Decl. ¶¶ 4-9. These efforts provided a significant benefit to the Settlement Class given the expertise of Altimeo's senior managers and their deep knowledge of the going-private transaction for Qihoo that was at the center of this Action. *Id.*

124.    Altimeo estimates that its senior managers devoted 300 hours total to these tasks. Based on their knowledge and experience as senior finance professionals, their time is worth over $500 per hour, but Altimeo is requesting that it be compensated $60,000 for these efforts, which comes out to a reduced rate of $200 per hour for the time that its senior managers spent on this matter. *See* Delattre Decl. ¶ 12. This was time that they did not spend conducting their usual business activities, which represents a cost to them and Altimeo. *Id.*

125.    As set forth in its declaration, Lead Plaintiff ODS has been committed to pursuing the claims of the Settlement Class since it filed an initial complaint in this Action in January 2019, complying with all of the demands placed upon it throughout the litigation and settlement of the Action. Ms. Shane, the Managing Member of ODS, has an undergraduate degree in economics from Princeton University, and a Ph.D. in finance from The Wharton School, and applied her knowledge and experience to this Action throughout its different stages—from the initial inception of the Action and development of the theory of liability through the development of the Settlement. *See* Shane Decl. ¶¶ 3-4, 9. As attested to, Ms. Shane: (a) provided valuable contributions to the development of the core case theory given her advanced degree in finance and experience with issues concerning mergers and appraisal rights; (b) had regular in-person, telephonic, and written communications with counsel concerning the Action; (c) remained fully informed regarding case developments; (d) carefully read and analyzed all court filings over the span of this five year litigation; (e) closely monitored and participated in all stages of the settlement

38

discussions and documentation, ultimately agreeing to accept the Settlement, subject to the Court's approval; and (f) prepared for, traveled to, and sat for a deposition taken by Defendants. *Id.* ¶¶ 4, 9.

126.    Altogether, Ms. Shane conservatively estimates that she spent more than 75 hours working on this Action.  *Id.* ¶ 10. The time that Ms. Shane dedicated to the litigation and settlement efforts was time that she did not spend conducting the usual business of ODS, which represents a cost to ODS.  *Id.*  Ms. Shane's effective hourly rate exceeds $1,000 per hour.  *Id.*  We are therefore requesting that Lead Plaintiff ODS be compensated in the amount of $60,000, which represents the cost of the time that Ms. Shane devoted to supervising and participating in this Action.  *Id.*

127.    To date, no objections to the Litigation Expenses or compensatory awards for Lead Plaintiffs have been received.  In Lead Counsel's opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

128.    In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable, and adequate, and the proposed Plan of Allocation should be approved as fair and reasonable.  Lead Counsel further submits that the requested fee in the amount of 33.33% ($9,915,675) of the Settlement Fund should be approved as fair and reasonable, the request for payment of $662,654.21 in Litigation Expenses, and Lead Plaintiffs' requests for $60,000 for Altimeo and $60,000 for ODS, pursuant to the PSLRA, should also be approved.

39

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 20th day of June 2024, at New York, New York.

*/s/ Michael Grunfeld*
MICHAEL GRUNFELD

40