O81AAltH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ALTIMEO ASSET MANAGEMENT & ODS
CAPITAL LLC,

                    Plaintiff,

              v.                         19 Civ. 10067 (PAE)

QIHOO 360 TECHNOLOGY, ET AL.,
                                         Hearing

                    Defendant.

------------------------------x
                                         New York, N.Y.
                                         August 1, 2024
                                         2:35 p.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                         District Judge

                              APPEARANCES

POMERANTZ LLP
     Attorneys for Plaintiff
BY:  MICHAEL GRUNFELD
     -and-
LABATON KELLER SUCHAROW LLP
     Attorneys for Plaintiff
BY:  JAKE BISSELL-LINSK


LATHAM & WATKINS LLP
     Attorneys for Defendant
BY:  HANYU XIE

O81AAltH

(Case called)

MR. GRUNFELD:  Michael Grunfeld from Pomerantz on behalf of the plaintiffs Altimeo Asset Management, ODS Capital, and the proposed settlement class.  Good afternoon, your Honor.

THE COURT:  Good afternoon, Mr. Grunfeld.

MR. BISSELL-LINSK:  Jake Bissell-Linsk from Labaton, and Mike will be presenting for the plaintiffs.

THE COURT:  Very good.  Good afternoon, Mr. Bissell-Linsk.  You may be seated.

And who do I have from the defense?

MS. XIE:  Good afternoon, your Honor.  Iris Xie from Latham on behalf of the defendants Qihoo 360 Technology, Mr. Zhou, and Mr. Eric Chen.

THE COURT:  Very good.  Good afternoon to you.  You may all be seated.

MS. XIE:  Thank you.

THE COURT:  We're here for the class settlement approval hearing.  To begin with, I want to thank really plaintiffs' counsel for very thorough, excellent, detailed submissions that really covered all the angles here and made my process of assessing the issues here considerably easier.  It's a really professional and sharp job, and I'm grateful to you for it.

I have a number of questions in the nature, though, more of housekeeping and somewhat less relating to the

O81AAltH

fundamentals.  I was assisted here by the fact that counsel, after you filed the preliminary approval papers and after I identified by order questions for you, you gave me very thoughtful answers to what struck me as the more consequential questions.  And having gotten those answers, I'm left with only a small bore questions for you now.

So let me begin.  To begin with, I'm going to make a record that there are no objectors here.  Indeed, there's nobody here.  So, for the record, I noted from the filings that there had not been any objectors, but it's also the case that I've had class action fairness hearings at which, notwithstanding the deadline having passed for objectors, people show up.  The courtroom, aside from my staff, is empty.

And counsel have also represented that nobody sought to opt out.  Am I correct that that remains the case, that you have not been communicated as of now by anybody an intention, timely or not, to object or opt out?

MR. GRUNFELD:  That's right, your Honor.

THE COURT:  Very good.  Let me then pursue that subject a little farther.

From the point at which any notice was given of a potential settlement, did you have any communications with any punitive member of the settlement class?  Did anyone even reach out with questions?

MR. GRUNFELD:  Your Honor, we've received several

O81AAltH

e-mails from claimants with just questions about their claims that either included the claims administrator on the correspondence, or that we passed along to the claims administrator, those were along the lines of technical questions about how they can file their claim. Nothing substantive about the settlement.

THE COURT: About how many people even fell into that category?

MR. GRUNFELD: I don't have the figures off the top of my head, but I would estimate between five and ten, and then separate from that, the claims administrator has been receiving claims in the ordinary course.

THE COURT: To your knowledge, either communications with the plaintiff's counsel or the claims administrator, were there any communications that went beyond the administrative and the technical?

MR. GRUNFELD: No, not that I know of, your Honor.

THE COURT: Is there any reason, even secondhand, to impute to any member of the settlement class any stated concerns about the settlement here?

MR. GRUNFELD: Plaintiffs' counsel have not heard of any concerns about the settlement.

THE COURT: Let me turn to defense counsel.

MS. XIE: Yes, your Honor.

THE COURT: Same questions, and I'll ask you to move

O81AAltH

the microphone close.  Yeah.

Have you had any contact with members of the settlement class?

MS. XIE:  We have not, your Honor.

THE COURT:  Nobody has reached out to you at all?

MS. XIE:  No one has.

THE COURT:  And secondhand, any basis for intuiting any skepticism, questions, anything by any member of the settlement class?

MS. XIE:  We have not received any.

THE COURT:  Okay.  All right.  Very good.

Let me come back to plaintiffs' counsel.  I'm eager to understand a little more about the class.  In the case in which you have a Fortune 500 issue or whatnot, some assumptions can be made about who constitutes the class.  And it will usually be big pension funds that own index funds or things of that nature, or other people who own index funds.  This is a somewhat quirky security.  It's ADS as opposed to the dominant security, where here those are traded on a foreign exchange. Who are in general the sorts of people who own these ADSs?

MR. GRUNFELD:  I don't know specifically, your Honor, because we don't have that information.  But from the limited information that I do know, I know the lead plaintiffs in this case are institutional investors.  I believe that the -- some of the queries we got that I referenced earlier were from

individual retail investors.  The only other information that I could add to that is that I would think that the securities here would fall somewhere in between what your Honor was referencing, because Qihoo was a multibillion dollar market cap company, so it's not like it was an unknown company.  But also, because the case arose out of the going private transaction, there's also specific cadre of investors that will often buy securities of companies that are specifically subject to pending mergers.  So my assumption would be investors that look to securities in that context would also be a large part of the class here.

THE COURT:  Help me with that latter point just because I'm not sure I'm fully understanding.  What's the niche that such a person is in?  In other words, it's somebody who was buying precisely because there's an announcement of a take private coming?

MR. GRUNFELD:  Right, and that's right, your Honor.  And also that was actually part of the claims here because the theory of loss causation that was upheld for the seller class here was specifically that the alleged misrepresentations were alleged to have misrepresented the public about the likelihood of the merger closing.  And had the public known the true likelihood, there would have been a narrower spread between the trading price and the merger price.  So it's investors that are looking to capitalize on that spread will often be involved in

O81AAltH

these types of securities.

THE COURT:  But the people who are buying in the short term while the tender offer is out there, in other words, this is a particular class of people that's really buying not because of a long term belief in the company so much as a strategic sense that there's opportunity here perhaps because the price -- the merger will go through and I'll make the quick delta, that sort of thing.

MR. GRUNFELD:  It could be both, your Honor, because there's also a chance that if the company -- this is true for Qihoo, but more generally, if a company is grossly undervalued and a merger -- could be that the merger will fail and then the price could go towards the fair value outside of the merger context.

THE COURT:  Right.  Right.  Right.  Okay.  That's very interesting.  But do you have an understanding of whether independent of people who are last minute buyers, that the tracking stock, the ADS, was part of mutual funds?  Is there some -- because it's an ADS, it's not clear to me whether there's an index fund dimension that would lead people to have a stake in this or whether you would have to be in effect buying it on an individualized basis.

MR. GRUNFELD:  I'm not aware of any index funds that the stock was a part of.

THE COURT:  Got it.  So related question to all that,

O81AAltH

which was the $10 cut off.  Under the distribution plan, my understanding is that if I'm a member of the class, but my aggregate damages, putting together my damages as a seller shareholder or a tenderer shareholder, if it all rolls up together and I'm entitled to less than $10, that wouldn't be paid to me, correct?

MR. GRUNFELD:  That's right, your Honor.  And that's a standard provision in these types of settlements, and it's partly because of the administrative costs associated with the settlement make it not so feasible to pay claims of that de minimis size, so those funds can instead go to shareholders that have more significant claims.

THE COURT:  Right.  Right.  I mean, you're skipping the mailing and the production apparatus and all that. Understood.

The question is I'm trying to figure out whether given what's known about the investor class here, the members of the class, whether that is likely to knock out a lot of people.  Is this the sort of stock where, to your knowledge, there are people, a lot of people out there, who have tiny holdings such that the $10 threshold is going to exclude a number of people from any recovery?

MR. GRUNFELD:  I don't know, your Honor.  But I would suspect that while I'm sure there will be some people that would have claims whose value comes under $10, there will be

many claimants for whom that will not be the case. Particularly because the settlement includes shareholders that could trade the stock multiple times over the class period. And so there's the opportunity for the same claimant to have many trades within the class period.

One other detail to add is that while the claims process is still ongoing, is we don't have final claims data yet. From what we know from the claims administrator, there's roughly 850 claims so far with a very large number of shares, which suggests that the settlement fund is very likely, if not even higher probability, to be exhausted by the claims, but that it will also be spread out over --

THE COURT: Right.

MR. GRUNFELD: -- a number of claims that will come to over $10 per claim.

THE COURT: In other words, what you're saying to me is we're not really at risk here of failing to use up the settlement fund?

MR. GRUNFELD: I think that's extremely unlikely.

THE COURT: Yeah. I assumed as much given the 2.5 percent payout. I mean, that seemed to me highly unlikely that with a number of large claims you would get there in a hurry.

Where I'm going is I'm just trying to figure out what the profile would be of somebody who was excluded on account of

O81AAltH

the $10 cut off.

Take, for example, a tenderer shareholder.  You know, the gap between the trading price and the tender price is not that large, but it's not nothing.  I assume if you so much as had three or four shares, by definition, you would clear the $10 cutoff, right?

MR. GRUNFELD:  That's right.  And we defined the damages for the tenderer shareholders as not based on the trading price, but based on what under the theory of the tenderer shareholders --

THE COURT:  Right.

MR. GRUNFELD:  -- was the fair value, which was multiple times the tender price.

THE COURT:  Right, but if the seller shareholders were per share, it would be somewhat less.

MR. GRUNFELD:  That's right.  But if a seller shareholder sold a lot of shares, then that would all aggregate.

THE COURT:  Right.  So with the seller shareholders, is it safe to say as long as you had three, four, five shares, you are almost certainly clearing the $10 stated value of your claim, even if your claimant, and point of fact, given the pro rata mechanism, will turn out to be worth less?

MR. GRUNFELD:  That's right, your Honor.

THE COURT:  So the $10 captures the stated value of

O81AAltH

your claim, not what the payout would be after the pro rata exercise?

MR. GRUNFELD:  Oh, I misunderstood.  I would need to look to be sure.  But I think that the $10 refers to the amount that will actually --

THE COURT:  Be paid.

MR. GRUNFELD:  Be paid out.  So you're right that it will depend on the pro rata share.

THE COURT:  So if in theory, you know, the number of claims that were put in was five times the value of the net settlement fund for that class of shares, you would more or less have to have a stated claim worth $50 to get a payout?

MR. GRUNFELD:  That's right, your Honor.

THE COURT:  But even as to that, you're not really excluding people with a terribly consequential holding because, even for the seller shareholders, you probably need -- what's the delta?  It's in the 70s to $80 you're talking about. Seven, ten shares and you're going to get your stated payout up to 50, right?

MR. GRUNFELD:  That's right.

THE COURT:  Very helpful.  Let me make sure I just understand the non-reversionary mechanism here.  That was obviously welcome to -- I'll just say it's always important to have a non-reversionary settlement to make sure that the defense is really paying what they claim to be paying.

O81AAltH

Just walk me through mechanically the sequence of events that will play out with the different branches of the decision tree in terms of a second round of distribution.  Just walk me through from start to finish how that works.

MR. GRUNFELD:  Well, the initial distribution should cover the -- should really exhaust the claims.  The second round of the distribution generally comes into play if there's a certain amount left over after the initial distribution, because, for example, rounding on the pro rata basis, so there's a certain amount of funds left.  And then the claims administrator will look and see is that amount of funds left enough to do a second distribution.  And this is because --

THE COURT:  Is it -- I thought it was more because people don't cash their checks?

MR. GRUNFELD:  That's another possibility.

THE COURT:  But putting that aside, where that would be an obvious explanation for a potential need for a second round, what's the scenario other than that where there's a potential second round?

MR. GRUNFELD:  So what I had in mind is that the claims are paid on a pro rata basis, and so it's possible that in that pro rata calculation, because it's done to be equal among similarly situated class members, there could be some amount of funds left over that -- what wasn't possible to distribute evenly to the class members.  Although that does --

O81AAltH

THE COURT:  I don't understand that.  I thought before you would be paying even the first part out, you would be trying to -- understanding the 75 and 25 percent allocations to the respective subclasses, I would have thought that you would have been fine tuning the proportionate payout to the relationship of claims made to funds available.  And so if everyone cashed their check, you would be within small number of dollars of the full amount to be paid.

MR. GRUNFELD:  I think that's actually right, your Honor.  I think, I mean, in my experience from other settlements, when there's funds left in the settlement account after the initial distribution, it is such a small amount that it doesn't actually make sense to do a second distribution.

So I think what you're describing is correct and that the more likely scenario of there being a significant amount of funds would be if claimants do not cash their checks.

THE COURT:  Is there any difference in the likelihood, as you see it, that the seller shareholders as opposed to the tenderer shareholders will not make claims or not make substantial enough claims to reach the stated amount for that class?  The amount of money set aside for that class.

MR. GRUNFELD:  I would expect that both will exhaust the portion of the settlement funds that are allocated to them, because on the one hand there are fewer shares eligible for the tenderer shareholder class because it's limited to each share

O81AAltH

that was tendered one time.  Whereas, for the seller shareholders, it's multiple times that number of shares that could have been traded over the course of the class period.

But on the other -- on the flip side, you have a smaller amount of funds allocated to the tenderer shareholders. So while it's a smaller class side, it's also a smaller amount of funds that is being allocated to them.

THE COURT:  In other words, just predictively, would you assume that either subclass would be more likely to be incented to participate?

MR. GRUNFELD:  I don't think -- I don't have any reason to think that would be the case.  And the lead plaintiffs are a good example of that because both lead plaintiffs are part of both subclasses.  So I don't have any reason to think that there's a large number of investors that are part of one, but not the other subclass.

THE COURT:  So that led me to this question:  Why would a rational investor be part of both classes?  Wouldn't, once you're in that chute where you're in the period where the tender offer is out there, wouldn't a rational investor make a call himself or herself as to which the more economically sensible call is, tenderer or not?  Why would an investor do some of each?

MR. GRUNFELD:  I can't say for sure, your Honor.  But one factor to consider is as you get closer to the time of the

O81AAltH

merger closing, it becomes more likely that it will close, and so there's less uncertainty involved in continuing to hold the shares through the closing.  And so it could be that earlier in time, you might say I don't know what's going to happen here, I want to sell my shares.  And as you get later on, you say oh, it's just a week until it closes, I'll capture that even if it's a minimal spread between now and the closing.

THE COURT:  Got it.  Coming back to the allocation. You had said to me that you've already gotten a number of applications, a number of people have put in for their recovery.  Is that usual that that happens before the approval hearing?

MR. GRUNFELD:  Yes.  So from talking to the claims administrator here and also from experience in other cases, claimants put in claims because if they want to recover from the settlement, then they might not want to wait until the last minute.  It's obviously dependent on whether the settlement is granted final approval.  But it's also the claims administrator's experience and my experience as well that a disproportionate number of claims will come in very close to or at the deadline for claims filing.

THE COURT:  Which is when again?

MR. GRUNFELD:  August 8, a week from today.

THE COURT:  Okay.  All right.  And are you already at the level where the claims made exceed the net settlement value

O81AAltH

for -- or even the gross settlement value for each of the two subclasses?

MR. GRUNFELD:  We don't know that because the claims administrator still needs to run the formula, which they don't typically do until after all claims are in.  But based on what they have told us about the number of shares that are covered by the claims that have come in already, which is I think they said several hundred million shares are covered by the claims, that would suggest that it will be exhausted and that number will go up as we get closer to the deadline.

THE COURT:  That sure does.  In the improbable event that money were left over, because there weren't enough claims or not enough people cashed their checks or there's a small amount of money left over where it doesn't pay for the postage, it was going to go to a side priority organization.  Just briefly tell me about that organization.

MR. GRUNFELD:  I want to check to make sure I'm getting the name right, but I believe it's the -- I want to check to make sure.

THE COURT:  Take your time.

MR. GRUNFELD:  Your Honor, I'm having trouble finding it in the papers and I don't remember the specific name, but I do know that it's consumer protection organization that we've referenced in prior settlements and that has been approved by courts in the past.

O81AAltH

THE COURT:  Very good.  Are all the individual defendants covered by the settlement?  At some point, and forgive me, this is just a lapse of my memory, somebody hadn't been served at some point.  I just want to make sure that I understand the coverage here.

MR. GRUNFELD:  That's -- yes, your Honor.  So defendant Qi was -- did not appear in the case and so was not represented.  And so in the settlement papers, we differentiated into fine terms between defendants and settling defendants.  So the settling defendants are the defendants other than defendant Qi because he wasn't represented by defense counsel, but the settlement does release him from claims, so there wouldn't be any further litigation against him either.

THE COURT:  Is he contributing to the settlement fund?

MR. GRUNFELD:  He's not, as far as I know, but also, as far as I know, the settlement fund is on behalf of all defendants.  I don't know specifically which defendant of the settling defendants are contributing to it.

THE COURT:  Right.  I mean, I guess the question would be he didn't appear, didn't participate in the litigation, that doesn't prevent him from settling.  But, to your knowledge, he's not a party to the settlement agreement but is a beneficiary of it in getting the claims against him dismissed with prejudice.  How does that happen?  Just curious.

O81AAltH

MR. GRUNFELD:  Well, as a practical matter, my sense is that the settlement is a contract and the settlement class has the power to release certain claims.  And the claims against him are certainly a core part of the case.  And so it would be within the power of the settlement class --

THE COURT:  Oh, no question.  The question is from your perspective why you're giving him something from arguably nothing.

MR. GRUNFELD:  Right.  So I was going to get to that as well.  Which is that I do know that this was specifically negotiated for in the settlement, I remember in the mediation and the subsequent correspondence, it was discussed with defense counsel about whether or not he would be included.  And when we -- plaintiffs' counsel determined that the settlement amount was fair and reasonable, it was specifically accounting for the fact that he would be included in the settlement.

THE COURT:  Got it.  In other words, from your perspective, at least it's possible that had he not been included, defendants would have offered marginally less money?

MR. GRUNFELD:  I think it's likely that had he not been included, the difference would have been more than marginal.  And it's very likely the settlement wouldn't have happened at all had plaintiffs insisted on him not being included in the settlement.

THE COURT:  Right.  In other words, the defendants'

O81AAltH

goal here, much as they had an interest in including the tenderer shareholders, is just to get maximal piece.

MR. GRUNFELD:  That's right, your Honor.  And I mean, I can only speculate as to this.  But I would imagine that the individual defendants that were in the case have some level of personal relationship with defendant Qi, and so it was in their interest to have the case against him resolved as well.  And I also don't think that the claims against him were any stronger than were the claims against defendant Zhou, who was the CEO of the company and the leader of the buyer group.

THE COURT:  How often is it, just in your experience, that a settlement runs to the benefit of a named but non-appearing defendant?

MR. GRUNFELD:  I don't think I've experienced it before, but it does strike me as something that would occur more in the context of dealing with foreign defendants where it's easier for them to evade appearing in the case.

THE COURT:  Right. Okay. Very interesting.  Very helpful.  Let me ask defense counsel a few questions.

MS. XIE:  Yes, your Honor.

THE COURT:  First of all, thank you.

MR. GRUNFELD:  Thank you, your Honor.

THE COURT:  Starting where we left off, anything you want to add by way of explanation of defendant Qi?  And forgive me for not pronouncing it the same as plaintiffs did, but I'm

O81AAltH

using the phonetic as it presents to me.

Any incite as to why he didn't appear but wants the benefit of the settlement?  How does that all come to pass?

MS. XIE:  Yes, your Honor.  Happy to address that.  So first off, to our knowledge, Mr. Qi did not contribute to the settlement fund.  It entirely came from our clients, so the company, Mr. Zhou, and Mr. Chen.  And from our client's perspective, it's exactly as your Honor described, our clients are willing and prepared to enter into the settlement for finality and closure.  So they would like that this entire lawsuit and claims against this company arising from the events described in the complaint would be settled once and for all.

THE COURT:  But, look, one way to look at it is all the other defendants were served, appeared, put themselves at risk for going to be deposed if it had come to pass.  And this other defendant doesn't participate and now gets to free ride.  It may have no bearing on any relevant factor for me, but it's hard not to alert to that as odd.

Why are the other defendants willing to, in effect, underwrite immunizing the defendant who didn't participate in the defense expose himself?

MS. XIE:  Of course.  Sure, your Honor.  I think from our clients' perspective, again, they would prefer closure and finality.  And to the extent that the lawsuit proceeds, even after the settlement with them, and proceeds against Mr. Qi,

O81AAltH

the allegations in the complaint would be still subject to discovery and further dispute, and the company could become a third party in future discovery efforts.  And the company would like to shield itself from all that.

THE COURT:  I see.  In other words, even if the company had been dismissed with prejudice, that wouldn't spare it the transaction costs of the ongoing litigation?

MS. XIE:  Yes, your Honor.

THE COURT:  Okay.  Is Mr. Qi still associated with the company?

MS. XIE:  He is not anymore.  And to our knowledge, the company is not in contact with him.

THE COURT:  Well, I mean, for him I guess I would say nice work if you can get it, but I think I'd understand why the company might do that.  It is anomalous.  Is this, in your experience, have you seen this fact pattern before?

MS. XIE:  I personally have not.  But I understand that in our colleague's experience there are settlements that involved parties, individual defendants in particular, that have not appeared in the case.

THE COURT:  Okay.

MS. XIE:  In global settlements.

THE COURT:  From the defense perspective, the tenderer shareholders were out and the seller shareholders, although surviving, had a host of hurdles to clear here before actually

O81AAltH

getting money in their pockets.  Why did you settle?

MS. XIE:  Yes, your Honor.  It is certainly our position still that defendants would have strong arguments to dismiss, to seek the dismissal of the remaining claims brought on behalf of the sellers.  And still, there would be a long road towards summary judgment.  There would be class certification, discovery, expert discovery, and all that.  And I believe plaintiff has also indicated their intention to seek an appeal of the already dismissed claims.

THE COURT:  Though they could not appeal until the litigation as to the seller shareholders had run its course.

MS. XIE:  That's exactly right.  But from our clients' perspective, they would prefer finality and closure.  The litigation has already been ongoing for over five years and they are at a point where they're willing to reach into a settlement and resolve this lawsuit.

THE COURT:  Is that because the transaction costs of the litigation looking forward were so high that it potentially would have approached the amount of the settlement?

MS. XIE:  That's a good question, your Honor.  I would like to think further about that and couldn't speak definitively in terms of putting a monetary value to it.  But litigation certainly has been costly and burdensome from the company's perspective.  And not just limited to monetary value, but also reputational risk associated with a foreign company.

O81AAltH

And also potentially foreign discovery where the vast majority of the witnesses and documents would be located in China, it would also impose a burden on the company moving forward in terms of its ongoing business.  So I believe that's also a major consideration in our clients' --

THE COURT:  How much document discovery did you do? How much documents did you produce to the plaintiffs?

MS. XIE:  Your Honor, I do not have the number offhandedly, but if it would be helpful, we would be happy to disclose to the Court.

THE COURT:  No, no, I'm trying to just for the purpose of this discussion.  My understanding has been that there had been document demands made, and that the plaintiffs produced a couple thousand pages.  But I did not get a sense and I couldn't find anywhere in the papers the suggestion that the corporate defendant made much of a production.  That essentially the settlement occurred early in the process of talking about discovery parameters and, therefore, even written discovery, there wasn't much that went from the defense to the plaintiffs; is that accurate?

MS. XIE:  I believe that is accurate, your Honor.  I would need to check my record, but that was exactly right. When we settled it was at the beginning of discovery period. Defendants were certainly in the process -- I believe we were still in the process of meeting and conferring with plaintiffs

O81AAltH

on the discovery requests and are getting -- were getting ready to produce documents.

THE COURT:  So then thinking about transaction costs for you, assuming there hadn't been a settlement, describe for me what the burdens would have been like for your client in particular, the institutional client, both as to document and deposition discovery and expert discovery.

MS. XIE:  Yes, of course.  From the corporate defendant's perspective, it would involve search, locate, search, and reveal documents associated with the transactions and the events described in the complaint.  Our understanding is that the vast majority of that documents are stored in the company's server physically located in China and the key witnesses are all located in China.  So making them available for potential depositions and discovery efforts would be quite burdensome on the company.

THE COURT:  Were you in a position to estimate, even at a ballpark level, the volume of outgoing documents you would have had to produce making reasonable assumptions about how meeting and conferring would have ended?

MS. XIE:  Yes, I would estimate in the volume of hundreds of thousands of pages at the very least.

THE COURT:  And as to depositions, ballpark, do you have a sense of how many percipient witnesses there were from within the company or its affiliates that would have had some

O81AAltH

hand in the events that were being said by the plaintiffs to be important here?

MS. XIE:  Yes, your Honor.  To start, there would be the individual defendants who are a party to the litigation and would have to produce testimony, and then there are also the rest of the board and potentially other employees and officers and executives were involved in the negotiation of the process of the merger.

THE COURT:  So, what?  15 or 20 potential depositions; is that a fair ballpark to assume?

MS. XIE:  Yes, your Honor.  I believe that's a fair estimate.

THE COURT:  All right.  The plaintiffs are seeking a one-third fee here.  Did the defendants negotiate about that?

MS. XIE:  Your Honor, we did not, and our clients do not take a position on the plaintiffs' counsel's request for fee.

THE COURT:  Do you ever pay out -- are you aware of cases where more than a third in securities class actions gets paid as a fee?

MS. XIE:  Your Honor, I personally am not aware of any such examples, but I will confess that I have limited experience in securities litigation settlements.

THE COURT:  Fair enough.  So the defense outline doesn't take a position on what the reasonable fee percentage

O81AAltH

is?

MS. XIE:  That's right, your Honor.

THE COURT:  Why not?

MS. XIE:  We believe that is an issue within plaintiffs and plaintiffs' counsel purview and it doesn't -- it isn't a concern or consideration from defendants' side in entering into the settlement.

THE COURT:  But understand the problem with defense saying we don't care is that it means that on that aspect of the analysis here the Court has no benefit of the adversary system.  I have to rely on my review of the case law and my, by now, considerable experience doing this, my prior experience in private practice.  But at the end of the day, the adversary system, which is usually the best gauge, breaks down in this area because -- and you're not the first and won't be the last -- defense counsel at this point chooses to say all we care about is the bottom line, how it gets carved up as between the lawyers and the clients, we don't care about.

But it deprives the Court of the considerable insight that the defendants might have.

MS. XIE:  I appreciate that, your Honor.  Thank you.  Like your Honor described, my understanding is that it is very typical and a common position for defense counsel to take in class action settlements.  And one consideration that may be relevant is that even without the benefit of the adversarial

O81AAltH

system, I believe that plaintiffs or members of the class could have potentially advised the Court of their position in terms of a share of the entire settlement fund as to be attributed to plaintiffs' counsel.

THE COURT:  In your experience, have you ever seen a named plaintiff fight before a Court with the lawyer as to the percentage that the lawyer would get from the fund?

MS. XIE:  I have not, your Honor.

THE COURT:  Nor have I.  And they are the last people who might, in part because the lawyer is endorsed sometimes a hefty named plaintiff fee for them.

The point is, structurally here, we have a breakdown in the adversary system as to this discrete issue.  There is nobody here who, in reality, is incented to get up and say that's too much.  Now, you might get objectors.  Once in a blue moon, you do.  I've had it.

MR. GRUNFELD:  Your Honor, if I could speak to that one.

THE COURT:  Yeah, when I'm done with the defense counsel.  But, look, I'm making the point.  I certainly agree with you that defense counsel never seems to fight this issue. But it basically means that, but for the happenstance of an objector, somebody who wants to take the time to scrap about this, we never get that even when the request is clearly excessive.  It just doesn't happen.  And I'm just putting the

O81AAltH

word out there, as one lonely District Judge, that that's a regrettable feature of practice in this area.  That I've got an excellent set of lawyers at both tables, but on this one issue, the defense takes the view I don't want to rock the boat.  I don't want to annoy plaintiffs' counsel.  It's easier to get to yes.  I'm not going to address that issue.

But it leaves the Court with what amounts to a one-party presentation.  And even, frankly, an objection by a lone objector or two is very rare.  And I've been at this now on the bench for 13 years.  It's very rare that that objection, beyond claiming greed by the lawyers, is going to have a nuanced approach that canvasses like cases or anything like that.

The practical effective, although this is the adversary system, is ill-matched to this particular determination.  So I'm putting that out there so that next time your firm is before me or before a colleague, you'll remember that a judge would have preferred that defense counsel make that argument.

So with that, I'm directing you, what's the argument you would make, if you had to, as to why the fee here should be something other than one-third?

MS. XIE:  Yes, your Honor.  First of all, thank you for the observation and the comments, which we will certainly take into consideration and appreciate and incorporate into our

O81AAltH

future practice.

THE COURT:  Are you prepared to just articulate as a thoughtful counsel why what amounts to -- one-third is generally the maximalist fee.  It's not literally so.  But we've all been doing this for a while.  And, in practice, that is in general what the recovery tops out at, save the very rare case.

Is there an argument in this case why the fee should be something less?

MS. XIE:  Your Honor, I would like to answer that question more thoughtfully and perhaps with a benefit and with the Court's permission if it would be helpful, we're happy to put in a written submission.

THE COURT:  No.  I'm resolving this today.

MS. XIE:  Yes, standing here today, and just thinking based on the facts and circumstances that I know, it does appear to me that this distribution seemed fair, and it would be difficult to make an argument to say that it's excessive given how long this litigation has been ongoing and the complexity of the issues and the --

THE COURT:  I'm sorry.  You're telling me it would be difficult to come up with an argument, or you're choosing not to make one?  You're having difficulty coming up with an argument -- if you were in law school and I said make the argument, would you really say it's difficult to come up with

O81AAltH

one?

MS. XIE:  No.  Sorry, your Honor.  No.  I am simply trying to assess the facts based on what I know in terms of a fee and argument for the amount of the fee that is sought here.

And also, due to the fact that I do have limited experience in settlement in class securities, class actions.  But as your Honor described, a 30 percent seems to be the upper boundary of the permissible legal fees in the settlement agreements and tend to be rare.  But this case does seem to fall on a spectrum of more complex and sophisticated argument and issues here, including novel legal issues here.

THE COURT:  Okay.  Thank you.

MS. XIE:  Thank you, your Honor.

THE COURT:  Mr. Grunfeld, you wanted to say something?

MR. GRUNFELD:  Yes.  Thank you, your Honor.  I just wanted to point out that there are in fact several avenues where objections to fees can be made.  As your Honor noted, a class member can file an objection, and that does happen occasionally.

THE COURT:  But, as you know, the pro se objection by the class member plaintiff tends to be considerably less tutored than one that I may have gotten from Latham and Watkins.

MR. GRUNFELD:  They're not always pro se.  I've seen fee objections that are represented by purportedly public

O81AAltH

interest organizations.

THE COURT:  Yeah.

MR. GRUNFELD:  That take interest in these types of things.  And I also wanted to add that what you don't see on the docket, a named plaintiff disputing the fee request, that's because plaintiffs' counsel, myself and my colleague, discussed with our clients, the lead plaintiffs, before we make the fee application.

And so we don't always request a third.  And sometimes when requests are made for less than a third, that's as a result of input from the lead plaintiffs.  So we do think that the fee request here is particularly appropriate based on the complexity of the case and the work and the results.

THE COURT:  Have you, in your considerable experience, had a case where in the settlement posture the defense disputes before the Court the fee request by plaintiffs' counsel?

MR. GRUNFELD:  I have had that, your Honor.

THE COURT:  What's the posture that tends to produce that?

MR. GRUNFELD:  I had a recent case that was in the Eastern District of New York that was a class action and it settled pretty far along in the case after class certification, towards the end of merits discovery.  And it seemed like it was either the defense counsel or the defendant wanting to take a principled position of what they thought fees should be.  It

O81AAltH

wasn't necessarily specific to that -- the details of that case.

THE COURT:  But, I mean, is it because in effect the parties had been at striking blows for a while and there was some holdover from that that led defense counsel to fight you on fees or something else?  I'm just trying to understand what the structural features would be that would bring a defense lawyer, get them to stand up and say, no, that's too much.

MR. GRUNFELD:  So all I know for a fact is the arguments that defense counsel made in that case.  And I believe in that case, we requested a third, and defense counsel was arguing for something -- I don't remember the specific number, but it was a small reduction that they were arguing for.  And if I remember correctly, I think that the defendant in that case had made similar arguments in other cases.  So my sense was this was sort of the position of the defendant in that case to argue against.

THE COURT:  In other words, the defendant, as opposed to defense counsel, had a longer term view of the matter?

MR. GRUNFELD:  That's right, your Honor.

THE COURT:  All right.  Very helpful.

Anything further from you?

MR. GRUNFELD:  No, your Honor.

THE COURT:  Anything further from the defense?

MS. XIE:  No, your Honor.  Thank you.

O81AAltH

THE COURT:  All right.  I have a bench ruling.  This will take a little while.

This is a securities class action brought under the Securities Exchange Act of 1934.  The lead plaintiffs are Altimeo Asset Management and ODS Capital LLC.  This lawsuit was filed in 2019 against internet company Qihoo 360 Technology Co. Ltd., and three executives, Hongyi Zhou, Eric X. Chen, and Xiangdong Qi, to whom I will refer collectively as the "individual defendants."  Plaintiffs brought claims against all defendants under Section 10(b) of the Exchange Act and the SEC'S implementing Rule 10b-5.  They also brought claims against the individual defendants under Section 20(a) for control person liability and under Section 20A for insider trading.

In essence, plaintiffs contend that the defendants schemed to depress the trading of Qihoo's stock.  That stock included, as relevant in this U.S. lawsuit, American Depository Shares, or ADSs, which traded on a domestic change.  Defendants did so, plaintiffs allege, to induce Qihoo shareholders to agree to pay an unfairly low price when the defendants took the company private in 2016 in a transaction I will call the "Go-Private Merger" or the "Merger."  Plaintiffs allege that the scheme involved making materially false and misleading statements tending to depress the price of Qihoo shares.  Most centrally, defendants are alleged to have concealed a plan to

relist Qihoo on another stock exchange after completion of the Merger.  Defendants are also alleged to have dissembled about the fairness of the Merger terms, the reasons for the Merger, and strategic alternatives to it.

This case has a substantial history.  In 2020, this Court granted Qihoo's motion to dismiss; in 2021, the Second Circuit reinstated a portion of plaintiffs' claims, relating to the theory of a concealed plaintiff to relist; and in 2023, this Court, on Zhou's motion to dismiss, sustained the claims of so-called Seller Shareholders while dismissing the claims of so-called Tenderer Shareholders based on an inability to non-speculatively establish loss causation.  After those rulings, the parties agreed to a proposed class settlement. The Court, after posing and receiving responses to factual questions about the allocation and tabulation of the settlement, preliminarily approved it and scheduled today's hearing.  This bench ruling resolves plaintiffs' motion to approve the proposed settlement, see Dkt. 229, and their motion for an award of fees and costs to counsel and service fees for the lead plaintiffs, see Dkt. 231.

I will not be issuing a written decision.  Instead, I will issue a bottom-line order reflecting the fact that the motions were resolved, substantially for the reasons set forth on the record today.  And, of course, I will issue the orders substantively providing for the relief at issue.  So, if the

O81AAltH

content of what I say is important to you, you will need to order the transcript of this conference.

I will begin with a motion to approve the proposed class settlement.

I'll begin by reviewing the proposed settlement.  It would resolve all claims.  The gross settlement amount is $29.75 million plus accruing interest, minus attorneys' fees, expenses, service fees to the lead plaintiffs, notice and administration expenses, and taxes on interest.

The $29.75 million settlement fund would be broken into two sub-funds.  Sub-Fund 1 allocates 75 percent of the net settlement fund to the Seller Shareholders — the shareholders who sold Qihoo shares before the Go-Private Merger closed. Sub-Fund 2 allocates the remaining 25 percent to Tenderer Shareholders — shareholders that tendered, canceled or exchanged shares in the Go-Private Merger.  The differential allocation reflects factors including the fact that the Court had dismissed claims of the tenderer shareholders.

The claims administrator will determine each authorized claimant's share of the net settlement fund based upon the following allocation formulas.

For Sub-Fund 1, the claims administrator will calculate a "seller loss amount" for each Qihoo ADS or Class A ordinary share sold during the class period that a claimant lists in a submitted "proof of clam" form and for which

O81AAltH

adequate documentation is submitted.  The seller loss amount for ADSs will be calculated as the Merger consideration price of $77 per ADS minus the price at which the claimant's ADS was sold.  The seller loss amount for Class A ordinary shares will be calculated as the Merger consideration price of $51.33 per Class A ordinary share minus the price at which the claimant's share was sold.  A claimant's seller loss amount will then be aggregated in a figure called the claimant's "recognized seller claim."  The claims administrator will allocate to each claimant a *pro rata* share of sub-fund 1 based on the proportion of the claimant's recognized seller claim to the total recognized seller claims for all authorized claimants.

For Sub-Fund 2, much the same, the claims administrator will calculate a "Merger Consideration Amount" for each Qihoo ADS or Class A ordinary share tendered, canceled, or exchanged in the merger that a claimant lists in a submitted proof of claim form, again, subject to adequate documentation.  The Merger Consideration amounts to $385 per ADS, and $265.65 per Class A ordinary share.  A claimant's Merger Consideration Amount will similarly be aggregated in a figure called the claimant's "Recognized Merger Claim."  The claims administrator will allocate to each claimant a *pro rata* share of Sub-Fund 2 based on the proportion of the claimant's Recognized Seller Claim to the total Recognized Seller Claims for all authorized claimants.

A claimant's *pro rata* share of each Sub-Fund will be combined to determine the claimant's total distribution amount. No distribution will be made to a claimant who would receive less than $10.  If the settlement fund is sufficient to pay 100 percent of the Recognized Seller Claims in Sub-Fund 1, any excess amount will be applied proportionally to claims in Sub-Fund 2 and vice versa.  If there's any remaining balance in the Settlement Fund after at least six months from the date of initial distribution, the claims administrator must, if feasible and economical, redistribute such balance among claimants who have cashed their checks in an equitable and economic fashion.  If it is no longer feasible or economical to do so, any remaining balance will be contributed to the Investor Protection Trust -- that's the name we were trying to remember -- or another private, nonprofit, non-sectarian 501(c)(3) organization designated by lead plaintiffs and approved by the Court.

The settlement terms resulted from a full day mediation held on September 28, 2023, with former United States District Judge Layn R. Phillips.  Ensuing discussions yielded an agreement in principle.  On December 21, 2023, the parties memorialized the settlement terms in a term sheet.  On February 12, 2024, the parties executed a stipulation of settlement, and moved for preliminary approval.  On March 12, 2024, the Court, after receiving a response to inquiries it had

posed by order to counsel, granted preliminary approval.

Thereafter, class counsel and the claims administrator, Angeion, disseminated notices to potential members of the settlement class by U.S. mail and publication. As of July 25, 2024, a total of 27,542 potential settlement class members had been notified by mail.  The administrator also posted copies of the notice and claim form online on the settlement website.  On April 9, 2024, a summary of the notice was published in *The Wall Street Journal* and transmitted over *PR Newswire*.  The notice stated that the deadline to request exclusion or to file objections was July 5, 2024.  To date, no requests for exclusion nor objections have been received.

I will now turn to the motion to approve the settlement.

Under Rule 23(e)(2), a court may approve a proposed settlement "only after a hearing and only on finding that is fair, reasonable, and adequate."  Per a 2018 amendment to the rule, the Court, in making this determination, must consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

O81AAltH

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

(iii) the terms of any proposed award of attorneys' fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and finally

(D) the proposal must treat class members equitably relative to each other.

So factors (A) and (B) are procedural in nature. They focus on the conduct of the litigation and the negotiations leading to the proposed settlement. Factors (C) and (D) are substantive and focus on the relief the settlement is expected to provide to class members.

The Rule 23(e) factors largely track some of the nine factors in the test that has long been applied in this circuit for settlement approval. That test derives from the Circuit's decision in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463, (2d Cir. 1974). The *Grinnell* factors are:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the

O81AAltH

defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* approval is subject to the Court's broad discretion, which should "be exercised in light of the general judicial policy favoring settlement."  I'm citing this Court's decision in *Hart v. RCI Hosp. Holdings, Inc.*, 2015 WL 557713 at *6 (S.D.N.Y. Sept. 22, 2015) (citations omitted).

So I will begin with Rule 23(e)(2) factors.

Under subpart A, concerning adequacy of representation, the Court must consider whether the lead plaintiffs' interests are antagonistic to the interest of other class members and whether the lead plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation.

Here, lead plaintiffs' interests are aligned with members of the proposed settlement class.  The class encompasses both seller and tenderer shareholders.  Lead plaintiffs Altimeo and ODS each belong to both subclasses, in that each sold Qihoo securities during the class period and also tendered Qihoo securities in exchange for Merger consideration.  Their claims thus rise or fall in unison with those of the overall class, giving lead plaintiffs an "interest in vigorously pursuing the claims of the class."  Citing *In re*

O81AAltH

*GSE Bonds Antitrust Litig.*, 414 F.Supp. 3d 686, 692 (S.D.N.Y. 2019) (internal citation omitted).  Lead plaintiffs thus share with the settlement class the objective of maximizing recovery. *See In re Glob. Crossing Sec. & ERISA Litig.* 225 F.R.D. 436, 453 (S.D.N.Y. 2004).  Lead plaintiffs, the Court finds, are well-positioned to adequately represent the class.

Class counsel have also demonstrated that they are "qualified, experienced, and generally able to conduct the litigation." Citing again *In re Glob. Crossing*, 225 F.R.D. 453. They have extensive expertise and experience in securities litigation.  They have worked diligently in this case, including resuscitating the case on appeal, resulting in favorable results for their clients.

This factor thus favors approval.

Next, under subpart B of Rule 23(e)(2), I must find, and I do find, that the settlement was negotiated at arm's length.

Before commencing settlement negotiations, class counsel had investigated and vigorously prosecuted the case. Counsel briefed the initial motion to dismiss before this Court, and on appeal in the Second Circuit, briefed Zhou's later motion to dismiss before this Court, moved for class certification, and consulted with loss causation and damages experts.  As to settlement, counsel participated in the mediation and exchanged written statements and exhibits with

O81AAltH

defense counsel about liability and damages, leading to the settlement in principle.

These circumstances bespeak a procedurally fair and arm's length settlement process.  It favors settlement approval.

Turning now to subpart C of Rule 23(e)(2), in assessing whether the settlement provides adequate relief, the Court must consider, as I mentioned earlier, the four factors. And I find that all four sub factors weigh in favor of approval.

First, in evaluating the possible costs, risks and delay of trial and appeal, "courts may need to forecast the likely range of possible class-wide recoveries and the likelihood of success in obtaining such results." *In re Payment Card Interchange Fee & Merch Disc. Antitrust Litig.*, 330 F.R.D. 11, 36 (E.D.N.Y 2019).  This inquiry overlaps with four of the *Grinnell* factors:  The first, fourth, fifth, and sixth.  *See GSE Bonds Antitrust Litig.*, 414 F.Supp 3d 686 at 693.

Securities class actions are "notably difficult and notoriously uncertain to litigate," citing *In re Bear Stearns Companies, Inc. Sec. Derivative & ERISA Litig.*, 909 F.Supp 2d 259, 266 (S.D.N.Y. 2012).  Settlements in these cases are generally favored because they result in "substantial and tangible present recovery, without the attendant risk and delay of trial," Cites *Skyes v. Harris* 2016 WL 3030156 at *12

O81AAltH

(S.D.N.Y. May 24, 2016).

That is absolutely the case here.  Continued litigation would have been time-consuming, expensive, and would have entailed briefing and resolving complex legal and factual issues.  The class's ability to recover was uncertain, to say the least.  It would have required securing class certification, undertaking potentially extensive fact and expert discovery, litigating summary judgment, and perhaps Daubert motions, and, if those hurdles were cleared, prevailing at trial and on appeal, and then recovering from parties abroad.  The road ahead was long, expensive, and uncertain.

To elaborate a bit on the formidable hurdles plaintiffs faced, discovery stood to be complex and costly, particularly with records and witnesses located in China. Establishing both class certification and loss causation presented significant challenges, well beyond those presented by garden-variety securities litigation class actions.  That is because of the unusual factual posture of the case, in that plaintiffs effectively challenged the terms of a Go-Private transaction, as opposed to the typical case of challenging false or misleading statements made by an ongoing public company that lends to loss causation as measured by a drop in a stock's trading price.  Indeed, as of settlement, the claims of the Tenderer Shareholders had been dismissed based on plaintiffs' inability to establish loss causation.  For that

O81AAltH

subset of the class to have had any chance of recovery, plaintiffs' counsel would have had to resuscitate those claims on appeal.  That was improbable for the reasons I gave in my decision applying loss-causation doctrine to the Tenderer Shareholders' conjectural theories of loss.

Plaintiffs thus faced substantial and unusual barriers in establishing liability, damages, and maintaining the class action through trial.  Seeing the case to completion, let alone collection of damages, would have been time consuming and risky, and expensive.  This Rule 23(e) factor, and the associated Grinnell factors, all favor of approving the nearly $30 million settlement, which puts money in the hands of the class that it was quite uncertain otherwise to receive.

Next, the Court examines "the method of processing class-member claims."  The plan of allocation and claims-processing method must be fair and adequate.  It requires "a reasonable, rational basis, particularly if recommended by experienced and competent class counsel," *see In re Bear Stearns Companies*, 909 F.Supp. 2d at 270, but it "need not be perfect," Citing *Payment Card Interchange Fee Litig.*, 330 F.R.D. at 40.

The plan here, developed by experienced counsel with the assistance of damages consultants, is sensible and thoughtful and favors approval.  The plan has separate formulas for Tenderer and Seller Shareholders, giving due weight to

O81AAltH

factors including the Court's dismissal of the claims brought by the former, plus of course the scale of the potential claims in each category.  The plan is commendable in various respects, including its use of an experienced claims administrator, giving claimants an opportunity to cure any deficiencies with their initial submissions, and providing for a potential second round of distributions if material funds are leftover after the first round.  The Court finds the formulas and method for processing claims fair and reasonable.  I particularly valued counsel's thoughtful answers to the questions that I posed about allocation methodology in the order I issued after receiving the application for preliminary approval.  The terms of the settlement, I find, are reasonably designed to ensure "the equitable and timely distribution of the settlement fund without burdening the process in a way that will unduly waste the fund."  Citing *In re Credit Default Swaps Antitrust Litig.*, 13 Misc. 2476, 2016 WL 2731524 at *4 (S.D.N.Y. 2016).

Next as to the factor of attorneys' fees, it requires courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment."  The Court will address fees later, in explaining why a substantial award is merited.  The award of fees, whose amount here will be within the range of customary fee awards, is consistent with settlement approval.

The final component under subpart C of Rule 23(e)(2)

O81AAltH

requires the Court to consider "any agreement made in connection with the proposal."  Here, the parties entered into a confidential agreement that sets out certain conditions under which defendants could terminate the settlement if class members who collectively purchased more than a specific amount of Qihoo's securities opt out from the settlement.  That agreement is moot, as there have been no timely requests for exclusion, and thus does not provide an obstacle to class settlement.

Turning finally to subpart D of Rule 23(e)(2), it requires that courts assess whether "the proposal treats class members equitably relative to each other."  The allocation formula takes appropriate account of the differences among the claims of seller and tenderer shareholders.  And it rightly provides for a *pro rata* distribution of authorized claims.  That distribution model is equitable.  *See e.g., Payment Card Interchange Fee Litig.*, 330 F.R.D. at 47; and see also this Court's decision in *Meredith Corp. v. SESAC*, 87 F.Supp 3d 650, 667 (S.D.N.Y. 2015), which upheld a *pro rata* allocation plan as equitable and having "the benefit of simplicity."

In sum, I find that all four Rule 23(e)(2) factors to favor settlement approval.

I'm now going to turn to the *Grinnell* factors.  My discussion of Rule 23(e)(2) covered four of those nine so this discussion addresses the other five.

O81AAltH

First, as to the reaction of the class to the settlement, under *Grinnell*, the "reaction of the class to the settlement is perhaps the single most significant factor to be weighed in considering its adequacy." *See Maley v. Del Glob. Techs. Corp.*, 186 F.Supp. 2d 358, 362, (S.D.N.Y. 2002). Strikingly here, there were zero requests for exclusion and zero objections. This factor strongly supports approval.

Second, as to the stage of the proceedings and the amount of discovery completed, the relevant inquiry is "whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner Inc.*, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). This case was at a relatively advanced stage. There had been significant motions practice, class certification briefing had been filed, the parties had engaged in a bit of written discovery, plaintiffs had gotten some third-party discovery, and I understand that plaintiffs may have gotten at least some insights from the related appraisal action in the Cayman Islands. All this put plaintiffs in an informed position to evaluate potential settlement terms. This factor also supports approval.

Third, as to defendant's ability to withstand a greater judgment, this factor does not affirmatively favor the settlement. Defendants could likely withstand a greater

O81AAltH

judgment than the $29.75 million they will pay.  But, as plaintiffs note, the location of Qihoo, Zhou, and Qi in China could have made collecting on a litigated judgment at trial difficult.  Indeed, because Qi did not appear, plaintiffs would have had to collect overseas on a default judgment entered here, which might have presented distinct difficulties.  In all events, as a matter of law, even if defendants could ultimately withstand a greater judgment, this fact alone does not "suggest that the settlement is unfair."  *In re Austrian & German Bank Holocaust Litig.*, 80 F.Supp. 2d 164, 178 n.9 (S.D.N.Y. 2000), *aff'd*, 236 F.2d 78, (2d Cir. 2001).

Finally, the last two *Grinnell* factors assess the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risk of litigation. The issue is not whether the settlement represents the best possible recovery, but how it measures up in light of the strength and weaknesses of the case.  The Court must "consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *20 (SDNY Nov. 8, 2010).  The Court need only find that the settlement falls within the "range of reasonableness." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  I find that to be so here.

Had a class been certified and plaintiffs' run the table and prevailed on all liability and damages theories, the maximum damages are estimated at around $909.81 million. The settlement here thus represents a recovery of about 2.45 percent. To be sure, that percentage is numerically underwhelming. We have all seen securities settlements with much higher percentage recoveries. But there are also lower settlements. According to Exhibit 2 to Mr. Grunfeld's declaration, at page 26, the median recovery for all securities class actions settled in 2023 is 1.8 percent of estimated damages. And the settlement needs to be evaluated in light of the degree of difficulty. There were huge obstacles to securing any such recovery, for the reasons I've given, including challenges with class certification, establishing liability, establishing damages, and recovering on a judgment. There is every possibility that a certified class, or individual plaintiffs if no class were certified, would have come up empty. Considering these obstacles, the Court finds the $29.75 million settlement within the "range of reasonableness." This factor, on balance, favors settlement approval.

Therefore, after considering the Rule 23(e)(2) and Grinnell factors, the Court finds that the proposed settlement is fair, adequate, and reasonable. I approve it.

I turn next to class certification. When I

preliminarily approved the settlement on March 12, I found it likely that I would certify the settlement class under Rules 23(a) and (b)(3). See Dkt. 228. Plaintiffs now seek final certification. I adopt by reference plaintiffs' arguments in support of certification, including their memorandum in support of preliminary approval, at Dkt. 223, pages 19-23. There have not been any intervening developments weakening the force of those arguments. There is valid certifiable settlement class here. The numerosity requirement is met, as reflected in the more than 27,542 notices to potential class members, and the absence of any objections reinforces that the class and Seller and Tenderer Shareholder subclasses have been properly drawn. I approve the motion to certify that class.

We're now going to take a ten-minute comfort break and I will pivot at that point to the discussion of the fee application.

(Recess)

THE COURT:  Picking up where we left off, I will now turn to the motion to approve attorneys' fees and costs and lead plaintiffs' service award.

The class has been ably represented by lead counsel Pomerantz LLP, assisted by Labaton Keller Sucharow LLP. I will collectively refer to them as "class counsel." Class counsel have applied for an award of attorneys' fees of one-third, 33.33 percent, of the $29.75 million settlement fund, net of

O81AAltH

litigation costs and expenses and service awards, or as calculated $9,915,675.  Counsel separately seek recovery of $662,654.21 in out-of-pocket costs.  Class counsel represent that its "lodestar," as of June 20, 2024 -- the product of their reported hours worked times their reported regularly hourly rates -- is $3,377,423.

For reasons that I will discuss in just a moment, the Court grants lead counsel's motion for a generous award of attorneys' fees, but the award will be of a sum modestly lower than the one requested.  A substantial fee award, in addition to an award to enable class counsel to recoup their out-of-pocket expenses, is well-deserved in this case.  But I'm not going to award the full fee request of $9,915,675 or one-third of the settlement.  Instead, guided by precedent, my experience, and a close examination of the circumstances here, I am going to award fees that amount to 25 percent of the estimated $29.75 million cash settlement fund.  This translates into a fee of award of $7,437,500.

As the Supreme Court long ago recognized, a lawyer who "recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  It is for the Court to determine the reasonable fee.  It should go without saying that the fact that defense counsel has not opposed a fee proposed by class counsel

O81AAltH

does not speak at all to whether that fee is reasonable.  If the fee comes out of the common fund, it is of no economic consequence to the defense whether the fee award represents 1 percent or 33 percent of that fund.  Inherent at this stage of class action proceedings is a risk that counsel will reach an agreement in which defense counsel, to secure an overall settlement that affords the defense closure on a class-wide basis, will not oppose an outsized request for attorneys' fee.  Because the adversary system does not provide a meaningful check, or really any check at this point in the process, it falls on the Court to critically examine the reasonableness of plaintiffs' counsels' requested fee award, and to protect the class against a request for an unnecessarily large fee.

In the Second Circuit, district courts may employ a percent-of-the-fund method when awarding fees in common fund cases.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47, (2d Cir. 2000); *see also In re Marsh & McLennan Cos., Inc., Sec. Litig.*, 2009 WL 5178546, at *14 (S.D.N.Y. Dec. 23, 2009), which observed that "the percentage method continues to be the trend of district courts in this Circuit and has been adopted in the vast majority of circuits."  However, the Second Circuit also advises district courts to cross-check a percent fee against class counsel's "lodestar."  *See Goldberger*, 209, F.3d at 50.

Regardless of the method used, attorneys' fees may not

O81AAltH

exceed what is reasonable under the circumstances.  *Id.* at 47.
In assessing reasonableness, the Court considers the six
*Goldberger* factors.  These are:

(1) the time and labor expended by counsel; (2) the
magnitude and complexities of the litigation; (3) the risk of
the litigation; (4) the quality of representation; (5) the
requested fee in relation to the settlement; and (6) public
policy considerations.

I will review these factors in turn, while using the
lodestar analysis as a cross-check.  Overwhelmingly, I am in
agreement with class counsel that all six factors support a
substantial fee award.  My modest reduction in the proposed
attorneys' fee award from 33.3 percent to 25 percent of the
settlement fund is guided largely by the lodestar cross-check,
and is also supported by the monetary interest of the class.
Insofar as the gross settlement amount before the fee and other
deductions starts at less than 2.5 percent of what plaintiffs
could have recovered had they prevailed, the class has an
obvious interest in not unduly reducing its recovery further.

As to the time and labor expended by counsel.  First
factor, class counsel represent that they put significant time
and effort -- more than 4,339.81 hours -- into litigating the
action.  Counsel, among other actions, obtained appointment of
lead plaintiff and counsel, investigated potential claims,
briefed the initial motion to dismiss, successfully appealed to

secure reinstatement of some theories of fraud, briefed Zhou's motion to dismiss, moved for class certification, participated in settlement negotiations, created a plan of allocation, drafted submissions in support of preliminary approval, responded to the questions the Court posed about the proposed settlement, oversaw the notice process, and drafted the present motion for final approval and supporting documents. Counsel vigorously and effectively prosecuted this case. And so this factor thus favors a substantial fee award.

The lodestar cross-check, however, exists to assure a degree of proportionality between the fee award and the amount of hours worked. Counsel that have done good work, even really good work, are not automatically entitled to the fee they request. And counsel here are seeking a fee equating to one-third of the settlement award. Based on the Court's experience, a one-third fee is at the very upper end of fee awards in this district in securities fraud cases measured by the percentage-of-the fund award.

The lodestar analysis cross-check here supports a modest reduction from the requested award. That methodology entails multiplying the hours counsel claim to have worked on this matter by counsel's claimed billing rates, which counsel represent today range from for associates $425 to $950 and from $750 to $1,325 for partners. Those figures yield a lodestar of $3,377,423. Compared against that lodestar, counsel's proposal

to take a one-third fee award of more than $9.9 million would mean a lodestar multiplier of 2.94.  In other words, counsel here are seeking a fee that is nearly three times the amount of money counsel would have made had they billed on an hourly basis at the very substantial billing rates counsel use, including $950 for associates.

It is of course not at all uncommon for fees to be awarded that reflect multiples of plaintiffs' counsel's lodestar, as this Court has repeatedly recognized in approving fee awards for class counsel in prior common fund cases.  *See*, for example, *Hart* 2015, WL 5577713, at *14.  The practice of paying above the lodestar reflects the reality that plaintiffs' counsel, lacking a paying client, takes a risk in taking on such representation.  And that is widely understood to justify a lodestar multiplier above 1.0.  I find that logic valid.  But the higher the multiple of counsels' lodestar that is sought by way of a fee, the greater the justification there must be. Here, counsel's work is claimed to translate into under $3.4 million in fees.  Counsel, in seeking close to $10 million in fees, propose to be paid $2.94 for every $1 of work measured at their usual billing rate.  Or to go back to the associate who pays $950, just one moment, to yield a lodestar of approximately $2,800 for the $950 hours worked by that associate.  That's what you're asking.  Almost three times multiplier is not in my judgment defensible here.

O81AAltH

A 25 percent fee award on the other hand I can find defensible. It would amount to a $7,437,500 attorneys' fee, nearly $7.5 million. That is amply sufficient, amply sufficient, to compensate class counsel for the time they have spent litigating the case on behalf of their clients. But it yields a more restrained lodestar multiplier of 2.2. Drawing on my experience and my research into awards issued by my colleagues, a 25 percent fee award of $7.5 million comfortably aligns, more comfortably aligns indeed with the range of attorneys' fees awarded in securities fund class actions. Here are just a few examples. In *In re Merrill Lynch & Co.*, 2007 WL 313474, at *24, Judge Keenan awarded attorneys' fees representing 22.5 percent of the settlement fund, equating to a 1.95 lodestar multiplier; *In re Telik Inc. Sec. Litig.,* 576 F.Supp.2d 570, 590 (S.D.N.Y. 2008) future Chief Judge McMahon awarded attorneys' fees representing 25 percent of the settlement fund, equating to a 1.6 lodestar multiplier; and in *Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019), Chief Judge McMahon awarded attorneys' fees representing 25 percent of the settlement fund, equating to a lodestar multiplier of 2.15, and described such an award as well within the range commonly awarded in security class actions of this complexity and magnitude.

Turning to complexity and magnitude, and I'll turn to that factor now, courts in this district repeatedly recognize

O81AAltH

securities fraud class action litigation in general as complex. *See*, for example, *AOL Time Warner*, 2006, WL 903236, at *8. And this action presented case-specific challenges for counsel, because of its international dimension, and because of the fact pattern, which is unusual, of a company going private, which complicated loss-causation and damages analysis.

On the other hand, there were obvious respects in which this case was of lesser magnitude and complexity. The events at issue in the end involved a discreet transaction, the Go-Private merger, which played out over a compact period of time. And the theory of plausible fraud liability is winnowed on district and appellate review, was narrow too, and not complex. It centered on the claim that insiders concealed a plan to later relist the company. That presents a simpler and more compact liability narrative by far than do many securities fraud cases, where establishing liability may require a much deeper dive into subjects like accounting, and a deep dive into numerous areas of complex company economics. The Court is also mindful that the case never really reached active discovery, just a bit occurred. It settled after effectively written demands for discovery had been made, but not after much discovery occurred. So unlike many securities class actions, which are more complex and settle deep into discovery or on the brink of summary judgment motions practice, this case did not require plaintiffs' counsel to undertake very much of that

O81AAltH

work.  The scale of the class was also relatively modest from a managerial perspective.  It encompassed some 28,000 members, in contrast to cases that have had half a million or more class members, and which potentially thereby present greater organizational challenges for counsel.  See, for example, *Marsh & McLennan*, 2009 WL 5178546, at *21, which involves some 596,000 notices being mailed to class members; or the *Merrill Lynch* case, 249 F.R.D. 124, 130 (S.D.N.Y. 2008), in which more than 604,000 notices were mailed.  These factors considered together provide important perspective.  They support the modest downward reduction from plaintiffs' counsel's maximalist fee award.

Defense counsel, that's what I meant by if you can make the argument.  I think you could have made that argument.  It's sitting right out there to be made.  Next time a judge asks you to make the argument, please take a stab at doing so.

MS. XIE:  Yes, your Honor.  Thank you.

THE COURT:  Okay.

Third, risk of litigation.  The Court considers the risks of litigation, which is also an important factor in determining a reasonable fee award.  Once a case has cleared a motion to dismiss, as courts in it district have recognized, "the risk of achieving no recovery at all in a securities class action suit has become quite small." *In re Citigroup Inc. Bond Litig.*, 988 F.Supp. 2d 371, 379 (S.D.N.Y. 2013).  On the other

hand, in an important respect, this case was more difficult than some.  In some securities class actions, plaintiffs' counsel's task is made easier by proceeding events that signal, if not establish, liability — a restatement by the company of its earnings, perhaps, or regulatory actions by the SEC or a prosecutor.  In these circumstances, the case law has sometimes likened follow-on private litigants to jackals to a lion's kill.  See, for example, *Hart,* 220 WL 5645984, at \*10 (S.D.N.Y. Sept. 22, 2020), in which Judge Pauley made that point.  Here, in contrast, plaintiffs' counsel were authors of their success and did not rely on the work of others.  That favors a substantial fee, consistent with a fee equating to more than two times the lodestar, 2.2 times to be more precise, that the Court will award.

Fourth, I consider the quality of representation.  "To evaluate the quality of representation, courts in the Second Circuit review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit."  *Marsh & McLennan Sec. Litig.*, 2009 WL 5178546, at \*19.  The recovery here, as noted, was substantial.  Although it represented only approximately 2.45 percent of the theoretical maximum recovery, there were, as I said, good reasons for that discount, and the figure is within the mainstream of recoveries in securities class actions.  As to the lawyers' backgrounds, plaintiffs' counsel here are credentialed, experienced, and skilled.  And they

performed commensurately with their impressive advance billing — their qualifications and expertise.  The high quality of counsel's work justifies a substantial fee, consistent with a lodestar multiplier that the award will reflect.

Fifth, the Court reviews the requested fee in relation to the overall size of the settlement "to ensure that the percentage awarded does not constitute a windfall." *Beckman v. Key Bank*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013).  In support of the one-third fee request, counsel pointed to two securities class actions of roughly comparable size awarding such a fee.  The range of comparators, however, is broader than those two cases.  And as I have noted, with few exceptions, a 33.33 percent fee tops out the awards in class actions of this kind.  As plaintiffs' counsel's own submissions show, an empirical review by NERA of securities class action litigation in 2023 found that plaintiffs' attorneys' fee awards, including expenses, comprised roughly 24.9 percent of the aggregate settlement value.  Citing here the Grunfeld declaration, Exhibit 2 at 31.  So a 25 percent fee, before costs, falls squarely within the mainstream of securities class action fees approved in this district.  See, for example, *Telik*, 576 F.Supp. 2d at 593, awarding a 25 percent fee; *Merrill Lynch*, 249 F.R.D. at 136, awarding a 22.5 percent fee*; In re Facebook* 343, F.Supp. 3d, 394, 415 (S.D.N.Y. 2018), *aff'd* 826 Federal.App'x 40 (2d Cir. 2020), awarding a 25 percent fee; and

O81AAltH

*Bear Stearns*, 909 F.Supp. 2d at 271-272, awarding a 12 percent fee, and noting that that fee was "well below the 17-25 percent awarded in securities class actions and comparable cases in the Second Circuit." Having given considerable thought to the matter, exercising its discretion, and drawing on its knowledge and experience, and its review of comparator cases, the Court awards a 25 percent fee here, which the Court finds consonant with like cases and the assembled facts.

Finally, the Court considers public policy considerations.  "A strong public policy concern exists for awarding firms for bringing successful securities litigation." *In re Telik*, 576 F.Supp 2d at 593.  Attorneys' fees should be substantial enough to "provide lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 909 F.3d at 51.  If attorneys' fees are routinely set too low, it may create poor incentives to bringing large class action cases.  At the same time, courts must also "guard against providing a monetary windfall to class counsel to the detriment of the potential class."  Citing Judge Kaplan's decision in *In re NTL Inc. Sec. Litig.*, 2007 WL 1294377, at *8 (SDNY May 2, 2007).

The 25 percent fee award here strikes the appropriate balance between these considerations.  It amply incents counsel to take on such cases, by awarding them materially more than twice the fee they would have received had they billed by the

O81AAltH

hour. Any argument by counsel that a lodestar, that would reward a high billing associate at $2,850 -- excuse me, at 2.2 times $950. One moment. Which translates to close to $2,100 an hour as a billing rate for an associate, any argument that that is insufficient incentive for a lawyer to bring a class action would be laughable. It would be risible. At the same time, a 25 percent fee, helps protect the absent class by preserving a greater portion of the settlement funds relevant to 33.3 percent fee to compensate the class for the damages the plaintiffs' counsel claimed that their clients suffered.

Bottom line, for the foregoing reasons, the Court grants class counsel's attorneys' fees in the amount of $7,437,500, which represents 25 percent of the gross settlement award.

Turning to costs, class counsel request a reimbursement of costs incurred in the amount of 662,654.21. These costs reflect, among many things, expert and consultant fees, costs incurred in investigating claims, and mediation fees. These expenses I find were all reasonably and actually incurred. I grant this request.

Class counsel also requests a service award of $60,000 for each of the two lead plaintiffs, Altimeo and ODS, to compensate them for the time and effort they expended on behalf of the class. Such awards are common in class action cases to compensate class representatives for their time and effort in

O81AAltH

representing the class.  An award of this nature is merited here.  Counsel represent that the two lead plaintiffs provided important services, took an active role in the litigation over the past five years, regularly consulted with class counsel regarding progress and strategy, conferred with counsel about mediation and settlement, evaluated and approved the proposed settlement and plan of allocation, and provided access to their trading data and records.  Collectively, Altimeo and ODS estimate that their staff members spent close to 375 hours on this litigation.

Ordinarily, I would say that $60,000 award for each of two class plaintiffs significantly exceeds that which is routinely awarded.  On the other hand, so too does the estimated time worked of 375 hours, and by a good amount. Given the representation that lead plaintiffs played a longstanding, deep involvement, I have no basis to discredit the factual representations.  I do find that a service award as requested of $60,000 to each plaintiff is warranted to compensate them for their time and commitment, and to encourage future such service by future named plaintiffs.  I therefore approve that award.

Therein ends the ruling.

And I will issue on the docket, an award, essentially a line with the proposed final judgment that counsel have given me, but plugging in the numbers that I have announced today.

O81AAltH

With that, let me go around the horn.  Is there anything further from plaintiffs?

MR. GRUNFELD:  No, your Honor.  Thank you.

THE COURT:  Anything further from the defense?

MS. XIE:  No, your Honor.  Thank you.

THE COURT:  Look, before we adjourn, let me again thank counsel.  It's been a pleasure to have all of you in front of me.  It's been quite engaging and interesting to engage with somewhat unusual problems presented particularly at the loss-causation stage of the case, and I really value the excellent lawyering I received.  I thank you for it.

Be well.  Have a good rest of summer, everyone.  Thank you.

(Adjourned)